# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| THE WET SEAL, INC., a Delaware corporation, *et al.*[1] | Case No.: 15-10081 (___) |
|  | (Joint Administration Requested) |
| Debtors. |  |

## MOTION OF THE DEBTORS FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 365(a) AND 503(b) (I) APPROVING AND AUTHORIZING THE ASSUMPTION OF THE PLAN SPONSORSHIP AGREEMENT, AND (II) APPROVING AND AUTHORIZING THE PAYMENT OF THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT

The Wet Seal, Inc. and its subsidiaries, the debtors and debtors in possession (the "Debtors") in the above captioned jointly administered chapter 11 cases (the "Cases"), hereby move (the "Motion") for entry of an order substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105(a), 365(a) and 503(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) approving and authorizing the Debtors' assumption of that certain Plan Sponsorship Agreement, dated as of January 15, 2015 (together with all exhibits thereto, the "PSA"),[2] entered into by and among the Debtors and B. Riley Financial, Inc., and its affiliates and designees (collectively, "B. Riley"), (ii) approving and authorizing the Debtors' payment of the break-up fee and expense reimbursement in accordance with the terms of the PSA as

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: The Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265), Wet Seal Catalog, Inc. (7604), and Wet Seal GC, LLC (2855-VA). The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

[2] Unless otherwise noted herein, capitalized terms not otherwise defined herein shall have the meaning(s) ascribed to such terms in the PSA. A copy of the PSA is attached as *Exhibit 1* to the proposed order annexed hereto as Exhibit A. The summary of the PSA contained herein is qualified in its entirety by reference to the PSA. If there are any inconsistencies between the summary set forth herein and the terms of the PSA, the PSA shall govern in all respects.

administrative expenses of the estates under Bankruptcy Code section 503(b), and (iii) granting

such other relief as is just and proper.

In support of the Motion, the Debtors rely on the *Declaration of Thomas R. Hillebrandt*

(the "Hillebrandt Declaration") and the *Declaration of Derek Pitts* (the "Pitts Declaration")

concurrently filed herewith.  In further support of the Motion, the Debtors respectfully represent

as follows:

## I. PRELIMINARY STATEMENT

1.    In the period leading up to the Petition Date, the Debtors worked diligently to

maximize the value from the Debtors' business and assets.  As a critical step toward that

objective, the Debtors have now filed this Motion seeking assumption of the PSA, which

provides a blueprint for the Debtors to navigate through the reorganization process.  The

transactions contemplated under the PSA, if consummated, will result in confirmation of a plan

of reorganization and preservation of both jobs for hundreds of rank and file employees and

going concern value for the benefit of the Debtors' constituents.

2.    The PSA is premised upon the fact that the Debtors need a balance sheet

restructuring; and a chapter 11 process, without a clear path forward, risks erosion of the value of

the estates and would reduce the recoveries available to creditors.  The Debtors determined that a

free-fall into bankruptcy, with no clear path, could cause panic among the Debtors' vendors,

suppliers, customers and employees and severely reduce value.  Without a committed plan

sponsorship combined with debtor-in-possession financing from B. Riley, the Debtors would

have no clear exit path, and insufficient liquidity to run anything other than an expedited sale

process, potentially by way of a naked auction.  To avoid this value-destructive scenario, the

Debtors and B. Riley negotiated the PSA and the accompanying debtor-in-possession financing

arrangement.

3.       The PSA represents the best available means under the present circumstances for effectuating a comprehensive restructuring on an expedited basis and maximizing creditor recoveries.  The plan of reorganization contemplated in the PSA (the "Plan") will provide for the payment in full of all administrative expenses, the satisfaction of all allowed secured claims, and the payment in full of all allowed priority claims consistent with section 1129 of the Bankruptcy Code.  The Plan also will provide for the issuance of 20% of the newly issued common stock in the reorganized Debtors to holders of allowed general unsecured claims whose claims are not satisfied through a convenience class cash election.  Upon the effective date of the Plan, B. Riley will purchase the remaining 80% of the newly issued stock in the reorganized Debtors in consideration of $20 million in the form of (i) conversion of the principal amount of B. Riley's debtor-in-possession term loan facility into equity and (ii) cash.

4.       Assumption of the PSA affords B. Riley a measure of protections, by affording administrative priority for the Debtors' limited financial obligations to B. Riley under the PSA and by making the PSA a contractual obligation of the estates.  In turn, assumption of the PSA marks an important step in the Debtors' rehabilitative efforts, as noted above.  Absent assumption of the PSA by February 6, 2015, B. Riley may terminate the PSA pursuant to its terms.  The Debtors seek to assume the PSA in accordance with its terms to ensure that the agreement will continue to be valid and enforceable against B. Riley as these Cases move swiftly towards plan solicitation and confirmation.  Under the PSA and subject to its terms, just as B. Riley is committed to proceed toward confirmation of the Plan, the Debtors are as well – albeit subject to a robust "fiduciary out" ensuring that the Debtors can exercise their fiduciary duties to terminate the PSA, if necessary.  If the Debtors terminate the PSA under these circumstances, B. Riley is entitled to a break-up fee and any unpaid expense reimbursement.

5.      In view of the foregoing, approving and authorizing the Debtors to assume the

PSA is integral to the Debtors' pursuit of the Plan, which the Debtors intend to file (along with a

related Disclosure Statement) in the near term in accordance with the milestones contained in the

PSA.  Notably, consummation of the transactions contemplated in the PSA is contingent upon

confirmation and effectiveness of the Plan.  Accordingly, approval of this Motion does not

require the Court to pre-approve any plan of reorganization in these Cases.

6.      The Debtors' entry into the PSA is an exercise of sound business judgment as in

the best interests of the Debtors, their estates and all parties in interest.

## II.  JURISDICTION

7.      The United States Bankruptcy Court for the District of Delaware (the "Court")

has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the

*Amended Standing Order of Reference* from the United States District Court for the District of

Delaware dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C.

§ 157(b)(2).  Venue of these Cases and the Motion in this district is proper under 28 U.S.C.

§§ 1408 and 1409.

8.      Pursuant to Rule 9013-1(f) of the *Local Rules of Practice and Procedure of the

United States Bankruptcy Court for the District of Delaware* (the "Local Rules"), the Debtors

consent to the entry of a final judgment or order with respect to the Motion if it is determined

that the Court, absent consent of the parties, cannot enter final orders or judgments consistent

with Article III of the United States Constitution.

9.      The statutory and legal predicates for the relief requested herein are sections

105(a), 365(a) and 503(b) of the Bankruptcy Code and Rule 6006 of the Bankruptcy Rules.

## III. BACKGROUND

A.    **Introduction.**

10.    On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.

11.    The Debtors are authorized to continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To date, no trustee, examiner or statutory committee has been appointed in these Cases by the United States Trustee.

12.    The Debtors are a national multi-channel specialty retailer selling fashion apparel and accessory items designed for female customers aged 13 to 24 years old.  The Debtors are comprised of two primary units: (a) the retail store business, which is primarily operated by The Wet Seal Retail, Inc.; and (b) the e-commerce business, which is primarily operated by Wet Seal Catalog, Inc.  Through their retail store business, until shortly before the Petition Date, the Debtors operated over 500 retail locations, principally in mall locations.  Though their e-commerce business, the Debtors operate an e-commerce site at www.wetseal.com and have nearly 2.5 million followers on their Facebook page.  The Debtors also sell gift cards, which business is primarily operated through Wet Seal GC, LLC.

13.    The continuing fundamental shift in consumer behavior away from traditional mall shopping toward online-only stores and increased competition throughout the specialty retail fashion industry have created a difficult operating environment for traditional mall-based fashion retailers such as the Debtors.  Indeed, over the past several weeks, at least three other specialty retailers catering to teen and young adult females—Deb Stores Holding LLC, dELiA*s, Inc., and Body Central Corp.—have commenced bankruptcy cases or assignments for the benefit of creditors and are in the process of conducting liquidations.  This industry-wide weakness was,

01:16512586.1

in the Debtors' case, exacerbated by (i) shifts by former management away from the "fast fashion" segment that had comprised the Debtors' core business, and (ii) failed ventures into side businesses.  In the third quarter of 2014 the Debtors' board hired a new management team with the objective of bringing the Debtors back to their profitable roots, including (i) as Chief Executive Officer, Ed Thomas, who had served as CEO for the Debtors during the profitable years between 2007 and 2010, (ii) as Chief Digital Officer, Jon Kubo, who had also been with the Debtors during Mr. Thomas's earlier tenure, and (iii) as Chief Merchandising Officer, Christine Lee, an experienced merchant who shared Mr. Thomas's strategic vision.  Beginning in September 2014, this team began the process of shifting the Debtors' operational strategy toward a more fashionable inventory mix and smaller inventory purchases.

14.      There was, unfortunately, insufficient time to implement the strategic vision before the Debtors faced a liquidity crisis, resulting from extensive operating losses driven by persistent sales weakness across the majority of the Debtors' store base.  The Debtors' liquidity position became further constrained in late 2014, when many of the Debtors' vendors began to require cash on delivery  payment terms in order to ship goods, rather than the credit terms that those vendors had offered in the past, and the Debtors were required to cash collateralize all of the letters of credit issued by Bank of America, N.A. (the "Prepetition Lender").  under that certain Amended and Restated Credit Agreement, dated as of February 3, 2011 (as subsequently amended, modified, or restated, the "Prepetition Facility").

15.      Facing the foregoing issues, the Debtors determined that it would not be possible to restructure the Debtors out of Court without significant landlord concessions.  Accordingly, the Debtors engaged in negotiations with their major landlords regarding concessions from such landlords.  However, the Debtors were not able to reach an agreement with landlords on potential

lease concessions during these negotiations, and on or about January 7, 2015, the Debtors closed 338 of their stores, irrevocably surrendered the premises to the applicable landlords, and terminated the portion of their workforce that had been employed in connection with those stores. The Debtors capitalized on the holiday shopping season to conduct the liquidation of the inventory in the closed stores, which required closing those stores as soon as they ran out of inventory.

16.     The Debtors intend to reorganize their business around the e-commerce business and the remaining stronger-performing stores, which together accounted for more than half of the Debtors' net sales for the nine months ending on November 1, 2014. The Debtors believe that doing so will help restore the Debtors to a stronger financial position.

17.     To meet their objectives, the Debtors have entered into (i) that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement with B. Riley (the "DIP Financing"), pursuant to which the Debtors will receive a senior debtor-in-possession term loan that should provide them with sufficient runway to navigate through the reorganization process, and (ii) the PSA, pursuant to which B. Riley will commit to a plan of reorganization under which B. Riley will receive 80% of newly issued common stock in the reorganized Debtors in exchange for investment of $20 million. On the effective date of the plan, B. Riley will convert the entire DIP Financing into equity and contribute the balance of the $20 million to the reorganized Debtors in cash. The remaining common stock will be issued to holders of allowed general unsecured claims whose claims are not satisfied through a convenience class cash election.

18.     The detailed factual background relating to the Debtors and the commencement of these Cases is set forth in the Hillebrandt Declaration and the Pitts Declaration.

**B.**     <u>Events Leading Up to the PSA.</u>

19.     Recognizing that they were facing a near term liquidity crisis, the Debtors attempted for much of the second half of 2014 to obtain liquidity on an out-of-court basis to provide them with sufficient runway to implement an operational turnaround.  The Debtors, however, were unable to obtain such financing absent significant concessions from landlords to reduce the cash burn associated with the store base.  As it became apparent that sufficient landlord concessions might not be forthcoming, the Debtors focused significant efforts on obtaining debtor-in-possession financing and a chapter 11 investor.

20.     Despite the severe distress in the teen retail sector (evidenced by the liquidations within the last few weeks of Deb Stores Holding LLC, dELiA*s, Inc., and Body Central Corp.) in the weeks following mid-December 2014 the Debtors were nonetheless able to engage with the potential lenders most likely to provide them with debtor-in-possession financing or be a plan sponsor.  As a result of these efforts, investment banking firm B. Riley agreed both to provide debtor-in-possession financing and to serve as a plan sponsor to the Debtors.

21.     The financing and plan sponsorship package presented by B. Riley presents the best option for the Debtors to maximize the value of their estates under the circumstances.  Absent this package, the Debtors are expected to run out of cash within a matter of weeks.

**C.**     <u>Overview of the PSA.</u>

22.     The PSA commits the Debtors and B. Riley to exercise commercially reasonable efforts toward confirmation of the Plan.  The PSA contemplates, among other things, that the Plan will provide for the following:

(a)     consistent with section 1129 of the Bankruptcy Code, all allowed administrative expenses will be paid in full, all allowed secured claims will be satisfied, and all allowed priority claims will be

paid in full;

(b)    B. Riley will purchase the remaining 80% of the newly issued stock in the reorganized Debtors in consideration of $20 million in the form of (i) conversion of the DIP Financing into equity and (ii) cash; and

(c)    the remaining 20% of the newly issued common stock in the reorganized Debtors will be issued to holders of allowed general unsecured claims that are not satisfied through a convenience class cash election.[3]

23.    Under the PSA, the Debtors have agreed to pursue a restructuring in accordance with the milestones set forth in Section 1(a) of the PSA. If the Debtors fail to meet such milestones, B. Riley may terminate the PSA. The milestones require the Debtors to take the following actions, among others, and/or obtain the following relief by the deadlines below:

(a)    by February 6, 2015, the Debtors shall (i) obtain entry of an order by the Court approving assumption of the PSA and specifically approving the reimbursement of certain fees and expenses of B. Riley as administrative expenses consistent with Section 2(d)(iv) of the PSA, and (ii) file the Plan and the Disclosure Statement;

(b)    by March 20, 2015, the Debtors shall obtain entry of an order by the Court approving the Disclosure Statement and granting related relief, including, without limitation, approval of applicable solicitation procedures;

(c)    by April 15, 2015, the Debtors shall file a supplement to the Plan (i) setting forth the executory contracts and unexpired leases to be assumed on the effective date of the Plan as well as the estimated cure cost for such contracts and leases, (ii) attaching the new charter, bylaws, and stockholders agreement of the reorganized Debtors, and (iii) identifying the members of the board of

---

[3] The common stock in the reorganized Debtors issued to B. Riley and holders of allowed general unsecured claims will be subject to dilution by a stock-based management incentive plan to be approved by the board representing up to 10% of the common stock.

01:16512586.1

directors of the reorganized Debtors;

(d)    by April 30, 2015, the Debtors shall (i) obtain entry of an order by the Court confirming the Plan (the "Confirmation Order"), and (ii) obtain entry of an order of the Court authorizing and approving the assumption of executory contracts and unexpired leases (excluding any contracts or leases which are the subject of outstanding objections to the proposed assumption, including objections to the estimated cure cost) and fixing the cure costs for the assumed contracts and leases;[4] and

(e)    the Debtors shall obtain interim and final orders approving the DIP Financing by the deadlines, on the terms, and subject to the conditions set forth in the DIP Financing.

The Debtors believe that the milestones set forth in the PSA will allow these Cases to proceed expeditiously, while also providing sufficient time for parties in interest to review and consider the relevant transactions.

24.    The PSA, like most plan sponsorship agreements, contains a number of events, the occurrence of which may result in B. Riley's termination of the PSA, including:

(a)    the Debtors fail to perform any obligation (including, without limitation, obtaining specified relief) under the PSA by the applicable deadline or within the applicable timeframe specified in the PSA, including, without limitation, as required under Section 1(a) of the PSA (discussed above);

(b)    an event or occurrence required by the PSA does not happen by the applicable deadline or within the applicable timeframe specified in the PSA, including, without limitation, the occurrence of the effective date of the Plan by May 15, 2015;

(c)    the reorganized Debtors have failed to obtain access to the contemplated exit facility, or any other condition to occurrence of the effective date of the

---

[4] Subject to Section 2(f) of the PSA, the hearing to consider entry of the Confirmation Order and the hearing to consider entry of the order authorizing and approving the assumption of executory contracts and unexpired leases shall be scheduled for the same date.

Plan has not occurred, within the applicable required timeframe;

(d)  there is any material modification to, or material severance of any provision of, the Plan or any related document that is inconsistent with the terms and conditions set forth in the PSA;

(e)  there is an event of default under the DIP Financing, and such event of default is not cured in accordance with the terms (including, without limitation, within the timeframe) set forth in the DIP Financing or waived;

(f)  a motion is filed or relief is otherwise sought or supported by any Debtor seeking to (i) appoint a trustee, receiver, or examiner for any Debtor or any of its assets and/or business, in the Cases or otherwise, (ii) convert the Case of any Debtor to a case under chapter 7 of the Bankruptcy Code, or (iii) dismiss any Case of any Debtor;

(g)  an order is entered by the Court (i) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization pursuant to section 1121 of the Bankruptcy Code, (ii) directing the appointment of an examiner with expanded powers or a trustee, (iii) converting any Case to a case under chapter 7 of the Bankruptcy Code, or (iii) dismissing any Case;

(h)  an order is entered appointing a trustee, receiver, or examiner for any Debtor or its assets and/or business, in the Cases or otherwise;

(i)  there has been a material breach of, material inaccuracy in, or material failure to perform any representation, warranty, covenant, or agreement made by the Debtors in the PSA that has not been cured by the Debtors within ten (10) business days following receipt of notice from B. Riley;

(j)  any event or condition in respect of the operation of the Debtors has occurred that results, or would reasonably be expected to result, individually or in the aggregate, in a material adverse effect (as

defined in Section 11(a)(x) of the PSA) on (i) the business, financial condition and operations of the Debtors, taken as a whole, or on (ii) the ability of the Debtors to consummate the transaction contemplated in the PSA and in the Plan;

(k)     if any court of competent jurisdiction or other competent governmental or regulatory authority shall (i) have issued an order making illegal or otherwise restricting, preventing or prohibiting the Plan in a manner that cannot reasonably be remedied or (ii) have entered a final, non-appealable judgment or order declaring the PSA or any material provision of the PSA or any related document to be illegal, invalid, or unenforceable; and

(l)     Edmond S. Thomas, or a replacement acceptable to B. Riley in its sole and absolute discretion, ceases to be the chief executive officer of the Debtors.

25.     Conversely, the Debtors may terminate the PSA pursuant to Sections 4(d), 4(e), and 11(b)(1) if Debtors terminate the PSA in compliance with their fiduciary duties following the receipt of a Superior Proposal (defined in Section 4(d) of the PSA) or the occurrence of an Intervening Event (defined in Section 4(e) of the PSA and set forth below) that did not result from a breach of the exclusivity, notice and other provisions of Section 4 of the PSA.

26.     Notably, the PSA does not purport to impair the Debtors' fiduciary duties in administering the Cases.  Specifically, Section 4(d) of the PSA provides:

Notwithstanding anything to the contrary herein, the Company may terminate this Agreement in order to enter into a definitive Alternative Transaction Agreement with respect to a Superior Proposal that did not result from a breach of this section 4, subject to compliance with the following notice requirements and payment of the Break-Up Fee in accordance with the terms of this Agreement, if (i) the Company has received an Alternative Transaction Proposal that, in the good-faith determination of the board of directors of the Company, constitutes a Superior Proposal, after having complied with the following notice requirements, and (ii) the board of directors of the

> Company determines in good faith, after consultation with
> its outside legal counsel, that failure to take such action
> would be inconsistent with the fiduciary obligations of the
> board of directors under applicable law . . . .

27.     Similarly, Section 4(e) of the PSA provides:

> Notwithstanding anything to the contrary set forth in this
> Agreement, the Company's board of directors may
> terminate this Agreement following the occurrence of an
> event, fact, development or occurrence after the date hereof
> that did not result from a breach of this section 4 (an
> "Intervening Event") if, subject to compliance with the
> following notice requirements and payment of the Break-
> Up Fee in accordance with the terms of this Agreement, the
> board of directors of the Company determines in good
> faith, after consultation with its outside legal counsel, that
> failure to take such action would be inconsistent with the
> fiduciary obligations of the board of directors under
> applicable law because the Intervening Event makes it
> unlikely that either (x) the Company will maximize value
> for stakeholders by consummating the Plan or (y) the
> Company can consummate the Plan within a reasonable
> period of time . . . .

28.     If the Debtors choose to terminate the PSA under the circumstances specified in

Sections 4(d), 4(e), and/or 11(b)(1), provided that B. Riley is not in material breach of the PSA,

the Debtors shall pay to B. Riley a $1,000,000 break-up fee plus the reimbursement of B. Riley's

reasonable, unpaid out-of-pocket fees and expenses, including, without limitation, legal fees, and

after application of any retainer previously funded by the Debtors (collectively, the "Break-Up

Fee"), within the applicable timeframe specified in Section 5 of the PSA.  The payment of the

Break-Up Fee in accordance with the terms of the PSA will constitute the sole and exclusive

remedy of B. Riley for any breach of the PSA by the Debtors.

29.     The Debtors may also terminate the PSA in the following circumstances:

> (a)     there has been a material breach of, material
>         inaccuracy in, or material failure to perform any
>         representation, warranty, covenant, or agreement

made by B. Riley in the PSA that has not been
cured by B. Riley within ten (10) business days
following receipt of notice from the Debtors;

(b)     if any court of competent jurisdiction or other
competent governmental or regulatory authority
shall (i) have issued an order making illegal or
otherwise restricting, preventing or prohibiting the
Plan in a manner that cannot reasonably be
remedied or (ii) have entered a final, non-appealable
judgment or order declaring the PSA or any
material provision of the PSA or any related
document to be illegal, invalid, or unenforceable;
and

(c)     if the funding under the DIP Financing is terminated
by B. Riley.

30.     Section 4 of the PSA contains limitations on the Debtors' ability to solicit or

initiate a proposal for an alternative transaction.  The Debtors, however, are permitted to engage

in discussions and negotiations regarding an unsolicited Alternative Transaction Proposal that is,

or could reasonably be expected to result in, a Superior Proposal.  The Debtors are also permitted

to participate in discussions with, or provide any information to, any official committee

appointed in the Cases, so long as the Debtors do not otherwise violate the prohibitions contained

in Section 4(c) of the PSA.

31.     Finally, Section 2(d)(iv) of the PSA requires the Debtors to periodically reimburse

B. Riley for certain fees and expenses, including, without limitation, legal fees, it incurs in

connection with the Cases (collectively, the "Expense Reimbursement"), administrative expenses

of the estates under Bankruptcy Code section 503(b).

## IV.  RELIEF REQUESTED

32.     By this Motion, the Debtors seek the entry of an order (i) approving and

authorizing the Debtors' assumption of the PSA, (ii) approving and authorizing the Debtors'

payment of the Break-Up Fee and the Expense Reimbursement in accordance with the terms of

the PSA as administrative expenses of the estates under Bankruptcy Code section 503(b), and

(iii) granting such other relief as is just and proper.

## V.  BASIS FOR RELIEF

**A.      The Debtors' Assumption of the PSA Is an Exercise of Their Sound Business Judgment.**

33.      The Debtors seek authority, pursuant to Bankruptcy Code section 365(a), to

assume the PSA in their sound business judgment.  Bankruptcy Code section 365(a) provides, in

relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject

an executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  As noted by the

United States Court of Appeals for the Third Circuit, "[s]ection 365 enables the trustee to

maximize the value of the debtor's estate by assuming executory contracts and unexpired leases

that benefit the estate and rejecting those that do not." *L.R.S.C. Co. v. Rickel Home Ctrs., Inc.*

*(In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000); *see also Enterprise Energy*

*Corp. v. United States (In re Columbia Gas Sys.)*, 50 F.3d 233, 238 (3d Cir. 1995) ("The debtor

will assume an executory contract when the package of assets and liabilities is a net asset to the

estate.  When it is not the debtor will (or ought to) reject the contract.").

34.      The assumption or rejection of an executory contract or unexpired lease, including

a plan support agreement or plan sponsorship agreement, by a debtor is subject to review under

the business judgment standard. *See In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir.

1992) (the "resolution of [the] issue of assumption or rejection will be a matter of business

judgment by the bankruptcy court"); *In re Residential Capital, LLC*, 2013 Bankr. LEXIS 2601,

at *70, 72 (Bankr. S.D.N.Y. June 27, 2013) (applying the business judgment standard to the

decision whether to approve the debtor's motion to assume a plan support agreement and finding

the debtor's decision to assume the agreement was a proper exercise of sound business judgment

where "[t]he PSA is not manifestly unreasonable, nor has there been a showing of bad faith, self-interest or gross negligence," and "the Court has no difficulty in concluding that the [parties] reached their decisions to sign and support the PSA in good faith and in what they believed was the best interests of the investors," and "a preponderance of the evidence introduced at the hearing supports approval of the PSA"). If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of the contract or lease. *See, e.g., NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Grp. of Inst. Investors v. Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *Glenstone Lodge, Inc. v. Buckhead Am. Corp (In re Buckhead Am. Corp.)*, 180 B.R. 83, 88 (D. Del. 1995).

35.    "In Delaware, the business judgment rule is a presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company." *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) (citation omitted). The business judgment rule shields a debtor's management from judicial second-guessing. *See, e.g., End of the Road Trust ex rel. Fruehauf Trailer Corp. v. Terex Corp. (In re Fruehauf Trailer Corp.)*, 250 B.R. 168, 196 (D. Del. 2000) (the "'business judgment rule shields corporate decision-makers and their decisions from judicial second-guessing'") (citation omitted); *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 124 (Del. Ch. 2009) ("the business judgment rule prevents a judge or jury from second guessing director decisions"). Indeed, in applying the "business judgment" standard, debtors are usually given significant discretion when requesting to assume or reject an executory contract. *See, e.g., NLRB*, 465 U.S. at 523; *Delightful Music Ltd. v. Taylor (In re Taylor)*, 913 F.2d 102, 107 (3d Cir. 1990); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *In re Trans*

*World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) (noting a debtor's decision to assume or reject an executory contract "must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice'") (citation omitted). Further, the "business judgment" standard merely requires the debtors to establish that the requested assumption taken as a whole will benefit the estate. *See Columbia Gas System*, 50 F.3d at 238 ("The debtor will assume an executory contract when the package of assets and liabilities is a net asset to the estate. When it is not the debtor will (or ought to) reject the contract.").

36.　　In addition to the preceding authority, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code, providing, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to Bankruptcy Code section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (the bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

37.     The Debtors' decision to assume the PSA is an exercise of their sound business judgment.  Following the exploration of alternatives, as detailed in the Hillebrandt Declaration and the Pitts Declaration, the Debtors determined, in the exercise of their reasonable business judgment, that the terms of the reorganization set forth in the PSA represent the best opportunity to maximize the value of their estates and, thereby, maximize creditor recoveries,  The terms of the PSA are the result of arm's length negotiations between the Debtors and B. Riley, with all parties represented by counsel.  The final terms of the PSA are the culmination of give-and-take negotiations and represent a positive outcome for the Debtors in their efforts to restructure and emerge from bankruptcy as expeditiously as possible.  To be sure, assumption confers benefits on B. Riley, by rendering the PSA an obligation of the estates, but it also confers important benefits on these estates.  As noted above, without the committed plan sponsorship and debtor-in-possession financing offered by B. Riley, the Debtors would face a free-fall into bankruptcy, with no clear exit, and insufficient liquidity to run anything other than an expedited sale process, potentially by way of a naked auction.  The PSA provides the Debtors with the path to maximize their value through an expeditious plan of reorganization while also imposing important obligations on B. Riley to support and facilitate the transactions contemplated under the PSA.

38.     Importantly, the Debtors may terminate their obligations under the PSA to the extent required to comply with their fiduciary duties under the situations specified in Sections 4(d), 4(e), and 11(b)(1) of the PSA.  Thus, assumption of the PSA will enable, not prohibit, the Debtors' fulfillment of their fiduciary obligations to maximize the value of their estates.

39.     Similar relief has been granted by this district.  *See, e.g.*, *In re Dendreon Corp.*, Case No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014) (Docket No. 215); *In re Tuscany Int'l Holdings (U.S.A.) Ltd.*, Case No. 14-10193 (KG) (Bankr. D. Del. March 21, 2014) (Docket No.

218); *In re Rural/Metro Corp.*, Case No. 13-11952 (KJC) (Bankr. D. Del. Sept. 5, 2013) (Docket

No. 217); *In re Bicent Holdings LLC*, Case No. 12-11304 (KG) (Bankr. D. Del. May 15, 2012)

(Docket No. 110); *In re William Lyons Homes*, Case No. 11-14019 (CSS) (Bankr. D. Del. Dec.

29, 2011) (Docket No. 105); *In re Satelites Mexicanos, S.A. DE C.V.*, Case No. 11-11035 (CSS)

(Bankr. D. Del. April 13, 2011) (Docket No. 125); *In re HMP Servs. Holding Sub III, LLC*, Case

No. 10-13618 (BLS) (Bankr. D. Del. Jan. 20, 2011) (Docket No. 157); *In re NextMedia Grp.,*

*Inc.*, Case No. 09-14463 (PJW) (Bankr. D. Del. Jan. 22, 2010) (Docket No. 126); *In re MES*

*Int'l, Inc.*, Case No. 09-14109 (PJW) (Bankr. D. Del. Dec. 18, 2009) (Docket No. 144).

**B.**  **The Break-Up Fee and Expense Reimbursement Are Reasonable and Appropriate.**

40.     The Debtors submit that Break-Up Fee and the Expense Reimbursement payable

to B. Riley under the PSA are reasonable and appropriate in light of the benefit that the Debtors

and their estates would receive from consummation of the Plan.  These fees and expenses

represent an actual and necessary cost and expense of preserving the estates under section 503 of

the Bankruptcy Code and should be allowed and paid as an administrative expense in the Cases.

41.     The Break-Up Fee and Expense Reimbursement are an integral part of the

transactions contemplated by the PSA, without which B. Riley would not have entered into the

PSA. *See* PSA, §§ 5 & 11(b)(i)(1). They are designed to compensate B. Riley for the efforts and

resources expended and yet to be extended and, in the case of the Break-Up Fee, for the

opportunities foregone and opportunities lost in the event the Debtors determine not to proceed

with the Plan. *Id.* Among other things, B. Riley is making a multi-million debtor-in-possession

term loan that it might not otherwise make and, pursuant to the PSA, is reserving multi-millions

in cash to be contributed under the Plan which, absent the PSA, could be deployed elsewhere.

42.     Here, as in *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455 (Bankr. S.D.N.Y.

2014), "[t]he termination fee . . . is simply one component of a much larger negotiated

transaction . . . that creates tremendous value for the estate.  Considered in this light, it is clearly

satisfies the business judgment test." *Id.* at 465.  In *Genco Shipping*, the debtors had sought the

assumption of a restructuring support agreement contemplating a restructuring under which over

$1 billion in debt would be converted to equity.  One component of the restructuring support

agreement was a $26.5 million termination fee.  The bankruptcy court authorized the assumption

of the restructuring support agreement and approved the $26.5 million termination fee.  *Id.* at

469.  In particular, the bankruptcy court found that the amount of the termination fee would not

"unduly hamper the Debtors' efforts to maximize the value for the estate given the fiduciary out,

or that it is unreasonable when compared to the overall transaction . . . ." *Id.* at 465.

43.     The same is true here.  In the event that the Debtors determine that they need to

terminate the PSA in the exercise of their fiduciary duties, the PSA expressly permits them to do

so.  Moreover, the $1 million Break-Up Fee is proportionate to the $20 million purchase price for

80% of the newly issued stock in the reorganized Debtors to be acquired by B. Riley.  The value

a party wishing to propose an alternative transaction would have to provide to even match

B. Riley – $20 million – easily dwarfs the amount of the Break-Up Fee, "making it highly

unlikely that the fee would chill any other financial options." *Id.* at 467.

44.     Under *Calpine Corp. v. O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 535

(3d Cir. 1999), of course, for a break-up fee to be approved there must be a demonstration that

the break-up fee not only was agreed to in the exercise of the debtors' reasonable business

judgment but that it also is actually necessary to preserve the value of the estate.  Here, the

Break-Up Fee is actually necessary to preserve the value of the Debtors' estates.  Without it,

B. Riley would not have agreed to be a plan sponsor, and without a plan sponsor and a clear path forward in these Cases, the risk of erosion of the value of the estates is significant.

45.    Similar relief has been granted by this district. *In re AbitibiBowater Inc.*, Case No. 09-11296 (KJC) (Bankr. D. Del. June 22, 2010); *In re NextMedia Grp., Inc.*, Case No. 09-14463 (PJW) (Bankr. D. Del. Jan. 22, 2010); *In re Spansion Inc.*, Case No. 09-10690 (KJC) (Bankr. D. Del. Jan. 7, 2010).

**C.    The Court Is Not Being Asked to Pre-Approve the Plan.**

46.    This Court is not being asked to pre-approve the terms of the Plan itself. At this point, the Court is only being asked to evaluate whether assumption of the PSA pursuant to section 365 of the Bankruptcy Code is a valid exercise of the Debtors' business judgment. Assumption of the PSA by no means assures that the Plan will be confirmed. *See Genco Shipping*, 509 B.R. at 468 (citing *Residential Capital*, 2013 Bankr. LEXIS 2601, at *8). That issue will be addressed at the confirmation hearing in a distinct inquiry which examines whether the Plan satisfies the applicable standards under the Bankruptcy Code, at which parties in interest may object to the Plan on any number of grounds. *Id.* What assumption of the PSA does do, however, is allow the Plan a chance to be considered for confirmation. Without assumption of the PSA, B. Riley will terminate the PSA and there will be no plan for the Court to consider or parties to object to at all.

## VI. NOTICE

47.    Notice of this Motion has been given to: (i) the Office of the United States Trustee for the District of Delaware; (ii) holders of the forty (40) largest unsecured claims on a consolidated basis against the Debtors; (iii) the Prepetition Lender; and (iv) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.

The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## VII.    CONCLUSION

WHEREFORE, for the reasons set forth herein, in the Hillebrandt Declaration, and in the Pitts Declaration, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: January 15, 2015

_/s/ Maris J. Kandestin_
Michael R. Nestor, Esq. (DE Bar No. 3526)
Maris J. Kandestin, Esq. (DE Bar No. 5294)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Email:  mnestor@ycst.com
        mkandestin@ycst.com

and

Lee R. Bogdanoff, Esq.
Michael L. Tuchin, Esq.
David M. Guess, Esq.
Jonathan M. Weiss, Esq.
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel:    (310) 407-4022
Fax:    (310) 407-9090
Email: lbogdanoff@ktbslaw.com
        mtuchin@ktbslaw.com
        dguess@ktbslaw.com
        jweiss@ktbslaw.com

# EXHIBIT A

**Proposed Order**

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| THE WET SEAL, INC., a Delaware corporation, *et al.*[1] | Case No.:  15-10081 (___) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. ___** |

## ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 365(a) AND 503(b) (I) APPROVING AND AUTHORIZING THE ASSUMPTION OF THE PLAN SPONSORSHIP AGREEMENT, AND (II) APPROVING AND AUTHORIZING THE PAYMENT OF THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT

Upon the motion (the "Motion")[2] of The Wet Seal, Inc. and its subsidiaries, the debtors and debtors in possession (the "Debtors") in the above-captioned jointly administered chapter 11 cases (the "Cases"), for entry of an order pursuant to sections 105(a), 365(a) and 503(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) approving and authorizing the Debtors' assumption of that certain Plan Sponsorship Agreement, dated as of January 15, 2015 (together with all exhibits thereto, the "PSA"), entered into by and among the Debtors and B. Riley Financial, Inc.., and its affiliates and designees (collectively, "B. Riley"), (ii) approving and authorizing the Debtors' payment of the Break-Up Fee and the Expense Reimbursement in accordance with the terms of the PSA as expenses of administration against the estates under Bankruptcy Code section 503(b), and (iii) granting related relief; and upon

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: The Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265), Wet Seal Catalog, Inc. (7604), and Wet Seal GC, LLC (2855-VA).  The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion and the PSA, as applicable.

consideration of the Hillebrandt Declaration, the Pitts Declaration, and the entire record of these chapter 11 cases; and it appearing that the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that the Motion is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these Cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and it appearing that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and after due deliberation, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED that:**

1.    The Motion is GRANTED as set forth herein.

2.    The PSA, a copy of which is attached hereto as Exhibit 1, is approved.

3.    The Debtors are authorized to assume the PSA and the obligations contained therein, pursuant to section 365(a) of the Bankruptcy Code, and to perform their obligations thereunder (including without limitation, payment of the Break-Up Fee and the Expense Reimbursement in accordance with the terms of the PSA).

4.    No default exists under the PSA, and, therefore, the Debtors are not required to satisfy the requirements of Bankruptcy Code section 365(b)(1) to assume the PSA.

5.    Pursuant to section 503 of the Bankruptcy Code, as the Break-Up Fee and the Expense Reimbursement each represent an actual and necessary cost and expense of preserving the estates, they constitute an administrative expense of the estates.

6.       The PSA may be modified, amended, or supplemented by the parties thereto, solely in accordance with the terms thereof, without further order of the Court.

7.       The failure to specifically include any particular provisions of the PSA in this Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the PSA be assumed in its entirety.

8.       The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order, and such actions shall not constitute a solicitation of acceptances or rejections of a plan pursuant to Bankruptcy Code section 1125.

9.       For the avoidance of doubt, nothing in this Order shall constitute an approval of any disclosure statement or confirmation of any plan of reorganization.

10.      Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon its entry; (b) the Debtors are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this order; and (c) the Debtors are authorized and empowered, and may in their discretion and without further delay, take any action necessary or appropriate to implement this Order.

11.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: _____, 2015
       Wilmington, Delaware

                      _____
                      UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**The Plan Sponsorship Agreement ("PSA")**

*EXECUTION COPY*

# PLAN SPONSORSHIP AGREEMENT

This Plan Sponsorship Agreement (this "Agreement"), dated as of January 15, 2015 (the "Execution Date"), is entered into by and among (1) The Wet Seal, Inc., The Wet Seal Retail, Inc., Wet Seal Catalog, Inc., and Wet Seal GC, LLC (individually, a "Company Party", and collectively, the "Company") and (2) B. Riley Financial, Inc. and its affiliates or designees selected in its sole discretion in accordance with section 26 of this Agreement (collectively, the "Sponsor" and, together with the Company, the "Parties").

WHEREAS, the Parties previously executed the Exclusivity and Work Fee Agreement dated January 9, 2015 (including all exhibits, appendices, and attachments thereto, the "Term Sheet"), which outlines certain terms and conditions relating to a restructuring of the Company's affairs subject to definitive documentation.

WHEREAS, the Parties have agreed to the restructuring of the Company's affairs on the terms and conditions set forth in this Agreement (including all transactions contemplated by this Agreement in connection therewith, the "Restructuring"), which will be effected in voluntary bankruptcy cases (collectively, the "Bankruptcy Case") commenced by the Company Parties under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").

WHEREAS, the Company has entered into certain commitments with respect to debtor-in-possession financing (the "DIP Financing").

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Bankruptcy Actions.

(a)    The Parties shall take the following actions and/or obtain the following relief by the specified deadlines:

(i)    by January 15, 2015, the Company shall (A) commence the Bankruptcy Case in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and (B) file a motion to approve the Company's assumption of this Agreement;

(ii)    by February 6, 2015, the Company shall (A) obtain entry of an order by the Bankruptcy Court approving assumption of this Agreement and specifically approving the allowance and payment of certain fee and expenses of the Sponsor as administrative expenses consistent with section 2(d)(iv) hereof (the "PSA Order"), (B) provide a list to the Sponsor reflecting all executory contracts necessary or desirable for the operation of the Company's business (the "Contracts") and unexpired leases (the "Leases") to which the Company is a party, along with a list of any and all projected cure and reinstatement costs or expenses (the "Cure Costs") of or relating to the potential assumption of each Contract and

Lease, and (C) file a reorganization plan that is consistent with the terms set forth in this Agreement and/or is otherwise reasonably acceptable to the Sponsor and the Company (the "<u>Plan</u>") and an accompanying disclosure statement (the "<u>Disclosure Statement</u>");

(iii)    by February 20, 2015, the Company shall provide any supplements to the list of Contracts, including associated Cure Costs;

(iv)    by March 20, 2015, the Company shall obtain entry of an order by the Bankruptcy Court approving the Disclosure Statement and granting related relief, including, without limitation, approval of applicable solicitation procedures;

(v)    by April 1, 2015, the Sponsor shall deliver to the Company a list of designated Contracts and Leases to be assumed on the Effective Date pursuant to the Plan (the "<u>Designated Contracts</u>");

(vi)    by April 7, 2015, the Company shall deliver a notice to each of the counterparties of the Designated Contracts providing each such counterparty with notice that the respective Designated Contract may be assumed by the Company subject to payment of the estimated Cure Cost, and informing such counterparty that objections to the proposed assumption, including objections to the estimated Cure Cost (such objections, "<u>Assumption Objections</u>") must be filed with the Bankruptcy Court and submitted to the Parties no later than 4:00 p.m. prevailing Eastern time on April 21, 2015;

(vii)    by April 10, 2015, the Sponsor shall deliver to the Company the new charter, bylaws, and stockholders agreement of the Reorganized Company, as well as the members of the board of directors of the Reorganized Company accompanied by any disclosures required by Bankruptcy Code section 1129(a)(5) in connection therewith;

(viii)   by April 15, 2015, the Company shall file a supplement to the Plan (a "<u>Plan Supplement</u>") (A) setting forth the Designated Contracts as well as the estimated Cure Cost for each such Designated Contract, (B) attaching the new charter, bylaws, and stockholders agreement of the Reorganized Company, and (C) identifying the members of the board of directors of the Reorganized Company;

(ix)    by April 30, 2015, the Company shall (A) obtain entry of an order by the Bankruptcy Court confirming the Plan (such order, the "<u>Confirmation Order</u>"), and (B) obtain entry of an order of the Bankruptcy Court authorizing and approving the assumption of the Designated Contracts (excluding any Designated Contracts which are the subject of outstanding Assumption Objections pursuant to

section 2(f) below) and fixing the Cure Costs for the Designated Contracts (the "Assumption Order");[1] and

(x)    the Company shall obtain interim and final orders approving that certain postpetition financing set forth in the DIP Financing by the deadlines, on the terms, and subject to the conditions set forth in the DIP Financing.

(b)    The Company agrees and covenants that, on the terms and subject to the conditions set forth in this Agreement, it will

(i)    prepare, as soon as reasonably practicable after the date of this Agreement a draft Plan and a draft Disclosure Statement, and after such preparation promptly provide such Plan and Disclosure Statement, in draft form, to the Sponsor and the Sponsor's legal and financial advisors for review and comment a reasonable period of time in advance of any filing thereof;

(ii)    include in the approved Disclosure Statement a statement that the Company's board of directors has recommended the acceptance of the Plan by the stakeholders of the Company who are entitled to vote on the Plan;

(iii)    in consultation with the Sponsor, use its commercially reasonable efforts to commence solicitation of the Plan as soon as practicable following entry of an order by the Bankruptcy Court approving the Disclosure Statement, as provided in any such Bankruptcy Court order;

(iv)    prepare and provide the proposed Confirmation Order, in draft form, to the Sponsor and the Sponsor's legal and financial advisors for review and comment a reasonable period of time in advance of any filing thereof and, subject to the prior written consent of the Sponsor to the form and substance of the Confirmation Order (which consent shall not be unreasonably withheld, conditioned or delayed) and consultation with the Sponsor, use its commercially reasonable efforts to file with the Bankruptcy Court the proposed Confirmation Order promptly following the end of the period to solicit acceptances of the Plan;

(v)    diligently pursue confirmation and consummation of the Plan;

(vi)    reasonably cooperate with the Sponsor and the Sponsor's legal advisor in connection with any discovery and hearings in connection with this Agreement, the Disclosure Statement, and/or the Plan and any transactions contemplated by such documents;

(vii)    use commercially reasonable efforts to provide drafts of any notices, motions, pleadings, filings, or other documents to be filed by the Company in the

---

[1]    Subject to section 2(f) below, the hearing to consider entry of the Confirmation Order and entry of the Assumption Order shall be scheduled for the same date (the "Confirmation Hearing").

Bankruptcy Case to the Sponsor and the Sponsor's legal advisor a reasonable period of time (or, in the event of an emergency, the longest period of time practicable under the circumstances) prior to the date on which the Company intends to file such documents with the Bankruptcy Court, which such documents must be reasonably acceptable to the Sponsor and the Company and consistent with this Agreement;

(viii)    without duplication or limitation of the foregoing, use commercially reasonable efforts to provide drafts of any proposed modifications, amendments, supplements, schedules, exhibits, and other documents related to the Plan, the Restructuring, the Disclosure Statement or their terms and conditions (collectively, the "Plan Related Documents") to the Sponsor and the Sponsor's legal advisor a reasonable period of time prior to the date on which the Company intends to file such documents with the Bankruptcy Court, and any such Plan Related Documents must be reasonably acceptable to the Sponsor and the Company and consistent with this Agreement;

(ix)    timely file a formal objection and prosecute in good faith such objection to any motion filed with the Bankruptcy Court seeking the entry of an order (A) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization pursuant to section 1121 of the Bankruptcy Code, (B) directing the appointment of an examiner with expanded powers or a trustee, (C) converting the Bankruptcy Case of any Company Party to a case under chapter 7 of the Bankruptcy Code, or (D) dismissing the Bankruptcy Case of a Company Party.

(c)    The Sponsor agrees and covenants that, on the terms and subject to the conditions set forth in this Agreement, it and its affiliates will:

(i)    upon execution of this Agreement and through the Bankruptcy Case, continue to support the Plan;

(ii)    following the commencement of the Bankruptcy Case, not (1) object to the Plan or the Disclosure Statement or the consummation of the Plan, or any efforts to obtain acceptance of, and to confirm and implement, the Plan; (2) initiate any legal proceedings that are inconsistent with, or that would delay, prevent, frustrate or impede, the approval, confirmation or consummation of the Plan or the Disclosure Statement or the transactions outlined therein or otherwise commence any proceedings to oppose any of the transactions contemplated by the Plan or the Disclosure Statement, or take any other action that is barred by this Agreement; (3) vote for, consent to, support or participate in the formulation of any other restructuring, any other transaction involving the Company or its assets, or any plan of reorganization (with the sole exception of the Plan) or liquidation under applicable bankruptcy or insolvency laws, whether domestic or foreign, in respect of the Company; (4) directly or indirectly seek, solicit, support, formulate, entertain, encourage or engage in discussions, or enter into any agreements relating to, any restructuring, plan of reorganization, proposal or offer of

dissolution, winding up, liquidation, reorganization, merger, transaction, sale, disposition or restructuring of the Company (or any of its assets or stock) other than the Plan (collectively, clauses (3) and (4) describe an "Alternative Plan"); (5) engage in or otherwise participate in any negotiations regarding any Alternative Plan, enter into any letter of intent, memorandum of understanding, agreement in principle or other agreement relating to any Alternative Plan; (6) solicit, encourage, or direct any person to undertake any action prohibited by clauses (1) through (5) of this subsection (c)(ii); or (7) permit any of its, or its controlled affiliates', officers, directors, managers, employees, partners, representatives and agents to undertake any action prohibited by clauses (1) through (6) of this subsection (c)(ii); and

(iii)    reasonably cooperate with the Company and the Company's legal advisor in connection with any discovery and hearings in connection with this Agreement, the Disclosure Statement, and/or the Plan and any transactions contemplated by such documents.

2.    The Plan and Certain Related Matters. The Plan and all related documents, including, without limitation, the Disclosure Statement, and the motion and order relating to approval of this Agreement, must be in form and substance reasonably acceptable to the Sponsor and the Company and not inconsistent with the terms and conditions set forth in this Agreement. The Plan shall provide for the following, among other things:

(a)    Effective Date. The effective date of the Plan (the "Effective Date") shall occur as soon as practicable but in no event later than May 15, 2015.

(b)    Conditions Precedent to the Effective Date. The Plan shall include the following conditions precedent (each a "Condition Precedent") which must be satisfied or waived prior to the occurrence of the Effective Date.

(i)    The Plan and any and all Plan Supplements, including any amendments or modifications thereto, shall be reasonably acceptable to the Sponsor and the Company.

(ii)    The Confirmation Order shall have been entered, shall not be subject to any stay on enforcement and be in form and substance reasonably satisfactory to the Sponsor and the Company. The Confirmation Order shall provide that, among other things, the Company or the Reorganized Company, as appropriate, is authorized to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing, and consummating the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with or described in the Plan.

(iii)    All documents and agreements necessary to implement the Plan, including, without limitation, the Exit Facility (as defined below) shall have (A) been tendered for delivery, and (B) been effected or executed. All conditions precedent to all such documents and agreements shall have been satisfied or

*EXECUTION COPY*

waived pursuant to the terms and conditions of such documents or agreements, as applicable.

(iv)      All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws or regulations.

(v)      As of the Effective Date, there shall be no existing or continuing events of default under the DIP Financing that has not been waived in writing.

(c)      <u>Transactions Structure</u>.  The transactions contemplated by the Plan shall be structured in an efficient manner (including, without limitation, from a tax perspective and given the intent that the Company, as reorganized pursuant to the Plan (the "<u>Reorganized Company</u>"), not be a "public" company as of the Effective Date) and otherwise reasonably acceptable to the Sponsor, in consultation with the Company.

(d)      <u>Treatment of Claims</u>.  Allowed claims shall be treated in a manner that satisfies the requirements of section 1129 of the Bankruptcy Code, including, without limitation, as follows:

(i)      <u>Secured Claims</u>.  Except to the extent that a particular claimant agrees to a less favorable treatment approved by the Sponsor, secured claims allowed under section 506(a) of the Bankruptcy Code shall be unimpaired and reinstated upon the Effective Date under the Plan consistent with the requirements of section 1129 of the Bankruptcy Code.

(ii)      <u>Priority Claims</u>.  Except to the extent that a particular claimant agrees to a less favorable treatment approved by the Sponsor, allowed claims that are entitled to priority under section 507(a) of the Bankruptcy Code will be paid in full in cash or treated as otherwise provided for under the Bankruptcy Code.

(iii)      <u>Non-Priority Unsecured Claims.</u>  Except to the extent that a particular claimant agrees to a less favorable treatment approved by the Sponsor, holders of non-priority unsecured claims allowed under section 502 of the Bankruptcy Code (the "<u>Unsecured Claims</u>"), including, without limitation, obligations arising under or in connection with that certain convertible senior note issued on March 26, 2014, will receive their pro rata shares of the Non-Sponsor Stock (as defined below) in satisfaction of such Unsecured Claims, unless a claimant participates in the Convenience Class (as defined below).

(1)      The Plan shall provide for treatment of a class of Unsecured Claims that, for administrative convenience, will receive treatment different from the Unsecured Claims in the Unsecured Claims class (such class receiving different treatment, the "<u>Convenience Class</u>").  The Convenience Class will comprise all Unsecured Claims of a single holder  of a type that would otherwise be included in the Unsecured Claims Class that are either (i) a

maximum dollar amount or less in the aggregate or (ii) greater than such maximum dollar amount in the aggregate but as to which such holder has made an election (the "Convenience Class Election") on the ballot for voting on the Plan to have such claim treated as a claim in the Convenience Class (all such claims, the "Convenience Claims"). The parties shall negotiate in good faith regarding the maximum dollar amount to be set forth in the Plan, which shall take into account the working capital needs of the Reorganized Company as of the Effective Date.

(iv)    Administrative Expenses. Unless otherwise agreed by the holder thereof, the Plan will provide for the payment in full of all administrative expenses allowed under section 503 of the Bankruptcy Code consistent with section 1129(a)(9) of the Bankruptcy Code. The Sponsor's reasonable fees and expenses incurred in connection with the Bankruptcy Case, including, without limitation, its legal fees, are actual and necessary costs and expenses of preserving the estates under section 503 of the Bankruptcy Code and must therefore be allowed and paid as administrative expenses in the Bankruptcy Case. Following entry of the PSA Order, the Sponsor or the Sponsor's legal advisor shall periodically invoice (with reasonable detail concerning hours, rates and description of work performed, subject to redaction to preserve attorney-client privilege) the Company for legal fees due and owing, and the Company shall tender payment of such amounts due and owing within fifteen (15) days of receipt of such invoice. To the extent that any amounts remain due and owing pursuant to the Term Sheet, such amounts shall also be allowed and paid as administrative expenses in the Bankruptcy Case following entry of the PSA Order. Any remaining funds previously deposited pursuant to the Term Sheet shall be applied against the amounts incurred pursuant to this Agreement.

(e)    Cancellation of Equity Securities. On the Effective Date, all previously issued and outstanding equity securities of the Company (and all rights to convert, exchange, exercise for, or otherwise receive equity securities of the Company) shall be deemed void, cancelled, and of no further force and effect.

(f)    Executory Contracts and Unexpired Leases. The Sponsor, in consultation with the Company, shall determine the treatment of Contracts and Leases pursuant to the terms hereof and in a manner consistent with the Bankruptcy Code. All Contracts and Leases which are not Designated Contracts as of the Effective Date shall be deemed rejected as of such date. At any time before the effective date of assumption of a Designation Contract, the Sponsor may, in its sole discretion, withdraw or modify its designation of a Designation Contract for assumption by providing notice via email to the Company and its counsel.

(i)    The Company shall promptly inform the Sponsor of any formal or informal Assumption Objection. In the event that the Company, the Sponsor, and such objecting counterparty cannot resolve an Assumption Objection prior to the

Confirmation Hearing, the Assumption Objection will be heard during the Confirmation Hearing, or at such later date as the Parties and the objecting counterparty may fix and agree and the Bankruptcy Court approves.

(ii)    In the event that any outstanding Assumption Objection remains unresolved following the Confirmation Hearing, the Sponsor reserves the right to direct the Company to reject the Designated Contract which is the subject of such Assumption Objection at any time prior to entry of an order by the Bankruptcy Court authorizing the assumption of such Designated Contract. The Plan shall provide that rejection of the Designated Contract shall be effective upon the tenth (10th) day following delivery of a rejection notice to the contract counterparty.

(g)    <u>Claims Resolution</u>. Resolutions of claims will be subject to the terms and procedures set forth in the Plan, which, among other things, will (i) require that the Reorganized Company file any and all objections to claims during the ninety (90)-day period following the Effective Date (unless such period is extended by the Bankruptcy Court) and (ii) provide that any settlements of claims approved by the Bankruptcy Court prior to the Effective Date will be binding on all parties.

(h)    <u>Avoidance Actions</u>. The Plan shall provide that the Reorganized Company shall waive any avoidance actions that the Company or the estates may have against holders of Unsecured Claims that agree in writing to continue to participate in and extend trade credit in connection with the go-forward operations of the Reorganized Company. All other avoidance actions will be reserved and prosecuted by the Reorganized Company in its reasonable discretion.

(i)    <u>Corporate Governance</u>. The Plan shall designate the number of members of the board of directors of the Reorganized Company (the "New Board"), as such number is determined by the Sponsor. At a minimum, the New Board shall consist of five (5) members, including the Chief Executive Officer of the Reorganized Company, one (1) member to be nominated by the official committee of unsecured creditors appointed by the United States Trustee in the Bankruptcy Case (the "Committee") subject to the consent of the Sponsor (such consent not to be unreasonably withheld, conditioned or delayed)), and three (3) additional members to be selected by the Sponsor; provided that if the Committee fails to nominate a member to the New Board, the Sponsor shall be permitted to appoint an additional member to the New Board in lieu of the Committee's nominee. The members of the New Board will be identified in the Plan Supplement, accompanied by any disclosures required by Bankruptcy Code section 1129(a)(5) in connection therewith. Under the Plan, the Reorganized Company will implement a new charter, bylaws, and stockholders agreement, all of which must be acceptable to the Sponsor in its reasonable discretion, and all of which will be filed in the Plan Supplement.

(j)    <u>Management Options</u>. On or after the Effective Date, the New Board will support the implementation of a stock-based management incentive plan which will provide for distributions not exceeding 10%, in the aggregate, on a fully-diluted basis.

(k)    Exit Facility.  The Reorganized Company shall obtain access to a revolving credit facility (the "Exit Facility") to fund its operations on and after the Effective Date.  The Sponsor shall be responsible for procuring the Exit Facility, the Company shall reasonably cooperate with the Sponsor's efforts to procure the Exit Facility and the Exit Facility shall be in an amount and on terms and conditions reasonably acceptable to the Sponsor.

3.    Equity in Reorganized Company.  On the Effective Date, equity in the Reorganized Company will be distributed as follows:

(a)    The Sponsor will purchase 80% of newly issued common stock in the Reorganized Company in consideration of $20 million in the form of (x) conversion of the principal amount of the DIP Financing into equity and (y) cash; and

(b)    in full satisfaction of the Unsecured Claims that are not otherwise settled or resolved under the terms of the Plan, holders of such Unsecured Claims will receive collectively 20% of newly issued common stock in the Reorganized Company (the "Non-Sponsor Stock").

4.    Exclusivity.

(a)    As used in this Agreement, "Alternative Transaction Proposal" means, other than the transactions contemplated by this Agreement, any offer, proposal, or inquiry relating to, or any third-party indication of interest in, any of the following:

(i)    any purchase, sale, or other disposition of all or a material portion of the Company's business or assets, except for the sale of assets in the ordinary course of business;

(ii)    any issuance, sale, or other disposition of any equity interest (including, without limitation, securities or instruments directly or indirectly convertible or exchangeable into equity) in the Company (by the Company) or any subsidiary of the Company primarily engaged in the Company's business (a "Business Subsidiary") (other than the issuance of stock options or similar instruments to existing directors, officers, or employees in the ordinary course of business consistent with past practice or otherwise pursuant to existing contractual obligations);

(iii)    any merger, acquisition, consolidation, or similar business combination transaction involving the Company or a Business Subsidiary; or

(iv)    any other transaction the purpose or effect of which would be reasonably expected to, or which would, prevent or render impractical, or otherwise frustrate or impede in any material respect, any of the transactions contemplated by this Agreement.

(b)    As used in this Agreement, "Superior Proposal" means a bona fide written Alternative Transaction Proposal that the Company concludes in good faith, after

consultation with its financial advisors and outside legal counsel, taking into account all legal, financial, regulatory, and other aspects of the proposal and the person or entity making the proposal (including any break-up fees, expense-reimbursement provisions, and conditions to consummation), (i) is more favorable, from a financial point of view, to the Company's stakeholders than the transactions contemplated by this Agreement and (ii) is reasonably likely to be consummated on a timely basis on the terms proposed (taking into account financing, among other things).

(c)    Except as expressly permitted by this Agreement, from and after the Execution Date, the Company agrees that it will not, and will cause each entity comprising the Company, and will use commercially reasonable efforts to cause its controlled affiliates, directors, officers, employees, advisors, and any other persons acting under the direction of any of them, and the representatives of any of the foregoing (collectively, all such entities and persons, the "Company Representatives") not to, initiate or solicit inquiries or proposals with respect to, or engage or participate in any negotiations concerning, or provide any confidential or nonpublic information or data to, or have or participate in any discussions with, any person or entity relating to, or approve or recommend, or propose to approve or recommend, or execute or enter into, any letter of intent, agreement in principle, or other agreement related to, any Alternative Transaction (an "Alternative Transaction Agreement").  This section 4(c) shall not prohibit the Company from furnishing nonpublic information regarding the Company and its subsidiaries to, or entering into discussions and negotiations with, any person or entity in response to an Alternative Transaction Proposal that is, or could reasonably be expected to result in, a Superior Proposal that is submitted to the Company by such person or entity (and not withdrawn prior to the furnishing of such information or such discussions) if (i) neither the Company nor any Company Representative shall have violated any of the restrictions set forth in this section 4, (ii) the Company receives from such person or entity an executed confidentiality agreement containing customary limitations on the use and disclosure of all nonpublic written and oral information furnished to such person or entity by or on behalf of the Company, and (iii) within one (1) business days after furnishing any such nonpublic information to such person or entity, the Company furnishes such nonpublic information to the Sponsor (to the extent such nonpublic information has not been previously furnished by the Company to the Sponsor) and gives the Sponsor written notice of the identity of such person or entity and of the Company's intention to enter into discussions with such person or entity.  The Company shall keep the Sponsor reasonably informed with respect to the status of any such Alternative Transaction Proposal, inquiry, indication of interest, or request and any modification or proposed modification thereto. Without limiting the generality of the foregoing, the Company acknowledges and agrees that any violation of or the taking of any action inconsistent with any of the restrictions set forth in the preceding sentence by any Company Representative, whether or not such Company Representative is purporting to act on behalf of the Company shall be deemed to constitute a breach of this section 4 by the Company.

(d)    Notwithstanding anything to the contrary herein, the Company may terminate this Agreement in order to enter into a definitive Alternative Transaction Agreement with respect to a Superior Proposal that did not result from a breach of this section 4, subject to compliance with the following notice requirements and payment of the Break-Up Fee

(defined below) in accordance with the terms of this Agreement, if (i) the Company has received an Alternative Transaction Proposal that, in the good-faith determination of the board of directors of the Company, constitutes a Superior Proposal, after having complied with the following notice requirements, and (ii) the board of directors of the Company determines in good faith, after consultation with its outside legal counsel, that failure to take such action would be inconsistent with the fiduciary obligations of the board of directors under applicable law (such entitlement to terminate the Agreement, the "Superior Proposal Company Termination Right").  The Company shall not be entitled to exercise the Superior Proposal Company Termination Right unless:

    (i)    the Company promptly notifies the Sponsor, in writing, at least three (3) Business Days (the "Notice Period") before entering into an Alternative Transaction Agreement, of its intention to take such action with respect to a Superior Proposal, which notice shall state expressly that the Company has received an Alternative Transaction Proposal that the Company intends to declare a Superior Proposal and/or that the Company intends to enter into an Alternative Transaction Agreement;

    (ii)    the Company attaches to such notice the most current version of the proposed Alternative Transaction Agreement (which version shall be updated on a prompt basis) and the identity of the third party making such Superior Proposal;

    (iii)    the Company shall, and shall cause the Company Representatives to, during the Notice Period, negotiate with the Sponsor in good faith to make such adjustments in the terms and conditions of this Agreement so that such Alternative Transaction Proposal ceases to constitute a Superior Proposal, if the Sponsor, in its discretion, proposes to make such adjustments (it being agreed that in the event that, after commencement of the Notice Period, there is any material revision to the terms of a Superior Proposal, including, any revision in price, the Notice Period shall be extended, if applicable, to ensure that at least two (2) business days remain in the Notice Period subsequent to the time the Company notifies the Sponsor of any such material revision (it being understood that there may be multiple extensions)); and

    (iv)    the Company determines in good faith, after consulting with outside legal counsel and its financial advisor, that such Alternative Transaction Proposal continues to constitute a Superior Proposal after taking into account any adjustments made by the Sponsor during the Notice Period in the terms and conditions of this Agreement.

    (e)    Notwithstanding anything to the contrary set forth in this Agreement, the Company's board of directors may terminate this Agreement following the occurrence of an event, fact, development or occurrence after the date hereof that did not result from a breach of this section 4 (an "Intervening Event") if, subject to compliance with the following notice requirements and payment of the Break-Up Fee (defined below) in

accordance with the terms of this Agreement, the board of directors of the Company determines in good faith, after consultation with its outside legal counsel, that failure to take such action would be inconsistent with the fiduciary obligations of the board of directors under applicable law because the Intervening Event makes it unlikely that either (x) the Company will maximize value for stakeholders by consummating the Plan or (y) the Company can consummate the Plan within a reasonable period of time (such entitlement to terminate the Agreement, the "Intervening Event Company Termination Right"). The Company shall not be entitled to exercise the Intervening Event Company Termination Right unless:

    (i)    the Company promptly notifies the Sponsor, in writing, at least five (5) Business Days before terminating this Agreement, of its intention to take such action with respect to an Intervening Event, which notice shall state expressly the Intervening Event as well as provide written notice and supporting documentation articulating the impact of the Intervening Event;

    (ii)    the Company shall, and shall cause the Company Representatives to, during the Notice Period, negotiate with the Sponsor in good faith (including, without limitation, promptly responding to the Sponsor's reasonable requests for financial and other information regarding the Intervening Event and the impact of the Intervening Event) to make such adjustments in the terms and conditions of this Agreement so that the failure of the board of directors of the Company to terminate this Agreement in light of such Intervening Event would not be inconsistent with the fiduciary obligations of the board of directors under applicable law, if the Sponsor, in its discretion, proposes to make such adjustments (it being agreed that in the event that, after commencement of the Notice Period, there is any material revision to the Intervening Event, the Notice Period shall be extended, if applicable, to ensure that at least three (3) business days remain in the Notice Period subsequent to the time the Company notifies the Sponsor of any such material revision (it being understood that there may be multiple extensions)); and

    (iii)    the Company determines in good faith, after consulting with outside legal counsel and its financial advisor, that the failure of the board of directors of the Company to terminate this Agreement in light of such Intervening Event would be inconsistent with the fiduciary obligations of the board of directors under applicable law because the Intervening Event makes it unlikely that either (x) the Company will maximize value for stakeholders by consummating the Plan or (y) the Company can consummate the Plan within a reasonable period of time (such entitlement to terminate the Agreement, after taking into account any adjustments made by the Sponsor during the Notice Period in the terms and conditions of this Agreement).

    (f)    For the avoidance of doubt, and notwithstanding anything to the contrary herein, this section 4 shall not prohibit, limit, or otherwise restrict the Company from

participating in discussions with, or providing any information to, any official committee appointed in the Bankruptcy Case so long as the Company does not otherwise violate the prohibitions contained in this section 4.

5.    Break-up Fee. The Company acknowledges and agrees that the Sponsor would not have undertaken the obligations set forth in this Agreement without the Company's commitment to pay the Break-Up Fee (as defined below) on the terms and conditions set forth in this Agreement. In the event that the Company chooses to terminate this Agreement as set forth in section 11(b)(i) below, provided that the Sponsor is not in material breach of this Agreement, the Company shall pay to the Sponsor a break-up fee in the amount of one million dollars ($1,000,000) plus the Sponsor's reasonable out-of-pocket fees and expenses (including, without limitation, legal fees, and after application of any retainer previously funded by the Company) (such fees and expenses, collectively, the "Break-Up Fee"), and such Break-Up Fee shall be deemed earned immediately for all purposes. The Break-Up Fee shall be paid (i) via wire transfer of immediately available funds upon the closing of a Superior Proposal in the event of an exercise of the Superior Proposal Company Termination Right or (ii) upon payment of other allowed administrative expenses of the Company under section 503 of the Bankruptcy Code in the event such Superior Proposal does not close or upon an exercise of the Intervening Event Company Termination Right. The Company expressly acknowledges that the Break-Up Fee is an actual and necessary cost and expense of preserving the estates under section 503 of the Bankruptcy Code and must therefore be allowed and paid as an administrative expense in the Bankruptcy Case, and the PSA Order shall so provide.

6.    Exculpation. The Plan, the Disclosure Statement, and the Confirmation Order shall provide, to the maximum extent permitted by law, that each of the Parties, each Party's affiliates and subsidiaries, the members of each Party's respective boards of directors, and each Party's directors, officers, employees, agents, consultants, advisors and other representatives, including each Party's legal counsel, accountants and financial advisors, shall neither have nor incur any liability to any entity (as defined in section 101(15) of the Bankruptcy Code) for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the Restructuring.

7.    Releases. The Plan, the Disclosure Statement, and the Confirmation Order shall provide, to the maximum extent permitted by law, that the Company, the Company's estates (within the meaning of the Bankruptcy Code), all holders of claims against the Company, all holders of interests in the Company, and all parties in interest with respect to the Company (collectively, the "Releasing Parties"), shall be deemed to have released the Sponsor and its representatives as well as the directors and officers of the Company serving in such capacity as of the date on which the Bankruptcy Case is commenced by filing a petition with the Bankruptcy Court (such directors and officers, the "Released Parties") from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, at law, in equity or otherwise, relating to or based upon any act or omission relating to the Company which occurred prior to

the effectiveness of the Restructuring, and furthermore that the performance of the terms of the Plan in facilitating the Restructuring shall be a full and complete settlement of any claims or causes of action, whether known or unknown, that the Releasing Parties have or could have against the Released Parties relating to the Releasing Parties.

8.    <u>Representations of the Sponsor</u>.  The Sponsor hereby represents and warrants to the Company as follows:

    (a)    it is duly organized, validly existing, and in good standing under the laws of its state of formation;

    (b)    it has the requisite corporate or entity power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement;

    (c)    the execution and delivery of this Agreement and the performance by it of its obligations under this Agreement have been duly authorized by all necessary corporate or entity action;

    (d)    this Agreement has been duly executed and delivered by it and constitutes the valid and binding obligation of it, enforceable against it in accordance with its terms; and

    (e)    assuming the accuracy of the Company's representations in section 9(h), the execution, delivery, and performance by it of this Agreement do not and shall not require any material registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any federal, state, or other governmental authority or regulatory body.

9.    <u>Representations of the Company</u>.  Each Company Party hereby represents and warrants to the Sponsor as follows, subject to Bankruptcy Court approval as applicable:

    (a)    it is duly organized, validly existing, and in good standing under the laws of its state of formation;

    (b)    it has the requisite corporate or entity power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement;

    (c)    the execution and delivery of this Agreement and the performance by it of its obligations under this Agreement have been duly authorized by all necessary corporate or entity action;

    (d)    this Agreement has been duly executed and delivered by it and constitutes the valid and binding obligation of it, enforceable against it in accordance with the Agreement's terms;

    (e)    to the actual knowledge of the senior executive officers of the Company (the "<u>Company's Knowledge</u>"), the financial and other information (excluding projections) concerning the Company which the Company or its representatives have made available to the Sponsor was complete and correct in all material respects as of the date of such

information and did not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not materially misleading in light of the circumstances under which such statements were made;

(f)      to the Company's Knowledge, the Company and the Company's business are in compliance, in all material respects, with all applicable laws, and no pending written claim has been filed against any of the Company Parties alleging a material violation of any United States federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, other requirement, or rule of law (collectively, "Laws"), in each case except any non-compliance or violation that would not have a material adverse impact on the Company's ability to operate its business;

(g)      as of the date of this Agreement, the Company has not received any written notice that the Company and the Company's business are under current investigation by a Governmental Entity with respect to the violation of any Laws that have a material adverse impact on the Company's ability to operate its business; and

(h)      assuming the accuracy of the Sponsor's representations in section 8(e), the execution, delivery, and performance by it of this Agreement do not and shall not require any material registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any federal, state, or other governmental authority or regulatory body, except the filings in the Bankruptcy Case contemplated by this Agreement and as required under the federal securities laws.

10.      Additional Conditions.  In addition to the other conditions to the Parties' obligations set forth in this Agreement, each obligation and liability of the Parties under this Agreement is conditioned in its entirety upon (a) the truth of the representations and warranties of the other Party set forth in this Agreement in all material respects and the other Party's performance in all material respects of its agreements and covenants in this Agreement, (b) this Agreement not having been terminated pursuant to its terms, and (c) the Plan being (i) consistent in all material respects with the terms and provisions of this Agreement and (ii) otherwise reasonably acceptable to the Company and the Sponsor.

11.      Termination of Agreement.

(a)      The Sponsor may, but shall not be required to, terminate this Agreement immediately if any of the following occurs, by providing written notice of such termination to the Company.

(i)      The Company fails to perform any obligation (including, without limitation, obtaining specified relief) by the applicable deadline or within the applicable timeframe specified in this Agreement, including, without limitation, as required under section 1(a) of this Agreement.

(ii)      An event or occurrence required by this Agreement does not happen by the applicable deadline or within the applicable timeframe specified in this Agreement, including, without limitation, as required under section 2(a) of this Agreement.

(iii)   The Reorganized Company has failed to obtain access to the Exit Facility, or any other condition to occurrence of the Effective Date has not occurred, within the applicable required timeframe.

(iv)   There is any material modification to, or material severance of any provision of, the Plan or any related document that is inconsistent with the terms and conditions set forth in this Agreement.

(v)   There is an event of default under the DIP Financing, and such event of default is not cured in accordance with the terms (including, without limitation, within the timeframe) set forth in the DIP Financing or waived.

(vi)   A motion is filed or relief is otherwise sought or supported by the Company or any Company Party seeking to (A) appoint a trustee, receiver, or examiner for any Company Party or any Company Party's assets and/or business, in the Bankruptcy Case or otherwise, (B) convert the Bankruptcy Case of any Company Party to a case under chapter 7 of the Bankruptcy Code, or (C) dismiss any Bankruptcy Case of a Company Party.

(vii)   An order is entered by the Bankruptcy Court (A) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization pursuant to section 1121 of the Bankruptcy Code, (B) directing the appointment of an examiner with expanded powers or a trustee, (C) converting the Bankruptcy Case of any Company Party to a case under chapter 7 of the Bankruptcy Code, or (D) dismissing any Bankruptcy Case of a Company Party.

(viii)   An order is entered appointing a trustee, receiver, or examiner for any Company Party or any Company Party's assets and/or business, in the Bankruptcy Case or otherwise.

(ix)   There has been a material breach of, material inaccuracy in, or material failure to perform any representation, warranty, covenant, or agreement made by the Company in this Agreement that has not been cured by the Company within ten (10) business days following receipt of notice from the Sponsor.

(x)   Any event or condition in respect of the operation of the Company has occurred that results, or would reasonably be expected to result, individually or in the aggregate, in a material adverse effect on (A) the business, financial condition and operations of the Company, taken as a whole, or on (B) the ability of the Company to consummate the transaction contemplated herein and in the Plan; provided, however, that for the purposes of this subsection, a material adverse effect shall not be deemed to include the effects of events or conditions resulting from (1) the Bankruptcy Case, (2) changes in general economic, financial or securities market or political conditions in the United States, (3) general changes or developments in the industries and markets in which the Business operates, (4) changes in (or proposals to change) any applicable Laws or regulations or applicable accounting regulations or principles or interpretations thereof, (5) any

outbreak or escalation of hostilities or war or any act of terrorism, (6) the announcement, pendency or consummation of the transactions contemplated by this Agreement (including any impact on customers, suppliers, vendors or employees), or (7) any action taken (or omitted to be taken) as required by this Agreement or at the request, or with the consent, of the Sponsor, shall, in each case, be excluded from the determination of a material adverse effect; provided further, however, that such events or conditions referred to in clauses (2), (3), (4) and (5) above do not materially and disproportionately affect the Company, taken as a whole, as compared to other businesses in the industries in which the Company operates.

(xi)    If any court of competent jurisdiction or other competent governmental or regulatory authority shall (i) have issued an order making illegal or otherwise restricting, preventing or prohibiting the Plan in a manner that cannot reasonably be remedied or (ii) have entered a final, non-appealable judgment or order declaring this Agreement or any material provision of this Agreement or any related document to be illegal, invalid, or unenforceable.

(xii)    Edmond S. Thomas, or a replacement acceptable to the Sponsor in its sole and absolute discretion, ceases to be the chief executive officer of the Company.

(b)    The Company may, but shall not be required to, terminate this Agreement immediately if any of the following occurs, by providing written notice of such termination to the Sponsor.

(i)    Subject to the notice and other provisions of section 4(d) or section 4(d) of this Agreement, as applicable, the Company may terminate this Agreement (A) in connection with the Superior Proposal Company Termination Right, if the Company determines to enter into an Alternative Transaction Agreement in respect of a Superior Proposal; provided that in the event of such termination, the Company substantially concurrently enters into such Alternative Transaction Agreement, or (B) in connection with the Intervening Event Company Termination Right. If the Company exercises the Superior Proposal Company Termination Right or the Intervening Event Company Termination Right, the Company shall pay the Break-up Fee to the Sponsor in accordance with section 5.

(1)    The Parties acknowledge and agree that the Break-up Fee (i) is an integral part of the transactions contemplated by this Agreement, and that, without the Break-up Fee, the Sponsor would not have entered into this Agreement and (ii) is not a penalty, but is liquidated damages, in a reasonable amount that will compensate the Sponsor in the circumstances in which such fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated by this Agreement, which amount would otherwise be impossible to calculate with precision. The payment of the Break-Up Fee in accordance with the terms of this Agreement shall

constitute the sole and exclusive remedy of the Sponsor for any breach of this Agreement by the Company.

(2)     If the Company fails to pay the Break-up Fee in a timely manner, and, in order to obtain such payment, the Sponsor makes a claim against the Company that results in a judgment against the Company, the Company Party shall pay to the Sponsor the reasonable costs and expenses (including its reasonable attorneys' fees and expenses) incurred or accrued by the Sponsor in connection with such suit, together with interest on the amounts set forth in this section at the prime lending rate prevailing during such period as published in *The Wall Street Journal*. Any interest payable hereunder shall be calculated on a daily basis from the date such amounts were required to be paid until (but excluding) the date of actual payment, and on the basis of a 360-day year.

(ii)     There has been a material breach of, material inaccuracy in, or material failure to perform any representation, warranty, covenant, or agreement made by the Sponsor in this Agreement that has not been cured by the Sponsor within ten (10) business days following receipt of notice from the Company.

(iii)     If any court of competent jurisdiction or other competent governmental or regulatory authority shall (i) have issued an order making illegal or otherwise restricting, preventing or prohibiting the Plan in a manner that cannot reasonably be remedied or (ii) have entered a final, non-appealable judgment or order declaring this Agreement or any material provision of this Agreement or any related document to be illegal, invalid, or unenforceable.

(iv)     If the funding under the DIP Financing is terminated by the Sponsor.

(c)     Subject to section 13(b), this Agreement shall terminate automatically upon occurrence of the Effective Date.  For the avoidance of doubt, the DIP Financing shall survive any termination of this Agreement, except as otherwise specifically provided therein.

12.     <u>Notices.</u>  All demands, notices, requests, consents, and communications (each a "<u>Notice</u>") under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or by courier service, messenger, Federal Express or similar expedited delivery service, email, facsimile, telecopy, or if duly deposited in the mails, by certified or registered mail, postage prepaid-return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by a Notice to the Parties:

If to the Company,

Edmond S. Thomas, CEO
The Wet Seal, Inc.
26972 Burbank
Foothill Ranch, CA 92610
Email:  Ed.Thomas@wetseal.com

with a copy to

> Michael Tuchin
> Klee, Tuchin, Bogdanoff & Stern LLP
> 1999 Avenue of the Stars
> 39th Floor
> Los Angeles, CA 90067
> Email: mtuchin@ktbslaw.com

If to the Sponsor,

> Steven H. Reiner, Managing Director
> B. Riley & Co., L.L.C.
> 11100 Santa Monica Blvd., Suite 800
> Los Angeles, CA 90025
> Email: sreiner@brileyco.com

with a copy to

> Van C. Durrer, II
> Skadden, Arps, Slate, Meagher & Flom LLP
> 300 South Grand Avenue
> Suite 3400
> Los Angeles, CA 90071
> Email: Van.Durrer@skadden.com

A Notice shall be deemed to have been duly given or made (a) upon delivery, if delivered personally or by courier service, messenger, or Federal Express or similar expedited delivery service, in each case with record of receipt, (b) upon transmission with confirmed delivery, if sent by facsimile or telecopy, or (c) two (2) business days after being sent by certified or registered mail, postage pre-paid, return receipt requested.

13.   Remedies; Limitation on Liability.

   (a)   Subject to section 11(b)(i), the Parties acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm to the other Party for which money damages would not be an adequate remedy and, accordingly, agrees that each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief without the necessity of proving the inadequacy of money damages as a remedy or posting a bond or other security in connection with such remedy.

   (b)   Notwithstanding anything that may be expressed or implied in this Agreement, each Party hereto covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any Party's affiliates, or any of such Party's

affiliates or respective former, current or future direct or indirect equity holders, controlling persons, stockholders, directors, officers, employees, agents, members, managers, general or limited partners or assignees (each a "Related Party" and collectively, the "Related Parties") in each case other than the Parties and each of their respective successors and permitted assignees under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties, as such, for any obligation or liability of any Party under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, nothing in this section 13(b) shall relieve or otherwise limit the liability of any Party hereto or any of their respective successors or permitted assigns, for any breach or violation of its obligations under such contracts. For the avoidance of doubt, none of the Parties will have any recourse, be entitled to commence any proceeding or make any claim under this Agreement or in connection with the transactions contemplated hereby except against any of the Parties, as applicable. The limitation on liability provision in this Section 13(b) shall survive the termination of this Agreement.

14.    Entire Agreement; Amendment. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all other prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter of this Agreement, including the Term Sheet; provided, however, without duplication, any expense reimbursement due to the Sponsor from the Company pursuant to the Term Sheet shall be allowed and paid as an administrative expense pursuant to section 2(d)(iv) hereof. This Agreement may not be amended, altered, or modified in any manner whatsoever, except by a written instrument executed by each of the Parties hereto.

15.    Waiver. The Parties hereto may (a) extend the time for the performance of any of the obligations or other acts of the other Parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions contained herein. Any agreement on the part of a Party hereto to any such extension or waiver shall be valid only if set forth in a written instrument executed by the Parties.

16.    Public Announcements. Unless such disclosure is otherwise required by applicable Law or by obligations of the Company or the Sponsor or their respective affiliates pursuant to any listing agreement with or rules of any securities exchange, the Company and the Sponsor shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other.

17.    Authority to Sign. Each of the Parties represents and warrants that the person who executes this Agreement on behalf of such Party has been duly authorized on behalf of such

Party to execute this Agreement on behalf of such Party and, in the case of an entity, that such authority has been validly obtained in accordance with the articles of incorporation and bylaws (or other organizational documents) of such Party, and the laws of the state of its organization for such Party.

18.　No Third-Party Beneficiaries.  This Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement except as set forth in section 13(b).

19.　Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the provisions of such laws relating to conflicts of law).

20.　Jurisdiction.  The Company and the Sponsor each hereby irrevocably and unconditionally submit to the nonexclusive jurisdiction of any Delaware state court or federal court of the United States of America sitting in Wilmington, Delaware, or the Bankruptcy Court (following commencement of the Bankruptcy Case), and any appellate court from any of the foregoing, but solely in any action or proceedings to enforce this Agreement.  Each of the Parties agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

21.　Savings Clause.  Any provision or part of this Agreement that is determined to be invalid or unenforceable in any situation in any jurisdiction shall, as to such situation and such jurisdiction, be ineffective only to the extent of such invalidity and shall not affect the enforceability of the remaining provisions of this Agreement or the validity or enforceability of any such provision in any other situation or in any other jurisdiction.  In lieu of any such provision, there shall be added a provision as similar in terms to such illegal, invalid, or unenforceable provision(s) as may be possible and mutually agreed upon by the Parties and still be legal, valid, and enforceable under applicable laws.

22.　Headings.  Section headings in this Agreement are used for convenience only and shall not be considered for any purpose in construing this Agreement.

23.　Neutral Construction.  Each Party has cooperated, including by and through its counsel, in the drafting and preparation of this Agreement.  Hence, this Agreement will be construed neutrally, and will not be applied more strictly against one Party than against another.

24.　Execution in Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one document.

25.　Electronic Transmittal.  Signatures transmitted electronically (e.g., by facsimile or in .pdf format as an attachment to an e-mail) shall have the full force and effect of original signatures.

26.　Assignment.  Each Party hereby agrees, for so long as this Agreement shall remain in effect, not to assign it rights or obligations under this Agreement without the prior written consent of the other Party; provided, however, that B. Riley Financial, Inc. may assign its rights and obligations under this Agreement to its affiliates or designees selected in its sole discretion;

*EXECUTION COPY*

provided further that no such assignment shall relieve B. Riley Financial, Inc. from its obligations under this Agreement.

27.    <u>Acknowledgement</u>.  This Agreement and the transactions contemplated herein are the product of negotiations among the Parties, together with their respective representatives. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (i) a solicitation of votes for the acceptance of the Plan or any Chapter 11 plan for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (ii) an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for purposes of the Securities Act of 1933 and the Securities Exchange Act of 1934. Notwithstanding anything herein to the contrary, the Company will not solicit acceptances of the Plan from any person until such person has been provided with a Disclosure Statement approved by the Bankruptcy Court.

[SIGNATURE PAGE FOLLOWS]

01:16513529.1

754123.06-LACSR02A

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective representatives duly authorized as of the Execution Date.

**By the Company:**

THE WET SEAL, INC.
THE WET SEAL RETAIL, INC.
WET SEAL CATALOG, INC.
WET SEAL GC, LLC

by _____

Name: EDMOND S. THOMAS

Title: CEO

**By the Sponsor:**

B. RILEY FINANCIAL, INC., ON
BEHALF OF THE ENTITIES
CONSTITUTING THE SPONSOR

by _____

Name:

Title:

23

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective representatives duly authorized as of the Execution Date.

**By the Company:**

THE WET SEAL, INC.
THE WET SEAL RETAIL, INC.
WET SEAL CATALOG, INC.
WET SEAL GC, LLC

by  _____
    Name:
    Title:


**By the Sponsor:**

B. RILEY FINANCIAL, INC., ON
BEHALF OF THE ENTITIES
CONSTITUTING THE SPONSOR

by  _____
    Name:  Phillip J. Ahn
    Title:  CFO & COO

23