## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>THE WET SEAL, INC., a Delaware<br>corporation, *et al.*[1]<br><br>                Debtors. | Chapter 11<br><br>Case No.:  15-10081 (___)<br><br>(Joint Administration Requested) |

## DECLARATION OF THOMAS R. HILLEBRANDT IN SUPPORT OF
## FIRST DAY MOTIONS

I, Thomas R. Hillebrandt, declare as follows:

1.      I am the interim Chief Financial Officer for The Wet Seal, Inc., a Delaware

corporation ("WSI").  I also serve as the Chief Financial Officer for WSI's wholly owned

subsidiaries: (a) The Wet Seal Retail, Inc., a Delaware corporation, (b) Wet Seal Catalog, Inc., a

Delaware corporation, and (c) Wet Seal GC, LLC, a Virginia limited liability company

(collectively, with WSI, the "Debtors").  I am familiar with the day-to-day operations and

business and financial affairs of the Debtors, having served in my current capacity since

December 1, 2014, and having previously served as Vice President and Corporate Controller

since September 2013.

2.      I have over twenty five years of experience in corporate finance and accounting,

having served in several senior level positions with both public and private companies.  Prior to

joining the Debtors, I served as Vice President of Finance/IT for The Territory Ahead, a multi-

channel apparel retailer.  I also previously served as Chief Financial Officer for Deckers Outdoor

---

[1]    The Debtors and the last four digits of their respective federal taxpayer identification numbers are as
follows: The Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265); Wet Seal Catalog, Inc. (7604); and Wet Seal
GC, LLC (2855-VA).  The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

Corporation; Corporate Controller and Chief Accounting Officer for K2 Inc.; and Chief

Financial Officer of Fotoball USA, Inc.  In addition, I have served as Chief Financial Officer for

several privately held internet and technology firms.  I began my career at KPMG, where I

became a Certified Public Accountant, and I received a Bachelor of Business Administration and

Master of Science in Accounting from the University of Wisconsin.

     3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief with the United States Bankruptcy Court for the District of Delaware (the

"Court") under chapter 11 of the Bankruptcy Code, thus commencing these chapter 11 cases (the

"Cases").  To enable the Debtors to operate effectively, minimize disruption to their operations,

and maximize the value of their assets, the Debtors have filed various applications and motions

seeking immediate or expedited relief.  Specifically, the following have been filed on behalf of

the Debtors (collectively, the "First Day Motions"):

     (a).     Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (I) Authorizing Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Priority, (III) Authorizing Use of Cash Collateral and Providing for Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing (the "DIP Motion");

     (b)     Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only (the "Joint Administration Motion");

     (c)     Debtors' Motion for Entry of an Order (I) Authorizing Payment of Certain Prepetition Employee Claims, Including Wages, Salaries And Bonuses, (II) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Payment of Reimbursement to Employees for Prepetition Expenses, (IV) Authorizing Payment of Withholding And Payroll-Related Taxes, (V) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers, and (Vi) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments (the "Employee Compensation and Benefits Motion");

(d)    Debtors' Motion for Entry of Order (I) Authorizing Continued Use of Cash Management System, (II) Authorizing the Continuation of Intercompany Transactions, (III) Granting Administrative Priority Status to Postpetition Intercompany Transactions, (IV) Authorizing Use of Prepetition Bank Accounts, Account Control Agreements, and Certain Payment Methods, and (V) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis(the "<u>Cash Management Motion</u>");

(e)    Debtors' Motion for an Order (I) Authorizing Payment of Prepetition Sales, Use and Franchise Taxes and Similar Taxes and Fees and (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing (the "<u>Taxes Motion</u>");

(f)    Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "<u>Utilities Motion</u>");

(g)    Debtors' Motion for Entry of an Order (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Various Insurance Policies, and (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto (the "<u>Insurance Motion</u>");

(h)    Debtors' Motion for Entry of an Order Authorizing Maintenance, Administration, and Continuation of Certain Customer Programs (the "<u>Customer Programs Motion</u>");

(i)    Debtors' Motion for Entry of an Order Authorizing Payment of Certain Prepetition Shipping, Delivery and Customs Charges (the "<u>Shippers Motion</u>");

(j)    Debtors' Motion for Order Confirming Administrative Expense Priority Status of Debtors' Undisputed Obligations for Postpetition Delivery of Goods Ordered Prepetition (the "<u>Postpetition Goods Motion</u>");

(k)    Debtors' Emergency Ex Parte Motion, Pursuant to Bankruptcy Code Sections 105(a), 362 and 541, for Entry of Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Equity Interests in and Claims Against the Debtors Nunc Pro Tunc to the Petition Date (the "<u>NOL Motion</u>");

(l)    Debtors' First Omnibus Motion for the Entry of an Order Authorizing the Debtors to (I) Reject Certain Unexpired Non-Residential Real Property Leases Pursuant to 11 U.S.C. § 365, and (II) Abandon Any Remaining

Property Located at the Leased Premises Nunc Pro Tunc to the Petition Date (the "First Omnibus Lease Motion");

(m)    Debtors' Second Omnibus Motion for the Entry of an Order Authorizing the Debtors to (I) Reject Certain Unexpired Non-Residential Real Property Leases Pursuant to 11 U.S.C. § 365, and (II) Abandon Any Remaining Property Located at the Leased Premises Nunc Pro Tunc to the Petition Date (the "Second Omnibus Lease Motion");

(n)    Debtors' Third Omnibus Motion for the Entry of an Order Authorizing the Debtors to (I) Reject Certain Unexpired Non-Residential Real Property Leases Pursuant to 11 U.S.C. § 365, and (II) Abandon Any Remaining Property Located at the Leased Premises Nunc Pro Tunc to the Petition Date (the "Third Omnibus Lease Motion");

(o)    Debtors' Fourth Omnibus Motion for the Entry of an Order Authorizing the Debtors to (I) Reject Certain Unexpired Non-Residential Real Property Leases Pursuant to 11 U.S.C. § 365, and (II) Abandon Any Remaining Property Located at the Leased Premises Nunc Pro Tunc to the Petition Date (the "Fourth Omnibus Lease Motion"; together with the First Omnibus Lease Motion, the Second Omnibus Lease Motion, and the Third Omnibus Lease Motion, the "Lease Rejection Motions");

(p)    Debtors' Motion for Entry of an Order Establishing Procedures for the Rejection of Executory Contracts and Unexpired Leases of Nonresidential Real Property (the "Rejection Procedures Motion"); and

(q)    Application for an Order Appointing Donlin, Recano & Company, Inc. as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c) (the "Section 156(c) Application").

4.    This Declaration is submitted in support of the First Day Motions, which are described in greater detail below, and may serve as support of additional motions that may be filed on or after the Petition Date.

5.    If called as a witness, I could and would competently testify to the matters set forth herein based on my personal knowledge. As interim Chief Financial Officer for WSI and as Chief Financial Officer for the other Debtors, I have become familiar with the Debtors' day-to-day operations, business affairs, financial condition and books and records. My testimony herein is based on my service as an officer of the Debtors currently and in the past, my review of

the Debtors' books and records and other relevant documents, and my review of information compiled and communicated to me, at my request, by other employees of the Debtors.

6.      After a brief Preliminary Statement, Part I of this Declaration describes the business operations and background of the Debtors and of these Cases. Part II sets forth the facts relevant to each of the First Day Motions.

## PRELIMINARY STATEMENT

7.      The Debtors are a national multi-channel specialty retailer selling fashion apparel and accessory items designed for female customers aged 13 to 24 years old. The Debtors are currently comprised of two primary units: (a) the retail store business, which is primarily operated by The Wet Seal Retail, Inc.; and (b) the e-commerce business, which is primarily operated by Wet Seal Catalog, Inc. Through their retail store business, until shortly before the Petition Date, the Debtors operated over 500 retail locations, principally in mall locations. Though their e-commerce business, the Debtors operate an e-commerce site at www.wetseal.com and have nearly 2.5 million followers on their Facebook page. The Debtors also sell gift cards, which business is primarily operated through Wet Seal GC, LLC.

8.      The continuing fundamental shift in consumer behavior away from traditional mall shopping toward online-only stores and increased competition throughout the specialty retail fashion industry have created a difficult operating environment for many traditional mall-based fashion retailers such as the Debtors. Indeed, over the past several weeks, at least three other specialty retailers focused on young adult girls—Deb Stores Holding LLC, dELiA*s, Inc., and Body Central Corp.—have commenced bankruptcy cases or assignments for the benefit of creditors and are in the process of conducting liquidations. In addition to this industry-wide weakness, in the Debtors' case, the Debtors' financial performance was further adversely impacted by, among other things, (i) shifts away from the "fast fashion" segment, and

(ii) ventures into business extensions that were ultimately not profitable.  In the third quarter of 2014 the Debtors hired a new management team, including (i) as Chief Executive Officer, Edmond S. Thomas, who had served as CEO for the Debtors during their profitable years between 2007 and 2010, (ii) as Chief Digital Officer, Jon Kubo, who had also been with the Debtors during Mr. Thomas's earlier tenure, and (iii) as Chief Merchandising Officer, Christine Lee, an experienced merchant who shares Mr. Thomas's strategic vision.  Beginning in the fall of 2014, this team began the process of shifting the Debtors' operational strategy toward a more fashionable inventory mix and smaller and more varied style assortments.

9.    There was, unfortunately, insufficient time to implement the strategic vision before the Debtors faced a liquidity crisis, resulting from extensive operating losses driven by persistent sales weakness across the majority of the Debtors' store base, and changes in vendor credit terms, among other things.  The Debtors' liquidity position became further constrained in late 2014, when many of the factors that the Debtors' vendors use for receivable financing began to reduce their credit limits and the main factors began to require that the Debtors post standby letters of credit.  Further, as the Debtors' financial condition continued to deteriorate toward the end of fiscal year 2014, many of the Debtors' vendors began to require cash on delivery payment terms in order to ship goods, rather than the credit terms that those vendors had offered in the past, and the Debtors were required to cash collateralize all of the letters of credit issued by the Debtors' lender, Bank of America, N.A. (the "Prepetition Lender") under that certain Amended and Restated Credit Agreement, dated as of February 3, 2011 (as subsequently amended, modified, or restated, the "Prepetition Facility").

10.    Facing the foregoing issues, the Debtors determined that it would not be possible to restructure the Debtors out of Court without significant landlord concessions.  Accordingly,

the Debtors engaged in negotiations with their major landlords regarding concessions from such landlords. However, the Debtors were not able to reach an agreement with landlords on potential lease concessions during these negotiations, and on or about January 7, 2015, the Debtors closed 338 of their stores, irrevocably and unequivocally surrendered the premises to the applicable landlords, and terminated the portion of their workforce that had been employed in connection with those stores. The Debtors capitalized on the holiday shopping season to conduct aggressive sales of the inventory in the closed stores and closed such stores in early January 2015.

11.     The Debtors intend to reorganize their business around the e-commerce business and the remaining stores with the most potential upside, which together accounted for more than half of the Debtors' net sales for the nine months ending on November 1, 2014. The Debtors believe that doing so will help restore the Debtors to a stronger financial position.

12.     To meet their objectives, the Debtors have entered into (i) that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement with B. Riley Financial, Inc. ("B. Riley") (the "DIP Term Facility"), pursuant to which the Debtors will receive a senior debtor-in-possession term loan that should provide them with sufficient runway to navigate through the reorganization process, and (ii) that certain Plan Sponsorship Agreement with B. Riley, pursuant to which B. Riley will commit to a plan of reorganization under which B. Riley will receive 80% of newly issued common stock in the reorganized Debtors in exchange for investment of $20 million. On the effective date of the plan, B. Riley will convert the entire DIP Term Facility into equity and contribute the balance of the $20 million to the reorganized Debtors in cash. The remaining common stock will be issued to holders of allowed general unsecured claims whose claims are not satisfied through a convenience class cash election. The Debtors also have entered into that certain Senior Secured, Super-Priority Debtor-in-Possession

Letter of Credit Agreement (the "DIP L/C Facility"; together with the DIP Term Facility, the

"DIP Facilities") with Bank of America, N.A. (as L/C Issuer, the "DIP L/C Lender"), pursuant to

which the Debtors will obtain letters of credit that are required postpetition in the ordinary course

of their business.

## I.

## BACKGROUND

### A.    Overview of the Debtors.

13.     Wet Seal was founded in 1962 by Lorne Huycke in Newport Beach, California.

Following a series of transactions and ownership changes, the Debtors completed an initial

public offering in July 1990 to raise capital to fund future growth.  The Debtors acquired 233

new stores in 1995 with its purchase of the Contempo Casuals clothing store chain from the

Neiman Marcus Group.  Mr. Thomas was instrumental in consummating that purchase and

turning the business from a multi-million dollar loss to profitability following the acquisition.

14.     The Debtors have a multicultural customer base of teenage and young adult

females, who live in suburban or metro areas.  The Debtors' core customer is historically a

female between 13 and 24 years old who buys for leisure, or the "club."  Wet Seal's customer

tends to be fashionable and on-trend; she creates her own signature look by matching core

products with new and unique pieces, and she wants trendy apparel and accessories that are

affordable given a typical teen or young adult budget.

15.     Arden B, an additional brand name owned by the Debtors, was a fashion brand at

affordable prices for the contemporary woman aged 24 to 34 years old.  The Debtors determined

in April 2014 to wind down operations under the "Arden B" brand name.  As of the Petition

Date, no Arden B stores remain open.

B.      **The Debtors' Business Operations.**

1.      **Employees and Stores.**

16.      As of the Petition Date, the Debtors employ approximately 721 individuals on a full time basis and 2,104 individuals on a part time basis.  None of the Debtors' employees are unionized.  The Debtors operate (i) 173 retail stores, which are located in 42 states and Puerto Rico, principally in mall-based locations, and (ii) executive offices and a distribution center, which are located in Foothill Ranch, California.  The foregoing takes into account the Debtors' closure, on or about January 7, 2015, of 338 of their stores and the accompanying termination of employees in connection with those stores.

17.      The Debtors' business is seasonal in nature, with the Christmas season, beginning the week of Thanksgiving and ending the first Saturday after Christmas, and the back-to-school season, beginning the last week of July and ending during September, historically accounting for a large percentage of its annual sales volume.  For the past three fiscal years, the Christmas and back-to-school seasons together accounted for an average of slightly less than 30% of the Debtors' annual net sales.

2.      **The Women's Clothing Industry.**

18.      The women's clothing store industry in the United States is highly competitive, with fashion, quality, price, location, and service being among the principal competitive factors. The Debtors compete with specialty apparel retailers, department stores, and other apparel retailers, including Abercrombie & Fitch, Aeropostale, American Eagle, Anthropologie, Banana Republic, BCBG, bebe, Body Central, Charlotte Russe, Express, Forever 21, Gap, Guess?, H&M, Nordstrom, Old Navy, Pacific Sunwear, rue21, Target, Urban Outfitters, Zara, and other regional retailers.

01:16512283.1

19.     The Debtors operate in the fast fashion section of the women's clothing industry. Fast fashion clothing collections are based on the most recent trends and are designed and manufactured quickly and cost-effectively to allow the mainstream consumer to take advantage of current clothing styles at a lower price.  To be generally considered fast fashion, a company must (i) sell fashionable clothes primarily intended for consumers under 40 years of age, (ii) offer affordable prices in the mid-to-low range, (iii) have a quick response from a sourcing, operations and supply chain perspective, and (iv) have frequent inventory assortment changes.

**3.     E-Commerce and Information Technology.**

20.     The Debtors operate an e-commerce site at www.wetseal.com and have nearly 2.5 million followers on their Facebook page.  In the first 11 months of 2014, the Debtors generated 6.5% of total sales, or $26.5 million, through e-commerce.  The Debtors operate an in-house e-commerce sales fulfillment center within their Foothill Ranch, California distribution center.  In 2014, the e-commerce business generated operating margins that were higher than those generated from the stores.

21.     The Debtors' primary and most significant trademark and service mark is Wet Seal, which is registered in the United States Patent and Trademark Office.  In addition to trademarks, the Debtors own 32 domain names in order to protect the integrity of their e-commerce site and brand image.  The Debtors maintain a customer database with over 15.5 million unique entries.  Of those entries, the Debtors have an engaged email address database of 2.6 million customers with 1.4 million active subscribers.  In addition, the Debtors have over 540,000 active mobile text users and are focused on growing that number daily.

**4.     Marketing Activities.**

22.     A key emphasis for the Debtors is to generate editorial placement for their products in magazines and websites read by female teenagers and young adults.  In 2014, the

01:16512283.1

Debtors partnered with several musical artists, including four who were nominated for Teen Choice Awards. Most notably, the Debtors' recent sweepstakes with 5 Seconds of Summer garnered over 166,000 customer entries. Additionally, an exclusive collection of merchandise inspired by the members of Fifth Harmony launched in August 2014.

23.     The Debtors spend approximately 1.0% of net sales on advertising. The primary marketing focus is on visual merchandising, including in-store promotion programs and events, and on-line.

**5.      Vendors and Factors.**

24.     Retailers in the fast fashion sector must be able to provide their customers with high-quality merchandise that reflects the current fashion trends. To do so requires the use of vendors who are able to cost-effectively and quickly manufacture and deliver goods to the Debtors' distribution center. The Debtors have developed a network of vendors to supply their stores with well-made but low-cost apparel and accessories. The Debtors do not have long-term contracts with any of their vendors; rather the Debtors place orders on an as-needed basis and are invoiced by the vendor for each order. No single vendor provides the Debtors with more than 10% of their merchandise.

25.     The Debtors place orders directly with certain of their vendors. Prior to the move to "cash on delivery" in the weeks leading to the Petition Date, these vendors would accept orders from the Debtors on credit, pay for the cost of production and delivery and invoice the Debtors for the cost of the merchandise (with payment typically due within 30 to 60 days following delivery). The Debtors' business relationships with these vendors are essential to the Debtors' ongoing operations.

26.     Many of the Debtors' vendors have historically been either unwilling or unable to produce and deliver merchandise to the Debtors on credit. To place orders with these vendors,

01:16512283.1

the Debtors must deal with the vendor's factor. In this relationship, the Debtors place orders with the vendor and the vendor's factor then purchases, at a discount, the account receivable owed to the applicable vendor with respect to the Debtors' order. The Debtors then pay the factor on the invoice, generally between 30 and 60 days of the invoice. The Debtors are not party to the factoring agreement between the vendor and the factor. This system provides the factored vendor with upfront cash to pay for the cost of production. The risk of non-payment by the Debtors is assumed by the factor.

27. There are several different factors through which the Debtors' vendors finance their operations; however three factors—CIT Group Inc. ("CIT"), Rosenthal & Rosenthal, Inc. ("Rosenthal"), and Milberg Factors, Inc. ("Milberg")—currently account for nearly 60% of the Debtors' factored merchandise. The services that the factors provide are irreplaceable to the Debtors, and if the factors ceased purchasing accounts receivable from the vendors, the Debtors would be unable to obtain sufficient merchandise to adequately stock their stores and would be unable to continue business operations. The Debtors have caused the Prepetition Lender to issue letters of credit for the benefit of CIT, Rosenthal, and Milberg, which letters of credit have been cash collateralized.

## C.    Organizational Structure.

28. WSI is a Delaware corporation. Each of the other Debtors is a wholly-owned subsidiary of WSI: (a) The Wet Seal Retail, Inc., a Delaware corporation, (b) Wet Seal Catalog, Inc., a Delaware corporation, and (c) Wet Seal GC, LLC, a Virginia limited liability company.

## D.    Capital Structure.

### 1.    Secured Debt.

29. The Debtors are indebted to the Prepetition Lender under the Prepetition Facility. As of the Petition Date, there are no outstanding borrowings under the Prepetition Facility, and

all letters of credit issued by the Prepetition Lender (approximating $10.8 million) are cash collateralized by the Debtors.

30.     Borrowings under the Prepetition Facility are secured by cash, cash equivalents, investments, receivables and inventory held by WSI and three of its wholly owned subsidiaries, The Wet Seal Retail, Inc. and Wet Seal Catalog, Inc., each of which is a borrower under the Prepetition Facility, as well as the assets of Wet Seal GC, LLC, which is a guarantor of the obligations owing under the Prepetition Facility.

**2.      Unsecured Debt.**

31.     On March 20, 2014, pursuant to that certain Securities Purchase Agreement between WSI and Hudson Bay Master Fund Ltd., as Buyer ("Hudson Bay"), WSI sold $27.0 million of senior convertible notes and issued warrants to purchase up to 8,804,348 shares of WSI's Class A Common Stock in a private placement to Hudson Bay with proceeds to the Debtors, net of $1.9 million of deferred financing costs, of $25.1 million.

32.     On September 3, 2014, WSI entered into an Amendment, Consent and Exchange Agreement (the "Exchange Agreement") whereby WSI agreed to issue a new convertible senior note in principal amount equal to $27 million (the "Exchange Note") in exchange for the initial note and a new warrant to purchase up to 8,804,348 shares of WSI's Class A Common Stock in exchange for the initial warrants (the "Exchange Warrant"). The Exchange Warrant is exercisable beginning six months and one day after issuance through March 4, 2020 at $1.76 per share, which is $0.36 less than the initial exercise price of the initial warrants, subject to potential future adjustments.

33.     The senior convertible notes bear interest at a rate of 6% per year, subject to certain adjustments, and mature in March 2017. The senior convertible notes are convertible, at Hudson Bay's option, into shares of WSI's Class A Common Stock at a price of $1.84 per share,

subject to customary adjustments. Interest on the Exchange Note is payable monthly and the principal amount of the Exchange Note amortizes monthly with payments having begun on September 26, 2014. The installment amount due under the Exchange Note for each month during a six-month time period beginning on September 26, 2014 is $700,000.

34.    The Debtors did not pay principal or interest due to Hudson Bay on December 26, 2014. Hudson Bay declared an immediate event of default under the Exchange Note because of the missed principal payment and demanded immediate payment of the event of default redemption price, equal to $28,778,175, plus costs of collection, including attorneys' fees and disbursements. Hudson Bay agreed to forbear for a limited period of time.

35.    In addition to the unsecured debt pursuant to the senior convertible notes, the Debtors have accumulated a significant amount of accrued and unpaid trade and other unsecured debt in the normal course of their business, which, as of the Petition Date amounted to approximately $31.1 million.

36.    Additionally, in light of the Debtors' concurrent motions to reject 339 nonresidential real property leases on or about January 7, 2015, the Debtors anticipate that there will be substantial rejection damage claims filed by landlords against the Debtors' estates.

37.    Finally, the Debtors are, from time to time, defendants in certain litigation matters relating to claims arising out of their operations in the normal course of business. Among other cases, on October 27, 2011, a wage-and-hour complaint was filed in the Superior Court of the State of California for the County of Los Angeles on behalf of certain of the Debtors' current and former California employees alleging various violations under the State of California Labor Code and the State of California Business and Professions Code and seeking unpaid wages, civil and statutory penalties, restitution, injunctive relief, interest, and attorneys' fees and costs. The

Debtors attempted to compel arbitration, but, on January 7, 2015 the California Court of Appeal denied the Debtors' motion to compel.  In addition, on July 12, 2012, a complaint was filed in United States District Court for the Central District of California on behalf of certain of the Debtors' employees alleging that the Debtors engaged in disparate treatment of certain African American current and former employees.   On December 9, 2013, the District Court granted final approval of the parties' class action settlement that provided for a cash payment of $7.5 million and also included programmatic relief and periodic reporting to the court and opposing counsel.

### 3.    Equity Interests.

38.    WSI is publicly-owned and has two classes of common stock.  The number of shares outstanding of WSI's Class A common stock, par value $0.10 per share, as of December 5, 2014, was 84,358,776.  There were no shares outstanding of WSI's Class B common stock, par value $0.10 per share, at the Petition Date.  WSI has no preferred stock.  The Debtors other than WSI are each wholly-owned subsidiaries of WSI.

39.    Nasdaq has notified WSI that the bid price of its common stock for the 30 consecutive business days ending August 15, 2014 had closed below the minimum $1.00 per share required for continued listing under Nasdaq listing rules.  This could result in Nasdaq de-listing WSI's common stock if not cured within a 180-day period, subject to additional applicable grace periods for which WSI may be eligible.

40.    On December 16, 2014, WSI and American Stock Transfer & Trust Company, LLC, as Rights Agent, entered into that certain Tax Asset Protection Plan (along with all related agreements and documents, the "Rights Agreement").  The Rights Agreement, and the rights plan established therein, was designed to deter trading that would lead to the loss of potentially valuable federal net operating losses held by WSI, and a resulting reduction in the Debtors'

value. The Debtors estimate that the amount of federal net operating losses held by WSI through the end of its fiscal year ending January 31, 2015 will be approximately $250 million.

**E.    Events Leading To These Cases.**

**1.    The Debtors Were Profitable in 2007 Through 2010 During Ed Thomas's First Tenure as Chief Executive Officer.**

41.    Ed Thomas, who has recently been re-hired by the Debtors as Chief Executive Officer, previously served in that capacity from October 2007 through October 2010. During his previous tenure, the Debtors focused primarily on the 13-to-24 year old female segment and maintained small and quickly-selling amounts of inventory comprised of 70% fashion and 30% basics.[2] That merchandising strategy proved successful, as the Debtors were profitable during each of the years in which Mr. Thomas was CEO (despite those years being largely during a recessionary period), with earnings before interest, taxes, depreciation and amortization ("EBITDA") consistently between $40 and $52 million per year.

42.    During that time, complementing the Debtors' profitable retail business, the Debtors were industry leaders in e-commerce, led by Jon Kubo, who served as Chief Information Officer between 2005 and 2011, and who was re-hired by the Debtors in October 2014 as Chief Digital Officer. During the period in which the Debtors' e-commerce business was under Mr. Kubo's leadership, wetseal.com was awarded many industry awards and was noted as one of the most successful examples of social and mobile technologies by leading analysts, journalists, and industry leaders.

---

[2] A product assortment is identified as "basic" if its lifecycle is long, meaning the identical product will be delivered several times over the course of multiple seasons. Basic products essentially do not change; colors and features remain constant over the product's life. In contrast, a product assortment is identified as "fashion" if its lifecycle is short, meaning the product's lifecycle will include a single selling season or less. Fashion products change frequently; the product delivered for a new season may be similar to product delivered in the past, but it is not the identical product.

2.     **The Debtors Struggled After Mr. Thomas Left.**

43.     In the third quarter of fiscal year 2011 the Debtors began to experience material erosion in their financial performance, driven both by industry-wide factors and by a shift in certain operating strategies.

44.     There were several industry-wide factors that created a more competitive and challenging environment for fast fashion retailers. Among those factors were: First, many large retailers such as Wal-Mart and Target began carrying fast fashion apparel; consumers shopping for fast fashion apparel could therefore do so at general retail stores and had no need to shop at a specialty store such as Wet Seal. Second, there has been a fundamental shift for many consumers away from traditional mall shopping toward online-only stores, which further negatively impacted sales in the Debtors' retail stores. Third, the Debtors' core customer base—13-to-24 year old females—has shifted a larger portion of its discretionary spending to technology, such as mobile phones and other products, and away from fast fashion apparel. Fourth, competition in the fast fashion industry is largely based, among other factors, on price, and there is an intense promotional environment that leads consumers to expect consistently low prices. This limits the merchandise margins available to retailers.

45.     There were also several factors specific to the Debtors that negatively impacted the Debtors' financial results. There was significant management turnover and the Debtors' management from 2011 until mid-2014 revised the Debtors' strategy in their core business, and attempted to expand the Debtors' business to the plus-size market and to a large number of outlet malls.

46.     Specifically, with respect to their core business, the Debtors moved from their prior profitable formula of targeting young adult females and maintaining an inventory mix of 70% fashion that had been in place during Mr. Thomas's previous tenure as CEO. Instead, the

Debtors tried to target a younger customer base and de-emphasized the late-teen, early-twenties customer. In addition, the Debtors revised their inventory strategy, increasingly stocking their stores with basics and less with fashion.

47.     Exacerbating matters was that the Debtors also revised their strategy with respect to the *amount* of merchandise ordered. Because of frequent changes in styles and trends, fast fashion retailers, especially those focused on young women, tend to typically order small amounts of inventory at more frequent intervals in order to maintain the latest trends and avoid excess outdated inventory. During Mr. Thomas's previous tenure at the Debtors, this is precisely what the Debtors had done. However, beginning in 2011, the Debtors began buying inventory with up to 12-month lead times, resulting in stores stocking merchandise that had been ordered several months earlier.

48.     Moreover, between 2007 and 2010 the Debtors had several systems in place designed to ensure that merchandise was appropriately allocated to stores, and that the merchandise ordered and allocated to stores with the appropriate mix of sizes, in order to optimize sales and minimize the need for markdowns. Beginning in 2011, certain of these systems were not maintained. In particular, the Debtors (i) stopped using their size optimization system, (ii) stopped using their Oracle markdown optimization system, (iii) changed pricing strategy, moving from selective promotions to high initial retail prices with corresponding higher markdown rates, and (iv) stopped using store profiles, which had been developed and modified over many years.

49.     In addition to the strategic changes in the Debtors' core business, the Debtors' management in the period from 2011 to 2014 ventured into two new business lines that ultimately turned out not to be as successful as intended. First, in connection with the Debtors'

exit from the Arden B brand, the Debtors' management expanded their plus-size business line—which had historically been offered exclusively online—into standalone "Wet Seal Plus" stores, and converted 30 Arden B stores into "Wet Seal Plus" stores. These stores failed to attract sufficient customers and were unprofitable. In addition, the entry into the "plus" market was done quickly, with approximately 30 "Wet Seal Plus" stores being opened within two years of creating "Wet Seal Plus" as a standalone concept. Second, the Debtors' management opened stores in many more outlet malls. The Debtors had historically maintained very few stores in outlet malls, yet quickly opened over 30 such stores. Performance at almost all of these new outlet stores was worse than performance at mall stores.

50.     During this time period, the Debtors' EBITDA declined an estimated $82 million between fiscal year 2011 and fiscal year 2014, from $49 million in fiscal year 2011 to an estimated negative $33 million for fiscal year 2014. In addition, since 2011, merchandise margins and sales productivity have both declined significantly, and sales per square foot in stores have declined from $271 to less than $190.

### 3.     The Debtors Re-Hire Ed Thomas as CEO and Jon Kubo as CDO and Hire Christine Lee as CMO

51.     On September 8, 2014, the Debtors announced that Ed Thomas was rejoining the Debtors as CEO and a member of the Board of Directors. Notably, Mr. Thomas is the only member of management on the Debtors' otherwise independent Board of Directors. In March 2014, three new independent directors joined the Debtors' Board of Directors and modifications were made to the board compensation structure to reduce board compensation for fiscal year 2014.

52.     Mr. Thomas previously served as CEO and a Director of the Debtors from October 2007 to October 2010 and President and Chief Operating Officer and a Director of the

Debtors from 1992 to 2000. Mr. Thomas most recently served as a partner of KarpReilly, LLC, a private investment firm focused on small to mid-size growth companies. In addition to his prior roles at the Debtors, Mr. Thomas served as President and Co-Chief Executive of Tilly's, Inc. from 2005 to 2007. He holds a B.S. from Villanova University and is a Certified Public Accountant.

53.     Mr. Thomas has a record of creating significant value for the Debtors. In particular, during his previous tenure as CEO, Mr. Thomas grew the Debtors' market capitalization 25%, increased cash by 75%, retired all outstanding convertible notes, and oversaw a 10.2% increase in the Debtors' stock performance, compared to a 29.3% decrease among certain of the Debtors' peers during the same time period. In addition, Mr. Thomas and/or the Debtors were presented with several accolades and awards during his previous tenure with the Debtors, including (i) honorable mention as Orange County's Most Influential Businessperson by the Orange County Business Journal in April 2008, (ii) recognized as the 6th top performing CEO in retail by Chain Store Age in December 2008, (iii) runner-up for Orange County Businessperson of the year in January 2009, (iv) honorable mention as Orange County's Most Influential Businessperson by the Orange County Business Journal in April 2010; (v) Women's Wear Daily ranked the Debtors #1 retailer in inventory productivity in June 2010; and (vi) Apparel Magazine recognized the Debtors as #1 in their annual top-50 ranking in July 2010.

54.     The Debtors also hired Christine Lee as Chief Merchandising Officer in September 2014. She joined the Debtors from Pacific Sunwear of California, Inc., a specialty retailer offering apparel, accessories and footwear to teens and young adults, where she had served as Senior Vice President/General Merchandise Manager, Women's Apparel, Accessories

and Design since 2010.  During her tenure with Pacific Sunwear, Ms. Lee played an integral role in the strategic repositioning and turnaround of the women's division.  Prior to Pacific Sunwear, Ms. Lee spent 18 years with Urban Outfitters, Inc., a lifestyle specialty retailer.  She started her career with Urban Outfitters as a sales associate and held various buying and merchandising positions until being appointed General Merchandise Manager, Women's Apparel & Accessories and Urban Renewal & Design.  Ms. Lee holds a B.A. from the University of Michigan.

55.    Approximately one month after hiring Ms. Lee, the Debtors re-hired Jon Kubo as Chief Digital Officer.  Mr. Kubo returned to the Debtors after having had a successful tenure with the Debtors from 2005 through 2011 as head of e-commerce and Chief Information Officer.  During his initial tenure, the Debtors' e-commerce business grew through various social and mobile customer engagement programs.  Before returning to the Debtors, Mr. Kubo was head of product strategy at Fluid, Inc., a web development firm, and was previously Chief Product Officer at 8th Bridge, Inc., a social commerce startup, until it was acquired by Fluid in April 2014.  Before joining the Debtors in 2005, Mr. Kubo was Chief Administrative Officer for FAO Schwarz and Chief Information Officer for FAO, Inc. and also held several executive positions in the software technology industry.  Mr. Kubo earned a bachelor's degree in systems engineering from the U.S. Naval Academy, a master's degree in engineering from California State University at Fullerton, and an MBA from the Peter Drucker Institute at Claremont Graduate University.

56.    Mr. Kubo received the Oracle Retail CIO of the year Award for 2010 for executing a comprehensive information technology strategy which emphasizes the localization of price, size, and assortment with significant integration of social and mobile touch points.  Mr.

Kubo also received the RIS CIO of the Year for Innovation Award in 2012 for mobile and social innovations.

4. **The Debtors' New Management Team Planned and Implemented Strategic and Operational Changes to Restore the Debtors to their Profitable Model From 2007-2010.**

57.     This new management team—Messrs. Thomas and Kubo, and Ms. Lee—quickly assessed the Debtors' finances and operations and implemented a plan to turn around the Debtors that is largely based on (i) returning to the core business model which was successful for the Debtors during Mr. Thomas's first tenure, and (ii) ending certain of the less successful business ventures.

58.     With respect to merchandising, the Debtors, led by new Chief Merchandising Officer Christine Lee, have begun to move back to an inventory mix comprised primarily of fashion and to re-focus on the young adult customer.  The Debtors expect that returning to the successful inventory strategies of Mr. Thomas's previous tenure will allow the Debtors to regain customers that may have shopped elsewhere.  In addition, the Debtors are broadening their assortment of styles and conducting more frequent inventory purchases of less inventory per style in order to maintain constant newness, avoid excess outdated inventory, raise merchandise margins, and be equipped to quickly react to rapidly-changing teenage and young adult fashions. The Debtors are also adding new brands to their merchandise mix and expanding underdeveloped areas in order to differentiate the Debtors from their competition.

59.     With respect to planning and allocation, the Debtors have begun to refresh and restore their size optimization system, which the Debtors expect will support ordering proper size arrays and reducing the need for markdowns.  Relatedly, the Debtors are restoring the Oracle markdown optimization system, which, in conjunction with more "normal" pricing with only select promotions (rather than the high pricing structure with constant markdowns), is designed

to allow the Debtors to maintain a disciplined approach to merchandise markdowns.  Finally, the Debtors are updating their store profiles, which should permit the Debtors to more quickly incorporate seasonal, climatic, and regional differences into their inventory purchases and allocation.

60.     With respect to the e-commerce business, the Debtors, led by new Chief Digital Officer Jon Kubo, have begun revamping the e-commerce platform to create an online community where customers can shop, get fashion tips and insights, and interact with the brand and other community members.  To achieve that goal, the Debtors are focusing on several key areas.  First and foremost, the Debtors are expanding the breadth and depth of their online merchandise offering, and are beginning to offer additional core styles and a broader array of fast-changing fashions.  The Debtors are also creating a "mobile first" e-commerce strategy, as many of customers' online interactions with the Debtors stem from mobile devices.  This includes an enhanced user experience via a mobile-optimized website, a more integrated digital merchandising process, and better visual content.  The Debtors are also working to create greater brand loyalty through improvements to their loyalty program.

61.     The new management team has closed the standalone "Wet Seal Plus" stores and almost all of the new outlet stores as part of the closure of 338 stores on or about January 7, 2015.  The Debtors expect their financial performance to improve without these stores.

62.     In addition to planning and implementing new operational strategies, in October 2014, the Debtors' new management executed a cost savings plan which eliminated 66 corporate positions and 12 field management positions, representing annualized savings of approximately $5.7 million.  Additional future savings of $1.3 million are expected from implementing

operating efficiencies across the organization, primarily focused on the Debtors' distribution center.

### 5. The Debtors Faced a Near-Term Liquidity Crisis and Considered Strategic Alternatives.

63.     Notwithstanding the foregoing, there simply was not enough time to implement the Debtors' new strategies and cost-savings without additional liquidity. Certain of the Debtors' vendors and factors had conditioned the continuation of business with the Debtors on more stringent business terms. In particular, many of the Debtors' vendors (those that do not use factors) began to require that deliveries of merchandise be paid for by the Debtors with cash on delivery. In addition, the Debtors' three largest factors—CIT, Rosenthal, and Milberg—required that the Debtors maintain letters of credit in the aggregate amount of $8,500,000. These letters of credit support both (i) unpaid merchandise orders and (ii) any payments made by the Debtors during the preference period. There is little to no availability remaining under the letters of credit. Moreover, the Debtors' Prepetition Lender required that the Debtors cash collateralize their letters of credit, further limiting the Debtors' liquidity.

64.     Notwithstanding the existence of the letters of credit, one of the factors, in mid-December 2014, sent the Debtors a demand letter for approximately $823,000 in overdue indebtedness owing to such factor. The Debtors eventually negotiated an agreement with that factor, pursuant to which the Debtors have been making weekly $100,000 payments on their indebtedness.

65.     Recognizing that they were facing a liquidity crisis, the Debtors retained FTI Consulting ("FTI") in October 2014 to serve as the Debtors' financial advisors, and Houlihan Lokey ("Houlihan") in November 2014 to serve as the Debtors' investment banker to explore strategic alternatives. Houlihan engaged in discussions with potential lenders and potential

investors regarding out-of-court and in-court alternatives. At the same time, the Debtors and FTI

negotiated with the Debtors' major landlords regarding possible concessions from such

landlords. As it became apparent that sufficient landlord concessions and new capital might not

be forthcoming in time, Houlihan and the Debtors focused significant efforts on obtaining DIP

financing and a chapter 11 investor, as that would permit, among other things, a substantial

downsizing of the chain and accompanying rent reduction, which the Debtors felt was critical to

their restructuring efforts.

66.     The Debtors required both debtor-in-possession financing and a viable exit

strategy from bankruptcy in order to survive as a going concern. The Debtors, however, had a

limited window of time to obtain financing and an exit strategy before their projected liquidity

shortfall.

### 6.     The Debtors' Closure of 338 Stores

67.     In order to maximize the value of the Debtors' remaining inventory, the Debtors

conducted aggressive inventory sales in certain of their weaker-performing stores during the

holiday selling season. The Debtors believed that aggressively selling inventory by themselves

during the holiday season would be more successful, and far less expensive, than retaining an

outside liquidator. Such stores were closed in early January 2015; there was insufficient

inventory in the stores to keep them open past that time.

68.     On or about January 7, 2015, the Debtors closed 338 of their stores, irrevocably

surrendered the premises to the applicable landlords, and terminated the portion of their

workforce that had been employed in connection with those stores.

### F.     The Debtors' Goals in These Cases.

69.     The Debtors intend to reorganize the Company around the e-commerce business

and the remaining stores which the Debtors believe have the most potential upside, which stores

01:16512283.1

accounted for more than half of the Debtors' net sales for the nine months ending on November 1, 2014. The Debtors believe that doing so will help restore the Debtors to a stronger financial position.

70.     To meet their objectives, the Debtors have entered into (i) the DIP Term Facility, pursuant to which the Debtors will receive a senior debtor-in-possession term loan that should provide them with sufficient runway to navigate through the reorganization process, and (ii) that certain Plan Sponsorship Agreement with B. Riley, pursuant to which B. Riley will commit to a plan of reorganization under which B. Riley will receive 80% of newly issued common stock in the reorganized Debtors in exchange for investment of $20 million. On the effective date of the plan, B. Riley will convert the entire DIP Term Facility into equity and contribute the balance of the $20 million to the reorganized Debtors in cash. The remaining common stock will be issued to holders of allowed general unsecured claims whose claims are not satisfied through a convenience class cash election. The Debtors also have entered into the DIP L/C Facility with the DIP L/C Lender, pursuant to which the Debtors will obtain letters of credit that are required postpetition in the ordinary course of their business.

71.     I believe that the financing and plan sponsorship package presented by B. Riley, combined with the financing agreement offered by the DIP L/C Lender, presents the best option for the Debtors to maximize the value of their estates under the circumstances. Without a committed plan sponsorship combined with debtor-in-possession financing from B. Riley and the financing agreement offered by the DIP L/C Lender, I believe the Debtors would have no clear exit path, and insufficient liquidity to run anything other than an expedited sale process, potentially by way of a naked auction. I further believe the Debtors are unable, in the present

circumstances, to meet their liquidity needs by obtaining financing on an unsecured, administrative expense basis.

72.     The plan sponsorship provided by B. Riley is particularly important, as it provides a blueprint for how the Debtors will navigate through the reorganization process and should provide needed confidence to the Debtors' vendors, suppliers, customers and employees and thereby prevent the reduction of value that would likely occur with no exit strategy in place.

73.     Based on my experience and the negotiations which were undertaken, I believe that the DIP Facilities and the PSA offered by B. Riley to the Debtors are on the best terms and conditions available to the Debtors under the current circumstances.  In addition, I believe that the financing and plan sponsorship provide the Debtors with superior value than they could reasonably expect to obtain if the Debtors commenced their Cases without debtor-in-possession financing or a plan sponsorship.  If the Debtors had commenced a free-fall bankruptcy, I believe there was a substantial likelihood that the Debtors would ultimately be forced to liquidate their assets, which almost certainly would have yielded inferior value to the estates and a significantly increased creditor pool.  Importantly, the financing and plan sponsorship offered by B. Riley also provide the Debtors with the time they need to implement an operational turnaround and for any superior alternatives to the proposed plan of reorganization sponsored by B. Riley to present themselves.

74.     After filing their petitions, the Debtors intend to operate their business in the ordinary course.  In the various First Day Motions, the Debtors seek relief on an expedited basis that will help preserve the value of their assets and permit them to conduct the Cases efficiently and economically.

01:16512283.1

27

## II.

## FACTS IN SUPPORT OF FIRST DAY MOTIONS

75.     In order to enable the Debtors to minimize the adverse effects of the commencement of these Cases, the Debtors have requested various types of relief in the First Day Motions filed concurrently with this Declaration.  A summary of the relief sought in each First Day Motion, as well as the factual basis for each First Day Motion, is set forth below.

76.     I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their current business operations; and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

### A.     DIP Motion

77.     On an interim basis, the Debtors are requesting access to $1,000,000 out of a $20,000,000 total commitment under the DIP Term Facility and for authorization to obtain up to $18,328,777 in postpetition letters of credit under the DIP L/C Facility, with such amount representing $10,828,777 in "rolled up" prepetition letters of credit, which shall be deemed issued under the DIP L/C Facility and $7,500,000 in new commitments.  Such amounts will be used to fund fees under the DIP Term Facility, pay the Debtors' vendors and provide working capital in connection with the Debtors' operations.  The reasons supporting the Debtors' request for authority to enter into the DIP Term Facility are compelling.  As explained in greater detail in the DIP Motion, the DIP Term Facility will be used to provide liquidity for working capital and other general corporate purposes of the Debtors.  The usage of cash collateral and the funds available under the DIP Term Facility will provide the Debtors with funds necessary for the

01:16512283.1

28

operation of their businesses, including meeting their payroll and other business obligations.

Without the immediate use of cash collateral and the funds available under the DIP Term

Facility, the Debtors would be unable to fund their operations, which would be catastrophic for

the Debtors' businesses. I believe that access to cash collateral and the funds available under the

DIP Term Facility is crucial to the Debtors' ability to maintain their businesses and to avoid

immediate and irreparable harm to their estates, employees, customers, and creditors.

78.     Acting under my supervision, and with the significant assistance of FTI, the

Debtors' management has cash flow and operating projections ("Projections") set forth in

**Exhibit A** hereto. The Projections represent the Debtors' estimate of their near term financial

performance, recognizing that any financial projection is just an estimate of future performance,

and actual performance may differ. The Projections are expressly premised on approval of the

DIP Term Facility on an interim and final basis. In my view, without the availability provided

under the DIP Term Facility even if undrawn, the Debtors would be unable to fund operations, as

the financing provides a measure of comfort to vendors that the Debtors should be able to honor

their obligations during the pendency of the Cases.

79.     The Debtors have sought and were unable to obtain financing from other sources

on terms preferable to the proposed DIP Facilities, including on an unsecured, administrative

expense basis. Given the troubles generally facing teen and young adult retailers, as evidenced

by the liquidations within the last few weeks of competitors Deb Stores, dELiA*s, Inc., and

Body Central Corp., combined with the Debtors' continued projected losses, the Debtors'

investment banker Houlihan Lokey quickly found that most of the potential third-party lenders

and equity investors were not interested in providing financing to the Debtors.

01:16512283.1

80.     The terms of the DIP Facilities and the agreements related thereto were negotiated in good faith and at arm's-length between the Debtors and B. Riley and between the Debtors and the DIP L/C Lender, resulting in agreements designed to permit the Debtors to maximize the value of their assets.  The proposed terms are fair, reasonable, and appropriate under the circumstances.

81.     The Debtors' seven-member board of directors, including all six of the Debtors' independent board members, determined, in the exercise of their sound business judgment, that the Debtors require financing under the terms of the DIP Facilities and the agreements related thereto.

82.     I believe that the relief requested in the DIP Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**B.      Joint Administration Motion.**

83.     The Debtors in these Cases are affiliated entities.  The Debtors' financial affairs and business operations are closely related.  Debtor The Wet Seal, Inc. is the sole shareholder of each of the other three Debtors.  All of the Debtors are under common management.  The Debtors share many creditors and parties in interest.  As a result, joint administration will prevent duplicative efforts and unnecessary expenses.

84.     I understand that the joint administration of the Cases will permit the Clerk of the Court to utilize a single general docket for these Cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which will result in significant savings to the estates.  Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates.

C.    **Employee Compensation and Benefits Motion.**

85.    The Debtors' workforce is comprised of full-time salaried employees, full-time hourly employees (collectively, the "Full Time Employees"), and regular part-time hourly employees ("Part Time Employees"). As of the Petition Date, the Debtors employ approximately 445 hourly Full Time Employees and 276 salaried Full Time Employees, for a total of 721 Full Time Employees, and 2,104 Part Time Employees. In addition, 21 of the Debtors' employees (the "Employees") (15 Full Time Employees and 6 Part Time Employees) are currently on leave. The foregoing numbers reflect the reduction in force implemented by the Debtors on or about January 7, 2015, through which 3,695 employees were terminated. Of the Debtors' current workforce (including those on leave), 172 Employees are employed by The Wet Seal, Inc. All Employees employed by The Wet Seal, Inc. are based at the Debtors' Foothill Ranch headquarters. The remainder of the Debtors' Employees are employed by The Wet Seal Retail, Inc. and are stationed either at the Debtors' headquarters or at one of the Debtors' store locations.

86.    All Employees are paid bi-weekly for the prior two weeks ending on the Saturday of any payroll week. Payroll to the Employees is funded in gross to ADP, the Debtors' third-party payroll administrator, two business days before each pay date, and ADP is responsible for distributing net pay to the Employees from its own accounts. In 2014, the average amount funded to ADP in each two-week period was approximately $3.6 million. The Debtors' most recent prepetition payroll date was January 2, 2015. It covered the pay period from December 14, 2014 through December 27, 2014. The total amount of the January 2, 2015 payroll was approximately $4.0 million. It exceeded the average because the holiday period represents a peak staffing period for the Debtors. The Debtors' next scheduled payroll date is January 16, 2015, and will cover the pay period from December 28, 2014 through January 10, 2015. Funds

in respect of this pay period have been withdrawn from the Debtors' accounts prepetition in accordance with the ordinary course of dealing between the Debtors and ADP. The Debtors expect that payroll expenses going forward will be lower than the foregoing historical amounts due to the prepetition reduction in force.

87.     As of the Petition Date, approximately $625,000 was earned but remains unfunded with respect to Employees on account of accrued prepetition wages and salaries. This amount includes approximately $5,000 of floating prepetition compensation checks, in respect of wages to Employees who choose to be paid by live check rather than by direct deposit. The amount owed to any individual Employee on account of prepetition Employee Claims does not exceed $12,475 and is not in respect of any time period more than 180 days before the Petition Date.

88.     In addition, the Debtors contract with 9 additional workers, who are either independent contractors or employees leased from temporary placement agencies. These 9 individuals are compensated outside of the Debtors' payroll system, and receive, in the aggregate, approximately $18,000 per week. The Debtors owe no amounts in respect of these services as of the Petition Date.

89.     In order to ensure optimal performance by the Employees, the Debtors have implemented two bonus and incentive programs (collectively, the "Employee Bonus Programs") as follows:

      a.      Corporate Incentive Plan. The Corporate Incentive Plan is designed as a tool to award full-time eligible Employees an incentive payout as part of the Debtors' goal to provide a performance-based, total compensation package to attract, retain, and motivate top talent. The program rewards Employees based upon the Debtors reaching certain financial and operational performance targets for the fiscal year, as measured by EBITDA. The Corporate Incentive Plan has not made any payments in the last five years because the incentive targets have not been met. It is currently not expected that any of these targets will be reached for the fiscal year ending January 31, 2015.

b.    Field Bonus Program.  The Debtors maintain a field bonus program (the "Field Bonus Program") for all Employees that are regional directors and district directors, and for the store manager and assistant store manager in each store.  In order to be eligible for an incentive payment under the Field Bonus Program, eligible Employees must hit certain quarterly (for regional and district directors) or monthly (for store managers and assistant store managers) sales goals.   Once a quarterly sales goal is attained, commissions are awarded as follows: (i) $9,375 per quarter to regional directors, (ii) $3,375 per quarter to district directors, (iii) between $250 and $500 per month to store managers, and (iv) between $75 and $175 per month to assistant store managers. Aggregate payments on account of the Field Bonus Program average approximately $50,000 to $60,000 per month, and, in recent years, have been primarily in respect of store managers and assistant store managers (as opposed to regional and district directors).  As of the Petition Date, there are no accrued but unpaid amounts owing to Employees under the Field Bonus Program.

90.    *Vacation Time*.  Full Time Employees accrue vacation time ("Vacation") on a pro

rata basis throughout the year.  Vacation time for the majority of Employees is accrued based on

years of service.  Full Time Employees with one to four years of service can earn up to 10

Vacation days per year.  Full Time Employees with five to nine years of service can earn up to

15 Vacation days per year.  Finally, Full Time Employees with ten or more years of service can

earn up to 20 Vacation days per year.  Unused Vacation days may be carried over to the

following year, provided, however, that the maximum amount of days of accrued Vacation is

equal to one and one half times an Employee's annual accrual (i.e., 15 days for an Employee

with one year of service).  Once an Employee reaches the maximum unused Vacation accrual,

that Employee may not accrue any additional Vacation until the Employee uses Vacation to

reduce the amount of accrued unused Vacation below the maximum.  Vacation pay is calculated

based on an Employee's base hourly pay or base salary.  Except where required by state law, at

separation of employment, Employees do not receive payment for any unused Vacation.

91.    Certain high-level Employees are entitled to a set amount of Vacation time

regardless of years of service.  Specifically, the Debtors' CEO, Executive Vice Presidents, and

Senior Vice Presidents receive four (4) weeks of Vacation, and all Vice Presidents and

department directors receive two (2) or three (3) weeks of Vacation.  Because all of the Debtors' high-level Employees are located in California, in which vacation must be "cashed out" at separation, these Employees do receive payment, at separation, for unused vacation.

92.     As of the Petition Date, the Employees (including high-level Employees) had approximately $1,080,000 in the aggregate of accrued and unused Vacation.  No Employee is owed more than $12,475 in the aggregate for wages, salaries, and accrued but unused Vacation.

93.     *Sick Leave*.  The Debtors provide paid accrued sick time ("Sick Leave") to all Full Time Employees and to Part Time Employees where dictated by state law.  Eligible Employees accrue six sick days per twelve-month period, which period begins when such Employee begins to accrue Sick Leave benefits.  Unused Sick Leave may be carried over to the next twelve-month period, provided that Employees may only accrue a maximum of six sick days at any point in time.  Full Time Employees are not paid for unused sick days upon termination of employment or retirement, and the Debtors therefore do not make any cash payments on account of the Sick Leave policy.

94.     The Debtors do not maintain a formal severance pay policy for the majority of their Employees.  However, in their discretion, the Debtors do, on occasion, provide severance packages to certain Employees, particularly for certain high-level Employees.

95.     Prior to the Petition Date, the Debtors offered their Full Time Employees various standard employee benefits (the "Benefit Programs") including, without limitation, (a) medical and prescription drug coverage, (b) dental insurance, (c) vision insurance, (d) COBRA coverage, (e) flexible spending accounts, (f) an employee assistance program, (g) life and accidental death and dismemberment insurance, and (h) temporary disability insurance.  Such benefits are administered pursuant to plans, programs and policies that cover the Debtors' Full Time

Employees.  The Debtors expect that Benefit Program expenses going forward will be lower than they have historically been, on account of the prepetition reduction in force.

96.    *Medical Insurance Program.*  The Debtors offer a self-insured medical and prescription drug program (the "Health Plan") to their Full Time Employees, which is administered by United Healthcare (except that for Full Time Employees in Puerto Rico, the Debtors' medical program is administered by Triple S, Inc., and for Full Time Employees in Hawaii, the Debtors' medical program is administered by HMSA).  The Health Plan is approximately 66% paid by the Debtors and 34% paid by the Debtors' Full Time Employees through paycheck withholding.  The Debtors also maintain a stop-loss insurance policy (the "Stop-Loss Policy") to provide protection against catastrophic losses under their self-insured medical insurance program, which is administered by Sun Life Financial, Inc.  The average monthly cost (after taking into account Employee contributions) of maintaining the Health Plan, including administrative costs and premiums in respect of the Stop-Loss Policy, has been approximately $317,220 per month.  The Debtors typically wire funds to the Health Plan administrators on a weekly basis on account of claims paid by the administrators on the Debtors' behalf.  The Debtors are unable to estimate with specificity the prepetition amounts owing in respect of the Health Plan, because the typical lag time on Employees' submissions of medical claims is approximately 36 days.  However, based on historical data, the Debtors estimate that as of the Petition Date they owe approximately $380,644 in respect of "incurred but not reported" claims under the Health Plan and related administrative costs (excluding amounts paid through Employee deductions), and approximately $75,000 in respect of filed claims that have not yet been paid.

01:16512283.1

97.    *Dental Insurance Program.*  The Debtors offer a self-insured dental program (the

"<u>Dental Plan</u>") to their Full Time Employees, which is administered by Cigna.  For Employees

choosing the PPO Dental Plan, the Dental Plan is approximately 22% paid by the Debtors and

78% paid by the Debtors' Full Time Employees through paycheck withholding.  For Employees

choosing the HMO Dental Plan, the Dental Plan is approximately 45% paid by the Debtors and

55% paid by the Debtors' Full Time Employees through paycheck withholding.  The average

monthly cost (after taking into account Employee contributions) of maintaining the Dental Plan,

including administrative costs, has been approximately $8,590 per month.  The Debtors are

unable to estimate with specificity the prepetition amounts owing in respect of the Dental Plan;

however, because the typical lag time on Employees' assertions of dental claims is

approximately one month, the Debtors estimate that as of the Petition Date they owe

approximately $8,590 in respect of "incurred but not reported" claims under the Dental Plan and

related administrative costs (excluding amounts paid through Employee deductions), and

approximately $2,000 in respect of filed but not yet paid claims.

98.    *Vision Insurance Program.*  The Debtors offer vision insurance to their Full Time

Employees through VSP (the "<u>Vision Plan</u>").  Full Time Employees participating in the Vision

Plan pay 100% of the plan premium.  The average monthly cost of maintaining the Vision Plan

has been approximately $320 per month.

99.    *Life, Disability and Related Insurance Coverage.*  The Debtors provide their Full

Time Employees with company-funded short-term and long-term disability insurance, accidental

death and dismemberment insurance, and basic life insurance, which are all insured by Unum.

The Debtors pay 100% of the costs of these benefits.  In the aggregate, the average monthly cost

of maintaining these programs has been approximately $35,000. The Debtors estimate that as of the Petition Date they owe approximately $35,000 in respect of these benefits.

100.     *COBRA.* The Debtors seek to continue to perform any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("COBRA") in respect of former Employees and their covered dependents. Discovery Benefits, Inc. is the third-party COBRA administrator for the Debtors. The Debtors have paid approximately $450 per month for administration of their COBRA obligations. The Debtors estimate that as of the Petition Date they owe approximately $450 in respect of this benefit.

101.     *Flexible Spending Accounts.* The Debtors offer their Full Time Employees the use of flexible spending accounts for various medical claims not otherwise covered or payable by the Health Plan. The flexible spending benefits (the "Flex Benefits") are administered by Discovery Benefits, Inc. The Debtors have paid approximately $500 per month for administration of all Flex Benefit plans. The Debtors estimate that as of the Petition Date they owe approximately $1,000 in respect of these benefits.

102.     *Employee Assistance Program.* The Debtors offer their Full Time Employees and their family members counseling services to help resolve personal issues (the "EAP") through Unum. The EAP has been funded by the Debtors at an average monthly cost of $110. The Debtors estimate that as of the Petition Date they owe approximately $110 in respect of this benefit.

103.     *New York State Temporary Disability Insurance.* The Debtors offer their Full Time Employees in New York State a temporary disability insurance benefit. The average monthly cost of maintaining these programs is approximately $5,000. The Debtors estimate that as of the Petition Date they owe approximately $4,000 in respect of these benefits.

104.     As of the Petition Date, certain of the Benefit Programs described above remained unpaid or not yet provided because certain obligations of the Debtors under the applicable plan, program or policy accrued either in whole or in part prior to the commencement of these Cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date.  These programs are an important component of the total compensation offered to the Employees, and are essential to the Debtors' efforts to maintain Employee morale and minimize attrition among those whose retention is important for the Debtors' success.  I believe that the expenses associated with such programs are reasonable and necessary in light of that potential attrition, loss of morale and loss of productivity that would occur if such programs were discontinued.

105.     The Debtors maintain a self-insured workers' compensation benefits program through Sentry Insurance (the "WC Program").  The WC Program provides benefits to all of the Debtors' Employees for claims arising from or related to the Employee's employment with the Debtors.  During the past two years, the average monthly cost to the Debtors of honoring claims under the WC Program has historically been approximately $40,000; however, claims under the WC Program have often fluctuated significantly month-to-month, and the range during the past two years has been between $0 and nearly $106,000 per month.  It is therefore difficult to estimate with precision the value of prepetition obligations in respect of the WC Program.

106.     The Debtors maintain a 401(k) plan (the "Retirement Plan"), administered by Fidelity Investments, through which qualified and participating Employees may defer a portion of their salary to help meet their financial goals and accumulate savings for their future.  The Retirement Plan is funded by Employee and employer contributions.  The Debtors provide an immediately vesting match of 100% on each Employee's first 3% of deferred compensation and

50% on such Employee's next 2% of deferred compensation. In 2014, the Debtors incurred expense for matching contributions of approximately $640,000. As of the Petition Date, there are no accrued but unfunded matching contributions with respect to the Retirement Plan. The Debtors pay approximately $10,000 each year for the audit of the Retirement Plan. An audit for the last plan year was recently performed in October 2014.

107.    Prior to the Petition Date, the Debtors directly or indirectly reimbursed their Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment. The Employee Expenses are incurred in the ordinary course of the Debtors' business operations and include, without limitation, expenses for meals, travel, automobile mileage and other business-related expenses.

108.    The Debtors maintain two kinds of Employee credit card programs. First, the Debtors maintain certain company-paid credit cards (the "Corporate Cards") issued by either American Express or US Bank on which the Debtors and the Employee cardholders are both liable. Four Employees hold Corporate Cards—one such card is issued by American Express, and the other three cards are issued by US Bank. In addition, the Debtors maintain certain cardholder-paid credit cards (the "Employee Cards") on which cardholder Employees incur and pay expenses by using credit cards issued by US Bank and subsequently are reimbursed after submission and approval of expense reimbursement requests.

109.    Historically, approximately $155,000 has been paid on account of Employee Expenses (comprised of the Corporate Cards and the Employee Cards) each month. Because a delay often occurs between the time such expenses are incurred and the time a charge is posted, or an expense reimbursement request (in the case of the Employee Cards) is submitted, it is difficult to determine with precision the aggregate amount of outstanding Employee Expenses.

However, the Debtors estimate that, as of the Petition Date, approximately $55,000 in Employee Expenses remain unpaid.

110.    The Debtors routinely deduct certain amounts from Employees' compensation that represent earnings that judicial or government authorities or the Employees have designated for deduction, including, for example, various federal, state and local income, Federal Insurance Contribution Act ("FICA") and other taxes, support payments and tax levies, savings programs contributions, benefit plans insurance programs and other similar programs. On a monthly basis, the Debtors have deducted approximately $1.7 million in the aggregate from Employees' pay. Approximately $10,000 of deductions have accrued prepetition but have not yet been funded to various third parties. In addition, the Debtors are responsible for remitting, for their own account, various taxes and fees associated with payroll pursuant to the FICA and federal and state laws regarding unemployment and disability taxes ("Payroll Taxes").

111.    The Debtors pay ADP approximately $50,000 per month for its administrative services, which the Debtors expect will decrease as a result of the recent reduction in force. ADP typically bills the Debtors approximately 1-2 weeks after each payroll for associated payroll costs. As of the Petition Date, approximately $70,000 is owing to ADP.

112.    The Debtors utilize Fidelity as their Retirement Plan administrator. Among the services that Fidelity provides are managing the day-to-day and strategic decisions associated with the Debtors' Retirement Plan. The Debtors pay Fidelity approximately $400 per quarter for these services. As of the Petition Date, approximately $400 is owing to Fidelity.

113.    The Debtors utilize Sentry Insurance as their WC Program administrator. The Debtors pay Sentry Insurance approximately $22,000 per month for its administrative services. As of the Petition Date, approximately $22,000 is owing to Sentry Insurance.

114.    I believe that the relief sought in the Employee Compensation and Benefits Motion represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates. I believe that without the relief requested in the Employee Compensation and Benefits Motion being granted, there is great risk that the Employees required going forward for the Debtors' success will seek alternative opportunities. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to successfully conduct these Cases.

**D.    Cash Management Motion.**

115.    In the ordinary course of their business, the Debtors maintain a complex cash management system (the "Cash Management System"), which includes all activities necessary and pertinent to collecting and disbursing the Debtors' cash assets. The Cash Management System allows the Debtors to efficiently identify the Debtors' cash requirements and transfer cash as needed to respond to these requirements. The Cash Management System is important to the efficient execution and achievement of the Debtors' business objectives, and, ultimately, to maximizing the value of the Debtors' estates. The Cash Management System consists of bank accounts (the "Bank Accounts"), which are maintained at Bank of America, N.A. ("Bank of America") and certain other banks.

116.    *Store Collections.* Cash collections from brick and mortar sales are deposited directly into accounts maintained by The Wet Seal Retail, Inc. at Bank of America and certain other banks (the "Shop Sub-Accounts"). Most stores make deposits twice each week, on Mondays and Fridays; however, certain mall-location stores that bank in the malls in which they are located make deposits each day. The Debtors initiate daily transfers of the cash from the Shop Sub-Accounts to restricted accounts maintained by The Wet Seal Retail, Inc. at Bank of America (the "WS Retail, Inc. Proceeds Accounts"). The proceeds from brick and mortar credit

card sales and other miscellaneous checks and wires are deposited by the third-party processors of those credit card or check transactions, net of certain customer returns, chargebacks and fees, directly into separate restricted accounts maintained by The Wet Seal Retail, Inc. at Bank of America ("WS Retail, Inc. Credit Card Proceeds Accounts").

117.    *E-Commerce Collections*.  The proceeds from credit card purchases on the Debtors' website, net of certain customer returns, chargebacks and fees, are deposited into separate accounts maintained by Wet Seal Catalog, Inc. at Bank of America (the "E-Commerce Proceeds Accounts" and, together with the WS Retail, Inc. Proceeds Accounts and the WS Retail, Inc. Credit Card Proceeds Accounts, the "Proceeds Accounts").

118.    The deposits in the Proceeds Accounts are automatically swept daily to a blocked concentration account maintained by The Wet Seal, Inc. at Bank of America.  Bank of America automatically transfers daily balances to a restricted disbursements account maintained by The Wet Seal, Inc.

119.    Several of the Debtors' deposit accounts are subject to a Deposit Account Control Agreement between (i) The Wet Seal, Inc., (ii) Bank of America, as Prepetition Lender, and (iii) Bank of America, as the Debtors' banking institution (as amended, the "Deposit Account Control Agreement").

120.    The Debtors fund eight standalone disbursement accounts held by The Wet Seal, Inc. and The Wet Seal Retail, Inc. (the "Disbursement Accounts") each business day in order to pay checks that have been presented that day for payment as well as to fund any payroll and payroll taxes (paid bi-weekly), non-payroll items relating to employee health benefits and insurance (generally paid monthly), vendor and factor payments (paid each day based on terms with vendors and factors), lease payments (paid monthly), sales taxes (generally paid monthly),

and other expenditures as they come due. The Debtors are required to fund each Disbursement
Account manually, via wire transfer or book transfer, and ensure, on each business day, that
there are sufficient collected and available funds in each Disbursement Account in the amount of
all items drawn on such account, whether outstanding or presented for payment, and any other
debit transactions initiated with respect to such Disbursement Account. The Debtors make
disbursements from the Disbursement Accounts directly to third parties.

121.    The Debtors also maintain two standalone money market accounts, one of which
secures their obligations in connection with letters of credit issued by the Prepetition Lender, and
the other which is used by the Debtors for general purposes.

122.    Prior to the Petition Date, the Debtors engaged in certain intercompany
transactions with each other in the ordinary course of business (collectively, the "Intercompany
Transactions"). The revenues derived from The Wet Seal Catalog, Inc.'s online sales are
deposited into The Wet Seal, Inc. accounts and commingled with the proceeds of The Wet Seal
Retail, Inc. brick-and-mortar sales. The Wet Seal, Inc., in turn, directly and indirectly makes
certain operational payments on behalf of The Wet Seal Retail, Inc. and The Wet Seal Catalog,
Inc.; for example, payments are made to pay vendors, insurers, and all employees of The Wet
Seal Retail, Inc. and The Wet Seal Catalog, Inc. In addition, net revenues from the sale of gift
cards, which business is operated by Wet Seal GC, LLC, are transferred monthly to WS, Inc.
accounts. These costs are reconciled through Intercompany Transactions. The Intercompany
Transactions are recorded by the Debtors as intercompany payables, receivables or loans, as
applicable.

123.    The Debtors have deposited the sum of $1,500,000 into an account maintained at
Bank of America (the "Cash Management/Indemnity Account") as security for the Debtors':

(a) payment and/or reimbursement of all prepetition and postpetition fees, costs expenses and other charges and liabilities, including, without limitation, reasonable professional fees and expenses incurred or charged by BofA in connection with the maintenance and administration of any BofA Bank Accounts, the Cash Management System and related treasury management services (collectively, "Treasury Management Obligations"), and (b) Pre-Petition Indemnity Obligations, as defined in the interim order approving the DIP L/C Facility.  Bank of America will be granted a first priority, valid, perfected, and enforceable lien in and upon the Cash Management/Indemnity Account until such time as: (a) all Treasury Management Obligations have been indefeasibly paid in full, and (b) all Pre-Petition Indemnity Obligations have been satisfied in full.

124.    In light of the substantial size and complexity of the Debtors' operations, I believe that it is critical that the Debtors continue to utilize their existing Cash Management System without disruption and believe that the relief requested in the Cash Management Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**E.    Taxes Motion.**

125.    In the ordinary course of business, the Debtors incur or collect and remit certain taxes including sales, use, franchise, commercial activity, business and occupation, and various other taxes, fees, charges, and assessments (the "Taxes and Fees").  The Debtors remit such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the sale of their products or services at store locations, or through shipments of products purchased through the Debtors' website to customers.  The Taxes and Fees are paid monthly, quarterly, semi-annually or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is

paid. As of the Petition Date, the Debtors estimate that they owe approximately $3,001,237 in unremitted Taxes and Fees, which are comprised entirely of current tax obligations, and are not in respect of "catch-up" payments.

126.    Any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole, as described further in the Taxes Motion. I believe that payment of the Taxes and Fees is in the best interest of the Debtors and their estates, will not harm unsecured creditors and may reduce harm and administrative expense to the Debtors' estates.

**F.    Utilities Motion.**

127.    In connection with the operation of their business and management of their properties, the Debtors obtain electricity, natural gas, telephone, water, waste disposal, and other similar services (collectively, the "Utility Services") from several utility companies or brokers (collectively, the "Utility Companies"). Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and the overall success of these Cases.

128.    On average, the Debtors pay approximately $223,287.54 each month for third party Utility Services in respect of the locations which remain open after the Debtors' closure of 338 stores shortly before the Petition Date. In the aggregate, the Utility Companies currently hold $25,798.95 in deposits from the Debtors. In addition, the Debtors have caused cash collateralized letters of credit to be issued for the benefit of Pacific Gas & Electric Company and Southern California Edison Company in the aggregate amount of $221,905.

129.    For the reasons already set forth herein and in the Utilities Motion, the relief requested in the Utilities Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

G.    **Insurance Motion.**

130.    In connection with their business operations, the Debtors maintain multiple insurance policies (each an "Insurance Policy" and, collectively, the "Insurance Policies"). The Insurance Policies vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtors operate and various contractual obligations. The Insurance Policies include (a) crime, (b) fiduciary liability, (c) employment practices liability, (d) employed lawyers, (e) all-risk property, (f) ocean cargo, (g) difference in condition, (h) commercial general liability, (i) automobile, (j) foreign general liability, excess auto, and foreign workers' compensation, (k) cyber liability, and (l) umbrella.

131.    The total annual premiums under the current Insurance Policies are approximately $1,628,779. These premiums are paid to the relevant Insurance Carriers either as annual prepayments or as installment payments. The estimated prepetition amount owing to the Insurance Carriers is $83,110.

132.    In connection with the procurement and maintenance of their Insurance Policies, the Debtors obtain brokerage services from AON, Barney & Barney, Marsh, and Sterling & Sterling (collectively, the "Brokers"). The Brokers assist the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors' with the procurement and negotiation of the Insurance Policies, and enabling the Debtors to obtain those policies on advantageous terms and at competitive rates. Historically, the Debtors have paid the Brokers approximately $182,868 in the aggregate on an annual basis for their services (the "Brokerage Fees"). As of the Petition Date, the Debtors believe that they do not owe any amounts in respect of Brokerage Fees.

133.    In connection with the maintenance of certain of the Insurance Policies, the Debtors obtain insurance claims administration services from UIC. Historically, the Debtors

have paid UIC approximately $12,000 in the aggregate on an annual basis for its services (the "Administration Fees").  As of the Petition Date, the Debtors believe that they do not owe any amounts to UIC for the Administration Fees.

134.    The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, in many instances, such coverage is required by various regulations, laws and contracts that govern the Debtors' business operations.  Moreover, I understand that maintenance of insurance policies is required by the operating guidelines established by the Office of the United States Trustee.  If the Debtors fail to perform their obligations under the Insurance Policies, their coverage thereunder could be voided.  The Debtors may also need to renew or replace certain of the Insurance Policies during the course of these chapter 11 Cases, or enter into new policies.  If the Debtors do not pay prepetition amounts owing in respect of the Insurance Policies, there is a risk that the Insurance Carriers will refuse to renew the Insurance Policies.

135.    For the reasons already set forth herein and in the Insurance Motion, the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

## H.    Customer Programs Motion.

136.    In the ordinary course of business, the Debtors provide customers with certain customer-related programs as described in the Customer Programs Motion (the "Customer Programs") that engender goodwill, maintain loyalty, increase the Debtors' sales opportunities, and allow the Debtors a comparative advantage over their competition.  Specifically, the Customer Programs relate to the Debtors' programs by which they offer gift cards, refunds and exchanges, coupons and other promotional offers to their customers, as well as processing

customer purchases through the use of credit cards. The Debtors believe that their ability to continue the Customer Programs and to honor their obligations thereunder in the ordinary course of business is necessary to (i) retain their reputation for reliability, (ii) meet competitive market pressures, (iii) maintain positive customer relationships and (iv) ensure customer satisfaction, thereby retaining current customers, attracting new ones, and, ultimately, enhancing revenue and profitability for the benefit of all the Debtors' stakeholders.

137.    In the ordinary course of business, the Debtors sell gift cards (collectively, the "Gift Cards") to customers in amounts ranging from $5 to $500. Customers can purchase Gift Cards in the Debtors' retail stores and/or through its online store, which can be accessed at www.wetseal.com. Gift Cards can be used only for in-store purchases or online purchases. The Debtors also offer gift cards for sale in selected grocery and other retailers such as Albertson's, Pathmark, and A&P. With respect to the gift cards offered for sale through such retailers, the Debtors utilize the services of third party processors who either (i) remit the customer payments on account of the Gift Cards to the Debtors, less a percentage commission or (ii) keep a processing fee. Gift card programs of this nature are commonplace and popular in the retail industry, and the Debtors' competitors offer similar programs to their customers.

138.    The Debtors allow their customers to return or exchange regular or promotional merchandise that is unworn, unwashed, undamaged, and with tags attached for any reason within 30 days of original purchase (the "Refund and Exchange Program"). Merchandise that is unworn, unwashed, undamaged with the tags attached presented within 14 days of original purchase with the original receipt may be returned for the same tender; merchandise presented after 14 days of original purchase but within 30 days of original purchase may be returned for an exchange or store credit. Jewelry, lingerie, swimwear, cosmetics, compact discs and clearance

merchandise are "final sale" items and are not accepted for an exchange or store credit. If merchandise is not returned within 30 days of original purchase, the Debtors generally do not offer a refund, exchange or store credit. Programs similar to the Refund and Exchange Program are common in the retail industry, and similar programs are used by the Debtors' competitors. Based on historical practice, the Debtors' books and records reflect an aggregate net liability in respect of Gift Cards and store credit of approximately $3.7 million.

139.    As a result of the inherently uncertain nature of the Refund and Exchange Program, the Debtors are unable to estimate the value of their obligations with precise accuracy with respect thereto as of the Petition Date. The Debtors, however, do not expect the commencement of these chapter 11 cases to result in a significant deviation in the volume of monthly returns and exchanges from that which they experienced prepetition, which average between $1.0 million to $2.0 million per month.

140.    The Debtors offer various promotional offers to customers throughout the year (collectively, the "Promotions"). The Promotions are aimed at driving sales and maintaining market competitiveness. The Debtors offer various in-store and online promotions that provide discounts to customers, such as "percentage off," "buy-one-get-one-free," and "gift with purchase" promotions. The Promotions are similar to those routinely offered in the retail industry. The Debtors seek authority to continue offering these Promotions postpetition in the ordinary course of business.

141.    In addition to cash, the Debtors accept several other methods of payment from customers at their point of sale:  (i) credit cards; (ii) PayPal; (iii) Amazon.com; and (iv) checks. For all methods of payment (other than a cash transaction), the Debtors receive the net customer sales less any chargebacks, returns and processing fees charged. The processing fees charged by

each company vary, but are in the range of 1% to 4%. The fees that are owing to these companies are set off from the funds that are remitted to the Debtors on a daily basis. Maintaining use of the credit cards and other payment mechanisms such as PayPal and Amazon.com is essential to the continuing operation of the Debtors' business because the vast majority of the Debtors' sales are made using these payment methods.

142.    The Customer Programs are standard in the retail industry. If the Debtors are unable to honor or continue their Customer Programs, their ability to conduct business and generate sales will be severely hampered. On the other hand, continuing to administer their Customer Programs without interruption during the pendency of these Cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' stakeholders.

143.    For the reasons already set forth herein and in the Customer Programs Motion, the relief requested in the Customer Programs Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

**I.      Shippers Motion.**

144.    The Debtors' business depends on the daily process of importing and shipping its clothing products to stock the Debtors' stores. In order to ensure the steady movement of products, the Debtors rely on a network of shippers and freight forwarders who process and ship the Debtors' merchandise (the "Merchandise") to and from the Debtors' distribution center and stores. If the Debtors fail to pay any of the foregoing entities for charges incurred in connection with the transportation of the Merchandise, various statutes, tariffs and agreements permit the shipper and freight forwarders to assert possessory liens against the Merchandise in their possession.

01:16512283.1

145.    Merchandise that is received from overseas is shipped to various ports in the United States, cleared for customs, loaded onto railroad containers, and finally moved onto trucks, which transport the Merchandise to the Debtors' distribution center and their stores. The Debtors are required to pay customs duty charges, which charges the Debtors pay directly without the use of an outside broker. The Merchandise can be stopped in transit if customs duties are not paid in the ordinary course.

146.    As of the Petition Date, the Debtors estimate that approximately $300,000 is owed on account of certain prepetition claims for shipping, freight forwarding, and customs duties (the "Transporter Claims"). These amounts are in respect of shippers, freight forwarders, and customs duties, and include both invoices that the Debtors have received, as well as amounts that the Debtors have not yet received, but are believed to have been incurred as of the Petition Date based on historical practice. Payment of the foregoing Transporter Claims will avoid disruption in the Debtors' business, prevent the possibility of possessory liens being asserted against the Debtors' Merchandise, and enable the Debtors to realize the value of the Merchandise and continue their operations uninterrupted.

147.    Given the nature of the Debtors' industry, the failure to satisfy the shipping and warehouse charges could have a material adverse effect on the day-to-day operations of the Debtors' business. Payment of the prepetition Transporter Claims is imperative to the Debtors' continued operation and ability to maximize the value of their estates for the benefit of their creditors.

148.    For the reasons already set forth herein and in the Shippers Motion, the relief requested in the Shippers Motion is necessary to avoid immediate and irreparable harm to the

Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

**J.      Postpetition Goods Motion.**

149.    As a result of the commencement of these Cases, the Debtors believe that several suppliers (collectively the "Suppliers") with whom, as of the Petition Date, the Debtors had outstanding prepetition purchase orders (collectively, the "Outstanding Orders") may perceive a risk that they will be treated as prepetition general unsecured creditors with respect to any shipments made after the Petition Date pursuant to the Outstanding Orders. As a result, the Suppliers may refuse to deliver such goods to the Debtors unless the Debtors assure payment. The Debtors' business depends on the ability to quickly obtain necessary merchandise from their Suppliers in order to stock their stores and fulfill online orders. The inability to maintain sufficient inventory due to the Suppliers' refusal to deliver goods could have a significant detrimental impact on the Debtors' business.

150.    For the reasons already set forth herein and in the Postpetition Goods Motion, the relief requested in the Postpetition Goods Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

**K.      NOL Motion.**

151.    The Debtors estimate that the amount of federal net operating losses ("NOLs") held by WSI through the end of its fiscal year ending January 31, 2015 will be approximately $250 million. However, it is my understanding that the Debtors' ability to use its NOLs could be substantially limited if there were an "ownership change" as defined under section 382 of the Internal Revenue Code. In general, an ownership change would occur if certain ownership changes related to WSI's stock held by 5% or greater stockholder exceeded 50%, measured over

various measuring points over a three-year period beginning with the last ownership change. These provisions can be triggered not only by merger and acquisition activity, but also by normal market trading. As a result, on December 16, 2014, WSI and American Stock Transfer & Trust Company, LLC entered into the Rights Agreement. The Rights Agreement, and the rights plan established therein, was designed to deter trading that would lead to the loss of WSI's valuable NOLs and a resulting reduction in the Debtors' value. However, the Rights Agreement does not completely restrict trading in WSI's stock, and thus, WSI's valuable NOLs could still be impacted by trading in WSI's stock.

### L.    Lease Rejection Motions.

152.    On or about January 7, 2015, the Debtors closed 338 of their stores (the "Leased Premises"). The Debtors have ceased operations at the Leased Premises, have no further use for the Leased Premises, and on or about January 7, 2015, the Debtors irrevocably surrendered each of the Leased Premises and abandoned any property remaining at the Leased Premises. In addition, since on or about January 8, 2015, the landlords in respect of the Leased Premises (the "Landlords") have been in sole possession of the Leased Premises.

153.    On January 7, 2015, the Debtors sent to each Landlord, via overnight Federal Express, a letter informing the Landlords that the letter served as written notice that the Debtors were surrendering the premises effective as of the end of the day on January 8, 2015. On January 12, 2015, the Debtors sent to each Landlord, via overnight Federal Express, a letter confirming that the Debtors had provided the Landlords written notice that the premises were vacated and that possession has been unequivocally and irrevocably delivered to the Landlords. The letters also stated that the Debtors had irrevocably abandoned and forfeited to the Landlords any and all property located in the Leased Premises. The Debtors' Prepetition Lender has waived any rights it may have had in any property remaining on the demised premises as of the

date and time of the Debtors' abandonment and forfeiture thereof in favor of the Landlords; however, the Prepetition Lender has not waived any other property rights that it may have under the Prepetition Facility, except to the extent set forth in the DIP L/C Facility filed with the Court. Finally, prior to the filing of the Cases, the Debtors sent, via overnight FedEx delivery, the keys for each of the Leased Premises to the Landlords.

154.    For the reasons already set forth herein and in the Lease Rejection Motions, the relief requested in the Lease Rejection Motions is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

**M.      Rejection Procedures Motion**

155.    I believe that the procedures proposed in the Rejection Procedures Motion are tailored to minimize potential administrative expenses, maximize the recovery for creditors in these Cases and, with respect to leases, return control of the affected premises to the applicable landlords as quickly as possible.

156.    In light of several contracts that the Debtors anticipate the need to reject during the first weeks of these Cases, the relief requested in the Rejection Procedures Motion is necessary to avoid immediate and irreparable harm to the Debtors by imposing an administrative burden on the Debtors' employees and professionals.

**N.      Section 156(c) Application**

157.    Prior to the selection of Donlin, Recano & Company ("DRC") as claims and noticing agent, the Debtors obtained and reviewed engagement proposals from at least three claims and noticing agents to ensure selection through a competitive process.  I believe, based on all engagement proposals obtained and reviewed, that DRC's rates are competitive and reasonable given DRC's quality of services and expertise.

158.    In view of the number of anticipated claimants and the complexity of the Debtors'

business, I believe that the appointment of DRC as claims and noticing agent is both necessary

and in the best interests of the Debtors' estates and their creditors.

Executed this 15th day of January, 2015 at Foothill Ranch, California.

The Wet Seal, Inc., *et al.*, Debtors and Debtors in
Possession

By: _____

Thomas R. Hillebrandt
Interim Chief Financial Officer

**EXHIBIT A**

**Projections**

wet seal

# 13-Weekl Cash Flow Budget

January 15, 2015

I.   Budget                               Page 2
II.  Professional Fees Support Schedule   Page 3

Wet Seal, Inc.
13-Week Cash Flow Forecast - Summary
($ in 000's)

| | January | | | | February | | | | March | | | | April | | | | 16 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Forecast Week | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Total |
| Actual/Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| Week Ending | 17-Jan | 24-Jan | 31-Jan | 7-Feb | 14-Feb | 21-Feb | 28-Feb | 7-Mar | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | |
| **I. Memo: Store Merch Sales Comp** | -47.1% | -47.6% | -46.2% | -10.0% | -10.0% | -10.0% | -10.0% | -5.0% | -5.0% | -5.0% | -5.0% | -5.0% | 0.0% | 0.0% | 0.0% | 0.0% | -7.5% |
| Memo: Ending Store Count | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 |
| **II. Cash Flows** | | | | | | | | | | | | | | | | | |
| Sales Receipts | 765 | 844 | 829 | 2,267 | 3,485 | 3,853 | 3,590 | 3,731 | 4,307 | 4,512 | 4,347 | 4,204 | 4,453 | 5,395 | 4,735 | 3,973 | 55,291 |
| **Operating Disbursements** | | | | | | | | | | | | | | | | | |
| Merchandise Disbursements | 500 | 1,043 | 960 | 1,563 | 1,953 | 1,948 | 1,746 | 1,932 | 2,176 | 2,147 | 2,045 | 2,014 | 2,082 | 2,591 | 1,750 | 1,851 | 28,301 |
| Payroll & 401K | 1,911 | 525 | 2,161 | 46 | 2,261 | 64 | 1,949 | 65 | 1,949 | 51 | 1,949 | 43 | 1,949 | 46 | 1,949 | 46 | 16,965 |
| Rent | 199 | - | 3,953 | - | - | - | 3,953 | - | - | - | 3,953 | - | - | - | 2,504 | 3,953 | 18,515 |
| Sales Tax Remittance | 510 | 2,600 | - | - | 122 | 1,102 | - | - | 86 | 777 | - | - | 138 | 1,242 | - | - | 6,578 |
| Other Operating Disbursements | 793 | 1,083 | 990 | 886 | 841 | 601 | 825 | 474 | 334 | 541 | 918 | 751 | 375 | 425 | 348 | 968 | 11,153 |
| Subtotal | 3,912 | 5,251 | 8,064 | 2,495 | 5,177 | 3,715 | 8,474 | 2,470 | 4,546 | 3,516 | 8,865 | 2,808 | 4,545 | 4,304 | 6,552 | 6,818 | 81,511 |
| Operating Cash Flow | (3,148) | (4,407) | (7,235) | (228) | (1,692) | 138 | (4,883) | 1,261 | (239) | 996 | (4,518) | 1,396 | (92) | 1,091 | (1,816) | (2,844) | (26,221) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | | |
| Capital Expenditures | 65 | 65 | 65 | 28 | 36 | 36 | 32 | 37 | 42 | 42 | 40 | 39 | 45 | 54 | 47 | 40 | 714 |
| DIP Interest/Fees | - | 375 | - | - | - | - | - | - | - | - | - | 23 | - | - | - | 35 | 433 |
| Professional Fees | 501 | 32 | 82 | 72 | 72 | 655 | 72 | 52 | 52 | 933 | 52 | 52 | 39 | 39 | 872 | 39 | 3,616 |
| Subtotal | 566 | 472 | 147 | 100 | 108 | 691 | 104 | 89 | 94 | 975 | 92 | 114 | 84 | 93 | 920 | 114 | 4,763 |
| Freight/Utility Deposits | - | 250 | 250 | 250 | 250 | - | - | - | - | - | - | - | - | - | - | - | 1,000 |
| Total Disbursements | 4,479 | 5,974 | 8,461 | 2,845 | 5,535 | 4,405 | 8,577 | 2,559 | 4,640 | 4,491 | 8,957 | 2,922 | 4,629 | 4,397 | 7,471 | 6,932 | 87,274 |
| Net Cash Flow | (3,714) | (5,129) | (7,633) | (578) | (2,050) | (552) | (4,987) | 1,172 | (333) | 21 | (4,610) | 1,282 | (176) | 998 | (2,736) | (2,958) | (31,983) |
| **III. Cash / ABL Loan Balance** | | | | | | | | | | | | | | | | | |
| Beginning Bank Balance | 21,565 | 18,971 | 13,129 | 9,104 | 5,296 | 3,645 | 2,864 | 1,594 | 1,500 | 1,500 | 1,562 | 1,500 | 1,500 | 1,500 | 2,065 | 1,500 | 21,565 |
| Net Cash Flow | (3,714) | (5,129) | (7,633) | (578) | (2,050) | (552) | (4,987) | 1,172 | (333) | 21 | (4,610) | 1,282 | (176) | 998 | (2,736) | (2,958) | (31,983) |
| Bounced Checks | 1,684 | | | | | | | | | | | | | | | | 1,684 |
| Change to Check Float | (564) | 788 | 3,608 | (3,231) | 399 | (229) | 3,716 | (3,918) | 178 | 62 | 3,998 | (3,878) | (265) | 565 | 1,574 | 383 | 3,185 |
| BofA Cash Management Deposit | | (1,500) | | | | | | | | | | | | | | | (1,500) |
| Revolver Draw | - | - | - | - | - | - | - | 2,653 | 156 | (21) | 550 | 2,596 | 441 | (998) | 597 | 2,576 | 8,549 |
| Ending Bank Cash | 18,971 | 13,129 | 9,104 | 5,296 | 3,645 | 2,864 | 1,594 | 1,500 | 1,500 | 1,562 | 1,500 | 1,500 | 1,500 | 2,065 | 1,500 | 1,500 | 1,500 |
| Beginning Revolver | - | - | - | - | - | - | - | - | 2,653 | 2,809 | 2,788 | 3,338 | 5,934 | 6,375 | 5,377 | 5,973 | - |
| Draw / (Pay Down) | - | - | - | - | - | - | - | 2,653 | 156 | (21) | 550 | 2,596 | 441 | (998) | 597 | 2,576 | 8,549 |
| Ending Revolver Draw | - | - | - | - | - | - | - | 2,653 | 2,809 | 2,788 | 3,338 | 5,934 | 6,375 | 5,377 | 5,973 | 8,549 | 8,549 |
| **IV. Borrowing Base (Weekly)** | | | | | | | | | | | | | | | | | |
| Total Borrowing Base | 8,973 | 8,909 | 9,067 | 10,069 | 10,648 | 10,940 | 10,928 | 11,915 | 12,139 | 12,459 | 12,563 | 13,706 | 14,148 | 14,469 | 15,058 | 14,492 | 14,492 |
| **V. Available Line Calculation (Weekly)** | | | | | | | | | | | | | | | | | |
| Revolving Commitment | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Lesser of BB or Available Line | 8,973 | 8,909 | 9,067 | 10,069 | 10,648 | 10,940 | 10,928 | 11,915 | 12,139 | 12,459 | 12,563 | 13,706 | 14,148 | 14,469 | 15,000 | 14,492 | 14,492 |
| Less: Current Balance Outstanding | - | - | - | - | - | - | - | 2,653 | 2,809 | 2,788 | 3,338 | 5,934 | 6,375 | 5,377 | 5,973 | 8,549 | 8,549 |
| Net Availability | 8,973 | 8,909 | 9,067 | 10,069 | 10,648 | 10,940 | 10,928 | 9,263 | 9,331 | 9,671 | 9,225 | 7,772 | 7,774 | 9,092 | 9,027 | 5,943 | 5,943 |
| Plus: Ending Bank Cash | 18,971 | 13,129 | 9,104 | 5,296 | 3,645 | 2,864 | 1,594 | 1,500 | 1,500 | 1,562 | 1,500 | 1,500 | 1,500 | 2,065 | 1,500 | 1,500 | 1,500 |
| Total Liquidity (Wkly BBase) | 27,944 | 22,038 | 18,171 | 15,365 | 14,293 | 13,804 | 12,522 | 10,763 | 10,831 | 11,232 | 10,725 | 9,272 | 9,274 | 11,158 | 10,527 | 7,443 | 7,443 |

Wet Seal, Inc.
Weekly Cash Flows - Professional Fees
($ in 000s)

| | Jan W1 Forecast 17-Jan | Jan W2 Forecast 24-Jan | Jan W3 Forecast 31-Jan | Feb W4 Forecast 7-Feb | Feb W5 Forecast 14-Feb | Feb W6 Forecast 21-Feb | Feb W7 Forecast 28-Feb | Mar W8 Forecast 7-Mar | Mar W9 Forecast 14-Mar | Mar W10 Forecast 21-Mar | Mar W11 Forecast 28-Mar | Mar W12 Forecast 4-Apr | Apr W13 Forecast 11-Apr | Apr W14 Forecast 18-Apr | Apr W15 Forecast 25-Apr | Apr W16 Forecast 2-May | 16 Week Forecast Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Professional Fees Incurred** | | | | | | | | | | | | | | | | | |
| **A. Company Professionals** | | | | | | | | | | | | | | | | | |
| FTI | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 800 |
| KTBS / Young Conaway | 60 | 110 | 110 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 1,385 |
| Houlihan Lokey | 40 | 40 | 40 | 40 | 40 | 40 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 505 |
| Paul Hastings | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 500 |
| Subtotal | 181 | 231 | 231 | 206 | 206 | 206 | 206 | 191 | 191 | 191 | 191 | 191 | 191 | 191 | 191 | 191 | 3,190 |
| **B. ABL Professionals** | | | | | | | | | | | | | | | | | |
| Reimer & Braunstein - BofA | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 10 |
| Skadden / Other - GA | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 500 |
| Subtotal | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 510 |
| **C. DIP Professionals** | | | | | | | | | | | | | | | | | |
| B. Riley/Skadden | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **D. Unsecured Creditors Professionals** | | | | | | | | | | | | | | | | | |
| Counsel | - | - | 55 | 43 | 43 | 43 | 43 | 43 | 43 | 43 | 43 | 43 | 13 | 13 | 13 | 13 | 488 |
| Financial Advisor | - | - | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 350 |
| Subtotal | - | - | 80 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 38 | 38 | 38 | 38 | 838 |
| **E. Other Professionals** | | | | | | | | | | | | | | | | | |
| Donlin, Recano, & Co. | 49 | 25 | 25 | 40 | 40 | 40 | 40 | 20 | 20 | 20 | 20 | 20 | 8 | 8 | 8 | 8 | 389 |
| US Trustee | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 25 |
| Subtotal | 51 | 27 | 27 | 42 | 42 | 42 | 42 | 22 | 22 | 22 | 22 | 22 | 9 | 9 | 9 | 9 | 414 |
| **Total Incurred** | 264 | 290 | 370 | 347 | 347 | 347 | 347 | 312 | 312 | 312 | 312 | 312 | 270 | 270 | 270 | 270 | 4,952 |
| **II. Professional Fees Paid** | | | | | | | | | | | | | | | | | |
| **A. Company Professionals** | | | | | | | | | | | | | | | | | |
| FTI | - | - | - | - | - | 120 | - | - | - | 160 | - | - | - | - | 160 | - | 440 |
| KTBS / Young Conaway | 239 | - | - | - | - | 224 | - | - | - | 272 | - | - | - | - | 272 | - | 1,007 |
| Houlihan Lokey | 110 | - | - | - | - | 96 | - | - | - | 128 | - | - | - | - | 80 | - | 414 |
| Paul Hastings | 60 | - | - | - | - | 75 | - | - | - | 100 | - | - | - | - | 100 | - | 335 |
| Subtotal | 409 | - | - | - | - | 515 | - | - | - | 660 | - | - | - | - | 612 | - | 2,196 |
| **B. ABL Professionals - Paid as Incurred** | | | | | | | | | | | | | | | | | |
| Reimer & Braunstein- BofA | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 10 |
| Skadden / Other - GA | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 500 |
| Subtotal | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 510 |
| **C. DIP Professionals** | | | | | | | | | | | | | | | | | |
| B. Riley/Skadden | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **D. Unsecured Creditors Professionals** | | | | | | | | | | | | | | | | | |
| Counsel | - | - | - | - | - | 44 | - | - | - | 136 | - | - | - | - | 136 | - | 316 |
| Financial Advisor | - | - | - | - | - | 20 | - | - | - | 80 | - | - | - | - | 80 | - | 180 |
| Subtotal | - | - | - | - | - | 64 | - | - | - | 216 | - | - | - | - | 216 | - | 496 |
| **E. Other Professionals** | | | | | | | | | | | | | | | | | |
| Donlin, Recano, & Co. | 60 | - | 50 | 40 | 40 | 40 | 40 | 20 | 20 | 20 | 20 | 20 | 8 | 8 | 8 | 8 | 400 |
| US Trustee | - | - | - | - | - | 4 | - | - | - | 5 | - | - | - | - | 5 | - | 14 |
| Subtotal | 60 | - | 50 | 40 | 40 | 44 | 40 | 20 | 20 | 25 | 20 | 20 | 8 | 8 | 12 | 8 | 414 |
| **Total Paid** | 501 | 32 | 82 | 72 | 72 | 655 | 72 | 52 | 52 | 933 | 52 | 52 | 39 | 39 | 872 | 39 | 3,616 |