# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| THE WET SEAL, INC., a Delaware corporation, *et al.*[1] | Case No.: 15-10081 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363
AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY
RULES 2002, 4001 AND 9014: (I) AUTHORIZING POSTPETITION
FINANCING, (II) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY,
(III) AUTHORIZING USE OF CASH COLLATERAL AND
PROVIDING FOR ADEQUATE PROTECTION, (IV) MODIFYING
THE AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING**

The Wet Seal, Inc. and its subsidiaries, the debtors and debtors in possession (the

"Debtors") in the above-captioned jointly administered chapter 11 cases (the "Cases"), hereby

move the Court (the "Motion") for entry of two interim orders on an expedited basis (the

"Interim DIP Term Order" and "Interim DIP L/C Order" and, together, the "Interim Orders")

substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, and following a final

hearing to be set by the Court (the "Final Hearing"), entry of two final orders (the "Final DIP

Term Order" and the "Final DIP L/C Order" and, together, the "Final Orders" and, with the

Interim Orders, the "DIP Orders"), pursuant to sections 105, 361, 362, 363 and 364 of title 11 of

the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of

---

[1]   The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows:
The Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265); Wet Seal Catalog, Inc. (7604); and Wet Seal GC, LLC
(2855-VA).  The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing the Debtors to obtain secured post-petition superpriority financing (the "DIP Term Facility" and the "DIP L/C Facility" and, together, the "DIP Facilities") and use cash collateral on an interim and final basis pursuant to the terms and conditions of (i) that certain *Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement*, dated as of January 15, 2015 (the "DIP Term Credit Agreement"), by and among the Debtors and B. Riley Financial, Inc. ("B. Riley"), as Lender (the "DIP Term Lender") (attached hereto as **Exhibit C**), (ii) that certain *Security Agreement*, dated as of January 15, 2015 (the "DIP Term Security Agreement"), by and among the Debtors and the DIP Term Lender (attached hereto as **Exhibit D**), (iii) that certain *Senior Secured, Super-Priority Debtor-in-Possession Letter of Credit Agreement*, dated as of January 15, 2015 (the "DIP L/C Credit Agreement"), by and among the Debtors and Bank of America, N.A. (the "Pre-Petition Lender"), as L/C Issuer (the "DIP L/C Issuer") (attached hereto as **Exhibit E**), (iv) that certain *Pledge and Security Agreement*, dated as of January 15, 2015 (the "DIP L/C Security Agreement"), by and among the Debtors and the DIP L/C Issuer (attached hereto as **Exhibit F**).[2]

In support of the Motion, the Debtors rely on the *Declaration of Thomas R. Hillebrandt in Support of First Day Motions and Second Day Motions* (the "Hillebrandt Declaration") and the *Declaration of Derek Pitts* (the "Pitts Declaration") concurrently filed herewith. In further support of the Motion, the Debtors respectfully represent as follows:

## I. OVERVIEW

1.      By this Motion, the Debtors seek entry of the Interim Orders, which:

---

[2]    Capitalized terms not defined herein shall have the meanings ascribed to them in the DIP Term Credit Agreement, the DIP L/C Credit Agreement and the DIP Orders, as applicable.

a.    approve the DIP Term Credit Agreement, pursuant to which the DIP Term Lender is providing a term loan of up to $20,000,000 to the Debtors, subject to a $1,000,000 borrowing limit on an interim basis pending entry of the Final DIP Term Order;

b.    approve the DIP L/C Credit Agreement, pursuant to which the DIP L/C Issuer is providing a commitment to provide $18,328,777 in post-petition letters of credit on behalf of the Debtors (with such amount representing $10,828,777 in "rolled up" Pre-Petition Letters of Credit which shall be deemed issued under the DIP L/C Credit Agreement and $7,500,000 in new commitments);

c.    authorize the Debtors to execute the DIP Term Credit Agreement and DIP L/C Credit Agreement, and to perform such other acts as may be necessary or desirable in connection therewith;

d.    grant to the DIP Term Lender first priority, valid, perfected, and enforceable liens upon substantially all of the Debtors' assets (but excluding the Pre-Petition Cash Collateral Account and the Cash Management/Indemnity Account in favor of the Pre-Petition Secured Parties and the Post-Petition Cash Collateral Account (as defined in the Interim DIP L/C Order)) to the extent set forth in the DIP Term Credit Agreement, DIP Term Security Agreement and the Interim Orders to secure the obligations owing under the DIP Term Credit Agreement and the Interim Orders (collectively, the "DIP Term Obligations"), subject only to the Professional Fee Carve Out and the Permitted Prior Liens (as defined in the Interim DIP Term Order);

e.    grant to the DIP L/C Issuer first priority, valid, perfected, and enforceable liens upon the Post-Petition Cash Collateral Account (and to the extent applicable, the Pre-Petition Cash Collateral Account) to the extent set forth in the DIP L/C Credit Agreement, DIP L/C Security Agreement and the Interim Orders to secure the obligations owing under the DIP L/C Credit Agreement and the Interim Orders (collectively, the "DIP L/C Obligations" and, with the DIP Term Obligations, the "DIP Obligations"), with such liens not to be subject to the Professional Fee Carve Out or any Permitted Prior Lien;

f.    grant allowed superpriority administrative expense claims to the DIP Term Lender, subject to the Professional Fee Carve Out, to the extent set forth in the Interim DIP Term Order;

g.    grant allowed superpriority administrative expense claims to the DIP L/C Issuer, with such claims not subject to the Professional Fee Carve Out, to the extent set forth in the Interim DIP L/C Order;

h.    authorize the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code ("Cash Collateral") in which the Pre-Petition Secured Parties assert an interest other than the Cash Collateral in the Pre-Petition Cash Collateral Account and the Cash Collateral in the Cash Management/Indemnity Account;

i.    grant the Pre-Petition Secured Parties certain adequate protection for any decrease from and after the Petition Date in the value of their respective interests in the Debtors' property resulting from (i) the use, sale or lease of the Debtors' property (including the use of Cash Collateral), (ii) the subordination to the Professional Fee Carve Out, or (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, including, among other things, replacement liens, superpriority administrative expense claims, modification of, and relief from, the automatic stay (discussed below), the establishment of the Cash Management/Indemnity Account, and the ongoing payment of cash interest, fees, costs and expenses (including attorneys' fees), all to the extent provided in the Interim DIP L/C Order;

j.    modify and grant relief from the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Term Credit Agreement, DIP L/C Credit Agreement, and the Interim Orders, including, without limitation, granting the Pre-Petition Secured Parties relief from the automatic stay to enable them to apply the Cash Collateral deposited in the Pre-Petition Cash Collateral Account (and/or Post-Petition Cash Collateral Account, as applicable) to reimburse the Pre-Petition L/C Issuer for drawings and letter of credit fees when due without further order of the Court;

k.    waive any applicable stays under the Bankruptcy Rules, including, without limitation, under Rule 6004(h) of the Bankruptcy Rules, and provide for the immediate effectiveness of the Interim Orders; and

l.    schedule a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, to consider entry of the Final Orders granting the relief requested in this Motion on a final basis.

## II. JURISDICTION

2.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. §

157(b)(2).  Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§

1408 and 1409.

3.        Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry

of a final judgment or order with respect to the Motion if it is determined that the Court, absent

consent of the parties, cannot enter final orders or judgments consistent with Article III of the

United States Constitution.

4.        The statutory and legal predicates for the relief requested herein are sections

105, 361, 362, 363 and 364 of title 11 of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the

Bankruptcy Rules, and Rule 4001-2 of the Local Rules.

### III.  BACKGROUND

**A.    Introduction.**

5.        On the date hereof (the "Petition Date"), each of the Debtors commenced a

voluntary case under chapter 11 of the Bankruptcy Code.

6.        The Debtors are authorized to continue to operate their business and manage

their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  To date, no trustee, examiner or statutory committee has been appointed in these Cases by

the United States Trustee.

7.        The Debtors are a national multi-channel specialty retailer selling fashion

apparel and accessory items designed for female customers aged 13 to 24 years old.  The Debtors

are comprised of two primary units: (a) the retail store business, which is primarily operated by

The Wet Seal Retail, Inc.; and (b) the e-commerce business, which is primarily operated by

Wet Seal Catalog, Inc.  Through their retail store business, until shortly before the Petition Date,

the Debtors operated over 500 retail locations, principally in mall locations.  Though their e-

commerce business, the Debtors operate an e-commerce site at www.wetseal.com and have

01:16511103.1

5

nearly 2.5 million followers on their Facebook page. The Debtors also sell gift cards, which business is primarily operated through Wet Seal GC, LLC.

8.      The continuing fundamental shift in consumer behavior away from traditional mall shopping toward online-only stores and increased competition throughout the specialty retail fashion industry have created a difficult operating environment for traditional mall-based fashion retailers such as the Debtors. Indeed, over the past several weeks, at least three other specialty retailers catering to teen and young adult females—Deb Stores Holding LLC, dELiA*s, Inc., and Body Central Corp.—have commenced bankruptcy cases or assignments for the benefit of creditors and are in the process of conducting liquidations. This industry-wide weakness was, in the Debtors' case, exacerbated by (i) shifts by former management away from the "fast fashion" segment that had comprised the Debtors' core business, and (ii) failed ventures into side businesses. In the third quarter of 2014 the Debtors' board hired a new management team with the objective of bringing the Debtors back to their profitable roots, including (i) as Chief Executive Officer, Ed Thomas, who had served as CEO for the Debtors during the profitable years between 2007 and 2010, (ii) as Chief Digital Officer, Jon Kubo, who had also been with the Debtors during Mr. Thomas's earlier tenure, and (iii) as Chief Merchandising Officer, Christine Lee, an experienced merchant who shared Mr. Thomas's strategic vision. Beginning in September 2014, this team began the process of shifting the Debtors' operational strategy toward a more fashionable inventory mix and smaller inventory purchases.

9.      There was, unfortunately, insufficient time to implement the strategic vision before the Debtors faced a liquidity crisis, resulting from extensive operating losses driven by persistent sales weakness across the majority of the Debtors' store base,. The Debtors' liquidity position became further constrained in late 2014, when many of the Debtors' vendors began to

require cash on delivery payment terms in order to ship goods, rather than the credit terms that those vendors had offered in the past, and the Debtors were required to cash collateralize all of the letters of credit issued by the Pre-Petition Lender under that certain Amended and Restated Credit Agreement, dated as of February 3, 2011 (as amended, modified, or restated, the "Pre-Petition Facility").

10.    Facing the foregoing issues, the Debtors determined that it would not be possible to restructure the Debtors out of court without significant landlord concessions. Accordingly, the Debtors engaged in negotiations with their major landlords regarding concessions from such landlords. However, the Debtors were not able to reach an agreement with landlords on potential lease concessions during these negotiations, and on or about January 7, 2015, the Debtors closed 338 of their stores, irrevocably surrendered the premises to the applicable landlords, and terminated the portion of their workforce that had been employed in connection with those stores. The Debtors capitalized on the holiday shopping season to conduct the liquidation of the inventory in the closed stores, which required closing those stores as soon as they ran out of inventory.

11.    The Debtors intend to reorganize their business around the e-commerce business and the remaining stronger-performing stores, which together accounted for more than half of the Debtors' net sales for the nine months ending on November 1, 2014. The Debtors believe that doing so will help restore the Debtors to a stronger financial position.

12.    To meet their objectives, the Debtors have entered into (i) the DIP Term Facility, pursuant to which the Debtors will receive a senior debtor-in-possession term loan that should provide them with sufficient runway to navigate through the reorganization process, and (ii) that certain Plan Sponsorship Agreement with B. Riley, pursuant to which B. Riley will

commit to a plan of reorganization under which B. Riley will receive 80% of newly issued common stock in the reorganized Debtors in exchange for investment of $20 million. On the effective date of the plan, B. Riley will convert the entire DIP Term Facility into equity and contribute the balance of the $20 million to the reorganized Debtors in cash. The remaining common stock will be issued to holders of allowed general unsecured claims whose claims are not satisfied through a convenience class cash election. The Debtors also have entered into the DIP L/C Credit Agreement, pursuant to which the Debtors will obtain letters of credit that are required post-petition in the ordinary course of their business.

13.     The detailed factual background relating to the Debtors and the commencement of these Cases is set forth in the Hillebrandt Declaration, as well as the Pitts Declaration.

**B.     Events Leading Up to the DIP Facilities.**

14.     Recognizing that they were facing a near term liquidity crisis, the Debtors attempted for much of the second half of 2014 to obtain liquidity on an out-of-court basis to provide them with sufficient runway to implement an operational turnaround. The Debtors, however, were unable to obtain such financing absent significant concessions from landlords to reduce the cash burn associated with the store base. As it became apparent that sufficient landlord concessions might not be forthcoming, the Debtors focused significant efforts on obtaining debtor-in-possession financing and a chapter 11 investor.

15.     Despite the severe distress in the teen retail sector (evidenced by the liquidations within the last few weeks of Deb Stores Holding LLC, dELiA*s, Inc., and Body Central Corp.), in the weeks following mid-December 2014 the Debtors were nonetheless able to engage with the potential lenders most likely to provide them with debtor-in-possession financing or be a plan sponsor. As a result of these efforts, investment banking firm B. Riley

agreed both to provide debtor-in-possession financing and to serve as a plan sponsor to the Debtors.  In addition, the Pre-Petition Lender, as DIP L/C Issuer, agreed to issue letters of credit that are required post-petition in the ordinary course of the Debtors' business.

16.     The financing and plan sponsorship package presented by B. Riley, combined with the financing offered by the DIP L/C Issuer, presents the best option for the Debtors to maximize the value of their estates under the circumstances.  Absent these arrangements, the Debtors are expected to run out of cash within a matter of weeks.

### IV.  PRE-PETITION CAPITAL STRUCTURE AND INDEBTEDNESS

17.     The Debtors are indebted to the Pre-Petition Secured Parties under the Pre-Petition Facility.  As of the Petition Date, however, there are no outstanding borrowings under the Pre-Petition Facility, and all letters of credit issued by the Pre-Petition Lender in connection with the Pre-Petition Facility are cash collateralized by the Debtors.  On the Petition Date, borrowings and other claims under the Pre-Petition Facility were secured by cash, cash equivalents, investments, receivables and inventory held by the Debtors.

### V.  NEED FOR THE DIP FACILITIES<br>AND CONTINUED USE OF CASH COLLATERAL

18.     The Debtors have an urgent and immediate need to obtain post-petition financing.  The Debtors do not have sufficient funds on hand or generated from their business to fund operations.  Without the post-petition financing and the use of cash collateral that will be provided under the DIP Term Credit Agreement, DIP L/C Credit Agreement and the proposed DIP Orders, the Debtors would not be able to maintain operations pending confirmation of a plan of reorganization that will maximize value for all constituents.

01:16511103.1

19.     As described above, the Debtors have executed a plan sponsorship agreement with B. Riley, pursuant to which it shall pay $20 million (including through conversion of the entire DIP Term Facility into equity) in exchange for 80% of the equity in the reorganized Debtors under a plan of reorganization (the "Plan"). Pending confirmation of the Plan, the Debtors intend to operate their business in the ordinary course and require immediate access to post-petition financing and cash collateral.

20.     Without the proposed credit facility and access to cash collateral, the Debtors will not have any liquidity to operate their business, fund their ordinary course expenditures, including paying their over 2,825 employees, or pay the expenses necessary to administer the Cases. Absent adequate funding, the Debtors would be required to close their stores prematurely, otherwise cease operations, and liquidate on a piecemeal basis, causing irreparable harm to the Debtors and their estates. Accordingly, the Debtors have an urgent and immediate need for the DIP Facilities and entry of the Interim Orders.

21.     The Debtors have sought and were unable to obtain financing from other sources on terms preferable to the proposed DIP Facilities.

22.     Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require financing under the terms of the DIP Term Credit Agreement and DIP L/C Credit Agreement and hereby request authority to obtain such financing in compliance with the proposed DIP Orders.

## VI. CONCISE STATEMENT OF RELIEF REQUESTED

23.　　In accordance with Rule 4001 of the Bankruptcy Rules and Local Rule

4001-2, below is a summary of the terms of the DIP Term Credit Agreement[3]

| | | |
|---|---|---|
| (a) | Borrowers: | The Wet Seal, Inc. (Lead Borrower);<br>The Wet Seal Retail, Inc.; Wet Seal Catalog, Inc.<br><br>(*see* introductory paragraph of the DIP Term Credit Agreement (pg. 1); Schedule 1.01 of the DIP Term Credit Agreement) |
| (b) | Guarantors: | Wet Seal GC, LLC<br><br>(*see* defined terms of the DIP Term Credit Agreement (pg. 12)) |
| (c) | DIP Lender: | B. Riley Financial, Inc. ("B. Riley") (DIP Term Lender)<br><br>(*see* introductory paragraph of the DIP Term Credit Agreement (pg. 1)) |
| (d) | Purpose: | The DIP Term Facility will be used (i) for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms of the Interim DIP Term Order, and in accordance with the Approved Budget and (ii) to pay costs, expenses and fees in connection with the preparation, negotiation, execution and delivery of the DIP Term Credit Agreement and the other DIP Term Financing Agreements (defined below), subject to Section 6.19 of the DIP Term Credit Agreement.<br><br>Neither the proceeds of the DIP Term Financing Agreements, the DIP Collateral, nor the Professional Fee Carve Out will be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Term Lender, including in connection with the validity of the |

---

[3]　　The summary of the terms and conditions of the DIP Term Credit Agreement and the DIP Orders set forth in this Motion are intended solely for informational purposes and are qualified in their entirety by the DIP Term Credit Agreement and the DIP Orders. In the event there is any conflict between this Motion and the DIP Orders, the DIP Orders will control in all respects. Capitalized terms used in the following chart but not defined therein have the meanings set forth in the DIP Term Credit Agreement and the Interim DIP Term Order, as applicable.

|     |                                      | claims granted to the DIP Term Lender.                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                     |
| --- | ------------------------------------ | --------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|     |                                      | In addition, none of the proceeds of the DIP Term Facility will be used for any other purpose prohibited by Section 7.11 of the DIP Term Credit Agreement or Paragraph 17 of the Interim DIP Term Order.                                                                                                                                                                                                                                                                                                                                                     |
|     |                                      | (*see* § 7.11 of the DIP Term Credit Agreement; ¶¶ 4 & 17 of the Interim DIP Term Order)                                                                                                                                                                                                                                                                                                                                                                                                                                                                   |
| (e) | <u>Type and Amount of DIP Facility</u>: | Term loan with total Commitment of $20,000,000 and $5,000,000 Availability Block.  (*See* defined terms of the DIP Term Credit Agreement (pp. 2 &5)                                                                                                                                                                                                                                                                                                                                                                                                         |
| (f) | <u>Interest Rate</u>:                | Loans under the DIP Term Credit Agreement bear interest on the outstanding principal amount thereof at a rate per annum equal 10.25%. The Default Rate is 12.25%.  (*see* defined terms of the DIP Term Credit Agreement (pp. 1 & 7))                                                                                                                                                                                                                                                                                                                        |
| (g) | <u>Facility Fees</u>:                | The Borrowers shall pay to the DIP Term Lender commitment fees (a) on January 24, 2015, in an amount equal to 2.50% times the amount by which the Commitment exceeds the Availability Block then in effect, and (b) on any subsequent date on which the DIP Term Lender decreases the Availability Block, in an amount equal to 2.50% times the amount of such reduction. The commitment fees shall be fully earned on the Closing Date, and shall not be subject to refund or rebate for any reason.  (*see* § 2.09 of the DIP Term Credit Agreement)         |
| (h) | <u>Payment of Professional Fees</u>: | The Debtors shall pay all reasonable out-of-pocket costs and expenses of the DIP Term Lender (and its Affiliates) in connection with the DIP Term Financing Agreements and the Interim DIP Term Order.  Payment of such fees shall not be subject to allowance by the Court, provided, however, that the Debtors may seek a determination by the Court whether such fees and expenses are reasonable. Professionals of the DIP Term Lender will not be required to comply with the U.S. Trustee fee guidelines, but shall provide to the Office of the United States Trustee and any Committee a copy of any invoices for professional fees and expenses provided to the Debtors during the pendency of the Cases.  (*see* § 9.04(a) of the DIP Term Credit Agreement; ¶ 38 of |

| | | the Interim DIP Term Order) |
|---|---|---|
| (i) | <u>Closing Date</u>: | "<u>Closing Date</u>" means the date on which the conditions precedent to the initial Borrowing under the DIP Term Credit Agreement are satisfied or waived by the DIP Term Lender.<br><br>(*see* defined terms of the DIP Term Credit Agreement (pg. 5)) |
| (j) | <u>Conditions Precedent to Interim Lending</u>: | The obligations of the DIP Term Lender to make the interim financing available will be subject to satisfaction, or waiver by the DIP Term Lender in its sole and absolute discretion, of the conditions precedent set forth in Article IV of the DIP Term Credit Agreement.<br><br>(*see* Article IV of the DIP Term Credit Agreement; ¶ 5 of the Interim DIP Term Order) |
| (k) | <u>Borrowing Limit on Interim Basis</u> | Pursuant to the Interim DIP Term Order, the Debtors may, on an interim basis, borrow under the DIP Term Facility up to an aggregate principal amount of $1,000,000.<br><br>(*see* pg. 1 & ¶ 3 of the Interim DIP Term Order) |
| (l) | <u>Approved Budget and Financial Reporting</u>: | Use of cash shall be subject to the Approved Budget.  The Debtors are required to provide post-petition financial reporting to the DIP Term Lender, and to satisfy financial covenants customary for a transaction of this kind.<br><br>(*see* §§ 6.01 & 6.19 of the DIP Term Credit Agreement) |
| (m) | <u>Cash Dominion</u>: | During the period from and after any date on which the Liquidity Amount (the sum of (x) unrestricted cash and cash equivalents of the Debtors (excluding, for the avoidance of doubt, amounts deposited as cash collateral) plus (y) the maximum amount that is available for borrowing under the DIP Term Credit Agreement, provided that, if such borrowing is unavailable solely due to a Default (that has not become an Event of Default), then such Default shall be deemed not to exist solely for purposes of the foregoing clause (y)) of the Debtors is less than $5,000,000, the Debtors shall (i) deliver written notice to each of its credit card clearinghouses and cause each such clearinghouse to pay into the Cash Collateral Account and (ii) as soon as practicable, but in any event within ten (10) Business Days of the beginning of such period, enter into and maintain a Blocked Account Agreement with each Blocked Account Bank, which agreement shall require the |

| | | |
|---|---|---|
| | | automated clearing house transfers or wire transfer no less frequently than daily to the Cash Collateral Account of all cash receipts and collections, and, notwithstanding anything in Section 6.01(a) of the DIP Term Credit Agreement to the contrary, the Debtors shall cause any and all amounts that would be required to be deposited to the Cash Collateral Account pursuant to Section 6.01(a) of the DIP Term Credit Agreement to be deposited in the Cash Collateral Account in the manner provided in that section.<br><br>(*see* § 6.11 of the DIP Term Credit Agreement) |
| (n) | Prepayments: | The Borrowers may, upon irrevocable notice, voluntarily prepay Loans in whole or in part without premium or penalty, provided that notice is given not later than 1:00 p.m. on the date of prepayment of such Loans and that such prepayment is in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof (or, if less, the entire principal amount outstanding). Such prepayment must be accompanied by all accrued interest on the amount prepaid.  The Debtors shall prepay the Loans with the net proceeds of any sale or disposition of any furniture, fixture or equipment promptly upon receipt of such proceeds.<br><br>(*see* § 2.05 of the DIP Term Credit Agreement) |
| (o) | Maturity Date: | The Maturity Date is the earlier of (a) February 16, 2015 unless the Final DIP Term Order shall have been entered on or before such date, in which case it shall be May 15, 2015, unless otherwise extended by the DIP Term Lender in its sole and exclusive discretion, and (b) the date on which the Sponsor terminates the Plan Sponsorship Agreement.<br><br>(*see* defined terms of the DIP Term Credit Agreement (pg. 16)) |
| (p) | Lien and Superpriority Claim; Priority: | The DIP Term Lender is granted the following Liens (as defined in section 101(37) of the Bankruptcy Code) and claims, subject only to the Professional Fee Carve Out and collective senior liens, claims, and interests of Bank of America, N.A. specifically identified in the Interim DIP L/C Order and/or the Cash Management Order (the "BofA Interests"):<br><br>        (i)      a first priority valid, perfected, and enforceable lien upon all of the DIP Collateral (defined below) to the extent set forth in the DIP Term Credit Agreement and all other agreements, |

<table>
<tr>
<td></td>
<td></td>
<td>documents, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Term Lender, including, without limitation, all "Loan Documents" (as defined in the DIP Term Credit Agreement), each as amended and in effect from time to time (collectively, the "<u>DIP Term Financing Agreements</u>"); and

(ii)     a superpriority administrative expense claim.

(*see* § 2.13 of the DIP Term Credit Agreement; ¶¶ 6-9 of the Interim DIP Term Order)</td>
</tr>
<tr>
<td>(q)</td>
<td><u>Collateral:</u></td>
<td>"<u>DIP Collateral</u>" means, collectively, all of the Debtors' presently owned or hereafter acquired property and assets, whether such property and assets were acquired before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located, and the proceeds and products thereof, including, without limitation, (a)(i) claims and causes of action arising under section 549 of the Bankruptcy Code and any and all recoveries and settlements thereof, and (ii) claims and causes of action under chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof but only to the extent necessary to reimburse the DIP Term Lender for the amount of the Professional Fee Carve Out, if any, used to finance the pursuit of such recovery or settlement with respect to such claims and causes of action (together, the "<u>Specified Bankruptcy Recoveries</u>"), and (b) the proceeds of the Debtors' leases of real property (the "<u>Lease Proceeds</u>") (for the avoidance of doubt, the encumbrance of the Lease Proceeds pursuant to the Interim DIP Term Order and the Final DIP Term Order shall not constitute a direct encumbrance of any real property lease itself unless such encumbrance is permitted thereunder), and in all cases subject to the BofA Interests and the Professional Fee Carve Out.

(*see* ¶ E(3) of the Interim DIP Term Order)</td>
</tr>
<tr>
<td>(r)</td>
<td><u>Waivers:</u></td>
<td>Subject to entry of the Final DIP Term Order, the DIP Term Lender shall be entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

In addition, the Debtors shall not in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Term Lender under the Interim DIP Term Order by offering a subsequent lender or a party-in-interest a</td>
</tr>
</table>

|     |     | superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise. |
| --- | --- | --- |
|     |     | The DIP Term Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral. |
|     |     | (*see* ¶ E(6), 32 & 42 of the Interim DIP Term Order) |
| (s) | Perfection Other Than Under State Law: | The DIP Liens may be perfected other than under state law. |
|     |     | (*see* ¶¶ 6, 7 & 12 of the Interim DIP Term Order) |
| (t) | Professional Fee Carve Out: | The Professional Fee Carve Out consists of (i) all fees required to be paid to the Clerk of the Court; (ii) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. §§ 156(c) and 1930(a)(6); (iii) all professional fees and expenses which have been incurred, accrued or invoiced (but remain unpaid), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice less the amount of the chapter 11 professionals' pre-petition retainers received but not previously applied to their professional fees and expenses; and (iv) all accrued and unpaid professional fees and expenses of chapter 11 professionals incurred after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $300,000 less, without duplication, the amount of such chapter 11 professionals' pre-petition retainers received but not previously applied to their professional fees and expenses. |
|     |     | (*see* defined terms of the DIP Term Credit Agreement (pg. 21)) |
| (u) | Representations and Warranties: | Customary for financings of this type. |
|     |     | (*see* Article V of the DIP Term Credit Agreement) |
| (v) | Covenants: | As specified in the DIP Term Credit Agreement. |
|     |     | The Debtors covenant that, on or before ninety (90) days following the Petition Date, they will obtain an order of the Court extending the time period for the Debtors to assume or reject Leases to not less than two hundred ten (210) days from the Petition Date. |
|     |     | Article VII of the DIP Term Credit Agreement includes Bankruptcy Related Negative Covenants, including that the Loan Parties shall not seek, consent to, or permit to exist: |

(i)　　any order which authorizes the rejection or assumption of any Leases of any of the Debtors (other than rejection of Leases related to Permitted Store Closings) without the DIP Term Lender's prior consent, which shall not be unreasonably withheld or delayed,

(ii)　　any modification to the Interim DIP Term Order or the Final DIP Term Order,

(iii)　　a priority claim or administrative expense against any Debtor equal or superior to the priority claim of the DIP Term Lender in respect of the Obligations, except with respect to the Professional Fee Carve Out and the Other DIP Term Obligations,

(iv)　　any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations (subject to certain exceptions),

(v)　　any order which authorizes the return of any of the Debtors' property pursuant to section 546(h) of the Bankruptcy Code,

(vi)　　any order which authorizes the payment of any Indebtedness (other than payments of Indebtedness reflected in the Approved Budget and permitted to be paid under the DIP Term Credit Agreement, and other payments of Indebtedness approved by the DIP Term Lender) incurred prior to the Petition Date or the grant of "adequate protection" with respect to any such Indebtedness which is secured by a Lien (other than as provided in the Interim DIP Term Order with respect to Pre-Petition Liabilities becoming Other DIP Term Obligations), or

(vii)　　any order seeking authority to take any action that is prohibited by the terms of the DIP Term Credit Agreement or the other Loan Documents or refrain from taking required actions under those documents.

The Debtors also covenant that in the event that, for any reason, Edmund Thomas shall cease to serve as the chief executive officer of The Wet Seal Inc. with substantially the same authority and duties as existed prior to the Petition Date, The Wet Seal Inc. shall appoint a successor to such role acceptable to the DIP Term Lender in its sole

| | | |
|---|---|---|
| | | discretion within five (5) Business Days.<br><br>(*see* Article VI (affirmative covenants), Article VII (negative covenants), §§ 6.21 & 7.16 of the DIP Term Credit Agreement) |
| (w) | Events of Default: | As specified in the Interim DIP Term Order and the DIP Term Credit Agreement.  Among other defaults, failure of the Court to enter a Final DIP Term Order, in form and substance satisfactory to the DIP Term Lender, within thirty (30) days after the Petition Date constitutes an Event of Default.<br><br>Failure of the Debtors to obtain, on or before ninety (90) days following the Petition Date, an order of the Court extending the time period for the Debtors to assume or reject Leases to not less than two hundred ten (210) days from the Petition Date is an Event of Default under the DIP Term Credit Agreement.<br><br>Under the Interim DIP Term Order, the termination of the Plan Sponsorship Agreement triggers the "Commitment Termination Date", which constitutes a DIP Order Event of Default (defined below), provided that the Debtors shall be given written notice and five (5) business days to cure any act, event, default or delay under the Plan Sponsorship Agreement.<br><br>If the Liquidity Amount falls below $3,000,000 at any time, such event is an Event of Default.<br><br>(*see* defined terms of the DIP Term Credit Agreement (pg. 10); § 8.01 of the DIP Term Credit Agreement; ¶¶ 22-24 of the Interim DIP Term Order) |
| (x) | Remedies Upon Default: | Prior to exercising any remedy under the DIP Term Financing Agreements following the occurrence of a DIP Order Event of Default (defined as the occurrence of (a) the Commitment Termination Date or (b) an Event of Default under the DIP Term Credit Agreement), the DIP Term Lender shall provide not less than five (5) days' written notice of such default occurrence to: (i) the Debtors and their counsel, (ii) counsel for any Committee(s) (or if no Committee has been appointed, the Debtors' forty (40) largest unsecured creditors), (iii) counsel to Bank of America, N.A., and (iv) the Office of the United States Trustee.  Following the giving of written notice by the DIP Term Lender of the occurrence of a DIP Order Event of Default, the Debtors and any Committee(s) appointed in |

the Cases, if any, shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether a DIP Order Event of Default has occurred. If either (a) the Debtors or any such Committee(s) do not contest the occurrence of a DIP Order Event of Default and, therefore, the right of the DIP Term Lender to exercise its remedies, or (b) the Debtors or any such Committee(s) do timely contest the occurrence of a DIP Order Event of Default and the Court, after notice and hearing, declines to stay the enforcement thereof, the automatic stay as to the DIP Term Lender shall automatically terminate at the end of the five (5) day notice period or the order of the Court declining to stay such enforcement.

Upon the occurrence and during the continuance of any DIP Order Event of Default, the DIP Term Lender is granted relief from the automatic stay to exercise its rights on default without further order of the Court.  The DIP Term Lender may require the Debtors to liquidate the DIP Collateral on behalf of the DIP Term Lender in such manner as the DIP Term Lender may require.  If the Debtors fail to do so or to do so diligently, the DIP Term Lender may liquidate the DIP Collateral itself, including through filing and prosecuting motions, in the name of the Debtors.

In addition, as set forth in the Interim DIP Term Order, the Debtors shall continue to deliver the proceeds of DIP Collateral (other than the Cash Collateral on deposit in the Pre-Petition Cash Collateral Account, the Post-Petition Cash Collateral Account, and the Cash Management/Indemnity Account under the Interim DIP L/C Order and Cash Management Order) to the DIP Term Lender (who shall continue to apply such proceeds in accordance with the DIP Term Financing Agreements and the Interim DIP Term Order and the Interim DIP L/C Order (where applicable)).  The Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the DIP Term Obligations, the DIP L/C Obligations (where applicable), and the Professional Fee Carve Out.  Any obligation imposed on the DIP Term Lender to provide any loan or advance to the Debtors pursuant to the DIP Term Facility shall be suspended (whether for expenses previously incurred or to be incurred after the DIP Order Event of Default).

| | | |
|---|---|---|
| | | (*see* ¶¶ 25-29 of the Interim DIP Term Order; § 8.02 of the DIP Term Credit Agreement) |
| (y) | Amendments: | No amendment or waiver of any provision of the DIP Term Credit Agreement or any other Loan Document, and no consent to any departure by any Debtor therefrom, shall be effective unless in writing signed by the DIP Term Lender and the applicable Debtor, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. |
| | | The Debtors and the DIP Term Lender may amend, modify, supplement, or waive any provision of the DIP Term Financing Agreements to make non-material changes to such agreements (as determined by the Debtors and the DIP Term Lender) without further approval of the Court or any Committee; provided that, prior to effectuating any non-material change, amendment, modification, supplement or waiver of any provision of the DIP Term Financing Agreements, the Debtors and the DIP Term Lender shall consult with Bank of America, N.A. and any Committee with respect to same.  For the avoidance of doubt, any amendment, modification, supplement, or waiver that (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the Commitment, or (iii) changes the maturity date of the DIP Term Facility shall be considered a material change. Except as set forth above, all waivers, modifications, or amendments of any of the provisions of the DIP Term Order shall not be effective unless set forth in writing, signed by on behalf of the Debtors and the DIP Term Lender, and approved by the Court. |
| | | (*see* § 9.01 of the DIP Term Credit Agreement; ¶ 43 of the Interim DIP Term Order) |
| (z) | Indemnification and Exculpation: | The DIP Term Credit Agreement contains customary provisions regarding the Debtors' indemnification and exculpation of the DIP Term Lender. |
| | | (*see* § 9.04 of the DIP Term Credit Agreement) |
| (aa) | Releases: | The Debtors shall be deemed to have waived, discharged, and released the DIP Term Lender (together with its affiliates, agents, attorneys, officers, directors, and employees) of any rights the Debtors may have: |
| | | (i)    to challenge or object to any of the DIP |

| | | Term Obligations; |
|---|---|---|
| | | (ii)      to challenge or object to the security for the DIP Term Obligations, including, without limitation, the DIP Liens on the DIP Collateral; and |
| | | (iii)      to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the DIP Term Financing Agreements, the DIP Term Obligations, the DIP Liens, or any other obligations related thereto. |
| | | The Debtors acknowledge that they do not possess and will not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, and non-avoidability of any of the DIP Term Financing Agreements, the DIP Term Obligations, or the DIP Liens, or any claim of the DIP Term Lender pursuant to the DIP Term Financing Agreements or otherwise. |
| | | (*see* ¶¶ E(4) & 40 of the Interim DIP Term Order) |
| (bb) | Prohibited Orders | Unless the (a) DIP Term Lender has provided its prior written consent or all DIP Term Obligations have been irrevocably paid in full in cash (or will be irrevocably paid in full in cash upon entry of an order approving indebtedness described in Paragraph 33 of the Interim DIP Term Order, or other arrangements for the payment of the DIP Term Obligations satisfactory to the DIP Term Lender in its sole and exclusive discretion have been made), and (b) the Commitment has terminated, there shall not be any order entered in the Cases or in any Successor Cases that authorized, or any action taken that involves, any of the following: |
| | | (i)      Any modification, stay, vacation, or amendment to the Interim DIP Term Order or the Cash Management Order, or any change in the terms applicable to the DIP L/C Facility that is less favorable to the Debtor than the existing applicable terms, to which the DIP Term Lender has not consented; |
| | | (ii)      A priority claim or administrative expense or unsecured claim against the Debtors (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in |

sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the DIP Term Lender in respect of the DIP Term Obligations, except with respect to the Professional Fee Carve Out or the BofA Interests;

(iii)    Any Lien on any DIP Collateral having a priority equal or superior to the Lien securing the DIP Term Obligations, except (i) with respect to the Professional Fee Carve Out, and (ii) with respect to the BofA Interests;

(iv)    The return of any of the Debtors' property pursuant to section 546(h) of the Bankruptcy Code;

(v)    The payment of any Indebtedness (other than Indebtedness reflected in the Approved Budget and other Indebtedness approved by the DIP Term Lender) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) that is secured by a Lien, in each case other than as set forth in the Interim DIP L/C Order or the Cash Management Order; or

(vi)    Any exercise by Bank of America, N.A. of any default remedy under the Interim DIP L/C Order or any agreement or document entered into under or in connection with the Interim DIP L/C Order, directly or indirectly, against any DIP Collateral in which the DIP Term Lender's interests in such DIP Collateral are senior to any interests therein held by Bank of America, N.A.; provided that, for the avoidance of doubt, Bank of America, N.A. shall be permitted to use the Cash Collateral on deposit in the Pre-Petition Cash Collateral Account (as defined in the Interim DIP L/C Order), the Post-Petition Cash Collateral Account (as defined in the Interim DIP L/C Order), and the Cash Management/Indemnity Account (as defined in the Interim DIP L/C Order) in accordance with the terms of the Interim DIP L/C Order and any agreement or document entered into under or in connection with the Interim DIP L/C Order.

(*see* ¶ 24 of the Interim DIP Term Order)

24.     In accordance with Rule 4001 of the Bankruptcy Rules and Local Rule 4001-2, below is a summary of the terms of the proposed DIP L/C Credit Agreement:[4]

| (a) | Applicants: | The Wet Seal, Inc. (Applicant Representative); The Wet Seal Retail, Inc.; Wet Seal Catalog, Inc.; and Wet Seal GC, LLC *(see* introductory paragraph of the DIP L/C Credit Agreement (pg. 1); Schedule 1.01 of the DIP L/C Credit Agreement) |
|---|---|---|
| (b) | DIP L/C Issuer: | Bank of America, N.A. ("BofA") (L/C Issuer) *(see* defined terms of the DIP L/C Credit Agreement (pg. 8)) |
| (c) | Purpose: | The letters of credit issued under the DIP L/C Facility will be used in a manner consistent with the terms and conditions of the DIP L/C Facility Agreements and the Interim DIP L/C Order. Neither the Post-Petition Letters of Credit issued under the DIP L/C Facility Agreements, the DIP Collateral, the Pre-Petition Collateral, nor the Professional Fee Carve Out (to the extent funded with proceeds of the Pre-Petition Collateral) will be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP L/C Issuer or the Pre-Petition Secured Parties, including in connection with the validity of the liens granted to the DIP L/C Issuer or the Pre-Petition Secured Parties. Any L/C Credit Extension (other than the Pre-Petition Letters of Credit which are deemed issued under the DIP L/C Credit Agreement) may not be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purposes other than in connection with the purchase of Inventory or Equipment (each as defined in the UCC) by a Debtor in the ordinary course of business. *(see* § 7.05 of the DIP L/C Credit Agreement; ¶¶ 6 & 26 of |

---

[4]   The summary of the terms and conditions of the DIP L/C Credit Agreement and the DIP Orders set forth in this Motion are intended solely for informational purposes and are qualified in their entirety by the DIP L/C Credit Agreement and the DIP Orders. In the event there is any conflict between this Motion and the DIP Orders, the DIP Orders will control in all respects. Capitalized terms used in the following chart but not defined therein have the meanings set forth in the DIP L/C Credit Agreement and the Interim DIP L/C Order, as applicable.

| | | the Interim DIP L/C Order) |
|---|---|---|
| (d) | Type and Amount of DIP Facility: | A $18,328,777 letter of credit facility, consisting of (i) $10,828,777 in "rolled-up" Pre-Petition Letters of Credit, which are deemed issued under the DIP L/C Credit Agreement and (ii) $7,500,000 in new commitments.<br><br>(*See* defined terms of the DIP L/C Credit Agreement (pg. 4) |
| (e) | Interest Rate: | Not applicable. |
| (f) | Facility Fees: | There is a 0.75% (or $56,250) closing fee (with respect to the $7,500,000 in new Commitments only), a 0.50% per annum undrawn line fee, and a 2.5% per annum letter of credit fee payable to the DIP L/C Issuer.  The Default Rate for letter of credit fees is 4.50% (*i.e.*, 2.50% plus 2% per annum).<br><br>(*see* §§ 2.01(h) & 2.04(a) & (b) of the DIP L/C Credit Agreement) |
| (g) | Payment of Professional Fees: | The Debtors shall pay all reasonable out-of-pocket costs and expenses of the DIP L/C Issuer (and its Affiliates) and Pre-Petition Secured Parties in connection with the DIP L/C Facility Agreements, the Pre-Petition Loan Documents and the Interim DIP L/C Order, including, without limitation, reasonable and documented legal, accounting, financial advisory and other professional fees, costs and expenses.<br><br>Payment of such fees shall not be subject to allowance by the Court, provided, however, that the Debtors may seek a determination by the Court whether such fees and expenses are reasonable. Professionals of the DIP L/C Issuer and/or Pre-Petition Secured Parties will not be required to comply with the U.S. Trustee fee guidelines, but shall provide to the Office of the United States Trustee and any Committee a copy of any invoices for professional fees and expenses provided to the Debtors during the pendency of the Cases.<br><br>(*see* § 9.04(a) of the DIP L/C Credit Agreement; ¶ 38 of the Interim DIP L/C Order) |
| (h) | Closing Date: | "Closing Date" means the date on which the conditions precedent to the initial L/C Credit Extension under the DIP L/C Credit Agreement are satisfied or waived by the DIP L/C Issuer.<br><br>(*see* defined terms of the DIP L/C Credit Agreement |

| | | (pg. 3)) |
|---|---|---|
| (i) | Conditions Precedent to Interim Lending: | The obligations of the DIP L/C Issuer to make the interim financing available will be subject to satisfaction, or waiver by the DIP L/C Issuer in its exclusive discretion, of the conditions precedent set forth in Article IV of the DIP L/C Credit Agreement.<br><br>The DIP L/C Issuer will issue Letters of Credit during the Letter of Credit Availability Period, which commences on the Closing Date and ends on the earliest of:<br><br>(i)    April 30, 2015,<br><br>(ii)    the date on which the maturity of the Obligations is accelerated and the Commitment and the L/C Issuer's obligation to issue Letters of Credit under the DIP L/C Credit Agreement is irrevocably terminated in accordance with Article VIII of the DIP L/C Credit Agreement,<br><br>(iii)    the termination of the Commitment and the L/C Issuer's obligation to issue Letters of Credit under the DIP L/C Credit Agreement in accordance with the provisions of Section 2.02 of the DIP L/C Credit Agreement,<br><br>(iv)    the date on which a Sale is consummated, or<br><br>(v)    a Plan Effective Date.<br><br>(*see* defined terms of the DIP L/C Credit Agreement (pg. 9); Article IV of the DIP L/C Credit Agreement; ¶ 7 of the Interim DIP L/C Order) |
| (j) | Approved Budget and Financial Reporting: | The Debtors are required to provide post-petition financial reporting (including the Approved Budget) to the DIP L/C Issuer.<br><br>(*see* § 6.01 of the DIP L/C Credit Agreement) |
| (k) | Maturity Date: | The Maturity Date is February 13, 2015 unless the Final DIP L/C Order shall have been entered on or before such date, in which case it shall be May 15, 2015, in each case, unless otherwise extended by the L/C Issuer in its sole and exclusive discretion.<br><br>(*see* defined terms of the DIP L/C Credit Agreement (pg. 10)) |

01:16511103.1

| (l) | Lien and Superpriority Claim; Priority: | All obligations under the DIP L/C Credit Agreement (and upon effectuation of the deemed "roll up" of the Pre-Petition Letters of Credit into Post-Petition Letters of Credit, inclusive of any payment and/or reimbursement obligations in respect of any Pre-Petition Letters of Credit) shall be: |
|---|---|---|
| | | (i)      secured by a first priority valid, perfected, and enforceable lien upon all of the DIP Collateral (defined below); and |
| | | (ii)      entitled to superpriority administrative expense claim status, which claim shall be (i) junior and subordinate to the Professional Fee Carve Out and (ii) *pari passu* with any superpriority administrative claim that may be granted to the DIP Term Lender under the Interim DIP Term Order and Final DIP Term Order. |
| | | (*see* § 2.08 of the DIP L/C Credit Agreement; pp. 3-4 & ¶¶ 8, 9, 10 & 11 of the Interim DIP L/C Order) |
| (m) | Collateral: | "DIP Collateral" means, collectively, (i) the cash collateral (as such term is defined in section 363 of the Bankruptcy Code) ("Cash Collateral") deposited in the post-petition cash collateral account established with the DIP L/C Issuer under the DIP L/C Facility Agreements (the "Post-Petition Cash Collateral Account"), (ii) any Cash Collateral deposited in the Pre-Petition Cash Collateral Account, and (iii) subject to Paragraph 13(d) of the Interim DIP L/C Order, any excess Cash Collateral deposited in the Cash Management/Indemnity Account (defined below) after satisfaction of any Pre-Petition Indemnity Claims and payment of all Treasury Management Obligations. |
| | | (*see* ¶ 8 of the Interim DIP L/C Order) |
| (n) | Waivers: | Subject to entry of the Final DIP L/C Order, the DIP L/C Issuer and the Pre-Petition Secured Parties shall be entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code. |
| | | In addition, upon entry of the Final DIP L/C Order, the Debtors shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the DIP L/C Issuer and/or the Pre-Petition Secured Parties with respect to proceeds, product, offspring or profits of any of the Pre-Petition Collateral or the DIP Collateral. |

<table>
<tr><td></td><td></td><td>Neither the DIP L/C Issuer nor the Pre-Petition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Pre-Petition Collateral, as applicable.

The Debtors shall not in any way prime or seek to prime the security interests and post-petition Liens provided to the DIP L/C Issuer under the Interim DIP L/C Order and the DIP L/C Facility Agreements by offering a subsequent lender or a party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise in the Cash Collateral securing the DIP Letters of Credit.

(*see* ¶¶ E(6), 41 & 42 of the Interim DIP L/C Order)</td></tr>
<tr><td>(o)</td><td>Roll Up of Pre-Petition Debt:</td><td>All (a) outstanding Pre-Petition Letters of Credit, in the approximate aggregate amount of $10,828,777 are deemed to be "rolled up" into DIP Letters of Credit such that, effective upon entry of the Interim DIP L/C Order all outstanding Pre-Petition Letters of Credit shall be treated for all purposes as if they were DIP Letters of Credit issued pursuant to the DIP L/C Credit Agreement, and (b) all Cash Collateral on deposit in the Pre-Petition Cash Collateral Account will be treated as post-petition Cash Collateral and as part of the DIP Collateral for all purposes under the Interim DIP L/C Order. At the election of the DIP L/C Issuer, amounts in the Pre-Petition Cash Collateral Account may be transferred to the Post-Petition Cash Collateral Account.

(*see* § 2.01 of the DIP L/C Credit Agreement; § 4.2(b) of the DIP L/C Security Agreement; ¶¶ 3 of the Interim DIP L/C Order)</td></tr>
<tr><td>(p)</td><td>Perfection Other Than Under State Law:</td><td>DIP L/C Liens may be perfected other than under state law.

(*see* ¶¶ 8, 9 & 17 of the Interim DIP L/C Order)</td></tr>
<tr><td>(q)</td><td>Professional Fee Carve Out:</td><td>The Professional Fee Carve Out consists of (i) all fees required to be paid to the Clerk of the Court; (ii) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. §§ 156(c) and 1930(a)(6); (iii) all professional fees and expenses which have been incurred, accrued or invoiced (but remain unpaid), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice less the amount of the chapter 11 professionals'</td></tr>
</table>

| | | |
|---|---|---|
| | | pre-petition retainers received but not previously applied to their professional fees and expenses; and (iv) all accrued and unpaid professional fees and expenses of chapter 11 professionals incurred after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $300,000 less, without duplication, the amount of such chapter 11 professionals' pre-petition retainers received but not previously applied to their professional fees and expenses.<br><br>(*see* defined terms of the DIP Term Credit Agreement (pg. 21); pg. 3 of the Interim DIP L/C Order) |
| (r) | Voluntary Subordination of Pre-Petition Secured Parties' Liens to DIP Term Lender: | Subject to entry of the Interim DIP Term Order, (i) the Pre-Petition Secured Parties' Liens in and upon the Pre-Petition Collateral, (ii) the Adequate Protection Replacement Liens, and (iii) the Adequate Protection Superpriority Claims, shall be subordinate to any Liens and priorities granted to the DIP Term Lender in accordance with the terms of the Interim DIP Term Order and to the Professional Fee Carve Out; provided that, any such subordination shall expressly exclude for all purposes in the Interim DIP L/C Order, and otherwise, any and all (x) Liens granted to the DIP L/C Issuer and the Pre-Petition Secured Parties in and upon the DIP Collateral (including any Cash Collateral deposited in the Pre-Petition Cash Collateral Account) and the proceeds and products thereof, and (y) Liens granted to the DIP L/C Issuer and/or the Pre-Petition Secured Parties in and upon the Cash Collateral deposited in the Cash Management/Indemnity Account and the proceeds and products thereof.<br><br>(*see* ¶ 15 of the Interim DIP L/C Order) |
| (s) | Adequate Protection for Pre-Petition Secured Parties: | As adequate protection, solely to the extent of any diminution in value of their interests in the Debtors' property, the Pre-Petition Secured Parties are granted, subject to certain conditions set forth in the Interim DIP L/C Order:<br><br>    (i)    additional and replacement security interests and liens in "assets" of the same type which constituted Pre-Petition Collateral, whether arising pre-petition or post-petition and the DIP Collateral (in each case junior and subordinate to the DIP Term Lender's Liens and priorities (subject to the satisfaction of the conditions set forth in |

Paragraph 15 of the Interim DIP L/C Order), the DIP L/C Issuer's DIP L/C Liens, Permitted Prior Liens and the Professional Fee Carve Out and DIP Term Loan, as applicable); and

(ii)     an allowed superpriority administrative expense claim, which shall have priority over all administrative expense claims and unsecured claims against the Debtors and their estates, provided, however, that such claim shall be junior to (i) the DIP Superpriority Claim, (ii) the superpriority administrative expense claim granted to the DIP Term Lender (subject to the satisfaction of the conditions set forth in Paragraph 15 of the Interim DIP L/C Order), and (iii) the Professional Fee Carve Out.

The Pre-Petition Secured Parties are also granted:

(i)     relief from the automatic stay to enable them to apply the Cash Collateral deposited in the Post-Petition Cash Collateral Account (and where applicable, the Pre-Petition Cash Collateral Account) in respect of drawings and letter of credit fees when due without further order of the Court; and

(ii)     subject to Paragraph 38 of the Interim DIP L/C Order, current payment of the reasonable documented out-of-pocket costs and expenses of their financial advisors and attorneys.

Additionally, the Debtors shall establish an account (the "Cash Management/Indemnity Account") in the control of the Pre-Petition Secured Parties and BofA into which the sum of $1,500,000 shall be deposited as security for the mutual benefit of (i) the Pre-Petition Secured Parties, in respect of the Debtors' indemnification obligations arising under the Pre-Petition Loan Documents (the "Pre-Petition Indemnity Obligations"), and (ii) BofA, in respect of its provision of pre-petition and post-petition cash management and treasury management services to the Debtors (the "Treasury Management Fees").

The Pre-Petition Indemnity Obligations and the Treasury Management Obligations shall be secured by *pari passu* first priority liens in favor of the Pre-Petition Secured Parties and BofA on the Cash Management/Indemnity Account and the funds deposited therein and the proceeds thereof, and the Cash Management/Indemnity Account

| | | |
|---|---|---|
| | | shall also secure the Adequate Protection Superpriority Claim. The Pre-Petition Secured Parties and BofA may apply amounts in the Cash Management/Indemnity Account against the Pre-Petition Indemnity Obligations and the Treasury Management Obligations as and when they arise, without further notice to or consent from the Debtors, any Committee or any other parties in interest and without further order of the Court, subject to compliance with the provisions of Paragraph 38 of the Interim DIP L/C Order solely in the case of the Pre-Petition Indemnity Obligations. The Debtors shall remain liable to the Pre-Petition Secured Parties for all unpaid Pre-Petition Indemnity Obligations to the extent that the funds in the Cash Management/Indemnity Account are insufficient to satisfy them in full. |
| | | If as of the Challenge Period Termination Date a party in interest with requisite standing (including any Committee) has filed a Challenge Proceeding against the Pre-Petition Secured Parties related to the Pre-Petition Debt and/or Pre-Petition Liens, then the Cash Management/Indemnity Account shall be maintained until final resolution of such Challenge Proceeding. If as of the Challenge Period Termination Date no party has filed a Challenge Proceeding against the Pre-Petition Secured Parties related to the Pre-Petition Debt and/or Pre-Petition Liens, whether in the Chapter 11 Cases or independently in another forum, court, or venue, then the Cash Management/Indemnity Account shall thereafter secure only Treasury Management Obligations. |
| | | (*see* ¶ 13 of the Interim DIP L/C Order.) |
| (t) | Termination of Pre-Petition Credit Agreement and Related Liens: | Provided that: (i) the Challenge Period Termination Date has occurred, (ii) no Challenge Proceeding has theretofore been timely asserted and remains unresolved and outstanding, (iii) all Pre-Petition Indemnity Obligations then due and owing have been indefeasibly paid and satisfied in full (or other arrangements for payment of the Pre-Petition Indemnity Obligations have been made that are acceptable to the Pre-Petition Secured Parties), and (iv) the Court has issued the Final DIP Term Order (the latest to occur of (i)-(iv) being defined as the "Lien Release Date"), effective as of such Lien Release Date: (x) the Pre-Petition Credit Agreement shall be deemed to have been terminated (except for those provisions which survive by their terms or as otherwise provided in the Interim DIP L/C Order) and (y) any and all Liens held by the Pre-Petition |

| | | |
|---|---|---|
| | | Secured Parties in any Pre-Petition Collateral (excluding (i) Liens granted to the Pre-Petition Secured Parties in and upon the DIP Collateral, including Cash Collateral deposited in the Pre-Petition Cash Collateral Account (or as same may have been transferred to the Post-Petition Cash Collateral Account) and the proceeds and products thereof, and (ii) Liens granted to the Pre-Petition Secured Parties in and upon the Cash Collateral deposited in the Cash Management/Indemnity Account and the proceeds and products thereof) are deemed to be released.<br><br>(*see* ¶ 16 of the Interim DIP L/C Order) |
| (u) | Representations and Warranties: | Customary for financings of this type.<br><br>(*see* Article V of the DIP L/C Credit Agreement) |
| (v) | Covenants: | As specified in the DIP L/C Credit Agreement. Article VII of the DIP L/C Credit Agreement includes Bankruptcy Related Negative Covenants, including that the Debtors shall not seek, consent to, or permit to exist (i) any modification to the Interim DIP L/C Order or the Final DIP L/C Order, (ii) except as provided in the Interim DIP L/C Order and the Final DIP L/C Order, a priority claim or administrative expense against any Debtor equal or superior to the priority claim of the DIP L/C Issuer in respect of the Obligations and the Pre-Petition Liabilities, (iii) any Lien on any Cash Collateral having a priority equal or superior to the Lien securing the Obligations, and (iv) any order seeking authority to take any action that is prohibited by the terms of the DIP L/C Credit Agreement or the other Loan Documents or refrain from taking required actions under those documents.<br><br>(*see* Article VI of the DIP L/C Credit Agreement (affirmative covenants); Article VII of the DIP L/C Credit Agreement (negative covenants)) |
| (w) | Events of Default: | As specified in the Interim DIP L/C Order and the DIP L/C Credit Agreement. Among other defaults, failure of the Court to enter a Final DIP L/C Order, in form and substance satisfactory to the DIP L/C Issuer, within thirty (30) days after the Petition Date is an Event of Default.<br><br>(*see* § 8.01 of the DIP L/C Credit Agreement; ¶¶ 29-30 of the Interim DIP L/C Order) |
| (x) | Remedies Upon Default: | Prior to exercising any remedy under the DIP L/C Facility Agreements following the occurrence of a DIP Order |

Event of Default (defined as the occurrence of (a) the Commitment Termination Date or (b) an Event of Default under the DIP L/C Credit Agreement) (other than application of Cash Collateral on deposit in the Pre-Petition Cash Collateral Account, Post-Petition Cash Collateral Account, and/or Cash Management/Indemnity Account), the DIP L/C Issuer shall provide not less than five (5) days' written notice of such default occurrence to: (i) the Debtors and their counsel, (ii) counsel for any Committee(s) (or if no Committee has been appointed, the Debtors' forty (40) largest unsecured creditors), (iii) counsel to the DIP Term Lender, (iv) counsel to the Pre-Petition Secured Parties, and (v) the Office of the United States Trustee.  Following the giving of written notice by the DIP L/C Issuer of the occurrence of a DIP Order Event of Default, the Debtors and any Committee(s) appointed in the Chapter 11 Cases, if any, shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether a DIP Order Event of Default has occurred. If either (a) the Debtors or any such Committee(s) do not contest the occurrence of a DIP Order Event of Default and, therefore, the right of the DIP L/C Issuer to exercise its remedies, or (b) the Debtors or any such Committee(s) do timely contest the occurrence of a DIP Order Event of Default and the Court, after notice and hearing, declines to stay the enforcement thereof, the automatic stay as to the DIP L/C Issuer shall automatically terminate at the end of the five (5) day notice period provided for in Paragraph 32 of the Interim DIP L/C Order or the order of the Court declining to stay such enforcement.

Upon the occurrence and during the continuance of any DIP Order Event of Default, among other things, the automatic stay otherwise applicable to the DIP L/C Issuer and/or Pre-Petition Secured Parties shall be modified so that such parties, as applicable, may apply the proceeds on deposit to the Post-Petition Cash Collateral Account and/or the Cash Collateral on deposit in the Pre-Petition Cash Collateral Account to payment and/or reimbursement obligations in respect of the DIP Letters of Credit and Pre-Petition Letters of Credit, as applicable.

In addition, the Debtors shall continue to deliver (i) the proceeds of DIP Collateral to the DIP L/C Issuer (who shall continue to apply such proceeds in accordance with the DIP L/C Facility Agreements and the Interim DIP L/C Order) and (ii) the Cash Collateral on deposit in the Pre-

| | | |
|---|---|---|
| | | Petition Cash Collateral Account to the Pre-Petition Secured Parties (who shall continue to apply such Cash Collateral in accordance with the provisions of the Pre-Petition Loan Documents and the Interim DIP L/C Order). The Debtors shall have no right to use any of the proceeds of DIP Collateral (including any the Cash Collateral on deposit in the Pre-Petition Cash Collateral Account, where applicable), other than towards the satisfaction of the DIP L/C Obligations and the Pre-Petition Debt, as applicable, and any obligation otherwise imposed on the DIP L/C Issuer to provide any DIP Letters of Credit to the Debtors pursuant to the DIP L/C Facility shall be suspended. Moreover, any applicable automatic stay will be modified so that the DIP L/C Issuer (and/or Pre-Petition Secured Parties, as applicable) may apply the proceeds on deposit in the Post-Petition Cash Collateral Account (and/or the Pre-Petition Cash Collateral Account, where applicable) and the Cash Management/Indemnity Account, as applicable, without further order of the Court.  In addition, all DIP L/C Obligations will be immediately due and payable in full.<br><br>(*see* ¶¶ 31-33 of the Interim DIP L/C Order; § 8.02 of the DIP L/C Credit Agreement) |
| (y) | <u>Amendments:</u> | No amendment or waiver of any provision of the DIP L/C Credit Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the DIP L/C Issuer and The Wet Seal Inc. or the applicable Debtor, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.<br><br>The Debtors and the DIP L/C Issuer may amend, modify, supplement, or waive any provision of the DIP L/C Facility Agreements to make non-material changes to such agreements (as determined by the Debtors and the DIP L/C Issuer) without further approval of the Court, any Committee or the DIP Term Lender; provided that, prior to effectuating any non-material change, amendment, modification, supplement or waiver of any provision of the DIP L/C Facility Agreements, the Debtors and the DIP L/C Issuer shall consult with any Committee and the DIP Term Lender with respect to same.  For the avoidance of doubt, any amendment, modification, supplement, or waiver that (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the |

| | | |
|---|---|---|
| | | Commitment, or (iii) changes the maturity date of the DIP L/C Facility shall be considered a material change. Except as set forth above, all waivers, modifications, or amendments of any of the provisions of the Interim DIP L/C Order shall not be effective unless set forth in writing, signed by on behalf of the Debtors and the DIP L/C Issuer, and approved by the Court.<br><br>(*see* § 9.01 of the DIP L/C Credit Agreement; ¶ 43 of the Interim DIP L/C Order) |
| (z) | Indemnification and Exculpation: | The DIP L/C Credit Agreement contains customary provisions regarding the Debtors' indemnification and exculpation of the DIP L/C Issuer.<br><br>(*see* § 9.04 of the DIP L/C Credit Agreement) |
| (aa) | Validity, Perfection and Amount of Pre-Petition Liens and Claims: | The Debtors in the Interim DIP L/C Order confirm the validity, priority, perfection and amount of the Pre-Petition Secured Parties' liens and claims, subject to the right of challenge of (i) a party in interest with requisite standing until the later of (x) sixty (60) days following the appointment of the first Committee, or (y) if no Committee is appointed, seventy-five (75) days following entry of the Interim DIP L/C Order, and (ii) a chapter 7 trustee within sixty (60) calendar days of entry of an order converting the Cases to cases under chapter 7 if entered within the sixty (60) or seventy-five (75) day period, as applicable.<br><br>If no Challenge Proceeding is timely commenced, then any and all such challenges and objections in the nature of a Challenge Proceeding by any party shall be deemed to be forever waived and barred, and the Pre-Petition Debt shall be deemed to be allowed in full and shall be deemed to be allowed as a fully secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Cases and the Debtors' Stipulations (in ¶ E(4)) shall be binding on all creditors, interest holders, and parties-in-interest.<br><br>To the extent any Challenge Proceeding is filed, the Pre-Petition Secured Parties shall be entitled to include the reasonable costs and expenses, including, but not limited to, reasonable attorneys' fees and disbursements, incurred in defending the Challenge Proceeding (or as part of any agreed upon resolution thereof) as part of the Pre-Petition Debt and as part of the Pre-Petition Indemnity Obligations, which amounts, if any, shall be reimbursed by the Debtors out of the Cash Management/Indemnity Account. The |

| | | |
|---|---|---|
| | | Debtors shall remain liable to the Pre-Petition Secured Parties for all unpaid Pre-Petition Indemnity Obligations to the extent that the funds in the Cash Management/Indemnity Account are insufficient to satisfy them in full. <br><br> (*see* ¶¶ E(4) & 23-27 of the Interim DIP L/C Order) |
| (bb) | Releases: | As of the Petition Date, the Debtors stipulate and agree as follows: <br><br> Subject to the terms of the Interim DIP L/C Order, including, without limitation, Paragraphs 23-27 of that order, on the date that the Interim DIP L/C Order is entered the Debtors shall be deemed to have waived, discharged, and released the Pre-Petition Secured Parties, together with their respective affiliates, agents, attorneys, officers, directors, and employees, of any right the Debtors may have: <br><br> (i)    to challenge or object to any of the Pre-Petition Debt; <br><br> (ii)    to challenge or object to the security for the Pre-Petition Debt, including, without limitation, the Pre-Petition Liens in and upon the Pre-Petition Collateral; and <br><br> (iii)    To bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the Pre-Petition Loan Documents, the Pre-Petition Debt, the Pre-Petition Liens, or otherwise. <br><br> The Debtors acknowledge that they do not possess and will not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, and non-avoidability of any of the Pre-Petition Loan Documents, the Pre-Petition Debt, or the Pre-Petition Liens, or any claim of the Pre-Petition Secured Parties pursuant to the Pre-Petition Loan Documents or otherwise. <br><br> (*see* ¶ E(4) of the Interim DIP L/C Order) |

## VII. DISCLOSURES

25.     The required disclosures under Local Rule 4001-2(a)(i) are limited to seeking approval of (i) the immediate grant of liens in avoidance actions (disclosure required under Bankr. L.R. 4001-2(a)(i)(D)), (ii) the deemed "roll up" of pre-petition secured debt into post-petition secured debt (disclosure required under Bankr. L.R. 4001-2(a)(i)(E)), and (iii) the waivers of the "equities of the case" exception under section 552(b) of the Bankruptcy Code (disclosure required under Bankr. L.R. 4001-2(a)(i)(H)).  While the Motion also seeks to waive any surcharge of costs or expenses under section 506(c) of the Bankruptcy Code, such relief is only being requested pursuant to the Final Orders.

26.     These terms are justified because the Debtors are in immediate and critical need of the DIP Facilities.  As discussed above and further below, the Debtors were unable to obtain financing on an unsecured, administrative expense basis.  The only acceptable proposals that would provide the critical liquidity to the Debtors were provided after extensive negotiations with the DIP Lenders on the terms set forth in the DIP Term Credit Agreement, the DIP L/C Credit Agreement and the DIP Orders.  Without this financing, the Debtors would not be able to pay their employees or vendors, which is essential to operating their business as a going concern and, ultimately, exiting these Cases.

27.     Moreover, the foregoing terms are limited in scope.  The grant of liens in avoidance actions is narrowly limited to Specified Bankruptcy Recoveries (*i.e.*, all avoidance actions but only to the extent that the Professional Fee Carve Out is used for the prosecution of such actions, and all claims under section 549 of the Bankruptcy Code without limit).  The deemed "roll up" contemplated here by the DIP L/C Credit Agreement is not prejudicial to any party.  It merely converts fully-cash collateralized pre-petition letters of credit into fully-cash collateralized post-petition letters of credit.  Finally, the

waiver of the "equities of the case" exception solely with respect to the Pre-Petition Secured

Parties is not particularly meaningful to the estate given the anticipated near-term voluntary

release of the Pre-Petition Secured Parties' liens (other than in and to the Pre-Petition Cash

Collateral Account, Post-Petition Cash Collateral Account, and Cash

Management/Indemnity Account, and the funds deposited therein and the proceeds and

products thereof) following the passage of the Challenge Period Termination Date.

### VIII.  BASIS FOR RELIEF

**C.     The Debtors Should Be Permitted to Obtain Post-Petition Financing Pursuant to Section 364(c) of the Bankruptcy Code.**

28.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice

and a hearing, that the debtors seeking post-petition financing on a secured basis cannot

"obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an

administrative expense . . . ." 11 U.S.C. § 364(c).

29.     In evaluating proposed post-petition financing under section 364(c) of the

Bankruptcy Code, courts perform a qualitative analysis and generally consider similar

factors, including whether:

> a.     unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> b.     the credit transactions are necessary to preserve assets of the estate;
>
> c.     the terms of the credit agreement are fair, reasonable, and adequate;
>
> d.     the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and
>
> e.     the proposed financing agreement adequately protects pre-petition secured creditors.

*See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011)

(applying the first three factors); *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa.

1991) (applying the first three factors in making a determination under section 364(c)); *In re*

*Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker*

*Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a

determination under section 364(d)).

        30.      For the reasons discussed below, the Debtors satisfy the standards required

to obtain post-petition financing on a secured superpriority lien basis under section 364(c) of

the Bankruptcy Code.

**D.      The Debtors Were Unable to Obtain Financing on More Favorable Terms.**

        31.      Whether debtors were unable to obtain unsecured credit is determined by

application of a good faith effort standard, and debtors must make a good faith effort to

demonstrate that credit was not available without granting a security interest. *See In re YL*

*West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have

generally deferred to a debtor's business judgment in granting section 364 financing.");

*In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009). The required

showing under section 364 of the Bankruptcy Code that unsecured credit was not available

is not rigorous. *See, e.g.*, *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe*

*Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy

Code imposes no duty to seek credit from every possible lender, particularly when "time is

of the essence in an effort to preserve a vulnerable seasonal enterprise").

        32.      Here, as detailed in the Hillebrandt Declaration and the Pitts Declaration,

the Debtors face severe liquidity constraints. The Debtors were forced to file these Cases to

preserve the value of their assets and reorganize.  The Debtors are unable, in the present circumstances, to meet their liquidity needs by obtaining financing on an unsecured, administrative expense basis.  In fact, most of the Debtors' vendors have instituted cash on delivery payment terms or have required cash-collateralized letters of credit in order to continue providing goods or services, further constraining liquidity.  Given the troubles generally facing teen and young adult retailers, as evidenced by the liquidations within the last few weeks of competitors Deb Stores, dELiA*s, Inc., and Body Central Corp., combined with the Debtors' continued projected losses, the Debtors' investment banker Houlihan Lokey quickly found that most of the potential third-party lenders and equity investors were not interested in providing financing to the Debtors.  Without the proposed DIP Facilities, the Debtors would be assured of a piecemeal liquidation under chapter 7 of the Bankruptcy Code, rather than a plan of reorganization that will maximize value.

33.    The Debtors respectfully submit that their efforts to obtain post-petition financing therefore satisfy the standards required under section 364(c) of the Bankruptcy Code. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**E.      The Proposed Financing Is Necessary to Preserve the Assets of the Debtors' Estates.**

34.      As described above, the Debtors have executed a plan sponsorship agreement with B. Riley, pursuant to which it shall pay $20 million (including through conversion of the entire DIP Term Facility into equity) in exchange for 80% of the equity in the reorganized Debtors under a plan of reorganization. Pending confirmation of the Plan, the Debtors intend to operate their business in the ordinary course and require immediate access to post-petition financing and cash collateral.

35.      Cash is necessary for working capital, operating costs and expenses incurred during these Cases, including funding payroll to the Debtors' over 2,825 employees. The Debtors also require post-petition letters of credit. The Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on the operation of their business without additional financing. The Debtors' ability to maintain their business pending confirmation of the Plan is dependent on their ability to continue to operate, and the Debtors cannot operate unless they can fund payments for post-petition rent, payroll, goods, services and other operating expenses. The proposed DIP Facilities thus are essential to the Debtors' continued operational viability and will provide the Debtors with the opportunity to preserve their business through a reorganization.

36.      The alternative in this case is "to force the debtors to close down their operations and thus doom any effort at reorganization which will hopefully extract the maximum value of the assets involved to the benefit of *all* classes of creditors and other constituencies involved in this case." *In re Dynaco Corp.,* 162 B.R. 389, 396 (Bankr. D. N.H. 1993). Because this result would be at fundamental odds to the rehabilitative purposes of chapter 11, approval of the Motion is warranted. *Id.* at 394 (noting that "'it is apparent

that the Congress intended business under reorganization to proceed in as normal a fashion as possible'" (quoting *In re Prime, Inc.*, 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981))).

37.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtors require post-petition financing and the use of cash collateral under the terms of the DIP Financing Agreements to continue their operations pending their reorganization through confirmation of the Plan.

**F.     The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate.**

38.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

39.     The terms of the DIP Term Credit Agreement and DIP L/C Credit Agreement and the proposed DIP Orders were negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders, resulting in agreements designed to permit the Debtors to obtain the needed liquidity to maximize the value of their assets through confirmation of the Plan.

**G.     Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment.**

40.     A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition credit facility because such facility "reflect[ed]

sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 ("cases

consistently reflect that the court's discretion under section 364 is to be utilized on grounds that

permit reasonable business judgment to be exercised so long as the financing agreement does not

contain terms that leverage the bankruptcy process and powers or its purpose is not so much to

benefit the estate as it is to benefit a party-in-interest"). One court has noted that "[m]ore

exacting scrutiny [of the debtors' business decisions] would slow the administration of the

debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private

control of administration of the estate, and threaten the court's ability to control a case

impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

41.       Here, the Debtors' sound business judgment clearly supports entry into the DIP

Term Credit Agreement and DIP L/C Credit Agreement in order to gain access to needed

funding and thereby maximize value for all constituents.

**H.    Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral.**

42.       Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession

may not use cash collateral unless (i) each entity that has an interest in such cash collateral

provides consent, or (ii) the court approves the use of cash collateral after notice and a hearing.

*See* 11 U.S.C. § 363(c).

43.       Section 363(e) of the Bankruptcy Code provides that, "on request of an entity

that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession],

the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate

protection of such interest." 11 U.S.C. § 363(e).

44.       Section 361 of the Bankruptcy Code provides that:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1)    requiring the [debtor in possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2)    providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3)    granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. "The determination of adequate protection is a fact-specific inquiry" to be decided on a case-by-case basis. *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." (internal quotation marks omitted) (citation omitted)).

45.    Here, the interests of the Pre-Petition Secured Parties are adequately protected for purposes of section 363(e) of the Bankruptcy Code for the following reasons.

46.    First, the Pre-Petition Secured Parties consent to the Debtors' use of cash collateral on the terms of the DIP Term Credit Agreement, DIP L/C Credit Agreement and proposed DIP Orders.

47.    Second, the Debtors intend to preserve value by maintaining operations pending their reorganization pursuant to the Plan.

01:16511103.1

48.     Third, pursuant to the DIP Orders, the Pre-Petition Secured Parties, among other things, (i) will have the benefit of replacement liens and superpriority administrative expense claims to the extent set forth therein to protect them from any diminution in value of the their interest in the Debtors' assets, (ii) will have relief from the automatic stay to enable the Pre-Petition Secured Parties to apply the Cash Collateral deposited in the Pre-Petition Cash Collateral Account and Post-Petition Cash Collateral Account, as applicable, to reimburse the Pre-Petition L/C Issuer for drawings and letter of credit fees when due, (iii) will have the benefit of the $1.5 million Cash Management/Indemnity Account, which will secure the indemnity claims of the Pre-Petition Secured Parties and the Debtors' past and future obligations to the Pre-Petition Lender Secured Parties in connection with its provision of cash management and treasury management services to the Debtors, and (iv) will receive ongoing cash payments of interest, fees, costs and expenses.

49.     The Debtors believe that such protections are adequate under the circumstances. Further, given the significant value that the Debtors stand to lose in the event they are denied access to continued use of cash collateral, such protections are wholly appropriate and justified.

## IX. <u>INTERIM ORDER AND FINAL HEARING</u>

50.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

51.     The urgent need to preserve the Debtors' business, and avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to obtain post-petition financing and use cash collateral as of the Petition Date, pending the Final Hearing, in order to continue their operations and administer the Cases. Without the ability to obtain access to such funding, the Debtors would be unable to meet their post-petition

obligations, including payroll obligations to over 2,825 employees, and otherwise would be unable to fund their working capital needs, thus causing irreparable harm to the value of the Debtors' estates and ending the Debtors' efforts to maintain operations through a reorganization.

52.     Accordingly, the Debtors respectfully request that, pending the hearing on the Final Orders, the Interim Orders be approved in all respects and that the terms and provisions of the Interim Orders be implemented and be deemed binding and that, after the Final Hearing, the Final Orders be approved in all respects and the terms and provisions of the Final Orders be implemented and be deemed binding.

## X.  IMMEDIATE RELIEF IS NECESSARY

53.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

## XI.  WAIVER OF ANY APPLICABLE STAY

54.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

01:16511103.1

## XII.  NOTICE

55.        Notice of this Motion has been given to (i) the Office of the United States Trustee for the District of Delaware; (ii) holders of the forty (40) largest unsecured claims on a consolidated basis against the Debtors; (iii) co-counsel for each of the DIP Lenders and co-counsel for the Pre-Petition Secured Parties; (iv) any party that may assert a lien in the Debtors' assets; (v) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002; (vi) the United States Internal Revenue Service; and (vii) the United States Securities and Exchange Commission.  As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## XIII. CONCLUSION

WHEREFORE, based upon the foregoing, the Debtors request entry of the Interim Orders and the Final Orders under sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the Bankruptcy Rules and Local Rule 4001-2, (i) authorizing the Debtors to (a) obtain financing under the terms of the DIP Term Credit Agreement and DIP L/C Credit Agreement, and (b) use cash collateral and provide adequate protection to the Pre-Petition Secured Parties; (ii) granting the other relief requested in this Motion; and (iii) scheduling the Final Hearing.

Dated: January 16, 2015

*/s/ Maris J. Kandestin*

Michael R. Nestor, Esq. (DE Bar No. 3526)
Maris J. Kandestin, Esq. (DE Bar No. 5294)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Email:  mnestor@ycst.com
        mkandestin@ycst.com

and

Lee R. Bogdanoff, Esq.
Michael L. Tuchin, Esq.
David M. Guess, Esq.
Jonathan M. Weiss, Esq.
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel:    (310) 407-4022
Fax:    (310) 407-9090
Email:  lbogdanoff@ktbslaw.com
        mtuchin@ktbslaw.com
        dguess@ktbslaw.com
        jweiss@ktbslaw.com

01:16511103.1