UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>THE WET SEAL, INC. *et al*, a Delaware corporation[1]<br><br>Debtors. | Chapter 11<br><br>Case No.: 15-_____ (___)<br><br>(Joint Administration Requested) |

**DECLARATION OF DEREK PITTS IN SUPPORT OF (A) DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014: (1) AUTHORIZING POST-PETITION FINANCING, (2) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY, (3) AUTHORIZING USE OF CASH COLLATERAL AND PROVIDING FOR ADEQUATE PROTECTION, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SCHEDULING A FINAL HEARING, AND (B) MOTION OF THE DEBTORS FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 365(a) AND 503(b) (I) APPROVING AND AUTHORIZING THE ASSUMPTION OF THE PLAN SPONSORSHIP AGREEMENT, AND (II) APPROVING AND AUTHORIZING THE PAYMENT OF THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT**

I, Derek Pitts, declare as follows:

1.      I am a Managing Director with Houlihan Lokey Capital, Inc. (together with its affiliates, its wholly-owned subsidiaries, and independent contractors, "Houlihan Lokey"). I am authorized to execute this declaration (this "Declaration") on behalf of Houlihan Lokey. I am an individual over the age of 18. Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein, and if called upon to testify, I would testify competently to all of the facts set forth herein.

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: The Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265), Wet Seal Catalog, Inc. (7604), and Wet Seal GC, LLC (2855-VA). The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

154119.1

2. This Declaration is being submitted in connection with the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (1) Authorizing Post-Petition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral and Providing for Adequate Protection, (4) Modifying the Automatic Stay, and (5) Scheduling a Final Hearing* (the "DIP Financing Motion") and the *Motion of the Debtors for an Order Pursuant to 11 U.S.C. §§ 105(a), 365(a) And 503(b) (i) Approving and Authorizing the Assumption of the Plan Sponsorship Agreement, and (ii) Approving and Authorizing the Payment of the Break-Up Fee and Expense Reimbursement* (the "PSA Assumption Motion") filed on the date hereof.  I have reviewed and am familiar with the DIP Financing Motion and the PSA Assumption Motion and the relief sought therein.

3. In forming the opinions set forth herein, I have relied upon and/or considered, among other things, the following: (a) my experiences in chapter 11 cases, including with debtor-in-possession ("DIP") financing facilities and plan sponsorships; (b) the DIP Financing Motion; (c) the PSA Assumption Motion; (d) the Declaration of Thomas R. Hillebrandt; (e) certain of the Debtors' financial statements and reports; (f) documents related to the proposed DIP financing; (g) Houlihan Lokey's analyses regarding the proposed DIP financing and DIP financings in other chapter 11 cases; (h) discussions with the Debtors' management concerning the Debtors' business and finances; (i) discussions with, and proposals by, prospective sources of DIP financing, including with regard to the proposed DIP financing; and (j) discussions with certain other professionals at Houlihan Lokey and other advisors to the Debtors.

4. Houlihan Lokey is a nationally recognized investment banking and financial advisory firm, with eighteen offices worldwide and more than 1,000 professionals.  Houlihan

Lokey's Financial Restructuring Group, which has more than 160 professionals including me, is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties-in-interest involved with financially troubled companies in a variety of industries, both in and outside of bankruptcy.

5.  As a Managing Director at Houlihan Lokey, I have worked on numerous financial restructuring, corporate finance and valuation engagements across several industries, including retail, consumer products, textiles, restaurants, energy and industrials since 2000.  Prior to my employment with Houlihan Lokey, I worked for eight years in corporate financial management and business development in the financial services and software development industries.  During my career, I have advised on more than 40 restructuring transactions, including approximately 19 in the retail sector, including recent teen retailer Deb Stores Holdings LLC and its affiliated debtors and debtors in possession (collectively, "Deb Stores").  I also have significant expertise in procuring, structuring, and negotiating DIP and exit financing facilities.

6.  I received my B.S. from Northeastern University and my M.B.A. from the Darden School of Business at the University of Virginia.  I am registered with FINRA as a General Securities Representative (Series 7 and 63) and a Limited Representative – Investment Banking (Series 79).

7.  In November 2014, The Wet Seal, Inc. and its subsidiaries, the debtors and debtors in possession (collectively, the "Debtors") first engaged Houlihan Lokey to provide general financial advisory services to explore strategic alternatives.  Such alternatives included, among others, a potential sale of the Debtors, a potential debt and/or equity investment in the Debtors, as well as a potential refinancing of the Debtors' existing capital structure in order to provide additional liquidity to fund the ongoing strategic turnaround.  Houlihan Lokey's

retention by the Debtors was announced in the Debtors' November 24, 2014 Form 8-K and in a concurrent press release.  I lead the Houlihan Lokey team in connection with its representation of the Debtors.

8. When the Debtors retained Houlihan Lokey, they were facing a near term liquidity crisis and were projecting a liquidity shortfall as early as January 2015.  The Debtors had already attempted for much of the second half of 2014 to obtain liquidity on an out-of-court basis to provide them with sufficient runway to implement the operational turnaround being pursued by the Debtors' new management.  It is my understanding that on or about September 3, 2014, the Company entered into a securities purchase agreement, subject to certain terms and conditions, to sell approximately $18.5 million of common stock pursuant to a private placement, with the expectation that they would also pursue a simultaneous rights offering to raise additional equity capital.  This financing required several months of processing and the satisfaction of various conditions in order to achieve a closing and funding, including the necessary SEC filings.  For a variety of reasons, including deteriorating operating performance, this financing option became not viable.

9. Faced with these issues, among others, the Debtors determined that it would not be possible to restructure the Debtors out of Court without significant landlord concessions.  Accordingly, the Debtors engaged in negotiations with their major landlords regarding concessions.  At the same time the Company was also simultaneously negotiating an expansion of the existing credit facility with Bank of America as well as looking to raise additional third-party debt/equity financing that could possibly be put in place to the extent the landlord negotiations were successful.  Those efforts were not successful, and the Debtors and Houlihan Lokey focused efforts on obtaining DIP financing and finding a potential chapter 11 investor.

Given their tightening liquidity, the Debtors had a limited window of time (including the impact of the holiday season) to obtain financing and an exit strategy before their projected liquidity shortfall.

10. Houlihan Lokey, working closely with the Debtors' management and other advisors, engaged with the Debtors' existing lender, the lenders with whom the Debtors had been in discussions with respect to obtaining financing out-of-court, and other lenders / equity investors known to potentially have an interest in the teen retail sector for providing DIP financing and/or making an investment in the Debtors as part of a bankruptcy process. I participated directly in these discussions, due diligence, and negotiations.

11. Given the troubles generally facing teen and young adult retailers, as evidenced by the liquidations within the last few weeks of competitors Deb Stores, dELiA*s, Inc., and Body Central Corp., combined with the Debtors' continued projected losses, most of the potential third-party lenders / equity investors were not interested in providing DIP financing to the Debtors, purchasing the assets in a bankruptcy and/ or sponsoring a plan of reorganization.

12. The situation faced by the Debtors was similar to circumstances faced only weeks before by Deb Stores. When faced with an anticipated liquidity shortfall, Houlihan Lokey on behalf of Deb Stores ran a formal marketing process seeking a debt or equity investment in Deb Stores to provide additional liquidity support to cover an anticipated funding shortfall and fund operations. Such liquidity support, however, was not available. Although 37 parties executed confidentiality agreements and accessed the dataroom that was established, none submitted a preliminary indication of interest to acquire or provide financing to Deb Stores on a going-concern basis either in or out of court, or expressed interest in serving as a potential stalking horse purchaser or investor as part of a bankruptcy process. Ultimately, as noted above, without

third party interest in acquiring Deb Stores or providing financing on a going-concern basis, Deb Stores was forced to pursue a liquidation.

13. At present, the teen retail sector is in such distress that even potential lenders who might typically make distressed loans have been reticent to advance funds into this sector. Although in my experience the public announcement of the retention of Houlihan Lokey as investment banker to a distressed entity often results in unsolicited financing proposals, that did not happen following the public announcement of Houlihan Lokey's retention by the Debtors.

14. Of the few potential lenders / equity investors theoretically willing to provide financing to the Debtors under their current circumstances, only one of the parties, B. Riley & Co., L.L.C. (together with its affiliates and designees, "B. Riley"), was willing to provide a DIP loan as well as an exit strategy for the Debtors, providing the Debtors with an option to continue as a going concern and potentially generate a recovery for constituents.

15. In my view, the financing and plan sponsorship package presented by B. Riley presents the last best option for the Debtors to maximize the value of their estates under the circumstances. Absent this package, the Debtors are expected to run out of cash within a matter of weeks and face grim alternatives. Without a committed plan sponsorship combined with DIP financing from B. Riley, in my view, the Debtors would have no clear exit path, and insufficient liquidity to run anything other than an expedited sale process, potentially by way of a naked auction. The Debtors are unable, in the present circumstances, to meet their liquidity needs by obtaining financing on an unsecured, administrative expense basis. In fact, many of the Debtors' vendors have instituted cash on delivery payment terms or have required letters of credit (which must be secured by cash collateral as required by Debtors' bank) in order to continue providing goods or services, further constraining liquidity.

16. The plan sponsorship provided by B. Riley is particularly important, as it provides a blueprint for the Debtors to navigate through the reorganization process and has the potential to provide needed confidence to the Debtors' vendors, suppliers, customers and employees and thereby prevent the reduction of value that would likely occur with no plan sponsorship in place. If the Debtors had commenced a free-fall bankruptcy, there was a substantial likelihood that the Debtors would be forced to liquidate their assets, which almost certainly would have yielded inferior value to the estates. Importantly, the financing and plan sponsorship offered by B. Riley also provide the Debtors with additional time to implement an operational turnaround and for any superior alternatives to the proposed plan of reorganization sponsored by B. Riley to present themselves. Unlike Deb Stores, dELiA*s, Inc., and Body Central Corp., only the Debtors have been able to obtain a plan sponsorship. With a plan sponsorship in place, it is hoped that the Debtors will be able to avoid the fate of these other teen retailers.

17. Based on my experience, I believe that the DIP financing and the plan sponsorship offered by B. Riley to the Debtors, including the fees and expenses in the proposed DIP financing, are on the best terms and conditions available to the Debtors that is reasonably achievable under the current circumstances. In my view, the DIP financing offered by B. Riley is on market terms and conditions for a debtor whose financial condition and financial projections are comparable to the Debtors' condition and projections.

18. I also believe that, based on the Debtors' projections, the proposed DIP financing will provide the Debtors with necessary liquidity to fund and continue operations during these chapter 11 cases, and will send a strong positive signal to vendors, employees, customers, suppliers and other parties critical to maintaining the Debtors' viability as a going concern. Accordingly, if approved, the DIP financing will provide capital which is essential to preserving

the value of the Debtors' businesses and liquidity to reorganize and, as such, is in the best interests of the Debtors' estates and creditors.

19. I have personally participated in negotiations with B. Riley and believe that the Debtors' negotiations with it were conducted at arm's length and in good faith.

20. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: January 14, 2015
New York, New York

HOULIHAN LOKEY

By: _____
Derek Pitts
Managing Director