## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| THE WET SEAL, INC., a Delaware corporation, *et al.*[1] | Case No.: 15-10081 (CSS) |
| Debtors. | (Jointly Administered) |

## MOTION OF THE DEBTORS FOR ENTRY OF ORDER
## PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE
## AND BANKRUPTCY RULES 2002, 4001 AND 9014: (I) AUTHORIZING
## REPLACEMENT POSTPETITION FINANCING FROM MADOR LENDING, LLC,
## (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
## EXPENSE PRIORITY, (III) AUTHORIZING USE OF CASH COLLATERAL
## AND PROVIDING FOR ADEQUATE PROTECTION,
## AND (IV) MODIFYING THE AUTOMATIC STAY

The Wet Seal, Inc. and its subsidiaries, the debtors and debtors in possession (the

"Debtors") in the above-captioned jointly administered chapter 11 cases (the "Cases"), hereby

move the Court (the "Motion") for entry of an order on an expedited basis (the "DIP Order")

substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105, 361, 362, 363

and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2

of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the

"Local Rules"), authorizing the Debtors to obtain replacement secured post-petition superpriority

financing (the "DIP Facility") from Mador Lending, LLC ("Mador"), an affiliate of Versa

Capital Management, LLC, the successful bidder at the March 10 and 12, 2015 auction held by

---

[1]    The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: The Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265); Wet Seal Catalog, Inc. (7604); and Wet Seal GC, LLC (2855-VA).  The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

the Debtors, and use cash collateral pursuant to the terms and conditions of (i) that certain *Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement*, dated as of March 12, 2015 (the "<u>DIP Credit Agreement</u>"), by and among the Debtors and Mador, as Lender (the "<u>DIP Lender</u>") (attached hereto as **Exhibit C**), and (ii) that certain *Security Agreement*, dated as of March 12, 2015 (the "<u>DIP Security Agreement</u>"), by and among the Debtors and the DIP Lender (attached hereto as **Exhibit E**).[2]

In support of the Motion, the Debtors rely on the *Declaration of Thomas R. Hillebrandt in Support of First Day Motions* [Dkt. No. 19] (the "<u>Prior Hillebrandt Declaration</u>"), the *Declaration of Derek Pitts*, etc. [Dkt. No. 22] (the "<u>Prior Pitts Declaration</u>"), and the *Declaration of Thomas R. Hillebrandt*, etc. (the "<u>Supplemental Hillebrandt Declaration</u>") and the *Declaration of Derek Pitts*, etc. (the "<u>Supplemental Pitts Declaration</u>") concurrently filed herewith.

In further support of the Motion, the Debtors respectfully represent as follows:

## I. PRELIMINARY STATEMENT

1.      By this Motion, the Debtors seek approval of replacement debtor-in-possession financing by Mador that is in all material respects similar to (and, in some instances, more favorable) than the Debtors' existing debtor-in-possession financing with B. Riley Financial, Inc. ("<u>B. Riley</u>" and the "<u>Existing DIP Facility</u>"). By way of example, interest accruing under the DIP Facility is 0.25% per annum less than under the Existing DIP Facility. The DIP Facility represents an overbid of the Existing DIP Facility that was expressly contemplated by this Court's bid procedures order. The bid procedures order

---

[2]    Capitalized terms not defined herein shall have the meanings ascribed to them in the DIP Credit Agreement and the DIP Order, as applicable. For the convenience of the Court and other parties in interest, a redline comparing Exhibit A against the Court's final order approving the Debtors' existing debtor-in-possession financing with B. Riley Financial, Inc. is attached hereto as **Exhibit B**, and redlines comparing Exhibits C and E to the existing debtor-in-possession financing documents are attached hereto as **Exhibit D** and **Exhibit F**.

further contemplated the need for approval of the DIP Facility on an expedited basis. As indicated in the redlines attached hereto, the Mador loan documents and the proposed DIP Order are modeled after, and track almost identically, the B. Riley loan documents and this Court's prior final financing order approving the Existing DIP Facility.

2.     The need to replace the Existing DIP Facility is urgent and immediate. The selection of Mador as the successful bidder at the March 10 and 12, 2015 auction has set off a chain of events that will result in the maturity of the Existing DIP Facility potentially as early as a few days after the requested hearing on this Motion.[3] Under this Court's bid procedures order, B. Riley may terminate its plan sponsorship agreement with the Debtors as soon as it is no longer the back-up bidder. According to the Court-approved bid procedures, B. Riley will cease to be the back-up bidder as soon as Mador provides a $1 million additional deposit which is due no later than March 20, 2015. Once the Debtors' plan sponsorship agreement with B. Riley is terminated, the Existing DIP Facility will mature five business days later. This will result in an immediate liquidity crisis for the Debtors if the DIP Facility is not yet in place. As set forth in the Approved Budget attached as Exhibit 1 to the DIP Order, the Debtors project that they will need to borrow approximately $1.6 million to maintain operations during the week of March 22-28, 2015. The Debtors will require several days after entry of the DIP Order to establish the DIP Facility and meet all of the conditions to borrowing, including the payoff of B. Riley.

3.     For these reasons and those set forth below, this Court should enter the DIP Order authorizing the Debtors to enter into the DIP Facility with Mador.

---

[3]     The Existing DIP Facility could mature as early as March 20, 2015 if Mador provides its $1 million additional deposit on March 13, 2015 and B. Riley terminates its plan sponsorship agreement with the Debtors that same day.

01:16795065.1

## II. OVERVIEW

4.       By this Motion, the Debtors seek entry of the DIP Order, which:

a.       approves the DIP Credit Agreement, pursuant to which the DIP Lender is providing a replacement term loan of up to $20,000,000 to the Debtors, subject to a $5 million availability block, on substantially similar terms to the existing debtor-in-possession financing;

b.       authorizes the Debtors to execute the DIP Credit Agreement, and to perform such other acts as may be necessary or desirable in connection therewith;

c.       grants to the DIP Lender first priority, valid, perfected, and enforceable liens upon substantially all of the Debtors' assets (but excluding the Pre-Petition Cash Collateral Account and the Cash Management/ Indemnity Account in favor of the Pre-Petition Secured Parties and the Post-Petition Cash Collateral Account (each as defined in the *Final Order Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (1) Authorizing Post-Petition L/C Financing Facility, (2) Granting Liens and Providing Superpriority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral and Providing for Adequate Protection, and (4) Modifying the Automatic Stay* [Dkt. No. 249] (the "Final DIP L/C Order")) to the extent set forth in the DIP Credit Agreement, DIP Security Agreement and the DIP Order to secure the obligations owing under the DIP Credit Agreement and the DIP Order (collectively, the "DIP Obligations"), subject only to the Professional Fee Carve Out (as defined in the DIP Credit Agreement);

d.       grants allowed superpriority administrative expense claims to the DIP Lender, subject to the Professional Fee Carve Out, to the extent set forth in the DIP Order;

e.       authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code ("Cash Collateral") in which the DIP Lender asserts an interest, other than the Cash Collateral in the Pre-Petition Cash Collateral Account and the Cash Collateral in the Cash Management/Indemnity Account (each as defined in the Final DIP L/C Order);

f.       modifies and grants relief from the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement and the DIP Order; and

g.    waives any applicable stays under the Bankruptcy Rules and provides for the immediate effectiveness of the DIP Order.

### III.  JURISDICTION

5.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

6.    Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

7.    The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363 and 364 of title 11 of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the Bankruptcy Rules, and Rule 4001-2 of the Local Rules.

### IV.  BACKGROUND

A.    **Introduction.**

8.    On January 15, 2015 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.

9.    The Debtors are authorized to continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On January 30, 2015, the United States Trustee appointed an official committee of

01:16795065.1

unsecured creditors of the Debtors (the "Committee"). To date, no trustee, examiner or other statutory committee has been appointed in these Cases by the United States Trustee.

10.      The detailed factual background relating to the Debtors and the commencement of these Cases is set forth in the Prior Hillebrandt Declaration and the Prior Pitts Declaration.

**B.      Events Leading Up to the DIP Facility.**

11.      On the Petition Date, the Debtors filed a motion seeking approval of the Existing DIP Facility. On February 5, 2015, the Court approved that financing on a final basis. *See Final Order Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (1) Authorizing Post-Petition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral, and (4) Modifying the Automatic Stay* [Dkt. No. 251] (the "Existing DIP Order"). As set forth in Paragraph 43 of the Existing DIP Order, the Existing DIP Facility will mature five (5) business days after the termination of that certain *Plan Sponsorship Agreement* (the "Existing PSA"), dated as of January 15, 2015, by and among the Debtors and B. Riley.

12.      On the Petition Date, the Debtors also filed a motion for entry of an order authorizing them to assume the Existing PSA. On February 5, 2015, the Court authorized the assumption of the Existing PSA as modified. *See Order Pursuant to 11 U.S.C. §§ 105(a), 365(a) and 503(b) (I) Approving and Authorizing the Assumption of the Plan Sponsorship Agreement as Modified, and (II) Approving and Authorizing the Payment of Break-Up Fee and Expense Reimbursement* [Dkt. No. 252] (the "Existing PSA Order"). Among other things, the Existing PSA Order contemplated the submission of competing proposals to sponsor a plan of reorganization or acquire all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code and, in either case, provide replacement debtor-in-possession financing.

01:16795065.1

13.     On February 18, 2015, the Court approved bid procedures governing the submission of competing proposals. *See Order Approving Certain Bid Procedures Governing the Submission of Competing Proposals to (I)(A) Sponsor a Plan of Reorganization for the Debtors or (B) Acquire All or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code and (II) Provide Debtor-in-Possession Financing* [Dkt. No. 329] (the "Bid Procedures Order"). Pursuant to the Bid Procedures Order an auction to determine the highest or otherwise best bid to sponsor a plan of reorganization or acquire all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, and, in either case, to provide replacement debtor-in-possession financing was to be held on March 10, 2015. Paragraph 8 of the Bid Procedures Order further provides that B. Riley may not terminate the Existing PSA (and thereby cause the Existing DIP Facility to mature) "until it is no longer either the Successful Bidder or the Back-Up Bidder." According to the Court-approved bid procedures, the Back-up Bid must remain open until the earlier of (i) six (6) business days following the selection of the Successful Bidder and (ii) the Successful Bidder's making of an additional deposit.

14.     At the conclusion of the March 10 and 12, 2015 auction, the Debtors, in consultation with the Official Committee of Unsecured Creditors, identified Mador as the Successful Bidder and B. Riley as the Back-Up Bidder. Mador agreed purchase all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code and provide the Debtors with replacement debtor-in-possession financing to replace the maturing Existing DIP Facility.

15.     Because the Existing DIP Facility is expected to mature imminently and the Debtors will thereafter be unable to borrow under that financing or to use cash collateral to meet their near-term liquidity needs, the Debtors require immediate approval of the DIP Facility offered by Mador as part of its bid on an emergency basis to replace the Existing DIP Facility.

01:16795065.1

## V.  PRE-PETITION CAPITAL STRUCTURE AND INDEBTEDNESS

16.     The Debtors are indebted to the Pre-Petition Secured Parties under the Pre-Petition Facility (each as defined in the Final DIP L/C Order).  As of the Petition Date, however, there were no outstanding borrowings under the Pre-Petition Facility, and all letters of credit issued in connection with the Pre-Petition Facility were fully cash collateralized by the Debtors.  On the Petition Date, borrowings and other claims under the Pre-Petition Facility were secured by cash, cash equivalents, investments, receivables and inventory held by the Debtors.

17.     Pursuant to the Final DIP L/C Order, the letters of credit issued in connection with the Pre-Petition Facility were deemed to be rolled into post-petition letters of credit, and, as adequate protection, a $1.5 million fund was established to cash collateralize the Debtors' contingent indemnification obligations under the Pre-Petition Facility and the Debtors' obligations for cash management and treasury management services.  As detailed in the Final DIP L/C Order, other adequate protection was also provided to the Pre-Petition Secured Parties, including in connection with the Pre-Petition Secured Parties' agreement to subordinate their liens in substantially all of the assets of the Debtors' estates to the liens granted to B. Riley.  As set forth in the DIP Order that the Debtors request be entered, the Pre-Petition Secured Parties will similarly subordinate their liens to those granted to Mador.

## VI.  NEED FOR THE DIP FACILITY
## AND CONTINUED USE OF CASH COLLATERAL

18.     As the Existing DIP Facility is about to mature, the Debtors have an urgent and immediate need to obtain replacement debtor-in-possession financing and to use cash collateral.  Without the replacement debtor-in-possession financing and the use of cash collateral that will be provided under the DIP Credit Agreement and the proposed DIP Order, the Debtors would not be able to maintain operations pending confirmation a sale of

their assets that will maximize value for all constituents. Pending a sale of the Debtors' assets, the Debtors intend to operate their business in the ordinary course and require immediate access to post-petition financing and cash collateral.

19.        Without the replacement debtor-in-possession facility and access to cash collateral, the Debtors will not have any liquidity to operate their business, fund their ordinary course expenditures, including paying their over 2,200 employees, or pay the expenses necessary to administer the Cases. Absent adequate funding, the Debtors would be required to close their stores, cease operations, and liquidate on a piecemeal basis, causing irreparable harm to the Debtors and their estates. Accordingly, the Debtors have an urgent and immediate need for the DIP Facility and entry of the DIP Order.

20.        The Debtors have sought and were unable to obtain financing from other sources on terms preferable to the DIP Facility. The financing offered by Mador is on as good or better economic terms than the financing under the Existing DIP Facility and, in any event, as the Existing DIP Facility is maturing, the Debtors will no longer have access to it.

21.        Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require financing under the terms of the DIP Credit Agreement and hereby request authority to obtain such financing in compliance with the DIP Order.

## VII. CONCISE STATEMENT OF RELIEF REQUESTED

22.        In accordance with Rule 4001 of the Bankruptcy Rules and Local Rule 4001-2, below is a summary of the terms of the DIP Credit Agreement[4]

---

[4]    The summary of the terms and conditions of the DIP Credit Agreement and the DIP Order set forth in this Motion and the following chart are intended solely for informational purposes and are qualified in their entirety by the DIP Credit Agreement and the DIP Order. In the event there is any conflict between this Motion and the DIP Credit Agreement, the DIP Credit Agreement will prevail. In the event there is any conflict between this Motion and/or the DIP Credit Agreement and the DIP Order, the DIP Order will prevail.

01:16795065.1

| (a) | Borrowers: | The Wet Seal, Inc. (Lead Borrower); The Wet Seal Retail, Inc.; Wet Seal Catalog, Inc. *(see* introductory paragraph of the DIP Credit Agreement (pg. 1); Schedule 1.01 of the DIP Credit Agreement) |
|---|---|---|
| (b) | Guarantors: | Wet Seal GC, LLC *(see* defined terms of the DIP Credit Agreement (pg. 12)) |
| (c) | DIP Lender: | Mador Lending, LLC ("Mador") (DIP Lender) *(see* introductory paragraph of the DIP Credit Agreement (pg. 1)) |
| (d) | Purpose: | The DIP Facility will be used (i) for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the DIP Order and subject to the terms and conditions of the DIP Financing Agreements, and in accordance with the Approved Budget; and (ii) if necessary, to repay the B. Riley Obligations (described in detail below). Neither the proceeds of the DIP Financing Agreements, the DIP Collateral, nor the Professional Fee Carve Out will be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lender, including in connection with the validity of the claims granted to the DIP Lender. None of the proceeds of the DIP Facility will be used for any other purpose prohibited by Section 7.11 of the DIP Credit Agreement or Paragraph 17 of the DIP Order. *(see* § 7.11 of the DIP Credit Agreement; ¶¶ 4 & 17 of the DIP Order) |
| (e) | Type and Amount of DIP Facility: | Term loan with total Commitment of $20,000,000 and $5,000,000 Availability Block. *(See* defined terms of the DIP Credit Agreement (pp. 2 & 5) |
| (f) | Interest Rate: | Loans under the DIP Credit Agreement bear interest on the outstanding principal amount thereof at a rate per annum equal to 8%. The Default Rate is 10% per annum. *(see* defined terms of the DIP Credit Agreement (pp. 1 & 7)) |

| (g) | Facility Fees: | None. |
| | | (*see* § 2.09 of the DIP Credit Agreement) |
| (h) | Payment of Professional Fees: | The Debtors shall pay all reasonable out-of-pocket costs and expenses of the DIP Lender (and its Affiliates) in connection with the DIP Financing Agreements and the DIP Order; provided, however that, notwithstanding anything to the contrary contained in the DIP Financing Agreements, the fees and expenses incurred by the DIP Lender in connection with the negotiation and preparation of the DIP Financing Agreements and the DIP Order shall be borne by the DIP Lender. |
| | | Payment of such fees shall not be subject to allowance by the Court, provided, however, that the Debtors may seek a determination by the Court whether such fees and expenses are reasonable.  The Debtors shall provide to the Office of the United States Trustee and any Committee(s) a copy of any invoices for professional fees and expenses provided to the Debtors during the pendency of the Cases. |
| | | (*see* § 9.04(a) of the DIP Credit Agreement; ¶ 35 of the DIP Order) |
| (i) | Closing Date: | "Closing Date" means the date on which the conditions precedent to the initial Borrowing under the DIP Credit Agreement are satisfied or waived by the DIP Lender. |
| | | (*see* defined terms of the DIP Credit Agreement (pg. 5)) |
| (j) | Conditions Precedent to Lending: | The obligations of the DIP Lender to make financing available will be subject to satisfaction, or waiver by the DIP Lender of the conditions precedent set forth in Article IV of the DIP Credit Agreement. |
| | | Among other conditions, the DIP Lender shall have received evidence, in form and substance satisfactory to the DIP Lender, that (i) the B. Riley Liens have been terminated and are of no force and effect, and (ii) except to the extent set forth in the DIP Order, the B. Riley Obligations shall have been paid in full. |
| | | (*see* Article IV of the DIP Credit Agreement; Finding of Fact F & K & ¶ 5 of the DIP Order) |
| (k) | Borrowing Limitations | The Debtors may borrow under the DIP Facility, subject in all respects to the terms and conditions of the DIP Order, the DIP Financing Agreements, and the Approved Budget (subject to any variances thereto permitted under Section |

01:16795065.1

| | | 6.19 of the DIP Credit Agreement). |
|---|---|---|
| | | (*see* pg. 1 & ¶ 3 of the DIP Order) |
| (l) | Approved Budget and Financial Reporting: | Use of cash shall be subject to the Approved Budget. The Debtors are required to provide post-petition financial reporting to the DIP Lender, and to satisfy financial covenants customary for a transaction of this kind. |
| | | (*see* §§ 6.01 & 6.19 of the DIP Credit Agreement) |
| (m) | Cash Dominion: | During the period from and after any date on which the Liquidity Amount (the sum of (x) unrestricted cash and cash equivalents of the Debtors (excluding, for the avoidance of doubt, amounts deposited as cash collateral) plus (y) the maximum amount that is available for borrowing under the DIP Credit Agreement, provided that, if such borrowing is unavailable solely due to a Default (that has not become an Event of Default), then such Default shall be deemed not to exist solely for purposes of the foregoing clause (y)) of the Debtors is less than $5,000,000, the Debtors shall (i) deliver written notice to each of its credit card clearinghouses and cause each such clearinghouse to pay into the Cash Collateral Account and (ii) as soon as practicable, but in any event within ten (10) Business Days of the beginning of such period, enter into and maintain a Blocked Account Agreement with each Blocked Account Bank, which agreement shall require the automated clearing house transfers or wire transfer no less frequently than daily to the Cash Collateral Account of all cash receipts and collections, and, notwithstanding anything in Section 6.01(a) of the DIP Credit Agreement to the contrary, the Debtors shall cause any and all amounts that would be required to be deposited to the Cash Collateral Account pursuant to Section 6.01(a) of the DIP Credit Agreement to be deposited in the Cash Collateral Account in the manner provided in that section. |
| | | (*see* § 6.11 of the DIP Credit Agreement) |
| (n) | Prepayments: | The Borrowers may, upon irrevocable notice, voluntarily prepay Loans in whole or in part without premium or penalty, provided that notice is given not later than 1:00 p.m. on the date of prepayment of such Loans and that such prepayment is in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof (or, if less, the entire principal amount outstanding). Such prepayment must be accompanied by all accrued interest on the amount |

|     |     |     |
| --- | --- | --- |
|     |     | prepaid. The Debtors shall prepay the Loans with the net proceeds of any sale or disposition of any furniture, fixture or equipment promptly upon receipt of such proceeds.<br><br>(*see* § 2.05 of the DIP Credit Agreement) |
| (o) | <u>Maturity Date</u>: | The Maturity Date is May 15, 2015, unless otherwise extended by the DIP Lender in its sole and exclusive discretion.<br><br>(*see* defined terms of the DIP Credit Agreement (pg. 16)) |
| (p) | <u>Lien and Superpriority Claim; Priority</u>: | The DIP Lender is granted the following Liens (as defined in section 101(37) of the Bankruptcy Code) and claims in, and upon and to all of the DIP Collateral, subject only to the Professional Fee Carve Out and interests of Bank of America, N.A. specifically identified in the Final DIP L/C Order and/or the Cash Management Order (the "<u>BofA Interests</u>"):<br><br>    (i)    a first priority valid, perfected, and enforceable lien upon all of the DIP Collateral (defined below) to the extent set forth in the DIP Financing Agreements; and<br><br>    (ii)    a superpriority administrative expense claim.<br><br>(*see* § 2.13 of the DIP Credit Agreement; ¶¶ 6-9 of the DIP Order) |
| (q) | <u>Collateral</u>: | "<u>DIP Collateral</u>" means, collectively, all of the Debtors' presently owned or hereafter acquired property and assets, whether such property and assets were acquired before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located, and the proceeds and products thereof, including, without limitation, (a)(i) claims and causes of action arising under section 549 of the Bankruptcy Code and any and all recoveries and settlements thereof, and (ii) claims and causes of action under chapter 5 of the Bankruptcy Code, and any claim and cause of action relating to a Commercial Tort Claim and any and all recoveries and settlements thereof but only to the extent necessary to reimburse the DIP Lender for the amount of the Professional Fee Carve Out, if any, used to finance the pursuit of such recovery or settlement with respect to such claims and causes of action (together, the "<u>Specified Bankruptcy Recoveries</u>"), and (b) the proceeds of the Debtors' leases of real property (the |

| | | |
|---|---|---|
| | | "Lease Proceeds") (for the avoidance of doubt, the encumbrance of the Lease Proceeds pursuant to the DIP Order shall not constitute a direct encumbrance of any real property lease itself unless such encumbrance is permitted thereunder), and in all cases subject to the BofA Interests and the Professional Fee Carve Out. *(see* Finding of Fact E(3) of the DIP Order) |
| (r) | Waivers: | The DIP Lender shall be entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code. In addition, the Debtors shall not in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Lender under the DIP Order by offering a subsequent lender or a party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral; provided, however, that the DIP Lender shall pursue payment of the DIP Obligations from DIP Collateral other than the Specified Bankruptcy Recoveries before pursuing payment of the DIP Obligations from the Specified Bankruptcy Recoveries. *(see* Finding of Fact E(6) & ¶¶ 32 & 39 of the DIP Order) |
| (s) | Perfection Other Than Under State Law: | The DIP Liens may be perfected other than under state law. *(see* ¶¶ 6, 7 & 12 of the DIP Order) |
| (t) | Professional Fee Carve Out: | The Professional Fee Carve Out consists of (i) all fees required to be paid to the Clerk of the Court; (ii) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. §§ 156(c) and 1930(a)(6); (iii) all professional fees and expenses which have been incurred, accrued or invoiced (but remain unpaid), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice less the amount of the chapter 11 professionals' pre-petition retainers received but not previously applied to their professional fees and expenses; and (iv) all accrued and unpaid professional fees and expenses of chapter 11 professionals incurred after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $300,000 less, without duplication, the amount of such chapter 11 professionals' |

01:16795065.1

| | | |
|---|---|---|
| | | pre-petition retainers received but not previously applied to their professional fees and expenses.<br><br>(*see* defined terms of the DIP Credit Agreement (pg. 21)) |
| (u) | Representations and Warranties: | Customary for financings of this type.<br><br>(*see* Article V of the DIP Credit Agreement) |
| (v) | Covenants: | As specified in the DIP Credit Agreement.<br><br>The Debtors covenant that, on or before ninety (90) days following the Petition Date, they will obtain an order of the Court extending the time period for the Debtors to assume or reject Leases to not less than two hundred ten (210) days from the Petition Date.<br><br>Article VII of the DIP Credit Agreement includes Bankruptcy Related Negative Covenants, including that the Debtors shall not seek, consent to, or permit to exist:<br><br>    (i)    any order which authorizes the rejection or assumption of any Leases of any of the Debtors (other than rejection of Leases related to Permitted Store Closings) without the DIP Lender's prior consent, which shall not be unreasonably withheld or delayed;<br><br>    (ii)    any modification to the DIP Order;<br><br>    (iii)    a priority claim or administrative expense against any Debtor equal or superior to the priority claim of the DIP Lender in respect of the Obligations, except with respect to the Professional Fee Carve Out and the Other DIP Obligations;<br><br>    (iv)    any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations (subject to certain exceptions);<br><br>    (v)    any order which authorizes the return of any of the Debtors' property pursuant to section 546(h) of the Bankruptcy Code;<br><br>    (vi)    any order which authorizes the payment of any Indebtedness (other than the payment in full on the Closing Date of the B. Riley Obligations, payments of Indebtedness reflected in the Approved Budget and permitted to be paid under the DIP Credit Agreement, and other payments of Indebtedness approved by the DIP Lender) incurred prior to the Petition Date or the grant of "adequate |

01:16795065.1

<table>
<tr><td></td><td></td><td>protection" with respect to any such Indebtedness which is secured by a Lien (other than as provided in the DIP Order with respect to Pre-Petition Liabilities becoming Other DIP Obligations); or<br><br>(vii)   any order seeking authority to take any action that is prohibited by the terms of the DIP Credit Agreement or the other Loan Documents or refrain from taking required actions under those documents.<br><br>The Debtors also covenant that in the event that, for any reason, Edmund Thomas shall cease to serve as the chief executive officer of The Wet Seal Inc. with substantially the same authority and duties as existed prior to the Petition Date, The Wet Seal Inc. shall appoint a successor to such role acceptable to the DIP Lender in its discretion within five (5) Business Days.<br><br>(*see* Article VI (affirmative covenants), Article VII (negative covenants), §§ 6.21, 7.15 & 7.16 of the DIP Credit Agreement)</td></tr>
<tr><td>(w)</td><td>Events of Default:</td><td>As specified in the DIP Order and the DIP Credit Agreement.<br><br>Among other Events of Default, (i) failure of the Court to enter an order by April 1, 2015 approving the sale of all or substantially all of the assets of the Debtors, including, without limitation, the DIP Collateral, to the DIP Lender (or its assignees) pursuant to that certain Asset Purchase Agreement dated as of March 12, 2015 by and among the Debtors and Mador Lending, LLC or (ii) the failure of the sale to have closed on or before April 15, 2015 constitutes an Event of Default.  Failure of any Debtor to comply with each and all of the terms and conditions of the DIP Order also constitutes an Event of Default.  If the Liquidity Amount falls below $3,000,000 at any time, such event is an Event of Default.  Failure of the Debtors to obtain, on or before ninety (90) days following the Petition Date, an order of the Court extending the time period for the Debtors to assume or reject Leases to not less than two hundred ten (210) days from the Petition Date is an Event of Default under the DIP Credit Agreement.<br><br>Unless the (a) DIP Lender has provided its prior written consent or all DIP Obligations have been irrevocably paid in full in cash (or will be irrevocably paid in full in cash upon entry of an order approving indebtedness described in</td></tr>
</table>

Paragraph 33 of the DIP Order, or other arrangements for the payment of the DIP Obligations satisfactory to the DIP Lender in its sole and exclusive discretion have been made), and (b) the Commitment has terminated, the entry of an order in the Cases or in any Successor Cases that authorizes, or any action taken that involves, any of the following constitutes a DIP Order Event of Default:

(i)     Any modification, stay, vacation, or amendment to the DIP Order or the Cash Management Order, or any change in the terms applicable to the DIP L/C Facility that is less favorable to the Debtor than the existing applicable terms, to which the DIP Lender has not consented;

(ii)     A priority claim or administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the DIP Lender in respect of the DIP Obligations, except with respect to the Professional Fee Carve Out or the BofA Interests;

(iii)     Any Lien on any DIP Collateral having a priority equal or superior to the Lien securing the DIP Obligations, except (i) with respect to the Professional Fee Carve Out, and (ii) with respect to the BofA Interests;

(iv)     The return of any of the Debtors' property pursuant to section 546(h) of the Bankruptcy Code;

(v)     The payment of any Indebtedness (other than Indebtedness reflected in the Approved Budget and other Indebtedness approved by the DIP Lender) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) that is secured by a Lien, in each case other than as set forth in the Final DIP L/C Order or the Cash Management Order; or

(vi)     Any exercise by Bank of America, N.A. of any default remedy under the Final DIP L/C Order or any agreement or document entered into under or in connection with the Final DIP L/C Order,

<table>
<tr><td></td><td></td><td>directly or indirectly, against any DIP Collateral in which the DIP Lender's interests in such DIP Collateral are senior to any interests therein held by Bank of America, N.A.;  provided that, for the avoidance of doubt, Bank of America, N.A. shall be permitted to use the Cash Collateral on deposit in the Pre-Petition Cash Collateral Account (as defined in the Final DIP L/C Order), the Post-Petition Cash Collateral Account (as defined in the Final DIP L/C Order), and the Cash Management/Indemnity Account (as defined in the Final DIP L/C Order) in accordance with the terms of the Final DIP L/C Order and any agreement or document entered into under or in connection with the Final DIP L/C Order.<br><br>(*see* defined terms of the DIP Credit Agreement (pg. 10); § 8.01 of the DIP Credit Agreement; ¶¶ 22-24 of the DIP Order)</td></tr>
<tr><td>(x)</td><td><u>Remedies Upon Default:</u></td><td>Prior to exercising any remedy under the DIP Financing Agreements following the occurrence of a DIP Order Event of Default (defined as the occurrence of (a) the Commitment Termination Date or (b) an Event of Default under the DIP Credit Agreement or (c) any of the events set forth in subparagraphs (c) through (h) of paragraph 23 of the DIP Order), the DIP Lender shall provide not less than five (5) days' written notice of such default occurrence to: (i) the Debtors and their counsel, (ii) counsel for any Committee(s), (iii) counsel to Bank of America, N.A., (iv) counsel to certain taxing authorities, and (v) the Office of the United States Trustee.  Following the giving of written notice by the DIP Lender of the occurrence of a DIP Order Event of Default, the Debtors and any Committee(s) appointed in the Cases, if any, shall be entitled to an emergency hearing before this Court. If either (a) the Debtors or any such Committee(s) do not contest the occurrence of a DIP Order Event of Default and, therefore, the right of the DIP Lender to exercise its remedies, or (b) the Debtors or any such Committee(s) do timely contest the occurrence of a DIP Order Event of Default and the Court, after notice and hearing, declines to stay the enforcement thereof, the automatic stay as to the DIP Lender shall automatically terminate at the end of the five (5) day notice period or the order of the Court declining to stay such enforcement.<br><br>Upon the occurrence and during the continuance of any</td></tr>
</table>

01:16795065.1

| | | DIP Order Event of Default, the DIP Lender is granted relief from the automatic stay to exercise its rights on default without further order of the Court. The DIP Lender may require the Debtors to liquidate the DIP Collateral on behalf of the DIP Lender in such manner as the DIP Lender may require. If the Debtors fail to do so or to do so diligently, the DIP Lender may liquidate the DIP Collateral itself, including through filing and prosecuting motions, in the name of the Debtors. |
|---|---|---|
| | | In addition, as set forth in the DIP Order, the Debtors shall continue to deliver the proceeds of DIP Collateral (other than the Cash Collateral on deposit in the Pre-Petition Cash Collateral Account, the Post-Petition Cash Collateral Account, and the Cash Management/Indemnity Account under the Final DIP L/C Order and Cash Management Order) to the DIP Lender (who shall continue to apply such proceeds in accordance with the DIP Financing Agreements and the DIP Order and the Final DIP L/C Order (where applicable)). The Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the DIP Obligations, the DIP L/C Obligations (where applicable), and the Professional Fee Carve Out. Any obligation imposed on the DIP Lender to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended (whether for expenses previously incurred or to be incurred after the DIP Order Event of Default). |
| | | (*see* ¶¶ 23 & 25-29 of the DIP Order; § 8.02 of the DIP Credit Agreement) |
| (y) | <u>Amendments</u>: | No amendment or waiver of any provision of the DIP Credit Agreement or any other Loan Document, and no consent to any departure by any Debtor therefrom, shall be effective unless in writing signed by the DIP Lender and the applicable Debtor, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. |
| | | The Debtors and the DIP Lender may amend, modify, supplement, or waive any provision of the DIP Financing Agreements to make non-material changes to such agreements (as determined by the Debtors and the DIP Lender) without further approval of the Court or any Committee(s); provided that, prior to effectuating any non-material change, amendment, modification, supplement or waiver of any provision of the DIP Financing Agreements, |

| | | the Debtors and the DIP Lender shall consult with Bank of America, N.A. and any Committee(s) with respect to same. For the avoidance of doubt, any amendment, modification, supplement, or waiver that (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the Commitment, or (iii) changes the maturity date of the DIP Facility shall be considered a material change.  Except as set forth above, all waivers, modifications, or amendments of any of the provisions of the DIP Order shall not be effective unless set forth in writing, signed by on behalf of the Debtors and the DIP Lender, and approved by the Court.<br><br>(*see* § 9.01 of the DIP Credit Agreement; ¶ 40 of the DIP Order) |
|---|---|---|
| (z) | Indemnification and Exculpation: | The DIP Credit Agreement contains customary provisions regarding the Debtors' indemnification and exculpation of the DIP Lender.<br><br>(*see* § 9.04 of the DIP Credit Agreement) |
| (aa) | Releases: | The Debtors shall be deemed to have waived, discharged, and released the DIP Lender (together with its affiliates, agents, attorneys, officers, directors, and employees) of any rights the Debtors may have:<br><br>(i)    to challenge or object to any of the DIP Obligations except as permitted under the DIP Financing Agreements;<br><br>(ii)    to challenge or object to the security for the DIP Obligations, including, without limitation, the DIP Liens on the DIP Collateral; or<br><br>(iii)    to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action based on facts and circumstances existing prior to entry of the DIP Order arising out of, based upon, or related to the DIP Financing Agreements, the DIP Obligations, the DIP Liens, or any other obligations related thereto.<br><br>The Debtors acknowledge that they do not possess and will not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, and non-avoidability of any of the DIP Financing Agreements, the DIP Obligations, or the DIP Liens, or any claim of the DIP Lender pursuant to the DIP Financing Agreements or |

| | | |
|---|---|---|
| | | otherwise.<br><br>(*see* Finding of Fact E(4) & ¶ 37 of the DIP Order) |
| (bb) | Satisfaction of Claims and Release of Liens Under Existing DIP Facility | As of March 10, 2015, the outstanding amount of the B. Riley Obligations is $497,616.67, consisting of: (i) a commitment fee of $375,000 (the "B. Riley Commitment Fee"); (ii) fees and expenses owed to Skadden, Arps, Slate, Meagher & Flom LLP in the amount of $63,325.30; (iii) fees and expenses owed to FreedMaxick ABL Services, LLC in the amount of $39,291.37; and (iv) fees and expenses owed to B. Riley in the amount of $20,000.<br><br>Upon entry of the DIP Order, the B. Riley Liens shall be of no further force or effect, without the need for any further action.  The Debtors will be authorized by the DIP Order to pay from up to $497,616.67 of Mador Lending LLC's Good Faith Deposit, which amount shall be reserved for such purpose: (a) immediately upon entry of the DIP Order, any B. Riley Commitment Fee; and (b) under and in accordance with Paragraph 35 of the B. Riley Final Order, the Outstanding B. Riley Fees and Expenses.  Upon payment of the sums set forth in (a) and (b) above, the B. Riley Obligations shall be deemed to be paid in full, without the need for further action.  Notwithstanding the foregoing, upon the DIP Lender's request: (x) the Debtors are authorized to take all such actions as are necessary to terminate the B. Riley DIP Facility and the B. Riley Loan Documents, and to release and discharge the B. Riley Liens; and (y) B. Riley is directed to cooperate with such termination, release and discharge of the B. Riley DIP Obligations and B. Riley Liens (including, without limitation, by filing any applicable UCC-3 termination statements, terminating any control agreements, and turning over any possessory DIP Collateral to the DIP Lender; provided that, notwithstanding anything to the contrary contained in the DIP Financing Agreements, the Debtors and B. Riley shall have up to five (5) business days after entry of the DIP Order to turn over any possessory DIP Collateral to the DIP Lender).<br><br>(*see* Finding of Fact F & ¶ 5 of the DIP Order) |

## VIII. DISCLOSURES

23.     The required disclosures under Local Rule 4001-2(a)(i) are limited to (i) provisions of the DIP Order that immediately grant liens in avoidance actions, (ii) provisions of the DIP Order waiving the estates' rights under section 506(c) of the Bankruptcy Code, and (iii) provisions of the DIP Order that seek to affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code. None of these provisions are new. They were all set forth in the Existing DIP Order.

24.     Here, the grant of liens in avoidance actions is narrowly limited to Specified Bankruptcy Recoveries (*i.e.*, all avoidance actions and commercial tort claims but only to the extent that the Professional Fee Carve Out is used for the prosecution of such actions, and all claims under section 549 of the Bankruptcy Code without limit). In essence, the DIP Lender is only being granted liens in avoidance actions to the extent of diminution of the DIP Collateral – either because DIP Collateral is transferred without authorization or because DIP Collateral is expended in the pursuit of avoidance actions. The Debtors submit that such limited liens in avoidance actions are appropriate under the circumstances.

25.     The waivers of any surcharge of costs or expenses under section 506(c) of the Bankruptcy Code and of the "equities of the case" exception under section 552(b) of the Bankruptcy Code are similarly appropriate as the DIP Lender is requiring these waivers as a condition to providing the DIP Facility, and the Debtors need to enter into the DIP Facility immediately in order to borrow funds to pay for necessary operating expenses.

01:16795065.1

## IX.  BASIS FOR RELIEF

A.    **The Debtors Should Be Permitted to Obtain Post-Petition Financing Pursuant to Section 364(c) of the Bankruptcy Code.**

26.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense . . . ." 11 U.S.C. § 364(c).

27.    In evaluating proposed post-petition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;

b.    the credit transactions are necessary to preserve assets of the estate;

c.    the terms of the credit agreement are fair, reasonable, and adequate;

d.    the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

e.    the proposed financing agreement adequately protects pre-petition secured creditors.

*See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying the first three factors); *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

28.     For the reasons discussed below, the Debtors satisfy the standards required to obtain post-petition financing on a secured superpriority lien basis under section 364(c) of the Bankruptcy Code.

**B.    The Debtors Were Unable to Obtain Financing on More Favorable Terms.**

29.     Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest. *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009).  The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

30.     As a result of the impending maturity of the Existing DIP Facility, the Debtors face severe liquidity constraints.  The Debtors are unable, in the present circumstances, to meet their liquidity needs by obtaining financing on an unsecured, administrative expense basis.  In fact, both pre-petition and post-petition, most of the Debtors' vendors have instituted cash on delivery payment terms or have required cash-collateralized letters of credit to continue providing goods, further constraining liquidity. Presently only Mador is willing to provide sufficient debtor-in-possession financing that will permit the Debtors to continue as a going concern.  Without the DIP Facility, the Debtors

would be assured of a piecemeal liquidation under chapter 7 of the Bankruptcy Code, rather than a sale of the Debtors' assets that will maximize value for all constituents.

31.     The Debtors respectfully submit that their efforts to obtain post-petition financing therefore satisfy the standards required under section 364(c) of the Bankruptcy Code. *See, e.g.*, *In re Simasko Production Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**C.    The Proposed Financing Is Necessary to Preserve the Assets of the Debtors' Estates.**

32.     Pending a sale of the Debtors' assets, the Debtors intend to operate their business in the ordinary course and require immediate access to post-petition financing and use of cash collateral. Cash is necessary for working capital, operating costs and expenses incurred during these Cases, including funding payroll to the Debtors' over 2,200 employees. The Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on the operation of their business without additional financing and the use of cash collateral. The Debtors' ability to maintain their business pending a sale of their assets pursuant to section 363 of the Bankruptcy Code is dependent on their ability to continue to operate, and the Debtors cannot operate unless they can fund payments for post-petition rent, payroll, goods, services and other operating expenses. The DIP Facility thus is

essential to the Debtors' continued operational viability and will provide the Debtors with the opportunity to preserve their business through a sale of their assets.

33.    The alternative in these Cases is "to force the debtors to close down their operations and thus doom any effort at reorganization which will hopefully extract the maximum value of the assets involved to the benefit of *all* classes of creditors and other constituencies involved in this case." *In re Dynaco Corp.,* 162 B.R. 389, 396 (Bankr. D. N.H. 1993). Because this result would be at fundamental odds to the rehabilitative purposes of chapter 11, approval of the Motion is warranted. *Id.* at 394 (noting that "'it is apparent that the Congress intended business under reorganization to proceed in as normal a fashion as possible'" (quoting *In re Prime, Inc.*, 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981))).

34.    As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtors require post-petition financing and the use of cash collateral under the terms of the DIP Financing Agreements and DIP Order to continue their operations pending the sale of the Debtors' assets.

**D.    The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate.**

35.    In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

01:16795065.1

36.     The terms of the DIP Credit Agreement and the proposed DIP Order were negotiated in good faith and at arm's-length between the Debtors and the DIP Lender, resulting in agreements designed to permit the Debtors to obtain the needed liquidity to maximize the value of their assets both pending and through the sale of the Debtors' assets.

**E.     Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment.**

37.     A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). One court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

38.     Here, the Debtors' sound business judgment supports entry into the DIP Credit Agreement to gain access to needed funding and thereby maximize value for all constituents.

**F.     Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral.**

39.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (i) each entity that has an interest in such cash collateral

provides consent, or (ii) the court approves the use of cash collateral after notice and a hearing. *See* 11 U.S.C. § 363(c).

40.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

41.     Section 361 of the Bankruptcy Code provides that:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
>
> > (1)     requiring the [debtor in possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
> >
> > (2)     providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
> >
> > (3)     granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.  "The determination of adequate protection is a fact-specific inquiry" to be decided on a case-by-case basis. *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." (internal quotation marks omitted) (citation omitted)).

01:16795065.1

28

42.    Here, the interests of the Pre-Petition Secured Parties are adequately protected for purposes of section 363(e) of the Bankruptcy Code for the following reasons.

43.    First, the Pre-Petition Secured Parties have already consented to the Debtors' use of cash collateral on the terms of the Final DIP L/C Order.  Their consent to the use of cash collateral pursuant to the terms of that order was not conditioned upon debtor-in-possession financing by B. Riley and does not terminate upon the maturity of such financing.

44.    Second, pursuant to the Final DIP L/C Order, the Pre-Petition Secured Parties, among other things, (i) have the benefit of replacement liens and superpriority administrative expense claims to the extent set forth therein to protect them from any diminution in value of their interest in the Debtors' assets, (ii) have relief from the automatic stay to enable the Pre-Petition Secured Parties to apply the Cash Collateral deposited in the Pre-Petition Cash Collateral Account and Post-Petition Cash Collateral Account, as applicable, to reimburse the Pre-Petition L/C Issuer (each such term as defined therein) for drawings and letter of credit fees when due, (iii) have the benefit of the $1.5 million Cash Management/Indemnity Account, which will secure the contingent indemnity claims of the Pre-Petition Secured Parties and the Debtors' past and future obligations to Bank of America, N.A. in connection with its provision of cash management and treasury management services to the Debtors, and (iv) receive ongoing cash payments of interest, fees, costs and expenses.

45.    Third, the Debtors intend to preserve value of the Pre-Petition Secured Parties' collateral by maintaining operations pending the sale of their assets.

46.    The Debtors believe that such protections are adequate under the circumstances. Further, given the significant value that the Debtors stand to lose in the event they are denied access to continued use of cash collateral, such protections are wholly appropriate and justified.

## X. ENTRY OF DIP ORDER ON EXPEDITED BASIS

47.     For the reasons set forth above, the Debtors seek entry of the DIP Order on an expedited basis. Although 14 days' notice is required by Bankruptcy Rule 4001(c)(2) in connection with motions seeking approval of debtor-in-possession financing, that rule has already been fully complied with in connection with the Debtors' prior motion for approval of the Existing DIP Facility, pursuant to which parties received more than 14 days' notice.

48.     Here, the Debtors are seeking replacement debtor-in-possession financing that is an overbid of the existing financing pursuant to Court-approved procedures contemplating the replacement of that financing on an expedited basis. The Existing DIP Facility was always subject to overbid, as contemplated by both the Existing PSA Order (which was entered concurrently with the Existing DIP Order) and the Bid Procedures Order. Those orders further contemplated the need for approval of the DIP Facility on an expedited basis as a result of the maturity of the Existing DIP Facility if B. Riley is not the successful bidder at auction. This Motion is simply continuation of the Debtors' motion for approval of the Existing DIP Facility. Had Mador successfully overbid the Existing DIP Facility at the final hearing on approval of that financing, there is no question that the Court could have approved that overbid without the need to provide an additional 14 days' notice under Bankruptcy Rule 4001(c)(2). This is because that rule was already fully satisfied in connection with the underlying financing motion. Similarly, an additional 14 days' notice is not required now.

49.     Here, the terms of the DIP Facility are virtually identical to the terms of the Existing DIP Facility, with the key differences being the identity of the lender and the fact that interest accrues under the DIP Facility at 0.25% per annum less than under the Existing DIP Facility. In the Debtors' business judgment, the DIP Facility is an improvement to the Existing DIP Facility. The identity of the new lender and the lower interest rate are facially

01:16795065.1

unobjectionable.  As the Existing DIP Order was entered without objection, there can be no objection by any party to entry of the virtually-identical DIP Order on an expedited basis.

## XI.  WAIVER OF ANY APPLICABLE STAY

50.    The Debtors also request that the Court waive any stay imposed by the Bankruptcy Rules.  The relief that the Debtors seek in this Motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive any stay imposed by the Bankruptcy Rules, as the exigent nature of the relief sought herein justifies immediate relief.

## XII.  NOTICE

51.    Notice of this Motion has been given to (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to B. Riley, (iv) counsel to Bank of America, N.A., (v) counsel to the Pre-Petition Secured Parties, (vi) counsel to Mador, (vii) any party that may assert a lien in the Debtors' assets; (viii) all parties who have filed a notice of appearance and request for service of papers in the Cases pursuant to Bankruptcy Rule 2002; (ix) the United States Internal Revenue Service; and (x) the United States Securities and Exchange Commission.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

01:16795065.1

## XIII. CONCLUSION

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court

enter the DIP Order, pursuant to sections 105, 361, 362, 363 and 364 of the Bankruptcy Code,

Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2, (i) authorizing the Debtors to

(a) obtain financing under the terms of the DIP Credit Agreement, and (b) use cash collateral;

and (ii) granting the other relief requested in this Motion.

Dated: March 13, 2015

/s/ *Maris J. Kandestin*
Michael R. Nestor, Esq. (DE Bar No. 3526)
Maris J. Kandestin, Esq. (DE Bar No. 5294)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Email: mnestor@ycst.com
          mkandestin@ycst.com

and

Lee R. Bogdanoff, Esq.
Michael L. Tuchin, Esq.
David M. Guess, Esq.
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel:    (310) 407-4022
Fax:    (310) 407-9090
Email: lbogdanoff@ktbslaw.com
          mtuchin@ktbslaw.com
          dguess@ktbslaw.com

*Counsel to the Debtors and Debtors in
Possession*