**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>THE WET SEAL, INC., a Delaware corporation, *et al.*[1]<br><br>     Debtors. | Chapter 11<br><br>Case No.:  15-10081 (CSS)<br><br>(Jointly Administered) |

# Transcript of March 10 and 12, 2015 Auction

---

[1]   The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: The Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265); Wet Seal Catalog, Inc. (7604); and Wet Seal GC, LLC (2855-VA).  The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

1          IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE DISTRICT OF DELAWARE

3

4    _____

     In re                         )

5                                  )

     THE WET SEAL, INC., a Delaware) Chapter 11

6    corporation, et al.,          )

                                   ) Case No. 15-10081 (CCS)

7                                  )

                                   ) (Jointly Administered)

8              Debtors.            )

                                   )

9    _____)

10

11

12

13

14              TRANSCRIPT OF PROCEEDINGS

15               Los Angeles, California

16              Tuesday, March 10, 2015

17

18

19

20

21   Reported by:

     LYNN ZINK, RPR

22   CSR No. 9466

23   JOB No. 2028826

24

25   PAGES 1 - 8

                                          Page 1

1          IN THE UNITED STATES BANKRUPTCY COURT
2              FOR THE DISTRICT OF DELAWARE
3
4   _____
    In re                        )
5                                )
    THE WET SEAL, INC., a Delaware) Chapter 11
6   corporation, et al.,         )
                                 ) Case No. 15-10081 (CCS)
7                                )
                                 ) (Jointly Administered)
8              Debtors.          )
                                 )
9   _____)
10
11
12
13
14        Transcript of proceedings at 1999 Avenue of the
15   Stars, 39th Floor, Los Angeles, California, beginning at
16   1:07 p.m. and ending at 1:09 p.m. on Tuesday, March 10,
17   2015, before LYNN ZINK, Certified Shorthand Reporter No.
18   9466.
19
20
21
22
23
24
25

                                             Page  2

1    APPEARANCES:

2

3    For Debtor:

4        KLEE, TUCHIN, BOGDANOFF & STERN LLP

5        BY:  LEE R. BOGDANOFF

6        BY:  DAVID M. GUESS

7        Attorneys at Law

8        1999 Avenue of the Stars, 39th Floor

9        Los Angeles, California 90067

10       (310) 407-4000

11       lbogdanoff@ktbslaw.com

12       dguess@ktbslaw.com

13

14   For the Creditors Committee:

15       PACHULSKI, STANG, ZIEHL & JONES

16       BY:  BRADFORD J. SANDLER

17       Attorney at Law

18       919 North Market Street, 17th Floor

19       Wilmington, Delaware 19801

20       (302) 778-6424

21       bsandler@pszjlaw.com

22

23

24

25

Page 3

1   APPEARANCES (Continued):

2

3   For the Creditors Committee:

4       PACHULSKI, STANG, ZIEHL & JONES

5       BY:  ROBERT J. FEINSTEIN

6       BY:  JEFFREY POMERANTZ

7       Attorneys at Law

8       780 Third Avenue, 34th Floor

9       New York, New York 10017-2024

10      (212) 561-7710

11      rfeinstein@pszjlaw.com

12

13  For B. Riley Financial, Inc.:

14      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

15      BY:  VAN C. DURRER II

16      Attorney at Law

17      300 South Grand Avenue

18      Los Angeles, California 90071

19      (213) 687-5200

20      van.durrer@skadden.com

21

22

23

24

25

                                        Page 4

1   APPEARANCES (Continued):

2

3   For Mador Lending:

4       GREENBERG TRAURIG, LLP

5       BY:  NANCY PETERMAN

6       BY:  HOWARD J. STEINBERG

7       Attorneys at Law

8       1840 Century Park East, Suite 1900

9       Los Angeles, California 90067

10      (310) 586-7702

11      steinbergh@gtlaw.com

12      petermann@gtlaw.com

13

14  Also Present:

15      STEVEN REINER, B. Riley Financial, Inc.

16      BRYANT RILEY, B. Riley Financial, Inc.

17      PAUL HUYGENS, Province, Inc.

18

19

20

21

22

23

24

25

                                    Page 5

1          Los Angeles, California, Tuesday, March 10, 2015

2                          1:07 p.m.

3

4          MR. BOGDANOFF: This is Lee Bogdanoff, a member of

5     Klee, Tuchin, Bogdanoff & Stern LLP, counsel to the Wet

6     Seal, Inc. and affiliates, debtor and debtor in possession.

7          We are now commencing an auction.  The auction is

8     being convened in accordance with those certain, quote, bid

9     procedures, close quote, approved by the order of the

10    Bankruptcy Court dated February 18, 2015.

11         There have been discussions that have occurred this

12    morning among the parties, and thus the auction is being

13    convened a bit later than the originally planned time.

14         The debtors on March 5, 2015 received a qualifying

15    bid from Mador Lending, LLC.  Previously, pursuant to the

16    bid procedures, B. Riley Financial, Inc. was deemed to have

17    submitted a qualified bid in accordance with the bid

18    procedures.

19         I think it's appropriate at this time to ask the

20    counsel and parties to make an appearance, and I would ask

21    that we go around the room and do that.

22         MR. SANDLER:  Brad Sandler, Pachulski, Stang, Ziehl

23    & Jones, on behalf of the Committee.

24         MR. FEINSTEIN:  Robert Feinstein, same firm, same

25    client.

                                                    Page 6

1        MR. POMERANTZ:  Jeff Pomerantz, same firm, same

2    client.

3        MR. HUYGENS:  Paul Huygens on behalf of the

4    Creditors Committee from Province.

5        MS. PETERMAN:  Nancy Peterman from Greenberg Traurig

6    on behalf of Mador Lending.

7        MR. STEINBERG:  Howard Steinberg from Greenberg

8    Traurig, also on behalf of Mador.

9        MR. DURRER:  Van Durrer from Skadden on behalf of

10   B. Riley.  And with me from B. Riley are Steve Reiner and

11   Bryant Riley.

12       MR. BOGDANOFF:  Thank you.  Discussions are still

13   occurring among the parties, and thus it is appropriate to

14   recess this auction until 11:00 a.m. tomorrow, at which

15   time the debtors will plan to designate the highest and

16   best bid.

17       Does anybody wish to make any comment or say

18   anything about that?

19       And with that, we are recessed.  Thank you.

20       (TIME NOTED:  1:09 p.m.)

21

22

23

24

25

Page 7

1       I, the undersigned, a Certified Shorthand Reporter

2  of the State of California, do hereby certify:

3       That the foregoing proceedings were taken before me

4  at the time and place herein set forth; that any witnesses

5  in the foregoing proceedings, prior to testifying, were

6  placed under oath; that a verbatim record of the

7  proceedings was made by me using machine shorthand which

8  was thereafter transcribed under my direction; that the

9  foregoing transcript is a true record of the testimony

10  given.

11       Further, that if the foregoing pertains to the

12  original transcript of a deposition in a Federal Case,

13  before completion of the proceedings,  review of the

14  transcript [ ] was [ ] was not requested.

15       I further certify that I am neither financially

16  interested in the action nor a relative or employee of any

17  attorney or any party in this action.

18       IN WITNESS WHEREOF, I have this date subscribed my

19  name.

20

21  Dated:3/11/15

22

23

24           LYNN ZINK, RPR

                CSR No. 9466

25

Page 8

[& - ii]

| & | 7 | best 7:16 | deemed 6:16 |
|---|---|---|---|

**&**

**&**   3:4,15 4:4,14 6:5
  6:23

**7**

**778-6424**   3:20
**780**   4:8

**1**

**1**   1:25
**10**   1:16 2:16 6:1
**10017-2024**   4:9
**11**   1:5 2:5
**11:00**   7:14
**15-10081**   1:6 2:6
**17th**   3:18
**18**   6:10
**1840**   5:8
**1900**   5:8
**19801**   3:19
**1999**   2:14 3:8
**1:07**   2:16 6:2
**1:09**   2:16 7:20

**2**

**2015**   1:16 2:17 6:1
  6:10,14
**2028826**   1:23
**212**   4:10
**213**   4:19

**3**

**3/11/15**   8:21
**300**   4:17
**302**   3:20
**310**   3:10 5:10
**34th**   4:8
**39th**   2:15 3:8

**4**

**407-4000**   3:10

**5**

**5**   6:14
**561-7710**   4:10
**586-7702**   5:10

**6**

**687-5200**   4:19

**8**

**8**   1:25

**9**

**90067**   3:9 5:9
**90071**   4:18
**919**   3:18
**9466**   1:22 2:18 8:24

**a**

**a.m.**   7:14
**action**   8:16,17
**administered**   1:7
  2:7
**affiliates**   6:6
**al**   1:6 2:6
**angeles**   1:15 2:15
  3:9 4:18 5:9 6:1
**anybody**   7:17
**appearance**   6:20
**appearances**   3:1 4:1
  5:1
**appropriate**   6:19
  7:13
**approved**   6:9
**arps**   4:14
**attorney**   3:17 4:16
  8:17
**attorneys**   3:7 4:7
  5:7
**auction**   6:7,7,12
  7:14
**avenue**   2:14 3:8 4:8
  4:17

**b**

**b**   4:13 5:15,16 6:16
  7:10,10
**bankruptcy**   1:1 2:1
  6:10
**beginning**   2:15
**behalf**   6:23 7:3,6,8,9

**best**   7:16
**bid**   6:8,15,16,17,17
  7:16
**bit**   6:13
**bogdanoff**   3:4,5 6:4
  6:4,5 7:12
**brad**   6:22
**bradford**   3:16
**bryant**   5:16 7:11
**bsandler**   3:21

**c**

**c**   4:15
**california**   1:15 2:15
  3:9 4:18 5:9 6:1 8:2
**case**   1:6 2:6 8:12
**ccs**   1:6 2:6
**century**   5:8
**certain**   6:8
**certified**   2:17 8:1
**certify**   8:2,15
**chapter**   1:5 2:5
**client**   6:25 7:2
**close**   6:9
**commencing**   6:7
**comment**   7:17
**committee**   3:14 4:3
  6:23 7:4
**completion**   8:13
**continued**   4:1 5:1
**convened**   6:8,13
**corporation**   1:6 2:6
**counsel**   6:5,20
**court**   1:1 2:1 6:10
**creditors**   3:14 4:3
  7:4
**csr**   1:22 8:24

**d**

**date**   8:18
**dated**   6:10 8:21
**david**   3:6
**debtor**   3:3 6:6,6
**debtors**   1:8 2:8 6:14
  7:15

**deemed**   6:16
**delaware**   1:2,5 2:2,5
  3:19
**deposition**   8:12
**designate**   7:15
**dguess**   3:12
**direction**   8:8
**discussions**   6:11
  7:12
**district**   1:2 2:2
**durrer**   4:15 7:9,9

**e**

**east**   5:8
**employee**   8:16
**et**   1:6 2:6

**f**

**february**   6:10
**federal**   8:12
**feinstein**   4:5 6:24,24
**financial**   4:13 5:15
  5:16 6:16
**financially**   8:15
**firm**   6:24 7:1
**flom**   4:14
**floor**   2:15 3:8,18 4:8
**foregoing**   8:3,5,9,11
**forth**   8:4
**further**   8:11,15

**g**

**given**   8:10
**go**   6:21
**grand**   4:17
**greenberg**   5:4 7:5,7
**gtlaw.com**   5:11,12
**guess**   3:6

**h**

**highest**   7:15
**howard**   5:6 7:7
**huygens**   5:17 7:3,3

**i**

**ii**   4:15

**[interested - zink]**

| interested 8:16 | o | r | t |
|---|---|---|---|
| **j** | **oath** 8:6 | **r** 3:5 | **taken** 8:3 |
| **j** 3:16 4:5 5:6 | **occurred** 6:11 | **received** 6:14 | **testifying** 8:5 |
| **jeff** 7:1 | **occurring** 7:13 | **recess** 7:14 | **testimony** 8:9 |
| **jeffrey** 4:6 | **order** 6:9 | **recessed** 7:19 | **thank** 7:12,19 |
| **job** 1:23 | **original** 8:12 | **record** 8:6,9 | **think** 6:19 |
| **jointly** 1:7 2:7 | **originally** 6:13 | **reiner** 5:15 7:10 | **third** 4:8 |
| **jones** 3:15 4:4 6:23 | **p** | **relative** 8:16 | **time** 6:13,19 7:15,20 8:4 |
| **k** | **p.m.** 2:16,16 6:2 7:20 | **reported** 1:21 | **tomorrow** 7:14 |
| **klee** 3:4 6:5 | **pachulski** 3:15 4:4 6:22 | **reporter** 2:17 8:1 | **transcribed** 8:8 |
| **ktbslaw.com** 3:11 3:12 | **pages** 1:25 | **requested** 8:14 | **transcript** 1:14 2:14 8:9,12,14 |
| **l** | **park** 5:8 | **review** 8:13 | **traurig** 5:4 7:5,8 |
| **law** 3:7,17 4:7,16 5:7 | **parties** 6:12,20 7:13 | **rfeinstein** 4:11 | **true** 8:9 |
| **lbogdanoff** 3:11 | **party** 8:17 | **riley** 4:13 5:15,16,16 6:16 7:10,10,11 | **tuchin** 3:4 6:5 |
| **lee** 3:5 6:4 | **paul** 5:17 7:3 | **robert** 4:5 6:24 | **tuesday** 1:16 2:16 6:1 |
| **lending** 5:3 6:15 7:6 | **pertains** 8:11 | **room** 6:21 | **u** |
| **llc** 6:15 | **peterman** 5:5 7:5,5 | **rpr** 1:21 8:24 | **undersigned** 8:1 |
| **llp** 3:4 4:14 5:4 6:5 | **petermann** 5:12 | **s** | **united** 1:1 2:1 |
| **los** 1:15 2:15 3:9 4:18 5:9 6:1 | **place** 8:4 | **sandler** 3:16 6:22,22 | **v** |
| **lynn** 1:21 2:17 8:24 | **placed** 8:6 | **seal** 1:5 2:5 6:6 | **van** 4:15 7:9 |
| **m** | **plan** 7:15 | **set** 8:4 | **van.durrer** 4:20 |
| **m** 3:6 | **planned** 6:13 | **shorthand** 2:17 8:1 8:7 | **verbatim** 8:6 |
| **machine** 8:7 | **pomerantz** 4:6 7:1,1 | **signature** 8:23 | **w** |
| **mador** 5:3 6:15 7:6 7:8 | **possession** 6:6 | **skadden** 4:14 7:9 | **wet** 1:5 2:5 6:5 |
| **march** 1:16 2:16 6:1 6:14 | **present** 5:14 | **skadden.com** 4:20 | **whereof** 8:18 |
| **market** 3:18 | **previously** 6:15 | **slate** 4:14 | **wilmington** 3:19 |
| **meagher** 4:14 | **prior** 8:5 | **south** 4:17 | **wish** 7:17 |
| **member** 6:4 | **procedures** 6:9,16 6:18 | **stang** 3:15 4:4 6:22 | **witness** 8:18 |
| **morning** 6:12 | **proceedings** 1:14 2:14 8:3,5,7,13 | **stars** 2:15 3:8 | **witnesses** 8:4 |
| **n** | **province** 5:17 7:4 | **state** 8:2 | **y** |
| **name** 8:19 | **pszjlaw.com** 3:21 4:11 | **states** 1:1 2:1 | **york** 4:9,9 |
| **nancy** 5:5 7:5 | **pursuant** 6:15 | **steinberg** 5:6 7:7,7 | **z** |
| **neither** 8:15 | **q** | **steinbergh** 5:11 | **ziehl** 3:15 4:4 6:22 |
| **new** 4:9,9 | **qualified** 6:17 | **stern** 3:4 6:5 | **zink** 1:21 2:17 8:24 |
| **north** 3:18 | **qualifying** 6:14 | **steve** 7:10 | |
| **noted** 7:20 | **quote** 6:8,9 | **steven** 5:15 | |
| | | **street** 3:18 | |
| | | **submitted** 6:17 | |
| | | **subscribed** 8:18 | |
| | | **suite** 5:8 | |

1           IN THE UNITED STATES BANKRUPTCY COURT
2              FOR THE DISTRICT OF DELAWARE
3
4
5
   _____
6                                   )
   In re                            )
7                                   )
   THE WET SEAL, INC., a Delaware   ) Chapter 11
8  corporation, et al.,             )
                                    ) Case No.: 15-10081 (CCS)
9                                   )
                                    ) (Jointly Administered)
10                                  )
   _____)
11
12
13
14
15         REPORTER'S TRANSCRIPT OF PROCEEDINGS
16              Los Angeles, California
17             Thursday, March 12, 2015
18                    Volume I
19
20
21
22
   Reported by:
23 ROSA E. MORA
   CSR No. 13016
24
25 PAGES 1 - 17

                                          Page 1

1         IN THE UNITED STATES BANKRUPTCY COURT

2             FOR THE DISTRICT OF DELAWARE

3

4

5

    _____

6                                     )

    In re                             )

7                                     )

    THE WET SEAL, INC., a Delaware    ) Chapter 11

8   corporation, et al.,              )

                                      ) Case No.: 15-10081 (CCS)

9                                     )

                                      ) (Jointly Administered)

10                                    )

    _____)

11

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS, Volume I,

16      taken at 1999 Avenue of the Stars, 39th Floor,

17      Los Angeles, California, beginning at

18      9:21 p.m. and ending at 9:39 p.m. on Thursday,

19      March 12, 2015, before ROSA E. MORA, Certified

20      Shorthand Reporter No. 13016.

21

22

23

24

25

                                            Page 2

1    APPEARANCES:

2

3    For Debtor:

4        KLEE, TUCHIN, BOGDANOFF & STERN LLP

5        BY:   LEE R. BOGDANOFF, Esq.

6              DAVID M. GUESS, Esq.

7              MARTIN KOSTOV, Esq.

8        1999 Avenue of the Stars

9        39th Floor

10       Los Angeles, California 90067

11       (310) 407-4000

12       E-mail:  lbogdanoff@ktbslaw.com

13       E-mail:  dguess@ktbslaw.com

14       E-mail:  mkostov@ktbslaw.com

15

16   For the Creditors Committee:

17       PACHULSKI, STANG, ZIEHL & JONES

18       BY:   BRADFORD J. SANDLER, Esq.

19       919 North Market Street

20       17th Floor

21       Wilmington, Delaware 19801

22       (302) 778-6424

23       E-mail:  bsandler@pszjlaw.com

24

25

                                           Page 3

1   (continued)

2

APPEARANCES:

3

4   For B. Riley Financial, Inc.:

5        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

6        BY:  VAN C. DURRER II, Esq.

7        300 South Grand Avenue

8        Los Angeles, California 90071

9        (213) 687-5200

10       E-mail:  van.durrer@skadden.com

11

12  For Mador Lending:

13       GREENBERG TRAURIG, LLP

14       BY:  NANCY PETERMAN, Esq.

15       1840 Century Park East

16       Suite 1900

17       Los Angeles, California 90067

18       (310) 586-7702

19       E-mail:  petermann@gtlaw.com

20

21  Also Present:

22       STEVEN REINER, B. Riley Financial, Inc.

23       PAUL HALPERN, Mador Lending, LLP

24       DAVID S. LORRY, Mador Lending, LLP

25

                                    Page 4

```
 1                        I N D E X
 2
 3                        EXHIBITS
 4    NUMBER               DESCRIPTION              PAGE
 5    Exhibit 1    Credit agreement dated March 11, 2015    7
 6    Exhibit 2    Security agreement dated March 5, 2015   7
 7    Exhibit 3    Order Pursuant to Sections 105, 361,     7
                   362, 363 and 364 of the Bankruptcy Code
 8                 and Bankruptcy Rules 2002, 4001 and
                   9014; (1) Authorizing Post-Petition
 9                 Financing, (2) Granting Liens and
                   Providing Superpriority Administrative
10                 Expense Priority, (3) Authorizing Use
                   of Cash Collateral, and (4) Modifying
11                 The Automatic Stay
12    Exhibit 4    Approved Budget                          7
13    Exhibit 5    Asset purchase agreement dated           7
                   March 12, 2015
14
      Exhibit 6    Letter agreement dated March 12, 2015    8
15
      Exhibit 7    Order Authorizing (A) The Sale of        8
16                 Substantially All of the Debtors' Assets
                   Free and Clear of All Claims, Liens,
17                 Rights, Interests and Encumbrances; (B)
                   The Debtors to Enter Into and Perform
18                 their Obligations Under the Asset
                   Purchase Agreement; and (C) The Debtors
19                 to Assume and Assign Certain Executory
                   Contracts and Unexpired Leases
20
      Exhibit 8    B. Riley Financial, Inc. Fees and       10
21                 Expenses
22    Exhibit 9    Various e-mail exchanges                 9
23
24
25
                                        Page 5
```

1              Los Angeles, California, Thursday, March 12, 2015

2                            9:21 p.m.

3

4          MR. BOGDANOFF:  This is Lee Bogdanoff, a member of

5     Klee, Tuchin, Bogdanoff & Stern, LLP, appearing on behalf of

6     The Wet Seal and affiliates, debtors, and debtors in

7     possession.  We are reconvening the auction previously

8     commenced on March 10, 2015 in these Chapter 11 cases.  This

9     proceeding as the March 10 proceeding is being convened in

10    accordance with those certain bid procedures approved by

11    order of the Bankruptcy Court dated February 18, 2015.  I

12    think it's appropriate at this point to take appearances of

13    counsel.

14         MS. PETERMAN:  Nancy Peterman from Greenberg Traurig on

15    behalf of Mador Lending, LLC.

16         MR. DURRER:  Van Durrer from Skadden, Arps on behalf of

17    B. Riley, and Steve Reiner from B. Riley is also with me.

18         MR. BOGDANOFF:  And, Nancy, could you introduce the --

19         MS. PETERMAN:  Yes.  I have Paul Halpern and

20    David Lorry both with Mador Lending, LLC.

21         MR. BOGDANOFF:  And I'm accompanied today by

22    Ed Thomas, the chief executive officer of the debtors.

23         MR. SANDLER:  Brad Sandler, Pachulski, Stang, Ziehl &

24    Jones on behalf of the committee.

25         MR. BOGDANOFF:  I'm also joined by my colleagues

                                              Page 6

1    David Guess and Martin Kostov.   The debtors previously

2    received two qualified bids, one from Mador Lending, LLC,

3    Mador, and B. Riley Financial, comma, Inc., B. Riley.   The

4    debtors have received over the past few days a modified bid

5    from Mador.   I want to identify the documents comprising the

6    modified bid.   They include as Exhibit 1 a credit agreement

7    dated March -- dated as of March 11, 2015.   As Exhibit 2 a

8    security agreement dated as of March 5, 2015.   We may want

9    to change that date.   A proposed order approving the debtor

10   in possession financing as Exhibit 3.   Exhibit 4 is what has

11   been referred to as the Approved Budget.   That's initial cap

12   Approved Budget.   Exhibit 5 is the asset purchase agreement

13   dated as of March 12, 2015.   Exhibit 6 has been referred to

14   as the letter agreement dated as of March 12th, 2015.

15   Exhibit 7 is the order approving the sale of assets and

16   related relief pertaining to the asset purchase agreement.

17              (Exhibit 1 was marked for identification by the

18         court reporter; attached hereto.)

19              (Exhibit 2 was marked for identification by the

20         court reporter; attached hereto.)

21              (Exhibit 3 was marked for identification by the

22         court reporter; attached hereto.)

23              (Exhibit 4 was marked for identification by the

24         court reporter; attached hereto.)

25              (Exhibit 5 was marked for identification by the

Page 7

1          court reporter; attached hereto.)

2               (Exhibit 6 was marked for identification by the

3          court reporter; attached hereto.)

4               (Exhibit 7 was marked for identification by the

5          court reporter; attached hereto.)

6          MR. BOGDANOFF:  At this point I ask counsel for Mador

7     to confirm that these documents do comprise Mador's modified

8     bid.

9          MS. PETERMAN:  They do.

10         MR. BOGDANOFF:  These documents are in substantially

11    final form.  Mador has agreed and the debtors have agreed

12    that if this bid is a successful bid, the parties will work

13    expeditiously and in good faith to resolve any remaining

14    issues on the documents comprising this bid.  And any

15    dispute presented to -- any dispute relating to these

16    documents will be presented to the Bankruptcy Court on an

17    expedited basis in the unlikely event the parties are unable

18    to resolve those disputes.

19              I want to further disclose for the record and mark

20    as Exhibit 9 an exchange of correspondence between

21    Mr. Ed Thomas, the chief executive officer of the debtors,

22    and Mr. Greg Segal, the principal of Versa Capital,

23    concerning the arrangements between Mador and certain

24    members of the debtors' executive management regarding

25    employment by those individuals by Mador as well as

1    arrangements for severance.

2          The debtors throughout this proceeding have been

3    acting under the close and watchful supervision of their

4    board of directors, a special committee comprised of

5    Mr. Kenneth Reiss and Adam Rothstein, participated in the

6    first day of the auction and virtually every day since the

7    first day the debtors' board of directors has been convened

8    including multiple times today to monitor the process, to

9    address issues, and to ensure fairness.  The debtors have

10   also worked in accordance with bid procedures in

11   consultation, and I might add, close consultation with the

12   creditors' committee and at this point I would ask counsel

13   to the creditors' committee, Mr. Sandler, to confirm that

14   that is the case.

15          (Exhibit 9 was marked for identification by the

16        court reporter; attached hereto.)

17   MR. SANDLER:  That absolutely is the case.  The

18   committee and the debtor worked extremely cooperatively and

19   closely in this case and through this entire process.  And I

20   would expect that to the extent the debtors and Mador need

21   to modify, amend, supplement the bid documents in any way,

22   shape, or form, they will continue to do so in consultation

23   with the committee.  And I would ask that the debtors and

24   Mador confirm that.

25   MS. PETERMAN:  Nancy Peterman on behalf of Mador

Page 9

1    confirms that statement.

2        MR. BOGDANOFF:  Same here, Lee Bogdanoff.

3            Let me continue at this point and discuss B. Riley

4    and its participation in this process.  B. Riley has been an

5    important participant in this process, stepped up and

6    provided debtor in possession financing, entered into a plan

7    of support agreement at a very bleak time in the company's

8    history, and for that many of us will be grateful.  In

9    connection with the debtor in possession financing provided

10   by B. Riley, B. Riley earned a $375,000 commitment fee.  In

11   addition B. Riley has incurred other fees and expenses that

12   are more particularly set forth in the next document that I

13   will identify as Exhibit 8.  I'd like to ask perhaps counsel

14   for B. Riley the following question, if the Mador is

15   designated as the successful bidder, which means that

16   B. Riley will be designated as the backup bidder, does

17   B. Riley -- and provided that -- this is a compound

18   question.  So we have to work --

19       MR. DURRER:  I'll try to bear with you.

20            (Exhibit 8 was marked for identification by the

21        court reporter; attached hereto.)

22       MR. BOGDANOFF:  All right.  So the first predicate is

23   that Mador is designated as the successful bidder.  B. Riley

24   is the backup.  The next predicate is that the 700 -- the

25   $375,000 commitment fee is promptly paid from Mador's

Page 10

1   deposit following entry of the replacement Mador DIP

2   financing, which we would expect to occur sometime next

3   week.  The next predicate is that the remaining fees and

4   expenses as set forth in Exhibit 8 will likewise be paid

5   from that deposit following noticing and the passage of the

6   10-day period as required under the B. Riley DIP order.  So

7   those are the three predicates.

8        The question is, if those -- based upon those

9   predicates is B. Riley prepared to agree that it will not

10  object to the -- does not object to the designation of

11  Mador's bid as a successful bid, will not object to the

12  replacement DIP financing provided by B. Riley, will not

13  object to the auction process, will not object to the

14  proposed sale of assets to Mador, and will not present

15  additional bids.

16  MR. DURRER:  B. Riley -- this is Van Durrer on behalf

17  of B. Riley.  I can confirm that with just a couple of minor

18  clarifications.  I guess, folks are aware some of these

19  papers are coming in in realtime.  I just have a couple

20  clarifying things, and Ms. Peterman I hope can confirm our

21  understanding if there's any comment or objection by the

22  creditors' committee, please let us know.

23       So, first of all, the -- Exhibit 8 comprises the

24  estimated fees and expenses relative to the DIP as of

25  March 10.  We don't anticipate material expenses beyond

Page 11

1    that, but there may be some beyond March 10.  We're sitting

2    here on the 12th.  In addition, those fees and expenses are

3    exclusive of the plan support fees and expenses that are

4    otherwise due under the plan assumption agreement order.

5    That number is in the range of $162,000 just by way of

6    disclosure.

7          With respect to the financing order that was

8    included as part of the modified Versa bid on, I think,

9    page 8, I think we had agreed on the record that the

10   bracketed bold language to the extent actually due and

11   payable under the B. Riley loan documents was going to come

12   out of that form of order.  And I would just ask for that

13   clarification.

14         And then I didn't -- in the form of sale order I

15   didn't see any provision with -- by a quick scan that would

16   interfere with the provisions of the plan assumption order.

17   So we're proceeding on that assumption, but I didn't see

18   anything to that effect.

19         And, lastly, in the letter agreement setting forth

20   various understandings between Mador Lending and the debtor

21   and the committee, with respect to plan matters I didn't

22   read paragraph two to prohibit an exculpation in favor of

23   B. Riley assuming that the debtor and the committee were

24   comfortable with that under the circumstances, and I also

25   didn't read paragraph nine to unwind, you know, with respect

Page 12

1   to reclassify and claim as an administrative claim, I didn't

2   understand that to unwind the agreements that were

3   discussing with respect to the B. Riley fees and expenses.

4   So with those additional clarifications and understandings,

5   I can confirm that B. Riley commits to the request that the

6   debtor posed.

7        MR. BOGDANOFF:  And let me just say a couple of points

8   in response.  The none -- or I should say the PSA-related

9   fees incurred by B. Riley as well as the remaining breakup

10  fee are payable in accordance with the terms of the

11  B. Riley plan support agreement and those -- those fees are

12  not yet due.  They will become due under an accordance with

13  the terms.  Certainly the -- the bracketed information in

14  the order will be removed as soon as we get confirmation

15  from Mador.  I'm not aware of anything in the letter

16  agreement that precludes exculpation of B. Riley, just quite

17  frankly has not been addressed and that's something that we

18  will consider.  I don't have anything further regarding your

19  comments.

20        I think it's appropriate to ask Mador that -- the

21  following question, if Mador is declared the successful

22  bidder, does Mador agree that the $375,000 commitment fee

23  earned by B. Riley may be paid promptly from the deposit

24  following the entry of the replacement DIP order and that

25  the remaining fees payable to B. Riley as set forth in the

Page 13

1    exhibit and as may be further incurred, reasonably incurred,

2    will be paid from the deposit following noticing and the

3    passage of the 10-day period and that Mador will not object

4    to such additional -- to these amounts set forth in

5    Exhibit 8 and such additional reasonable amounts as may be

6    due and payable?

7        MS. PETERMAN:  That is agreeable to Mador.  And then

8    just one clarification for the record, when you were asking,

9    Mr. Durrer, the laying out the predicates to this agreement,

10   you mentioned that he would not object to the B. Riley

11   replacement DIP loan and I know you intended to the say the

12   Mador replacement DIP loan, which I assume --

13       MR. DURRER:  Yes.

14       MR. BOGDANOFF:  -- likewise will not be objecting to

15   that on the -- based on the agreement we've reached on the

16   record here.

17       MR. DURRER:  Yeah.  Van Durrer on behalf of B. Riley, I

18   can confirm that.

19       MR. BOGDANOFF:  Great.  The bid procedure is required

20   that the debtors designate the highest and best bid, and the

21   debtors are going to go ahead and designate the Mador

22   modified bid as the highest and best bid.  In addition and

23   in accordance with the bid procedures since the auction is

24   concluded, the debtors in consultation with the committee

25   are required to identify the highest or best offer, which

Page 14

1   we've just done, identify the next highest and best offer,

2   which we've indicated was received by B. Riley, and advise

3   the qualified bidders of that determination.   We've gone

4   ahead and advised you of that determination.   At this point

5   the debtors hereby designate the Mador modified bid as the

6   successful bid.   Does the committee support that

7   determination?

8        MR. SANDLER:   The committee does support that.

9        MR. BOGDANOFF:   I want to make a couple of points for

10  the record concerning this determination.   The proposal that

11  has been presented by Mador provides a path for the debtors'

12  business to extricate itself from Chapter 11 quickly.   And

13  that's through the 363 sale cap.   And it's our hope and

14  expectation that we can obtain expeditious approval of

15  that -- of that avenue.

16        Mador additionally has agreed to furnish seven and

17  a half million dollars in cash consideration, which will be

18  available for unsecured creditors after costs of

19  administration in connection with the administration of the

20  plan of reorganization and plan of liquidation, which is a

21  sizeable and significant recovery for the benefit of

22  unsecured creditors.   Through a related entity Mador

23  controls a very large unsecured claim.   The ownership of

24  that claim presents confirmation issues with respect to a

25  completing plan of reorganization and in particular with

Page 15

1    respect to the plan of reorganization sponsored by B. Riley.

2         In addition, Mador, as part of these transactions,

3    has agreed at closing to provide or procure a exit facility

4    that will have undrawn availability of $10 million which we

5    believe will furnish a significant adequate assurance to

6    landlords and parties to executory contracts to be assumed.

7    And that is a commitment that was not part of the B. Riley

8    bid.

9         I think the final point to make concerning this

10   determination is that Versa has been -- I should say Mador

11   has been incredibly diligent and single-minded in their

12   efforts to acquire these assets starting from virtually the

13   first day of the case, perhaps a little bit beforehand, and

14   continuing through to the present.  And I think the debtors

15   have a strong confidence that they will see this transaction

16   to the end and will make a serious and earnest effort to

17   make these businesses successful.  So for all of those

18   reasons the debtors in consultation with the creditors'

19   committee have determined to designate the Mador modified

20   bid as the successful bid.  And with that, I will declare

21   the auction concluded.  Thank you.

22

23                   (TIME NOTED 9:39 P.M.)

24

25

                                          Page 16

1  STATE OF CALIFORNIA      )  SS:

2  COUNTY OF LOS ANGELES    )

3

4      I, ROSA E. MORA, CSR No. 13016, do hereby

5   certify:

6          That the foregoing proceeding testimony was taken

7    before me at the time and place therein set forth and at

8    which time the witness was administered the oath:

9          That the testimony of the witness and all

10   objections made by counsel at the time of the

11   examination were recorded stenographically by me, and

12   were thereafter transcribed under my direction and

13   supervision, and that the foregoing pages contain a

14   full, true and accurate record of all proceedings and

15   testimony to the best of my skill and ability.

16          I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20

21          IN WITNESS WHEREOF, I have subscribed my name this

22    13th  day of March, 2015.

23

24   _____

25                    ROSA E. MORA, CSR No. 13016

                                              Page 17

[& - best]

**&**

**&**  3:4,17 4:5 6:5,23

**1**

**1**  1:25 5:5,8 7:6,17
**10**  5:20 6:8,9 11:6
  11:25 12:1 14:3
  16:4
**105**  5:7
**11**  1:7 2:7 5:5 6:8
  7:7 15:12
**12**  1:17 2:19 5:13,14
  6:1 7:13
**12th**  7:14 12:2
**13016**  1:23 2:20
  17:4,25
**13th**  17:22
**15-10081**  1:8 2:8
**162,000**  12:5
**17**  1:25
**17th**  3:20
**18**  6:11
**1840**  4:15
**1900**  4:16
**19801**  3:21
**1999**  2:16 3:8

**2**

**2**  5:6,9 7:7,19
**2002**  5:8
**2015**  1:17 2:19 5:5,6
  5:13,14 6:1,8,11 7:7
  7:8,13,14 17:22
**213**  4:9

**3**

**3**  5:7,10 7:10,21
**300**  4:7
**302**  3:22
**310**  3:11 4:18
**361**  5:7
**362**  5:7
**363**  5:7 15:13
**364**  5:7
**375,000**  10:10,25
  13:22

**39th**  2:16 3:9

**4**

**4**  5:10,12 7:10,23
**4001**  5:8
**407-4000**  3:11

**5**

**5**  5:6,13 7:8,12,25
**586-7702**  4:18

**6**

**6**  5:14 7:13 8:2
**687-5200**  4:9

**7**

**7**  5:5,6,7,12,13,15
  7:15 8:4
**700**  10:24
**778-6424**  3:22

**8**

**8**  5:14,15,20 10:13
  10:20 11:4,23 12:9
  14:5

**9**

**9**  5:22,22 8:20 9:15
**90067**  3:10 4:17
**90071**  4:8
**9014**  5:8
**919**  3:19
**9:21**  2:18 6:2
**9:39**  2:18 16:23

**a**

**ability**  17:15
**absolutely**  9:17
**accompanied**  6:21
**accurate**  17:14
**acquire**  16:12
**acting**  9:3
**action**  17:17,18
**adam**  9:5
**add**  9:11
**addition**  10:11 12:2
  14:22 16:2
**additional**  11:15
  13:4 14:4,5

**additionally**  15:16
**address**  9:9
**addressed**  13:17
**adequate**  16:5
**administered**  1:9
  2:9 17:8
**administration**
  15:19,19
**administrative**  5:9
  13:1
**advise**  15:2
**advised**  15:4
**affiliates**  6:6
**agree**  11:9 13:22
**agreeable**  14:7
**agreed**  8:11,11 12:9
  15:16 16:3
**agreement**  5:5,6,13
  5:14,18 7:6,8,12,14
  7:16 10:7 12:4,19
  13:11,16 14:9,15
**agreements**  13:2
**ahead**  14:21 15:4
**al**  1:8 2:8
**amend**  9:21
**amounts**  14:4,5
**angeles**  1:16 2:17
  3:10 4:8,17 6:1 17:2
**anticipate**  11:25
**appearances**  3:1 4:2
  6:12
**appearing**  6:5
**appropriate**  6:12
  13:20
**approval**  15:14
**approved**  5:12 6:10
  7:11,12
**approving**  7:9,15
**arps**  4:5 6:16
**arrangements**  8:23
  9:1
**asking**  14:8
**asset**  5:13,18 7:12
  7:16

**assets**  5:16 7:15
  11:14 16:12
**assign**  5:19
**assume**  5:19 14:12
**assumed**  16:6
**assuming**  12:23
**assumption**  12:4,16
  12:17
**assurance**  16:5
**attached**  7:18,20,22
  7:24 8:1,3,5 9:16
  10:21
**auction**  6:7 9:6
  11:13 14:23 16:21
**authorizing**  5:8,10
  5:15
**automatic**  5:11
**availability**  16:4
**available**  15:18
**avenue**  2:16 3:8 4:7
  15:15
**aware**  11:18 13:15

**b**

**b**  4:4,22 5:17,20
  6:17,17 7:3,3 10:3,4
  10:10,10,11,14,16
  10:17,23 11:6,9,12
  11:16,17 12:11,23
  13:3,5,9,11,16,23,25
  14:10,17 15:2 16:1
  16:7
**backup**  10:16,24
**bankruptcy**  1:1 2:1
  5:7,8 6:11 8:16
**based**  11:8 14:15
**basis**  8:17
**bear**  10:19
**beginning**  2:17
**behalf**  6:5,15,16,24
  9:25 11:16 14:17
**believe**  16:5
**benefit**  15:21
**best**  14:20,22,25
  15:1 17:15

**beyond**  11:25 12:1
**bid**  6:10 7:4,6 8:8,12
    8:12,14 9:10,21
    11:11,11 12:8 14:19
    14:20,22,22,23 15:5
    15:6 16:8,20,20
**bidder**  10:15,16,23
    13:22
**bidders**  15:3
**bids**  7:2 11:15
**bit**  16:13
**bleak**  10:7
**board**  9:4,7
**bogdanoff**  3:4,5 6:4
    6:4,5,18,21,25 8:6
    8:10 10:2,2,22 13:7
    14:14,19 15:9
**bold**  12:10
**bracketed**  12:10
    13:13
**brad**  6:23
**bradford**  3:18
**breakup**  13:9
**bsandler**  3:23
**budget**  5:12 7:11,12
**business**  15:12
**businesses**  16:17

**c**

**c**  4:6 5:18
**california**  1:16 2:17
    3:10 4:8,17 6:1 17:1
**cap**  7:11 15:13
**capital**  8:22
**case**  1:8 2:8 9:14,17
    9:19 16:13
**cases**  6:8
**cash**  5:10 15:17
**ccs**  1:8 2:8
**century**  4:15
**certain**  5:19 6:10
    8:23
**certainly**  13:13
**certified**  2:19

**certify**  17:5,16
**change**  7:9
**chapter**  1:7 2:7 6:8
    15:12
**chief**  6:22 8:21
**circumstances**
    12:24
**claim**  13:1,1 15:23
    15:24
**claims**  5:16
**clarification**  12:13
    14:8
**clarifications**  11:18
    13:4
**clarifying**  11:20
**clear**  5:16
**close**  9:3,11
**closely**  9:19
**closing**  16:3
**code**  5:7
**collateral**  5:10
**colleagues**  6:25
**come**  12:11
**comfortable**  12:24
**coming**  11:19
**comma**  7:3
**commenced**  6:8
**comment**  11:21
**comments**  13:19
**commitment**  10:10
    10:25 13:22 16:7
**commits**  13:5
**committee**  3:16 6:24
    9:4,12,13,18,23
    11:22 12:21,23
    14:24 15:6,8 16:19
**company's**  10:7
**completing**  15:25
**compound**  10:17
**comprise**  8:7
**comprised**  9:4
**comprises**  11:23
**comprising**  7:5 8:14
**concerning**  8:23
    15:10 16:9

**concluded**  14:24
    16:21
**confidence**  16:15
**confirm**  8:7 9:13,24
    11:17,20 13:5 14:18
**confirmation**  13:14
    15:24
**confirms**  10:1
**connection**  10:9
    15:19
**consider**  13:18
**consideration**  15:17
**consultation**  9:11,11
    9:22 14:24 16:18
**contain**  17:13
**continue**  9:22 10:3
**continued**  4:1
**continuing**  16:14
**contracts**  5:19 16:6
**controls**  15:23
**convened**  6:9 9:7
**cooperatively**  9:18
**corporation**  1:8 2:8
**correspondence**
    8:20
**costs**  15:18
**counsel**  6:13 8:6
    9:12 10:13 17:10,16
**county**  17:2
**couple**  11:17,19
    13:7 15:9
**court**  1:2 2:1 6:11
    7:18,20,22,24 8:1,3
    8:5,16 9:16 10:21
**credit**  5:5 7:6
**creditors**  3:16 9:12
    9:13 11:22 15:18,22
    16:18
**csr**  1:23 17:4,25

**d**

**d**  5:1
**date**  7:9
**dated**  5:5,6,13,14
    6:11 7:7,7,8,13,14

**david**  3:6 4:24 6:20
    7:1
**day**  9:6,6,7 11:6
    14:3 16:13 17:22
**days**  7:4
**debtor**  3:3 7:9 9:18
    10:6,9 12:20,23
    13:6
**debtors**  5:16,17,18
    6:6,6,22 7:1,4 8:11
    8:21,24 9:2,7,9,20
    9:23 14:20,21,24
    15:5,11 16:14,18
**declare**  16:20
**declared**  13:21
**delaware**  1:2,7 2:2,7
    3:21
**deposit**  11:1,5 13:23
    14:2
**description**  5:4
**designate**  14:20,21
    15:5 16:19
**designated**  10:15,16
    10:23
**designation**  11:10
**determination**  15:3
    15:4,7,10 16:10
**determined**  16:19
**dguess**  3:13
**diligent**  16:11
**dip**  11:1,6,12,24
    13:24 14:11,12
**direction**  17:12
**directors**  9:4,7
**disclose**  8:19
**disclosure**  12:6
**discuss**  10:3
**discussing**  13:3
**dispute**  8:15,15
**disputes**  8:18
**district**  1:2 2:2
**document**  10:12
**documents**  7:5 8:7
    8:10,14,16 9:21
    12:11

**[dollars - llp]**

**dollars** 15:17
**due** 12:4,10 13:12
  13:12 14:6
**durrer** 4:6 6:16,16
  10:19 11:16,16 14:9
  14:13,17,17

**e**

**e** 1:23 2:19 3:12,13
  3:14,23 4:10,19 5:1
  5:22 17:4,25
**earned** 10:10 13:23
**earnest** 16:16
**east** 4:15
**ed** 6:22 8:21
**effect** 12:18
**effort** 16:16
**efforts** 16:12
**employment** 8:25
**encumbrances** 5:17
**ensure** 9:9
**enter** 5:17
**entered** 10:6
**entire** 9:19
**entity** 15:22
**entry** 11:1 13:24
**esq** 3:5,6,7,18 4:6,14
**estimated** 11:24
**et** 1:8 2:8
**event** 8:17
**examination** 17:11
**exchange** 8:20
**exchanges** 5:22
**exclusive** 12:3
**exculpation** 12:22
  13:16
**executive** 6:22 8:21
  8:24
**executory** 5:19 16:6
**exhibit** 5:5,6,7,12,13
  5:14,15,20,22 7:6,7
  7:10,10,12,13,15,17
  7:19,21,23,25 8:2,4
  8:20 9:15 10:13,20
  11:4,23 14:1,5

**exhibits** 5:3
**exit** 16:3
**expect** 9:20 11:2
**expectation** 15:14
**expedited** 8:17
**expeditious** 15:14
**expeditiously** 8:13
**expense** 5:10
**expenses** 5:21 10:11
  11:4,24,25 12:2,3
  13:3
**extent** 9:20 12:10
**extremely** 9:18
**extricate** 15:12

**f**

**facility** 16:3
**fairness** 9:9
**faith** 8:13
**favor** 12:22
**february** 6:11
**fee** 10:10,25 13:10
  13:22
**fees** 5:20 10:11 11:3
  11:24 12:2,3 13:3,9
  13:11,25
**final** 8:11 16:9
**financial** 4:4,22
  5:20 7:3
**financing** 5:9 7:10
  10:6,9 11:2,12 12:7
**first** 9:6,7 10:22
  11:23 16:13
**flom** 4:5
**floor** 2:16 3:9,20
**folks** 11:18
**following** 10:14 11:1
  11:5 13:21,24 14:2
**foregoing** 17:6,13
**form** 8:11 9:22
  12:12,14
**forth** 10:12 11:4
  12:19 13:25 14:4
  17:7

**g**

**frankly** 13:17
**free** 5:16
**full** 17:14
**furnish** 15:16 16:5
**further** 8:19 13:18
  14:1 17:16

**g**

**go** 14:21
**going** 12:11 14:21
**good** 8:13
**grand** 4:7
**granting** 5:9
**grateful** 10:8
**great** 14:19
**greenberg** 4:13 6:14
**greg** 8:22
**gtlaw.com** 4:19
**guess** 3:6 7:1 11:18

**h**

**half** 15:17
**halpern** 4:23 6:19
**hereto** 7:18,20,22,24
  8:1,3,5 9:16 10:21
**highest** 14:20,22,25
  15:1
**history** 10:8
**hope** 11:20 15:13

**i**

**identification** 7:17
  7:19,21,23,25 8:2,4
  9:15 10:20
**identify** 7:5 10:13
  14:25 15:1
**ii** 4:6
**important** 10:5
**include** 7:6
**included** 12:8
**including** 9:8
**incredibly** 16:11
**incurred** 10:11 13:9
  14:1,1
**indicated** 15:2

**individuals** 8:25
**information** 13:13
**initial** 7:11
**intended** 14:11
**interested** 17:18
**interests** 5:17
**interfere** 12:16
**introduce** 6:18
**issues** 8:14 9:9
  15:24

**j**

**j** 3:18
**joined** 6:25
**jointly** 1:9 2:9
**jones** 3:17 6:24

**k**

**kenneth** 9:5
**klee** 3:4 6:5
**know** 11:22 12:25
  14:11
**kostov** 3:7 7:1
**ktbslaw.com** 3:12
  3:13,14

**l**

**landlords** 16:6
**language** 12:10
**large** 15:23
**lastly** 12:19
**laying** 14:9
**lbogdanoff** 3:12
**leases** 5:19
**lee** 3:5 6:4 10:2
**lending** 4:12,23,24
  6:15,20 7:2 12:20
**letter** 5:14 7:14
  12:19 13:15
**liens** 5:9,16
**likewise** 11:4 14:14
**liquidation** 15:20
**little** 16:13
**llc** 6:15,20 7:2
**llp** 3:4 4:5,13,23,24
  6:5

**[loan - quite]**

**loan** 12:11 14:11,12
**lorry** 4:24 6:20
**los** 1:16 2:17 3:10
4:8,17 6:1 17:2

**m**

**m** 3:6
**mador** 4:12,23,24
6:15,20 7:2,3,5 8:6
8:11,23,25 9:20,24
9:25 10:14,23 11:1
11:14 12:20 13:15
13:20,21,22 14:3,7
14:12,21 15:5,11,16
15:22 16:2,10,19
**mador's** 8:7 10:25
11:11
**mail** 3:12,13,14,23
4:10,19 5:22
**management** 8:24
**march** 1:17 2:19 5:5
5:6,13,14 6:1,8,9
7:7,7,8,13,14 11:25
12:1 17:22
**mark** 8:19
**marked** 7:17,19,21
7:23,25 8:2,4 9:15
10:20
**market** 3:19
**martin** 3:7 7:1
**material** 11:25
**matters** 12:21
**meagher** 4:5
**means** 10:15
**member** 6:4
**members** 8:24
**mentioned** 14:10
**million** 15:17 16:4
**minded** 16:11
**minor** 11:17
**mkostov** 3:14
**modified** 7:4,6 8:7
12:8 14:22 15:5
16:19

**modify** 9:21
**modifying** 5:10
**monitor** 9:8
**mora** 1:23 2:19 17:4
17:25
**multiple** 9:8

**n**

**n** 5:1
**name** 17:21
**nancy** 4:14 6:14,18
9:25
**need** 9:20
**neither** 17:16
**nine** 12:25
**north** 3:19
**noted** 16:23
**noticing** 11:5 14:2
**number** 5:4 12:5

**o**

**oath** 17:8
**object** 11:10,10,11
11:13,13 14:3,10
**objecting** 14:14
**objection** 11:21
**objections** 17:10
**obligations** 5:18
**obtain** 15:14
**occur** 11:2
**offer** 14:25 15:1
**officer** 6:22 8:21
**order** 5:7,15 6:11
7:9,15 11:6 12:4,7
12:12,14,16 13:14
13:24
**outcome** 17:19
**ownership** 15:23

**p**

**p.m.** 2:18,18 6:2
16:23
**pachulski** 3:17 6:23
**page** 5:4 12:9
**pages** 1:25 17:13

**paid** 10:25 11:4
13:23 14:2
**papers** 11:19
**paragraph** 12:22,25
**park** 4:15
**part** 12:8 16:2,7
**participant** 10:5
**participated** 9:5
**participation** 10:4
**particular** 15:25
**particularly** 10:12
**parties** 8:12,17 16:6
**party** 17:17,17
**passage** 11:5 14:3
**path** 15:11
**paul** 4:23 6:19
**payable** 12:11 13:10
13:25 14:6
**perform** 5:17
**period** 11:6 14:3
**pertaining** 7:16
**peterman** 4:14 6:14
6:14,19 8:9 9:25,25
11:20 14:7
**petermann** 4:19
**petition** 5:8
**place** 17:7
**plan** 10:6 12:3,4,16
12:21 13:11 15:20
15:20,25 16:1
**please** 11:22
**point** 6:12 8:6 9:12
10:3 15:4 16:9
**points** 13:7 15:9
**posed** 13:6
**possession** 6:7 7:10
10:6,9
**post** 5:8
**precludes** 13:16
**predicate** 10:22,24
11:3
**predicates** 11:7,9
14:9
**prepared** 11:9

**present** 4:21 11:14
16:14
**presented** 8:15,16
15:11
**presents** 15:24
**previously** 6:7 7:1
**principal** 8:22
**priority** 5:10
**procedure** 14:19
**procedures** 6:10
9:10 14:23
**proceeding** 6:9,9 9:2
12:17 17:6
**proceedings** 1:15
2:15 17:14
**process** 9:8,19 10:4
10:5 11:13
**procure** 16:3
**prohibit** 12:22
**promptly** 10:25
13:23
**proposal** 15:10
**proposed** 7:9 11:14
**provide** 16:3
**provided** 10:6,9,17
11:12
**provides** 15:11
**providing** 5:9
**provision** 12:15
**provisions** 12:16
**psa** 13:8
**pszjlaw.com** 3:23
**purchase** 5:13,18
7:12,16
**pursuant** 5:7

**q**

**qualified** 7:2 15:3
**question** 10:14,18
11:8 13:21
**quick** 12:15
**quickly** 15:12
**quite** 13:16

Veritext Legal Solutions
866 299-5127

[r - volume]

| r | | |
|---|---|---|
| **r**  3:5 | | |
| **range**  12:5 | | |
| **reached**  14:15 | | |
| **read**  12:22,25 | | |
| **realtime**  11:19 | | |
| **reasonable**  14:5 | | |
| **reasonably**  14:1 | | |
| **reasons**  16:18 | | |
| **received**  7:2,4 15:2 | | |
| **reclassify**  13:1 | | |
| **reconvening**  6:7 | | |
| **record**  8:19 12:9 | | |
| 14:8,16 15:10 17:14 | | |
| **recorded**  17:11 | | |
| **recovery**  15:21 | | |
| **referred**  7:11,13 | | |
| **regarding**  8:24 | | |
| 13:18 | | |
| **reiner**  4:22 6:17 | | |
| **reiss**  9:5 | | |
| **related**  7:16 13:8 | | |
| 15:22 17:17 | | |
| **relating**  8:15 | | |
| **relative**  11:24 | | |
| **relief**  7:16 | | |
| **remaining**  8:13 11:3 | | |
| 13:9,25 | | |
| **removed**  13:14 | | |
| **reorganization** | | |
| 15:20,25 16:1 | | |
| **replacement**  11:1,12 | | |
| 13:24 14:11,12 | | |
| **reported**  1:22 | | |
| **reporter**  2:20 7:18 | | |
| 7:20,22,24 8:1,3,5 | | |
| 9:16 10:21 | | |
| **reporter's**  1:15 2:15 | | |
| **request**  13:5 | | |
| **required**  11:6 14:19 | | |
| 14:25 | | |
| **resolve**  8:13,18 | | |
| **respect**  12:7,21,25 | | |
| 13:3 15:24 16:1 | | |

**response**  13:8
**right**  10:22
**rights**  5:17
**riley**  4:4,22 5:20
  6:17,17 7:3,3 10:3,4
  10:10,10,11,14,16
  10:17,23 11:6,9,12
  11:16,17 12:11,23
  13:3,5,9,11,16,23,25
  14:10,17 15:2 16:1
  16:7
**rosa**  1:23 2:19 17:4
  17:25
**rothstein**  9:5
**rules**  5:8

| s | | |
|---|---|---|
| **s**  4:24 | | |
| **sale**  5:15 7:15 11:14 | | |

**sale**  5:15 7:15 11:14
  12:14 15:13
**sandler**  3:18 6:23,23
  9:13,17 15:8
**scan**  12:15
**seal**  1:7 2:7 6:6
**sections**  5:7
**security**  5:6 7:8
**see**  12:15,17 16:15
**segal**  8:22
**serious**  16:16
**set**  10:12 11:4 13:25
  14:4 17:7
**setting**  12:19
**seven**  15:16
**severance**  9:1
**shape**  9:22
**shorthand**  2:20
**signature**  17:24
**significant**  15:21
  16:5
**single**  16:11
**sitting**  12:1
**sizeable**  15:21
**skadden**  4:5 6:16
**skadden.com**  4:10

**skill**  17:15
**slate**  4:5
**soon**  13:14
**south**  4:7
**special**  9:4
**sponsored**  16:1
**ss**  17:1
**stang**  3:17 6:23
**stars**  2:16 3:8
**starting**  16:12
**state**  17:1
**statement**  10:1
**states**  1:1 2:1
**stay**  5:11
**stenographically**
  17:11
**stepped**  10:5
**stern**  3:4 6:5
**steve**  6:17
**steven**  4:22
**street**  3:19
**strong**  16:15
**subscribed**  17:21
**substantially**  5:16
  8:10
**successful**  8:12
  10:15,23 11:11
  13:21 15:6 16:17,20
**suite**  4:16
**superpriority**  5:9
**supervision**  9:3
  17:13
**supplement**  9:21
**support**  10:7 12:3
  13:11 15:6,8

| t | | |
|---|---|---|
| **take**  6:12 | | |

**take**  6:12
**taken**  2:16 17:6
**terms**  13:10,13
**testimony**  17:6,9,15
**thank**  16:21
**thereof**  17:19
**things**  11:20

**think**  6:12 12:8,9
  13:20 16:9,14
**thomas**  6:22 8:21
**three**  11:7
**thursday**  1:17 2:18
  6:1
**time**  10:7 16:23 17:7
  17:8,10
**times**  9:8
**today**  6:21 9:8
**transaction**  16:15
**transactions**  16:2
**transcribed**  17:12
**transcript**  1:15 2:15
**traurig**  4:13 6:14
**true**  17:14
**try**  10:19
**tuchin**  3:4 6:5
**two**  7:2 12:22

| u | | |
|---|---|---|
| **unable**  8:17 | | |

**unable**  8:17
**understand**  13:2
**understanding**
  11:21
**understandings**
  12:20 13:4
**undrawn**  16:4
**unexpired**  5:19
**united**  1:1 2:1
**unsecured**  15:18,22
  15:23
**unwind**  12:25 13:2
**use**  5:10

| v | | |
|---|---|---|
| **van**  4:6 6:16 11:16 | | |

**van**  4:6 6:16 11:16
  14:17
**van.durrer**  4:10
**various**  5:22 12:20
**versa**  8:22 12:8
  16:10
**virtually**  9:6 16:12
**volume**  1:18 2:15

**[want - ziehl]**

| w |
|---|
| **want**  7:5,8 8:19 15:9 |
| **watchful**  9:3 |
| **way**  9:21 12:5 17:18 |
| **we've**  14:15 15:1,2,3 |
| **week**  11:3 |
| **wet**  1:7 2:7 6:6 |
| **whereof**  17:21 |
| **wilmington**  3:21 |
| **witness**  17:8,9,21 |
| **work**  8:12 10:18 |
| **worked**  9:10,18 |

| x |
|---|
| **x**  5:1 |

| y |
|---|
| **yeah**  14:17 |

| z |
|---|
| **ziehl**  3:17 6:23 |

Veritext Legal Solutions
866 299-5127

**Exhibit 1**

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of

March 11, 2015

among

MADOR LENDING, LLC

as Lender

THE WET SEAL, INC.

as Lead Borrower for

THE WET SEAL, INC.

THE WET SEAL RETAIL, INC.

WET SEAL CATALOG, INC.

as the Borrowers and Debtors-in-Possession

The GUARANTORS Party Hereto

# TABLE OF CONTENTS

Section .................................................................................................................................. Page

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ....................................................... 1

    1.01    Defined Terms ........................................................................................... 1
    1.02    Other Interpretive Provisions ................................................................ 26
    1.03    Accounting Terms .................................................................................. 26
    1.04    Rounding ................................................................................................ 27
    1.05    Times of Day .......................................................................................... 27
    1.06    Reserved ................................................................................................. 25

ARTICLE II THE COMMITMENT AND CREDIT EXTENSIONS ......................................... 27

    2.01    Loans ...................................................................................................... 27
    2.02    Borrowings. ............................................................................................ 27
    2.03    Reserved. ................................................................................................ 28
    2.04    Reserved. ................................................................................................ 28
    2.05    Prepayments. .......................................................................................... 28
    2.06    Termination or Reduction of Commitment. .......................................... 28
    2.07    Repayment of Loans. ............................................................................. 28
    2.08    Interest. ................................................................................................... 28
    2.09    Fees ........................................................................................................ 27
    2.10    Computation of Interest and Fees .......................................................... 29
    2.11    Evidence of Debt. .................................................................................. 29
    2.12    Payments Generally; Funding Source. ................................................. 29
    2.13    Priority; Liens ........................................................................................ 30

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY; APPOINTMENT OF
      LEAD BORROWER ................................................................................................ 30

    3.01    Taxes. ..................................................................................................... 30
    3.02    Reserved. ................................................................................................ 31
    3.03    Reserved. ................................................................................................ 31
    3.04    Increased Costs. ..................................................................................... 31
    3.05    Reserved. ................................................................................................ 32
    3.06    Reserved. ................................................................................................ 30
    3.07    Survival .................................................................................................. 32
    3.08    Designation of Lead Borrower as Borrowers' Agent. ........................... 32

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ............................. 32

    4.01    Conditions of Initial Borrowing ........................................................... 32
    4.02    Reserved. ................................................................................................ 34
    4.03    Conditions to all Borrowings ................................................................ 34

ARTICLE V REPRESENTATIONS AND WARRANTIES ...................................................... 35

    5.01    Existence, Qualification and Power ...................................................... 35
    5.02    Authorization; No Contravention .......................................................... 35
    5.03    Governmental Authorization; Other Consents ...................................... 36
    5.04    Binding Effect ....................................................................................... 36
    5.05    Budget; No Material Adverse Effect ..................................................... 36
    5.06    Litigation ............................................................................................... 36

i

| | | |
|---|---|---|
| 5.07 | No Default | 36 |
| 5.08 | Ownership of Property; Liens | 36 |
| 5.09 | Environmental Compliance. | 37 |
| 5.10 | Insurance | 38 |
| 5.11 | Taxes | 38 |
| 5.12 | ERISA Compliance | 38 |
| 5.13 | Subsidiaries; Equity Interests | 38 |
| 5.14 | Margin Regulations; Investment Company Act. | 38 |
| 5.15 | Disclosure | 39 |
| 5.16 | Compliance with Laws | 39 |
| 5.17 | Intellectual Property; Licenses. | 39 |
| 5.18 | Labor Matters. | 39 |
| 5.19 | Security Documents. | 39 |
| 5.20 | Reserved. | 40 |
| 5.21 | Reserved. | 40 |
| 5.22 | Brokers | 40 |
| 5.23 | Customer and Trade Relations | 40 |
| 5.24 | Casualty | 40 |

**ARTICLE VI AFFIRMATIVE COVENANTS** ............................................................ 40

| | | |
|---|---|---|
| 6.01 | Financial Statements | 40 |
| 6.02 | Notices | 41 |
| 6.03 | Payment of Obligations | 42 |
| 6.04 | Preservation of Existence | 42 |
| 6.05 | Maintenance of Properties | 42 |
| 6.06 | Maintenance of Insurance | 42 |
| 6.07 | Compliance with Laws | 43 |
| 6.08 | Books and Records; Accountants. | 43 |
| 6.09 | Inspection Rights. | 44 |
| 6.10 | Additional Loan Parties | 44 |
| 6.11 | Reserved. | 44 |
| 6.12 | Information Regarding the Collateral | 45 |
| 6.13 | Physical Inventories. | 46 |
| 6.14 | Environmental Laws. | 46 |
| 6.15 | Further Assurances. | 47 |
| 6.16 | Compliance with Terms of Leaseholds. | 47 |
| 6.17 | Depository Account | 47 |
| 6.18 | Retention of Independent Consultant. | 47 |
| 6.19 | Performance Within Approved Budget | 48 |
| 6.20 | Reserved. | 49 |
| 6.21 | Additional Bankruptcy Related Affirmative Covenant. | 49 |

**ARTICLE VII NEGATIVE COVENANTS** ............................................................ 49

| | | |
|---|---|---|
| 7.01 | Liens | 49 |
| 7.02 | Investments | 49 |
| 7.03 | Indebtedness; Disqualified Stock | 49 |
| 7.04 | Fundamental Changes | 49 |
| 7.05 | Asset Sales | 49 |
| 7.06 | Restricted Payments | 50 |
| 7.07 | Prepayments of Indebtedness | 50 |

ii

| | | |
|---|---|---|
| 7.08 | Change in Nature of Business. | 50 |
| 7.09 | Transactions with Affiliates | 50 |
| 7.10 | Burdensome Agreements | 50 |
| 7.11 | Use of Proceeds | 51 |
| 7.12 | Amendment of Material Documents. | 51 |
| 7.13 | Fiscal Year. | 51 |
| 7.14 | Reserved. | 52 |
| 7.15 | Bankruptcy Related Negative Covenants | 52 |

**ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES** .......................... 53

| | | |
|---|---|---|
| 8.01 | Events of Default | 53 |
| 8.02 | Remedies Upon Event of Default | 56 |
| 8.03 | Application of Funds | 57 |

**ARTICLE IX MISCELLANEOUS** .......................... 57

| | | |
|---|---|---|
| 9.01 | Amendments | 57 |
| 9.02 | Notices; Effectiveness; Electronic Communications. | 57 |
| 9.03 | No Waiver; Cumulative Remedies | 58 |
| 9.04 | Expenses; Indemnity; Damage Waiver. | 59 |
| 9.05 | Payments Set Aside | 60 |
| 9.06 | Successors and Assigns. | 60 |
| 9.07 | Treatment of Certain Information; Confidentiality | 61 |
| 9.08 | Right of Setoff | 62 |
| 9.09 | Interest Rate Limitation | 62 |
| 9.10 | Counterparts; Integration; Effectiveness. | 63 |
| 9.11 | Survival | 63 |
| 9.12 | Severability | 63 |
| 9.13 | Governing Law; Jurisdiction. | 64 |
| 9.14 | Waiver of Jury Trial. | 64 |
| 9.15 | No Advisory or Fiduciary Responsibility | 65 |
| 9.16 | Patriot Act Notice | 65 |
| 9.17 | Foreign Asset Control Regulations | 66 |
| 9.18 | Time of the Essence | 66 |
| 9.19 | Press Releases | 66 |
| 9.20 | Additional Waivers. | 66 |
| 9.21 | No Strict Construction. | 67 |
| 9.22 | Attachments. | 67 |
| 9.23 | Reserved. | 68 |
| 9.24 | Relationship with DIP Order. | 68 |

**ARTICLE X GUARANTEE** .......................... 68

| | | |
|---|---|---|
| 10.01 | The Facility Guaranty. | 68 |
| 10.02 | Guaranteed Obligations Not Affected. | 68 |
| 10.03 | Security. | 68 |
| 10.04 | Guarantee of Payment. | 69 |
| 10.05 | No Discharge or Diminishment of Guarantee. | 69 |
| 10.06 | Defenses of Loan Parties Waived. | 69 |
| 10.07 | Agreement to Pay; Subordination. | 70 |
| 10.08 | Limitation on Guarantee of Guaranteed Obligations. | 70 |

iii

SIGNATURES…………………………………………………………………………S-1

iv

**SCHEDULES**

1.01            Borrowers

5.08(b)(1)      Owned Real Estate

5.08(b)(2)      Leased Real Estate

5.10            Insurance

5.13            Subsidiaries; Other Equity Investments

7.01            Existing Liens

7.03            Existing Indebtedness

9.02            Lender's Office; Certain Addresses for Notices

**EXHIBITS**

*Form of*

A       Loan Notice

B       Note

C       Borrowing Order

*CHI 65672581v5*

## SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT ("Agreement") is entered into as of March 11, 2015 among

The Wet Seal, Inc., a Delaware corporation, as Debtor-in-Possession (the "Lead Borrower"),

the Persons (as defined below) named on Schedule 1.01 hereto, as Debtors-in-Possession (collectively, the "Borrowers" and individually, a "Borrower"),

the Guarantors, as Debtors-in-Possession (as defined below), and

Mador Lending, LLC, as lender (in such capacity, the "Lender").

RECITALS

WHEREAS, on January 15, 2015, the Borrowers and the Guarantors commenced Chapter 11 Case Nos. 15-10081, 15-10082, 15-10083, and 15-10084 (collectively, (the "Chapter 11 Case") by filing a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Borrowers continue to operate their business and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, the Borrowers have requested that the Lender provide a senior secured, super-priority term credit facility to the Borrowers on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the Lender and the Borrowers hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"ACH" means automated clearing house transfers.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means this Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement.

"Applicable Rate" means eight percent (8.0%).

"Approved Budget" has the meaning specified in Section 6.19.

"Approved Fund" means any Fund that is administered or managed by (a) the Lender, (b) an Affiliate of the Lender (c) an entity or an Affiliate of an entity that administers or manages the Lender, or

1

(d) the same investment advisor or an advisor under common control with the Lender, Affiliate or advisor, as applicable.

"Assignment and Assumption" means an assignment and assumption agreement, in form and substance reasonably satisfactory to the Lender, pursuant to which an assignee lender shall have agreed to become a party hereto as a lender.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Available Amount" means, as of any date of determination thereof by the Lender, the result, if a positive number, of:

(a)      Loan Cap (provided, however, that, in the event that an Interim Borrowing Order is entered by the Bankruptcy Court, the amount of the Loan Cap, for purposes of determining the Available Amount, shall not exceed $6,500,000 until the Borrowing Order is entered);

minus

(b)      The total of all Borrowings made hereunder (without regard to any repayment of Loans).

"Availability Block" means $5,000,000 subject to reduction at the sole discretion of the Lender.

"Availability Period" means the period beginning on (and including) the Closing Date and ending on (and excluding) the Termination Date.

"Availability Reserves" means such reserves as the Lender from time to time determines in the Lender's Permitted Discretion as being appropriate, including, without limitation, (a) to reflect the impediments to the Lender's ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Lender determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, or (d) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Availability Reserves may include (but are not limited to) reserves based on (i) post-petition rent for any Lease not rejected in the Chapter 11 Case; (ii) Gift Certificates and Merchandise Credit Liability; (iii) customs, duties, and other costs to release Inventory which is being imported into the United States; (iv) outstanding customer deposits; (v) outstanding Taxes and other governmental charges, including, ad valorem, real estate, personal property, sales, claims of the PBGC, and other Taxes which would reasonably be expected to have priority over the interests of the Lender in the Collateral; (vi) Other DIP Obligations Reserve; (vii) salaries, wages and benefits due to employees of any Loan Party; (vii) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory between appraisals;  (ix) warehousemen's or bailee's charges and other Liens which would reasonably be expected to have priority over the interests of the Lender in the Collateral; and (x) the Professional Fee Carve Out Reserve.

"B. Riley Liens" has the meaning set forth in the Borrowing Order.

2

"B. Riley Obligations" has the meaning set forth in the Borrowing Order.

"Bank" means any bank organized under the laws of the United States having combined capital and surplus of not less than $250,000,000.

"Bankruptcy Code" means Title 11, U.S.C. §101, et seq., as now or hereafter in effect, or any successor statute thereto.

"Bankruptcy Court" has the meaning provided in the recitals to this Agreement.

"Bankruptcy Events" means, the commencement of the Chapter 11 Case and any events that lead up to, and typically result from, the commencement of a case under Chapter 11 of the Bankruptcy Code.

"Bankruptcy Recoveries" means any claims and causes of action to which any Loan Party may be entitled to assert by reason of any avoidance or other power vested in or on behalf of any Loan Party or the estate of any Loan Party under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof.

"Blocked Account" has the meaning provided in Section 6.11(a)(ii).

"Blocked Account Agreement" means with respect to an account established by a Loan Party, an agreement, in form and substance satisfactory to the Lender, establishing control (as defined in the UCC) of such account by the Lender and whereby the bank maintaining such account agrees to comply only with the instructions originated by the Lender without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrowers" has the meaning specified in the introductory paragraph hereto.

"Borrowing" means a borrowing of Loans made by the Lender pursuant to Section 2.01.

"Borrowing Base" means, at any time of calculation, an amount equal to:

- the Tranche A Borrowing Base;

     plus

- the Tranche B Borrowing Base;

     plus

- the Cash Collateral Amount.

"Borrowing Base Certificate" means a certificate in form and substance satisfactory to the Lender (with such changes therein as may be reasonably required by the Lender to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Lead Borrower which shall include appropriate exhibits, schedules, and supporting documentation as reasonably requested by the Lender.

3

"Borrowing Order" means an order entered by the Bankruptcy Court substantially in the form of, and containing the provisions set forth in **Exhibit C** (or such other form and provisions as may be reasonably acceptable to the Lender),  which, among other matters but not by way of limitation, (i) authorizes the Loan Parties to obtain credit, incur (or guaranty) Obligations, grant Liens under this Agreement, the other Loan Documents, and the DIP Order(s) and otherwise perform their obligations under this Agreement and the other Loan Documents and (ii) provides for the super priority of the Lender's claims (subject to the Professional Fee Carve Out, and, with respect to Bank of America, to the extent set forth in the Sale Order).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Lender's Office is located.

"Capital Expenditures" means, with respect to any Person for any period, (a) the additions, improvements, refurbishments, redesigns, remodels, and build-outs to property (including leasehold interests), plant and equipment and other capital expenditures of the Loan Parties that are (or would be) set forth in a Consolidated statement of cash flows of the Loan Parties for such period prepared in accordance with GAAP and (b) any assets acquired by a Capital Lease Obligation during such period.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out Trigger Notice" means written notice from the Lender to the Lead Borrower, its lead counsel, the U.S. Trustee and lead counsel to the Creditors' Committee notifying such Persons of the occurrence and continuance of an Event of Default.

"Case Professionals" means Persons or firms retained by the Loan Parties or the Creditors' Committee or other statutory committee appointed in the Chapter 11 Case pursuant to §§327 and 1103 of the Bankruptcy Code.

"Cash Collateral Account" has the meaning set forth in Section 6.17.

"Cash Collateral Amount" means, at any time of calculation, the amount of cash then on deposit in the Cash Collateral Account.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"CFC" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"Change in Law" means the occurrence, after the Closing Date, of any of the following as applicable to any of the Loan Parties or Credit Parties: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation, or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any

4

Governmental Authority; provided however, for purposes of this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued and shall be deemed to have gone into effect and been adopted after the Closing Date.

"Change of Control" means, at any time, (a) during any period of twelve months, individuals who at the beginning of such period constituted the board of directors of the Lead Borrower (together with any new directors whose election or appointment by such board of directors, or whose nomination for election by shareholders of the Lead Borrower, as the case may be, was approved by a vote of a majority of the directors still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason other than by reason of death or disability to constitute a majority of the board of directors then in office; (b) any person or group (within the meaning of the Securities and Exchange Act of 1934, as amended) is or becomes the beneficial owner (within the meaning of Rule 13d-3 and 13d-5 of the Securities and Exchange Act of 1934, as amended, except that such person shall be deemed to have "beneficial ownership" of all shares that such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time) directly or indirectly of more than fifty percent (50%) of the total then outstanding voting power of the Voting Stock of the Lead Borrower on a fully diluted basis, whether as a result of the issuance of securities of the Lead Borrower, any merger, consolidation, liquidation or dissolution of the Lead Borrower, any direct or indirect transfers of securities or otherwise, or has the right or ability to Control the Lead Borrower; (c) the Lead Borrower fails to own one hundred percent (100%) of the Equity Interests of the other Loan Parties; or (d) any "change in control" or similar event as defined in any document governing Material Indebtedness of any Loan Party incurred on or after the Petition Date.

"Chapter 11 Case" has the meaning provided in the recitals to this Agreement.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 9.01.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means collectively, all property upon which a Lien is granted pursuant to any Security Document (including, without limitation, the DIP Order(s)). Notwithstanding anything to the contrary contained in this definition, the term "Collateral" shall not, except as expressly provided in the DIP Order(s), include Bankruptcy Recoveries.

"Commitment" means the maximum principal amount of the Lender's obligation to make Loans to the Borrowers pursuant to Section 2.01. As of the Closing Date, the Commitment is $20,000,000.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

5

"Control" means the possession, directly or indirectly, of the power (a) to vote more than 50% of the securities having ordinary voting power for the election of directors of a Person, or (b) to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. The terms "Controlling" and "Controlled" have meanings correlative thereto.

"Credit Card Holdback Amount" means the aggregate amount of holdbacks issued with respect to Credit Card Receivables, to the extent complying with all criteria of Eligible Credit Card Receivables other than clause (a) thereof.

"Credit Card Receivables" means each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a major credit or debit card issuer (including, but not limited to, Visa, MasterCard and American Express and such other issuers approved by the Lender) to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by such issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"Credit Party" or "Credit Parties" means (a) individually, (i) the Lender and its Affiliates, (ii) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (iii) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means: all reasonable and documented out-of-pocket expenses incurred by the Lender and its Affiliates, in connection with this Agreement and the other Loan Documents, including, without limitation, (i) the reasonable and documented fees, charges and disbursements of (A) counsel for the Lender and its Affiliates (limited to not more than one primary counsel, and necessary local counsel (limited to one local counsel for each other jurisdiction)), (B) outside consultants for the Lender, (C) appraisers, and (D) commercial finance examinations, and (ii) all reasonable and documented out-of-pocket expenses incurred in connection with (A) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), or (B) the enforcement or protection of their rights in connection with this Agreement or the other Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral or in connection with the Chapter 11 Case or any successor case.

"Creditors' Committee" means any official committee of creditors formed, appointed or approved in the Chapter 11 Case pursuant to the Bankruptcy Code.

"Customs Broker Agreement" means an agreement in form and substance satisfactory to the Lender among a Loan Party, a customs broker or other carrier, and the Lender, in which the customs broker or other carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Lender and agrees, upon notice from the Lender, to hold and dispose of the subject Inventory solely as directed by the Lender.

"Data Center Servers" means the data servers and related equipment located in the Borrowers' Las Vegas, Nevada data center.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties (other than any blocked account securing Other DIP Obligations). All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Lender shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

6

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Debtor Relief Laws" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default Rate" means an interest rate equal to ten percent (10.0%).

"DIP L/C Collateral" means the "DIP Collateral" as that terms is defined in the Other DIP Order.

"DIP L/C Obligations" means obligations of the Loan Parties in respect of DIP Letters of Credit (as defined in the Other DIP Order) approved as administrative claims pursuant to the Other DIP Order.

"DIP Order(s)" means and refers to the Borrowing Order and, solely if required by the Bankruptcy Court, any Interim Borrowing Order.

"Disclosure Statement" means that certain disclosure statement filed in the Chapter 11 Case in connection with the Plan of Reorganization.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale, transfer, license or other disposition of (whether in one transaction or in a series of transactions) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part.  The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Lead Borrower and its Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollars" and "$" mean lawful money of the United States.

"Dominion Period" means the period from and after any date on which the Liquidity Amount of the Loan Parties is less than $5,000,000.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America, any State thereof or the District of Columbia.(excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico or any other territory).

"Eligible Credit Card Receivables" means Credit Card Receivables due to a Borrower on a non-recourse basis from Visa, MasterCard, American Express Co., Discover, and other major credit card processors reasonably acceptable to the Lender as arise in the ordinary course of business, which have been earned by performance and are deemed by the Lender in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base. Without limiting the foregoing, unless otherwise

7

approved in writing by the Lender, none of the following shall be deemed to be Eligible Credit Card Receivables:

(a)    Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale;

(b)    Credit Card Receivables with respect to which a Borrower does not have good, valid and marketable title, free and clear of any Lien (other than Permitted Liens);

(c)    Credit Card Receivables that are not subject to a first priority security interest in favor of the Lender, for the benefit of itself and the Credit Parties (it being the intent that chargebacks in the ordinary course by the credit card processors shall not be deemed violative of this clause);

(d)    Credit Card Receivables which are disputed, are with recourse (other than standard chargeback rights), or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(e)    Credit Card Receivables which the Lender determines in its Permitted Discretion to be uncertain of collection; and

Any portion of any Credit Card Receivables subject to holdback.

"Eligible In-Transit Inventory" shall mean, as of the date of determination thereof, without duplication of other Eligible Inventory, Inventory (a) which has been shipped from a foreign location for receipt by a Borrower within fourteen (14) days of the date of shipment, but which has not yet been delivered to a Borrower, (b) for which payment has been made by a Borrower and title has passed to a Borrower, (c) for which the document of title reflects a Borrower or the Lender as consignee (along with delivery to such Borrower of the documents of title with respect thereto), (d) as to which the Lender has control over the documents of title which evidence ownership of the subject Inventory (such as, if requested by the Lender, by the delivery of a Customs Broker Agreement), and (e) which otherwise would constitute Eligible Inventory; provided that the Lender may, in its discretion, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event the Lender reasonably determines that such Inventory is subject to any Person's right or claim which is (or is capable of being) senior to, or pari passu with, the Lien of the Lender (such as, without limitation, a right of stoppage in transit), may not be received by the commencement of any Liquidation, or may otherwise adversely impact the ability of the Lender to realize upon such Inventory.

"Eligible Inventory" shall mean, as of the date of determination thereof, (a) Eligible In-Transit Inventory, and (b) items of Inventory of the Borrowers that are finished goods, merchantable and readily saleable to the public in the ordinary course deemed by the Lender in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base. Without limiting the foregoing, unless otherwise approved in writing by the Lender, none of the following shall be deemed to be Eligible Inventory:

(a)    Inventory that is not owned solely by a Borrower, or is leased or on consignment or a Borrower does not have good and valid title thereto;

(b)    Inventory (other than Eligible In-Transit Inventory) that is not located at a distribution center used by a Borrower in the ordinary course or at a property that is owned or leased by a Borrower;

(c)      Inventory that represents (i) goods damaged, defective or otherwise unmerchantable, (ii) goods that do not conform in all material respects to the representations and warranties contained in this Agreement or any of the Security Documents, or (iii) goods to be returned to the vendor;

(d)      Inventory that is not located in the United States of America (excluding territories and possessions thereof) other than Eligible In-Transit Inventory;

(e)      Inventory that is not subject to a perfected first priority security interest in favor of the Lender for the benefit of the Credit Parties;

(f)      Inventory which consists of supplies, samples, labels, bags, packaging, and other similar non-merchandise categories;

(g)      Inventory as to which insurance in compliance with the provisions of Section 6.06 hereof is not in effect; or

(h)      Inventory which has been sold but not yet delivered or as to which the Borrower has accepted a deposit.

"Eligible PP&E" shall mean, as of the date of determination thereof, PP&E of the Borrowers that is deemed by the Lender in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base. Without limiting the foregoing, unless otherwise approved in writing by the Lender, Eligible PP&E shall not include:

(i)      PP&E that is not owned solely by a Borrower, or is leased or to which a Borrower does not have good and marketable title thereto;

(j)      PP&E that is not located in the United States of America (excluding territories and possessions thereof);

(k)      PP&E that is not subject to a perfected first priority security interest in favor of the Lender for the benefit of the Credit Parties;

(l)      PP&E as to which insurance in compliance with the provisions of Section 6.06 hereof is not in effect; or

(m)      PP&E that is not in saleable condition and usable for its intended purpose.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract,

9

agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or non-voting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate.

"Event of Default" has the meaning specified in Section 8.01.  An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 9.01 hereof.

"Excluded Taxes" means, with respect to the Lender or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of the Lender, in which its Lender's Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Loan Party is located, and (c) any U.S. federal withholding tax imposed under FATCA.

"Executive Order" has the meaning set forth in Section 9.17.

10

"Facility Guaranty" means the Guarantee of the Obligations set forth in Article X hereof.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Final Order" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Clerk of the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal or seek leave to appeal, petition for certiorari, reargue or seek rehearing has expired and no proceeding for certiorari, reargument or rehearing is pending or if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing was sought, or certiorari has been denied and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"Financial Officer" means a chief financial officer or vice president corporate controller.

"Fiscal Quarter" means any fiscal quarter of any Fiscal Year, which quarters shall generally end on the Saturday nearest to the last day of each January, April, July or October of such Fiscal Year in accordance with the fiscal accounting calendar of the Borrowers.

"Fiscal Year" means any period of twelve consecutive months ending on the Saturday nearest to the last day of January of any calendar year.

"Foreign Assets Control Regulations" has the meaning set forth in Section 9.17.

"Foreign Vendor" means a Person that sells In-Transit Inventory to a Borrower.

"Foreign Vendor Agreement" means an agreement between a Foreign Vendor and the Lender in form and substance satisfactory to the Lender and pursuant to which, among other things, the parties shall agree upon their relative rights with respect to In-Transit Inventory of a Borrower purchased from such Foreign Vendor.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States as set forth in accounting rules and standards promulgated by the Financial Accounting Standards Board or any organization succeeding to any of its principal functions.

"Gift Certificates and Merchandise Credit Liability" means, at any time, the aggregate face value at such time of (a) outstanding gift certificates and gift cards of the Borrowers entitling the holder thereof to use all or a portion of the certificate to pay all or a portion of the purchase price for any Inventory, and (b) outstanding merchandise credits of the Borrowers.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality,

11

regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning specified in Section 10.01.

"Guarantor" means each of the Subsidiaries of the Lead Borrower (other than any Borrower), now existing or hereafter created, other than any CFC and the Borrowers.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

 (a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

 (b) the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

 (c) net obligations of such Person under any Swap Contract;

 (d) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than 60 days);

12

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      all Attributable Indebtedness of such Person;

(g)      all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock), or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)      all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 9.04(b).

"Independent Consultant" means FTI Consulting, Inc., (or another independent third party consultant reasonably acceptable to the Lender).

"Information" has the meaning specified in Section 9.07.

"Intellectual Property" means the following: (a) trademarks, service marks, logos, trade dress, copyrights, copyrightable works, including registrations and applications therefor: (b) patent and patent applications, including all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof; (c) inventions, processes, trade secrets, know-how, and confidential information; and (d) licenses of rights in any of the above.

"Interest Payment Date" means the first Business Day of each calendar month and the Maturity Date.

"Interim Borrowing Order" means that certain interim order entered by the Bankruptcy Court, in form and substance acceptable to the Lender, which, among other matters but not by way of limitation, (i) authorizes the Loan Parties to obtain credit, incur (or guaranty) Obligations, grant Liens under this Agreement, the other Loan Documents, and the DIP Order(s) and otherwise perform their obligations under this Agreement and the other Loan Documents and (ii) provides for the super priority of the Lender's claims (subject to the Professional Fee Carve Out, and, with respect to Bank of America, to the extent set forth in the Sale Order).

13

"In-Transit Inventory" means Inventory of a Borrower which is in the possession of a common carrier and is in transit from a Foreign Vendor of a Borrower from a location outside of the continental United States to a location of a Borrower that is within the continental United States.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Reserves" means such reserves as may be established from time to time by the Lender in the Lender's reasonable discretion with respect to the status, condition, saleability, or value of the Eligible Inventory. Without limiting the generality of the foregoing, Inventory Reserves may include (but are not limited to) reserves based on obsolescence or Shrink, reserves based on ad valorem or other taxes, or reserves reasonably required by the Lender to protect Collateral value based upon changes to the ordinary course business of the Borrowers.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or assets of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any other investment of money or capital (including Capital Expenditures) in order to obtain a profitable return.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"Laws" means each international, foreign, federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.  Without limiting the foregoing, "Laws" shall include the Bankruptcy Code.

"L/C Recovery Amount" means, the excess (if any) of (i) the cash collateral deposited by the Borrowers to secure obligations in respect of letters of credit issued to CIT, Rosenthal and other third-parties approved by the Lender in its sole discretion to secure delivery of certain Inventory over (ii) the sum of (x) the maximum payment obligation of Loan Parties upon delivery of such Inventory and (y) amounts drawn under such letters of credit and not reimbursed by a Loan Party.

"Lead Borrower" has the meaning specified in the introductory paragraph hereto.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any real property for any period of time.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lender Parties" shall have the meaning specified in Section 9.02(c).

14

"Lender's Office" means the Lender's address and, as appropriate, account as set forth on Schedule 9.02, or such other address or account as the Lender may from time to time notify the Lead Borrower.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidation" means the exercise by the Lender of those rights and remedies accorded to the Lender under the Loan Documents and applicable Laws as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Lender, of any public, private or "going-out-of-business", "store closing" or other similar sale or any other disposition of the Collateral for the purpose of liquidating the Collateral.  Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Liquidity Amount" shall mean the amount measured as the sum of (x) unrestricted cash and cash equivalents of the Loan parties (excluding, for the avoidance of doubt, amounts deposited as cash collateral) *plus* (y) the maximum amount that is available for borrowing hereunder), provided that, if borrowing is unavailable solely due to a Default (that has not become an Event of Default), then such Default shall be deemed not to exist solely for purposes of the foregoing clause (y),

"Loan" means an extension of credit by the Lender to the Borrower under Article II.

"Loan Account" has the meaning assigned to such term in Section 2.11.

"Loan Cap" means, at any time of determination, the lesser of (a) the Commitment (after giving effect to any reductions in the Commitment pursuant to Section 2.06) *minus* the Availability Block or (b) the Borrowing Base.

"Loan Documents" means this Agreement, each Note, each Issuer Document, the DIP Order(s), the Security Documents, and any other instrument or agreement now or hereafter executed and delivered in connection herewith.

"Loan Notice" means a notice of Borrowing of Loans, pursuant to Section 2.02(b), which, if in writing, shall be substantially in the form of Exhibit A.

"Loan Parties" means, collectively, the Borrowers and the Guarantors.

"Material Adverse Effect" means a material adverse effect on (a) the business, operations, property, assets, or condition, financial or otherwise, of the Lead Borrower and its Subsidiaries taken as a whole, (b) the ability of the Loan Parties to perform any Obligations under this Agreement or any of the other Loan Documents, or (c) the validity or enforceability of this Agreement or any of the other Loan Documents or any of the material rights or remedies of the Lender hereunder or thereunder.  In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then-existing events would result in a

15

Material Adverse Effect.  Notwithstanding anything to the contrary, a "Material Adverse Effect" shall not be deemed to exist as a result of the effect of the Bankruptcy Events and the Permitted Store Closings.

"Material Contract" means, with respect to any Person, each contract to which such Person is a party material to the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person.

"Material Indebtedness" means Indebtedness incurred after the Petition Date (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $1,000,000.   For purposes of determining the amount of Material Indebtedness at any time, (a) the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof, (b) undrawn committed or available amounts shall be included, and (c) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maturity Date" means May 15, 2015, unless otherwise extended by the Lender in its sole and exclusive discretion.

"Maximum Rate" has the meaning provided therefor in Section 9.09.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Lead Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Note" means (a) a promissory note made by the Borrower in favor of the Lender evidencing Loans made by the Lender, substantially in the form of Exhibit B, as amended, supplemented or modified from time to time.

"NOLV" means the net orderly liquidation value of any asset as follows: (i) the NOLV of any Eligible Inventory shall be deemed to be 70% of the Cost thereof, (ii) the NOLV of the Borrowers' Eligible PP&E shall be deemed to be $1,000,000 minus the net sale proceeds of any sale of any portion thereof, (iii) the NOLV of the Borrowers' Intellectual Property shall be deemed to be $1,500,000, and (iv) the NOLV of the Data Center Servers shall be $600,000.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and

16

similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other DIP Obligations" means (i) the DIP L/C Obligations, (ii) the Pre-Petition Indemnity Obligations, and (iii) the Treasury Management Obligations.

"Other DIP Obligation Reserves" means such reserves as the Lender, from time to time, determines in its reasonable discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Other DIP Obligations in excess of the cash collateral posted in respect thereof.

"Other DIP Order" means the certain final order entered by the Bankruptcy Court on February 5, 2015 approving the Loan Parties' obtaining credit and incurring (or guarantying), and granting the "DIP L/C Liens," as that term is defined in Paragraph 8 thereof, to secure, (i) the DIP L/C Obligations, (ii) the Pre-Petition Indemnity Obligations, and (iii) the Treasury Management Obligations. [Docket No.249]

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, excluding, however, any such amounts imposed as a result of an assignment by the Lender of its Loan or Commitment.

"Outstanding Amount" means the aggregate outstanding principal amount of Loans after giving effect to any Borrowings and prepayments or repayments of Loans, as the case may be, occurring on such date

"Parent" means the Lead Borrower.

"Participant" has the meaning specified in Section 9.06(c).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Lead Borrower or any ERISA Affiliate or to which the Lead Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Discretion" means the exercise of the Lender's good faith discretion, based on its commercially reasonable business judgment, taking into consideration all factors the Lender deems relevant, including, without limitation, facts, factors, risks or circumstances, that: (i) would reasonably be expected to adversely affect the value of the Collateral, the enforceability or priority of the Lender's Liens thereon in favor of the Credit Parties or the amount which the Lender and the Credit Parties would likely receive (after giving consideration to delays in payment and costs of enforcement) in the liquidation of

such Collateral; (ii) would reasonably suggest that any collateral report or financial information delivered to the Lender by or on behalf of the Loan Parties is incomplete, inaccurate or misleading in any material respect; (iii) would reasonably create or be expected to create a Default or Event of Default, of (iv) may increase the risk that the Obligations would not be paid or performed in a timely manner.  In exercising such judgment, the Lender may consider such factors or circumstances already included in or tested by the definitions of Eligible Credit Card Receivables, Eligible in-Transit Inventory or Eligible Inventory, as well as any of the following: (A) the financial and business climate and prospects of any member of the Loan Parties' industry and general macroeconomic conditions; (B) changes in demand for and pricing of Inventory; (C) changes in any concentration of risk with respect to Inventory; (D) any other factors or circumstances that will or would reasonably be expected to have a Material Adverse Effect; (E) audits of books and records by third parties, history of chargebacks or other credit adjustments; and (F) any other factors that change or would reasonably be expected to change the credit risk of lending to the Borrowers on the security of the Collateral.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.03;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 6.03;

(c)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations (other than any Lien imposed by ERISA);

(d)     deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)     judgment liens in respect of judgments that do not constitute an Event of Default under Section 8.01(h);

(f)     easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of a Borrower or any Subsidiary;

(g)     Liens created under the Loan Documents;

(h)     Liens existing on the Petition Date listed on Schedule 7.01; and

(i)     The "DIP L/C Liens" approved pursuant to the Other DIP Order (as that term is defined in the Other DIP Order), securing the Other DIP Obligations.

"Permitted Indebtedness" means each of the following:

(a)     Indebtedness incurred prior to the Petition Date and listed on Schedule 7.03;

(b)     Indebtedness created under the Loan Documents;

18

(c)    Indebtedness of any Loan Party to any other Loan Party, all of which Indebtedness shall be reflected in the Loan Parties' books and records in accordance with GAAP;

(d)    unsecured Indebtedness of the kind described in clause (d) of the definition of such term (and any Guaranty of any such Indebtedness of a Loan Party);

(e)    Other DIP Obligations;

(f)    Indebtedness of a Loan Party owing to another Loan Party; and

(g)    Permitted Refinancings of the Indebtedness described in clauses (a) through (g).

"Permitted Investments" means each of the following:

(a)    as long as no Loans are outstanding:

(i)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), and municipal securities with an "AA" long-term credit rating obtainable from S&P and/or from Moody's, including pre-funded municipal bonds escrowed to maturity and guaranteed by the securities issued by the United States of America (or by any agency thereof);

(ii)    Investments in commercial paper (taxable and tax-exempt);

(iii)    Investments in (i) securities issued by a corporation (other than a Loan Party or an Affiliate of a Loan Party) and denominated in U.S. Dollars maturing within three (3) years from the date of acquisition thereof and having, at such date of acquisition, the long-term credit rating of "A/A" or the short-term credit rating of "A1/P1 SP1/MIG-1" or better obtainable from S&P and/or from Moody's, (ii) securities issued by the Lender or another banking institution with total assets in excess of $250,000,000 maturing within three (3) years from the date of acquisition thereof; and (iii) auction rate preferred stock or bonds having, at such date of acquisition, the long-term credit rating of "AA" with a reset and maturing within 180 days from the date of acquisition thereof;

(iv)    Investments in certificates of deposit, bankers' acceptances and time deposits (including Eurodollar denominated issues) maturing within three (3) years from the date of acquisition thereof issued or guaranteed by or placed with, and demand deposit and money market deposit accounts issued or offered by, the Lender or another banking institution with total assets in excess of $250,000,000;

(v)    fully collateralized repurchase agreements for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with any primary dealer and having a market value at the time that such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such counterparty entity with whom such repurchase agreement has been entered into;

(vi)    short-term Tax exempt securities (including municipal notes, auction rate floaters and floating rate notes); and

19

(vii)    Shares of investment companies that are registered under the Investment Company Act of 1940, as amended, and invest solely in one or more of the types of securities described in clauses (i) through (vi) above.

(b)    reserved;

(c)    loans or advances made by any Loan Party to any other Loan Party;

(d)    Guarantees constituting Indebtedness permitted as Permitted Indebtedness;

(e)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business; and

(f)    loans or advances to employees for the purpose of travel, entertainment or relocation in the ordinary course of business in an amount not to exceed $50,000 in the aggregate at any time outstanding;

provided that, notwithstanding the foregoing, no such Investments described in clauses (a) through (f) shall be permitted unless such Investments are pledged to the Lender as additional collateral for the Obligations pursuant to such agreements or the DIP Order(s) as may be reasonably required by the Lender.

"Permitted Refinancing" means, with respect to any Person, any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting a Permitted Refinancing); provided, that such Refinancing has been approved by Lender.

"Permitted Sales" means (i) the Disposition of any furniture, fixture or equipment that is no longer used or useful in the business of the Lead Borrower and its Subsidiaries, to the extent expressly provided for in the Approved Budget; (ii) the Disposition of Inventory and furniture, fixtures or equipment in connection with Permitted Store Closings; and (iii) the sale transaction contemplated under that certain Asset Purchase Agreement dated as the date hereof by and among the Lead Borrower, the other sellers named therein, and Mador Lending, LLC.

"Permitted Store Closings" means the Store closures effectuated prior to the commencement of the Chapter 11 Case, or thereafter with Lender's approval.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" means January 15, 2015.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Lead Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Plan Effective Date" means the effective date of a Plan of Reorganization.

"Plan of Reorganization" means a plan filed in the Chapter 11 Case pursuant to Chapter 11 of the Bankruptcy Code that is in form and substance reasonably acceptable to Lender.

20

"PP&E" means (i) fixtures located at the Borrowers' retail stores and (ii) equipment located at the Borrowers' distribution centers (excluding, for the avoidance of doubt, Data Center Servers), and any furniture, fixture or equipment located in retail stores or distribution centers.

"Pre-Petition Credit Agreement" means that certain Amended and Restated Credit Agreement dated as of February 3, 2011 entered into among the Borrowers, the Guarantors, the Agents and the Lenders (as each of those terms is defined therein), together with all instruments, documents and agreements executed or delivered in connection therewith, in each case, as amended, modified or supplemented to the date hereof.

"Pre-Petition Indemnity Obligations" has the meaning ascribed to such term in the Other DIP Order.

"Pre-Petition Liabilities" means the "Secured Obligations" as defined in the security agreement executed and delivered in connection with the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Professional Fee Carve Out" means a carve out for the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court; (ii) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c); (iii) all Reported Fee Accruals, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice less the amount of the Case Professionals' pre-petition retainers received but not previously applied to their Professional Fees and Expenses; and (iv) all accrued and unpaid Professional Fees and Expenses incurred after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $300,000 less, without duplication, the amount of such Case Professionals' pre-petition retainers received but not previously applied to their Professional Fees and Expenses as set forth in clause (iii) herein; provided that the amount set forth in this clause (iv) shall be reduced on a dollar-for-dollar basis for the Professional Fees and Expenses incurred and paid by the Loan Parties after the date of service of a Carve Out Trigger Notice.

"Professional Fee Carve Out Reserve" means an Availability Reserve equal to the Professional Fee Carve Out.

"Professional Fees and Expenses" means, subject to any limitations contained in the DIP Order(s), (a) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6), and (b) professional fees of, and costs and expenses incurred by, Case Professionals.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Lead Borrower and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

21

"Reported Fee Accruals" means the amount of Professional Fees and Expenses which have been incurred, accrued or invoiced (but remain unpaid) prior to such time as the Lender delivers the Carve Out Trigger Notice.  For purposes of determining the amount of the Professional Fee Carve Out, "Reported Fee Accruals" shall be equal to the aggregate amounts under the heading "Professional Fees Incurred" in the Approved Budget (reflected on an accrual basis and not on a cash basis) for the line item in the relevant time period for each such Case Professional (or if less, the actual Professional Fees and Expenses incurred to such time) minus any payments received on account thereof.  Any Professional Fees and Expenses which have been incurred, accrued or invoiced (and remain unpaid) but are in excess of the amounts reflected in the Approved Budget in the line item for the relevant time period for each such Case Professional shall not constitute "Reported Fee Accruals."

"Reserves" means all (if any) Inventory Reserves and Availability Reserves.

"Responsible Officer" means the chief executive officer, president, chief financial officer, vice-president, corporate controller, treasurer or assistant treasurer of a Loan Party or any of the other individuals designated in writing to the Lender by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any shares of any class of Equity Interests of any Loan Party or any Subsidiary of any Loan Party, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests of any Loan Party or any such Subsidiary or any option, warrant or other right to acquire any such Equity Interests of any Loan Party or any such Subsidiary.  Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans and all proceeds of a dissolution or liquidation of such Person payable to the shareholders of such Person.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sale Order" means that order approving the sale of substantially all of the assets of the Borrowers to the Lender, in form and substance acceptable to the Lender in its discretion.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"Satisfaction of Obligations" (or words to similar effect) means all the Obligations have been indefeasibly paid in full in cash, a reserve account has been established with Lender for all indemnification obligations hereunder, and the Commitment hereunder has been terminated.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement dated as of the Closing Date among the Loan Parties and the Lender.

"Security Documents" means (a) the Security Agreement and each other security agreement or other instrument or document executed and delivered to the Lender pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations, and (b) the DIP Order(s).

"Sponsor" means Mador Lending, LLC, and/or its permitted designees under the Sponsor Support Agreement.

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Store" means any retail store (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Lender.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's Consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s)

23

determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include the Lender or any Affiliate of the Lender).

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of the Bankruptcy Code or any other debtor relief laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitment is terminated (or deemed terminated) in accordance with Article VIII, (iii) the termination of the Commitment hereunder in accordance with the provisions of Section 2.06 hereof, or a Plan Effective Date.

"Trading With the Enemy Act" has the meaning set forth in Section 9.17.

"Tranche A Borrowing Base" means, at any time of calculation, an amount equal to:

(i)      the product of (i) the face amount of Eligible Credit Card Receivables multiplied by (ii) 85%;

plus

- the product of (i) the NOLV of Eligible Inventory, net of Eligible In-Transit Inventory and net of applicable Inventory Reserves, multiplied by (ii) 90%;

plus

- the product of (i) the NOLV of Eligible In-Transit Inventory, net of applicable Inventory Reserves, multiplied by (ii) 80%;

plus

- the product of (i) NOLV of the Eligible PP&E multiplied by (ii) 50%;

plus

the product of (i) the NOLV of the Data Center Servers multiplied by (ii) 50%;

minus

- the then amount of all Reserves (other than Inventory Reserves) allocated to the Tranche A Borrowing Base by the Lender.

24

"Tranche B Borrowing Base" means, at any time of calculation, an amount equal to:

    (j)    the NOLV of Intellectual Property;

    plus

- the product of (i) L/C Recovery Amount multiplied by (ii) 70%;

    plus

- the product of (i) Credit Card Holdback Amount multiplied by (ii) 85%;

    plus

- the product of (i) the then amount of cash collateral posted in respect of Treasury Management Obligations multiplied by (ii) 85%;

    minus

- the then amount of all other Reserves (other than Inventory Reserves) allocated to the Tranche B Borrowing Base by the Lender.

"Treasury Management Obligations" has the meaning ascribed to such term in the Other DIP Order.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"United States" and "U.S." mean the United States of America.

"Unreimbursed Amount" has the meaning set forth in Section 2.03(c).

"Variance Report" means a report prepared by the Lead Borrower's management reflecting on a line-item basis the Loan Parties' actual performance compared to the Approved Budget for the immediately preceding four week period and on a cumulative basis for the period after the Petition Date and the percentage variance of the Loan Parties' actual results from those reflected in the then existing Approved Budget, along with management's explanation of such variance.

**1.02    Other Interpretive Provisions**. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any provision hereof requiring consent, agreement or approval of Lender shall be deemed to require such consent, agreement or approval to be in writing and signed by the Lender.

**1.03    Accounting Terms**

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the financial statements delivered to the Lender prior to the Closing Date, except as otherwise specifically prescribed herein.

(b)    Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, the Lender and the Lead Borrower shall negotiate in good faith to amend such ratio or requirement to preserve

26

the original intent thereof in light of such change in GAAP; provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Lender financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04    Rounding.**  Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05    Times of Day.**  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

## ARTICLE II
## THE COMMITMENT AND CREDIT EXTENSIONS

**2.01    Loans.**  Subject to the terms and conditions set forth herein, the Lender agrees to make Loans to the Borrowers no more than one (1) time per week on or after the Closing Date, on any Business Day during the Availability Period, in an aggregate amount not to exceed the Available Amount.  Any portion of Loans repaid may not be reborrowed.

**2.02    Borrowings**.

(a)    Reserved.

(b)    Each Loan shall be made upon the Lead Borrower's irrevocable written notice to the Lender.  Each such notice must be received by the Lender not later than 1:00 p.m. three (3) Business Days prior to the requested date of any Borrowing.  Each telephonic notice by the Lead Borrower pursuant to this Section 2.02(b) must be confirmed promptly by delivery to the Lender of a written Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower.  Each borrowing of Loans shall be in a principal amount of $500,000 or a whole multiple of $500,000 in excess thereof.  Each Loan Notice shall specify (i) the requested date of the Borrowing, which shall be a Business Day, (ii) the principal amount of Loans to be borrowed, and (iii) certify as to the calculations set forth in Section 4.03(e).

(c)    Upon satisfaction of the applicable conditions set forth in Section 4.03 (and, if such Borrowing is the initial Borrowing, Section 4.01), the Lender shall use reasonable efforts to make the proceeds of the Borrowing available to the Lead Borrower by no later than 4:00 p.m. on the requested funding date by wire transfer of such funds to the account of the Lead Borrower in accordance with instructions provided to (and reasonably acceptable to) the Lender by the Lead Borrower.]

(d)    The Lender shall have no obligation to make any Loan in excess of the Available Amount.

**2.03    Reserved**.

**2.04    Reserved**.

**2.05    Prepayments**.

(a)    The Borrowers may, upon irrevocable notice from the Lead Borrower to the Lender, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; provided that (i) such notice must be received by the Lender not later than 1:00 p.m. on the date of prepayment of such Loans; (ii) any prepayment shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof; or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment.  If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a Loan shall be accompanied by all accrued interest on the amount prepaid.

(b)    Amounts of Loans repaid may not be reborrowed and do not increase the Commitment.

(c)    The Borrowers shall prepay the Loans with the net proceeds of any sale or disposition of any PP&E promptly upon receipt of such proceeds.

(d)    At any time that the Outstanding Amount shall exceed the Loan Cap, the Borrowers shall immediately prepay Loans to eliminate such excess.

**2.06    Termination or Reduction of Commitment.**

(a)    The Borrowers may, upon irrevocable notice from the Lead Borrower to the Lender, terminate the Commitment or from time to time permanently reduce the Commitment; provided that (i) any such notice shall be received by the Lender not later than 1:00 p.m. three Business Days prior to the date of termination or reduction and (ii) any such partial reduction of the Commitment shall be in an aggregate amount of $1,000,000 or any whole multiple of $100,000 in excess thereof.

(b)    Reserved.

(c)    All fees (including, without limitation, commitment fees) and interest in respect of the Obligations accrued until the effective date of any termination of the Commitment shall be paid on the effective date of such termination.

**2.07    Repayment of Loans**.

The Borrower shall repay to the Lender on the Termination Date the aggregate principal amount of  Loans outstanding on such date.

**2.08    Interest**.

(a)    Subject to the provisions of Section 2.08(b) below, each Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Applicable Rate.

(b)    (i)    If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at the Default Rate to the fullest extent permitted by Law.

(ii)    If any Event of Default exists, then the Lender may notify the Lead Borrower that all Obligations shall thereafter bear interest at the Default Rate and thereafter outstanding Obligations shall bear interest at the Default Rate to the fullest extent permitted by Law.

(iii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

**2.09    Intentionally Omitted.**

**2.10    Computation of Interest and Fees**.  All computations of fees and interest shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Lender of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11    Evidence of Debt**.

The Loans made by the Lender shall be evidenced by one or more accounts or records maintained by the Lender (the "Loan Account") in the ordinary course of business, which shall include the date and amount of each Loan from the Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to the Lender.  The accounts or records maintained by the Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lender to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  Upon the request of the Lender, the Borrowers shall execute and deliver to the Lender a Note in the amount of the Commitment, which shall evidence the Lender's Loans in addition to such accounts or records.  The Lender may attach schedules to its Note and endorse thereon the date amount and maturity of its Loans and payments with respect thereto.  Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note together with an indemnity from the Lender related thereto in form and substance reasonably acceptable to the Borrowers, and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of the Lender, in the same principal amount thereof and otherwise of like tenor.

**2.12    Payments Generally; Funding Source**.

(a)    General.  All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Lender at the Lender's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date

29

specified herein.  All payments received by the Lender after 2:00 p.m. shall, at the option of the Lender, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    Funding Source.  Nothing herein shall be deemed to obligate the Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by the Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13    Priority; Liens**.  All of the Obligations are secured by Liens on substantially all the assets of the Borrowers and, at all times, shall constitute administrative expenses of the Borrowers in the Bankruptcy Case with priority under Section 364(c)(1) of the Bankruptcy Code over any and all other administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, subject and subordinate only to the Professional Fee Carve Out.  No other claims, except for the aforementioned, having a priority superior or *pari passu* to that granted to or on behalf of the Lender shall be granted or approved while any of the Obligations or the Commitment remain outstanding.

**ARTICLE III**
**TAXES, YIELD PROTECTION AND ILLEGALITY;**
**APPOINTMENT OF LEAD BORROWER**

**3.01    Taxes**.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrowers shall be required by Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrowers shall make such deductions and (iii) the Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with Law.

(b)    Payment of Other Taxes by the Borrowers.  Without limiting the provisions of subsection (a) above, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Law.

(c)    Indemnification by the Loan Parties.  The Loan Parties shall indemnify the Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Lender, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Lead Borrower by the Lender shall be conclusive absent manifest error.

(d)    Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrowers to a Governmental Authority, the Lead Borrower shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing

30

such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(e)  Treatment of Certain Refunds.  If the Lender reasonably determines, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Borrowers have paid additional amounts pursuant to this Section, it shall pay to the Lead Borrower, with reasonable promptness following the date upon which it actually realizes such benefit, an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Lender, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Parties, upon the request of the Lender, agree to repay the amount paid over to the Lead Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender in the event that the Lender is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require the Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Loan Parties or any other Person.

(f)  FATCA.  If a payment made to the Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if the Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), the Lender shall deliver to the withholding agent (i.e., any Loan Party), at the time or times prescribed by law and at such time or times reasonably requested by such withholding agent, such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by such withholding agent as may be necessary for the withholding agent to comply with its obligations under FATCA, to determine that the Lender has complied with the Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.

**3.02    Reserved.**

**3.03    Reserved.**

**3.04    Increased Costs**.

(a)  Reserved.

(b)  Capital Requirements.  If the Lender determines that any Change in Law affecting the Lender or any Lending Office of the Lender or the Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on the Lender's capital or liquidity or on the capital or liquidity of the Lender's holding company, if any, as a consequence of this Agreement, the Commitment of the Lender or the Loans made by the Lender, to a level below at which the Lender or the Lender's holding company could have achieved but for such Change in Law (taking into consideration the Lender's policies and the policies of the Lender's holding company with respect to capital adequacy), then from time to time the Loan Parties will pay to the Lender such additional amount or amounts as will compensate the Lender or the Lender's holding company for any such reduction suffered.

(c)  Certificates for Reimbursement.  A certificate of the Lender setting forth the amount or amounts necessary to compensate the Lender or its holding company, as the case may be, as specified in subsection (b) of this Section and delivered to the Lead Borrower shall be conclusive absent

31

manifest error.  The Loan Parties shall pay such the Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    <u>Delay in Requests</u>.  Failure or delay on the part of the Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of the Lender's right to demand such compensation, <u>provided</u> that the Loan Parties shall not be required to compensate the Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than 120 days prior to the date that the Lender notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of the Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 120 day period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    <u>Reserved</u>.

**3.05    Reserved.**

**3.06    Reserved.**

**3.07    Survival.**    All of the Borrowers' obligations under this <u>Article III</u> shall survive termination of the Commitment hereunder and repayment of all other Obligations hereunder.

**3.08    Designation of Lead Borrower as Borrowers' Agent.**

(a)    Each Borrower hereby irrevocably designates and appoints the Lead Borrower as such Borrower's agent to obtain Loans, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement.  As the disclosed principal for its agent, each Borrower shall be obligated to each Credit Party on account of Loans so made as if made directly by the applicable Credit Party to such Borrower, notwithstanding the manner by which such Loans are recorded on the books and records of the Lead Borrower and of any other Borrower.  In addition, each Loan Party other than the Borrowers hereby irrevocably designates and appoints the Lead  Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(b)    Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers.

(c)    The Lead Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Lead Borrower has requested a Borrowing.  Neither the Lender nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.

**ARTICLE IV**
**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

**4.01    Conditions of Initial Borrowing**.  The obligation of the Lender to make its initial Loan hereunder is subject to satisfaction of the following conditions precedent:

(a)    The Lender's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif " via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the

32

signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Lender:

(i)      executed counterparts of this Agreement sufficient in number for distribution to the Lender and the Lead Borrower;

(ii)      such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Lender may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iii)      copies of each Loan Party's Organization Documents and such other documents and certifications as the Lender may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction would not reasonably be expected to have a Material Adverse Effect;

(iv)      a certification to the Lender by Young Conaway Stargatt & Taylor, LLP, counsel to the Loan Parties, that such counsel has reviewed the docket in the Chapter 11 Case and confirmed that there was no notice filed or motion pending with the Bankruptcy Court to appeal, reverse, stay or vacate the DIP Order(s);

(v)      a certificate signed by a Responsible Officer of the Lead Borrower certifying that the conditions specified in Sections 4.03(a) and 4.03(b) have been satisfied;

(vi)      evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Lender required under the Loan Documents have been obtained and are in effect;

(vii)      the Security Documents, each duly executed by the applicable Loan Parties;

(viii)      all other Loan Documents, each duly executed by the applicable Loan Parties; and

(ix)      all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Lender to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Lender.

(b)      Reserved.

(c)    The Lender shall have received evidence, in form and substance satisfactory to the Lender, that (i) the B. Riley Liens have been terminated and are of no force and effect (including, without limitation, any applicable UCC-3 termination statements, terminations of control agreements, and delivery of any possessory Collateral, provided that the Borrowers shall have up to five (5) Business Days after entry of the Borrowing Order to turn over any possessory Collateral to the Lender), and (ii) except to the extent set forth in the DIP Order(s), the B. Riley Obligations shall have been paid in full.

(d)    The Lender shall have received and reviewed the thirteen week cash flow of the Loan Parties which shall be in form and substance satisfactory to the Lender and shall constitute the initial Approved Budget.

(e)    All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Order(s) and this Agreement shall be in form and substance reasonably satisfactory to the Lender.  The DIP Order(s) shall have been entered, shall be in full force and effect, and shall not have been reversed, vacated or stayed, or modified without the prior written consent of the Lender.

(f)    The Bankruptcy Court shall have entered the DIP Order(s), which shall be in form and substance reasonably acceptable to the Lender hereunder.

(g)    Other than Bankruptcy Events, there, there shall not be pending (or, to the knowledge of Borrower, threatened), in writing, any action, suit, investigation or proceeding in any court or before any arbitrator or Governmental Authority that would reasonably be expected to have a Material Adverse Effect and is not stayed by the filing of the Chapter 11 Case.

(h)    Reserved.

(i)    The consummation of the transactions contemplated hereby shall not violate any Law or any Organization Document.

(j)    All fees required to be paid to the Lender on or before the Closing Date shall have been paid in full.

(k)    The Borrowers shall have paid all reasonable fees, charges and disbursements of counsel to the Lender (including, without limitation, local bankruptcy counsel) to the extent invoiced prior to or on the Closing Date (including any estimated fees, charges and disbursements through the Chapter 11 Case; provided that such estimate shall not thereafter preclude a final settling of accounts for all reasonable fees, charges and disbursements between the Borrowers and the Lender) and the Borrowers shall pay such additional amounts of such reasonable fees, charges and disbursements incurred or to be incurred by the Lender through the Chapter 11 Case, in each case, as provided in Section 9.04(a) and the DIP Order(s).

(l)    The Lender shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

**4.02    Reserved.**

**4.03    Conditions to all Borrowings.**  The obligation of the Lender to honor any Loan Notice is subject to the following conditions precedent:

34

(a)　　The representations and warranties of each other Loan Party contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Borrowing, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects and (iii) for purposes of this Section 4.03, the representations and warranties contained in Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to Sections 6.01 and 6.19.

(b)　　No Default or Event of Default shall exist, or would result from such proposed Borrowing or from the application of the proceeds thereof.

(c)　　The Lender and shall have received a Loan Notice in accordance with the requirements hereof.

(d)　　After giving effect to the Borrowing requested to be made on any such date and the use of proceeds thereof, the Commitment shall be greater than or equal to zero.

(e)　　The Borrowers shall have provided evidence satisfactory to the Lender that after giving effect to (i) such request (and the funding of the proceeds thereof) and (ii) the payment of obligations of the Borrowers reflected in the Approved Budget to be paid during the seven-day period beginning with the requested funding date, the sum of cash and cash equivalents of the Loan Parties will not exceed $1,500,000.

(f)　　The requested Borrowing shall not exceed the Available Amount.

(g)　　Prior to, and after giving effect to, the making of any Loan, the Borrowers shall be in compliance with the provisions of Section 6.19 hereof.

Each Loan Notice submitted by the Borrower shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in Sections 4.01 and 4.03 have been satisfied on and as of the date of the applicable Borrowing.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans hereunder, each Loan Party represents and warrants to the Lender and the other Credit Parties that:

**5.01    Existence, Qualification and Power.**  Each Loan Party (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) subject to the entry of the DIP Order(s), has all requisite power and authority to carry on its business as now conducted, and (iii) except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

**5.02    Authorization; No Contravention.**  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, subject to the entry of the DIP Order(s), has been duly authorized by all necessary corporate or other organizational action, and does not

35

(a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Lender under the Security Documents); or (d) violate any Law.

**5.03    Governmental Authorization; Other Consents.**   Except for the entry of the DIP Order(s), no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for such as have been obtained or made and are in full force and effect.

**5.04    Binding Effect.**   This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto.   This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, subject to the entry of the DIP Order(s), enforceable against each Loan Party that is party thereto in accordance with its terms.

**5.05    Budget; No Material Adverse Effect.**   Each Approved Budget delivered to the Lender was prepared by the Loan Parties in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.06    Litigation.**   Other than the Bankruptcy Events, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after reasonable inquiry, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b)  either individually or in the aggregate, if determined adversely, would reasonably be expected to have a Material Adverse Effect except, in each case, any such actions, suits or proceedings which are stayed by virtue of the filing of the Chapter 11 Case.

**5.07    No Default**.   Other than as a result of the Bankruptcy Events, no Loan Party or any Subsidiary is in default under or with respect to, or party to, any Material Indebtedness.  No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08    Ownership of Property; Liens**

(a)    Except as disclosed on <u>Schedule 5.08(a)</u>, each of the Loan Parties has good record and marketable title in fee simple to or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except (i) as a result of the Bankruptcy Events and the Permitted Store Closings, or (ii) for such defects in title as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as disclosed on <u>Schedule 5.08(a)</u> or as a result of the Bankruptcy Events and the Permitted Store Closings, each of the Loan Parties has good and marketable title to, valid leasehold interests in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business.

36

(b)      Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all Real Estate that is owned by the Loan Parties, together with a list of the holders of any mortgage or other Lien thereon as of the Closing Date.  Each Loan Party has good, marketable and insurable fee simple title to the real property owned by such Loan Party or such Subsidiary, free and clear of all Liens, other than Permitted Encumbrances.  Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties (except for Leases which are the subject of Permitted Store Closings), together with the name of each lessor and its contact information with respect to each such Lease as of the Closing Date.

(c)      Schedule 7.01 sets forth a complete and accurate list of all Liens on the property or assets of each Loan Party, showing as of the Closing Date the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto.  The property of each Loan Party is subject to no Liens, other than Permitted Encumbrances.

(d)      reserved.

(e)      Schedule 7.03 sets forth a complete and accurate list of all Indebtedness of each Loan Party on the Closing Date, showing as of the date hereof the amount, obligor or issuer and maturity thereof.

**5.09      Environmental Compliance.**

(a)      No Loan Party  (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any unresolved Environmental Liability or (iv) has knowledge of any basis for any Environmental Liability, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)      None of the properties currently or operated by any Loan Party  is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list; to the knowledge of Loan Parties, there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently operated by any Loan Party or, to the best of the knowledge of the Loan Parties, on any property formerly operated by any Loan Party; to the knowledge of Loan Parties, there is no asbestos or asbestos-containing material on any property currently operated by any Loan Party; and to the knowledge of Loan Parties, Hazardous Materials have not been released, discharged or disposed of on any property currently operated by any Loan Party.

(c)      No Loan Party  is undertaking, and no Loan Party or any Subsidiary thereof has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law that would be reasonably expected to result in a Material Adverse Effect; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently operated by any Loan Party have been disposed of in a manner not reasonably expected to result in a Material Adverse Effect to any Loan Party.

**5.10    Insurance.**  The properties of the Loan Parties are insured with insurance companies having an A.M. Best Rating of at least A-, which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties operates.  Each insurance policy of the Loan Parties necessary to the truth of the foregoing representation is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**5.11    Taxes.**  Except as set forth on Schedule 5.11 hereto, each Loan Party has timely filed or caused to be filed all federal and state Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings, for which such Loan Party has set aside on its books adequate reserves, and as to which no Lien has been filed, or (b) to the extent that the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

**5.12    ERISA Compliance.**  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to result in a Material Adverse Effect. The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87, as amended) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87, as amended) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans.

**5.13    Subsidiaries; Equity Interests.**  The Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary.  All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for Liens created under the Security Documents, and (ii) Permitted Liens.  There are no outstanding rights to purchase any Equity Interests in any Subsidiary.  The Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of Schedule 5.13.  The copies of the Organization Documents of each Loan Party and each amendment thereto, if any, provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

**5.14    Margin Regulations; Investment Company Act.**

(a)    No Loan Party is engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  None of the proceeds of the Loans shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)     None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15    Disclosure**. Each Loan Party has disclosed to the Lender all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect. No report, financial statement (including, without limitation, any Approved Budget), certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information and the Approved Budget, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.16    Compliance with Laws.**  Each of the Loan Parties is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect or the enforcement of which is stayed by virtue of the filing of the Chapter 11 Case, or (c) the failure to comply therewith is as a result of a Bankruptcy Event.

**5.17    Intellectual Property; Licenses.**  The Loan Parties own, or possess the right to use, all of the Intellectual Property that is material to the operation of their respective businesses as currently conducted ("Company IP"), and to the knowledge of the Loan Parties, the use of the Company IP in connection with their respective businesses as currently conducted does not infringe the valid Intellectual Property rights of any other Person.  To the knowledge of the Lead Borrower, no claim or litigation regarding any of the Company IP is pending or threatened in writing, which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect or which claim or litigation would not be stayed by virtue of the filing of the Chapter 11 Case.

**5.18    Labor Matters.**  There are no strikes, lockouts or slowdowns against any Loan Party pending or, to the knowledge of the Lead Borrower, threatened. The hours worked by and payments made to employees of the Loan Parties have not been adjudged by any court of competent jurisdiction to be in violation of the Fair Labor Standards Act or any other applicable federal, state, or local law dealing with such matters to the extent that any such violation would reasonably be expected to have a Material Adverse Effect. All payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such member. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party is bound.

**5.19    Security Documents.**  Upon entry of the DIP Order(s), the Security Documents (including, without limitation, the DIP Order(s)), will create in favor of the Lender, for the benefit of the Credit Parties, a legal, valid, continuing and enforceable perfected first priority security interest and liens in the Collateral, subject to the Professional Fee Carve Out, the enforceability of which is subject to the

39

DIP Order(s) and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.  The financing statements, releases and other filings are in appropriate form and have been or will be filed in the offices specified in Schedule I of the Security Agreement.

**5.20    Reserved.**

**5.21    Reserved**.

**5.22    Brokers**.  No broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.23    Customer and Trade Relations**.  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations, except as a result of the Bankruptcy Events or the Permitted Store Closings.

**5.24    Casualty**.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

So long as the Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification claims for which a claim has not been asserted), the Loan Parties shall, and shall cause each Subsidiary to:

**6.01    Financial Statements and Other Information**.  The Lead Borrower will furnish to the Lender:

(a)    its Consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all audited and reported on by independent public accountants of recognized national standing, only if such audited financial statements are finalized and delivered to the Lead Borrower during the term of this Agreement

(b)    within thirty (30) days after the end of each fiscal month of the Lead Borrower, its Consolidated statements of operations and cash flows, as of the end of and for such fiscal month, all certified by one of its Financial Officers as presenting in all material respects the results of operations of the Lead Borrower and its Subsidiaries on a Consolidated basis;

(c)    reserved;

(d)    no later than Wednesday of each week (or, if Wednesday is not a Business Day, on the next succeeding Business Day), (i) a statement of Reported Fee Accruals, (ii) a rolling 13-week cash flow forecast for the Borrowers and their Subsidiaries, reflecting actual results from the prior period compared to budget and projected results for the subsequent 13 week period, (iii) if such date occurs on or after March 18, 2015, a Variance Report, in each case in form and

40

substance reasonably acceptable to the Lender and certified as complete and correct by the Independent Consultant, and (iv) a report of the Liquidity Amount;

(e)    promptly upon receipt thereof, copies of all reports submitted to any Loan Party by independent certified public accountants in connection with each annual, interim or special audit of the books of the Loan Parties or any of their Subsidiaries made by such accountants, including any management letter commenting on the Loan Parties' internal controls submitted by such accountants to management in connection with their annual audit;

(f)    the financial and collateral reports requested by the Lender in writing, at the times determined by the Lender in its Permitted Discretion;

(g)    notice of any intended sale or other disposition of any material portion of the assets of any Loan Party permitted hereunder or incurrence of any material amount of Indebtedness permitted hereunder at least thirty (30) Business Days prior to the date of consummation of such sale or disposition (except as otherwise provided in Section 6.20) or the incurrence of such Indebtedness;

(h)    as soon as practicable prior to the furnishing or filing thereof, copies of any statement, report or pleading proposed to be furnished to or filed with the Bankruptcy Court in connection with the Chapter 11 Case; and

(i)    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Loan Party, or compliance with the terms of any Loan Document, as the Lender may reasonably request.

**6.02    Notices.**    The Lead Borrower will furnish to the Lender prompt written notice of the following:

(a)    the occurrence of any Default or Event of Default;

(b)    the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting any Loan Party or any Affiliate thereof that, if adversely determined, would reasonably be expected to result in a Material Adverse Effect;

(c)    the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in a Material Adverse Effect;

(d)    any other development that results in, or would reasonably be expected to result in, a Material Adverse Effect;

(e)    any change in any Loan Party's chief executive officer, chief financial officer or chairman;

(f)    the discharge by any Loan Party of the Independent Consultant or its present independent accountants or any withdrawal or resignation by the Independent Consultant or such independent accountants;

(g)    any failure by any Loan Party to pay rent at any of such Loan Party's locations when such rent first came due following the Petition Date, unless related to a Permitted Store Closing or

41

such non-payment was permitted under the Bankruptcy Code or pursuant to an order of the Bankruptcy Court;

(h)    any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent; and

(i)    the filing of any Lien for due and unpaid Taxes after the Petition Date against any Loan Party exceeding $50,000.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Lead Borrower setting forth the details of the event or development requiring such notice and, if applicable, any action taken or proposed to be taken with respect thereto.

**6.03    Payment of Obligations**.  To the extent required by the Bankruptcy Code, pay its Indebtedness and other obligations, including Tax liabilities, and claims for labor, materials, or supplies, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (d) no Lien has been filed with respect thereto, and (e) the failure to make payment pending such contest would not reasonably be expected to result in a Material Adverse Effect.  Nothing contained herein shall be deemed to limit the rights of the Lender with respect to determining Reserves pursuant to this Agreement.

**6.04    Preservation of Existence**. (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except in connection with Permitted Store Closings or to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties, and except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.

**6.05    Maintenance of Properties**. Keep and maintain all property material to the conduct of its business in good working order and condition, except (a) ordinary wear and tear, (b) asset Dispositions permitted by Section 7.05, and (c) assets located at a Store following a Permitted Store Closing with respect to such Store.

**6.06    Maintenance of Insurance.**

(a)    (i) Maintain insurance with insurers reasonably acceptable to the Lender, having an A.M. Best Rating of at least A- (or, to the extent consistent with prudent business practice, a program of self-insurance) on such of its property and in at least such amounts and against at least such risks as is customary with companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death occurring upon, in or about or in connection with the use of any properties owned, occupied or controlled by it (including the insurance required pursuant to the Security Documents); (ii) maintain such other insurance as may be required by applicable Law; and (iii) furnish to the Lender, upon written request, full information as to the insurance carried.

42

(b)    Fire and extended coverage policies maintained with respect to any Collateral shall be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to real property) and lenders loss payable clause (regarding personal property), in form and substance reasonably satisfactory to the Lender, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Lender, (ii) a provision to the effect that none of the Loan Parties, the Lender or any other party shall be a coinsurer and (iii) such other provisions as the Lender may reasonably require from time to time to protect the interests of the Credit Parties. Commercial general liability policies shall be endorsed to name the Lender as an additional insured. Business interruption policies shall name the Lender as a loss payee and shall be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Lender, (ii) a provision to the effect that none of the Loan Parties, the Lender or any other party shall be a co-insurer and (iii) such other provisions as the Lender may reasonably require from time to time to protect the interests of the Credit Parties. Each such policy referred to in this paragraph also shall provide that it shall not be canceled, modified or not renewed for any reason except upon not less than 30 days' prior written notice thereof by the insurer to the Lender. The Lead Borrower shall deliver to the Lender, prior to the cancellation, modification or nonrenewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Lender, including an insurance binder) together with evidence reasonably satisfactory to the Lender of payment of the premium therefor.

(c)    Furnish to the Lender prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding.

**6.07    Compliance with Laws.**  Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP; (b) such contest effectively suspends enforcement of the contested Laws; (c) the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect; or (d) the failure to comply therewith is otherwise permitted under the Bankruptcy Code or the DIP Order(s).

**6.08    Books and Records; Accountants.**

(a)    Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

(b)    At all times retain a Registered Public Accounting Firm which is reasonably satisfactory to the Lender.

43

**6.09    Inspection Rights.**

(a)    Subject to the terms of <u>Section 9.07</u>, permit representatives and independent contractors of the Lender to visit and inspect any of its properties, provided that the Lender shall use reasonable efforts to minimize any disruption to the business of the Loan Parties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, at any time during normal business hours and with reasonable advance notice (unless an Event of Default has occurred and is continuing, in which event no such advance notice shall be required).

(b)    From time to time upon the request of the Lender and after reasonable prior notice, permit the Lender or professionals (including investment bankers, consultants, accountants, lawyers and appraisers) retained by the Lender to conduct appraisals, commercial finance examinations and other evaluations.  To the extent that Lender conducts appraisals, the cost of such appraisals shall not exceed $50,000, unless otherwise agreed by Lender and Lead Borrower.

(c)    Pay the reasonable out-of-pocket expenses of the Lender (including reasonable fees of such professionals) with respect to the activities described in this Section 6.09.

**6.10    Additional Loan Parties.**  Notify the Lender at the time that any Person becomes a Subsidiary, and promptly thereafter (and in any event within fifteen (15) days), cause any such Person (a) which is not a CFC to (i) become a Loan Party by executing and delivering to the Lender a joinder to this Agreement and such other documents as the Lender shall reasonably deem appropriate for such purpose, (ii) grant a Lien to the Lender on such Person's assets to secure the Obligations, and (iii) deliver to the Lender documents of the types referred to in <u>Section 4.01(a)</u> (including, without limitation, entry of such orders order by the Bankruptcy Court as the Lender may reasonably deem appropriate) and opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness (except that, if such Subsidiary is a CFC, the Equity Interests of such Subsidiary may be pledged may be limited to 65% of the outstanding voting Equity Interests of such Subsidiary and 100% of the non-voting Equity Interests of such Subsidiary, in each case in form, content and scope reasonably satisfactory to the Lender.  In no event shall compliance with this <u>Section 6.10</u> waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this <u>Section 6.10</u> if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrower.

**6.11    Cash Dominion**.

(a)    Upon the occurrence and during the continuation of any Dominion Period:

(i)    Promptly deliver written notice (together with a copy of the Interim Order or the Final Order, as applicable) to each of its credit card clearinghouses, setting forth the Credit Parties' rights in, and each such institution's obligations with respect to, all credit card proceeds (each, a "Credit Card Notification"), and take any other steps necessary to cause each of its credit card clearinghouses to pay into the Cash Collateral Account.

(ii)     As soon as practicable, but in any event within ten (10) Business Days of the beginning of such Dominion Period, enter into and maintain a Blocked Account Agreement satisfactory in form and substance to the Lender with each Blocked Account Bank (collectively, the "Blocked Accounts"), provided, that each Blocked Account Agreement shall require, and the Loan Parties shall cause, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the Cash Collateral Account, of all cash receipts and collections, including, without limitation, the following;

(A)     all available cash receipts from the sale of Inventory (including without limitation, proceeds of credit card charges) and other assets (whether or not constituting Collateral)

(B)     all proceeds of collections of Accounts;

(C)     all net proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any sale or other transaction or event;

(D)     the then contents of each DDA (net of any minimum balance, not to exceed $5,000.00, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained);

(E)     the then entire ledger balance of each Blocked Account (net of any minimum balance, not to exceed $5,000.00, as may be required to be kept in the subject Blocked Account by the Blocked Account Bank), provided that the aggregate amount of all balances maintained in all DDAs and Blocked Accounts shall not exceed $500,000; and

(F)     cause bank statements and/or other reports to be delivered to the Lender not less often than monthly (or more frequently upon the request of the Lender), accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

Notwithstanding anything in this Section 6.11(a) to the contrary, until the establishment of the Blocked Account Agreements, the Borrowers shall cause any and all amounts that would be required to be deposited to the Cash Collateral Account pursuant to Section 6.11(a) to be deposited in the Cash Collateral Account in the manner provided in Section 6.11(a).

(b)     In the event that, notwithstanding the provisions of this Section 6.11, any Loan Party receives or otherwise has dominion and control of any such proceeds or collections, such proceeds and collections shall be held in trust by such Loan Party for the Lender, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Cash Collateral Account or dealt with in such other fashion as such Loan Party may be instructed by the Lender.

**6.12    Information Regarding the Collateral.**  Furnish to the Lender at least fifteen (15) days prior written notice of any change in: (i) any Loan Party's corporate name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's identity or

45

type of organization or organizational structure; (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its jurisdiction of organization; or (v) any Loan Party's jurisdiction of organization (in each case, including, without limitation, by merging with or into any other entity, reorganizing, dissolving, liquidating, reincorporating or incorporating in any other jurisdiction). Each Loan Party agrees to take all action, if any, reasonably satisfactory to the Lender to maintain the perfection and priority of the security interest of the Lender for the benefit of the Credit Parties in the Collateral intended to be granted hereunder.  Each Loan Party agrees to promptly provide the Lender with certified Organization Documents reflecting any of the changes described in the preceding sentence.

> **6.13**    **Physical Inventories**.

> (a)    Permit the Lender, at the expense of the Loan Parties, to conduct (directly or through a third party of the Lender's choice), participate in and/or observe each physical count and/or inventory of so much of the Collateral as consists of Inventory which is undertaken on behalf of the Borrowers, reasonably cooperating with the Lead Borrower's efforts to ensure that such participation does not unreasonably disrupt the normal inventory schedule or process.

> (b)    At the Borrowers' own expense, cause, upon the request of the Lender, no more than one (1) physical inventory of the Borrowers' Inventory to be conducted by nationally recognized inventory takers and using practices consistent with practices in effect on the date hereof; provided that Borrowers shall provide Lender with the notes of the appraiser with respect to the inventory appraisal conducted thereby in January 2015.

> (c)    The Lead Borrower shall provide the Lender with the preliminary Inventory levels at each of each Borrower's Stores within ten (10) days following the completion of such inventory.

> (d)    The Lead Borrower, within forty-five (45) days following the completion of such inventory, shall provide the Lender with a reconciliation of the results of each such inventory (as well as of any other physical inventory undertaken by the Borrowers) and shall post such results to the Borrowers' stock ledger and general ledger, as applicable.

> (e)    Permit the Lender, in its reasonable discretion, if any Event of Default exists, to cause such additional inventories to be taken as the Lender reasonably determines (each, at the expense of the Borrowers).

> **6.14**    **Environmental Laws**.

> (a)    Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

46

### 6.15    Further Assurances.

Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, the delivery of control agreements with respect to deposit accounts, and other documents), that may be required under any Law, or which the Lender may request in its reasonable discretion, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Lender, from time to time upon reasonable request, evidence satisfactory to the Lender as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

### 6.16    Compliance with Terms of Leaseholds.

Except with respect to the Permitted Store Closings and as otherwise expressly permitted hereunder, to the extent required under the Bankruptcy Code or the DIP Order(s), make all payments and otherwise perform all obligations  in respect of all Leases of real property to which any Loan Party or any of its Subsidiaries is a party, keep such Leases in full force and effect and not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled, notify the Lender of any default by any party with respect to such Leases and cooperate with the Lender in all respects to cure any such default, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect.

### 6.17    Depository Account.  In order to facilitate the administration of the Loans and Lender's security interest in the Loan Parties' assets, the Borrowers shall work with the Lender (at the sole expense of the Borrowers) to open and maintain a depository bank account (the "Cash Collateral Account") in the name of the Lender and under the sole and exclusive dominion and control of the Lender) for deposits of cash collateral.   The Borrowers may deliver amounts to Lender for deposit in such Cash Collateral Account from time to time (it being understood that the Borrowers are under no obligation to do so, except as required pursuant to Section 6.11).  It is hereby agreed and acknowledged that the Lender may apply any amounts of cash collateral deposited in the Cash Collateral Account to the payment of Obligations due and payable hereunder without the consent of or prior notice to the Borrowers. The Lead Borrower may request that the Lender release amounts from the Cash Collateral Account, subject to the following conditions: (i) no more than one (1) request for release shall be sent per week, (ii) on each of the date of such request and the date of the requested disbursement, there shall be no Default or Event of Default that has occurred and is continuing or would occur as a result of the requested disbursement, (iii) after giving effect to the release of such amounts, the Outstanding Amount shall not exceed the Loan Cap.

### 6.18    Retention of Independent Consultant.

(a)       Until Satisfaction of the Obligations, the Borrowers shall continue to retain the Independent Consultant, pursuant to terms reasonably acceptable to the Lender, for the purpose of (i) assisting in the preparation of each 13-week cash flow forecast and the other financial and collateral reporting required to be delivered to the Lender pursuant to this Agreement, (ii) advising the Loan Parties with regard to their financial performance and affairs and operational initiatives, including, but not limited to, liquidity and working capital management, operational efficiencies, budgets and forecasts, and interactions with the Lender; (iii) being available to the Lender to discuss in detail the 13-week cash flow forecasts, the Loan Parties' operating and financial performance, and the reports and other materials and matters as set forth above, and (iv) assisting in the consummation of any Permitted Sales, and to perform financial and restructuring

47

services on terms reasonably satisfactory to the Lender.  In the event that an Independent Consultant resigns or is otherwise no longer engaged by the Borrowers, the Borrowers shall, subject to Bankruptcy Court approval, engage a replacement Independent Consultant reasonably acceptable to the Lender within ten (10) Business Days.

(b)     The Lead Borrower authorizes the Lender to communicate directly with its independent certified public accountants, financial advisors, investment bankers and consultants (including the Independent Consultant), which have been engaged from time to time by the Borrowers, and authorizes and shall instruct those accountants, financial advisors, investment bankers and consultants to communicate to the Lender such information relating to each Loan Party with respect to the business, results of operations, prospects and financial condition of such Loan Party and other matters as the Lender may reasonably request.

**6.19     Performance Within Approved Budget**.

(a)     The Borrowers and their Subsidiaries shall not pay any expenses other than those set forth in the budget approved by the Lender on the date of this Agreement (such budget, together with any subsequent budget which the Lender may, in its sole discretion, approve, the "Approved Budget"), provided that (1) the Borrowers and their Subsidiaries may pay expenses under an Approved Budget line item for any given four-week period up to and through the Saturday of the most recent week then ended (a "Cumulative Four Week Period") that are no more than 120% of the operating disbursements projected for such line item for such Cumulative Four Week Period in the Approved Budget; (2) no amounts allocated to a particular line item in the Approved Budget (including line items denominated "Miscellaneous" or "Other", or words of similar import) shall be used to pay any expenses under any other line item(s) in the Approved Budget without the prior express written consent of the Lender, in the Lender's sole and exclusive discretion; (3) the Borrowers and their Subsidiaries may expend any unused amounts contained in a line item for a given week (without giving effect to the 120% variance set forth in (1), above) for the same line item in any of the four successive weekly periods; (4) payments to the Lender shall not be subject to the limitations set forth above and shall not be included in determining compliance with the covenants set forth in this Section 6.19; and (5) the actual aggregate disbursements made for any Cumulative Four Week Period shall not exceed 110% of those projected in the Approved Budget for such Cumulative Four Week Period;

(b)     the Borrower and its Subsidiaries shall not make any payment that, at the time made, based on the going-forward cash-flow projections in the Approved Budget, would result in a failure to comply with clause (d) or (e) hereof on the next test date;

(c)     the Borrowers and their Subsidiaries shall achieve cash receipts for any Cumulative Four Week Period of at least 90% of those projected in the Approved Budget for such Cumulative Four Week Period;

(d)     the Liquidity Amount shall be at least 90% of that projected in the Approved Budget for the applicable test date; and

(e)     the Liquidity Amount shall not be less than $3,000,000 at any time.

Compliance with the covenants set forth in this Section 6.19 shall be tested on the close of business on Wednesday of each week after Lender's approval of the initial Approved Budget and shall be reflected in the Variance Report delivered pursuant to Section 6.01.

**6.20    Collateral and Diligence Review**.  Cause, at the Borrowers' own cost and expense, a review of the Collateral and a diligence audit to be completed by one or more third parties of the Lender's choosing within two weeks after the Petition Date, and a report thereon to be prepared by such parties in form, scope and substance satisfactory to the Lender, and any supplements to or additional reviews of the Collateral and diligence audit to be completed by one or more third parties of the Lender's choosing as the Lender may request in writing thereafter.

**6.21    Additional Bankruptcy Related Affirmative Covenant.**

On or before ninety (90) days following the Petition Date, obtain an order of the Bankruptcy Court extending the time period of the Borrowers to assume or reject Leases to not less than two hundred ten (210) days from the Petition Date.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as the Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification claims for which a claim has not been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01    Liens.**  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, other than those Liens set forth on Schedule 7.01, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

**7.02    Investments.**  Make any Investments, except Permitted Investments.

**7.03    Indebtedness; Disqualified Stock**

(a)    Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; or (b) issue Disqualified Stock.

**7.04    Fundamental Changes.**  Merge, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing), except in connection with a Permitted Sale or a Plan of Reorganization.

**7.05    Asset Sales.**  Sell, transfer, lease or otherwise Dispose of any asset, including any Equity Interests, nor permit any of the Subsidiaries to issue any additional shares of its Equity Interests in such Subsidiary, except:

(a)    (i) sales of Inventory in the ordinary course of business, or (ii) sales of used or surplus equipment in the ordinary course of business, or (iii)  sales of Permitted Investments;

(b)    Dispositions among the Loan Parties;

(c)    reserved;

49

(d)     rejection, disclaimer and termination of Leases otherwise permitted or required herein or in connection with Permitted Store Closings;

(e)     Asset sales pursuant to an order approved by the Bankruptcy Court and the Lender;

(f)     Permitted Sales; and

(g)     pursuant to a Plan of Reorganization;

provided that all Dispositions permitted hereby (other than Dispositions permitted under clause (b)) shall be made at arm's length and for fair value and solely for cash consideration.

**7.06    Restricted Payments**.  Declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except that:

(i)     any Loan Party may pay dividends to the Lead Borrower, and

(ii)     the Loan Parties and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person.

**7.07    Prepayments of Indebtedness.**  Prepay, redeem, purchase, defease or otherwise satisfy any Indebtedness, except (a) as long as no Event of Default then exists or would arise therefrom, regularly scheduled or mandatory repayments, repurchases, redemptions or defeasances of Permitted Indebtedness incurred after the Petition Date, (b) other payments reflected in the Approved Budget or approved by the Lender, (c) Permitted Refinancings of any such Indebtedness and (d) payments of Obligations or Other DIP Obligations.

**7.08    Change in Nature of Business.**

(a)     In the case of the Parent, engage in any business or activity other than (i) the direct or indirect ownership of all outstanding Equity Interests in the other Loan Parties, (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (iv) the execution and delivery of the Loan Documents to which it is a party and the performance of its obligations thereunder, and (v) activities incidental to the businesses or activities described in this Section 7.08(a)(i)-(iv).

(b)     In the case of each of the Loan Parties, engage in any line of business substantially different from the Business conducted by the Loan Parties and their Subsidiaries on the date hereof or any business substantially related or incidental thereto.

**7.09    Transactions with Affiliates.**  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to a transaction between or among the Loan Parties.

**7.10    Burdensome Agreements.**  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to

50

make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Lender; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

**7.11    Use of Proceeds.**  Use the proceeds of any Loan, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) (i) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose, (ii) except as expressly provided in the DIP Order(s), to (w) finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of the Credit Parties or their rights and remedies under this Agreement and the other Loan Documents, including, without limitation, for the payment of any services rendered by the professionals retained by the Borrowers or the Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief (1) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the Liens securing same, (2) for monetary, injunctive or other affirmative relief against any Credit Party or the Collateral, or (3) preventing, hindering or otherwise delaying the exercise by any Credit Party of any rights and remedies under the Loan Documents or applicable Law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the court or otherwise) by any or all of the Credit Parties upon any of the Collateral, (x) make any distribution under a Plan of Reorganization in the Chapter 11 Case; (y) make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other Governmental Authority without the prior written consent of the Lender; (z) to pay any fees or similar amounts to any Person who has proposed or may propose to purchase interests in any Borrower without the prior written consent of the Lender; or (b) for any purposes other than (i) to pay fees, costs and expenses in connection with the transactions contemplated hereby, and to the extent approved by the Bankruptcy Court and as set forth in the DIP Order(s) and in connection with the Chapter 11 Case, (ii) for other payments permitted to be made by the DIP Order(s) and any other order of the Bankruptcy Court, and (iii) for general corporate purposes, in each case to the extent expressly permitted under applicable Law, the Loan Documents, the DIP Order(s), and in accordance with the Approved Budget, subject to Section 6.19.

**7.12    Amendment of Material Documents**.

Amend, modify or waive (a) any of a Loan Party's rights under its Organization Documents in a manner materially adverse to the Credit Parties, or (b) any other Material Indebtedness to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties or otherwise would be reasonably likely to have a Material Adverse Effect.

**7.13    Fiscal Year**.

Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP or by prior written consent of the Lender which consent shall not be unreasonably withheld.

**7.14    Inventory**.

At any time permit the cost of Eligible Inventory to be less than $7,000,000.

**7.15    Bankruptcy Related Negative Covenants**.  Seek, consent to, or permit to exist any of the following:

(a)    Any order which authorizes the rejection or assumption of any Leases of any Loan Party (other than rejection of Leases related to Permitted Store Closings) without the Lender's prior consent, whose consent shall not be unreasonably withheld or delayed;

(b)    Any modification, stay, vacation or amendment to the DIP Order(s) to which the Lender has not consented in writing;

(c)    A priority claim or administrative expense or claim against any Loan Party (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lender in respect of the Obligations, except with respect to the Professional Fee Carve Out and the Other DIP Obligations (and except to the extent any pre-petition liability may have priority solely by virtue of pre-petition Permitted Liens);

(d)    Any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, other than with respect to (i) the Professional Fee Carve Out, (ii) Permitted Encumbrances described in clause (i) of the definition of such term, and (iii) Permitted Encumbrances described in clause (h) of the definition of such term having priority by operation of applicable Law;

(e)    Any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;

(f)    Any order which authorizes the payment of any Indebtedness (other than the payment in full on the Closing Date of the B. Riley Obligations, payments of Indebtedness reflected in the Approved Budget and permitted to be paid under this Agreement, and other payments of Indebtedness approved by the Lender) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien (other than as provided in the DIP Order(s) with respect to Pre-Petition Liabilities becoming Other DIP Obligations); or

(g)    Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

**7.16    Chief Executive Officer**.

In the event that, for any reason, Edmund Thomas shall cease to serve as the chief executive officer of the Lead Borrower with substantially the same authority and duties as exist prior to the date of this Agreement, the Lead Borrower shall fail to appoint a successor to such role acceptable to the Lender in its discretion within five (5) Business Days,

CHI 65672581v5

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01**    **Events of Default.**  If any of the following events ("Events of Default") shall occur:

(a)    the Loan Parties shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)     (i) the Loan Parties shall fail to pay any interest on any Loan payable under this Agreement, when and as the same shall become due and payable, or (ii) the Loan Parties shall fail to pay any fee or any other amount (other than an amount referred to in clause (a) or (b) of this Section 8.01) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable and such failure continues for five (5) days;

(c)    any representation or warranty made or deemed made by or on behalf of any Loan Party in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)    the Loan Parties shall fail to observe or perform any covenant, condition or agreement contained in Sections 6.01(d), 6.01(h), 6.06 (with respect to insurance covering the Collateral), 6.09, 6.18, 6.19, 6.20, 6.21 or in Article VII;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b), (c), or (d) of this Section 8.01), and such failure shall continue unremedied for a period of fifteen (15) days after notice thereof from the Lender to the Lead Borrower;

(f)    except as a result of the commencement of the Chapter 11 Case or unless payment is stayed by the Bankruptcy Court, any Loan Party shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness when and as the same shall become due and payable (after giving effect to the expiration of any grace or cure period set forth therein);

(g)    except as a result of the commencement of the Chapter 11 Case or unless payment is stayed by the Bankruptcy Court, any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (after giving effect to the expiration of any grace or cure period set forth therein) the holder or holders of any such Material Indebtedness or any trustee or agent on its or their behalf to cause any such Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(h)    following the Petition Date, one or more judgments for the payment of money in an aggregate amount in excess of $1,000,000 shall be rendered against any Loan Party or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a

CHI 65672581v5

judgment creditor to attach or levy upon any material assets of any Loan Party to enforce any such judgment;

(i)        following the Petition Date, an ERISA Event shall have occurred that when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of the Loan Parties in an aggregate amount exceeding $500,000;

(j)        any challenge in writing by or on behalf of any Loan Party to the validity of any Loan Document or the applicability or enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto;

(k)        any judicial proceeding by or on behalf of any other Person seeking to challenge the validity of any Loan Document (including, without limitation, the DIP Order(s)) or the applicability or enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto, and the Lender, in its reasonable discretion, has determined in good faith that there is appreciable risk of a Material Adverse Effect on the Credit Parties' ability to receive payment in full of the Obligations, or otherwise would be reasonably likely to have a Material Adverse Effect;

(l)        any Lien purported to be created under any Security Document (including, without limitation, the DIP Order(s)) shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any Collateral, with the priority required by the applicable Security Document, except as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents;

(m)        the occurrence of any uninsured loss to any portion of the Collateral which would reasonably be expected to have a Material Adverse Effect;

(n)        the indictment of, or institution of any legal process or proceeding against, any Loan Party, under any federal, state, municipal, and other civil or criminal statute, rule, regulation, order, or other requirement having the force of law where the relief, penalties, or remedies sought or available include the forfeiture of any material property of any Loan Party and/or the imposition of any stay or other order, the effect of which could reasonably be to restrain in any material way the conduct by the Loan Parties, taken as a whole, of their business in the ordinary course;

(o)        the determination by the Borrowers, whether by vote of the Borrowers' board of directors or otherwise to: (i) suspend the operation of any Borrower's business in the ordinary course, (ii) liquidate all or a material portion of the Borrowers' assets or Stores, or (iii) employ an agent or other third party to conduct any so-called Store closing, Store liquidation or "Going-Out-Of-Business" sales, except in connection with a Permitted Sale or a Plan of Reorganization;

(p)        the occurrence of any Change of Control;

(q)        The entry of an order in the Chapter 11 Case which stays, modifies or reverses the DIP Order(s) or which otherwise materially adversely affects the effectiveness of the DIP Order(s) without the express written consent of the Lender;

CHI 65672581v5

(r)    either (i) the appointment in the Chapter 11 Case of a trustee or of any examiner having expanded powers to operate all or any part of any Loan Party's business, or (ii) the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(s)    Reserved;

(t)    subject to stay relief rights afforded Bank of America, N.A. under the terms of the Other DIP Order, the entry of any order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code which permits any creditor to (i) realize upon, or to exercise any right or remedy with respect to any Collateral, where either the amount of the value of such Collateral exceeds $100,000, or (ii) to terminate any license, franchise, or similar agreement, where such termination would reasonably be likely to have a Material Adverse Effect;

(u)    the filing of any application by any Loan Party without the express prior written consent of the Lender for the approval of any super-priority claim in the Chapter 11 Case which is pari passu with or senior to the priority of the claims of the Lender and other Credit Parties for the Obligations, or there shall arise any such super-priority claim under the Bankruptcy Code;

(v)    the payment or other discharge by any Loan Party of any pre-petition Indebtedness, except as expressly permitted hereunder, under the DIP Order(s), or in the Approved Budget or by order in the Chapter 11 Case to which order the Lender has provided its written consent;

(w)    subject to the rights afforded Bank of America, N.A. under the Other DIP Order, the entry of any order in the Chapter 11 Case which provides adequate protection, or the granting by any Loan Party of similar relief in favor of any one or more of a Loan Party's pre-petition creditors, contrary to the terms and conditions of the DIP Order(s) or the terms hereof;

(x)    the failure of any Loan Party to (i) comply with each and all of the terms and conditions of the DIP Order(s) or (ii) comply in all material respects with any other order entered in the Chapter 11 Case;

(y)    the filing of any motion by any Loan Party seeking, or the entry of any order in the Chapter 11 Case: (i) (A) permitting working capital or other financing (other than ordinary course trade credit, unsecured debt) for any Loan Party from any Person other than the Lender (unless the proceeds of such financing are used to pay all Obligations in full, and the establishment of a reserve account for all indemnification obligations hereunder), (B) granting a Lien on, or security interest in (other than a Permitted Encumbrance) any of the Collateral, other than with respect to this Agreement (unless such Liens are granted in connection with a financing, the proceeds of which are applied to the payment in full of all Obligations and indemnification obligations hereunder), (C) except as permitted by this Agreement and, the DIP Order(s), permitting the use of any of the Collateral pursuant to Section 363(c) of the Bankruptcy Code without the prior written consent of the Lender, (D) permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (E) dismissing the Chapter 11 Case or converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or (ii) the filing of any motion by any party in interest or any Creditors' Committee appointed in the Chapter 11 Case) (x) seeking any of the matters specified in the foregoing clause (i) that is not dismissed or denied within thirty

55

(30) days of the date of the filing of such motion (or such later date agreed to in writing by the Lender) or (y) seeking the reconsideration of the DIP Order(s);

(z)    the filing of a motion by any Loan Party seeking approval of a disclosure statement and a plan of reorganization, or the entry of an order confirming a plan of reorganization, in either case, that is not the Disclosure Statement or the Plan of Reorganization; or

(aa)    the occurrence of a DIP Order Event of Default.

**8.02    Remedies Upon Event of Default.**  If any Event of Default occurs and is continuing, subject to the terms of the DIP Order(s), the Lender may take any or all of the following actions:

(a)    declare the Commitment of the Lender to make Loans to be terminated, whereupon such Commitment and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; and

(c)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, the DIP Order(s), any of the other Loan Documents or Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties.

In addition to the exercise by the Lender of any or all of its rights and remedies after the occurrence and during the continuance of an Event of Default, the Lender may require, and upon request by the Lender the Borrowers shall, undertake to Liquidate the Collateral on behalf of the Lender in such manner as the Lender may require.  Such Liquidation may be effected through a partial or chain-wide store closing sale in a manner consistent with the foregoing enumeration of the Lender's rights and remedies, and as otherwise permitted by the Bankruptcy Court.  The Lender and the Borrowers shall endeavor to implement such a Liquidation on mutually acceptable terms and conditions.  However, the Lender may by written notice to the Lead Borrower require the Borrowers to:

(d)    File a motion seeking to retain one or more nationally recognized professional retail inventory liquidation agents reasonably acceptable to the Lender to sell, lease, or otherwise dispose of the Collateral on terms acceptable to the Lender.

(e)    File a motion or motions seeking to sell or otherwise dispose of any or all of the Real Estate pursuant to Section 363 of the Bankruptcy Code, on terms acceptable to the Lender.

(f)    File a motion or motions seeking to sell, assume, assign, or otherwise dispose of any or all of the Leases pursuant to Sections 363 and 365 of the Bankruptcy Code, on terms acceptable to the Lender.

CHI 65672581v5

The Borrowers shall file such motion(s) within five (5) Business Days of the Lender's request and shall diligently prosecute such motion(s).  If the Borrowers fail to so file or diligently prosecute the motion(s), the Lender may file and prosecute such motion(s) in the name of the Borrowers.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**8.03     Application of Funds.**  After the exercise of remedies provided for in Section 8.02, any amounts received on account of the Obligations shall be applied by the Lender in the following order:

First, to payment of accrued and unpaid Professional Fees and Expenses up to an aggregate amount not to exceed the Professional Fee Carve Out;

Second, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Lender and amounts payable under Article III) payable to the Lender;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations, and fees, ratably between the Lender in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably between the Lender in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations as provided in Section 9.04(b)), ratably among the Credit Parties in proportion to the respective amounts described in this clause Fifth held by them;

Sixth, to be retained by the Lender as a reserve account for all indemnification obligations hereunder; and

Last, the balance, if any, after Satisfaction of the Obligations, to the Loan Parties or as otherwise required by Law.

## ARTICLE IX
## MISCELLANEOUS

**9.01     Amendments.**  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Lender and the Lead Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**9.02     Notices; Effectiveness; Electronic Communications**.

(a)     Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or

overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 9.02.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)    Electronic Communications.  Notices and other communications to the Lender hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Lender.  The Lender or the Lead Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Lender otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    Change of Address.  Each of the Loan Parties, the Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.

(d)    Reliance by Lender.  The Lender shall be entitled to rely and act upon any notices (including telephonic Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.  All telephonic notices to and other telephonic communications with the Lender may be recorded by the Lender, and each of the parties hereto hereby consents to such recording.

**9.03    No Waiver; Cumulative Remedies.**  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.  Without limiting the generality of the foregoing, the making of a Loan shall

58

not be construed as a waiver of any Default, regardless of whether any Credit Party may have had notice or knowledge of such Default at the time.

       **9.04**    **Expenses; Indemnity; Damage Waiver**.

       (a)    <u>Costs and Expenses</u>.  The Borrowers shall pay all reasonable documented out-of-pocket expenses incurred by the Lender and its Affiliates, in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Lender, (B) outside consultants for the Lender, (C) appraisers, (D) commercial finance examiners, and (E) all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (B) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral or in connection with the Chapter 11 Case or any successor case, or (C) any workout, restructuring or negotiations in respect of any Obligations.

       (b)    <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Lender (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Lender (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by a Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrowers or such Loan Party has obtained a final and non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

       (c)    <u>Waiver of Consequential Damages.</u>  To the fullest extent permitted by Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages)

arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(d)    <u>Payments</u>.  All amounts due under this Section shall be payable on demand therefor.

(e)    <u>Survival</u>.  The agreements in this Section shall survive the assignment of any Commitment or Loan by the Lender, the termination of the Commitment hereunder and the repayment, satisfaction or discharge of all the other Obligations.

**9.05    Payments Set Aside.**  To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its reasonable discretion) to be repaid to a trustee, receiver or any other party, in connection with the Chapter 11 Case or any successor case or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

**9.06    Successors and Assigns**.

(a)    <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Lender.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (c) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lender</u>.  The Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans with the prior consent of the Lead Borrower, such consent not be unreasonably withheld or delayed (provided that no such consent will be required after the occurrence and continuation of an Event of Default).  From and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u>, and <u>9.04</u> with respect to facts and circumstances occurring prior to the effective date

60

of such assignment.  Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender.

(c)    <u>Participations</u>.  The Lender may at any time, without the consent of, or notice to, the Loan Parties, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "<u>Participant</u>") in all or a portion of the Lender's rights and/or obligations under this Agreement owing to it); <u>provided</u> that (i) the Lender's obligations under this Agreement shall remain unchanged, (ii) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Lender shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any Participant shall agree in writing to comply with all confidentiality obligations set forth in <u>Section 9.07</u> as if such Participant was the Lender hereunder. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.04, and 3.01 (subject to the requirements and limitations therein, to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; <u>provided</u> that such Participant shall not be entitled to receive any greater payment under Sections 3.04 or 3.01, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section *9.08* as though it were a Lender. If the Lender sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "<u>Participant Register</u>"); <u>provided</u> that the Lender shall not have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d)    <u>Certain Pledges</u>.  The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of the Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u> that no such pledge or assignment shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

(e)    <u>Electronic Execution of Assignments</u>.   The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**9.07    Treatment of Certain Information; Confidentiality.**  Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, Approved Funds, and to its and its Affiliates' and Approved Funds'

respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Lead Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof, provided that, in the case of information received from any Loan Party or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with Law, including federal and state securities Laws.

**9.08    Right of Setoff.**  If an Event of Default shall have occurred and be continuing or if the Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, the Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) or other property at any time held and other obligations (in whatever currency) at any time owing by the Lender or any such Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to the Lender, regardless of the adequacy of the Collateral, and irrespective of whether or not the Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of the Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of the Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that the Lender or its Affiliates may have.  The Lender agrees to notify the Lead Borrower promptly after any such setoff and application, <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

**9.09    Interest Rate Limitation.**  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the

maximum rate of non-usurious interest permitted by Law (the "Maximum Rate"). If the Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, such Person may, to the extent permitted by Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**9.10    Counterparts; Integration; Effectiveness.** This Agreement may be executed in any number of counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. This Agreement and all other documents (including, without limitation, the Loan Documents) which have been or may be hereinafter furnished by the Loan Parties to any of the Credit Parties may be reproduced by the Credit Parties by any photographic, microfilm, xerographic, digital imaging, or other process. Any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business). Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**9.11    Survival.** All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied. Further, the provisions of Sections 3.01, 3.04 and 9.04 shall survive and remain in full force and effect regardless of the repayment of the Obligations, and the Commitment or the termination of this Agreement or any provision hereof. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Lender may require such indemnities and collateral security as it shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, and (y) any Obligations that may thereafter arise under Section 9.04 hereof.

**9.12    Severability.** If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

63

**9.13    Governing Law; Jurisdiction**.

(a)    GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE BANKRUPTCY CODE AND THE LAWS OF THE STATE OF NEW YORK.

(b)    SUBMISSION TO JURISDICTION.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND OF ANY COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT, SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  SUBJECT TO SECTION 9.13(e), NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    ACTIONS COMMENCED BY LOAN PARTIES.  EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN THE BANKRUPTCY COURT, A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR ANY FEDERAL COURT SITTING THEREIN AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**9.14    Waiver of Jury Trial.**  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT

MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND WHETHER INITIATED BY OR AGAINST ANY SUCH PERSON OR IN WHICH ANY SUCH PERSON IS JOINED AS A PARTY LITIGANT). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**9.15    No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, the each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**9.16    Patriot Act Notice.**  The Lender hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow the Lender to identify each Loan Party in accordance with the Patriot Act. Each Loan Party is in compliance, in all material respects, with the Patriot Act.  No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in

violation of the United States Foreign Corrupt Practices Act of 1977, as amended. The Loan Parties shall, promptly following a request by the Lender, provide all documentation and other information that the Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

**9.17    Foreign Asset Control Regulations.**  Neither of the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Patriot Act. Furthermore, none of the Borrowers or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**9.18    Time of the Essence.**  Time is of the essence of the Loan Documents.

**9.19    Press Releases.**  Each Loan Party consents to the publication by the Lender of advertising material relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo or trademark. The Lender shall provide a draft reasonably in advance of any advertising material to the Lead Borrower for review and comment prior to the publication thereof. The Lender reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

**9.20    Additional Waivers.**

(a)    The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Lender or any other Credit Party.

(b)    The Obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations after the termination of the Commitment hereunder), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Lender or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any

66

Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Commitment hereunder).

(c)     To the fullest extent permitted by Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Commitment hereunder. The Lender may, at its election, foreclose on any security held by it by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to it against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder (except if such results in Satisfaction of the Obligations) and the Commitment hereunder has been terminated.  Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)     Each Loan Party is obligated to repay the Obligations as joint and several obligors under this Agreement.  Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations and the termination of the Commitment hereunder. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness.  If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Lender to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.  Subject to the foregoing, to the extent that any Loan Party shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower, then the Loan Party making such payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers.

### 9.21    No Strict Construction.

The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

### 9.22    Attachments.

The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

67

**9.23    Reserved.**

**9.24    Relationship with DIP Order(s).**

In the event of any inconsistency between the terms of the DIP Order(s) and the Loan Documents, the terms of the DIP Order(s) shall control and the representations, warranties, covenants, agreements or events of default made herein and in the other Loan Documents shall be subject to any express, contrary terms of the DIP Order(s).

**ARTICLE X**
**GUARANTEE**

**10.01    The Facility Guaranty.**

Each Guarantor irrevocably and unconditionally guaranties, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, the due and punctual payment when due (whether at the stated maturity, by required prepayment, by acceleration or otherwise) and performance by the Borrowers of all Obligations (collectively, the "Guaranteed Obligations"), including all such Guaranteed Obligations which shall become due but for the operation of any Debtor Relief Law.  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice to or further assent from it, and that it will remain bound upon this Facility Guaranty notwithstanding any extension or renewal of any Guaranteed Obligation.

**10.02    Guaranteed Obligations Not Affected.**

To the fullest extent permitted by applicable Law, each Guarantor waives presentment to, demand of payment from, and protest to, any Loan Party of any of the Guaranteed Obligations, and also waives notice of acceptance of this Facility Guaranty, notice of protest for nonpayment and all other notices of any kind.  To the fullest extent permitted by applicable Law, the obligations of each Guarantor hereunder shall not be affected by (a) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any Loan Party under the provisions of this Agreement, any other Loan Document or otherwise or against any other party with respect to any of the Guaranteed Obligations, (b) any rescission, waiver, amendment or modification of, or any release from, any of the terms or provisions of this Facility Guaranty, any other Loan Document or any other agreement, with respect to any Loan Party or with respect to the Guaranteed Obligations, (c) the failure to perfect any security interest in, or the release of, any of the Collateral held by or on behalf of any Credit Party, or (d) the lack of legal existence of any Loan Party or legal obligation to discharge any of the Guaranteed Obligations by any Loan Party for any reason whatsoever, including, without limitation, in connection with any Debtor Relief Laws.

**10.03    Security.**

Each Guarantor hereby acknowledges and agrees that each of Credit Parties may (a) take and hold security for the payment of this Facility Guaranty and the Guaranteed Obligations and exchange, enforce, waive and release any such security, (b) apply such security and direct the order or manner of sale thereof as they in their sole discretion may determine, and (c) release or substitute any one or more endorsees, the Borrowers, other Loan Parties or other obligors, in each case without affecting or impairing in any way the liability of any Guarantor hereunder.

68

**10.04   Guarantee of Payment.**

Each Guarantor further agrees that this Facility Guaranty constitutes a guarantee of payment and performance when due of all Guaranteed Obligations and not of collection and, to the fullest extent permitted by applicable Law, waives any right to require that any resort be had by any Credit Party to any of the Collateral or other security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of any Credit Party in favor of any Loan Party or any other Person or to any other guarantor of all or part of the Guaranteed Obligations. Any payment required to be made by any Guarantor hereunder may be required by any Credit Party on any number of occasions and shall be payable to the Lender, for the benefit of any Credit Party, in the manner provided in this Agreement.

**10.05   No Discharge or Diminishment of Guarantee.**

The obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including any claim of waiver, release, surrender, alteration or compromise of any of the Guaranteed Obligations, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the Guaranteed Obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by the failure of any Credit Party to assert any claim or demand or to enforce any remedy under this Facility Guaranty, this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, by any default, failure or delay, willful or otherwise, in the performance of any of the Guaranteed Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

**10.06   Defenses of Loan Parties Waived.**

To the fullest extent permitted by applicable Law, each Guarantor waives any defense based on or arising out of any defense of any Loan Party or the unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any Loan Party, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Each Guarantor hereby acknowledges that the Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Loan Party, or exercise any other right or remedy available to them against any Loan Party, without affecting or impairing in any way the liability of each such Guarantor hereunder (except if such results in Satisfaction of the Obligations). Pursuant to, and to the extent permitted by, applicable Law, each Guarantor waives any defense arising out of any such election and waives any benefit of and right to participate in any such foreclosure action, even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement, indemnity, contribution or subrogation or other right or remedy of such Guarantor against any Loan Party, as the case may be, or any security. Each Guarantor agrees that it shall not assert any claim in competition with any Credit Party in respect of any payment made hereunder in connection with any proceedings under any Debtor Relief Laws.

69

**10.07    Agreement to Pay; Subordination.**

In furtherance of the foregoing and not in limitation of any other right that any Credit Party has at law or in equity against any Guarantor by virtue hereof, upon the failure of any Loan Party to pay any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each Guarantor hereby promises to and will forthwith pay, or cause to be paid, to any Credit Party as designated thereby in cash the amount of such unpaid Guaranteed Obligations.  Upon payment by any Guarantor of any sums to any Agent or any other Credit Party as provided above, all rights of such Guarantor against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Guaranteed Obligations.  In addition, any indebtedness of any Borrower or any other Loan Party now or hereafter held by any Guarantor is hereby subordinated in right of payment to the prior payment in full of all of the Guaranteed Obligations.  Notwithstanding the foregoing, prior to the occurrence of an Event of Default, any Borrower or any other Loan Party may make payments to any Guarantor on account of any such indebtedness.  After the occurrence and during the continuance of an Event of Default, no Guarantor will demand, sue for, or otherwise attempt to collect any such indebtedness until Satisfaction of the Obligations.  If any amount shall erroneously be paid to any Guarantor on account of (a) such subrogation, contribution, reimbursement, indemnity or similar right or (b) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Credit Party to be credited against the payment of the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of this Agreement.

**10.08    Limitation on Guarantee of Guaranteed Obligations.**

In any action or proceeding with respect to any Guarantor involving any state corporate law, the Bankruptcy Code of the United States or any other Debtor Relief Law, if the obligations of such Guarantor under Section 10.01 hereof would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under said Section 10.01, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Credit Party, or any other Person, be automatically limited and reduced to the highest amount which is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

*[signature pages follow]*

70

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**THE WET SEAL, INC.**, as Lead Borrower, as a Borrower and as a Debtor-in-Possession


By: _____

Name: _____

Title: _____


**THE WET SEAL RETAIL, INC.**, as a Borrower and as a Debtor-in-Possession


By: _____

Name: _____

Title: _____


**WET SEAL CATALOG, INC.**, as a Borrower and as a Debtor-in-Possession


By: _____

Name: _____

Title: _____


**WET SEAL GC, LLC**, as a Guarantor and as a Debtor-in-Possession


By:    The Wet Seal, Inc., its Sole Member

By:     _____

Name:   _____

Title:  _____

Signature Page to DIP Credit Agreement

MADOR LENDING, LLC, as the Lender

By: _____

Name:

Title:

**Exhibit 2**

SECURITY AGREEMENT

by

THE WET SEAL, INC.,
as the Lead Borrower, as a Debtor and as a Debtor-in-Possession

and

THE OTHER BORROWERS AND GUARANTORS PARTY HERETO
FROM TIME TO TIME, as Debtors and Debtors-in-Possession

and

MADOR LENDING, LLC,
as Lender,

Dated as of March 5, 2015

TABLE OF CONTENTS

Page

PREAMBLE ......................................................................................................... 1

RECITALS ........................................................................................................... 1

AGREEMENT ...................................................................................................... 2

ARTICLE I

DEFINITIONS AND INTERPRETATION

SECTION 1.1.    Definitions ........................................................................... 2
SECTION 1.2.    Interpretation ........................................................................ 5

ARTICLE II

GRANT OF SECURITY AND SECURED OBLIGATIONS

SECTION 2.1.    Pledge; Grant of Security Interest ....................................... 6
SECTION 2.2.    Secured Obligations ............................................................ 7
SECTION 2.3.    Security Interest .................................................................. 7

ARTICLE III

PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES;
USE OF COLLATERAL

SECTION 3.1.    Delivery of Certificated Securities Collateral ...................... 8
SECTION 3.2.    Perfection of Uncertificated Securities Collateral ................ 8
SECTION 3.3.    Maintenance of Perfected Security Interest .......................... 9
SECTION 3.4.    Other Actions ...................................................................... 9
SECTION 3.5.    Supplements; Further Assurances ...................................... 12

ARTICLE IV

REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 4.1.    Title .................................................................................. 13
SECTION 4.2.    Limitation on Liens; Defense of Claims; Transferability of
                Collateral ........................................................................... 13
SECTION 4.3.    Chief Executive Office; Change of Name; Jurisdiction of
                Organization ...................................................................... 13
SECTION 4.4.    Due Authorization and Issuance .......................................... 13

-i-

SECTION 4.5.    No Conflicts, Consents, etc ................................................................14
SECTION 4.6.    Collateral ...........................................................................................14
SECTION 4.7.    Insurance ............................................................................................14
SECTION 4.8.    Payment of Taxes; Compliance with Laws; Contested Liens;
                Claims ................................................................................................15

# ARTICLE V

## CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL

SECTION 5.1.    Pledge of Additional Securities Collateral ..............................................15
SECTION 5.2.    Voting Rights; Distributions; etc. ........................................................15
SECTION 5.3.    Organization Documents .......................................................................16
SECTION 5.4.    Defaults, Etc .......................................................................................16
SECTION 5.5.    Certain Agreements of Grantors As Issuers and Holders of Equity
                Interests ..............................................................................................16

# ARTICLE VI

## CERTAIN PROVISIONS CONCERNING INTELLECTUAL PROPERTY COLLATERAL

SECTION 6.1.    Registrations .......................................................................................17
SECTION 6.2.    No Violations or Proceedings ...............................................................17
SECTION 6.3.    Protection of Lender's Security ............................................................17
SECTION 6.4.    After-Acquired Property .......................................................................18
SECTION 6.5.    Modifications .......................................................................................18
SECTION 6.6.    Litigation .............................................................................................19

# ARTICLE VII

## CERTAIN PROVISIONS CONCERNING

## CREDIT CARD RECEIVABLES AND ACCOUNTS

SECTION 7.1.    Special Representations and Warranties .................................................19
SECTION 7.2.    Maintenance of Records .......................................................................19
SECTION 7.3.    Legend .................................................................................................20
SECTION 7.4.    Modification of Terms, Etc ...................................................................20
SECTION 7.5.    Collection .............................................................................................20

754025.02-LACSR02A - MSW
*CHI 65672578v2*

Page

## ARTICLE VIII

## REMEDIES

SECTION 8.1.    Remedies ................................................................................21
SECTION 8.2.    Notice of Sale ..........................................................................23
SECTION 8.3.    Waiver of Notice and Claims....................................................23
SECTION 8.4.    Certain Sales of Collateral .......................................................23
SECTION 8.5.    No Waiver; Cumulative Remedies. ...........................................24
SECTION 8.6.    Certain Additional Actions Regarding Intellectual Property....25
SECTION 8.7.    Application of Proceeds ...........................................................25
SECTION 8.8.    Grant of License; Use of Assets................................................25

## ARTICLE IX

## MISCELLANEOUS

SECTION 9.1.    Concerning Lender....................................................................25
SECTION 9.2.    Lender May Perform; Lender Appointed Attorney-in-Fact.....26
SECTION 9.3.    Expenses ..................................................................................27
SECTION 9.4.    Continuing Security Interest; Assignment ...............................27
SECTION 9.5.    Termination ..............................................................................27
SECTION 9.6.    Modification in Writing ............................................................28
SECTION 9.7.    Notices .....................................................................................28
SECTION 9.8.    GOVERNING LAW..................................................................28
SECTION 9.9.    CONSENT TO JURISDICTION; SERVICE OF PROCESS;
                WAIVER OF JURY TRIAL...............................................28
SECTION 9.10.   Severability of Provisions ........................................................30
SECTION 9.11.   Execution in Counterparts; Effectiveness ...............................30
SECTION 9.12.   No Release ................................................................................30
SECTION 9.13.   Obligations Absolute ...............................................................30
SECTION 9.14.   Pre-Petition Cash Collateral Account. ....................................31
SECTION 9.15.   Conflicts between Security Agreement and DIP Order(s).......31

SIGNATURES                                                              S-1

-iii-

EXHIBIT 1          Form of Securities Pledge Amendment
SCHEDULE I         Intercompany Notes
SCHEDULE II        Intellectual Property
SCHEDULE III       Pledged Interests
SCHEDULE IV        Commercial Tort Claims
SCHEDULE V         Instruments and Chattel Paper
SCHEDULE VI        Securities Accounts
SCHEDULE VII       Organizational Information

754025.02-LACSR02A - MSW
*CHI 65672578v2*

# SECURITY AGREEMENT

SECURITY AGREEMENT dated as of March 5, 2015 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "Security Agreement") made by (i) THE WET SEAL, INC., a Delaware corporation, as lead borrower for itself and the other Borrowers, each as a debtor and debtor-in-possession (the "Lead Borrower"), (ii) THE OTHER BORROWERS LISTED ON THE SIGNATURE PAGES HERETO, each as a debtor and debtor-in-possession (together with the Lead Borrower, the "Original Borrowers") OR FROM TIME TO TIME PARTY HERETO BY EXECUTION OF A JOINDER AGREEMENT, each as a debtor and debtor-in-possession (the "Additional Borrowers," and together with the Original Borrowers, the "Borrowers"), and (iii) THE GUARANTORS LISTED ON THE SIGNATURE PAGES HERETO, each as a debtor and debtor-in-possession (the "Original Guarantors") AND THE OTHER GUARANTORS FROM TIME TO TIME PARTY HERETO BY EXECUTION OF A JOINDER AGREEMENT, as Debtors and Debtors-in-Possession (the "Additional Guarantors," and together with the Original Guarantor, the "Guarantors"), as pledgors, assignors and debtors (the Borrowers, together with the Guarantors, in such capacities and together with any successors in such capacities, the "Grantors," and each, a "Grantor"), in favor of MADOR LENDING, LLC, as pledgee, assignee and secured party (in such capacities and together with any successors in such capacities, the "Lender").

## R E C I T A L S:

A.    On January 15, 2015, the Borrowers and the Guarantors commenced Case Nos. 15-10081, 15-10082, 15-10083, and 15-10084 (collectively, the "Bankruptcy Case") by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Borrowers and Guarantors continue to operate their business and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.    The Borrowers, the Guarantors and the Lender, among others, have, in connection with the execution and delivery of this Security Agreement, entered into that certain Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

C.    The Borrowers and the Guarantors will receive substantial benefits from the execution, delivery and performance of the Obligations and each is, therefore, willing to enter into this Security Agreement.

D.    This Security Agreement is given by each Grantor in favor of the Lender for the benefit of the Credit Parties to secure the payment and performance of all of the Secured Obligations (as hereinafter defined).

E.    It is a condition to the obligations of the Lender to make loans under the Credit Agreement under the Credit Agreement that each Grantor execute and deliver the applicable Loan Documents, including this Security Agreement.

A G R E E M E N T:

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor and the Lender hereby agree as follows:

ARTICLE I

DEFINITIONS AND INTERPRETATION

SECTION 1.1.    Definitions.  Unless otherwise defined herein or in the Credit Agreement, capitalized terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC.

(b)    Capitalized terms used but not otherwise defined herein that are defined in the Credit Agreement shall have the meanings given to them in the Credit Agreement.

(c)    The following terms shall have the following meanings:

"Additional Guarantors" shall have the meaning assigned to such term in the Preamble hereof.

"Borrowers" shall have the meaning assigned to such term in the Preamble hereof.

"Claims" shall mean any and all property taxes and other taxes, assessments and special assessments, levies, fees and all governmental charges imposed upon or assessed against, and all claims (including, without limitation, landlords', carriers', mechanics', workmen's, repairmen's, laborers', materialmen's, suppliers' and warehousemen's Liens and other claims arising by operation of Law) against, all or any portion of the Collateral.

"Collateral" shall have the meaning assigned to such term in SECTION 2.1 hereof.

"Control" shall mean in the case of any security entitlement, "control," as such term is defined in Section 8-106 of the UCC.

"Control Agreements" shall mean, collectively, the Blocked Account Agreements and the Securities Account Control Agreements.

2

"Copyrights" shall mean, collectively, with respect to each Grantor, all copyrights (whether statutory or common Law, whether established or registered in the United States or any other country or any political subdivision thereof whether registered or unregistered and whether *published* or unpublished) and all copyright registrations and applications made by such Grantor, in each case, whether now owned or hereafter created or acquired by or assigned to such Grantor, including, without limitation, the registrations and applications listed on Schedule II hereto, together with any and all (i) rights and privileges arising under applicable Law with respect to such Grantor's use of such copyrights, (ii) reissues, renewals, continuations and extensions thereof, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

"Credit Agreement" shall have the meaning assigned to such term in Recital B hereof.

"Distributions" shall mean, collectively, with respect to each Grantor, all Restricted Payments from time to time received, receivable or otherwise distributed to such Grantor in respect of or in exchange for any or all of the Pledged Securities or Intercompany Notes.

"Goodwill" shall mean, collectively, with respect to each Grantor, the goodwill connected with such Grantor's business including, without limitation, (i) all goodwill connected with the use of and symbolized by any of the Intellectual Property Collateral in which such Grantor has any interest, (ii) all know-how, trade secrets, customer and supplier lists, proprietary information, inventions, methods, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclosure thereof by any Person, pricing and cost information, business and marketing plans and proposals, consulting agreements, engineering contracts and such other assets which relate to such goodwill and (iii) all product lines of such Grantor's business.

"Grantor" shall have the meaning assigned to such term in the Preamble hereof.

"Guaranteed Obligations" shall have the meaning assigned to such term in the Guaranty.

"Guarantors" shall have the meaning assigned to such term in the Preamble hereof.

"Guaranty" shall have the meaning assigned to term "Facility Guaranty" in the Credit Agreement.

"Intellectual Property Collateral" shall mean, collectively, the Patents, Trademarks, Copyrights, Licenses and Goodwill.

3

"Intercompany Notes" shall mean, with respect to each Grantor, all intercompany notes described on Schedule I hereto and each intercompany note hereafter acquired by such Grantor and all certificates, instruments or agreements evidencing such intercompany notes, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereof to the extent permitted pursuant to the terms hereof.

"Lead Borrower" shall have the meaning assigned to such term in the Preamble hereof.

"Lender" shall have the meaning assigned to such term in the Preamble hereof.

"Letters of Credit" unless the context otherwise requires, shall have the meaning given to such term in the UCC.

"Licenses" shall mean, collectively, with respect to each Grantor, all license and distribution agreements with any other Person with respect to any Patent, Trademark or Copyright or any other patent, trademark or copyright, whether such Grantor is a licensor or licensee, distributor or distributee under any such license or distribution agreement, together with any and all (i) renewals, extensions, supplements and continuations thereof, (ii) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder and with respect thereto including, without limitation, damages and payments for past, present or future infringements or violations thereof, (iii) rights to sue for past, present and future infringements or violations thereof and (iv) other rights to use, exploit or practice any or all of the Patents, Trademarks or Copyrights or any other patent, trademark or copyright.

"Patents" shall mean, collectively, with respect to each Grantor, all patents issued or assigned to and all patent applications made by such Grantor (whether established or registered or recorded in the United States or any other country or any political subdivision thereof), including, without limitation, those patents, patent applications listed on Schedule II hereto, together with any and all (i) rights and privileges arising under applicable Law with respect to such Grantor's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including, without limitation, damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

"Pledged Interests" shall mean, collectively, with respect to each Grantor, all Equity Interests in any issuer now existing or hereafter acquired or formed, including, without limitation, all Equity Interests of such issuer described in Schedule III hereof and all Equity Interests in any successor corporation or interests or certificates of any successor limited liability company, partnership or other entity owned by such Grantor formed by or resulting from any consolidation, merger or amalgamation in which any Person listed on Schedule VII hereof is not the surviving entity, together with all rights, privileges, authority and powers of such Grantor relating to such Equity Interests issued by any such issuer or any such successor Person under the

4

Organization Documents of any such issuer or any such successor Person, and the certificates, instruments and agreements representing such Equity Interests and any and all interest of such Grantor in the entries on the books of any financial intermediary pertaining to such Equity Interests, from time to time acquired by such Grantor in any manner, and all other Investment Property owned by such Grantor.

"Secured Obligations" shall mean the Obligations (as defined in the Credit Agreement) and the Guaranteed Obligations.

"Securities Account Control Agreement" means with respect to a Securities Account established by a Grantor, an agreement, in form and substance satisfactory to the Lender, establishing Control of such Securities Account by the Lender and whereby the Securities Intermediary maintaining such Securities Account agrees, upon notice received by such Securities Intermediary from the Lender, to comply only with the instructions originated by the Lender without the further consent of any Grantor.

"Securities Act" means the Securities Exchange Act of 1934 and the applicable regulations promulgated by the Securities and Exchange Commission pursuant to such Act.

"Securities Collateral" shall mean, collectively, the Pledged Interests, the Intercompany Notes and the Distributions.

"Security Agreement" shall have the meaning assigned to such in the Preamble hereof.

"Trademarks" shall mean, collectively, with respect to each Grantor, all trademarks (including service marks), slogans, logos, certification marks, trade dress, uniform resource locations (URLs), domain names, corporate names and trade names, whether registered or unregistered, owned by or assigned to such Grantor and all registrations and applications for the foregoing (whether statutory or common Law and whether established or registered in the United States or any other country or any political subdivision thereof), including, without limitation, the registrations and applications listed on Schedule II hereto, together with any and all (i) rights and privileges arising under applicable Law with respect to such Grantor's use of any trademarks, (ii) reissues, continuations, extensions and renewals thereof, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including, without limitation, damages, claims and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present and future infringements thereof.

SECTION 1.2.    Interpretation.  The rules of interpretation specified in Article I of the Credit Agreement shall be applicable to this Security Agreement.

754025.02-LACSR02A - MSW
*CHI 65672578v2*

## ARTICLE II

## GRANT OF SECURITY AND SECURED OBLIGATIONS

SECTION 2.1.    Pledge; Grant of Security Interest.  As collateral security for the payment and performance in full of all the Secured Obligations, subject to the DIP Order(s), each Grantor hereby pledges and grants to the Lender for its benefit and for the benefit of the other Credit Parties a lien on and security interest in and to all of the right, title and interest of such Grantor in, to and under all personal property and interests in such personal property, wherever located, and whether now existing or hereafter arising or acquired from time to time (collectively, the "Collateral"), including, without limitation:

(i)      all Accounts;

(ii)     all Goods, including Equipment, Inventory and Fixtures;

(iii)    all Documents, Instruments and Chattel Paper;

(iv)     all Letters of Credit and Letter-of-Credit Rights;

(v)      all Securities Collateral;

(vi)     all Investment Property;

(vii)    all Intellectual Property Collateral;

(viii)   all Commercial Tort Claims, including, without limitation, those described on Schedule IV hereto;

(ix)     all General Intangibles, including, without limitation, all Credit Card Receivables;

(x)      all Deposit Accounts;

(xi)     all Supporting Obligations;

(xii)    all books and records relating to the Collateral;

(xiii)   Bankruptcy Recoveries, but only: (A) the full amount of any such recovery or settlement thereof to the extent arising under section 549 of the Bankruptcy Code, and (B) all amounts necessary to reimburse the Lender for the amount of the Professional Fee Carve Out, if any, used to finance the pursuit of such recovery or settlement with respect to all Bankruptcy Recoveries ((A) and (B) being hereinafter defined as the "Specified Bankruptcy Recoveries");

(xiv)    all owned real estate of the Grantors, all proceeds from the disposition of real estate, and all proceeds from the disposition of real estate leases (including, without limitation, all non-residential real property leases); provided that, with respect to the Grantors' non-residential real property Leases, and notwithstanding anything to the contrary in the DIP Order(s) or any Loan Document, no Liens or encumbrances shall be granted on or extend to the Grantors' real property Leases themselves, but rather, any such Liens granted shall extend only to the proceeds realized upon the sale, assignment, termination, or other disposition of such real property lease(s); and

(xv)    to the extent not covered by the foregoing clauses (i) through (xiv), all other personal property of such Grantor, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing.

Notwithstanding anything to the contrary contained in clauses (i) through (xv) above, the security interest created by this Security Agreement shall not extend to, and the term "Collateral" shall not include, any Bankruptcy Recoveries other than Specified Bankruptcy Recoveries. Additionally, notwithstanding anything to the contrary contained in clauses (i) through (xv) above, the security interests created by this Security Agreement shall be subject in all respects to the BofA Interests (as defined in the DIP Order(s)) in the DIP L/C Collateral.

SECTION 2.2.    Secured Obligations. This Security Agreement secures, and the Collateral is collateral security for, the payment and performance in full when due of the Secured Obligations.

SECTION 2.3.    Security Interest.

(a)  Each Grantor hereby irrevocably authorizes the Lender at any time and from time to time to authenticate and file in any relevant jurisdiction any financing statements (including fixture filings) and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including, without limitation, (i) whether such Grantor is an organization, the type of organization and any organizational identification number issued to such Grantor, (ii) a description of the Collateral as "all assets of the Grantor, wherever located, whether now owned or hereafter acquired" and (iii) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which such Collateral relates. Each Grantor agrees to provide all information described in the immediately preceding sentence to the Lender promptly upon request.

(b)    Each Grantor hereby ratifies its prior authorization for the Lender to file in any relevant jurisdiction any financing statements or amendments thereto relating to the Collateral if filed prior to the date hereof.

7

(c)     Each Grantor hereby further authorizes the Lender to file filings with the United States Patent and Trademark Office and United States Copyright Office (or any successor office or any similar office in any other country) or other necessary documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by such Grantor hereunder in any Intellectual Property Collateral, without the signature of such Grantor, and naming such Grantor, as debtor, and the Lender, as secured party.

ARTICLE III

PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES;
USE OF COLLATERAL

SECTION 3.1.    Delivery of Certificated Securities Collateral.  Each Grantor hereby agrees that all certificates, agreements or instruments representing or evidencing Securities Collateral acquired by such Grantor on or prior to the date hereof, shall be delivered to and held by or on behalf of the Lender pursuant hereto no later than the entry of the Borrowing Order. Each Grantor hereby agrees that all certificates, agreements or instruments representing or evidencing Securities Collateral acquired by such Grantor after the date hereof, shall promptly (and in any event within seven (7) Business Days) upon receipt thereof by such Grantor be delivered to and held by or on behalf of the Lender pursuant hereto.  All certificated Securities Collateral shall be in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Lender.  The Lender shall have the right, at any time upon the occurrence and during the continuance of any Event of Default and subject to the DIP Order(s), to endorse, assign or otherwise transfer to or to register in the name of the Lender or any of its nominees or endorse for negotiation any or all of the Securities Collateral, without any indication that such Securities Collateral is subject to the security interest hereunder.  In addition, the Lender shall have the right with written notice to exchange certificates representing or evidencing Securities Collateral for certificates of smaller or larger denominations, accompanied by instruments of transfer or assignment and letters of direction duly executed in blank.

SECTION 3.2.    Perfection of Uncertificated Securities Collateral.  Each Grantor hereby agrees that if any of the Pledged Interests are at any time not evidenced by certificates of ownership, then each applicable Grantor shall, to the extent permitted by applicable Law and upon the request of the Lender, cause such pledge to be recorded on the equityholder register or the books of the issuer, execute customary pledge forms or other documents necessary or reasonably requested to complete the pledge and give the Lender the right to transfer such Pledged Interests under the terms hereof.  Each Grantor hereby agrees that it will not permit any of the Pledged Interests that do not constitute "securities" (as defined in the UCC) to at any time become "securities" (as defined in the UCC) unless, concurrently with such conversion, such Grantor shall promptly notify the Lender thereof, cause such Pledged Interests to become evidenced by certificates of ownership, and endorse, assign and deliver the same to the Lender,

8

accompanied by such instruments of transfer or assignment duly executed in blank, all in form and substance reasonably satisfactory to the Lender.

SECTION 3.3.    Maintenance of Perfected Security Interest.    Each Grantor represents and warrants that, effective immediately upon the entry of the Borrowing Order, the Lender will have a priming first priority, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interest and Lien, senior and superior in priority to all other secured and unsecured creditors of the Grantors' estates (except with respect to the except, with respect to the rights of Bank of America, as set forth in the Sale Order, Professional Fee Carve Out and as may otherwise be provided in the DIP Order(s)), in, upon and to all of the Collateral securing the payment and performance of the Secured Obligations.  Upon the entry of the Borrowing Order, the Liens which secure the Secured Obligations shall constitute first priority Liens pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, subject only to the Professional Fee Carve Out.  Each Grantor agrees that at the sole cost and expense of the Grantors, (i) such Grantor will maintain the security interest created by this Security Agreement in the Collateral as a perfected security interest having the priority required by the Loan Documents and shall defend such security interest against the claims and demands of all Persons (other than with respect to claims and demands relating to the Professional Fee Carve Out and, with respect to the rights of Bank of America, as set forth in the Sale Order), (ii) such Grantor shall furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Lender may reasonably request, all in reasonable detail and (iii) at any time and from time to time, upon the written request of the Lender, such Grantor shall promptly and duly execute and deliver, and file and have recorded, such further instruments and documents and take such further action as the Lender may reasonably request, including the filing of any financing statements, continuation statements and other documents and agreements (including this Security Agreement) under the UCC (or other applicable Laws) in effect in any jurisdiction with respect to the security interest created hereby and the execution and delivery of Control Agreements, all in form reasonably satisfactory to the Lender and in such offices (including, without limitation, the United States Patent and Trademark Office and the United States Copyright Office) wherever required by applicable Law in each case to perfect, continue and maintain a valid, enforceable security interest in the Collateral (which security interest shall have the priority required by the Loan Documents and the Sale Order) as provided herein and to preserve the other rights and interests granted to the Lender hereunder, as against the Grantors and third parties (other than with respect to claims and demands relating to the Professional Fee Carve Out), with respect to the Collateral.

SECTION 3.4.    Other Actions.    In order to further evidence the attachment, perfection and priority of, and the ability of the Lender to enforce, the Lender's security interest in the Collateral, each Grantor represents, warrants and agrees, in each case at such Grantor's own expense, with respect to the following Collateral that:

(a)    Instruments and Tangible Chattel Paper.    As of the date hereof (i) no amount payable under or in connection with any of the Collateral is evidenced by any Instrument or Tangible Chattel Paper other than such Instruments and Tangible Chattel

Paper listed on Schedule V hereto and (ii) each Instrument and each item of Tangible Chattel Paper listed on Schedule V hereto, to the extent requested by the Lender, has been properly endorsed, assigned and delivered to the Lender, accompanied by instruments of transfer or assignment and letters of direction duly executed in blank. If any amount payable under or in connection with any of the Collateral shall be evidenced by any Instrument or Tangible Chattel Paper, the Grantor acquiring such Instrument or Tangible Chattel Paper shall promptly endorse, assign and deliver the same to the Lender, accompanied by such instruments of transfer or assignment duly executed in blank as the Lender may reasonably request from time to time.

(b)  Investment Property.

(i)  As of the date hereof (a) it has no Securities Accounts other than those listed on Schedule VI hereto, and (b) it does not hold, own or have any interest in any certificated securities or uncertificated securities other than those constituting Pledged Interests with respect to which the Lender has a perfected security interest in such Pledged Interests (subject only to the Professional Fee Carve Out) having the priority required by the Loan Documents.

(ii)  If any Grantor shall at any time hold or acquire any certificated securities, such Grantor shall promptly (a) notify the Lender thereof, and (b) upon request of the Lender and without derogating from the Lender's rights in after-acquired Collateral pursuant to the DIP Order(s), either (i) endorse, assign and deliver such certificated securities to the Lender, accompanied by such instruments of transfer or assignment duly executed in blank, all in form and substance reasonably satisfactory to the Lender or (ii) deliver such securities into a Securities Account with respect to which a Securities Account Control Agreement is in effect in favor of the Lender. If any securities now or hereafter acquired by any Grantor are uncertificated, such Grantor shall promptly (a) notify the Lender thereof, and (b) upon request of the Lender and without derogating from the Lender's rights in after-acquired Collateral pursuant to the DIP Order(s), either (i) grant Control to the Lender and cause the issuer to agree to comply with instructions from the Lender as to such securities, without further consent of any Grantor or such nominee, (ii) cause a security entitlement with respect to such uncertificated security to be held in a Securities Account with respect to which the Lender has Control or (iii) arrange for the Lender to become the registered owner of the securities, in each case pursuant to an agreement in form and substance reasonably satisfactory to the Lender. No Grantor shall hereafter establish and maintain any Securities Account with any Securities Intermediary unless (1) the applicable Grantor shall have given the Lender ten (10) Business Days' prior written notice of its intention to establish such new Securities Account with such Securities Intermediary, (2) such Securities Intermediary shall be reasonably acceptable to the Lender and (3) upon request of the Lender and without derogating from the Lender's rights in after-acquired Collateral pursuant to the DIP Order(s), such Securities Intermediary and such Grantor shall have duly executed and delivered a Control Agreement with respect to such Securities Account. Each Grantor shall accept any cash and Investment Property which are proceeds of the Pledged

10

Interests in trust for the benefit of the Lender and promptly upon receipt thereof, deposit any cash received by it into an account in which the Lender has Control, or with respect to any Investment Properties or additional securities, take such actions as required above with respect to such securities. No Grantor shall grant control over any Pledged Interests to any Person other than the Lender.

(iii)     As between the Lender and the Grantors, the Grantors shall bear the investment risk with respect to the Investment Property and Pledged Interests, and the risk of loss of, damage to, or the destruction of the Investment Property and Pledged Interests, whether in the possession of, or maintained as a security entitlement or deposit by, or subject to the control of, the Lender, a Securities Intermediary, any Grantor or any other Person; provided, however, that nothing contained in this SECTION 3.4(b) shall release or relieve any Securities Intermediary of its duties and obligations to the Grantors or any other Person under any Control Agreement or under applicable Law. Each Grantor shall promptly pay all Claims and fees of whatever kind or nature with respect to the Pledged Interests pledged by it under this Security Agreement. In the event any Grantor shall fail to make such payment contemplated in the immediately preceding sentence, the Lender may do so for the account of such Grantor and the Grantors shall promptly reimburse and indemnify the Lender for all costs and expenses incurred by the Lender under this SECTION 3.4(b) and under SECTION 9.3 hereof.

(c)     Electronic Chattel Paper and Transferable Records. As of the date hereof no amount payable under or in connection with any of the Collateral is evidenced by any Electronic Chattel Paper or any "transferable record" (as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction). If any amount payable under or in connection with any of the Collateral shall be evidenced by any Electronic Chattel Paper or any transferable record, the Grantor acquiring such Electronic Chattel Paper or transferable record shall promptly notify the Lender thereof and shall take such action as the Lender may reasonably request to vest in the Lender control under UCC Section 9-105 of such Electronic Chattel Paper or control under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record. The Lender agrees with such Grantor that the Lender will arrange, pursuant to procedures reasonably satisfactory to the Lender and so long as such procedures will not result in the Lender's loss of control, for the Grantor to make alterations to the Electronic Chattel Paper or transferable record permitted under UCC Section 9-105 or, as the case may be, Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or Section 16 of the Uniform Electronic Transactions Act for a party in control to allow without loss of control, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by such Grantor with respect to such Electronic Chattel Paper or transferable record.

754025.02-LACSR02A - MSW
*CHI 65672578v2*

(d)    <u>Letter-of-Credit Rights</u>.  If such Grantor is at any time a beneficiary under a Letter of Credit now or hereafter issued in favor of such Grantor, (which, for the avoidance of doubt, shall not include any Letter of Credit issued pursuant to the Credit Agreement), such Grantor shall promptly notify the Lender thereof and such Grantor shall, at the request of the Lender, pursuant to an agreement in form and substance reasonably satisfactory to the Lender, either (i) arrange for the issuer and any confirmer of such Letter of Credit to consent to an assignment to the Lender of, and to pay to the Lender, the proceeds of, any drawing under the Letter of Credit or (ii) arrange for the Lender to become the beneficiary of such Letter of Credit, with the Lender agreeing, in each case, that the proceeds of any drawing under the Letter of Credit are to be applied as provided in the Credit Agreement.

(e)    <u>Commercial Tort Claims</u>.  As of the date hereof it holds no Commercial Tort Claims other than those listed on Schedule IV hereto.  If any Grantor shall at any time hold or acquire a Commercial Tort Claim, such Grantor shall immediately notify the Lender in writing signed by such Grantor of the brief details thereof and grant to the Lender in such writing a security interest therein and in the Proceeds thereof, all upon the terms of this Security Agreement, with such writing to be in form and substance reasonably satisfactory to the Lender.

SECTION 3.5.    <u>Supplements; Further Assurances</u>.  Each Grantor shall take such further actions, and execute and deliver to the Lender such additional assignments, agreements, supplements, powers and instruments, as the Lender may in its reasonable judgment deem necessary or appropriate, wherever required by Law, in order to perfect, preserve and protect the security interest in the Collateral as provided herein and the rights and interests granted to the Lender hereunder, to carry into effect the purposes hereof or better to assure and confirm unto the Lender or permit the Lender to exercise and enforce its rights, powers and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, each Grantor shall make, execute, endorse, acknowledge, file or refile and/or deliver to the Lender from time to time upon reasonable request such lists, descriptions and designations of the Collateral, copies of warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, supplements, additional security agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments.  If an Event of Default has occurred and is continuing, subject to the DIP Order(s), the Lender may institute and maintain, in its own name or in the name of any Grantor, such suits and proceedings as the Lender may be advised by counsel shall be necessary or expedient to prevent any impairment of the security interest in or the perfection thereof in the Collateral.  All of the foregoing shall be at the sole cost and expense of the Grantors.  The Grantors and the Lender acknowledge that this Security Agreement is intended to grant to the Lender for the benefit of the Credit Parties a security interest in and Lien upon the Collateral and shall not constitute or create a present assignment of any of the Collateral.

754025.02-LACSR02A - MSW
*CHI 65672578v2*

# ARTICLE IV

# REPRESENTATIONS, WARRANTIES AND COVENANTS

In addition to, and without limitation of, each of the representations, warranties and covenants set forth in the Credit Agreement and the other Loan Documents, each Grantor represents, warrants and covenants as follows:

SECTION 4.1.    <u>Title</u>.    No financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except such as have been filed in favor of the Lender pursuant to this Security Agreement or as are permitted by the Credit Agreement.  No Person other than the Lender has control or possession of all or any part of the Collateral, except as permitted by the Credit Agreement.

SECTION 4.2.    <u>Limitation on Liens; Defense of Claims; Transferability of Collateral</u>.  Each Grantor is as of the date hereof, and, as to Collateral acquired by it from time to time after the date hereof, such Grantor will be, the sole direct and beneficial owner of all Collateral pledged by it hereunder free from any Lien or other right, title or interest of any Person other than the Liens and security interest created by this Security Agreement, Permitted Encumbrances and the Professional Fee Carve Out.  Each Grantor shall, at its own cost and expense, defend title to the Collateral pledged by it hereunder and the security interest therein and Lien thereon granted to the Lender and the priority thereof against all claims and demands of all Persons, at its own cost and expense, at any time claiming any interest therein adverse to the Lender or any other Credit Party other than (i) with respect to claims or demands regarding priority of Liens and the Professional Fee Carve Out, and (ii) with respect to all other claims and demands, Permitted Encumbrances.  There is no agreement, and no Grantor shall enter into any agreement or take any other action, that would restrict the transferability of any of the Collateral or otherwise impair or conflict with such Grantors' obligations or the rights of the Lender hereunder.

SECTION 4.3.    <u>Chief Executive Office; Change of Name; Jurisdiction of Organization</u>.  The exact legal name, type of organization, jurisdiction of organization, federal taxpayer identification number, organizational identification number and chief executive office of such Grantor is indicated next to its name on <u>Schedule VII</u> hereto.

SECTION 4.4.    <u>Due Authorization and Issuance</u>.  All of the Pledged Interests have been, and to the extent any Pledged Interests are hereafter issued, such shares or other equity interests will be, upon such issuance, duly authorized, validly issued and, to the extent applicable, fully paid and non-assessable.  All of the Pledged Interests have been fully paid for, and there is no amount or other obligation owing by any Grantor to any issuer of the Pledged Interests in exchange for or in connection with the issuance of the Pledged Interests or any Grantor's status as a partner or a member of any issuer of the Pledged Interests.

13

SECTION 4.5.    No Conflicts, Consents, etc.  No consent of any party (including, without limitation, equity holders or creditors of such Grantor) and no consent, authorization, approval, license or other action by, and no notice to or filing with, any Governmental Authority or regulatory body or other Person is required (A) for the grant of the security interest by such Grantor of the Collateral pledged by it pursuant to this Security Agreement or for the execution, delivery or performance hereof by such Grantor, (B) for the exercise by the Lender of the voting or other rights provided for in this Security Agreement or (C) for the exercise by the Lender of the remedies in respect of the Collateral pursuant to this Security Agreement except, in each case, (x) for such consents which have been obtained prior to the date hereof and (y) the entry of the DIP Order(s).  Following the occurrence and during the continuation of an Event of Default, subject to the DIP Order(s), if the Lender desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Security Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other Person therefor, then, upon the reasonable request of the Lender, such Grantor agrees to use commercially reasonable efforts to assist and aid the Lender to obtain as soon as commercially practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

SECTION 4.6.    Collateral.    All information set forth herein, including the schedules annexed hereto, and all information contained in any documents, schedules and lists heretofore delivered to any Credit Party in connection with this Security Agreement, in each case, relating to the Collateral, is accurate and complete in all material respects.  The Collateral described on the schedules annexed hereto constitutes all of the property of such type of Collateral owned or held by the Grantors.

SECTION 4.7.    Insurance.    Such Grantor shall maintain or shall cause to be maintained such insurance as is required pursuant to Section 6.06 of the Credit Agreement.  Each Grantor hereby irrevocably makes, constitutes and appoints the Lender (and all officers, employees or agents designated by the Lender) as such Grantor's true and lawful agent (and attorney-in-fact), exercisable only after the occurrence and during the continuance of an Event of Default and subject to the DIP Order(s), for the purpose of making, settling and adjusting claims in respect of the Collateral under policies of insurance, endorsing the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto.  In the event that any Grantor at any time or times shall fail to obtain or maintain any of the policies of insurance required hereby or to pay any premium in whole or in part relating thereto, the Lender may, without waiving or releasing any obligation or liability of the Grantors hereunder or any Default or Event of Default, in its sole discretion but subject to the DIP Order(s), obtain and maintain such policies of insurance and pay such premium and take any other actions with respect thereto as the Lender deems advisable.  All sums disbursed by the Lender in connection with this SECTION 4.7, including reasonable attorneys' fees, court costs, reasonable and documented expenses and other charges relating thereto, shall be payable, upon demand, by the Grantors to the Lender and shall be additional Secured Obligations secured hereby.

14

SECTION 4.8.    Payment of Taxes; Compliance with Laws; Contested Liens; Claims.  Each Grantor represents and warrants that all Claims imposed upon or assessed against the Collateral have been paid and discharged except to the extent (i) such Claims constitute a Lien not yet due and payable, a Permitted Encumbrance or the Professional Fee Carve Out, or (ii) the enforcement of which Claims has been stayed by virtue of the filing of the Chapter 11 Case.  Each Grantor shall comply with all applicable Law relating to the Collateral the failure to comply with which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Each Grantor may at its own expense contest the validity, amount or applicability of any Claims so long as the contest thereof shall be conducted in accordance with, and permitted pursuant to the provisions of, the Credit Agreement.    Notwithstanding the foregoing provisions of this SECTION 4.8, no contest of any such obligation may be pursued by such Grantor if such contest would expose the Lender or any other Credit Party to (i) any possible criminal liability or (ii) any additional civil liability for failure to comply with such obligations unless such Grantor shall have furnished a bond or other security therefor satisfactory to the Lender, or such other Credit Party, as the case may be.

## ARTICLE V

CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL

SECTION 5.1.    Pledge of Additional Securities Collateral.  Upon request of the Lender and without derogating from the Lender's rights in after-acquired Collateral pursuant to the DIP Order(s), each Grantor shall, upon obtaining any Pledged Interests or Intercompany Notes of any Person required to be pledged hereunder, accept the same in trust for the benefit of the Lender and forthwith deliver to the Lender a pledge amendment, duly executed by such Grantor, in substantially the form of Exhibit 1 annexed hereto (each, a "Pledge Amendment"), and the certificates and other documents required under SECTION 3.1 and SECTION 3.2 hereof in respect of the additional Pledged Interests or Intercompany Notes which are to be pledged pursuant to this Security Agreement, and confirming the attachment of the Lien created hereby and by the DIP Order(s) on and in respect of such additional Pledged Interests or Intercompany Notes.  Each Grantor hereby authorizes the Lender to attach each such Pledge Amendment to this Security Agreement and agrees that all Pledged Interests or Intercompany Notes (whether or not listed on any Pledge Amendment delivered to the Lender) shall for all purposes hereunder be considered Collateral.

SECTION 5.2.    Voting Rights; Distributions; etc.  So long as no Event of Default shall have occurred and be continuing, each Grantor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Securities Collateral or any part thereof for any purpose not inconsistent with the terms or purposes hereof, the Credit Agreement or any other Loan Document evidencing the Secured Obligations (it being understood and agreed that no vote by any Grantor may cause action or inaction in violation of the DIP Order(s) or any other order entered in connection with the Chapter 11 Case or any successor case).  The Lender shall be deemed without further action or formality to have granted to each Grantor all necessary consents

15

relating to voting rights and shall, if necessary, upon written request of any Grantor and at the sole cost and expense of the Grantors, from time to time execute and deliver (or cause to be executed and delivered) to such Grantor all such instruments as such Grantor may reasonably request in order to permit such Grantor to exercise the voting and other rights which it is entitled to exercise pursuant to this SECTION 5.2(i).

(ii)     Upon the occurrence and during the continuance of any Event of Default, subject to the DIP Order(s), all rights of each Grantor to exercise the voting and other consensual rights it would otherwise be entitled to exercise pursuant to SECTION 5.2(i) hereof without any action, other than, in the case of any Securities Collateral, or the giving of any notice shall immediately cease, and all such rights shall thereupon become vested in the Lender, which shall thereupon have the sole right to exercise such voting and other consensual rights; provided that the Lender shall have the right, in its sole discretion, from time to time following the occurrence and continuance of an Event of Default to permit such Grantor to exercise such rights under SECTION 5.2(i).  After such Event of Default is no longer continuing, each Grantor shall have the right to exercise the voting, managerial and other consensual rights and powers that it would otherwise be entitled to pursuant to SECTION 5.2(i) hereof.

(iii)     Subject to the DIP Order(s), the Lender shall have the sole right to receive and hold as Collateral any and all Distributions, and any Distributions received by any Grantor contrary to the foregoing shall be held in trust for the benefit of the Lender and immediately be paid over to the Lender in accordance with Section 6.11 of the Credit Agreement.

(iv)     Each Grantor shall, at its sole cost and expense, from time to time execute and deliver to the Lender appropriate instruments as the Lender may reasonably request in order to permit the Lender to exercise the voting and other rights which it may be entitled to exercise pursuant to SECTION 5.2(ii) hereof and to receive all Distributions which it may be entitled to receive under SECTION 5.2(iii) hereof.

SECTION 5.3.     Organization Documents.  No Grantor will terminate or agree to terminate any Organization Documents or make any amendment or modification to any Organization Documents, including electing to treat any Pledged Interests of such Grantor as a security under Section 8-103 of the UCC, except as permitted by the Credit Agreement.

SECTION 5.4.     Defaults, Etc.  No Securities Collateral pledged by such Grantor is subject to any defense, offset or counterclaim, nor have any of the foregoing been asserted or alleged against such Grantor by any Person with respect thereto, and as of the date hereof, there are no certificates, instruments, documents or other writings (other than the Organization Documents and certificates, if any, delivered to the Lender) which evidence any Pledged Interests of such Grantor.

SECTION 5.5.     Certain Agreements of Grantors As Issuers and Holders of Equity Interests.In the case of each Grantor which is an issuer of Securities Collateral, such Grantor agrees to be bound by the terms of this Security Agreement relating to the Securities Collateral issued by it and will comply with such terms insofar as such terms are applicable to it.

16

(ii)    In the case of each Grantor which is a partner in a partnership, limited liability company or other entity, such Grantor hereby consents to the extent required by the applicable Organization Documents to the pledge by each other Grantor, pursuant to the terms hereof, of the Pledged Interests in such partnership, limited liability company or other entity and, upon the occurrence and during the continuance of an Event of Default and subject to the DIP Order(s), to the transfer of such Pledged Interests to the Lender or its nominee and to the substitution of the Lender or its nominee as a substituted partner or member in such partnership, limited liability company or other entity with all the rights, powers and duties of a general partner or a limited partner or member, as the case may be.

# ARTICLE VI

## CERTAIN PROVISIONS CONCERNING INTELLECTUAL PROPERTY COLLATERAL

SECTION 6.1.    <u>Registrations</u>.    Except pursuant to licenses and other user agreements entered into by any Grantor in the ordinary course of business that are listed on <u>Schedule II</u> hereto, on and as of the date hereof (i) each Grantor owns and possesses the right to use, and has done nothing to authorize or enable any other Person to use, any material Copyright, Patent or Trademark listed on <u>Schedule II</u> hereto, and (ii) all registrations listed on <u>Schedule II</u> hereto are valid and in full force and effect.

SECTION 6.2.    <u>No Violations or Proceedings</u>.    To each Grantor's knowledge, on and as of the date hereof, there is no violation by others of any right of such Grantor with respect to any Copyright, Patent or Trademark listed on <u>Schedule II</u> hereto, respectively, pledged by it under the name of such Grantor.

SECTION 6.3.    <u>Protection of Lender's Security</u>.    On a continuing basis, each Grantor shall, at its sole cost and expense, (i) promptly following its becoming aware thereof, notify the Lender of (A) any adverse determination in any proceeding in the United States Patent and Trademark Office or the United States Copyright Office with respect to any Patent, Trademark or Copyright necessary for the conduct of business of such Grantor or (B) the institution of any proceeding or any adverse determination in any federal, state or local court or administrative body regarding such Grantor's claim of ownership in or right to use any of the Intellectual Property Collateral material to the use and operation of the Collateral, its right to register such Intellectual Property Collateral or its right to keep and maintain such registration in full force and effect, (ii) maintain and protect the Intellectual Property Collateral necessary for the conduct of business of such Grantor, (iii) not permit to lapse or become abandoned any Intellectual Property Collateral necessary for the conduct of business of such Grantor, and not settle or compromise any pending or future litigation or administrative proceeding with respect to such Intellectual Property Collateral, in each case, except as shall be consistent with commercially reasonable business judgment and, if any Event of Default has occurred and is continuing, with the prior approval of the Lender (such approval not to be unreasonably

17

withheld), (iv) upon such Grantor's obtaining knowledge thereof, promptly notify the Lender in writing of any event which may be reasonably expected to materially and adversely affect the value or utility of the Intellectual Property Collateral or any portion thereof material to the use and operation of the Collateral, the ability of such Grantor or the Lender to dispose of the Intellectual Property Collateral or any portion thereof or the rights and remedies of the Lender in relation thereto including, without limitation, a levy or threat of levy or any legal process against the Intellectual Property Collateral or any portion thereof, (v) not license the Intellectual Property Collateral other than licenses entered into by such Grantor in, or incidental to, the ordinary course of business, or amend or permit the amendment of any of the material licenses in a manner that materially and adversely affects the right to receive payments thereunder, or in any manner that would materially impair the value of the Intellectual Property Collateral or the Lien on and security interest in the Intellectual Property Collateral intended to be granted to the Lender for the benefit of the Credit Parties, without the consent of the Lender, (vi) until the Lender exercises its rights to make collection, diligently keep adequate records respecting the Intellectual Property Collateral and (vii) furnish to the Lender from time to time upon the Lender's reasonable request therefor detailed statements and amended schedules further identifying and describing the Intellectual Property Collateral and such other materials evidencing or reports pertaining to the Intellectual Property Collateral as the Lender may from time to time reasonably request. Notwithstanding the foregoing, nothing herein shall prevent any Grantor from selling, disposing of or otherwise using any Intellectual Property Collateral as permitted under the Credit Agreement.

SECTION 6.4.    After-Acquired Property.  If any Grantor shall, at any time before this Security Agreement shall have been terminated in accordance with SECTION 9.5, (i) obtain any rights to any additional Intellectual Property Collateral or (ii) become entitled to the benefit of any additional Intellectual Property Collateral or any renewal or extension thereof, including any reissue, division, continuation, or continuation-in-part of any Intellectual Property Collateral, or any improvement on any Intellectual Property Collateral, the provisions hereof shall automatically apply thereto and any such item enumerated in clause (i) or (ii) of this SECTION 6.4 with respect to such Grantor shall automatically constitute Intellectual Property Collateral if such would have constituted Intellectual Property Collateral at the time of execution hereof and be subject to the Lien and security interest created by this Security Agreement without further action by any party. With respect to any federally registered Intellectual Property Collateral, each Grantor shall promptly (a) provide to the Lender written notice of any of the foregoing and (b) upon request of the Lender and without derogating from the Lender's rights in after-acquired Collateral pursuant to the DIP Order(s), confirm the attachment of the Lien and security interest created by this Security Agreement to any rights described in clauses (i) and (ii) of the immediately preceding sentence of this SECTION 6.4 by execution of an instrument in form reasonably acceptable to the Lender.

SECTION 6.5.    Modifications.  Each Grantor authorizes the Lender to modify this Security Agreement by amending Schedule II hereto to include any Intellectual Property Collateral acquired or arising after the date hereof of such Grantor including, without limitation, any of the items listed in SECTION 6.4 hereof.

18

SECTION 6.6.    <u>Litigation</u>.    Unless there shall occur and be continuing any Event of Default, each Grantor shall have the right to commence and prosecute in its own name, as the party in interest, for its own benefit and at the sole cost and expense of the Grantors, such applications for protection of the Intellectual Property Collateral and suits, proceedings or other actions to prevent the infringement, counterfeiting, unfair competition, dilution, diminution in value or other damage as are necessary to protect the Intellectual Property Collateral.  Upon the occurrence and during the continuance of any Event of Default and subject to the DIP Order(s), the Lender shall have the right but shall in no way be obligated to file applications for protection of the Intellectual Property Collateral and/or bring suit in the name of any Grantor, the Lender or the other Credit Parties to enforce the Intellectual Property Collateral and any license thereunder. In the event of such suit, each Grantor shall, at the reasonable request of the Lender, do any and all lawful acts and execute any and all documents requested by the Lender in aid of such enforcement and the Grantors shall promptly reimburse and indemnify the Lender, as the case may be, for all costs and expenses incurred by the Lender in the exercise of its rights under this SECTION 6.6 in accordance with SECTION 9.3 hereof.  In the event that the Lender shall elect not to bring suit to enforce the Intellectual Property Collateral, each Grantor agrees, at the request of the Lender, to take all commercially reasonable actions necessary, whether by suit, proceeding or other action, to prevent the infringement, counterfeiting, unfair competition, dilution, diminution in value of or other damage to any of the Intellectual Property Collateral by others and for that purpose agrees to diligently maintain any suit, proceeding or other action against any Person so infringing necessary to prevent such infringement.

ARTICLE VII

CERTAIN PROVISIONS CONCERNING
CREDIT CARD RECEIVABLES AND ACCOUNTS

SECTION 7.1.    <u>Special Representations and Warranties</u>.  As of the time when any of its Credit Card Receivables is included in the Borrowing Base as an Eligible Credit Card Receivable, each Grantor shall be deemed to have represented and warranted that such Credit Card Receivable and all records, papers and documents relating thereto (i) are genuine and correct and in all material respects what they purport to be, (ii) represent the legal, valid and binding obligation of the account debtor, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability, evidencing indebtedness unpaid and owed by such account debtor, arising out of the performance of labor or services or the sale, lease, license, assignment or other disposition and delivery of the goods or other property listed therein or out of an advance or a loan, (iii) are in all material respects in compliance and conform with all applicable material federal, state and local Laws and applicable Laws of any relevant foreign jurisdiction, and (iv) are not subject to any right of offset as a result of any rebates, allowances, or similar promotional credit.

SECTION 7.2.    <u>Maintenance of Records</u>.  Each Grantor shall keep and maintain at its own cost and expense materially complete records of each Credit Card Receivable and each

19

Account, in a manner consistent with prudent business practice, including, without limitation, records of all payments received, all credits granted thereon, all merchandise returned and all other documentation relating thereto and the amount of the Credit Card Holdback.  Each Grantor shall, at such Grantor's sole cost and expense, upon the Lender's demand made at any time after the occurrence and during the continuance of any Event of Default and subject to the DIP Order(s), deliver all tangible evidence of all Credit Card Receivables and Accounts, including, without limitation, all documents evidencing such Credit Card Receivables and Accounts and any books and records relating thereto to the Lender or to its representatives (copies of which evidence and books and records may be retained by such Grantor).  Upon the occurrence and during the continuance of any Event of Default and subject to the DIP Order(s), the Lender may transfer a full and complete copy of any Grantor's books, records, credit information, reports, memoranda and all other writings relating to the Credit Card Receivables and Accounts to and for the use by any Person that has acquired or is contemplating acquisition of an interest in the Credit Card Receivables and Accounts or the Lender's security interest therein in accordance with applicable Law without the consent of any Grantor.

SECTION 7.3.    Legend.  Subject to the DIP Order(s), each Grantor shall legend, at the request of the Lender made at any time after the occurrence and during the continuance of any Event of Default and in form and manner reasonably satisfactory to the Lender, the Credit Card Receivables and Accounts and the other books, records and documents of such Grantor evidencing or pertaining to the Credit Card Receivables and Accounts with an appropriate reference to the fact that the Credit Card Receivables have been collaterally assigned to the Lender for the benefit of the Credit Parties and that the Lender has a security interest therein.

SECTION 7.4.    Modification of Terms, Etc.  No Grantor shall rescind or cancel any indebtedness evidenced by any Credit Card Receivable or Account or modify any term thereof or make any adjustment with respect thereto except in the ordinary course of business consistent with prudent business practice, or extend or renew any such indebtedness except in the ordinary course of business consistent with prudent business practice or compromise or settle any dispute, claim, suit or legal proceeding relating thereto or sell any Credit Card Receivable, Account or interest in any of the foregoing except in the ordinary course of business consistent with prudent business practice or in accordance with the Credit Agreement without the prior written consent of the Lender.

SECTION 7.5.    Collection.  Each Grantor shall cause to be collected from the account debtor of each of the Credit Card Receivables and Accounts, as and when due in the ordinary course of business consistent with prudent business practice (including, without limitation, Accounts that are delinquent, such Accounts to be collected in accordance with generally accepted commercial collection procedures), any and all amounts owing under or on account of such Credit Card Receivable or Account, and apply forthwith upon receipt thereof all such amounts as are so collected to the outstanding balance of such Credit Card Receivable or Account.  The costs and reasonable expenses (including, without limitation, attorneys' fees) of collection, in any case, whether incurred by any Grantor, the Lender or any other Credit Party, shall be paid by the Grantors.

# ARTICLE VIII

# REMEDIES

SECTION 8.1.    Remedies.  Upon the occurrence and during the continuance of any Event of Default and subject to the provisions of the DIP Order(s), the Lender may, from time to time in respect of the Collateral, in addition to the other rights and remedies provided for herein, under applicable Law or otherwise available to it:

(i)    Personally, or by agents or attorneys, immediately take possession of the Collateral or any part thereof, from any Grantor or any other Person who then has possession of any part thereof with or without notice or process of law, and for that purpose may enter upon any Grantor's premises where any of the Collateral is located, remove such Collateral, remain present at such premises to receive copies of all communications and remittances relating to the Collateral and use in connection with such removal and possession any and all services, supplies, aids and other facilities of any Grantor;

(ii)    Demand, sue for, collect or receive any money or property at any time payable or receivable in respect of the Collateral including, without limitation, instructing the obligor or obligors on any agreement, instrument or other obligation constituting part of the Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the Lender, and in connection with any of the foregoing, compromise, settle, extend the time for payment and make other modifications with respect thereto; provided, however, that in the event that any such payments are made directly to any Grantor, prior to receipt by any such obligor of such instruction, such Grantor shall segregate all amounts received pursuant thereto in trust for the benefit of the Lender and shall promptly pay such amounts to the Lender;

(iii)    Sell, assign, grant a license to use or otherwise liquidate, or direct any Grantor to sell, assign, grant a license to use or otherwise liquidate, any and all investments made in whole or in part with the Collateral or any part thereof, and take possession of the proceeds of any such sale, assignment, license or liquidation;

(iv)    Take possession of the Collateral or any part thereof, by directing any Grantor in writing to deliver the same to the Lender at any place or places so designated by the Lender, in which event such Grantor shall at its own expense:  (A) forthwith cause the same to be moved to the place or places designated by the Lender and therewith delivered to the Lender, (B) store and keep any Collateral so delivered to the Lender at such place or places pending further action by the Lender and (C) while the Collateral shall be so stored and kept, provide such security and maintenance services as shall be necessary to protect the same and to preserve and maintain them in good condition.  Each Grantor's obligation to deliver the Collateral as contemplated in this SECTION 8.1 is of the essence hereof.  Upon application to a court of equity having jurisdiction, the Lender shall be entitled to a decree requiring specific performance by any Grantor of such obligation;

21

(v)    Without limiting any rights of the Lender pursuant to Section 6.11 of the Credit Agreement and subject to the provisions of the DIP Order(s), withdraw all moneys, instruments, securities and other property in any bank, financial securities, deposit or other account of any Grantor constituting Collateral for application to the Secured Obligations as provided in Article VIII hereof;

(vi)    Without limiting any rights of the Lender pursuant to Section 6.11 of the Credit Agreement, retain and apply the Distributions to the Secured Obligations as provided in Article VIII hereof;

(vii)    Exercise any and all rights as beneficial and legal owner of the Collateral, including, without limitation, perfecting assignment of and exercising any and all voting, consensual and other rights and powers with respect to any Collateral;

(viii)    Exercise any rights and remedies provided by, or not contrary to, the DIP Order(s); and

(ix)    Exercise all the rights and remedies of a secured party under the UCC, and the Lender may also in its sole discretion, without notice except as specified in SECTION 8.2 hereof, sell, assign or grant a license to use the Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of the Lender's offices or elsewhere, as part of one or more going out of business sales in the Lender's own right or by one or more agents and contractors, all as the Lender, in its sole discretion, may deem advisable, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Lender may deem commercially reasonable.  The Lender shall have the right to conduct such sales on any Grantor's premises and shall have the right to use any Grantor's premises without charge for such sales for such time or times as the Agent may see fit.  The Lender or any other Credit Party or any of their respective Affiliates may be the purchaser, licensee, assignee or recipient of any or all of the Collateral at any such sale and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations owed to such Person as a credit on account of the purchase price of any Collateral payable by such Person at such sale.  Each purchaser, assignee, licensee or recipient at any such sale shall acquire the property sold, assigned or licensed absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives, to the fullest extent permitted by Law, all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of Law now existing or hereafter enacted.  The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.  To the fullest extent permitted by Law, each Grantor hereby waives any claims against the Lender arising by reason of the fact that the price at which any Collateral may have been sold, assigned or licensed at such a private sale was less than the price which might have been obtained at a public sale, even if the Lender accepts the first offer received and does not offer such Collateral to more than one offeree.  In connection with any sale or other disposition of Inventory and Goods, the

Lender and any agent or contractor conducting any such sale may augment the Inventory with other goods (all of which other goods shall remain the sole property of the Lender or such agent or contractor). Any amounts realized from the sale of such goods which constitute augmentations to the Inventory (net of an allocable share of the costs and expenses incurred in their disposition) shall be the sole property of the Lender or such agent or contractor and neither any Grantor nor any Person claiming under or in right of any Grantor shall have any interest therein.

SECTION 8.2.  Notice of Sale.  Subject to the DIP Order(s), each Grantor acknowledges and agrees that, to the extent notice of sale or other disposition of Collateral shall be required by applicable Law and unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Lender shall provide such Grantor such advance notice as may be practicable under the circumstances), ten (10) days' prior notice to such Grantor of the time and place of any public sale or of the time after which any private sale or other intended disposition is to take place shall be commercially reasonable notification of such matters.  Except as required by the DIP Order(s), no notification need be given to any Grantor if it has signed, after the occurrence and during the continuance of an Event of Default, a statement renouncing or modifying (as permitted under Law) any right to notification of sale or other intended disposition.

SECTION 8.3.  Waiver of Notice and Claims.  Subject to the DIP Order(s), each Grantor hereby waives, to the fullest extent permitted by applicable Law, notice or judicial hearing in connection with the Lender's taking possession or the Lender's disposition of any of the Collateral, including, without limitation, any and all prior notice and hearing for any prejudgment remedy or remedies and any such right which such Grantor would otherwise have under Law, and each Grantor hereby further waives, to the fullest extent permitted by applicable Law:  (i) all damages occasioned by such taking of possession, (ii) all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Lender's rights hereunder and (iii) all rights of redemption, appraisal, valuation, stay, extension or moratorium now or hereafter in force under any applicable Law.  The Lender shall not be liable for any incorrect or improper payment made pursuant to this Article VIII in the absence of gross negligence or willful misconduct.  Any sale of, or the grant of options to purchase, or any other realization upon, any Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the applicable Grantor therein and thereto, and shall be a perpetual bar both at law and in equity against such Grantor and against any and all Persons claiming or attempting to claim the Collateral so sold, optioned or realized upon, or any part thereof, from, through or under such Grantor.

SECTION 8.4.  Certain Sales of Collateral.  Subject to the DIP Order(s):

(i)     Each Grantor recognizes that, by reason of certain prohibitions contained in law, rules, regulations or orders of any Governmental Authority (including, without limitation, the Securities Act, and applicable state securities Laws), the Lender may be compelled, with respect to any sale of all or any part of the Collateral (including, without limitation, Securities Collateral and Investment Property), to limit purchasers to those who meet the requirements of such Governmental Authority (which requirements may include, with respect to Securities Collateral

23

and/or Investment Property, that such purchasers shall agree, among other things, to acquire such Securities Collateral or Investment Property for their own account, for investment and not with a view to the distribution or resale thereof). Each Grantor acknowledges that any such sales may be at prices and on terms less favorable to the Lender than those obtainable through a public sale without such restrictions (including, without limitation, a public offering made pursuant to a registration statement under the Securities Act), and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that, except as may be required by applicable Law, the Lender shall have no obligation to engage in public sales and no obligation to delay the sale of any Securities Collateral or Investment Property for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities Laws, even if such issuer would agree to do so.

(ii)    If the Lender determines to exercise its right to sell any or all of the Securities Collateral or Investment Property, upon written request, the applicable Grantor shall from time to time furnish to the Lender all such information as the Lender may reasonably request in order to determine the number of securities included in the Securities Collateral or Investment Property which may be sold by the Lender as exempt transactions under the Securities Act and the rules of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

(iii)    Each Grantor further agrees that a breach of any of the covenants contained in this SECTION 8.4 will cause irreparable injury to the Lender and the other Credit Parties, that the Lender and the other Credit Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this SECTION 8.4 shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred and is continuing.

SECTION 8.5.    No Waiver; Cumulative Remedies.  No failure on the part of the Lender to exercise, no course of dealing with respect to, and no delay on the part of the Lender in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy; nor shall the Lender be required to look first to, enforce or exhaust any other security, collateral or guaranties. The remedies herein provided are cumulative and are not exclusive of any remedies provided by Law.

(ii)    In the event that the Lender shall have instituted any proceeding to enforce any right, power or remedy under this Security Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Lender, then and in every such case, the Grantors, the Lender and each other Credit Party shall be restored to their respective former positions and rights hereunder with respect to the Collateral, and all rights, remedies and powers of the Lender and the other Credit Parties shall continue as if no such proceeding had been instituted.

SECTION 8.6.    <u>Certain Additional Actions Regarding Intellectual Property</u>.  If any Event of Default shall have occurred and be continuing, subject to the DIP Order(s), upon the written demand of the Lender, each Grantor shall execute and deliver to the Lender an assignment or assignments of the registered Patents, Trademarks and/or Copyrights and such other documents as are necessary or appropriate to carry out the intent and purposes hereof to the extent such assignment does not result in any loss of rights therein under applicable Law.  Within five (5) Business Days of written notice thereafter from the Lender, each Grantor shall make available to the Lender, to the extent within such Grantor's power and authority, such personnel in such Grantor's employ on the date of the Event of Default as the Lender may reasonably designate to permit such Grantor to continue, directly or indirectly, to produce, advertise and sell the products and services sold by such Grantor under the registered Patents, Trademarks and/or Copyrights, and such Persons shall be available to perform their prior functions on the Lender's behalf.

SECTION 8.7.    <u>Application of Proceeds</u>.    Subject to the DIP Order(s), the proceeds received by the Lender in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Lender of its remedies shall be applied, together with any other sums then held by the Lender pursuant to this Security Agreement, in accordance with and as set forth in Section 8.03 of the Credit Agreement.    It is understood and agreed that the Grantors shall remain jointly and severally liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate amount of the Secured Obligations.

SECTION 8.8.    <u>Grant of License; Use of Assets</u>.  Without limiting the Lender's rights as holder of a Lien in the Collateral, for the purpose of enabling the Lender, during the continuance of an Event of Default, to exercise rights and remedies under this Article VIII at such time as the Lender shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby grants to the Lender, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty, rent or other compensation to such Grantor) to use, assign, license or sublicense any assets of such Grantor (including, without limitation, all Fixtures, Equipment and Intellectual Property now owned or hereafter acquired by such Grantor) and to occupy any Real Property owned or leased by such Grantor, wherever the same may be located and whether or not constituting Collateral, including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout hereof.

ARTICLE IX

MISCELLANEOUS

SECTION 9.1.    <u>Concerning Lender</u>.  The actions of the Lender hereunder are subject to the provisions of the Credit Agreement.  The Lender shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or

25

refrain from taking action (including, without limitation, the release or substitution of the Collateral), in accordance with this Security Agreement and the Credit Agreement, but subject to the DIP Order(s). The Lender may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact.

(ii) The Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equivalent to that which the Lender, in its individual capacity, accords its own property consisting of similar instruments or interests, it being understood that neither the Lender nor any of the other Credit Parties shall have responsibility for, without limitation (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Securities Collateral, whether or not the Lender or any other Credit Party has or is deemed to have knowledge of such matters or (ii) taking any necessary steps to preserve rights against any Person with respect to any Collateral. In no event shall the Lender's or any other Credit Party's responsibility for the custody and preservation of the Collateral in its possession extend to matters beyond the control of such Person, including, without limitation, acts of God, war, insurrection, riot, governmental actions or acts of any corporate or other depository.

(iii) The Lender shall be entitled to rely upon any written notice, statement, certificate, order or other document or any telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper Person, and, with respect to all matters pertaining to this Security Agreement and its duties hereunder, upon advice of counsel selected by it.

(iv) If any item of Collateral also constitutes collateral granted to Lender under any other security agreement, pledge or instrument of any type, in the event of any conflict between the provisions hereof and the provisions of such other security agreement, pledge or instrument of any type in respect of such collateral, Lender, in its sole discretion, shall select which provision or provisions shall control.

SECTION 9.2.    Lender May Perform; Lender Appointed Attorney-in-Fact.  If any Grantor shall fail to perform any covenants contained in this Security Agreement or in the Credit Agreement (including, without limitation, such Grantor's covenants to (i) pay the premiums in respect of all required insurance policies hereunder, (ii) pay Claims, (iii) make repairs, (iv) discharge Liens or (v) pay or perform any other obligations of such Grantor with respect to any Collateral) or if any warranty on the part of any Grantor contained herein shall be breached, the Lender may (but shall not be obligated to), subject to the DIP Order(s), do the same or cause it to be done or remedy any such breach, and may expend funds for such purpose; provided, however, that Lender shall in no event be bound to inquire into the validity of any tax, lien, imposition or other obligation which such Grantor fails to pay or perform as and when required hereby. Any and all amounts so expended by the Lender shall be paid by the Grantors in accordance with the provisions of SECTION 9.3 hereof. Neither the provisions of this SECTION 9.2 nor any action taken by the Lender pursuant to the provisions of this SECTION 9.2 shall prevent any such failure to observe any covenant contained in this Security Agreement

26

nor any breach of warranty from constituting an Event of Default.  Each Grantor hereby appoints the Lender its attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor, or otherwise, from time to time after the occurrence and during the continuation of an Event of Default in the Lender's discretion (but subject to the DIP Order(s)) to take any action and to execute any instrument consistent with the terms of the Credit Agreement and the other Security Documents which the Lender may deem necessary to accomplish the purposes hereof.  The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof.  Each Grantor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

SECTION 9.3.    Expenses.  Each Grantor will upon demand pay to the Lender the amount of any and all amounts required to be paid pursuant to Section 9.04 of the Credit Agreement.

SECTION 9.4.    Continuing Security Interest; Assignment.  Upon entry of the Borrowing Order, this Security Agreement shall create a continuing security interest in the Collateral and shall (i) be binding upon the Grantors and their respective successors and assigns, and (ii) inure, together with the rights and remedies of the Lender hereunder, to the benefit of the Lender and the other Credit Parties and each of their respective successors, transferees and permitted assigns.  No other Persons (including, without limitation, any other creditor of any Grantor) shall have any interest herein or any right or benefit with respect hereto.  Without limiting the generality of the foregoing clause (ii), any Credit Party may assign or otherwise transfer any indebtedness held by it secured by this Security Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Credit Party, herein or otherwise, subject, however, to the provisions of the Credit Agreement.

SECTION 9.5.    Termination.  This Security Agreement, the Lien in favor of the Lender (for the benefit of itself and the other Credit Parties) and all other security interests granted hereby shall terminate with respect to all Secured Obligations when (i) the Commitment shall have expired or been terminated and the L/C Issuer has no further obligation to issue Letters of Credit under the Credit Agreement, (ii) the principal of and interest on each Loan and all fees and other Secured Obligations (other than contingent indemnification claims for which a claim has not been asserted) shall have been indefeasibly paid in full in cash, (iii) all Letters of Credit (as defined in the Credit Agreement) shall have (A) expired or terminated and have been reduced to zero, (B) been Cash Collateralized to the extent required by the Credit Agreement, or (C) been supported by another letter of credit in a manner reasonably satisfactory to the Lender, and (iv) all Unreimbursed Amounts shall have been indefeasibly paid in full in cash; provided, however, that (A) this Security Agreement, the Lien in favor of the Lender (for the benefit of itself and the other Credit Parties) and all other security interests granted hereby shall be reinstated if at any time payment, or any part thereof, of any Secured Obligation is rescinded or must otherwise be restored by any Credit Party or any Grantor upon the bankruptcy or reorganization of any Grantor or otherwise, and (B) in connection with the termination of this Security Agreement, the Lender may require such indemnities and collateral security as it shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account

27

of credits previously applied to the Secured Obligations that may subsequently be reversed or revoked, (y) any obligations that may thereafter arise with respect to the Other Liabilities, and (z) any Secured Obligations that may thereafter arise under Section 9.04 of the Credit Agreement.

SECTION 9.6.    Modification in Writing.    No amendment, modification, supplement, termination or waiver of or to any provision hereof, nor consent to any departure by any Grantor therefrom, shall be effective unless the same shall be made in accordance with the terms of the Credit Agreement and the DIP Order(s) and unless in writing and signed by the Lender and the Grantors.    Any amendment, modification or supplement of or to any provision hereof, any waiver of any provision hereof and any consent to any departure by any Grantor from the terms of any provision hereof shall be effective only in the specific instance and for the specific purpose for which made or given.    Except where notice is specifically required by this Security Agreement or any other document evidencing the Secured Obligations, no notice to or demand on any Grantor in any case shall entitle any Grantor to any other or further notice or demand in similar or other circumstances.

SECTION 9.7.    Notices.    Unless otherwise provided herein, in the Credit Agreement or in the DIP Order(s) any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Credit Agreement, as to any Grantor, addressed to it at the address of the Lead Borrower set forth in the Credit Agreement and as to the Lender, addressed to it at the address set forth in the Credit Agreement, or in each case at such other address as shall be designated by such party in a written notice to the other parties hereto complying as to delivery with the terms of this SECTION 9.7.

SECTION 9.8.    GOVERNING LAW.    THIS SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE BANKRUPTCY CODE AND THE LAWS OF THE STATE OF NEW YORK.

SECTION 9.9.    CONSENT TO JURISDICTION; SERVICE OF PROCESS; WAIVER OF JURY TRIAL. (a)    EACH    GRANTOR    IRREVOCABLY    AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH GRANTOR IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH BANKRUPTCY COURT, SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.    EACH GRANTOR AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER

28

MANNER PROVIDED BY LAW.  NOTHING IN THIS SECURITY AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(b)    EACH GRANTOR IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (A) OF THIS SECTION.  EACH GRANTOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)    EACH GRANTOR AGREES THAT ANY ACTION COMMENCED BY ANY GRANTOR ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN THE BANKRUPTCY COURT, A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR ANY FEDERAL COURT SITTING THEREIN AS THE LENDER MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

(d)    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.7.  NOTHING IN THIS SECURITY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND WHETHER INITIATED BY OR AGAINST ANY SUCH PERSON OR IN WHICH ANY SUCH PERSON IS JOINED AS A PARTY LITIGANT).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SECURITY

29

AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.10.  Severability of Provisions.   Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 9.11.  Execution in Counterparts; Effectiveness.   This Security Agreement may be executed in any number of counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Security Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Security Agreement.

SECTION 9.12.  No Release.  Nothing set forth in this Security Agreement shall relieve any Grantor from the performance of any term, covenant, condition or agreement on such Grantor's part to be performed or observed under or in respect of any of the Collateral or from any liability to any Person under or in respect of any of the Collateral or shall impose any obligation on the Lender or any other Credit Party to perform or observe any such term, covenant, condition or agreement on such Grantor's part to be so performed or observed or shall impose any liability on the Lender or any other Credit Party for any act or omission on the part of such Grantor relating thereto or for any breach of any representation or warranty on the part of such Grantor contained in this Security Agreement, the Credit Agreement or the other Loan Documents, or under or in respect of the Collateral or made in connection herewith or therewith. The obligations of each Grantor contained in this SECTION 9.12 shall survive the termination hereof and the discharge of such Grantor's other obligations under this Security Agreement, the Credit Agreement and the other Loan Documents.

SECTION 9.13.  Obligations Absolute.   All obligations of each Grantor hereunder shall be absolute and unconditional irrespective of:

(i)     any lack of validity or enforceability of the Credit Agreement or any other Loan Document, or any other agreement or instrument relating thereto;

(ii)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement or any other Loan Document or any other agreement or instrument relating thereto;

(iii)   any pledge, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Secured Obligations;

30

(iv)    any exercise, non-exercise or waiver of any right, remedy, power or privilege under or in respect hereof, the Credit Agreement or any other Loan Document except as specifically set forth in a waiver granted pursuant to the provisions of SECTION 9.6 hereof; or

(v)    any other circumstances which might otherwise constitute a defense available to, or a discharge of, any Grantor (other than the termination of this Security Agreement in accordance with SECTION 9.5 hereof).

SECTION 9.14.    Pre-Petition Cash Collateral Account.

Notwithstanding anything to the contrary contained herein, the Lender's Lien in and to the Cash Collateral (as defined in the DIP Order(s)) constituting DIP L/C Collateral shall be subordinate to the BofA Interests (as defined in the DIP Order(s)), including, without limitation, the Liens in favor of the Pre-Petition Secured Parties and the DIP L/C Issuer (each term as defined in the Other DIP Order(s)) therein.

SECTION 9.15.    Conflicts between Security Agreement and DIP Order(s).

In the event of any conflict between the terms and conditions of this Security Agreement and the terms and conditions of the DIP Order(s), the terms and conditions of the DIP Order(s) shall prevail.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

754025.02-LACSR02A - MSW
*CHI 65672578v2*

IN WITNESS WHEREOF, the Grantors and the Lender have caused this Security Agreement to be duly executed and delivered by their duly authorized officers as of the date first above written.

**THE WET SEAL, INC.**, as a Grantor, Lead Borrower, a Borrower, a Debtor and a Debtor-in-Possession

By: _____
Name: _____
Title: _____

**THE WET SEAL RETAIL, INC.**, as a Grantor, a Borrower, a Debtor and a Debtor-in-Possession

By: _____
Name: _____
Title: _____

**WET SEAL CATALOG, INC.**, as a Grantor, a Borrower, a Debtor and a Debtor-in-Possession

By: _____
Name: _____
Title: _____

**WET SEAL GC, LLC**, as a Grantor, a Guarantor, a Debtor and a Debtor -in-Possession

By: _____
Name: _____
Title: _____

Signature Page to Security Agreement

**MADOR LENDING, LLC**, as Lender

By:    _____

Name:  _____

Title:   _____

Signature Page to Security Agreement

EXHIBIT 1

[Form of]

SECURITIES PLEDGE AMENDMENT

This Securities Pledge Amendment, dated as of _____, is delivered pursuant to SECTION 5.1 of that certain Security Agreement (as amended, amended and restated, restated, supplemented or otherwise modified from time to time, the "Security Agreement;" capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement), dated as of _____, 2015, made by (i) THE WET SEAL, INC., a Delaware corporation, as lead borrower for itself and the Borrowers (the "Lead Borrower"), (ii) THE OTHER BORROWERS LISTED ON THE SIGNATURE PAGES THERETO (the "Original Borrowers") OR FROM TIME TO TIME PARTY THERETO BY EXECUTION OF A JOINDER AGREEMENT (the "Additional Borrowers," and together with the Original Borrowers, the "Borrowers"), and (iii) THE GUARANTORS LISTED ON THE SIGNATURE PAGES THERETO (the "Original Guarantors") AND THE OTHER GUARANTORS FROM TIME TO TIME PARTY THERETO BY EXECUTION OF A JOINDER AGREEMENT (the "Additional Guarantors," and together with the Original Guarantor, the "Guarantors"), as pledgors, assignors and debtors (the Borrowers, together with the Guarantors, in such capacities and together with any successors in such capacities, the "Grantors," and each, a "Grantor"), in favor of MADOR LENDING, LLC, as pledgee, assignee and secured party (in such capacities and together with any successors in such capacities, the "Lender").  The undersigned hereby agrees that this Securities Pledge Amendment may be attached to the Security Agreement and that the Pledged Interests and/or Intercompany Notes listed on this Securities Pledge Amendment shall be deemed to be and shall become part of the Collateral and shall secure all Secured Obligations.

Signature Page to Security Agreement

## PLEDGED INTERESTS

| ISSUER | CLASS OF STOCK OR INTERESTS | PAR VALUE | CERTIFICATE NO(S). | NUMBER OF SHARES OR INTERESTS | PERCENTAGE OF ALL ISSUED CAPITAL OR OTHER EQUITY INTERESTS OF ISSUER |
|---|---|---|---|---|---|

## INTERCOMPANY NOTES

| ISSUER | PRINCIPAL AMOUNT | DATE OF ISSUANCE | INTEREST RATE | MATURITY DATE |
|--------|------------------|------------------|---------------|---------------|
|        |                  |                  |               |               |

[_____],

as Grantor

By: _____

    Name:

    Title:

AGREED TO AND ACCEPTED:

MADOR LENDING, LLC, as Lender

By: _____

    Name:

    Title:

**Exhibit 3**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE WET SEAL, INC., et al.,[1] | ) | Case No. 15-10081 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | Re: Docket No. [_____] |

**ORDER PURSUANT TO SECTIONS 105, 361, 362, 363
AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY
RULES 2002, 4001 AND 9014: (1) AUTHORIZING POST-PETITION
FINANCING, (2) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY,
(3) AUTHORIZING USE OF CASH COLLATERAL, AND (4) MODIFYING
THE AUTOMATIC STAY**

Upon the motion (the "***Motion***"),[2] dated March __, 2015 [D.R. No. ____], of The Wet

Seal, Inc., et al., as debtors and debtors-in-possession (individually a "***Debtor***", and collectively

the "***Debtors***"), pursuant to sections 105, 361, 362, 363, and 364 of Title 11, United States Code

(the "***Bankruptcy Code***") and in accordance with Rules 2002, 4001 and 9014 of the Federal

Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 4001-2 of the Local

Bankruptcy Rules for the District of Delaware (the "***Local Rules***"), in the above-captioned

chapter 11 cases (collectively, the "***Chapter 11 Cases***"), for entry of an order (this "***Order***"),

granting the following relief:

**(I)     DIP Financing -**

      (A)     Authorizing the Debtors to obtain and guarantee post-petition financing,
subject to availability restrictions, pursuant to that certain Senior Secured,
Super-Priority Debtor-In-Possession Credit Agreement, dated as of March

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: The Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265), Wet Seal Catalog, Inc. (7604), and Wet Seal GC, LLC (2855-VA).  The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

[2] Capitalized terms used in this Order but not defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement (defined below).

5, 2015 (as the same may be amended, modified, restated, or supplemented and in effect from time to time, including by this Order, the "***DIP Credit Agreement***"), by and between the Debtors, as borrowers or guarantor, as applicable, and Mador Lending, LLC (in its capacity as lender under the DIP Credit Agreement, the "***DIP Lender***"), which may be used for funding the Debtors' day-to-day operations and working capital needs, subject in all respects to the Approved Budget and the terms and provisions of the DIP Credit Agreement and this Order (the post-petition credit facility represented in the DIP Credit Agreement shall sometimes be referred to herein as the "***DIP Facility***");

(B)     Approval of the DIP Credit Agreement and all other agreements, documents, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Lender, including, without limitation, all "Loan Documents", each as amended and in effect from time to time (collectively with the DIP Credit Agreement, the "***DIP Financing Agreements***" and, the obligations arising under or in connection with the DIP Financing Agreements, the "***DIP Obligations***");

(C)     Granting the DIP Lender the following Liens (as defined in section 101(37) of the Bankruptcy Code) and claims, subject only to the Professional Fee Carve Out (defined below) and the BofA Interests (defined below):

(i)      Except as otherwise expressly provided herein, first priority valid, perfected, and enforceable Liens, upon all of the Debtors' real and personal property and other assets as provided in and as contemplated by this Order and the DIP Financing Agreements; and

(ii)     A superpriority administrative claim in respect of all DIP Obligations.

**(II)**   **Use of Cash Collateral** – Subject to such limitations as shall be provided herein, authorizing the Debtors' use of "cash collateral," as such term is defined in section 363 of the Bankruptcy Code, in which the DIP Lender has an interest under this Order, the DIP Financing Agreements, or otherwise ("***Cash Collateral***").

**(III)**  **Modifying the Automatic Stay** – Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Order, without further order of the Court.

**(IV)**   **Waiving Any Stay under Rule 6004(h)** – Waiving any applicable stay to the immediate effectiveness of this Order, including, without limitation, under Bankruptcy Rule 6004(h).

2

and the Court having reviewed the Motion and having held a hearing with respect to the Motion on [_____], 2015 (the "*Hearing*"); upon the Motion and the record of the Hearing; and all objections, if any, to the entry of this Order having been withdrawn, resolved, or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

**I.**     <u>**Procedural Findings of Fact**</u>

**A.**     **Petition Date.**   On January 15, 2015 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "*Court*").   The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.   No trustee or examiner has been appointed in these Chapter 11 Cases.

**B.**     **Jurisdiction and Venue.**   This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby. Consideration of the Motion constitutes a "core" proceeding under 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

**C.**     **Committee Formation.**   On January 30, 2015, an official committee of unsecured creditors (the "*Creditors' Committee*") was appointed in the Chapter 11 Cases. Other than the Creditors' Committee, no official committee (each, including the Creditors' Committee, a "*Committee*") of unsecured creditors, equity interest holders, or other parties in interests has been appointed in the Chapter 11 Cases.

3

**D.**     **Notice.**  The Hearing is being held pursuant to the authorization of Bankruptcy Rule 2002, 4001(b), (c), and (d) and Rule 9014, and the Local Rules.  Notice of the Hearing and the relief requested in the Motion has been provided by the Debtors.  Under the circumstances, such notice of the Hearing and the relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rules 2002 and 4001 and Local Rule 4001-2.

## II.     Debtors' Acknowledgements and Agreements

**E.**     The Debtors admit, stipulate, acknowledge, and agree as follows, which (collectively, Paragraphs II.E (1) - (6) hereof shall be referred to herein as the "***Debtors' Stipulations***"):

(1)     **DIP Financing Agreements**.   The Debtors are parties to the DIP Financing Agreements.

(2)     **DIP Obligations**.  The Debtors will be indebted to the DIP Lender for all DIP Obligations.

(3)     **DIP Collateral**.  To secure the DIP Obligations, the DIP Lender shall have first priority, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and Liens (collectively, the "***DIP Liens***") senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates (except as may otherwise be provided in this Order,  the DIP Financing Agreements and the BofA DIP L/C Order (defined below), in, upon and to all of the following (collectively, the "***DIP Collateral***"):

(a)     All "Collateral" (as defined in the DIP Credit Agreement);

(b)     All tangible and intangible personal property assets of the Debtors, including, without limitation, the following:

(i)  all Accounts;

(ii)  all Goods, including Equipment, Inventory and Fixtures;

(iii)  all Documents, Instruments and Chattel Paper;

(iv)  all Letters of Credit and Letter-of-Credit Rights;

(v)  all Securities Collateral;

4

(vi) all Investment Property;

(vii) all Intellectual Property Collateral;

(viii) all Commercial Tort Claims;

(ix) all General Intangibles;

(x) all Deposit Accounts;

(xi) all Supporting Obligations; and

(xii) all books and records relating to the Collateral;

(c)     Bankruptcy Recoveries (as defined below), but only: (A) the full amount of any such recovery or settlement thereof to the extent arising under section 549 of the Bankruptcy Code, and (B) all amounts necessary to reimburse the DIP Lender for the amount of the Professional Fee Carve Out, if any, used to finance the pursuit of such recovery or settlement with respect to all Bankruptcy Recoveries ((A) and (B) being hereinafter defined as the "*Specified Bankruptcy Recoveries*"). As used herein, "*Bankruptcy Recoveries*" shall mean any claims and causes of action to which any Debtor may be entitled to assert by reason of any avoidance or other power vested in or on behalf of such Debtor(s) or the estates of the Debtors under Chapter 5 of the Bankruptcy Code, and any claim and cause of action relating to a Commercial Tort Claim and any and all recoveries and settlements thereof; and

(d)     All real property interests of the Debtors, all proceeds from the disposition of real property interests, and all proceeds from the disposition of real property leases (including, without limitation, all non-residential real property leases); provided that, with respect to the Debtors' non-residential real property leases, and notwithstanding anything to the contrary in this Order or any DIP Financing Agreements, no Liens or encumbrances shall be granted on or extend to the Debtors' real property leases themselves, but rather, any such Liens granted shall extend only to the proceeds realized upon the sale, assignment, termination, or other disposition of such real property lease(s).

(e)     To the extent not covered by clauses (a) through (d) above, all other personal property of the Debtors, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtors from time to time with respect to any of the foregoing.

5

(f)    The DIP Liens are subject to the BofA Interests and the Professional Fee Carve Out.

(4)    **DIP Obligations and DIP Liens**.

(a)    Upon entry of this Order,

(i)    The DIP Obligations shall constitute legal, valid, and binding obligations of the Debtors, enforceable in accordance with the terms of the DIP Financing Agreements (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code);

(ii)    No offsets, defenses, or counterclaims to any of the DIP Obligations exist;

(iii)    No portion of the DIP Obligations will be subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(iv)    The DIP Obligations constitute valid, allowed claims, payable on the terms and the priorities set forth herein; and

(v)    The DIP Liens are valid, binding, enforceable, and perfected first-priority Liens, subject only to the BofA Interests and the Professional Fee Carve Out, and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(b)    The Debtors shall be deemed to have waived, discharged, and released the DIP Lender, together with its affiliates, agents, attorneys, officers, directors, and employees, of any right the Debtors may have:

(i)    To challenge or object to any of the DIP Obligations, except as permitted under the DIP Financing Agreements,

(ii)    To challenge or object to the security for the DIP Obligations, including, without limitation, the DIP Liens on the DIP Collateral,

(iii)    To bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action

6

CHI 65672582v4

based on facts and circumstances existing prior to entry of this Order arising out of, based upon, or related to the DIP Financing Agreements, the DIP Obligations, the DIP Liens, or any other obligations related thereto.

(c)     The Debtors do not possess and will not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, and non-avoidability of any of the DIP Financing Agreements, the DIP Obligations, or the DIP Liens, or any claim of the DIP Lender pursuant to the DIP Financing Agreements or otherwise.

(5)     **Cash Collateral.**  Subject only to the BofA Interests and the Professional Fee Carve Out, the DIP Lender has a security interest in and Lien on Cash Collateral, including all amounts on deposit in the Debtors' banking, checking, or other deposit accounts to secure the DIP Obligations.

(6)     **DIP Facility**.  In entering into the DIP Financing Agreements, and as consideration therefor, the Debtors hereby agree that until such time as all Obligations (as defined in the DIP Financing Agreements) have been irrevocably paid in full in cash (or other arrangements for payment of the Obligations satisfactory to the DIP Lender in its sole and exclusive discretion have been made) and the DIP Financing Agreements have been terminated in accordance with the terms thereof, the Debtors shall not in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Lender under this Order by offering a subsequent lender or a party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise. Notwithstanding the foregoing, the Debtors shall be permitted to provide cash collateral and liens to BofA (defined below) in connection with (i) postpetition letters of credit (including the deemed "roll-up" of the Pre-Petition Letters of Credit (as defined in the BofA DIP L/C Order defined below)), and (ii) prepetition and postpetition cash management and treasury management services and prepetition indemnification rights and claims, in each case consistent with the terms of the BofA DIP L/C Order and the Cash Management Order (each defined below).

Upon entry of this Order, the Debtors' Stipulations shall be binding on all creditors, interest holders, and parties-in-interest, including, without limitation, on BofA (defined below).

## III.     **Findings Regarding the Post-Petition Financing.**

F.     **B. Riley Financing.**  On February 5, 2015, this Court entered the Final Order Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules

7

2002, 4001 and 9014: (1) Authorizing Post-Petition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral, and (4) Modifying the Automatic Stay [D.R. 251] (the "***B. Riley Final Order***"), authorizing the Debtors to obtain, from B. Riley Financial, Inc. ("***B. Riley***"), up to $20,000,000 in post-petition financing (the "***B. Riley Facility***"), subject to availability restrictions, pursuant to that certain Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of January 15, 2015, in substantially the form filed with the Court at D.R. No. 21 (the "***B. Riley Credit Agreement***") and the other "Loan Documents", as that term is defined in the B. Riley Credit Agreement (collectively with the B. Riley Credit Agreement and the B. Riley Final Order, the "***B. Riley Loan Documents***").  All obligations owed to B. Riley under the B. Riley Loan Documents (the "***B. Riley Obligations***") are secured by liens on the DIP Collateral, as that term is defined below (the "***B. Riley Liens***"). The outstanding amount of the B. Riley Obligations is $514,323.37, consisting of: (i) a commitment fee of $375,000**[, to the extent actually due and payable under the B. Riley Loan Documents]** (the ***"B. Riley Commitment Fee"***); (ii) fees and expenses owed to Skadden, Arps, Slate, Meagher & Flom LLP in the amount of $90,000; (iii) fees and expenses owed to FreedMaxick ABL Services, LLC in the amount of $39,323.37; and (iv) fees and expenses owed to Great American in the amount of $10,000 (collectively, (ii), (iii) and (iv) shall, to the extent remaining outstanding as of the entry of this Order, hereinafter be referred to as the ***"Outstanding B. Riley Fees and Expenses"***).   At the Hearing on this Motion, this Court determined that the entry into the DIP Facility would be more beneficial to the Debtors' estates than would a continuation of the B. Riley Facility, and thus should be approved.  **[TBD].**

      **G.**      **Need for Post-Petition Financing**.  An immediate need exists for the Debtors to obtain funds under the DIP Facility in order to continue operations and to administer and

8

preserve the value of their estates.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates, creditors, equity holders, and the possibility for a successful reorganization or sale of the Debtors' assets.

H.  **No Credit Available on More Favorable Terms**.  The Debtors have been unable to obtain any of the following:

(1)  unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense,

(2)  credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code,

(3)  credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien, or

(4)  credit for money borrowed secured by a junior Lien on property of the estates which is subject to a Lien, in each case, on more favorable terms and conditions than those provided in the DIP Financing Agreements and this Order.

The Debtors are unable to obtain credit for borrowed money without granting to the DIP Lender the DIP Protections (defined below).

I.  **Adequacy of the Budget.**  The Approved Budget, attached hereto as Exhibit 1, is adequate, considering all the available assets, to pay the administrative expenses due and accruing during the period covered by the Approved Budget.

J.  **Section 506(c) of the Bankruptcy Code**.  In light of its agreement to subordinate its Liens and superpriority claims to (x) the Professional Fee Carve Out and (y) the "DIP L/C Liens" (as that term is defined in the BofA DIP L/C Order) securing all claims and interests held by Bank of America, N.A. ("*BofA*") as specifically identified in (i) the Final Order Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001

9

and 9014: (1) Authorizing Post-Petition L/C Financing Facility, (2) Granting Liens and Providing Superpriority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral and Providing for Adequate Protection, and (4) Modifying the Automatic Stay (as in effect on the date hereof, as modified by this Order, the "***BofA DIP L/C Order***" and, as in effect on the date hereof, the BofA financing facility approved thereby, the "***BofA DIP L/C Facility***") and/or (ii) the Order (I) Authorizing Continued Use of Cash Management System, (II) Authorizing the Continuation of Intercompany Transactions, (III) Granting Administrative Priority Status to Postpetition Intercompany Transactions, (IV) Authorizing Use of Prepetition Bank Accounts, Account Control Agreement, and Certain Payment Methods, and (V) Waiving the Requirements of 11 U.S.C. § 345(b) on a final Basis (the "***Cash Management Order***," collectively, such senior "DIP L/C Liens" securing such claims and interests of BofA specifically identified in the BofA DIP L/C Order and/or the Cash Management Order, in each case subject to terms set forth therein, the "***BofA Interests***"), the DIP Lender is entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code, to the extent applicable.

**K.     Conditions Precedent to DIP Lender's Extension of Financing.** The DIP Lender has indicated a willingness to provide financing to the Debtors in accordance with the DIP Financing Agreements, and subject to the following:

(1)     the entry of this Order;

(2)     findings by this Court that such financing is essential to the Debtors' estates, that the DIP Lender is a good faith financier, and that the DIP Lender's claims, superpriority claims, security interests, and Liens and other protections granted pursuant to this Order and the DIP Facility will not be affected by any subsequent reversal, modification, vacation, or amendment of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code; and

(3)     the conditions set forth in the DIP Financing Agreements (including, without limitation, the payment of the B.Riley Obligations in accordance with Paragraph I.B.5 below, and the termination and release of the B. Riley Liens upon entry of this Order).

**L.**     **Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code.** The extension of credit under the DIP Facility and the DIP Financing Agreements (i) is fair, reasonable, and the best available under the circumstances (and entry into such DIP Facility and the DIP Financing Agreements is more beneficial to the Debtors' estates than a continuation of the B. Riley Facility would be, and thus should be approved); (ii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iii) are supported by reasonably equivalent value and consideration. The DIP Facility was negotiated in good faith and at arms' length between the Debtors and the DIP Lender, and the use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lender is entitled to the protections and benefits of section 364(e) of the Bankruptcy Code.

**M.**     **Relief Essential; Best Interest.** The relief requested in the Motion (and as provided in this Order) is necessary, essential, and appropriate for the continued operation of the Debtors' business and the management and preservation of the Debtors' assets and personal property. It is in the best interest of Debtors' estates that the Debtors be allowed to establish the DIP Facility contemplated by the DIP Financing Agreements. The Debtors have demonstrated good and sufficient cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:**

1.     The Motion is granted as set forth herein.

## I.     DIP FINANCING

**A.**     **Approval of Entry into the DIP Financing Agreements**

2.     The Debtors are expressly and immediately authorized to execute and deliver the DIP Financing Agreements, and to incur and to perform the post-petition Obligations thereunder in accordance with, and subject to, the terms of this Order and the DIP Financing Agreements,

11

and to execute and deliver all instruments, certificates, agreements, and documents which may be required or necessary or reasonably appropriate for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Order and the DIP Financing Agreements. The Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Financing Agreements as such become due, including, without limitation, reasonable attorneys', financial advisors' and accountants' fees, and disbursements as provided for in the DIP Financing Agreements, which amounts, subject to the provisions of Paragraph 35 below (solely with regard to reimbursement of the DIP Lender's reasonable attorneys', financial advisors' and accountants' fees, and disbursements), shall not otherwise be subject to approval of this Court. Upon execution and delivery, the DIP Financing Agreements shall represent valid and binding obligations of the Debtors enforceable against the Debtors in accordance with their terms and the terms of this Order.

**B.     Authorization to Borrow**

3.      In order to enable them to continue to operate their businesses following the entry of this Order, the Debtors are hereby authorized to borrow from the DIP Lender under the DIP Facility, subject in all respects to the terms and conditions of this Order, the DIP Financing Agreements, and the Approved Budget (subject to any variances thereto permitted under Section 6.19 of the DIP Credit Agreement).

**C.     Application of DIP Facility Proceeds**

4.      The proceeds of the DIP Facility (net of any amounts used to pay fees, costs, and expenses under the DIP Financing Agreements) shall be used in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, this Order, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted

12

under Section 6.19 of the DIP Credit Agreement), and otherwise solely for the following purposes:

(a)    If necessary, to repay the B. Riley Obligations in accordance with Paragraph I.B.5 below; and

(b)    For general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof and subject to the terms and conditions of the DIP Financing Agreements.

The Debtors shall provide a copy of any motion seeking entry of an order modifying any of the foregoing to the DIP Lender not less than five (5) business days before the hearing thereon and if the Court determines to enter such order, it shall immediately constitute a DIP Order Event of Default (defined below) (without the requirement of the notice requirements in Paragraph 26 below).

### D.    Conditions Precedent; Payment of B. Riley Obligations And Termination of B. Riley Liens

5.    The DIP Lender shall not have any obligation to make any loan or advance under the DIP Financing Agreements unless each of the conditions precedent to the making of such loan/advance under the DIP Financing Agreements has been satisfied in full or waived, as determined by the DIP Lender in its exclusive discretion, in accordance with the DIP Financing Agreements.  Upon entry of this Order, the B. Riley Liens shall be of no further force or effect, without the need for any further action.  The Debtors are hereby authorized and shall pay, from up to $514,323.37 of Mador Lending LLC's Good Faith Deposit deposited in accordance with the Bid Procedures that are attached to that Order Approving Certain Bid Procedures Governing the Submission of Competing Proposals to (I)(A) Sponsor A Plan of Reorganization for the Debtors or (B) Acquire All or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code and (II) Provide Debtor-In-Possession Financing [Docket No. 329] and

13

currently located at [_____], which amount shall be reserved for such purpose: (a) immediately upon entry of this Order, any B. Riley Commitment Fee; and (b) under and in accordance with Paragraph 35 of the B. Riley Final Order, the Outstanding B. Riley Fees and Expenses.  Upon payment of the sums set forth in (a) and (b) above, the B. Riley Obligations shall be deemed to be paid in full, without the need for further action.  Notwithstanding the foregoing, upon the DIP Lender's request: (x) the Debtors are authorized to take all such actions as are necessary to terminate the B. Riley DIP Facility and the B. Riley Loan Documents, and to release and discharge the B. Riley Liens; and (y) B. Riley is directed to cooperate with such termination, release and discharge of the B. Riley DIP Obligations and B. Riley Liens (including, without limitation, by filing any applicable UCC-3 termination statements, terminating any control agreements, and turning over any possessory DIP Collateral to the DIP Lender; provided that, notwithstanding anything to the contrary contained in the DIP Financing Agreements, the Debtors and B. Riley shall have up to five (5) business days after entry of this Order to turn over any possessory DIP Collateral to the DIP Lender). **[Debtors to provide].**

E.      **The DIP Liens**

6.      Pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, effective immediately upon the entry of this Order the DIP Lender is hereby granted the DIP Liens, which shall be senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates (except as may otherwise be provided in this Order), in, upon and to all of the DIP Collateral, subject to the BofA Interests and the Professional Fee Carve Out. For the avoidance of doubt, nothing in this Order limits the Debtors' obligations under the DIP Credit Agreement (including Section 6.03 thereof) with respect to any valid tax obligations, or the status of any such valid tax obligation as a "Permitted Encumbrance" under the terms of the DIP Credit Agreement, including, without limitation, with respect to any valid tax obligations

14

that may be owed to Arlington ISD, Crowley ISD, Burleson ISD, Spring Branch ISD, Clear Creek ISD, City of Houston, Brazoria County Tax Office, Fort Bend ISD, Fort Bend County LID #2, Dickinson ISD, Galveston County MUD #54, Woodlands Metro Center MUD, Woodlands Road UD, Potter County, Tyler ISD, McAllen ISD, Bexar County, Cypress-Fairbanks ISD, Dallas County, El Paso, Fort Bend County, Frisco, Gregg County, Harris County, Hidalgo County, Jefferson County, McAllen, Montgomery County, Nueces County, or Tarrant County, in each case subject to the Debtors' rights to challenge any and all asserted tax claims and interests, and the DIP Liens shall not be senior to any valid lien securing such a "Permitted Encumbrance" under the DIP Credit Agreement.

**F.    DIP Lien Priority**

7.    The DIP Liens to be created and granted to the DIP Lender, as provided herein, are:

(a)    created pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, and

(b)    first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to the DIP Collateral, subject only to: (i) the BofA Interests, and (ii) the Professional Fee Carve Out.

The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the same order and priority set forth in the DIP Financing Agreements.  Except as provided in Paragraph (b) above, the DIP Liens  shall be valid and enforceable against any trustee appointed in any one or more of the Chapter 11 Cases, upon the conversion of any one or more of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the foregoing (each a "*Successor Case*", and collectively the "*Successor Cases*"), and/or upon the dismissal of any one or more of the Chapter 11 Cases.  The DIP Liens shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code.

15

**G.**     **Superpriority Administrative Claim Status**

8.     Subject to the BofA Interests and the Professional Fee Carve Out, all DIP Obligations shall be granted the status of an allowed superpriority administrative expense claim (the "***DIP Superpriority Claim***" and, together with the DIP Liens, collectively, the "***DIP Protections***") with priority in the Chapter 11 Cases (and any Successor Cases) under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code; provided, however, that the DIP Protections shall not attach to any Bankruptcy Recoveries other than the Specified Bankruptcy Recoveries.

9.     Other than the Professional Fee Carve Out and the BofA Interests, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Lender arising hereunder.

## II.     USE OF CASH COLLATERAL

**A.**     **Authorization to Use Cash Collateral**

10.     Pursuant to the terms and conditions of this Order, the DIP Facility, the DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget, the Debtors are authorized to use Cash Collateral and to use the advances under the DIP Facility during the period commencing immediately after the entry of this Order and terminating upon

16

notice being provided by the DIP Lender to the Debtors that: (i) a DIP Order Event of Default (defined below) has occurred and is continuing, and (ii) the DIP Facility has been terminated. For the avoidance of doubt, and subject in all respects to the Approved Budget, the Debtors are authorized to contract for, among other things, inventories.

11.    Nothing in this Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business or the proceeds resulting therefrom, except as permitted under the DIP Financing Agreements.

### III.    POST-PETITION LIEN PERFECTION

12.    This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of Lien, control agreement, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, taking possession or control of DIP Collateral or giving notice to any third party or obtaining any consent or agreement of any third party) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein.  Upon entry of this Order, the DIP Lender shall have, in addition to any other rights granted it hereunder, full control, dominion, and such other status as might be required under applicable law to hold a perfected and enforceable interest in such cash, and a Lien in, upon and on all deposit accounts (whether or not a control agreement exists), subject to the BofA Interests and to the terms of the Cash Management Order.

13.    Notwithstanding the foregoing, the DIP Lender may, in its discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents as the DIP Lender deems necessary or desirable, and is

17

hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so.

14.     The Debtors shall execute and deliver to the DIP Lender all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents as the DIP Lender may reasonably request to evidence the DIP Liens granted pursuant hereto.

15.     The DIP Lender, in its discretion, may file a photocopy of this Order as evidence of the DIP Liens granted pursuant hereto with any recording office designated to file financing statements, with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property, and/or the United States Patent/Trademark/Copyright Office(s), and in such event, the subject filing or recording office shall be authorized to file or record such copy of this Order as evidence of the DIP Liens granted pursuant hereto.

16.     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the DIP Financing Agreements as necessary:

> (a)     permit the Debtors to grant the DIP Liens (subject to the BofA Interests) and to incur all liabilities and obligations to the DIP Lender under the DIP Financing Agreements, the DIP Facility, and this Order,
>
> (b)     authorize the DIP Lender to retain and apply payments hereunder as provided by the DIP Financing Agreements and this Order; or
>
> (c)     otherwise effect the transactions and actions permitted by the DIP Financing Agreement and this Order, including, without limitation, the DIP Lender's right to enforce its remedies.

**IV.     CERTAIN RESTRICTION ON USE OF PROCEEDS OF DIP FACILITY**

17.     Notwithstanding anything herein to the contrary, neither the proceeds of the DIP Financing Agreements, the DIP Collateral, nor the Professional Fee Carve Out may be used to:

18

(a) object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under the DIP Financing Agreements or the DIP Liens or claims granted under this Order or the DIP Financing Agreements;

(b) assert any claims and defenses or any other causes of action against the DIP Lender or its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors;

(c) prevent, hinder or otherwise delay the DIP Lender's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Financing Agreements or this Order;

(d) seek to modify any of the rights granted to the DIP Lender hereunder or under the DIP Financing Agreements (in the case of each of the foregoing clauses (a) through (d), without the DIP Lender's prior written consent); or

(e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are: (i) approved by an order of this Court (including with respect to the BofA Interests) and (ii) permitted under the Approved Budget;

provided, however, that nothing in this Paragraph 17 shall or does prohibit the proceeds of the DIP Financing Agreements, the DIP Collateral, or the Professional Fee Carve Out from being used in connection with discussions and negotiations relating to any matter with Mador Lending, LLC, including in its capacity as DIP Lender, and/or any of its affiliates.

**V.     PROFESSIONAL FEE CARVE OUT AND PAYMENT OF PROFESSIONALS.**

18.     Subject to the terms and conditions contained herein, the DIP Liens and the DIP Superpriority Claim are subordinate only to (i) the Professional Fee Carve Out (as defined in the DIP Financing Agreements), which, for the avoidance of doubt and notwithstanding anything in the DIP Financing Agreements to the contrary, shall include, among other things, provision for all due and owing U.S. Trustee quarterly fees in such amounts as determined in agreement with the U.S. Trustee or by final order of the Court, and (ii) the BofA Interests.  For the avoidance of doubt, the Professional Fee Carve Out shall be senior to the DIP Liens and the DIP Superpriority

Claim, and any and all other Liens or claims securing the DIP Obligations.  Any unused portion of the Professional Fee Carve Out shall at all times remain DIP Collateral as provided herein.

19.    Following the Petition Date, the allowed Professional Fees and Expenses of Case Professionals shall be paid first from retainers held by such professionals, if any, and thereafter at the times and in the amounts provided under the Approved Budget. To the extent that the Professional Fees and Expenses of Case Professionals have not been allowed by the Court at the time of payment pursuant to the Approved Budget, the amount so paid to the Case Professionals shall be held in escrow by them until the requested Professional Fees and Expenses have been so allowed.

20.    Subject to Paragraphs 25 and 26 below, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable and allowed by the Court, but always as provided in and as may be limited by the Approved Budget and this Order. Further, nothing contained herein shall limit payment of compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable and allowed by the Court even if they exceed the amounts contained in the Approved Budget, out of funds other than the Professional Fee Carve Out after the DIP Obligations have each been irrevocably paid in full to the DIP Lender.

21.    Nothing herein, including the inclusion of line items in the Approved Budget for Case Professionals, shall be construed as consent by the DIP Lender to the allowance of any professional fees or expenses of the Debtors, of any Committee(s), or of any person, nor shall it affect the right of the DIP Lender to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Approved Budget.

## VI.    COMMITMENT TERMINATION DATE, DIP ORDER EVENTS OF DEFAULT, AND REMEDIES

### A.    Commitment Termination Date

22.    All DIP Obligations shall be immediately due and payable and all authority to use the proceeds of the DIP Facility and to use Cash Collateral shall cease on the date that is the earliest to occur of any of the following (the "*Commitment Termination Date*"):

(a)    the Maturity Date;

(b)    the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitment is irrevocably terminated in accordance with Article VIII of the DIP Credit Agreement);

(c)    the termination of the Commitment under Section 2.06 of the DIP Credit Agreement;

(d)    the effective date of any Plan (defined below);

(e)    **[March 31, 2015]**, if this Court has not entered an order approving the sale of all or substantially all of the assets of the Debtors, including, without limitation, the DIP Collateral, to DIP Lender (or its assignees) pursuant to that certain Asset Purchase Agreement dated as **[March 11, 2015]** by and among the Debtors and Mador Lending, LLC, or (ii) **[April 10, 2015]**, if such sale has not closed on or before such date. **[TBD].**

### B.    DIP Order Events of Default

23.    Each of the following shall constitute a "*DIP Order Event of Default*":

(a)    the occurrence of the Commitment Termination Date;

(b)    the occurrence of an Event of Default under the DIP Credit Agreement;

(c)    the Debtors sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or seek to transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral) without the prior written consent of the DIP Lender (and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or an order of this Court), except under and in accordance with Section 7.05 of the DIP Credit Agreement (provided that, for the avoidance of doubt, BofA shall be permitted to use the Cash Collateral on deposit in the Pre-Petition Cash Collateral Account (as defined in the BofA DIP L/C Order), the Post-Petition Cash Collateral Account (as defined in the BofA DIP L/C Order), and the Cash Management/Indemnity Account (as defined in the BofA DIP L/C Order) in accordance with the terms of the

21

BofA DIP L/C Order and any agreement or document entered into under or in connection with the BofA DIP L/C Order);

(d)    the Debtors assume, reject, or assign any executory contract or unexpired lease without the prior consultation with the DIP Lender, except as provided for in the DIP Financing Agreements;

(e)    the Debtors use the Pre-Petition Cash Collateral Account (as defined in the BofA DIP L/C Order) for any purposes other than as authorized in connection with the Pre-Petition Letters of Credit (subject to the deemed "roll-up" of the Pre-Petition Letters of Credit into Post-Petition Letters of Credit as provided under the BofA DIP L/C Order);

(f)    except as set forth in the BofA DIP L/C Order and this Order, the DIP Liens are made subject to or *pari passu* with any Lien or other security interest by any court order heretofore or hereafter entered in the Chapter 11 Cases;

(g)    unless (a) the DIP Lender has provided its prior written consent or all DIP Obligations have been irrevocably paid in full in cash (or will be irrevocably paid in full in cash upon entry of an order approving indebtedness described in Paragraph 33 below, or other arrangements for the payment of the DIP Obligations satisfactory to the DIP Lender in its sole and exclusive discretion have been made), and (b) the Commitment has terminated, there is any order entered in the Chapter 11 Cases or in any Successor Cases that authorizes, or there is any action taken or inaction by any of the Debtors that results in, any of the following:

(i)    any modification, stay, vacation, or amendment to this Order or the Cash Management Order (which would have the effect of depriving the Debtors of access to their cash management system), or any change in the terms applicable to the DIP L/C Facility (as defined in the BofA DIP L/C Order) that is less favorable to the Debtor than the existing applicable terms, to which the DIP Lender has not consented;

(ii)    a priority claim or administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the DIP Lender in respect of the DIP Obligations, except with respect to the Professional Fee Carve Out or the BofA Interests;

(iii)    any Lien on any DIP Collateral having a priority equal or superior to the Lien securing the DIP Obligations, except (i) with respect to the Professional Fee Carve Out, and (ii) with respect to the BofA Interests;

(iv)    the return of any of the Debtors' property pursuant to section 546(h) of the Bankruptcy Code; or

(v)    the payment of any Indebtedness (other than Indebtedness reflected in the Approved Budget and other Indebtedness approved by the DIP Lender) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) that is secured by a Lien, in each case other than as set forth in this Order, the BofA DIP L/C Order or the Cash Management Order; or

(h)    unless (i) the DIP Lender has provided its prior written consent or all DIP Obligations have been irrevocably paid in full in cash (or will be irrevocably paid in full in cash upon entry of an order approving indebtedness described in Paragraph 33 below, or other arrangements for the payment of the DIP Obligations satisfactory to the DIP Lender in its sole and exclusive discretion have been made), and (ii) the Commitment has terminated, there is any exercise by BofA of any default remedy under the BofA DIP L/C Order, or any exercise by BofA of any default remedy under any agreement or document entered into under or in connection with the BofA DIP L/C Order, in each case, directly or indirectly, against any DIP Collateral in which the DIP Lender's interests in such DIP Collateral are senior to any interests therein held by BofA; provided that, for the avoidance of doubt, BofA shall be permitted to use the Cash Collateral on deposit in the Pre-Petition Cash Collateral Account (as defined in the BofA DIP L/C Order), the Post-Petition Cash Collateral Account (as defined in the BofA DIP L/C Order), and the Cash Management/Indemnity Account (as defined in the BofA DIP L/C Order) in accordance with the terms of the BofA DIP L/C Order and any agreement or document entered into under or in connection with the BofA DIP L/C Order;

provided, however, that notwithstanding anything to the contrary in Paragraph 23(g)(ii) or (g)(iv) of this Order or in Section 7.15(c) or (e) of the DIP Credit Agreement, the entry of an order in the Chapter 11 Cases or in any Successor Cases that authorizes, or an action taken or inaction by any of the Debtors resulting in, the valid reclamation of goods pursuant to sections 546(c) or (h) of the Bankruptcy Code or applicable non-bankruptcy law, will not constitute a DIP Order Event of Default, a Default, or an Event of Default, as the case may be, if the Court determines that the claim to reclamation of goods is equal or superior to the priority claim of the DIP Lender with respect to such goods as of immediately prior to the entry of this Order.

24.    Unless and until the DIP Obligations have been irrevocably repaid in full in cash (or other arrangements for payment of the DIP Obligations satisfactory to the DIP Lender, in its sole and exclusive discretion, have been made) and the Commitment has been irrevocably terminated, or as otherwise ordered by the Court, the protections afforded to the DIP Lender

23

pursuant to this Order and under the DIP Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order (a) appointing a trustee or examiner in any one or more of the Chapter 11 Cases, (b) confirming one or more plan(s) of reorganization or liquidation pursuant to Chapter 11 of the Bankruptcy Code in the Debtors' Chapter 11 Cases (a "***Plan***"), or (c) converting the Chapter 11 Cases into Successor Cases, and the DIP Liens and the DIP Superpriority Claim shall continue in the Chapter 11 Cases and in any Successor Cases, and such DIP Liens and DIP Superpriority Claim shall maintain their respective priorities as provided by this Order.

**C.      Rights and Remedies Upon DIP Order Event of Default**

25.      Upon the occurrence of a DIP Order Event of Default, and provided that such DIP Order Event of Default is still continuing, and unless and until the DIP Obligations have been irrevocably repaid in full in cash (or other arrangements for payment of the DIP Obligations satisfactory to the DIP Lender, in its sole and exclusive discretion, have been made) and the Commitment has been irrevocably terminated:

(a)      the Debtors shall continue to deliver and cause the delivery of the proceeds of DIP Collateral (other than the Cash Collateral on deposit in the Pre-Petition Cash Collateral Account, the Post-Petition Cash Collateral Account, and the Cash Management/Indemnity Account under the BofA DIP L/C Order (as each such term is defined therein) and Cash Management Order) to the DIP Lender as provided in the DIP Financing Agreements and this Order**;**

(b)      the DIP Lender shall continue to apply such proceeds in accordance with the provisions of the DIP Financing Agreements, this Order, and, to the extent applicable, the BofA DIP L/C Order;

(c)      the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the DIP Obligations, the BofA Interests, and the Professional Fee Carve Out;

(d)      any obligation otherwise imposed on the DIP Lender to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended (whether for expenses previously incurred or to be incurred after the DIP Order Event of Default); and

(e)    any automatic stay otherwise applicable to the DIP Lender is hereby modified so that the DIP Lender may accelerate the DIP Obligations, without further order of the Court.

26.    Prior to exercising any remedy under the DIP Financing Agreements following the occurrence of a DIP Order Event of Default, the DIP Lender shall provide not less than five (5) days' written notice of such default occurrence to: (i) the Debtors and their counsel, (ii) counsel for any Committee(s), (iii) counsel to BofA, (iv) counsel to certain taxing authorities, Beth Weller, Esq., Linebarger Goggan Blair & Sampson, LLP, 2777 N. Stemmons Freeway, Suite 1000, Dallas, TX 75207, Fax: (469) 221-5003, BethW@lgbs.com and (v) the Office of the United States Trustee.    Following the giving of written notice by the DIP Lender of the occurrence of a DIP Order Event of Default, the Debtors and any Committee(s) appointed in the Chapter 11 Cases, if any, shall be entitled to an emergency hearing before this Court (for the avoidance of doubt, such entitlement to an emergency hearing does not and shall not relieve the Debtors, creditors, interest holders, or parties-in-interest from the restrictions imposed by the Debtors' Stipulations or otherwise by this Order). If either (a) the Debtors or any such Committee(s) do not contest the occurrence of a DIP Order Event of Default and, therefore, the right of the DIP Lender to exercise its remedies, or (b) the Debtors or any such Committee(s) do timely contest the occurrence of a DIP Order Event of Default and the Court, after notice and hearing, declines to stay the enforcement thereof, the automatic stay as to the DIP Lender shall automatically terminate at the end of the five (5) day notice period provided for in this Paragraph 26 or the order of the Court declining to stay such enforcement.

27.    Subject to the provisions of Paragraphs 25-26 above, upon the occurrence of a DIP Order Event of Default, the DIP Lender is authorized to exercise its remedies under this Order, the DIP Financing Agreements, and applicable law; except that, with respect to any of the Debtors' leasehold locations, the DIP Lender's rights shall be limited to such rights (i) as may be

25

ordered by the Court upon motion and notice to the applicable landlord with an opportunity to respond that is reasonable under the circumstances; (ii) to which the applicable landlord agrees in writing with the DIP Lender; or (iii) which the DIP Lender has under applicable non-bankruptcy law.  All proceeds realized from any of the foregoing shall be turned over to the DIP Lender for application to the Professional Fee Carve Out (if not previously funded) and the DIP Obligations under, and in accordance with the provisions of, the DIP Financing Agreements, this Order, and, to the extent applicable, BofA DIP L/C Order.

28.    Subject to the provisions of Paragraphs 25-26 above, upon the occurrence of a DIP Order Event of Default, the DIP Lender shall be authorized to deliver a copy of this Order to any party in possession of DIP Collateral or proceeds thereof, in which event (a) such party shall, and shall be entitled to, rely upon the DIP Lender's representation that such delivery is permitted hereby and (b) this Order shall constitute the Court's order to such party to deliver such Collateral or proceeds to the DIP Lender.

29.    Nothing included herein shall prejudice, impair, or otherwise affect the DIP Lender's rights to seek any other or supplemental relief in respect of the Debtors, nor the DIP Lender's rights, as provided in the DIP Financing Agreements, to suspend or terminate the making of loans and granting financial accommodations under the DIP Financing Agreements.

**D.    No Waiver of Remedies**

30.    The delay in or the failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies shall not constitute a waiver of any of the DIP Lender's rights and remedies. Notwithstanding anything herein, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights and remedies of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Lender to (i) request conversion of the Chapter 11 Cases

26

to cases under Chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan; or (iii) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) the DIP Lender may have, including, but not limited to, credit bidding the DIP Obligations in connection with any sale of the Debtors' assets.

## VII.    CERTAIN LIMITING PROVISIONS

### A.    Section 506(c) Claims

31.    Nothing contained in this Order shall be deemed a consent by the DIP Lender to (i) any charge, Lien, assessment, or claim against the DIP Collateral or the DIP Liens, under section 506(c) of the Bankruptcy Code (to the extent applicable) or otherwise, or (ii) that the DIP Lender has any obligation to fund any amount or make any Loan following a DIP Order Event of Default or the Commitment Termination Date.

32.    As a further condition of the DIP Facility and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Financing Agreements, the Debtors (and any successor thereto or any representative thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Cases) are deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code, to the extent applicable.

### B.    Proceeds of Subsequent Financing

33.    Unless otherwise ordered by the Court, without limiting the provisions and protections otherwise contained in this Order, if at any time prior to the irrevocable repayment in full of all DIP Obligations and the termination of the DIP Lender's obligations to make loans under the DIP Facility (including subsequent to the confirmation of any Plan with respect to the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections

27

364(c)(1) or 364(d) of the Bankruptcy Code in violation of the DIP Financing Agreements, then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender and applied in reduction of the DIP Obligations; <u>provided</u> <u>that</u>, anything to the contrary herein notwithstanding, the Debtors shall be permitted to provide cash collateral and liens to BofA in connection with (i) postpetition letters of credit (including the deemed "roll-up" of the Pre-Petition Letters of Credit), and (ii) prepetition and postpetition cash management and treasury management services and prepetition indemnification rights and claims, in each case consistent with the terms of the BofA DIP L/C Order and the Cash Management Order.

## VIII.   OTHER RIGHTS AND OBLIGATIONS

**A.      Good Faith Under Section 364(e) of the Bankruptcy
Code; No Modification or Stay of this Order**

34.     Based on the findings set forth in this Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Order, in the event any or all of the provisions of this Order are hereafter modified, amended, or vacated by a subsequent order of this or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code.

**B.      DIP Lender's Expenses**

35.     All reasonable out-of-pocket costs and expenses of the DIP Lender in connection with the DIP Financing Agreements and this Order, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses will be paid by the Debtors; provided, however that, notwithstanding anything to the contrary contained in the DIP Financing Agreements, the fees and expenses incurred by DIP Lender in

28

connection with the negotiation and preparation of the DIP Financing Agreement and this Order shall be borne by the DIP Lender.  Payment of such fees shall not be subject to allowance by the Court; provided, however, the Debtors may seek a determination by the Court whether such fees and expenses are reasonable.  The Debtors shall provide to the Office of the United States Trustee and any Committee(s) a copy of any invoices for professional fees and expenses provided to the Debtors during the pendency of the Chapter 11 Cases. The Debtors, the U.S. Trustee, and any Committee(s) shall have ten (10) days after receipt of a copy of each invoice to assert a specific written objection as to the reasonableness of the amounts contained in the subject invoice. In the absence of a written objection or dispute as to an invoice, the Debtors shall pay and/or reimburse the DIP Lender for all such fees in expenses within ten (10) days of receipt of the invoice in question.  In the event any amount stated in any invoice is disputed, the Debtors shall be required to pay and/or reimburse the DIP Lender for any undisputed fees in expenses not later than ten (10) days after delivery of the aforementioned invoice.

## C.    **Binding Effect**

36.     The provisions of this Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors), and any Committee(s), whether in the Chapter 11 Cases, in any Successor Cases, or upon dismissal of any such Chapter 11 Cases or any Successor Cases.  The DIP Lender may assign all of its rights and obligations under the DIP Financing Agreements and this Order with the prior written consent of the Debtors and the Creditors' Committee, without further order of the Court, and any permitted assignee of the DIP Lender shall succeed to all of the protections afforded under this Order.

37.     All persons and entities shall be required to accept this Order as sole and

sufficient evidence of the validity and enforceability of the DIP Liens and all of the DIP Lenders' related rights and remedies, and may rely on this Order in recognizing, facilitating, and or complying with the enforcement of the DIP Liens and all of the DIP Lenders' related rights and remedies in accordance with the terms of this Order and the DIP Financing Agreement.

**D.**     <u>**No Third Party Rights**</u>

38.     Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

**E.**     <u>**No Marshaling**</u>

39.     The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral; <u>provided</u>, <u>however</u>, that the DIP Lender shall pursue payment of the DIP Obligations from DIP Collateral other than the Specified Bankruptcy Recoveries before pursuing payment of the DIP Obligations from the Specified Bankruptcy Recoveries.

**F.**     <u>**Amendments**</u>

40.     The Debtors and the DIP Lender may amend, modify, supplement, or waive any provision of the DIP Financing Agreements to make non-material changes to such agreements (as determined by the Debtors and the DIP Lender) without further approval of the Court or any Committee(s); <u>provided</u> <u>that</u>, prior to effectuating any non-material change, amendment, modification, supplement or waiver of any provision of the DIP Financing Agreements, the Debtors and the DIP Lender shall consult with any Committee(s) and with BofA with respect to same. For the avoidance of doubt, any amendment, modification, supplement, or waiver that (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the Commitment, or (iii) changes the maturity date of the DIP Facility shall be

30

considered a material change. Except as set forth above, all waivers, modifications, or amendments of any of the provisions hereof shall not be effective unless set forth in writing, signed by on behalf of the Debtors and the DIP Lender, and approved by the Court.

**G.**     **Survival of Order**

41.    The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:

    (a)    confirming any Plan in the Chapter 11 Cases,

    (b)    converting the Chapter 11 Cases to Cases under chapter 7 of the Bankruptcy Code,

    (c)    to the extent authorized by applicable law, dismissing the Chapter 11 Cases,

    (d)    withdrawing of the reference of the Chapter 11 Cases from this Court, or

    (e)    providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court.

42.    The terms and provisions of this Order including the DIP Protections granted pursuant to this Order and the DIP Financing Agreements shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their priority as provided by this Order until all of the DIP Obligations have been irrevocably paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

**H.**     **Inconsistency**

43.    In the event of any inconsistency between the terms and conditions of the DIP Financing Agreements and of this Order, the provisions of this Order shall govern and control. For the avoidance of doubt, nothing in Section 7.16 of the DIP Credit Agreement shall relieve the Debtors of any applicable requirements, under the Bankruptcy Code, the Bankruptcy Rules,

31

the "Protocol for Engagement of Jay Alix & Associates and Affiliates," or otherwise, in connection with any appointment of any successor to the Debtors' current Chief Executive Officer.

**I.      Enforceability; Waiver of Any Applicable Stay**

44.    This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Order.

**J.      Objections Overruled**

45.    All objections to the Motion to the extent not withdrawn or resolved are hereby overruled.

**K.      Headings**

46.    The headings in this Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Order.

**L.      Retention of Jurisdiction**

47.    The Court has and will retain jurisdiction to enforce this Order according to its terms.

**M.      Certain Defined Terms in the BofA DIP L/C Order**

48.    Upon entry of this Order: (a) the term "DIP Term Lender" in the BofA DIP L/C Order shall be, automatically and without further action, amended and restated to mean "Mador Lending, LLC (in its capacity as lender under the DIP Term Facility)," and (b) the term "DIP Term Facility" in the BofA DIP L/C Order shall be, automatically and without further action, amended and restated to mean the "DIP Facility," as that term is defined in this Order.

Dated: March [_____], 2015

_____

CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Approved Budget**

**Exhibit 4**

**Wet Seal, Inc.**
**13-Week Cash Flow Forecast - Summary**
**($ in 000's)**

| Cash Flow Forecast Week | March | | | | April | | | | May | | 10 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual/Forecast | Week 1 Forecast | Week 2 Forecast | Week 3 Forecast | Week 4 Forecast | Week 5 Forecast | Week 6 Forecast | Week 7 Forecast | Week 8 Forecast | Week 9 Forecast | Week 10 Forecast | Total |
| Week Ending | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | 9-May | 16-May | |
| I. *Memo: Store Merch Sales Comp* | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | 6.5% | 6.5% | |
| *Memo: Ending Store Count* | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | |
| *Memo: Total Sales* | 3,656 | 3,682 | 3,506 | 3,560 | 3,516 | 4,564 | 2,908 | 3,194 | 4,275 | 4,203 | |
| II. Cash Flows | | | | | | | | | | | |
| Sales Receipts | 3,597 | 3,928 | 3,832 | 3,784 | 3,782 | 4,403 | 3,871 | 3,286 | 4,078 | 4,530 | 39,092 |
| Operating Disbursements | | | | | | | | | | | |
| Merchandise Disbursements | 1,923 | 1,940 | 2,005 | 2,039 | 1,931 | 2,438 | 1,595 | 1,754 | 1,933 | 1,900 | 19,459 |
| Payroll & 401K | 1,774 | 111 | 1,949 | 93 | 1,949 | 71 | 1,949 | 71 | 1,949 | 50 | 9,967 |
| Rent | | | 3,953 | | - | - | - | 3,953 | - | - | 7,906 |
| Sales Tax Remittance | 80 | 1,584 | - | - | 120 | 1,081 | - | - | - | 100 | 2,965 |
| Other Operating Disbursements | 469 | 816 | 1,043 | 951 | 555 | 455 | 408 | 1,053 | 517 | 359 | 6,626 |
| Subtotal | 4,246 | 4,451 | 8,950 | 3,084 | 4,556 | 4,045 | 3,953 | 6,830 | 4,399 | 2,409 | 46,923 |
| Operating Cash Flow | (650) | (523) | (5,118) | 701 | (774) | 359 | (81) | (3,544) | (320) | 2,121 | (7,831) |
| Non-Operating Disbursements | | | | | | | | | | | |
| Capital Expenditures | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 301 |
| DIP Interest/Fees | - | - | 375 | 2 | - | - | - | 43 | - | - | 421 |
| Professional Fees | 805 | - | - | 1,397 | - | - | 1,334 | - | - | - | 3,536 |
| Subtotal | 836 | 30 | 405 | 1,429 | 30 | 30 | 1,364 | 73 | 30 | 30 | 4,257 |
| Contingency Expenses | | | | | | | | | | | |
| LC Cash Collateralization (103%) | - | - | - | - | - | - | - | - | - | - | - |
| Freight/Utility Deposits | 100 | - | - | - | - | - | - | - | - | - | 100 |
| Subtotal | 100 | - | - | - | - | - | - | - | - | - | 100 |
| Total Disbursements | 5,182 | 4,481 | 9,355 | 4,513 | 4,586 | 4,075 | 5,317 | 6,904 | 4,429 | 2,439 | 51,281 |
| Net Cash Flow | (1,585) | (553) | (5,523) | (729) | (804) | 329 | (1,445) | (3,617) | (350) | 2,091 | (12,188) |
| III. Cash / ABL Loan Balance | | | | | | | | | | | |
| Beginning Concentration Cash | 3,020 | 1,435 | 882 | (3,070) | 702 | 1,055 | 1,149 | (387) | (3,195) | 1,148 | 3,020 |
| Net Cash Flow | (1,585) | (553) | (5,523) | (729) | (804) | 329 | (1,445) | (3,617) | (350) | 2,091 | (12,188) |
| Plus Bounced Checks - Ch. 11 | - | - | - | - | - | - | - | - | - | - | - |
| BofA Cash Management Deposit | - | - | - | - | - | - | - | - | - | - | - |
| Ending Concentration Cash | 1,435 | 882 | (3,070) | 702 | 1,055 | 1,149 | (387) | (3,195) | 1,148 | 1,241 | 1,241 |
| O/S Check Float | 380 | 620 | 4,570 | 798 | 445 | 351 | 1,887 | 4,695 | 352 | 259 | 259 |
| Ending Bank Balance | 1,814 | 1,502 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Beginning Revolver | - | - | - | 1,572 | 6,072 | 7,229 | 6,994 | 6,904 | 7,714 | 12,407 | - |
| Draw / (Pay Down) | - | - | 1,572 | 4,500 | 1,157 | (235) | (91) | 810 | 4,693 | (1,998) | 10,409 |
| Ending Revolver Draw | - | - | 1,572 | 6,072 | 7,229 | 6,994 | 6,904 | 7,714 | 12,407 | 10,409 | 10,409 |
| IV. Borrowing Base (Weekly) | | | | | | | | | | | |
| Credit Card Receivables Availability | 1,037 | 1,287 | 1,297 | 1,233 | 1,252 | 1,236 | 1,618 | 1,015 | 1,119 | 1,513 | 1,513 |
| Inventory Availability | 6,916 | 7,072 | 7,231 | 8,719 | 9,009 | 9,239 | 9,491 | 9,680 | 9,888 | 9,888 | 9,888 |
| PP&E | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 |
| Less: Reserves | 2,681 | 2,780 | 2,879 | 2,979 | 3,081 | 3,182 | 3,184 | 3,184 | 3,184 | 3,185 | 3,185 |
| Total Tranche A Borrowing Base | 6,072 | 6,379 | 6,448 | 7,773 | 7,981 | 8,093 | 8,725 | 8,310 | 8,623 | 9,016 | 9,016 |
| Total Tranche B Borrowing Base | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 |
| Total A+B Tranches | 12,634 | 12,941 | 13,010 | 14,334 | 14,542 | 14,655 | 15,287 | 14,872 | 15,185 | 15,578 | 15,578 |
| V. Available Line Calculation (Weekly) | | | | | | | | | | | |
| Revolving Commitment | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Lesser of BB or Available Line | 12,634 | 12,941 | 13,010 | 14,334 | 14,542 | 14,655 | 15,000 | 14,872 | 15,000 | 15,000 | 15,000 |
| Less: Current Balance Outstanding | - | - | 1,572 | 6,072 | 7,229 | 6,994 | 6,904 | 7,714 | 12,407 | 10,409 | 10,409 |
| Subtotal | - | - | 1,572 | 6,072 | 7,229 | 6,994 | 6,904 | 7,714 | 12,407 | 10,409 | 10,409 |
| Net Availability | 12,634 | 12,941 | 11,438 | 8,262 | 7,313 | 7,660 | 8,096 | 7,158 | 2,593 | 4,591 | 4,591 |
| Plus: Ending Bank Cash | 1,814 | 1,502 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Total Liquidity (Wkly BBase) | 14,448 | 14,442 | 12,938 | 9,762 | 8,813 | 9,160 | 9,596 | 8,658 | 4,093 | 6,091 | 6,091 |

**Wet Seal, Inc.**
13-Week Cash Flow Forecast - Revenue & GM
($ in 000's)

| | March | | | | April | | | | May | | 10 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Forecast Week | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | |
| Actual/Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| Week Ending | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | 9-May | 16-May | Total |
| **I.** *Memo: Store Merch Sales Comp* | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | 6.5% | 6.5% | |
| *Memo: WetSeal.com Comp* | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | 10.0% | 10.0% | |
| *Memo: Store Count* | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | |
| *Memo: Annualized Sales per Sqft* | 234 | 232 | 216 | 213 | 225 | 290 | 185 | 197 | 274 | 272 | |
| **II. Sales to Cash Receipts** | | | | | | | | | | | |
| Store Sales | 3,215 | 3,191 | 2,969 | 2,933 | 3,098 | 3,981 | 2,544 | 2,702 | 3,770 | 3,732 | 32,135 |
| Ecommerce Sales Forecast | 441 | 491 | 537 | 627 | 418 | 583 | 364 | 492 | 505 | 471 | 4,928 |
| Subtotal | 3,656 | 3,682 | 3,506 | 3,560 | 3,516 | 4,564 | 2,908 | 3,194 | 4,275 | 4,203 | 37,064 |
| Total Sales Forecast | 3,656 | 3,682 | 3,506 | 3,560 | 3,516 | 4,564 | 2,908 | 3,194 | 4,275 | 4,203 | 37,064 |
| Last Week's Receipts (3/7) | 1,272 | 1,567 | 1,578 | 1,503 | 1,526 | 1,507 | 1,956 | 1,246 | 1,369 | 1,832 | 15,356 |
| Current Week's Receipts (4/7) | 2,089 | 2,104 | 2,004 | 2,034 | 2,009 | 2,608 | 1,662 | 1,825 | 2,443 | 2,402 | 21,179 |
| Sales Tax Receipts (7%) | 235 | 257 | 251 | 248 | 247 | 288 | 253 | 215 | 267 | 296 | 2,557 |
| Total Cash Receipts | 3,597 | 3,928 | 3,832 | 3,784 | 3,782 | 4,403 | 3,871 | 3,286 | 4,078 | 4,530 | 39,092 |
| **III. Revenue** | | | | | | | | | | | |
| Prior Year Merchandise Sales | | | | | | | | | | | |
| Store Sales | 3,783 | 3,755 | 3,493 | 3,450 | 3,644 | 4,684 | 2,993 | 3,179 | 3,454 | 3,418 | 35,852 |
| Ecommerce Sales | 533 | 591 | 646 | 752 | 509 | 703 | 445 | 595 | 486 | 455 | 5,716 |
| Prior Year Total | 4,316 | 4,346 | 4,139 | 4,202 | 4,153 | 5,387 | 3,438 | 3,774 | 3,940 | 3,873 | 41,569 |
| Current Year Merchandise Sales | | | | | | | | | | | |
| Store Sales | 3,215 | 3,191 | 2,969 | 2,933 | 3,098 | 3,981 | 2,544 | 2,702 | 3,770 | 3,732 | 32,135 |
| Ecommerce Sales | 441 | 491 | 537 | 627 | 418 | 583 | 364 | 492 | 505 | 471 | 4,928 |
| Current Year Total | 3,656 | 3,682 | 3,506 | 3,560 | 3,516 | 4,564 | 2,908 | 3,194 | 4,275 | 4,203 | 37,064 |
| Comp Sales | | | | | | | | | | | |
| Store Sales | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | 6.5% | 6.5% | |
| Ecommerce Sales | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | 10.0% | 10.0% | |
| Comp Total | -15.3% | -15.3% | -15.3% | -15.3% | -15.3% | -15.3% | -15.4% | -15.4% | 6.9% | 6.9% | |
| **IV. Gross Margin and COGS** | | | | | | | | | | | |
| Current Year Merchandise Sales | 3,656 | 3,682 | 3,506 | 3,560 | 3,516 | 4,564 | 2,908 | 3,194 | 4,275 | 4,203 | 37,064 |
| Forecast Total GM% | 54.8% | 54.8% | 54.8% | 54.7% | 54.7% | 54.7% | 54.8% | 54.8% | 54.8% | 54.8% | 54.8% |
| Current Year Total COGS | 1,653 | 1,665 | 1,586 | 1,612 | 1,591 | 2,066 | 1,316 | 1,444 | 1,934 | 1,900 | 16,766 |
| *Less Gift Cards Sold:* | (5) | (5) | (5) | (6) | (7) | (7) | (5) | (6) | (7) | (7) | (60) |
| *Add Gift Cards Redeemed:* | 6 | 6 | 5 | 5 | 5 | 5 | 5 | 6 | 7 | 7 | 57 |
| Subtotal | 1 | 1 | 0 | (1) | (1) | (2) | (0) | 0 | (1) | (0) | (4) |
| Net Current Year COGS: | 1,654 | 1,665 | 1,586 | 1,610 | 1,590 | 2,064 | 1,315 | 1,444 | 1,933 | 1,900 | 16,762 |
| Net Current Year Margin % | 54.8% | 54.8% | 54.8% | 54.8% | 54.8% | 54.8% | 54.8% | 54.8% | 54.8% | 54.8% | 54.8% |

Wet Seal, Inc.
13-Week Cash Flow Forecast - Working Capital
($ in 000's)

| Cash Flow Forecast Week | March | | | | April | | | | May | | 10 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual/Forecast | Week 1 Forecast | Week 2 Forecast | Week 3 Forecast | Week 4 Forecast | Week 5 Forecast | Week 6 Forecast | Week 7 Forecast | Week 8 Forecast | Week 9 Forecast | Week 10 Forecast | Total |
| Week Ending | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | 9-May | 16-May | |
| **I. Owned Inventory Roll-Forward** | | | | | | | | | | | |
| Beginning | 11,957 | 12,227 | 12,502 | 12,921 | 13,350 | 13,691 | 14,065 | 14,344 | 14,653 | 14,653 | 11,957 |
| + Inventory Receipts | 1,923 | 1,940 | 2,005 | 2,039 | 1,931 | 2,438 | 1,595 | 1,754 | 1,933 | 1,900 | 19,459 |
| - COGS Go-Forward | (1,654) | (1,665) | (1,586) | (1,610) | (1,590) | (2,064) | (1,315) | (1,444) | (1,933) | (1,900) | (16,762) |
| +/- Other | - | - | - | - | - | - | - | - | - | - | - |
| Ending Inventory (Excluding Inventory | 12,227 | 12,502 | 12,921 | 13,350 | 13,691 | 14,065 | 14,344 | 14,653 | 14,653 | 14,653 | 14,653 |
| Online Inventory | 2,100 | 2,300 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Net Store Inventory | 10,127 | 10,202 | 10,421 | 10,850 | 11,191 | 11,565 | 11,844 | 12,153 | 12,153 | 12,153 | 12,153 |
| Inventory per Store | 59 | 59 | 60 | 63 | 65 | 67 | 68 | 70 | 70 | 70 | 70 |
| **II. Accounts Payable** | | | | | | | | | | | |
| **Pre-Petition** | | | | | | | | | | | |
| Beginning | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 |
| + Inventory Receipts | - | - | - | - | - | - | - | - | - | - | - |
| - Merchandise Payments | - | - | - | - | - | - | - | - | - | - | - |
| + O/S Check Freeze | - | - | - | - | - | - | - | - | - | - | - |
| Ending Merchandise A/P | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 |
| **Post-Petition** | | | | | | | | | | | |
| Beginning | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) |
| + Inventory Receipts | 1,923 | 1,940 | 2,005 | 2,039 | 1,931 | 2,438 | 1,595 | 1,754 | 1,933 | 1,900 | 19,459 |
| - Merchandise Payments | (1,923) | (1,940) | (2,005) | (2,039) | (1,931) | (2,438) | (1,595) | (1,754) | (1,933) | (1,900) | (19,459) |
| + O/S Check Freeze | - | - | - | - | - | - | - | - | - | - | - |
| Ending Merchandise A/P | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) | (1,280) |
| **Total Merch AP** | | | | | | | | | | | |
| Beginning | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 |
| + Inventory Receipts | 1,923 | 1,940 | 2,005 | 2,039 | 1,931 | 2,438 | 1,595 | 1,754 | 1,933 | 1,900 | 19,459 |
| - Merchandise Payments | (1,923) | (1,940) | (2,005) | (2,039) | (1,931) | (2,438) | (1,595) | (1,754) | (1,933) | (1,900) | (19,459) |
| + O/S Check Freeze | - | - | - | - | - | - | - | - | - | - | - |
| Ending Merchandise A/P | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 | 10,790 |
| % of Merch Payable to Inventory | 88.2% | 86.3% | 83.5% | 80.8% | 78.8% | 76.7% | 75.2% | 73.6% | 73.6% | 73.6% | 73.6% |
| *DPO Calculation* | | | | | | | | | | | |
| Total Trailing 6 Week Receipts | 10,869 | 10,968 | 11,628 | 12,188 | 12,287 | 12,277 | 11,949 | 11,762 | 11,690 | 11,550 | 11,550 |
| Avg Daily Merch Purchase | 259 | 261 | 277 | 290 | 293 | 292 | 285 | 280 | 278 | 275 | 275 |
| *Total Days Payables Outstanding (DPO)* | *42 days* | *41 days* | *39 days* | *37 days* | *37 days* | *37 days* | *38 days* | *39 days* | *39 days* | *39 days* | *39 days* |
| **III. Credit Card Receivables** | | | | | | | | | | | |
| Beginning Balance | 1,220 | 1,515 | 1,526 | 1,450 | 1,473 | 1,455 | 1,904 | 1,194 | 1,316 | 1,780 | 1,220 |
| + Credit Card Sales | 3,656 | 3,682 | 3,506 | 3,560 | 3,516 | 4,564 | 2,908 | 3,194 | 4,275 | 4,203 | 37,064 |
| - Credit Card Cash Receipts | (3,361) | (3,671) | (3,581) | (3,537) | (3,535) | (4,115) | (3,618) | (3,071) | (3,812) | (4,234) | (36,535) |
| +/- Other | - | - | - | - | - | - | - | - | - | - | - |
| Ending Credit Card Receivables | 1,515 | 1,526 | 1,450 | 1,473 | 1,455 | 1,904 | 1,194 | 1,316 | 1,780 | 1,749 | 1,749 |
| **IV. Sales Tax Payable** | | | | | | | | | | | |
| Beginning Balance | 1,790 | 1,945 | 618 | 869 | 1,116 | 1,244 | 451 | 704 | 919 | 1,186 | 1,790 |
| + Sales Tax Receipts | 235 | 257 | 251 | 248 | 247 | 288 | 253 | 215 | 267 | 296 | 2,557 |
| - Sales Tax Cash Payments | (80) | (1,584) | - | - | (120) | (1,081) | - | - | - | (100) | (2,965) |
| +/- Other | - | - | - | - | - | - | - | - | - | - | - |
| Ending Sales Tax Payable | 1,945 | 618 | 869 | 1,116 | 1,244 | 451 | 704 | 919 | 1,186 | 1,382 | 1,382 |
| **V. Gift Cards** | | | | | | | | | | | |
| Beginning Balance | 939 | 938 | 937 | 936 | 939 | 942 | 946 | 947 | 946 | 947 | 939 |
| + Gift Cards Sold | 12 | 12 | 11 | 13 | 14 | 15 | 12 | 13 | 16 | 16 | 134 |
| - Gift Cards Redeemed | (13) | (13) | (11) | (10) | (12) | (12) | (11) | (13) | (14) | (15) | (125) |
| +/- Other | - | - | - | - | - | - | - | - | - | - | - |
| Ending Gift Cards | 938 | 937 | 936 | 939 | 942 | 946 | 947 | 946 | 947 | 948 | 948 |

**Wet Seal, Inc.**
**13-Week Cash Flow Forecast - Weekly Borrowing Base - BR Terms**
**($ in 000's)**

| | March | | | | April | | | | May | | 10 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Forecast Week | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | |
| Actual/Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| Week Ending | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | 9-May | 16-May | Total |
| *I.  Memo: Store Merch Sales Comp* | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | 6.5% | 6.5% | |
| *Memo: Store Count* | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | |
| *Memo: Total Store Sales* | 3,656 | 3,682 | 3,506 | 3,560 | 3,516 | 4,564 | 2,908 | 3,194 | 4,275 | 4,203 | |
| **I.  Borrowing Base** | | | | | | | | | | | |
| **A. Tranche A Availability** | | | | | | | | | | | |
| **Accounts Receivable** | | | | | | | | | | | |
| Credit Card A/R | 1,220 | 1,515 | 1,526 | 1,450 | 1,473 | 1,455 | 1,904 | 1,194 | 1,316 | 1,780 | 1,780 |
| Advance Rate | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% |
| Eligible Credit Card A/R (A) | 1,037 | 1,287 | 1,297 | 1,233 | 1,252 | 1,236 | 1,618 | 1,015 | 1,119 | 1,513 | 1,513 |
| **Inventory** | | | | | | | | | | | |
| Eligible Inventory | 11,957 | 12,227 | 12,502 | 12,921 | 13,350 | 13,691 | 14,065 | 14,344 | 14,653 | 14,653 | 14,653 |
| NOLV - Rate - Calendar | 60.0% | 60.0% | 60.0% | 70.0% | 70.0% | 70.0% | 70.0% | 70.0% | 70.0% | 70.0% | 70.0% |
| NOLV Eligible Inventory | 7,174 | 7,336 | 7,501 | 9,045 | 9,345 | 9,584 | 9,845 | 10,041 | 10,257 | 10,257 | 10,257 |
| Advance Rate | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| Inventory Availability | 6,457 | 6,602 | 6,751 | 8,140 | 8,411 | 8,626 | 8,861 | 9,037 | 9,232 | 9,232 | 9,232 |
| Eligible In-Transit Inventory | 957 | 978 | 1,000 | 1,034 | 1,068 | 1,095 | 1,125 | 1,148 | 1,172 | 1,172 | 1,172 |
| NOLV - Rate - Calendar | 60.0% | 60.0% | 60.0% | 70.0% | 70.0% | 70.0% | 70.0% | 70.0% | 70.0% | 70.0% | 70.0% |
| NOLV In-Transit Inventory | 574 | 587 | 600 | 724 | 748 | 767 | 788 | 803 | 821 | 821 | 821 |
| Advance Rate | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| In-Transit Inventory Availability | 459 | 470 | 480 | 579 | 598 | 613 | 630 | 643 | 656 | 656 | 656 |
| Total Inventory Availability (B) | 6,916 | 7,072 | 7,231 | 8,719 | 9,009 | 9,239 | 9,491 | 9,680 | 9,888 | 9,888 | 9,888 |
| **PP&E** | | | | | | | | | | | |
| Gross PP&E | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 |
| Advance Rate | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% |
| Net PP&E | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 |
| **Reserves** | | | | | | | | | | | |
| Gift Cards @ 50% | 470 | 469 | 468 | 468 | 470 | 471 | 473 | 473 | 473 | 474 | 474 |
| Merchandise Credits @ 50% | 1,056 | 1,056 | 1,056 | 1,056 | 1,056 | 1,056 | 1,056 | 1,056 | 1,056 | 1,056 | 1,056 |
| Landlord Lien Reserves | 204 | 204 | 204 | 204 | 204 | 204 | 204 | 204 | 204 | 204 | 204 |
| Carve Out | 500 | 600 | 700 | 800 | 900 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Texas Ad Valorem | 151 | 151 | 151 | 151 | 151 | 151 | 151 | 151 | 151 | 151 | 151 |
| Payroll Reserve | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Reserves (D) | 2,681 | 2,780 | 2,879 | 2,979 | 3,081 | 3,182 | 3,184 | 3,184 | 3,184 | 3,185 | 3,185 |
| **Total Tranche A Borrowing Base (A+B+C)** | 6,072 | 6,379 | 6,448 | 7,773 | 7,981 | 8,093 | 8,725 | 8,310 | 8,623 | 9,016 | 9,016 |
| **B. Tranche B Availability** | | | | | | | | | | | |
| Intellectual Property | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| L/C Recovery / Preferences (70%) | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| CC Holdback (85%) | 286 | 286 | 286 | 286 | 286 | 286 | 286 | 286 | 286 | 286 | 286 |
| BofA Cash Management Deposit (85%) | 1,275 | 1,275 | 1,275 | 1,275 | 1,275 | 1,275 | 1,275 | 1,275 | 1,275 | 1,275 | 1,275 |
| Tranche B Availability | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 | 6,561 |
| **Total Tranche A + B Availability** | 12,634 | 12,941 | 13,010 | 14,334 | 14,542 | 14,655 | 15,287 | 14,872 | 15,185 | 15,578 | 15,578 |
| **II.  Availability Line Calculation** | | | | | | | | | | | |
| Revolving Commitment | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Lesser of Borrowing Base or Available Line | 12,634 | 12,941 | 13,010 | 14,334 | 14,542 | 14,655 | 15,000 | 14,872 | 15,000 | 15,000 | 15,000 |
| Less: Current Loan Balance Outstanding | - | - | 1,572 | 6,072 | 7,229 | 6,994 | 6,904 | 7,714 | 12,407 | 10,409 | 10,409 |
| Total Liabilities | - | - | 1,572 | 6,072 | 7,229 | 6,994 | 6,904 | 7,714 | 12,407 | 10,409 | 10,409 |
| Net Availability | 12,634 | 12,941 | 11,438 | 8,262 | 7,313 | 7,660 | 8,096 | 7,158 | 2,593 | 4,591 | 4,591 |
| Plus: Cash | 1,814 | 1,502 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| **Total Liquidity** | 14,448 | 14,442 | 12,938 | 9,762 | 8,813 | 9,160 | 9,596 | 8,658 | 4,093 | 6,091 | 6,091 |

*Week Ending March 14th Borrowing Base is a forecast, not based on actual borrowing base file 3/11/15

Wet Seal, Inc.
Weekly Cash Flows Letters of Credit Support
($ in OOO's)

| Cash Flow Forecast Week | March | | | | April | | | | May | | 10 Week |
| Actual/Forecast | Week 1 Forecast | Week 2 Forecast | Week 3 Forecast | Week 4 Forecast | Week 5 Forecast | Week 6 Forecast | Week 7 Forecast | Week 8 Forecast | Week 9 Forecast | Week 10 Forecast | |
| Week Ending | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | 9-May | 16-May | |
| **Standby Letters of Credit** | | | | | | | | | | | |
| MILBERG FACTORS | - | - | - | - | - | - | - | - | - | - | - |
| PG AND E | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| BANK OF AMERICA | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 |
| ESQUIRE FOOTWEAR LLC | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| ROSENTHAL AND ROSENTHAL, INC | - | - | - | - | - | - | - | - | - | - | - |
| THE TRAVELERS INDEMNITY COMPAN | 1,045 | 1,045 | 1,045 | 1,045 | 1,045 | 1,045 | 1,045 | 1,045 | 1,045 | 1,045 | 1,045 |
| SENTRY INSURANCE A MUTUAL COMPA | 425 | 425 | 425 | 425 | 425 | 425 | 425 | 425 | 425 | 425 | 425 |
| THE CIT GROUP/COMMERCIAL SERVICI | - | - | - | - | - | - | - | - | - | - | - |
| SOUTHERN CALIFORNIA EDISON COMP | 144 | 144 | 144 | 144 | 144 | 144 | 144 | 144 | 144 | 144 | 144 |
| **Subtotal Standby** | 1,795 | 1,795 | 1,795 | 1,795 | 1,795 | 1,795 | 1,795 | 1,795 | 1,795 | 1,795 | 1,795 |
| **Commercial Letters of Credit** | | | | | | | | | | | |
| ESQUIRE FOOTWEAR LLC | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| NECKAR FAR EAST LTD | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| WA YAN/GARMENT/FACTORY COMPAN | - | - | - | - | - | - | - | - | - | - | - |
| NECKAR FAR EAST LTD | - | - | - | - | - | - | - | - | - | - | - |
| MEKO GARMENT COMPANY LIMITED | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 41 |
| **Subtotal Commercial** | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 |
| **Total Letters of Credit** | 1,881 | 1,881 | 1,881 | 1,881 | 1,881 | 1,881 | 1,881 | 1,881 | 1,881 | 1,881 | 1,881 |
| *Memo:* | | | | | | | | | | | |
| *Merch related LCs* | | | | | | | | | | | |
| *ESQUIRE FOOTWEAR LLC* | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 |
| *MILBERG FACTORS* | - | - | - | - | - | - | - | - | - | - | - |
| *ROSENTHAL AND ROSENTHAL, INC* | - | - | - | - | - | - | - | - | - | - | - |
| *THE CIT GROUP/COMMERCIAL SERVIC* | - | - | - | - | - | - | - | - | - | - | - |
| *NECKAR FAR EAST LTD* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| *WA YAN/GARMENT/FACTORY COMPA* | - | - | - | - | - | - | - | - | - | - | - |
| *MEKO GARMENT COMPANY LIMITED* | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 41 |
| *Total* | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 |
| *Merch A/P* | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 | 12,070 |
| *Merch LCs as a % of Merch A/P* | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% |

Wet Seal, Inc.
Weekly Cash Flows - Professional Fees
($ in 000's)

| | 8 Weeks Actuals Total | March Week 1 Forecast 14-Mar | March Week 2 Forecast 21-Mar | March Week 3 Forecast 28-Mar | March Week 4 Forecast 4-Apr | April Week 5 Forecast 11-Apr | April Week 6 Forecast 18-Apr | April Week 7 Forecast 25-Apr | April Week 8 Forecast 2-May | May Week 9 Forecast 9-May | May Week 10 Forecast 16-May | 10 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Professional Fees Incurred (Estimates)** | | | | | | | | | | | | |
| **A. Company Professionals** | | | | | | | | | | | | |
| FTI | 432 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 500 |
| KTBS / Young Conaway | 917 | 100 | 100 | 100 | 100 | 94 | 94 | 94 | 94 | 75 | 75 | 925 |
| Houlihan Lokey | 305 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 250 |
| Paul Hastings | 195 | 9 | 9 | 9 | 9 | 11 | 11 | 11 | 11 | 14 | 14 | 109 |
| Subtotal | 1,850 | 184 | 184 | 184 | 184 | 180 | 180 | 180 | 180 | 164 | 164 | 1,784 |
| **B. ABL Professionals** | | | | | | | | | | | | |
| Reimer & Braunstien - BofA | 47 | - | - | - | - | - | - | - | - | - | - | - |
| Skadden / Other - GA | 250 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 313 |
| Subtotal | 297 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 313 |
| **C. DIP Professionals** | | | | | | | | | | | | |
| DIP Professionals | - | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal | - | - | - | - | - | - | - | - | - | - | - | - |
| **D. Unsecured Creditors Professionals** | | | | | | | | | | | | |
| PSZJ | 315 | 40 | 40 | 40 | 40 | 25 | 25 | 25 | 25 | 30 | 30 | 320 |
| Province | 320 | 20 | 20 | 20 | 20 | 25 | 25 | 25 | 25 | 8 | 8 | 197 |
| Subtotal | 635 | 60 | 60 | 60 | 60 | 50 | 50 | 50 | 50 | 38 | 38 | 517 |
| **E. Other Professionals** | | | | | | | | | | | | |
| Donlin, Recano, & Co. | 352 | 56 | 56 | 56 | 56 | 18 | 18 | 18 | 18 | 8 | 8 | 311 |
| US Trustee | 12 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 15 |
| Subtotal | 365 | 58 | 58 | 58 | 58 | 19 | 19 | 19 | 19 | 9 | 9 | 327 |
| **Total Incurred** | 3,147 | 333 | 333 | 333 | 333 | 281 | 281 | 281 | 281 | 241 | 241 | 2,940 |
| | | | | | | | | | | | | |
| **II. Professional Fees Paid** | | | | | | | | | | | | |
| **A. Company Professionals** | | | | | | | | | | | | |
| FTI | - | 146 | - | - | 160 | - | - | 200 | - | - | - | 506 |
| KTBS / Young Conaway | 235 | 294 | - | - | 360 | - | - | 400 | - | - | - | 1,054 |
| Houlihan Lokey | 103 | 96 | - | - | 128 | - | - | 100 | - | - | - | 324 |
| Paul Hastings | 57 | 97 | - | - | 52 | - | - | 37 | - | - | - | 186 |
| Subtotal | 394 | 633 | - | - | 700 | - | - | 737 | - | - | - | 2,069 |
| **B. ABL Professionals - Paid as Incurred** | | | | | | | | | | | | |
| Reimer & Braunstien - BofA | 47 | - | - | - | - | - | - | - | - | - | - | - |
| Skadden / Other - GA | - | 125 | - | - | 250 | - | - | 125 | - | - | - | 500 |
| Subtotal | 47 | 125 | - | - | 250 | - | - | 125 | - | - | - | 500 |
| **C. DIP Professionals** | | | | | | | | | | | | |
| DIP Professionals | - | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal | - | - | - | - | - | - | - | - | - | - | - | - |
| **D. Unsecured Creditors Professionals** | | | | | | | | | | | | |
| PSZJ | - | 44 | - | - | 136 | - | - | 160 | - | - | - | 340 |
| Province | - | - | - | - | 240 | - | - | 82 | - | - | - | 322 |
| Subtotal | - | 44 | - | - | 376 | - | - | 242 | - | - | - | 662 |
| **E. Other Professionals** | | | | | | | | | | | | |
| Donlin, Recano, & Co. | 269 | - | - | - | 66 | - | - | 224 | - | - | - | 290 |
| US Trustee | - | 4 | - | - | 5 | - | - | 6 | - | - | - | 15 |
| Subtotal | 269 | 4 | - | - | 71 | - | - | 231 | - | - | - | 305 |
| **Total Paid** | 711 | 805 | - | - | 1,397 | - | - | 1,334 | - | - | - | 3,536 |

Privileged and Confidential

Wet Seal, Inc.
Weekly Cash Flows Other Operating Expenses Support Table
($ in 000's)

| Cash Flow Forecast Week | March | | | | April | | | | May | | 10 Week |
| | Week 6 | Week 7 | Week 8 | Week 9 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | |
| Actual/Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| Week Ending | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | 9-May | 16-May | Ending |
| **I. Current Year Forecast** | | | | | | | | | | | |
| Freight Out | 69 | 220 | 124 | 402 | 98 | 79 | 24 | 488 | 39 | 102 | 1,644 |
| Temp Help | 58 | 69 | 77 | 77 | 64 | 63 | 42 | 69 | 71 | 46 | 637 |
| Benefits / Medical | 21 | 126 | 147 | 76 | 18 | 40 | 74 | 32 | 94 | 25 | 653 |
| Advertising | 58 | 74 | 45 | 46 | 25 | 25 | 26 | 85 | 17 | 33 | 435 |
| Insurance | - | - | - | - | 29 | - | - | - | - | 29 | 57 |
| Utilities | 10 | - | 202 | - | - | - | - | 202 | - | - | 414 |
| Other | 253 | 325 | 448 | 350 | 323 | 247 | 242 | 177 | 296 | 124 | 2,786 |
| Total | 469 | 816 | 1,043 | 951 | 555 | 455 | 408 | 1,053 | 517 | 359 | 6,626 |
| **II. Prior Year Actuals** | | | | | | | | | | | |
| Freight Out | 24 | 246 | 156 | 508 | 72 | 120 | 36 | 741 | 76 | 200 | 2,181 |
| Temp Help | 124 | 149 | 165 | 165 | 149 | 148 | 99 | 162 | 157 | 102 | 1,421 |
| Benefits / Medical | 46 | 270 | 314 | 162 | 43 | 94 | 173 | 76 | 208 | 55 | 1,439 |
| Advertising | 20 | 66 | 120 | 123 | 61 | 62 | 65 | 209 | 27 | 52 | 806 |
| Insurance | - | - | 0 | - | - | - | - | - | - | 454 | 454 |
| Utilities | - | 4 | - | 765 | - | - | 4 | 586 | - | - | 1,359 |
| Other | 770 | 665 | 1,951 | 907 | 836 | 820 | 690 | 347 | 369 | 587 | 7,942 |
| Total | 984 | 1,401 | 2,706 | 2,630 | 1,162 | 1,249 | 1,063 | 2,121 | 836 | 1,450 | 15,602 |
| **III. Variance ($)** | | | | | | | | | | | |
| Freight Out | 45 | (26) | (32) | (106) | 25 | (41) | (12) | (254) | (37) | (98) | (537) |
| Temp Help | (66) | (79) | (88) | (88) | (86) | (85) | (57) | (93) | (86) | (56) | (783) |
| Benefits / Medical | (24) | (144) | (167) | (86) | (25) | (54) | (99) | (43) | (113) | (30) | (786) |
| Advertising | 37 | 8 | (76) | (77) | (36) | (37) | (38) | (124) | (10) | (19) | (372) |
| Insurance | - | - | (0) | - | 29 | - | - | - | - | (425) | (397) |
| Utilities | 10 | (4) | 202 | (765) | - | - | (4) | - | (384) | - | (945) |
| Other | (517) | (340) | (1,502) | (556) | (514) | (574) | (448) | (170) | (73) | (462) | (5,156) |
| Total | (516) | (585) | (1,663) | (1,678) | (607) | (795) | (655) | (1,068) | (319) | (1,091) | (8,976) |
| **IV. Variance (%)** | | | | | | | | | | | |
| Freight Out | 185.1% | -10.6% | -20.8% | -20.8% | 35.0% | -34.2% | -34.2% | -34.2% | -49.1% | -49.1% | -24.6% |
| Temp Help | -53.2% | -53.2% | -53.2% | -53.2% | -57.4% | -57.4% | -57.4% | -57.4% | -54.6% | -54.6% | -55.1% |
| Benefits / Medical | -53.2% | -53.2% | -53.2% | -53.2% | -57.4% | -57.4% | -57.4% | -57.4% | -54.6% | -54.6% | -54.6% |
| Advertising | 181.5% | 12.8% | -62.9% | -62.9% | -59.2% | -59.2% | -59.2% | -59.2% | -36.6% | -36.6% | -46.1% |
| Insurance | na | na | -100.0% | na | na | na | na | na | na | -93.7% | -87.4% |
| Utilities | na | -100.0% | na | -100.0% | na | -100.0% | na | -65.5% | na | na | -69.5% |
| Other | -67.2% | -51.1% | -77.0% | -61.4% | -61.4% | -69.9% | -64.9% | -49.1% | -19.7% | -78.8% | -64.9% |
| Total | -52.4% | -41.8% | -61.5% | -63.8% | -52.2% | -63.6% | -61.6% | -50.3% | -38.1% | -75.2% | -57.5% |

**Exhibit 5**

**ASSET PURCHASE AGREEMENT**

**by and among**

**THE WET SEAL, INC.,**

**THE OTHER SELLERS NAMED HEREIN,**

**and**

**MADOR LENDING, LLC**

**March 12, 2015**

# TABLE OF CONTENTS

**Page**

Article I Definitions ...........................................................................................................1

Article II Purchase and Sale..........................................................................................14
    Section 2.1    Purchase and Sale of Acquired Assets.....................................14
    Section 2.2    Excluded Assets.........................................................................17
    Section 2.3    Assumption of Assumed Liabilities...........................................17
    Section 2.4    Excluded Liabilities ..................................................................17
    Section 2.5    Consideration ...........................................................................19
    Section 2.6    Assumption and Assignment of Contracts................................19
    Section 2.7    Closing......................................................................................23
    Section 2.8    Deliveries at Closing.................................................................23
    Section 2.9    Allocation..................................................................................24
    Section 2.10   Non-Continuing Stores, Designated Stores and Continuing Stores..........24
    Section 2.11   Deposit.. ...................................................................................27

Article III Sellers' Representations and Warranties. .....................................................28
    Section 3.1    Organization of Sellers; Good Standing ...................................28
    Section 3.2    Authorization of Transaction ....................................................28
    Section 3.3    Noncontravention; Consents and Approvals .............................29
    Section 3.4    Financial Statements; No Undisclosed Liabilities. ...................30
    Section 3.5    Compliance with Laws.. ...........................................................30
    Section 3.6    Title to Acquired Assets............................................................30
    Section 3.7    Contracts ...................................................................................30
    Section 3.8    Intellectual Property..................................................................32
    Section 3.9    Litigation...................................................................................33
    Section 3.10   Environmental, Health and Safety Matters...............................33
    Section 3.11   Employees and Employment Matters ........................................34
    Section 3.12   Employee Benefit Plans.............................................................34
    Section 3.13   Real Property. ...........................................................................35
    Section 3.14   Permits ......................................................................................35
    Section 3.15   Insurance ...................................................................................36
    Section 3.16   Brokers' Fees ............................................................................36
    Section 3.17   No Other Representations or Warranties ...................................36

Article IV Buyer's Representations and Warranties.......................................................37
    Section 4.1    Organization of Buyer...............................................................37
    Section 4.2    Authorization of Transaction ....................................................37
    Section 4.3    Noncontravention......................................................................37
    Section 4.4    Financial Capacity ....................................................................38
    Section 4.5    Adequate Assurances Regarding Executory Contracts.............38
    Section 4.6    Good Faith Purchaser................................................................38
    Section 4.7    Brokers' Fees ............................................................................38
    Section 4.8    Condition of Business ...............................................................38

i

Article V Pre-Closing Covenants..................................................................................38
    Section 5.1    Certain Efforts; Cooperation..................................................39
    Section 5.2    Notices and Consents..............................................................40
    Section 5.3    Bankruptcy Actions ................................................................41
    Section 5.4    Conduct of Business ...............................................................42
    Section 5.5    Notice of Developments ..........................................................44
    Section 5.6    Access ......................................................................................44
    Section 5.7    Press Releases and Public Announcements .............................45
    Section 5.8    Bulk Transfer Laws.................................................................45
    Section 5.9    Suppliers .................................................................................45
    Section 5.10   No Competing Transactions. ...................................................45
    Section 5.11   Delivery of Disclosure Schedule.. ..........................................46

Article VI Other Covenants .........................................................................................46
    Section 6.1    Cooperation .............................................................................46
    Section 6.2    Further Assurances..................................................................46
    Section 6.3    Availability of Business Records ............................................46
    Section 6.4    Employee Matters ...................................................................47
    Section 6.5    Recording of Intellectual Property Assignments ...................49
    Section 6.6    Transfer Taxes ........................................................................49
    Section 6.7    Wage Reporting ......................................................................49
    Section 6.8    Acknowledgements..................................................................49
    Section 6.9    Certain Avoidance Actions .....................................................49
    Section 6.10   Insurance Policies ...................................................................50
    Section 6.11   Collection of Accounts Receivable..........................................50
    Section 6.12   Name Changes. .......................................................................51
    Section 6.13   Treatment of Certain Claims; Plan. ........................................51

Article VII Conditions to Closing................................................................................51
    Section 7.1    Conditions to Buyer's Obligations..........................................51
    Section 7.2    Conditions to Sellers' Obligations..........................................52
    Section 7.3    No Frustration of Closing Conditions .....................................53

Article VIII Termination...............................................................................................53
    Section 8.1    Termination of Agreement......................................................53
    Section 8.2    Procedure Upon Termination..................................................54
    Section 8.3    Effect of Termination..............................................................54
    Section 8.4    Deposit. ...................................................................................55

Article IX Miscellaneous ..............................................................................................55
    Section 9.1    Expenses .................................................................................55
    Section 9.2    Entire Agreement....................................................................55
    Section 9.3    Incorporation of Schedules, Exhibits and Disclosure Schedule ...............55
    Section 9.4    Amendments and Waivers.......................................................56
    Section 9.5    Succession and Assignment....................................................56
    Section 9.6    Notices ....................................................................................56
    Section 9.7    Governing Law; Jurisdiction...................................................57

*CHI 65634877v16*

Section 9.8     Consent to Service of Process..................................................57
Section 9.9     WAIVERS OF JURY TRIAL ................................................57
Section 9.10    Specific Performance ...........................................................58
Section 9.11    Severability ..........................................................................58
Section 9.12    No Third Party Beneficiaries ................................................58
Section 9.13    No Survival of Representations, Warranties and Agreements....................58
Section 9.14    Construction..........................................................................58
Section 9.15    Computation of Time.............................................................59
Section 9.16    Mutual Drafting ....................................................................59
Section 9.17    Disclosure Schedule..............................................................59
Section 9.18    Headings; Table of Contents..................................................60
Section 9.19    Counterparts; Facsimile and Email Signatures .......................60
Section 9.20    Time of Essence.....................................................................60
Section 9.21    General Releases....................................................................60

Exhibit A     -     Form of Sale Order
Exhibit B     -     Form of Bill of Sale
Exhibit C     -     Form of Assignment and Assumption Agreement
Exhibit D     -     Form of Trademark Assignment Agreement
Exhibit E     -     Form of Copyright Assignment Agreement
Exhibit F     -     Form of Domain Name Assignment Agreement


Appendix A     -     Cash Budget
Appendix B     -     Letter Agreement


Schedule 2.3     -     Certain Assumed Liabilities


Disclosure Schedule

CHI 65634877v16

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of March 12, 2015, by and among The Wet Seal, Inc., a Delaware corporation ("WSI"), The Wet Seal Retail, Inc., a Delaware corporation ("WSR"), Wet Seal Catalog, Inc., a Delaware corporation ("WSC"), and Wet Seal GC, LLC, a Virginia limited liability company ("WSGC," and together with WSI, WSR and WSC, "Sellers," and each individually, a "Seller"), and Mador Lending, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer").    Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

WHEREAS, Sellers are debtors and debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in jointly administered bankruptcy cases under Chapter 11 of the Bankruptcy Code captioned *In re The Wet Seal, Inc., a Delaware corporation et al.* (Case Number 15-10081(CSS)) (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Sellers engage in the business of the retail sale of, including developing, producing, distributing, marketing and selling, girl's and women's clothing, footwear, apparel and accessories (the "Business");

WHEREAS, (i) Sellers wish to sell, transfer and assign to Buyer, and Buyer wishes to purchase, acquire and assume from Sellers, the Acquired Assets as of the Closing, and (ii) Buyer wishes to assume from Sellers the Assumed Liabilities as of the Closing, all on the terms and subject to the conditions set forth herein and in accordance with sections 105, 363 and 365 and other applicable provisions of title 11 of the Bankruptcy Code;

WHEREAS, Sellers have agreed to file the Sale Motion (as defined below) with the Bankruptcy Court to implement the transactions contemplated hereby upon the terms and subject to the conditions set forth herein; and

WHEREAS, simultaneously with the execution hereof, Versa Capital Fund III, L.P. has entered into that certain funding commitment letter dated as of the date hereof ("Guarantee") in favor of Buyer pursuant to which Versa Capital Fund III, L.P. has guaranteed, on the terms set forth therein, the obligations of Buyer hereunder.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

"Accounts Receivable" means (a) all trade accounts receivable and other rights to payment from customers of Sellers, (b) all other accounts receivable, notes receivable, negotiable instruments, chattel paper (including completed work which has not yet been billed) and other

receivables of Sellers, whether current or non-current (including in respect of goods shipped, products sold, licenses granted, services rendered or otherwise associated with the Business and all amounts that may be returned or returnable with respect to letters of credit drawn down prior to the Closing), and (c) any security interest, claim, remedy or other right related to any of the foregoing, in each case, arising out of the operation of the Business prior to the Closing.

"Acquired Assets" means all of Sellers' right, title and interest in and to all of Sellers' properties, assets and rights of every nature, kind and description, tangible and intangible, whether real, personal or mixed, whether accrued, contingent or otherwise, wherever situated or located, existing as of the Closing, including all rights to bring claims for past, present or future infringement of the Intellectual Property owned by Sellers; provided, however, that, notwithstanding the foregoing or anything contained in this Agreement to the contrary, the Acquired Assets shall not include any Excluded Assets.

"Acquired Avoidance Actions" means all causes of action, lawsuits, claims, rights of recovery and other similar rights of any Seller, including avoidance claims or causes of action under Chapter 5 of the Bankruptcy Code, (i) against landlords, vendors or other counterparties who are party to any Assumed Contract, (ii) against any Participating Vendor and/or (iii) relating in any way to any party who was a beneficiary of a letter of credit or holding proceeds of a letter of credit on or before the Closing Date.

"Acquisition Proposal" shall mean any inquiry, proposal or offer relating to a Competing Transaction.

"Administrative Claim" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

"Agreement" has the meaning set forth in the preamble.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.8(a)(ii).

"Assumed Contracts" means those Leases and other Contracts that have been assigned to and assumed by Buyer pursuant to Section 2.6 and section 365 of the Bankruptcy Code.  For the avoidance of doubt, "Assumed Contracts" shall not include any Non-Real Property Contract or Lease that is excluded and rejected pursuant to Section 2.6.

"Assumed Liabilities" means those liabilities and obligations enumerated on Schedule 2.3 attached hereto.

 "Assumed Permits" means all Permits relating to the Business that are transferable in accordance with their terms, but excluding all Permits to the extent related to any Excluded Asset (including any Lease that is not an Assumed Contract).

"Assumption Approval" has the meaning set forth in Section 2.6(g).

"<u>Audited Financial Statements</u>" has the meaning set forth in <u>Section 3.4(a)</u>.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Events</u>" means, the commencement of the Chapter 11 Cases and any events that lead up to, and typically result from, the commencement of a case under Chapter 11 of the Bankruptcy Code.

"<u>Bill of Sale</u>" has the meaning set forth in <u>Section 2.8(a)(i)</u>.

"<u>BofA Accounts</u>" means each of the following accounts of Sellers: (a) the Cash Management/Indemnity Account and (b) the L/C Cash Collateral Account.

"<u>BofA Liens</u>" means the security interests of Bank of America in the DIP Collateral, including the BofA Accounts.

"<u>Break-Up Fee Payment</u>" has the meaning set forth in <u>Schedule 2.3</u>.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"<u>Business</u>" has the meaning set forth in the recitals.

"<u>Buyer</u>" has the meaning set forth in the preamble.

"<u>Cash</u>" means cash (including all cash located at any Continuing Store, Designated Store or Non-Continuing Store or in Sellers' or their designee's bank accounts, lock-boxes and cash in transit), cash equivalents and liquid investments, excluding (i) any cash in the BofA Accounts or the Escrow Account and (ii) any retainers or professional fee escrows held by the Sellers' and/or the estates' professionals.

"<u>Cash Budget</u>" means the "Approved Budget" as defined in and under the DIP Financing, a copy of which initial Approved Budget is attached hereto as <u>Appendix A</u>.

"<u>Cash Management/Indemnity Account</u>" shall have the meaning set forth in that certain Final Order Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (1) Authorizing the Post-Petition L/C Financing Facility, (2) Granting Liens and Providing Superpriority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral and Providing for Adequate Protection and (4) Modifying the Automatic Stay entered by the United States Bankruptcy Court for the District of Delaware. [Docket No. 249] (the "<u>BofA DIP Order</u>").

"<u>Cash Payment</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Chapter 11 Cases</u>" has the meaning set forth in the recitals.

"<u>Claim</u>" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"<u>Closing</u>" has the meaning set forth in <u>Section 2.7</u>.

"<u>Closing Assumed Contract List</u>" has the meaning set forth in <u>Section 2.6(b)</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 2.7</u>.

"<u>COBRA</u>" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state Law.

"<u>Committee</u>" means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

"<u>Competing Transaction</u>" shall mean any or all of the following, other than an Excluded Transaction:  (i) a sale, transfer or other disposition of assets of any of the Sellers (other than sales of inventory in the Ordinary Course of Business) in a single transaction or a series of related transactions; (ii) a sale, transfer or assignment of capital stock or other equity interests of any of the Sellers (including by means of a merger); (iii) any Chapter 11 plan of reorganization, any conversion of any of Sellers' Chapter 11 Cases to a Chapter 7 bankruptcy case, or any other liquidation or equivalent event with respect to any or all Sellers; (iv) a transaction that, directly or indirectly, competes with, or otherwise would prohibit or frustrate, the transactions contemplated hereby; or (v) a public announcement of a proposal, plan, intention or agreement to do any of the foregoing.

"<u>Confidentiality Agreement</u>" means that certain letter agreement, dated as of January 21, 2015, by and between Versa Capital Management, LLC and WSI, regarding the terms and conditions on which Sellers would make available certain information.

"<u>Consent</u>" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

"<u>Consumer Liabilities</u>" means Sellers' obligations to (a) provide merchandise refunds and exchanges, (b) honor store or customer credits, customer prepayments and customer loyalty programs and (c) provide customer refunds, in each case, to customers of the Business in a manner consistent with the customer policies of the Business.

"<u>Continuing Store</u>" means any of Sellers' store locations with respect to which the associated Leases have been designated by Buyer as Assumed Contracts, as such store locations may be changed in accordance with <u>Section 2.6(b)</u> and <u>Section 2.10</u>.

"<u>Contract</u>" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership

agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding.

"Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Credit Bid" has the meaning set forth in Section 2.5(b).

"Credit Card Receivables" means all accounts receivable and other amounts owed to any Seller (whether current or non-current) in connection with any customer purchases from any Seller or stores operated thereby that are made with credit cards or any other amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Sellers, in each case which are not subject to offset, chargeback or other reduction.

"Cure Amounts" has the meaning set forth in Section 2.6(f).

"Cure Notice" has the meaning set forth in Section 5.3(c).

"Current Employees" means all employees of Sellers employed as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Data Room" means that certain Project Jumpsuit virtual data room operated by RR Donnelly Venue, and made available to Buyer and its Representatives.

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Deposit" has the meaning set forth in Section 2.11.

"Designated Deposit Accounts" has the meaning set forth in Section 2.10(c).

"Designated Store" means any of Sellers' store locations with respect to which the associated Leases have not yet been designated by Buyer as Assumed Contracts or Excluded Contracts, as such store locations may be changed in accordance with Section 2.6(b) and Section 2.10.

"Designated Store Proceeds" has the meaning set forth in Section 2.10(c).

"Designation Deadline" means May 15, 2015; provided, however, that Buyer may extend such date until June 30, 2015 if Buyer funds the costs to be incurred by the Sellers during the period following May 15, 2015 until June 30, 2015. Notwithstanding the foregoing, the "Designation Deadline" with respect to the Lease for the Headquarters shall be the earlier of August 13, 2015 and 90 days after the entry of an order confirming the Plan (or such later date as may be agreed to by Buyer, Sellers and the landlord under the Lease for the Headquarters).

"DIP Collateral" has the meaning set forth in the BofA DIP Order.

"DIP Financing" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of March [__], 2015, among Buyer, as lender, The Wet Seal, Inc., as lead borrower for The Wet Seal, Inc., The Wet Seal Retail, Inc., and Wet Seal Catalog, Inc., as borrowers and debtors in possession, and the guarantors party thereto, as the same may have been or be amended, modified, restated, or supplemented and in effect from time to time, and as approved by the Bankruptcy Court.

"DIP Financing Obligations" means the "Obligations" as defined under the DIP Financing.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and any other benefit or compensation plan, program, agreement or arrangement of any kind, in each case, maintained or contributed to by any Seller or in which any Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

"End Date" means April 15, 2015.

"Enforcing Parties" has the meaning set forth in Section 9.10(a).

"Environmental, Health and Safety Requirements" means, as enacted and in effect on or prior to the Closing Date, all applicable Laws concerning worker health and safety, pollution or the protection of the environment.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Escrow Account" has the meaning set forth in Section 2.11.

"Escrow Agent" has the meaning set forth in Section 2.11.

"Excluded Assets" means, collectively, the following assets of Sellers: (a) all of Sellers' and their respective Affiliates' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller or any of its Affiliates as a corporation, limited liability company or other entity; (b) all equity securities of any Seller and all net operating losses of any Seller (it being understood, however, that any such net operating losses shall, to the extent possible, be applied so as to reduce any Taxes that are Assumed Liabilities hereunder); (c) all Leases (and related Leased Real Property) and Contracts, in each case, other than the Assumed Contracts; (d) the Excluded Claims; (e) any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances and other than loans or notes from any Transferred Employees); (f) any (1) confidential personnel and medical Records pertaining to any Current Employees or

Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records to the extent that such portions relate to the Business or any Acquired Asset; (g) all Permits other than the Assumed Permits; (h) all assets maintained pursuant to or in connection with any Employee Benefit Plan (other than the Health Plans); and (i) the rights of Sellers under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement.

"Excluded Contract" has the meaning set forth in Section 2.6(b).

"Excluded Claims" means all (a) litigation, claims and causes of action against any former officer and/or director of any Seller who was not an officer and/or director on the Petition Date (but not any Person who is a Transferred Employee); (b) avoidance claims or causes of action arising under Chapter 5 of the Bankruptcy Code (other than the Acquired Avoidance Actions); (c) all rights of Sellers with respect to the litigation captioned *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 1:05-md-01720 (E.D.N.Y), in which Sellers are plaintiffs; and (d) all rights (including rights of set-off and rights of recoupment), refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Sellers against third parties to the extent related to any Excluded Asset or Excluded Liability.

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Transaction" means the transaction described in this Agreement or any other transaction with Buyer.

"Final Order" means an order, judgment, or other decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended, or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"Former Employees" means all individuals who have been employed by the Sellers (or any of their predecessors) who are not Current Employees.

"Furnishings and Equipment" means tangible personal property (other than Inventory and Intellectual Property), which is used or held for use in the operation of the Business.

"GAAP" means generally accepted accounting principles in the United States as set forth in accounting rules and standards promulgated by the Financial Accounting Standards Board or any organization succeeding to any of its principal functions.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Guarantee" has the meaning set forth in the recitals.

"Hazardous Substance" means any substance that is listed, defined, designated or classified as hazardous, toxic or otherwise harmful under applicable Laws or is otherwise regulated by a Governmental Entity, including petroleum products and byproducts, asbestos-containing material,  polychlorinated biphenyls, lead-containing products and mold.

 "Headquarters" means the offices of the Business located at 26972 Burbank, Foothill Ranch, CA 92610.

"Health Plans" means each of the following (as in effect on the Closing Date): (a) Sellers' self-insured medical and prescription drug program provided to full-time employees, which program is administered by United Healthcare (except that for full-time employees in Puerto Rico, the program is administered by Triple S, Inc., and for full-time employees in Hawaii, the program is administered by HMSA); and (b) Sellers' self-insured dental program provided to full-time employees, which program is administered by Cigna.

"Historical Financial Statements" has the meaning set forth in Section 3.4(a).

"Indebtedness" of any Person means, without duplication, (a) the principal of and premium (if any) in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the Ordinary Course of Business), (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, (e) the liquidation value of all redeemable preferred stock of such Person, (f) all obligations of the type referred to in clauses (a) through (e) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations, and (g) all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other forms of insurance owned or held by or on behalf, or providing insurance coverage to the Business, Sellers and their operations, properties and assets, including, without limitation, all stop-loss insurance policies with respect to Sellers' self-insured medical and/or dental insurance programs.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names,

service names, brand names (including the name "Wet Seal"), Internet domain names and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) trade secrets; and (e) all other intellectual property rights arising from or relating to Technology.

"Intellectual Property Assignments" has the meaning set forth in Section 2.8(a)(iii).

"Interim Financial Statements" has the meaning set forth in Section 3.4(a).

"Inventory" means inventories of raw materials and supplies, manufactured, spare and purchased parts, goods in process and finished goods, in each case, that are used or held for use in the operation of the Business, whether or not prepaid and whether in transit to or from Sellers and whether in Sellers' warehouses, distributions facilities, stores, outlets, held by third parties or otherwise.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or Decree of any Governmental Entity.

"L/C Cash Collateral Account" has the meaning set forth in the BofA DIP Order.

"Leased Real Property" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property of Sellers or any of its Affiliates which is used in the Business.

"Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"Letter Agreement" means that certain letter agreement dated March 12, 2015 by and among Sellers, Buyer and the Committee, a copy of which is attached hereto as Appendix B.

"Liability" means any liability, Indebtedness, guaranty, claim, loss, damage, deficiency, assessment, responsibility or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or determinable, whether choate or inchoate, whether secured or unsecured, whether matured or not yet matured).

"Lien" means any mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien, encumbrance, interest, charge, security interest, put, call, other option, right of first refusal,

right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code).

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is materially adverse to the financial condition or results of operations of the Business (taken as a whole); provided, however, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) any change in GAAP or Law; (iv) compliance with this Agreement or any Related Agreement, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (v) any changes directly attributable to the announcement of this Agreement or any Related Agreement; (vi) resulting from any act of God or other force majeure event (including natural disasters); (vii) in the case of Sellers or the Business, (A) the failure to meet or exceed any projection or forecast or (B) changes in the business or operations of Sellers or any of their respective Affiliates (including changes in credit terms offered by suppliers or financing sources) resulting from the announcement or the filing of the Chapter 11 Cases or Sellers' and their respective Affiliates' financial condition or Sellers' and certain of their respective Affiliates' status as debtors under Chapter 11 of the Bankruptcy Code; (viii) seasonal changes in the results of operations (provided that such seasonal changes are consistent with the historic experience of the Business); or (ix) inaction by Sellers due to Buyer's refusal to consent to a request for consent by Seller under Section 5.4 hereof; or (b) would reasonably be expected to prevent, materially delay or materially impair to the ability of any Seller to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein.

"Non-Continuing Store" means any of Sellers' store locations with respect to which the associated Leases have been designated by Buyer as Excluded Contracts, as such store locations may be changed in accordance with Section 2.6(b) and Section 2.10.

"Non-Real Property Contracts" means the Contracts to which any Seller is a party other than the Leases.

"Offeree" has the meaning set forth in Section 6.4(a).

"Operational Expenses" means all expenses of the Business, including, but not limited to, employee and occupancy expenses, all costs and expenses associated with any Lease or Non-Real Property Contract, including rent, ground lease rent, common area maintenance, utilities, real estate Taxes, insurance, security, other actual out-of-pocket costs.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice.

"Participating Vendor" means a vendor that executes a Participating Vendor Agreement with Buyer.

"Participating Vendor Agreement" means an agreement with Buyer, in form and substance acceptable to Buyer, to continue to participate in and extend trade credit going forward in connection with the operation of the Business by Buyer.

"Party" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings; (b) with respect to leased or licensed personal property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assumed Contract; (c) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business for amounts which are not delinquent and which are not material or which are being contested in good faith by appropriate proceedings; (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property; and (f) matters that would be disclosed on an accurate survey or inspection of the real

property but which do not interfere in any material respect with the right or ability to use the property as currently used or operated or to convey fee simple title.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Petition Date" means January 15, 2015.

"Plan" means a plan of reorganization proposed by the Sellers and/or the Committee.

"Plan Effective Date" means the effective date of the Plan.

"Priority Claim" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"Products" means, collectively, all clothing, footwear, apparel and accessories developed, produced, distributed, marketed and/or sold in connection with the Business.

"Professional Services" has the meaning set forth in Section 2.4(b).

"Purchase Price" has the meaning set forth in Section 2.5.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Rejection Effective Date" has the meaning set forth in Section 2.6(b).

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignments and the Letter Agreement.

"Related Party" means, with respect to any Seller, each of such Seller's direct and indirect Subsidiaries, each of their respective officers, directors, managers and equity holders, and each member of the immediate family of the foregoing Persons.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Sale Motion" has the meaning set forth in Section 5.3(a).

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases in substantially the form of Exhibit A attached hereto (or otherwise agreed to in writing by Buyer and Sellers).

"Selected Employee" has the meaning set forth in Section 6.4(d).

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Sellers' Accounts" has the meaning set forth in Section 2.8(b).

"Sellers' Knowledge" (or words of similar import) means the actual knowledge of Ed Thomas and/or Thomas Hillebrandt.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation).  The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, sales, use, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Technology" means, collectively, all algorithms, APIs, designs, net lists, data, databases, data collections, diagrams, inventions (whether or not patentable), know-how, methods, processes, proprietary information, protocols, schematics, specifications, tools, systems, servers, hardware, computers, point of sale equipment, inventory management equipment, software, software code (in any form, including source code and executable or object code), subroutines, techniques, user interfaces, URLs, web sites, works of authorship and other similar materials,

including all documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing.

"Transfer Tax" has the meaning set forth in Section 6.6.

"Transferred Employee" has the meaning set forth in Section 6.4(a).

"Trustee" means the trustee or post-confirmation officer appointed in connection with the Plan.

"WARN Act" means the United States Worker Adjustment and Retraining Notification Act, or any similar applicable federal, state, provincial, local, municipal, foreign or other Law.

"WSC" has the meaning set forth in the preamble.

"WSGC" has the meaning set forth in the preamble.

"WSI" has the meaning set forth in the preamble.

"WSR" has the meaning set forth in the preamble.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Acquired Assets**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of the Acquired Assets, free and clear of all Liens (other than Permitted Liens expressly identified in the Sale Order), for the consideration specified in Section 2.5.  Without limiting the generality of the foregoing, the Acquired Assets shall include the following (except to the extent included as an Excluded Asset):

(a)    all (i) Cash of Sellers as of the Closing, (ii) restricted cash deposits of Sellers held by any Person and relating to Acquired Assets or securing chargebacks, credit card processing claims or similar claims, (iii) cash deposits in cash collateral, indemnity or other accounts, including cash deposits supporting letters of credit (except for the cash in the BofA Accounts, the Escrow Account and any retainers and professional fee escrows held by the Sellers' and/or the estates' professionals), and (iv) bank accounts and lock-boxes of Sellers (except for the BofA Accounts and any bank account(s) opened by the Sellers to hold the Cash Payment and handle any disbursements of the Sellers after the Closing); provided that, notwithstanding the foregoing, (1) upon the release of the BofA Liens in the BofA Accounts, any cash remaining in such BofA Accounts shall be deemed to be an Acquired Asset hereunder and promptly paid over by the Sellers to the Buyer and (2) any remaining cash retainer or professional fee escrow held by Sellers' and/or the estates' professionals

shall be deemed to be an Acquired Asset hereunder and promptly paid over by the Sellers to the Buyer after the professional services for which such retainer or escrow were held shall have been rendered or the professional relationship terminated;

(b)    all Accounts Receivable of Sellers as of the Closing, and all receivables and other amounts payable by any Seller to any other Seller;

(c)    all Inventory, supplies and materials of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing;

(d)    without duplication of the above, all royalties (except for any royalties under any Excluded Asset), advances, prepaid assets and deferred items (including all prepaid Taxes, prepaid rentals, unbilled charges, fees and deposits, prepaid insurance premiums), and other prepayments of Sellers as of the Closing relating to the Business;

(e)    all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.6;

(f)    all Intellectual Property owned by Sellers;

(g)    all open purchase orders with suppliers related to the Business;

(h)    all items of machinery, equipment, supplies, furniture, fixtures, leasehold improvements (to the extent of Sellers' rights to any leasehold improvements under the Leases that are Assumed Contracts) owned by Sellers and all other Furnishings and Equipment as of the Closing;

(i)    all Records, including Records related to Taxes paid or payable by any Seller (provided that Sellers are entitled to retain copies of all Records);

(j)    except for the Excluded Claims, all claims (including all rights to bring claims for past, present or future infringement of the Intellectual Property owned by Sellers) and causes of action of Sellers as of the Closing against any Persons (regardless of whether or not such claims and causes of action have been asserted by Sellers) and all guaranties, rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by Sellers as of the Closing (regardless of whether such rights are currently exercisable);

(k)    all goodwill associated with the Business or the Acquired Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(l)   all rights of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with current or former employees, directors, consultants, independent contractors and agents of any of Sellers or any of their Affiliates or with third parties to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(m)   subject to Section 2.6(i), all of the Assumed Permits, or, to the extent provided in Section 2.6(i), all of the rights and benefits accruing under any Permits relating to the Business;

(n)   the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Acquired Assets of a type set forth in Section 2.1(c), Section 2.1(f) or Section 2.1(h), occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(o)   all other rights, demands, claims, credits, allowances, rebates or other refunds (including any vendor or supplier rebates), rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Business as of the Closing, including all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances and prepayments;

(p)   to the extent transferable, all Insurance Policies that, on or prior to the Closing, Buyer designates in writing to Sellers as Acquired Assets hereunder, and all rights and benefits of any Seller of any nature (except for any rights to insurance recoveries thereunder required to be paid to other Persons under any order of the Bankruptcy Court or relating to the DIP Financing) with respect thereto, including, without limitation of Section 2.1(n), all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(q)   except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent), including, without limitation, the Acquired Avoidance Actions;

(r)   all assets, rights and claims arising from or with respect to Taxes of any Seller, including all rights arising from any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers, all deferred tax assets, Tax deposits, Tax prepayments and estimated Tax payments;

(s)      all Credit Card Receivables as of the Closing and all Cash or other property on deposit at credit card processors as of Closing related to the Business;

(t)      all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to products sold, or services provided, to Sellers or to the extent affecting any Acquired Assets and/or Assumed Liabilities;

(u)      the right to receive and retain mail, Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing;

(v)      all telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names;

(w)      without duplication of the above, all other current assets of Sellers as of the Closing;

(x)      all assets maintained or held (including all deposits) pursuant to or in connection with the Health Plans; and

(y)      all other assets that are related to or used in connection with the Acquired Assets or the Business (but excluding all of the Excluded Assets).

**Section 2.2      Excluded Assets**.  Nothing contained herein shall be deemed to sell, transfer, assign or convey any of the Excluded Assets to Buyer, and each Seller shall retain all of its right, title and interest to, in and under, and all obligations with respect to the Excluded Assets.

**Section 2.3      Assumption of Assumed Liabilities**.  On the terms and subject to the conditions of this Agreement, at the Closing (or, with respect to Assumed Liabilities under Assumed Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in <u>Sections 2.6</u>), Buyer shall assume and become responsible for the Assumed Liabilities and no other Liabilities of Sellers or any of their Affiliates, and from and after the Closing agrees to timely pay, honor and discharge, or cause to be timely paid, honored and discharged, all Assumed Liabilities in accordance with the terms thereof.

**Section 2.4      Excluded Liabilities**.  Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "<u>Excluded Liabilities</u>").  Without limiting the foregoing, Buyer shall not be obligated to assume, does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities of any Seller, any predecessor of any Seller or any other Person, whether incurred or accrued before or after the Petition Date or the Closing:

(a)     except to the extent enumerated in Schedule 2.3, all Taxes of Sellers, including Taxes imposed on Sellers under Treasury Regulations Section 1.1502-6 and similar provisions of state, local or foreign Tax Law;

(b)     except to the extent enumerated in item 10 on Schedule 2.3, all Liabilities of Sellers relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services ("Professional Services") performed in connection with this Agreement and any of the transactions contemplated, hereby, and any claims for such Professional Services, whether arising before or after the Petition Date;

(c)     all Liabilities of Sellers relating to or arising from any collective bargaining agreement (including any related multiemployer pension plan);

(d)     except to the extent enumerated in Schedule 2.3, all Liabilities relating to (i) payroll (including salary, wages and commissions), vacation, sick leave, parental leave, long service leave, workers' compensation claims (provided that, and for the avoidance of doubt, any letter(s) of credit issued on behalf of any Seller in support of such workers' compensation claims are an Excluded Asset) and unemployment benefits of any Current Employee and/or Former Employee and (ii) all severance, retention and termination agreements with Current Employees and/or Former Employees;

(e)     except to the extent enumerated in item 4 on Schedule 2.3, all Liabilities arising out of, relating to, or with respect to any notice pay or benefits (including under COBRA unless otherwise required by applicable Law) and claims under the WARN Act with respect to any Current Employees and/or Former Employees;

(f)     except to the extent enumerated in items 13 and 14 on Schedule 2.3, all Liabilities arising out of, relating to, or with respect to any Employee Benefit Plan (including any Liabilities related to any Employee Benefit Plan which is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Section 302 or Title IV of ERISA or IRC Section 412);

(g)     except to the extent enumerated in item 9 on Schedule 2.3, all Liabilities of Sellers in respect of Indebtedness (except to the extent of any Cure Amounts under any Assumed Contracts, and except with respect to any capitalized leases that are Assumed Contracts);

(h)     all Liabilities arising in connection with any violation of any applicable Law relating to the period prior to the Closing, including any Environmental, Health and Safety Requirements;

(i)     any and all Liabilities and obligations (i) that are the subject of any dispute, litigation, arbitration, judgment, order, decree or other proceeding as of the Closing Date, (ii) with respect to periods prior to the Closing Date and are or could be asserted as a claim in litigation or arbitration after the Closing Date, (iii) relating to

any bodily injury, or damage to property, incurred by any Person or (iv) arising as a result of actions or omissions with respect to services provided to customers prior to the Closing; provided that nothing herein shall prevent, prohibit or otherwise impair any Seller's right to make any claim for any insurance recovery after the Closing under any applicable Insurance Policy, as provided under Section 6.10(b);

(j)  any Liabilities or obligations which Buyer may or could become liable for as a result of or in connection with any "defacto merger" or "successor-in-interest" theories of liability (other than the Assumed Liabilities);

(k)  all Liabilities of Sellers under this Agreement and the Related Agreements and the transactions contemplated hereby or thereby (excluding all the Assumed Liabilities);

(l)  all Liabilities and other amounts payable by any Seller to any other Seller and/or its Affiliates; and

(m)  all other Liabilities of Sellers that are not expressly included in the Assumed Liabilities.

Section 2.5    **Consideration**.  In consideration of the sale of the Business and the Acquired Assets to Buyer, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale and transfer of the Acquired Assets (the "Purchase Price") shall be composed of the following:

(a)  the payment of an amount in cash (the "Cash Payment") equal to  (i) $7,500,000, less (ii) the Deposit;

(b)  (i) a credit bid pursuant to Section 363(k) of the Bankruptcy Code (a "Credit Bid") of all the DIP Financing Obligations held by Buyer, (ii) a Credit Bid of a portion of the DIP Financing Obligations held by Buyer plus the assumption by the Buyer of the remaining outstanding DIP Financing Obligations and/or (iii) the assumption by Buyer of all of the outstanding DIP Financing Obligations; and

(c)  the assumption by Buyer of the Assumed Liabilities.

Section 2.6    **Assumption and Assignment of Contracts**.

(a)  The Sale Order shall provide for the assumption by Sellers, and the assignment to the extent legally capable of being assigned by Sellers to Buyer, of the Assumed Contracts on the terms and conditions set forth in the remainder of this Section 2.6, and shall provide for the Designation Deadline as defined herein.  At Buyer's request, and at Buyer's cost and expense, Sellers shall reasonably cooperate from the date hereof forward with Buyer as reasonably requested by Buyer (i) to allow Buyer to enter into an amendment of any Lease upon assumption of such Lease by Buyer (and Sellers shall reasonably cooperate with Buyer to the extent reasonably requested with Buyer in negotiations with the landlords thereof), or (ii) to otherwise

amend any Lease to the extent such amendments would not adversely affect any Seller; provided that Sellers shall not be required to enter into any such amendment if such amendment would result in an assumption by any Seller of such Lease, unless such Lease will be assigned to Buyer at the time of such assumption.

(b)    Buyer shall, prior to the hearing on the Sale Motion, identify the Non-Real Property Contracts and Leases that Buyer has decided will be Assumed Contracts to be assumed and assigned to Buyer on the Closing Date by providing a list thereof to Sellers (as updated in accordance with this Agreement, the "Closing Assumed Contract List").  Up to 3 Business Days prior to the Closing Date, Buyer may, in its sole discretion, add or remove any Non-Real Property Contract or Lease as an Assumed Contract to be assumed and assigned to Buyer on the Closing Date by amending the Closing Assumed Contract List, and, in connection with the Closing, the applicable Seller shall move in the Bankruptcy Court to assign any such Non-Real Property Contract or Lease on the Closing Assumed Contract List to Buyer, and at the Closing shall assume and assign to, and Buyer shall accept the assignment of and assume such Non-Real Property Contract or Lease.  In advance of the Closing Date, Buyer may, in its sole discretion, designate a Non-Real Property Contract or Lease for exclusion and rejection by delivering written notice to Sellers and, in connection with the Closing, the applicable Seller shall move to reject any such Non-Real Property Contract or Lease as of the Closing Date (which date shall constitute the Rejection Effective Date with respect thereto).  From and after the Closing Date until the Designation Deadline, with respect to any Non-Real Property Contract or Lease that was neither included on the Closing Assumed Contract List nor excluded and rejected as of the Closing Date, Buyer may, in its sole discretion, (i) designate such Non-Real Property Contract or Lease as an Assumed Contract by providing written notice to Sellers, specifying the Non-Real Property Contracts or Leases to be assumed by Sellers and assigned to Buyer or (ii) designate such Non-Real Property Contract or Lease for exclusion and rejection for purposes of this Agreement and, if executory, to be rejected by providing written notice to Sellers, specifying the Non-Real Property Contracts or Leases to be excluded and rejected by the applicable Seller and the date that such rejection shall be effective, which rejection shall be effective upon the delivery of such notice to Sellers (each, a "Rejection Effective Date"); provided, however, that, notwithstanding anything herein to the contrary, Buyer may not designate any Lease for exclusion and rejection if such exclusion and rejection would result in fewer than 140 Leases being assumed and assigned to Buyer.  Upon delivery of a notification by Buyer with respect to any Non-Real Property Contract or Lease under Section 2.6(b)(i), the applicable Seller shall move in the Bankruptcy Court within 5 days of receipt of such notice to assign such Non-Real Property Contract or Lease to Buyer and shall assume and assign to, and Buyer shall accept the assignment of and assume such Non-Real Property Contract or Lease.  Upon delivery of a notification by Buyer with respect to any Non-Real Property Contract or Lease under Section 2.6(b)(ii), the applicable Seller shall move in the Bankruptcy Court within 5 days of receipt of such notice to reject such Non-Real Property Contract or Lease as of the applicable Rejection Effective Date.  In the event that Buyer has not provided a written designation to assume and assign or reject any Non-Real Property Contract or Lease pursuant to this Section 2.6(b) by the Designation Deadline, then such Non-

Real Property Contract or Lease shall be deemed to be excluded and rejected and Sellers may move in the Bankruptcy Court to reject such Non-Real Property Contract or Lease as of the Designation Deadline (which Designation Deadline shall constitute the Rejection Effective Date with respect thereto), and no Seller shall have any obligation to assign any such Non-Real Property Contract or Lease to Buyer hereunder. Any Non-Real Property Contract or Lease that is designated (or deemed to be designated) for exclusion and rejection pursuant to this Section 2.6(b) shall constitute an "Excluded Contract" as of the Closing Date or, if thereafter, as of the Rejection Effective Date.  To the extent that a Non-Real Property Contract or Lease has not at Closing been designated as an Excluded Contract or an Assumed Contract, then, until the Rejection Effective Date, Buyer shall be obligated to perform or cause to be performed all of Sellers' obligations under such Non-Real Property Contract or Lease, and Buyer shall be entitled to all benefits of Sellers thereunder; provided that no Cure Amount shall be due with respect to such Non-Real Property Contract or Lease until the permanent assumption thereof at Assumption Approval in accordance with Section 2.6(g). Notwithstanding anything to the contrary contained herein, prior to the Designation Deadline, Buyers shall have designated for assumption by Sellers and assignment to Buyers such number of Leases that when added to any Leases included in the Assumed Contracts as of the Closing equals at least 140 Leases.  In determining the total number of Leases assumed and assigned to Buyer, the following shall be included (in addition to Leases actually assumed and assigned to Buyer): (x) store locations that were previously closed by Sellers but reopened by Buyer (provided that Buyer pays the Cure Amounts due with respect to the Lease for such store); and (y) any Lease for which the landlord thereunder objects to the assignment and assumption of such Lease for any reason (other than payment of the Cure Amount) and such objection is not resolved in a manner acceptable to Buyer.

(c)     After the Closing and prior to the Designation Deadline, Sellers shall not terminate, amend, supplement, modify, waive any rights under, or create any Lien with respect to any Non-Real Property Contract or any Lease, or take any affirmative action not required by the terms thereof, without the prior written consent of Buyer (not to be unreasonably withheld or delayed), unless Buyer has provided notice to Sellers in writing designating such Non-Real Property Contract or Lease for rejection pursuant to Section 2.6(b).

(d)     Within three (3) Business Days of Buyer's delivery of any notice of removal or designation of any Non-Real Property Contract or Lease as an Assumed Contract by Buyer pursuant to Section 2.6(b), or such lesser time as is approved by the Bankruptcy Court, Sellers shall give notice of the removal or designation of such Non-Real Property Contract or Lease as an Assumed Contract to the other parties thereto.

(e)     As part of the Sale Motion (or as necessary in one or more separate motions), Sellers shall request that, by virtue of any Seller providing ten (10) Business Days' prior notice of its intent to assume and assign any Contract, the Bankruptcy Court deem any non-debtor party to such Contract that does not file an objection with the Bankruptcy Court during such notice period to have given any

required Consent to the assumption of the Contract by the relevant Seller and assignment to Buyer.

(f)     In connection with the assumption and assignment to Buyer of any Assumed Contract that is executory pursuant to this Section 2.6, the cure amounts, as determined by the Bankruptcy Court, if any (such amounts, the "Cure Amounts"), necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts, including any amounts payable to any landlord under any Lease that is an Assumed Contract that relates to the period prior to the Assumption Approval, shall be paid by Buyer, on or before the Assumption Approval, and not by Sellers and Sellers shall have no liability therefor, and neither the Cure Amounts paid by nor the expense of any other obligation set forth in this Section 2.6(f) shall reduce, directly or indirectly, any consideration received by Sellers hereunder; provided that any applicable Cure Amounts with regard to Assumed Contracts listed in the Closing Assumed Contract List shall be paid by Buyer at the Closing.

(g)     Sellers shall use their respective commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assumed Contracts to Buyer (the "Assumption Approval") on the terms set forth in this Section 2.6.  In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts until the Designation Deadline to obtain, and to cooperate in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts.

(h)     To the extent that any Consent that is required to assign to Buyer any Assumed Contract is not obtained by the Designation Deadline, each Seller shall, with respect to each such Assumed Contract, from and after the Closing and until the earliest to occur of (x) the date on which such applicable Consent is obtained (which Consents the Parties shall use their reasonable best efforts, and cooperate with each other, to obtain promptly; provided, however, that none of the Parties or any of their respective Affiliates shall be required to pay any consideration therefor other than filing, recordation or similar fees, which shall be borne by Buyer), and (y) the date on which such Contract is rejected following the written request of Buyer, use commercially reasonable efforts during the term of such Assumed Contract to (i) provide to Buyer the benefits under such Assumed Contract, (ii) cooperate in any reasonable and lawful arrangement (including holding such Contract in trust for Buyer pending receipt of the required Consent) designed to provide such benefits to Buyer and (iii) use its commercially reasonable efforts to enforce for the account of Buyer any rights of such Seller under such Assumed Contract (including the right to elect to terminate such Assumed Contract in accordance with the terms thereof upon the written direction of Buyer).  Buyer shall reasonably cooperate with Sellers in order to enable Sellers to provide to Buyer the benefits contemplated by this Section 2.6(h).

(i)     Notwithstanding the foregoing, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Designation Deadline and is not continued or otherwise extended upon assumption, or (ii) requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Contract, and no such Consent has been obtained prior to the Designation Deadline.  In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

**Section 2.7      Closing**.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by electronic exchange of counterpart signature pages commencing at 11:00 a.m. local time on the date (the "Closing Date") that is the third Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.  The Closing shall be deemed to have occurred at 11:59 p.m. (prevailing Eastern time) on the Business Day prior to the Closing Date.

**Section 2.8      Deliveries at Closing**.

(a)     At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

(i)     one or more Bills of Sale substantially in the form of Exhibit B attached hereto ("Bill of Sale");

(ii)     one or more Assignment and Assumption Agreements substantially in the form of Exhibit C attached hereto ("Assignment and Assumption Agreement");

(iii)     instruments of assignment substantially in the forms of Exhibit D, Exhibit E and Exhibit F attached hereto for each registered trademark, registered copyright and domain name, respectively, transferred or assigned hereby and for each pending application therefor (collectively, the "Intellectual Property Assignments");

(iv)     a copy of the Sale Order;

(v)      a certificate signed by an authorized officer of WSI to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(f) is satisfied in accordance with the terms thereof; and

(vi)     to the extent applicable, a non-foreign affidavit from each Seller dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC stating that such Seller is not a "foreign person" as defined in Section 1445 of the IRC.

(b)      At the Closing, Buyer shall deliver to Sellers, or the designated third-party recipients pursuant to Section 2.5, the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

(i)      the Assignment and Assumption Agreement(s);

(ii)     a certificate to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) is satisfied in accordance with the terms thereof;

(iii)    the Cash Payment by wire transfer of immediately available funds to one or more bank accounts designated by Sellers or the designated third-party recipients thereof (including to such other third party recipients as provided in Section 2.5(a)) in writing to Buyer (the "Sellers' Accounts");

(iv)     a letter evidencing that all of the outstanding DIP Financing Obligations have been satisfied in full and/or assumed by Buyer, that the DIP Financing has been terminated and that all Liens thereunder against Sellers and the Excluded Assets have been fully discharged and released; and

(v)      evidence that Buyer has obtained from a third party lender (or Buyer or its Affiliates have committed to provide) an exit credit facility that provides Buyer with undrawn availability of at least $10 million on the Closing Date, which exit credit facility shall not be used to fund the Cash Payment.

**Section 2.9    Allocation**.  Within thirty (30) calendar days after the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price (and all capitalized costs and other relevant items) among the Acquired Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate), which allocation shall be binding upon Sellers and Buyer.  Buyer and Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation.  Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation unless required to do so by applicable Law.

**Section 2.10    Non-Continuing Stores, Designated Stores and Continuing Stores**.

(a)      As of the Closing, (i) any of Sellers' store locations with respect to which the associated Leases have been designated by Buyer as Assumed Contracts in

accordance with Section 2.6(b) shall be deemed to have been classified as Continuing Stores, (ii) any of Sellers' store locations with respect to which the associated Leases have been classified as Excluded Contracts in accordance with Section 2.6(b) shall be deemed to have been classified as Non-Continuing Stores, and (iii) any of Sellers' store locations with respect to which the associated Leases have not yet been designated by Buyer as Assumed Contracts or Excluded Contracts shall be deemed to have been classified as  Designated Stores.  From time to time after the Closing Date, in accordance with Section 2.6(b), Buyer may reclassify any Designated Store (x) as a Continuing Store by designating the Lease associated with such store as an Assumed Contract in accordance with Section 2.6(b) or (y) as a Non-Continuing Store by designating the Lease associated with such store as an Excluded Contract in accordance with Section 2.6(b).

(b)     At any time prior to the Designation Deadline, Buyer may reclassify a Non-Continuing Store as a Continuing Store by designating the Lease associated with such store as an Assumed Contract in accordance with Section 2.6(b) (except to the extent such Lease has already been moved for exclusion and rejection pursuant to the terms of Section 2.6(b) or this Section 2.10).  Upon such designation, such Non-Continuing Store shall be deemed to be a Continuing Store.

(c)     Operation of Designated Stores.

(i)     From and after the Closing until any Designated Store becomes a Continuing Store or a Non-Continuing Store in accordance with Section 2.6(b) and this Section 2.10, Sellers hereby appoint Buyer, and Buyer shall serve, in accordance with the terms of this Section 2.10(c), as Sellers' exclusive agent for the purpose of running the Business at such Designated Stores.  During such period, (x) Buyer shall have sole and complete authority, in its sole discretion, to oversee, manage, direct the operation of, control the day-to-day activities of, and make and implement all business decisions with respect to, any such Designated Stores, (y) Buyer shall receive all proceeds generated by operation of any such Designated Stores (the "Designated Store Proceeds"), including to the extent arising from the sale of Products (exclusive of sales Tax), and (z) Buyer shall pay, and shall be solely responsible for, any and all Operational Expenses of Sellers that are directly related to the operation of such Designated Stores; provided, that, all Operational Expenses constituting employee Liabilities shall be treated as set forth in Section 6.4.  For the avoidance of doubt and subject to Section 6.4, the Operational Expenses owed by Sellers described above shall include those Operational Expenses that are obligations of Sellers that accrue at any point during the period from the Closing until either (A) the Lease associated with such Designated Store is assumed and assigned to Buyer or (B) the Rejection Effective Date of the Lease associated with such store has occurred; provided, that Buyer has exited the store premises and turned possession of the store premises over to the landlord, the condition of such store premises to be turned over in accordance with the Lease associated with such store premises.  In addition, Buyer shall perform, or shall cause to be performed, any and all obligations of Sellers arising following the Closing under any Non-Real Property Contract or Lease related to

the operation of any Designated Store (other than any such Non-Real Property Contract that has previously been designated for rejection and exclusion pursuant to Section 2.6(b)) from and after the Closing until either (1) the Lease associated with such Designated Store is assumed and assigned to Buyer or (2) the Rejection Effective Date of the Lease associated with such Designated Store has occurred.

(ii)     To the extent deemed necessary by Buyer:

(A)     Buyer may establish new accounts (the "Buyer Accounts") for the deposit of the Designated Store Proceeds and the disbursement of amounts payable to Sellers under this Section 2.10(c), and Sellers shall promptly upon Buyer's reasonable request execute and deliver all necessary documents to open and maintain such accounts; provided, however, that Buyer may elect to continue to use the Designated Deposit Accounts as the Buyer Accounts. The Buyer Accounts shall be dedicated solely to the deposit of the Designated Store Proceeds and the disbursement of amounts payable under this Section 2.10(c), and Buyer shall exercise sole signatory authority and control with respect to the Buyer Accounts. Sellers shall not be responsible for, and Buyer shall pay as an Operational Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Buyer Accounts.  Upon Buyer's designation of the Buyer Accounts, all Designated Store Proceeds (including credit card proceeds) shall be deposited into the Buyer Accounts.  During the period between the Closing and the date Buyer establishes the Buyer Accounts, if any, all Designated Store Proceeds (including credit card proceeds), shall be collected by Buyer and deposited on a daily basis into depository accounts (as determined by Buyer) for the Designated Stores, which accounts shall be designated solely for the deposit of Designated Store Proceeds (including credit card proceeds), and the disbursement of amounts payable by Buyer under this Section 2.10(c) (the "Designated Deposit Accounts"). Notwithstanding anything to the contrary contained herein, Sellers shall have no ownership interest in, and shall not be entitled to withdraw any, Designated Store Proceeds.

(B)     Buyer shall have the right to use Sellers' credit card facilities (including credit card terminals and processors, credit card processor coding, the merchant identification numbers and existing bank accounts) for Designated Store Proceeds derived from credit card purchases (including Sellers' proprietary credit card).  In the event that Buyer elects to use Sellers' credit card facilities, Sellers shall process credit card transactions on behalf of Buyer and for Buyer's account, applying customary practices and procedures. Without limiting the foregoing, Sellers shall cooperate with Buyer to download data from all credit card terminals in the Designated Stores each day and to effect settlement with Sellers' credit card processors, and shall take such other actions as are necessary to process credit card transactions on behalf of Buyer under Sellers' merchant identification numbers. At Buyer's request,

Sellers shall cooperate with Buyer to establish Sellers' merchant identification numbers under Buyer's name to enable Buyer to process all Designated Store Proceeds derived from credit card purchases for Buyer's account.

(iii)    For the avoidance of doubt, nothing contained in this Section 2.10(c) shall require Buyer to become, or to be considered or deemed, the employer of any person, and Buyer shall not become, or be considered or deemed to be, the employer of any person, unless and until Buyer, in its discretion, chooses to employ such a person, it being understood that all agreements with respect to such matters are set forth exclusively in Section 6.4.

(iv)    Notwithstanding anything herein to the contrary, without the prior written consent of Sellers, Buyer may assign any or all of its rights and obligations under this Section 2.10(c) to any Person; provided that Buyer remains liable for performance under this Section 2.10(c).

(d)    Buyer shall indemnify and hold each Seller and its Representatives harmless from and against all claims, demands, penalties, losses, liability or damage to the extent arising from or relating to the operation of any of the Designated Stores, Non-Continuing Stores or the Continuing Stores by Buyer after the Closing Date, including, without limitation, reasonable attorneys' fees and expenses, resulting from, or related to: (i) Buyer's breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement and the Related Agreements or applicable Law; (ii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers or Representatives of any Seller by Buyer or any of its Representatives; (iii) any claims by any party engaged by Buyer as an employee or independent contractor arising out of such employment; (iv) the gross negligence (including omissions) or willful misconduct of Buyer, its officers, directors, employees, agents or representatives; and (v) violations of Law by Buyer, its officers, directors, employees, agents or representatives.

**Section 2.11    Deposit**.    Prior to the date hereof, Buyer made a cash deposit in the amount of $1,500,000 (the "Initial Deposit") by wire transfer of immediately available funds and is being held by KTBS (as defined herein) as described below.  Upon entry of the Sale Order by the Bankruptcy Court, Buyer shall make an additional cash deposit in the amount of $1,000,000 (the "Additional Deposit") by wire transfer of immediately available funds in accordance with such wire transfer instructions as are provided by the Escrow Agent (as defined herein).  The Initial Deposit, plus the Additional Deposit, plus any interest accrued thereon, is referred to herein as the "Deposit".   The Deposit is initially to be held in escrow by Klee Tuchin Bogdanoff & Stern LLP, as trustee ("KTBS"), it being understood that no later than March 17, 2015, the Buyer will select a commercial bank, agreeable to the Sellers, as escrow agent (the "Escrow Agent"), to hold the Deposit in escrow (the "Escrow Account"), and the Parties will direct KTBS to release the Deposit to the Escrow Agent.  In the event that the Closing occurs, the Deposit (less any amounts used, with prior written consent of Buyer, to satisfy obligations owed to B. Riley Financial, Inc.) will be applied to satisfy an equal portion of the Closing Payment, and Buyer shall direct the Escrow Agent to release the Deposit to Sellers at the Closing.  In any other

event, the Deposit shall be released by the Escrow Agent to the Party entitled thereto in accordance with Section 8.4, and the Parties shall promptly direct the Escrow Agent to release the Deposit accordingly. The Deposit shall only constitute property of the Sellers' bankruptcy estates in the event that the Deposit is required to be released to Sellers by the Escrow Agent in accordance with the terms of this Agreement.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES.

Each of the Sellers jointly and severally represents and warrants to Buyer that except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"):

**Section 3.1     Organization of Sellers; Good Standing**.

(a)     Each Seller (other than WSGC) is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware, and WSGC is a limited liability company duly organized, validly existing and in good standing under the Laws of the Commonwealth of Virginia.

(b)     Each Seller has all requisite corporate or similar power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

(c)     Each Seller is duly authorized to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Acquired Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

(d)     None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

**Section 3.2     Authorization of Transaction**.  Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)     each Seller has all requisite corporate power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by such Seller and no other corporate action on the part of any Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the transactions contemplated hereby or thereby; and

(b)     this Agreement has been duly and validly executed and delivered by each Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable.

Assuming that this Agreement constitutes a valid and legally-binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.  Assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3**    **Noncontravention; Consents and Approvals**.

(a)    Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>), will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) conflict with or result in a breach of the certificate of incorporation, by-laws or other organizational documents of any Seller, (ii) violate any Law to which any Seller is, or its respective assets or properties are, subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel or require any notice under any Contract to which any Seller is a party or by which it is bound or to which any of the Acquired Assets is subject, after giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of any such Contract that is an Assumed Contract hereunder,  and, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    Subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing), no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement.  After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of any Contract that is an Assumed Contract hereunder, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, be material to the Business as a whole.

**Section 3.4**    **Financial Statements; No Undisclosed Liabilities**.

(a)    The Data Room or Sellers' public securities filings contain true, correct and complete copies of the consolidated, audited financial statements of Sellers for the fiscal years ended February 2, 2013 and February 1, 2014 (collectively, the "Audited Financial Statements") as well as the unaudited, consolidated balance sheets, statements of income, changes in stockholders' equity and cash flows of Sellers for the fiscal year period ended January 31, 2015 (such statements, the "Interim Financial Statements" and, collectively, with the Audited Financial Statements, the "Historical Financial Statements"). The Historical Financial Statements have been prepared in accordance with GAAP applied on a consistent basis during the periods involved, and fairly present, in all material respects, the financial condition and results of operations and cash flows of the Business as of the dates thereof or the periods then ended, except, in each case, as expressly indicated in such Historical Financial Statements, and subject, in the case of the Interim Financial Statements, to normal year-end adjustments that will not be material in amount or effect and the absence of footnotes.

(b)    Except as set forth in Section 3.4(b) of the Disclosure Schedule, Sellers do not have any material Indebtedness or other Liabilities of a nature (whether accrued, absolute, contingent or otherwise) that would be required by GAAP to be reflected on a consolidated balance sheet of the Business (or in the notes thereto) that were not disclosed or reserved against in the Historical Financial Statements, except for Indebtedness or other Liabilities that (i) were incurred on or after November 1, 2014 in the Ordinary Course of Business, (ii) arise under this Agreement or the Related Agreements, or (iii) will be or are Liabilities of Sellers as debtors in the Chapter 11 Cases and that will not result in any Lien (other than Liens expressly contemplated by the Sale Order) on the Acquired Assets following the entry of the Sale Order.

**Section 3.5**    **Compliance with Laws**.  Sellers are in compliance with all material Laws applicable to the Business or the Acquired Assets, except in any such case where the failure to be in compliance would not have a Material Adverse Effect, and no Seller has received any written notice within the past twelve months relating to violations or alleged violations or material defaults under any Decree or any Permit, in each case, with respect to the Business.

**Section 3.6**    **Title to Acquired Assets**.  Sellers, as of the Closing, have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Acquired Assets, free and clear of all Liens (except for Permitted Liens and except for BofA Liens). At the Closing or such time as title is conveyed under Section 2.6, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Acquired Assets, free and clear of all Liens (except for Permitted Liens and except for BofA Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

**Section 3.7**    **Contracts**.

(a)    Section 3.7 of the Disclosure Schedule and the Sellers' schedules of assets and liabilities filed with the Bankruptcy Court by Sellers in the Chapter 11 Cases, taken together, include an accurate list of the following Contracts to which a Seller is a party with respect to the Business as of the date hereof (and Sellers have made available, or within five (5) days of the date hereof shall make available, to Buyer true and complete copies of all such Contracts):

(i)    any Contracts for the lease of personal property to or from any Person providing for lease payments in excess of $50,000 per annum;

(ii)    any Contracts for the purchase or sale of equipment, supplies, products or other personal property, the performance of which will extend over a period of more than six months after the Closing Date or involves consideration in excess of $50,000 per annum;

(iii)    any Contracts for services involving consideration in excess of $50,000 per annum;

(iv)    any Contracts that is a collective bargaining agreement;

(v)    any material licenses of Intellectual Property to or from any Person (other than licenses for commercially-available, off-the-shelf or click-wrap software);

(vi)    any employment Contracts as to which an employee is entitled to receive an annual salary in excess of $100,000, and all material severance Contracts;

(vii)    any material Contracts prohibiting the Company from freely engaging in any material business (other than pursuant to any radius restriction contained in any lease, reciprocal easement or development, construction, operating or similar agreement);

(viii)    any Contracts relating to Indebtedness;

(ix)    any Contracts that involve the lease of real property or that obligate the Company to purchase real property;

(x)    any Contracts that create or govern a partnership, joint venture, strategic alliance or similar arrangement;

(xi)    any Contracts (other than purchase orders accepted or confirmed in the Ordinary Course of Business) with the ten (10) largest customers of the Business, based on revenues during the twelve (12) month period ended February 1, 2014 and January 31, 2015;

(xii)    any Contracts (other than purchase or equipment orders entered into in the Ordinary Course of Business) with the ten (10) largest suppliers of the

Business, based on expenditures during the twelve (12) month period ended February 1, 2014 and January 31, 2015;

(xiii)    any Contracts with any Related Party; and

(xiv)    Contracts of or relating to employment or severance with any Current Employees (as determined as of the date of this Agreement).

(b)    With respect to each Contract listed on the schedules of assets and liabilities filed with the Bankruptcy Court by Sellers in the Chapter 11 Cases or on Section 3.7 of the Disclosure Schedule: (i) to the Sellers' Knowledge, such Contract is in full force and effect and constitutes the valid and legally-binding obligation of a Seller and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity; and (ii) except for breaches or defaults caused by or resulting from the Bankruptcy Events, neither the Seller party thereto nor, to Sellers' Knowledge, the counterparty thereto is in material breach or default thereof that presently would permit or give rise to a right of termination, modification or acceleration thereunder, except, in the case of either clause (i) or (ii), for such failure to be in full force and effect, breaches or defaults which would not, individually or in the aggregate, have a Material Adverse Effect on the Business.

**Section 3.8    Intellectual Property.**

(a)    Section 3.8 of the Disclosure Schedule sets forth a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller and used in or related to the Business, (ii) all material Contracts pursuant to which any Seller obtains the right to use any Intellectual Property, and (iii) all material Contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property. Sellers own all such Registered Intellectual Property free and clear of all Liens (except for Permitted Liens), and all such Registered Intellectual Property is valid, subsisting and, to Sellers' Knowledge, enforceable, and is not subject to any outstanding Decree adversely affecting Sellers' use thereof or rights thereto. Immediately after the Closing, Buyer will own or have the right to, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, use all of the Intellectual Property included in the Acquired Assets on the same terms and conditions as in effect for Sellers immediately prior to the Closing, to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

(b)    To Sellers' Knowledge and except as set forth on Section 3.8 of the Disclosure Schedule, none of the use of the Intellectual Property included in the Acquired Assets, the conduct of the Business as currently conducted, nor any of the Products sold or services provided by Sellers or any of their Affiliates in connection therewith, infringes upon or otherwise violates the Intellectual Property of any other Person. To Sellers' Knowledge, no third party is infringing any Intellectual Property owned by any

Seller and included in the Acquired Assets, except as would not reasonably be expected to have a Material Adverse Effect.

(c)     Except as set forth in the statements of financial affairs filed with the Bankruptcy Court by Sellers in the Chapter 11 Cases, as of the date hereof, no Litigation is currently pending or, to Sellers' Knowledge, threatened against any Seller that challenges the validity, ownership, registerability, enforceability, infringement or use of any material Intellectual Property owned by any Seller.

(d)     All Technology that is material to the Business operates and performs in all material respects in accordance with its documentation and functional specifications and otherwise as required in connection with the Business, and has not malfunctioned or failed within the past twelve (12) months in any manner that (i) resulted in a material disruption to the conduct of the Business or (ii) has had or could reasonably be expected to have a Material Adverse Effect. To Sellers' Knowledge, such Technology does not contain any "time bombs," "Trojan horses," "back doors," "trap doors," "worms," viruses, bugs, faults or other devices or effects that (A) enable or assist any Person to access without authorization such Technology, or (B) otherwise significantly adversely affect the functionality of such Technology.  To Sellers' Knowledge, in the past twelve (12) months, no Person has gained unauthorized access to the Technology that is material to the Business.  Sellers have implemented commercially reasonable security measures and backup and disaster recovery plans with respect to the Technology that is material to the Business.  Sellers are in material compliance with any privacy policies publicly posted by Sellers and any Laws relating to personal data.

**Section 3.9     Litigation**.  The statements of financial affairs filed with the Bankruptcy Court by Sellers in the Chapter 11 Cases set forth all Litigation brought by or against any Seller, and to Sellers' Knowledge, there is no other Litigation threatened in writing, before any Governmental Entity against any Seller.

**Section 3.10     Environmental, Health and Safety Matters**.

(a)     Sellers are in compliance with all applicable Environmental, Health and Safety Requirements with respect to the Leased Real Property, except in any such case where the failure to be in compliance would not have a Material Adverse Effect, and there are no Liabilities under any Environmental, Health and Safety Requirements with respect to the Business which would have a Material Adverse Effect.

(b)     To the Sellers' Knowledge, no Seller has received any written notice or report regarding any violation of Environmental, Health and Safety Requirements or any Liabilities relating to the Business or any Leased Real Property arising under Environmental, Health and Safety Requirements which violation has not been appropriately addressed and/or cured in accordance with such Environmental, Health and Safety Requirements.  There are no Decrees outstanding, or any Litigations pending or, to Sellers' Knowledge, threatened, relating to compliance with or Liability under any Environmental, Health and Safety Requirements affecting the Business or any Leased Real Property.

(c)     Sellers have made available to Buyer such environmental reports, documents, studies, analyses, investigations, audits and reviews in any Seller's possession as necessary to reasonably disclose to Buyer any environmental, health or safety Liability known to Sellers with respect to the Leased Real Property which would have a Material Adverse Effect.

(d)     To Sellers' Knowledge, there has been no release, threatened release, contamination or disposal of Hazardous Substances at any Leased Real Property, or waste generated by any Seller or any legally responsible predecessor corporation thereof, that has given or could reasonably be expected to give rise to any Liability under any Environmental, Health and Safety Requirement which would have a Material Adverse Effect. There are no underground storage tanks, asbestos-containing materials, lead-based products or polychlorinated biphenyls on any of the Leased Real Property which could be reasonably expected to have a Material Adverse Effect. To Sellers' Knowledge, no property currently or formerly owned or operated in connection with the Business has been contaminated with any Hazardous Substance that could reasonably be expected to require any investigation or remediation under Environmental, Health and Safety Requirements.

(e)     To Sellers' Knowledge, no Seller has entered into any indemnification or other agreements with any third party relating to any Liability or potential Liability under any Environmental, Health and Safety Requirements.

**Section 3.11    Employees and Employment Matters**. No Seller is a party to or bound by any collective bargaining agreement covering the Current Employees (as determined as of the date of this Agreement), nor is there any ongoing strike, walkout, work stoppage, or other material collective bargaining dispute affecting any Seller with respect to the Business.  To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to the Current Employees (as determined as of the date of this Agreement). Except for potential violations that are the subject of ongoing Litigation as set forth in the statements of financial affairs filed with the Bankruptcy Court by Sellers in the Chapter 11 Cases, within the ninety (90) day period ending on the date hereof, no Seller has implemented any plant closing or layoff of the Current Employees (as determined as of the date of this Agreement) in violation of the United States Worker Adjustment and Retraining Notification Act, or any similar applicable Law (collectively, the "WARN Act").  Within five (5) days of the date hereof, Sellers shall make available to Buyer a list of all Current Employees.

**Section 3.12    Employee Benefit Plans**.

(a)     Section 3.12 of the Disclosure Schedule lists each material Employee Benefit Plan that Sellers maintain or to which Sellers contribute.  With respect to each such Employee Benefit Plan:

(i)     such Employee Benefit Plan, if intended to meet the requirements of a "qualified plan" under Section 401(a) of the IRC, has received a favorable determination letter from the United States Internal Revenue Service or may rely

on a favorable opinion letter issued by the Unites States Internal Revenue Service; and

      (ii)    Sellers have made available to Buyer accurate summaries of all such Employee Benefit Plans.

(b)    Each Employee Benefit Plan has been established, funded, maintained and administered, in each case, in all material respects, in accordance with its terms and all applicable Laws.  As of the date hereof, there is no material pending or, to Sellers' Knowledge, threatened, Litigation relating to the Employee Benefit Plans.

**Section 3.13**   **Real Property**.

(a)    Sellers do not own any real property.

(b)    Section 3.13(b) of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true and complete list of all Leases for such Leased Real Property.  Sellers have made available, or within seven (7) days of the date hereof shall make available, to Buyer true and complete copies of such Leases and all other material Contracts or instruments entered into or delivered in connection therewith, as amended through the date hereof.  With respect to each of the Leases:

      (i)    such Lease is legal, valid, binding, enforceable and, to Sellers' Knowledge, in full force and effect against a Seller subject to proper authorization and execution of such Lease by the other party thereto and the application of any bankruptcy or other creditor's rights Laws;

      (ii)    no Seller is in breach or default under such Lease and, to Sellers' Knowledge, no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, except to the extent such breach or default would not, individually or in the aggregate, materially impair, the continued use and operation of the Leased Real Property to which it relates in the conduct of the Business as presently conducted, and except for breaches or defaults caused by or resulting from the Bankruptcy Events; and

      (iii)    the current and intended use of the Leased Real Property complies with all applicable Laws.

**Section 3.14**   **Permits**.  Section 3.14 of the Disclosure Schedule contains a list of all material Permits that Sellers hold as of the date hereof in connection with the operations of the Business.  As of the date hereof, there is no Litigation pending or, to Sellers' Knowledge, threatened that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, except where a failure of this representation and warranty to be so true and correct could not reasonably be expected to have a Material Adverse Effect. To Sellers' Knowledge, all required filings with respect to the material Assumed Permits have been made and all required applications for renewal thereof have been filed, except where a

failure of this representation and warranty to be so true and correct could not reasonably be expected to have a Material Adverse Effect.

   **Section 3.15   Insurance**.  Section 3.15 of the Disclosure Schedule contains a list, as of the date hereof, of all material Insurance Policies. The term "Insurance Policies" does not include policies of insurance that fund or relate to any Employee Benefit Plan.  The material Insurance Policies (including the amounts and deductibles thereunder) are, in the good faith judgment of Sellers, commercially reasonable for the Business. To Sellers' Knowledge, all of the material Insurance Policies are in full force and effect and no written notice of cancellation or termination has been received by Sellers with respect to any of such Insurance Policies. All premiums due and payable by Sellers or their Affiliates under the material Insurance Policies prior to the date hereof have been duly paid. Except as disclosed on Section 3.15 of the Disclosure Schedule, there is no material claim pending under any of the material Insurance Policies.

   **Section 3.16   Brokers' Fees**.  Except for amounts due to Houlihan Lokey Capital, Inc. (all of which shall be paid by Sellers), no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated to pay.

   **Section 3.17   No Other Representations or Warranties**. Except for the representations and warranties contained in this Article III (as qualified, amended, supplemented and modified by the Disclosure Schedule), neither a Seller nor any other Person makes (and Buyer is not relying upon) any other express or implied representation or warranty with respect to Sellers, the Business, the Acquired Assets (including the value, condition or use of any Acquired Asset), the Assumed Liabilities or the transactions contemplated by this Agreement, and Sellers disclaim any other representations or warranties, whether made by Sellers, any Affiliate of Sellers or any of their respective officers, directors, employees, agents or Representatives.  Except for the representations and warranties contained in this Article III (as qualified, amended, supplemented and modified by the Disclosure Schedule), each Seller (i) expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of title, merchantability or fitness for a particular purpose, or of the probable success or profitability of the ownership, use or operation of the Business or the Acquired Assets by Buyer after the Closing), and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant or Representative of any Seller or any of their Affiliates).  The disclosure of any matter or item in the Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows:

**Section 4.1    Organization of Buyer**.    Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2    Authorization of Transaction**.

(a)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the transactions contemplated hereby or thereby.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer.  Assuming that this Agreement constitutes a valid and legally-binding obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.  Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3    Noncontravention**.    Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II) will (i) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, violate any Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such

conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.

Section 4.4    **Financial Capacity**. As of the Closing, Buyer (i) will have the resources (including sufficient funds available to pay the Purchase Price and any other expenses and payments incurred by Buyer in connection with the transactions contemplated by this Agreement) and capabilities (financial or otherwise) to perform its obligations hereunder, and (ii) will not have incurred any obligation, commitment, restriction or Liability of any kind, that would impair or adversely affect such resources and capabilities.

Section 4.5    **Adequate Assurances Regarding Executory Contracts**. Buyer as of the Closing will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

Section 4.6    **Good Faith Purchaser**. Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder. Buyer is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to all of the Acquired Assets. Buyer has negotiated and entered into this Agreement in good faith and without collusion or fraud of any kind.

Section 4.7    **Brokers' Fees**. Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated to pay**.**

Section 4.8    **Condition of Business**. Buyer hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in Article III of this Agreement, Sellers (including each of their directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants and other representatives) make no express or implied representations or warranties whatsoever, including, without limitation, any representation or warranty as to physical condition or value of any of the Acquired Assets or the future profitability or future earnings performance of the Business. Buyer will accept the Acquired Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS".

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1    Certain Efforts; Cooperation**.

(a)    Each of the Parties shall use its commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the transactions contemplated by this Agreement on or prior to the End Date (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the transactions contemplated hereby set forth in Article VII), except as otherwise provided in Section 5.2.  Without limiting the generality of the foregoing, each of the Parties shall use its commercially reasonable efforts not to take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any other Party to consummate, or materially delay any other Party's ability to consummate, the transactions contemplated hereby, including taking any action that is intended or would reasonably be expected to result in any of the conditions to any other Party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied.

(b)    Buyer undertakes to ensure, that there shall be no amendment, modification, termination, replacement, restatement, cancellation or other change made to the Guarantee that could adversely affect the ability of Buyer to satisfy its obligations under this Agreement or otherwise prevent or adversely affect or delay the Closing.

(c)    On and after the Closing, Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken by themselves or any of their respective Affiliates, all appropriate action, to do or cause to be done by Sellers and Buyer or any of their respective Affiliates all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated hereby, including in order to more effectively vest in Buyer all of Sellers' right, title and interest to the Acquired Assets, free and clear of all Liens (other than Permitted Liens expressly contemplated by the Sale Order).

(d)    From and after the Closing Date until the Designation Deadline, Sellers agree to reasonably cooperate, and shall not interfere, with Buyer or its Representatives with respect to the operation of the Continuing Stores, Designated Stores or Non-Continuing Stores.  From and after the Closing Date, no Seller shall voluntarily convert its Chapter 11 Bankruptcy Case to a Chapter 7 bankruptcy case, or otherwise cause a liquidation or equivalent event with respect to any Seller, without providing Buyer with at least twenty (20) days' prior written notice.

**Section 5.2     Notices and Consents**.

(a)     To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its reasonable best efforts to obtain any third party consents or sublicenses.

(b)     Sellers and Buyer shall cooperate with one another (a) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the transactions contemplated hereby and (b) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers.

(c)     Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (A) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the transactions contemplated by this Agreement, (B) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the transactions contemplated by this Agreement and incorporate the other Party's reasonable comments, (C) not participate in any substantive meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the transactions contemplated by this Agreement unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (D) furnish the other Party with copies of all correspondences, filings, and written communications between them and their Subsidiaries and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement, provided, however, that any materials or information provided pursuant to any provision of this Section 5.2(c) may be redacted before being provided to the other Party (i) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (ii) financing arrangements, (iii) as necessary to comply with contractual arrangements, and (iv) as necessary to address reasonable privilege or confidentiality issues.  Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.2(c) as "outside counsel only."  Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be).  Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any

third party has any objection to the Agreement on antitrust or anti-competitive grounds.

**Section 5.3**    **Bankruptcy Actions**.

(a)    On or before March 16, 2015, Sellers shall serve and file a motion (the "Sale Motion") in the Chapter 11 Cases requesting that the Bankruptcy Court enter the Sale Order at a hearing on the Sale Motion.  Thereafter, Buyer and Sellers shall take all actions as may be reasonably necessary to cause the Sale Order to be issued, entered and become a Final Order.  Each of Sellers and Buyer agree to take any action reasonably necessary or appropriate to obtain the issuance and entry of the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.

(b)    Sellers shall provide appropriate notice of the hearings on the Sale Motion, as is required by the Bankruptcy Code and the Bankruptcy Rules to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens in the Acquired Assets, all parties to the Assumed Contracts and all Taxing and environmental authorities in jurisdictions applicable to Sellers.  Sellers shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted, to the extent practicable, to Buyer prior to their filing with the Bankruptcy Court for Buyer's prior review.

(c)    On or before March 18, 2015, Sellers shall serve a cure notice (the "Cure Notice") by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases and provide a copy of the same to Buyer.  The Cure Notice shall inform each recipient that its respective Non-Real Property Contract or Lease may be designated by Buyer as either assumed or rejected, and the timing and procedures relating to such designation, and, to the extent applicable (i) the title of the Non-Real Property Contract or Lease, (ii) the name of the counterparty to the Non-Real Property Contract or Lease, (iii) Sellers' good faith estimates of the Cure Amounts required in connection with such Non-Real Property Contract or Lease, (iv) the identity of Buyer and (v) the deadline by which any such Non-Real Property Contract or Lease counterparty may file an objection to the proposed assumption and assignment and/or cure, and the procedures relating thereto.

(d)    The Parties (in consultation with the Committee) shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Sale Order.  Each Seller shall promptly provide Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Seller has in its possession (or receives) pertaining to the motion for approval of the Sale Order, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Buyer and its counsel.  No Seller shall seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to

the Chapter 11 Cases has been appealed, in each case, without the prior written consent of Buyer.

(e)     If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order, or other such order), subject to rights otherwise arising from this Agreement, Sellers shall use their reasonable best efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(f)     Notwithstanding anything expressed or implied herein to the contrary, Sellers shall not consent or agree to the allowance or re-classification of any Claim as an Administrative Claim or a Priority Claim without the prior written consent of Buyer.

**Section 5.4**    **Conduct of Business**.  Except as may be required by the Bankruptcy Court or as agreed to in writing by Buyer, from the date hereof until the Closing, Sellers shall use their commercially reasonable efforts to: (i) operate the Business in the Ordinary Course of Business, including ordering and purchasing Inventory, and making capital, sales and marketing expenditures, (ii) preserve in all material respects the Acquired Assets (excluding sales of Inventory in the Ordinary Course of Business), and (iii) preserve its current relationships with the suppliers, vendors, customers, clients, contractors and other Persons having business dealings with the Business.  For the avoidance of doubt, the Parties acknowledge that the foregoing shall not require Sellers to breach any of the covenants set forth in this Agreement which obligate Sellers to operate the Business in the Ordinary Course of Business. Without limiting the generality of the foregoing, except as expressly required or contemplated in this Agreement, from the date hereof until the Closing, without the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), Sellers shall not, and shall not permit any of their Affiliates to:

(a)     sell, lease (as lessor), transfer or otherwise dispose of (or permit to become subject to any additional Lien, other than Liens expressly contemplated by Sale Order, Liens arising under any Bankruptcy Court orders relating to the use of cash collateral (as defined in the Bankruptcy Code), Liens arising in connection with the DIP Financing and Liens that will not be enforceable against any Acquired Asset following the Closing in accordance with the Sale Order) any material Acquired Assets, other than (A) the sale of Inventory in the Ordinary Course of Business, (B) the collection of receivables, (C) the use of prepaid assets and Records in the conduct of the Business in the Ordinary Course of Business, and (D) in connection with store closings listed on <u>Section 5.4 of the Disclosure Schedule</u> or otherwise consented to by Buyer;

(b)     conduct any store closings or "going out of business," liquidation or similar sales, other than those listed on <u>Section 5.4 of the Disclosure Schedule</u> (or otherwise consented to by Buyer) or made with respect to stores with Leases which

by their terms or pursuant to a court order terminate prior to the Closing;

(c)     declare, set aside, make or pay any dividend or other distribution (excluding any payments made in accordance with the provisions of any applicable services agreement between any Seller or any of its subsidiaries in the Ordinary Course of Business) of any assets (including Cash) to any Affiliate or other Person holding direct or indirect equity interests in any Seller;

(d)     (i) grant or provide any severance or termination payments or benefits to any Current Employee of Sellers or any of their Affiliates, except, in the case of employees who are not officers, in the Ordinary Course of Business consistent with past practice, (ii) increase the compensation, bonus or pension, welfare, severance or other benefits of, pay any bonus to, or make any new equity awards to any Current Employee of Sellers or any of their Affiliates, except for increases in base salary in the Ordinary Course of Business consistent with past practice for employees who are not officers, (iii) establish, adopt, amend or terminate any Employee Benefit Plan or amend the terms of any outstanding equity-based awards, (iv) take any action intended to accelerate the vesting or payment, or fund or in any other way secure the payment, of compensation or benefits under any Employee Benefit Plan, to the extent not already provided in any such Employee Benefit Plan, (v) enter into any employment, severance, change in control, termination, deferred compensation or other similar agreement with any Current Employee of Sellers or their Affiliates, (vi) change any actuarial or other assumptions used to calculate funding obligations with respect to any Employee Benefit Plan or to change the manner in which contributions to such plans are made or the basis on which such contributions are determined, except as may be required by GAAP, (vii) forgive any loans to Current Employees of Sellers or any of their Affiliates, or (viii) relocate any Current Employees to the Headquarters;

(e)     solely with respect to any action which could have an adverse effect on Buyer or any of its Affiliates following the Closing, make or rescind any material election relating to Taxes, settle or compromise any material claim, Litigation or controversy relating to Taxes, or except as may be required by applicable Law or GAAP, make any material change to any of its methods of Tax accounting, methods of reporting income or deductions for Tax or Tax accounting practice or policy from those employed in the preparation of its most recent Tax Returns;

(f)     acquire, dispose of, or allow to lapse any material assets or properties (other than Excluded Assets) or make any other material investment in any such event outside the Ordinary Course of Business;

(g)     enter into or agree to enter into any merger or consolidation with any corporation or other entity;

(h)     except in the Ordinary Course of Business, cancel or compromise any material Indebtedness or claim or waive or release any material right, in each case, that is Indebtedness or a claim or right that is an Acquired Asset or Assumed

Liability;

(i)     introduce any material change with respect to the operation of the Business, including any material change in the types, nature, composition or quality of products or services sold in the Business, other than, in each case, in the Ordinary Course of Business;

(j)     enter into any material new Contract or modify, terminate, amend, restate, supplement, renew or waive any rights under or with respect to any existing material Contract or the DIP Financing;

(k)     terminate, amend, restate, supplement, renew or waive any rights under or with respect to, any Lease, or, other than in the Ordinary Course of Business, any material Contract or Permit, or increase any payments required to be paid thereunder (whether or not in connection with obtaining any Consents) by Buyer after the Closing, or increase, or take any affirmative action not required by the terms thereof that would result in any increase in, any operating expenses of any Leases without Buyer's written consent, not to be unreasonably withheld, conditioned or delayed, provided, that such consent of Buyer may be conditioned on a reasonable valuation adjustment based on the increased costs in an amount to be determined in good faith;

(l)     deviate from past practice in the Ordinary Course of Business with respect to ordering or maintenance of Inventory;

(m)     file any motion to pay any pre-Petition claims of any Person without the express written consent of Buyer, unless such payments are consistent with the terms and conditions of the DIP Financing and with the Cash Budget; or

(n)     prepay any expenses unless expressly set forth in the Cash Budget.

**Section 5.5     Notice of Developments**.  From the date hereof until the Closing Date, Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any material failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.5 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement.

**Section 5.6     Access**.

(a)     Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all premises, properties, personnel, Records and Contracts related to the Business, in each case, for the sole purpose of evaluating the

Business; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.

(b)     All information obtained pursuant to this Section 5.6 shall be subject to the terms and conditions of the Confidentiality Agreement.

**Section 5.7     Press Releases and Public Announcements**.  Prior to the Closing and for a period of ninety days following the Closing Date, no Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of each of Buyer and WSI; provided, however, that (a) any Party may disclose that this Agreement exists (but not the terms hereof) and (b) any Party may make (and permit the making of) any public disclosure that it believes in good faith is required by applicable Law or court process (in which case the disclosing Party, as applicable, shall use its reasonable best efforts to advise the other Parties, as applicable, prior to making the disclosure).

**Section 5.8     Bulk Transfer Laws**.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith.  The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Liens in the Acquired Assets, including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 5.9     Suppliers**.  Sellers shall, following the request thereof by Buyer, seek and use their respective commercially reasonable efforts to arrange meetings and telephone conferences with material suppliers of Sellers as may be reasonably requested by Buyer and necessary and appropriate for Buyer to coordinate transition of such suppliers following the Closing.  For the avoidance of doubt, Buyer shall be permitted to contact any customers, suppliers or licensors of the Business in connection with or pertaining to any matter; provided, however, that during the period from the date hereof until the Closing, (i) Buyer shall give prior notice to Sellers, and (ii) Sellers shall be permitted, but shall not be obligated, to attend and participate in any meeting or telephone conference with such customers, suppliers or licensors to the extent reasonably requested.

**Section 5.10    No Competing Transactions**.  Sellers shall not, and shall cause the their Representatives not to:  (a) initiate, solicit or encourage any inquiries concerning an Acquisition Proposal or a Competing Transaction; (b) engage in any negotiations concerning, or provide any confidential information or data to, or have any discussions with, any Person relating to an Acquisition Proposal or a Competing Transaction; (c) facilitate any effort or attempt to make or implement an Acquisition Proposal; or (d) consummate or agree or commit to consummate an Acquisition Proposal or a Competing Transaction.   Sellers shall, and shall cause their Representatives to, immediately cease or cause to be terminated any existing activities, discussions or negotiations with any Person relating to any of the foregoing activities.

**Section 5.11    Delivery of Disclosure Schedule.** No later than March 20, 2015, Sellers shall deliver to Buyer the "Disclosure Schedule", which shall be in form and substance reasonably acceptable to Buyer (it being understood that if any disclosure set forth thereon is materially inconsistent with, or would cause the representations and warranties of Sellers in this Agreements to be materially inconsistent with, the information contained in the Data Room prior to the date hereof or the schedules filed by Sellers in the Bankruptcy Court in connection with the Chapter 11 Cases prior to the date hereof, then a Material Adverse Effect shall be deemed to have occurred and Buyer shall be entitled to terminate this Agreement pursuant to Section 8.1(b)(ii)).

## ARTICLE VI
## OTHER COVENANTS.

The Parties agree as follows with respect to the period from and after the Closing:

**Section 6.1    Cooperation.** Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Acquired Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the transactions contemplated hereby.

**Section 6.2    Further Assurances.** In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Acquired Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discovers any additional assets or properties which should have been transferred or assigned to Buyer as Acquired Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

**Section 6.3    Availability of Business Records.** From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives and the Trustee (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Acquired Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for Sellers or the Trustee (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) seven years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records related to Taxes, the expiration of the statute

of limitation applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain originals or copies of all of Records included in the Acquired Assets for periods prior to the Closing. Prior to destroying any Records included in the Acquired Assets for periods prior to the Closing, Buyer shall notify Sellers thirty days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense. With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers and the Trustee may request in defending or prosecuting such Litigation or claim and shall make available to Sellers and the Trustee such personnel as are most knowledgeable about the matter in question, all without charge.

**Section 6.4    Employee Matters**.

(a)    With the exception of the Selected Employees, each Seller shall, effective as of the day prior to the Closing Date, discharge all Current Employees. Prior to the Closing, Buyer (through and in consultation with Ed Thomas in his capacity as chief executive officer of Buyer) shall offer (or cause a designee of Buyer to offer) to employ those Current Employees (i) to operate the Continuing Stores (once so designated) (provided that such Current Employees will be advised that such offer may be rescinded if the Lease for such Designated Store is rejected), with employment commencing as of the date that such Designated Store becomes a Continuing Store and such Lease is assumed or (ii) to be employed in the Buyer's head office with employment commencing on the Closing Date. For purposes of this Agreement, each Current Employee who receives such an offer of employment shall be referred to as an "Offeree." Prior to the Closing Date, Buyer will provide Sellers with a schedule setting forth a list of the names of all Offerees. Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "Transferred Employee." Except to the extent Sellers fail to comply in any material respects with Section 6.4(c)(i) and Section 6.4(c)(iii), Buyer hereby agrees that the offer to an Offeree shall include a level of base salary, wages and benefits that are substantially comparable in the aggregate to the base salary, wages and benefits provided to such Offeree by Sellers as of the Closing Date.

(b)    Each Current Employee of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c)    Following the date of this Agreement,

(i)    Sellers shall allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the Current Employees who are members of executive management and other employees reasonably requested during normal business hours; *provided*, *however*, that such access shall not unduly interfere with the operation of the Business prior to the Closing;

(ii)    Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or

any Affiliate, to (A) interfere with Buyer's or its Representatives rights under Section 6.4(a) to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment; and

(iii)    Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of appropriate terms and conditions of employment for any Offeree.

(d)    Notwithstanding anything in this Agreement to the contrary,

(i)    Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all employees of Sellers;

(ii)    from the Closing Date until (x) the date upon which a Designated Store or a Non-Continuing Store becomes a Continuing Store or (y) the Rejection Effective Date associated with such store has occurred, Buyer shall (or shall cause its designee to) process the payroll for, and Buyer shall be liable for and shall pay, or cause to be paid, the base wages, base salary and benefits that accrue after the Closing Date with respect to all employees of Sellers that are required, in Buyer's sole discretion, to remain employed by Sellers to operate such Designated Store or Non-Continuing Store (the "Selected Employees"); and

(iii)    Buyer shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that accrue after the Closing Date with respect to all Transferred Employees. Buyer shall withhold and remit all applicable payroll taxes as required by Law after the Closing Date with respect to Transferred Employees.  In addition, Buyer shall (or shall cause its designee to) process all employee and Tax reporting covering the periods prior to the Closing in connection with the Excluded Employees and the Transferred Employees that will be required to be prepared and delivered after the Closing.

For the avoidance of doubt, and without limiting the effect of any other term of this Agreement, if Buyer prior to the Closing Date has designated a Lease for a store for rejection by providing written notice to Sellers in accordance with Section 2.6, Buyer shall not be liable for any employee/employment related Liabilities with respect to the employees of such store, with the exception of Buyer's payment obligations to Seller as expressly set out in this Section 6.4. Likewise, Buyer shall not be liable for any employee/employment Liabilities related to the employment of Selected Employees in Designated Stores or Non-Continuing Stores, with the exception of Buyer's payment obligations to Seller as expressly set out in this Section 6.4.

(e)    Nothing contained herein shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue

the employment of any specific person.  Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

(f)     From and after the Closing Date until the Designation Deadline, Sellers shall not voluntarily terminate any Selected Employee of Sellers without the prior written consent of Buyer.

(g)     At Closing, Buyer will offer employment to Ed Thomas, Christine Lee, Jon Kubo, Rachel Page, Tom Hillebrandt and Kim Bajrech, on the terms outlined in the email exchange between Ed Thomas and Greg Segall on March 7, 2015 concluding at 4:21 pm Pacific Time.

**Section 6.5    Recording of Intellectual Property Assignments**.  All of the Intellectual Property Assignments shall be recorded and filed by Buyer with the appropriate Governmental Entities as promptly as practicable following the Closing.

**Section 6.6    Transfer Taxes**.  To the extent not exempt under section 1146 of the Bankruptcy Code, then Buyer shall pay any stamp, documentary, registration, transfer, added-value or similar Tax (each, a "Transfer Tax") imposed under any applicable Law in connection with the transactions contemplated by Article II of this Agreement.  Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

**Section 6.7    Wage Reporting**.  Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the standard procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

**Section 6.8    Acknowledgements**.  Buyer acknowledges that it has received from Sellers certain projections, forecasts and prospective or third party information relating to Sellers, the Business, the Acquired Assets, the Assumed Liabilities or any related topics.  Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information, (ii) Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts and information so furnished, and (iii) neither Buyer nor any other Person shall have any claim against any Seller, its Affiliates or their respective Representatives with respect thereto.   Accordingly, without limiting the generality of Section 3.4, Sellers make no representations or warranties with respect to such projections, forecasts or information.

**Section 6.9    Certain Avoidance Actions**.  The Parties acknowledge and agree that: (a) upon execution of a Participating Vendor Agreement (in form and substance acceptable to Buyer) with Buyer no later than ninety (90) days following the Closing Date, the applicable

Participating Vendor shall be entitled to a waiver and release of any and all claims and causes of action against such Participating Vendor arising under section 547 of the Bankruptcy Code; and (b) Sellers shall not pursue any litigation, claims and/or causes of action (including causes of action under Chapter 5 of the Bankruptcy Code) against any Participating Vendor (or any vendor who could be a Participating Vendor, unless and until it is determined that such vendor is not a Participating Vendor, in which case, Sellers may only pursue a claim or cause of action against such vendor to the extent such claim or cause of action is an Excluded Asset hereunder).

### Section 6.10    Insurance Policies.

(a)    To the extent that any current or prior Insurance Policy is not transferable to Buyer at the Closing in accordance with the terms thereof, each Seller, as applicable, shall hold such Insurance Policy for the benefit of Buyer, shall reasonably cooperate with Buyer (at Buyer's cost and expense) in pursuing any claims thereunder, and shall pay over to Buyer promptly any insurance proceeds paid or recovered thereunder with respect to the Acquired Assets or the Assumed Liabilities.  In the event Buyer determines to purchase replacement coverage with respect to any such Insurance Policy, Sellers shall reasonably cooperate with Buyer to terminate such Insurance Policy to the extent only applicable to the Acquired Assets, and Sellers shall, at the option of Buyer, promptly pay over to Buyer any refunded or returned insurance premiums received by any Sellers in connection therewith (or, if applicable, Buyer's pro rata portion thereof) or cause such premiums to be applied by the applicable carrier to the replacement coverage arranged by Buyer.

(b)    To the extent that any current or prior Insurance Policy of any Seller relates to the Acquired Assets or Assumed Liabilities and the Excluded Assets or the Excluded Liabilities, and such Insurance Policy is transferred to Buyer at the Closing, Buyer shall hold such Insurance Policy with respect to the Excluded Assets or Excluded Liabilities, as applicable, for the benefit of Sellers, shall reasonably cooperate with Sellers in pursuing any claims thereunder, and shall pay over to Sellers promptly any insurance proceeds paid or recovered thereunder with respect to the Excluded Assets or the Excluded Liabilities.

### Section 6.11    Collection of Accounts Receivable.

(a)    As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Acquired Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Acquired Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Seller's order, for Buyer's own account.

(b)    As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to

Accounts Receivable (including, without limitation, Credit Card Receivables) that are Acquired Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments. In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)     As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Acquired Assets and accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.12    Name Changes**.  Neither Sellers nor any of their Affiliates shall use, license or permit any third party to use, any name, slogan, logo or trademark which is similar or deceptively similar to any of the names, trademarks or service marks included in the Intellectual Property included in the Acquired Assets, and within 21 days following the Closing Date, each Seller shall change its corporate name to a name which (a) does not use the name "Wet Seal", "WTSL" or any other name that references or reflects any of the foregoing in any manner whatsoever, (b) is otherwise substantially dissimilar to its present name and (c) is approved in writing by Buyer.

**Section 6.13    Treatment of Certain Claims; Plan.**

(a)     Notwithstanding anything expressed or implied herein to the contrary, (i) neither Sellers nor Trustee shall consent or agree to the allowance or re-classification of any Claim as an Administrative Claim or a Priority Claim without the prior written consent of Buyer and (ii) no Administrative Claims or Priority Claims can be classified or re-classified as a general unsecured claim without the consent of the Sellers or the Trustee, as applicable, or an order of the Bankruptcy Court.

(b)     The Plan shall be (i) consistent with the terms of this Agreement and the Letter Agreement and (ii) reasonably acceptable to Buyer.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1    Conditions to Buyer's Obligations**.  Subject to Section 7.3, Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)     as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section

3.1, Section 3.2 or Section 3.3 shall be true and correct in all respects, and (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)     Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.8(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)     Sellers shall have performed and complied with all their respective obligations under the Employee Benefit Plans through the Closing in all material respects;

(d)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(e)     the Sale Order entered by the Bankruptcy Court shall have become a Final Order and shall not be materially different than the form of Sale Order set forth on Exhibit A attached hereto;

(f)     from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect; and

(g)     Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(f) has been satisfied.

**Section 7.2     Conditions to Sellers' Obligations**.     Subject to Section 7.3, Sellers' obligation to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)     as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2 or Section 4.3 shall be true and correct in all respects, and (ii) each other representation or warranty set forth in Article IV shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the

consummation of the transactions contemplated hereby or by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.8(b) to be delivered to Sellers (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    the Sale Order entered by the Bankruptcy Court shall have become a Final Order and shall not be materially different than the form of Sale Order set forth on Exhibit A attached hereto except to the extent that Buyer has waived any deviation from the Sale Order attached as Exhibit A; and

(e)    Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

Section 7.3    **No Frustration of Closing Conditions**.  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the transactions contemplated hereby set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its reasonable best efforts or commercially reasonable efforts, as applicable, with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the transactions contemplated hereby or other breach of a representation, warranty or covenant hereunder.

## ARTICLE VIII
## TERMINATION.

Section 8.1    **Termination of Agreement**.  This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)    by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event Sellers have breached any material covenant contained in this Agreement in any material respect, Buyer has notified Sellers of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.1

shall become incapable of being satisfied by the Closing, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(c)     by Sellers by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any material covenant contained in this Agreement in any material respect, Sellers have notified Buyer of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.2 shall become incapable of being satisfied by the Closing, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by them prior to the Closing, and such condition is not waived by Sellers;

(d)     by Buyer, on the one hand, or Sellers, on the other hand, on any date that is after the End Date if the Closing shall not have occurred by the End Date; provided, however, that (i) Buyer shall not have the right to terminate this Agreement under this Section 8.1(d) or Section 8.1(b) if, at the time of such termination, Sellers would then be entitled to terminate this agreement pursuant to Section 8.1(c) (subject only to delivery of notice and the opportunity to cure, if curable, required by Section 8.1(c)), and (ii) Sellers shall not have the right to terminate this Agreement under this Section 8.1(d) or Section 8.1(c) if, at the time of such termination, Buyer would then be entitled to terminate this agreement pursuant to Section 8.1(b) (subject only to delivery of notice and the opportunity to cure, if curable, required by Section 8.1(b)); or

(e)     by Buyer if (i) the Sale Order shall not have been entered by the Bankruptcy Court by the End Date or (ii) the Sale Order shall not have become a Final Order by the 15th day following entry of the Sale Order on the Bankruptcy Court docket.

**Section 8.2     Procedure Upon Termination**.   In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3     Effect of Termination**.

(a)     If any Party terminates this Agreement pursuant to Section 8.1, then all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I (Definitions), Article IX (Miscellaneous), and this Article VIII (Termination) shall survive any such termination) and no Party shall have any Liability to any other Party, as applicable, hereunder except as otherwise expressly set forth in this Agreement.

(b)    Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(c)    The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 8.3 shall relieve Buyer or Sellers of their respective obligations under the Confidentiality Agreement.

**Section 8.4    Deposit**.

(a)    If this Agreement is terminated pursuant to any provision of Section 8.1, other than Section 8.1(c)(i), then the Deposit shall be returned to Buyer within two Business Days of such termination.

(b)    If this Agreement is terminated pursuant to Section 8.1(c)(i) and Buyer is in material breach of this Agreement at the time of termination, then the Deposit shall be disbursed to Sellers within two Business Days of such termination (it being understood and agreed that disbursement of the Deposit to Sellers shall be liquidated damages and Sellers shall not have any other rights or remedies at law or in equity).

(c)    Buyer and Sellers hereby acknowledge that the obligation to deliver the Deposit (to the extent due hereunder) shall survive the termination of this Agreement and shall be paid pursuant to the terms herein.

**ARTICLE IX**
**MISCELLANEOUS**.

**Section 9.1    Expenses**.  Except as otherwise provided in this Agreement or a Related Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including, but not limited to, all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.

**Section 9.2    Entire Agreement**.  This Agreement constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof, except for the Guarantee and the Related Agreements.

**Section 9.3    Incorporation of Schedules, Exhibits and Disclosure Schedule**.  The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 9.4**    **Amendments and Waivers**.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 9.4</u> except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 9.5**    **Succession and Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; <u>provided</u>, <u>however</u>, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Sellers; provided, however, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment.

**Section 9.6**    **Notices**.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Sellers, then to:

> Edmond S. Thomas, CEO
> The Wet Seal, Inc.
> 26972 Burbank
> Foothill Ranch, CA 92610
> Email:  Ed.Thomas@wetseal.com

with a copy to:

> Michael Tuchin
> Klee, Tuchin, Bogdanoff & Stern LLP
> 1999 Avenue of the Stars
> 39th Floor

               Los Angeles, CA 90067
               Email:  mtuchin@ktbslaw.com

If to Buyer, then to:

               c/o Versa Capital Management, LLC
               Cira Centre
               2929 Arch Street
               Philadelphia, PA 19104
               Attention: General Counsel
               Email:  tkennedy@versa.com

with copies (which shall not constitute notice) to:

               Greenberg Traurig, LLP
               77 W. Wacker Drive Suite 3100
               Chicago, Illinois 60601
               Attention:  Nancy A. Peterman
               Email:  petermann@gtlaw.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this <u>Section 9.6</u>.

     **Section 9.7**    **<u>Governing Law; Jurisdiction</u>**.  This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws.  The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court; <u>provided</u> that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

     **Section 9.8**    **<u>Consent to Service of Process</u>**.  Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 9.6</u>.

     **Section 9.9**    **<u>WAIVERS OF JURY TRIAL</u>**.  EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**Section 9.10    Specific Performance**.

(a)    Each of the Parties acknowledges and agrees that the other Parties (collectively, the "Enforcing Parties") would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that each of the Parties may have under Law or equity, each of the Parties shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof (except as otherwise expressly set forth herein).

(b)    Each of the Parties agrees that it shall not oppose the granting of specific performance or an injunction sought in accordance with this Section 9.10 on the basis that the Enforcing Parties have an adequate remedy at law or that any award of specific performance is, for any reason, not an appropriate remedy (except as otherwise expressly set forth herein).  The Enforcing Parties shall not be required to provide any bond or other security in connection with any such injunction or other equitable remedy.  The End Date shall be tolled from the date any of the Enforcing Parties files a petition seeking specific performance or an injunction under this Section 9.10 until a final, non-appealable, decision regarding this matter is obtained from a court of competent jurisdiction.

**Section 9.11    Severability**.    The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.12    No Third Party Beneficiaries**.    This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 9.13    No Survival of Representations, Warranties and Agreements**.    None of the Parties' representations, warranties, covenants and other agreements in this Agreement, including any rights of the other Party or any third party arising out of any breach of such representations, warranties, covenants and other agreements, shall survive the Closing, except for (i) those covenants and agreements contained herein that by their terms apply or are to be performed in whole or in part after the Closing, (ii) this Article IX, and (iii) all defined terms set forth in Article I that are referenced in the foregoing provisions referred to in clauses (i) and (ii) above.**Construction**.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular

form of names and pronouns shall include the plural and vice versa.  The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation."  The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement.  Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof."  Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement.  Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time.  Any reference herein to "dollars" or "$" means United States dollars.

Section 9.15    **Computation of Time**.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

Section 9.16    **Mutual Drafting**.  Each of the Parties has participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.17    **Disclosure Schedule**.  All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement.  The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule.  The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure with respect to any other sections of the Disclosure Schedule to which such disclosed matter reasonably relates, but only to the extent that such relationship is reasonably apparent on the face of the disclosure contained in the Disclosure Schedule.  The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.  No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  In no event shall the disclosure of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties and/or covenants set forth in this Agreement.  All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly or indirectly referenced.  The information contained in the Disclosure Schedule is in all events subject to the Confidentiality Agreement.

**Section 9.18**    **Headings; Table of Contents**.    The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.19**    **Counterparts; Facsimile and Email Signatures**.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.    This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**Section 9.20**    **Time of Essence**.    Time is of the essence of this Agreement.

**Section 9.21**    **General Releases.**

(a)    Effective upon the Closing, Sellers, on behalf of themselves and their respective past, present and future subsidiaries, parents, divisions, Affiliates, agents, representatives, insurers, attorneys, successors and assigns (collectively, the "Seller Releasing Parties"), hereby release, remise, acquit and forever discharge the Buyer and its past, present and future subsidiaries, parents, divisions, Affiliates, agents, representatives, insurers, attorneys, successors and assigns, and each of its and their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies and partners (collectively, the "Buyer Released Parties"), from any and all claims, contracts, demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, damages, Liabilities, costs and expenses, whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute, common law of any kind, nature, or description, including, without limitation as to any of the foregoing, any claim by way of indemnity or contribution, which any Seller Releasing Party has, may have had or may hereafter assert against any Buyer Released Party arising from or related in any way, either directly or indirectly, to any action or inaction of any Buyer Released Party relating in any way to Sellers and/or the Business, including without limitation, any action or inaction of any Buyer Released Party relating to the Chapter 11 Cases; provided, however, that the foregoing release shall not apply to the Sellers' rights or the Buyer's obligations under this Agreement (including Section 6.10 hereof), any Related Agreements and/or any other agreements entered into in connection with the transactions contemplated hereby.

(b)    Effective upon the Closing, Buyer, on behalf of itself and its past, present and future subsidiaries, parents, divisions, successors and assigns (collectively, the "Buyer Releasing Parties"), hereby releases, remises, acquits and forever discharges each Seller and its past and present subsidiaries, parents, divisions, agents, representatives, attorneys, successors and assigns, and each of its and their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, owners and partners (collectively, the "Seller Released Parties"), from any and all claims,

contracts, demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, damages, Liabilities, costs and expenses, whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute, common law of any kind, nature, or description (including, without limitation as to any of the foregoing, any claim by way of indemnity or contribution), in each case, which any Buyer Releasing Party has, may have had or may hereafter assert against any Seller Released Party to the extent arising from or related in any way, either directly or indirectly, to any action or inaction of any Seller Released Party with respect to the operation of the Business prior to the Closing Date, including without limitation, any action or inaction of any Seller Released Party relating to the Chapter 11 Cases prior to the Closing Date; provided, however, that the foregoing release shall not apply to (i) the Buyer's rights or the Sellers' obligations under or with respect to this Agreement (including Section 6.10 hereof), any Related Agreements, the DIP Financing and/or any other agreements entered into in connection with the transactions contemplated hereby or thereby, (ii) the rights of Buyer Releasing Parties under any Insurance Policy and/or (iii) any matter to the extent not related to the Business.

[END OF PAGE]
[SIGNATURE PAGES FOLLOW]

CHI 65634877v16

**SIGNATURE PAGE TO
ASSET PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**<u>SELLERS</u>:**

THE WET SEAL, INC.
THE WET SEAL RETAIL, INC.
WET SEAL CATALOG, INC.
WET SEAL GC, LLC

By _____
    Name:
    Title:

**<u>BUYER</u>:**

MADOR LENDING, LLC

By _____
    Name:
    Title:

**EXHIBIT A**

**Form of Sale Order**

See attached.

# **EXHIBIT B**

## **Form of Bill of Sale**

To be in form and substance reasonably satisfactory to the Parties.

# EXHIBIT C

## Form of Assignment and Assumption Agreement

To be in form and substance reasonably satisfactory to the Parties.

## EXHIBIT D

## Form of Trademark Assignment Agreement

To be in form and substance reasonably satisfactory to the Parties.

## EXHIBIT E

## Form of Copyright Assignment Agreement

To be in form and substance reasonably satisfactory to the Parties.

**EXHIBIT F**

**Form of Domain Name Assignment Agreement**

To be in form and substance reasonably satisfactory to the Parties.

## **APPENDIX A**

## **Cash Budget**

See attached.

# **APPENDIX B**

## **Letter Agreement**

See attached.

## SCHEDULE 2.3

## Assumed Liabilities

1.   Liabilities under the Assumed Contracts and the Assumed Permits to the extent arising from and after the Closing Date (except for any Liabilities to the extent based on the actions of Sellers);

2.   All current liabilities, trade payables and accrued expenses of Sellers incurred in the Ordinary Course of Business, in each case, as of the Closing Date (and not paid by Sellers prior thereto), to the extent arising and related to the period following the Petition Date;

3.   All accrued payroll, accrued and unused vacation, and accrued payroll Taxes, in each case, as of the Closing Date (and not paid by Sellers prior thereto) to the extent arising and related to the period following the Petition Date, provided that Sellers pay all liabilities and obligations described in this item 3 as and when due through the Closing Date consistent with Sellers' past practices;

4.   To the extent required by applicable law, Liabilities relating to continuation health care coverage, to the extent required by COBRA, to Current Employees and Former Employees of the Sellers (and their qualified beneficiaries) who left employment or otherwise experienced a COBRA qualifying event on or prior to the Closing Date;

5.   All employee related Liabilities that are Priority Claims or Administrative Claims (and not paid by Sellers prior to the Closing Date), to the extent such Liabilities are Administrative Claims as set forth in item 11 or Priority Claims as set forth in item 15 below;

6.   All Consumer Liabilities as of the Closing Date;

7.   All Operational Expenses that are the obligation of Buyer pursuant to Section 2.10;

8.   Ordinary course gift card obligations of Sellers as of the Closing Date, provided that such obligations (i) arise from gift cards sold in the Ordinary Course of Business and (ii) shall not include any escheatment claims asserted by any Governmental Entity or any similar claim; and provided that the amount of any such obligation shall be no more than the face value of the gift card and shall be limited to use of such gift cards presented by individual holders for goods sold at their retail stores by the Sellers, subject to such lawful limitations as the Sellers may impose for gift cards issued by them;

9.   Any portion of the DIP Financing Obligations that is not credit bid by the Buyer as part of the Purchase Price under Section 2.5(b);

10.  Liabilities consisting of amounts Buyer has expressly agreed to pay hereunder, including all Cure Amounts;

11. Administrative Claims incurred prior to the Closing Date to the extent allowed by order of the Bankruptcy Court (including, by way of clarification, all Taxes incurred for the period from and after the Petition Date through the Closing Date to the extent such Taxes are Administrative Claims as set forth in this item 11 or Priority Claims as set forth in item 15 below) or otherwise agreed to (in writing) by Buyer;

12. Any fees and expenses incurred by professionals employed by Sellers and/or the Committee (in each case, that are allowed Administrative Claims as set forth in item 11 above), provided that such fees and expenses shall not (in the aggregate) exceed 110% of the amount of the professional fee budget included in the Cash Budget for the period through and including May 15, 2015;

13. All obligations under any Employee Benefit Plan to the extent such obligations are Administrative Claims as set forth in item 11 above or Priority Claims as set forth in item 15 below;

14. Sponsorship of, and obligations under, the Health Plans, provided that Sellers pay all liabilities and obligations described in this item 14 as and when due through the Closing Date consistent with Sellers' past practices;

15. Priority Claims incurred prior to the Closing Date to the extent allowed by order of the Bankruptcy Court or agreed to (in writing) by Buyer; provided, however, that any Priority Claims with respect to Taxes may, at the written election of Buyer, remain as (and be deemed) an Excluded Liability, to be paid in accordance with section 1129(a)(9) of the Bankruptcy Code under the Plan, so long as Buyer covenants to fund such payment obligations (it being understood, however, that any Taxes that are Assumed Liabilities hereunder shall be determined after giving effect, to the extent possible, to available deductions for net operating losses of Sellers);

16. The break-up fee and expense reimbursement payable to B. Riley Financial, Inc. (the "Break-Up Fee Payment"), on the terms and as described in and provided under that certain Order Pursuant to 11 U.S.C. §§105(a), 365(a) and 503(b) (I) Approving and Authorizing the Assumption of the Plan Sponsorship Agreement As Modified, and (II) Approving and Authorizing the Payment of Break-Up Fee and Expense Reimbursement, entered by the Bankruptcy Court on February 5, 2015 (it being understood that Buyer shall pay the Break-Up Fee Payment when due); and

17. Claims for stub-rent pursuant to section 503(b) of the Bankruptcy Code (it being understood that Buyer shall pay such amounts no later than the later of (a) 10 days following Closing and (b) the last day of the month in which the Closing occurs).

**Exhibit 6**

**MADOR LENDING, LLC**

March 12, 2015

The Wet Seal, Inc.
The Wet Seal Retail, Inc.
Wet Seal Catalog, Inc.
Wet Seal GC, LLC
c/o Lee R. Bogdanoff
Klee, Tuchin & Bogdanoff LLP
1999 Avenue of the Stars
Thirty-Ninth Floor
Los Angeles, California  90067

The Official Committee of Unsecured Creditors
c/o Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA  90067-4003

> Re:  The Wet Seal, Inc., et al. (collectively, the "Debtors")
> Case No. 15-10081 (CSS) (Jointly Administered)

This Letter Agreement sets forth certain agreements reached between the Debtors, the Official Committee of Unsecured Creditors (the "Committee") and Mador Lending, LLC (the "Buyer"), the Successful Bidder at the Auction conducted by the Debtors on March 10, 2015 and concluded on March 11, 2015, in accordance with those certain Bid Procedures approved by that Order Approving Certain Bid Procedures Governing the Submission of Competing Proposals to (I)(A) Sponsor a Plan of Reorganization for the Debtors or (B) Acquire All or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code and (II) Provide Debtor-In-Possession Financing entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on February 18, 2015 [Docket No. 329]:

1. Any plan of reorganization to be proposed by the Debtors and/or the Committee in connection with the above-referenced cases and confirmed in such cases shall be consistent with the terms and conditions of that certain Asset Purchase Agreement by and among the Debtors and Buyer, dated March 12, 2015 (the "Asset Purchase Agreement"), and this Letter Agreement, and in a form reasonably acceptable to Buyer (the "Plan"). Any capitalized terms used herein and not otherwise defined shall have those meanings set forth in the Asset Purchase Agreement.

2. The Plan shall contain releases and exculpations, including, without limitation, for (a) Buyer, (b) all current and former members of the Committee, (c) the Debtors and (d) each of their respective officers, directors, members, affiliates, subsidiaries, professionals, advisors, representatives, agents, successors and assigns.

3. Buyer shall cause those claims previously held by Hudson Bay to be voted in favor of the Plan (the "Claims").

4. The Claims shall be subordinated for distribution purposes under the Plan.

5. Buyer shall not consent or agree to the allowance or reclassification of any claim as a general unsecured claim without the written consent of the Debtors and Committee or any trustee of a trust appointed in connection with the Plan (the "Trustee"), as applicable, or by Order of Court.

6. No amendments to the Plan shall be made by any party that adversely affects the rights or recoveries of the general unsecured creditors without the Committee's consent.

7. The consideration paid by Buyer under the Asset Purchase Agreement is the only consideration to be provided by Buyer in connection with the Plan.

8. There shall be no option for the general unsecured creditors or any other creditors to receive equity in or from Buyer or any of its affiliates under the Plan.

9. Neither the Debtors nor the Trustee shall consent or agree to the allowance or reclassification of any claim as an Administrative Claim (as defined in the Asset Purchase Agreement) or Priority Claim (as defined in the Asset Purchase Agreement) without the written consent of Buyer.

10. At Buyer's election, in accordance with the Asset Purchase Agreement, any priority tax claim shall be retained by the Debtors' estates and paid in accordance with Section 1129(a)(9) of the Bankruptcy Code; provided that Buyer shall be obligated to make any and all such payments.

11. The Trustee and any oversight committee members shall be selected by the Committee, in the Committee's sole discretion.

12. Buyer shall have no liability for any costs of administering any trust established under the Plan.

13. Buyer shall have the ability to designate any of the Debtors' executory contracts or unexpired leases for assumption or rejection to and including May 15, 2015 subject to the terms and conditions of the Asset Purchase Agreement; provided, however, that Buyer may extend such date until June 30, 2015 if Buyer funds the costs to be incurred by the Debtors during the period following May 15, 2015 and to and including June 30, 2015 (the "Extended Designation Deadline").

14. The Plan shall be effective no earlier than May 15, 2015, unless agreed by Buyer.  To the extent that Buyer exercises its option for the  Extended Designation Deadline, the Plan shall be effective no earlier than June 30, 2015, unless agreed by Buyer.  Further, as provided in the Asset Purchase Agreement, the Buyer shall fund the costs incurred by the Debtors that arise from and during the Extended Designation Period.

15. Notwithstanding the foregoing, with respect to the Debtors' lease for the offices located at 26972 Burbank, Foothill Ranch, CA 92610 (the "Headquarters Lease"), Buyer shall be entitled to assume or reject the Headquarters Lease until the earlier of (a) August 13, 2015 and (b) 90 days after the entry of an order confirming the Plan (or such later date as may be agreed to by Buyer, the Debtors and the landlord under the Headquarters Lease).

In exchange for the agreements set forth in this Letter Agreement and the terms of the Asset Purchase Agreement, the Debtors and the Committee shall not and shall cause their Representatives not to:  (a) initiate, solicit or encourage any inquiries concerning an Acquisition Proposal or a Competing Transaction; (b) engage in any negotiations concerning, or provide any confidential information or data to, or have any discussions with, any Person relating to an Acquisition Proposal or a Competing Transaction; (c) facilitate any effort or attempt to make or implement an Acquisition Proposal; or (d) consummate or agree or commit to consummate an Acquisition Proposal or a Competing Transaction.  Debtors and the Committee shall, and shall cause their Representatives to, immediately cease or cause to be terminated any existing activities, discussions or negotiations with any Person relating to any of the foregoing activities. The Debtors and Committee shall use commercially reasonable efforts to obtain the approval of this Letter Agreement and the Asset Purchase Agreement by the Bankruptcy Court.

By signing in the space below, the Debtors (subject to any necessary approval of the Bankruptcy Court) and the Committee are agreeing to the terms of this Letter Agreement and shall be deemed bound to such terms.


Very truly yours,

MADOR LENDING, LLC


By:_____
Name:_____
Title:_____


The foregoing is accepted and agreed to on this ___ day of March, 2015:


THE WET SEAL, INC.,
THE WET SEAL RETAIL, INC.,
WET SEAL CATALOG, INC.
AND WET SEAL GC, INC.


By:_____
Name:_____
Title:_____


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS


By:_____
Name:_____
Title:_____


The following person is signing this Letter Agreement solely for purposes of agreeing to Paragraphs 3 and 4 of this Letter Agreement:

RODAM, LLC


By:_____
Name:_____
Title:_____

**Exhibit 7**

*PROPOSED ORDER*
**NOT YET APPROVED BY BANKRUPTCY COURT**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| THE WET SEAL, INC., *et al.*,[1] | ) | Case No. 15-10081 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | Re: Docket No. [____] |

## ORDER AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS AND ENCUMBRANCES; (B) THE DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT; AND (C) THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the motion, dated [_____, 2015] [Docket No. __] (the "**Motion**"), of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") for the entry of an order, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, 9007, 9014 and 9019 (a) authorizing and approving the entry into, performance under and terms and conditions of the Asset Purchase Agreement by and between the Debtors and Mador Lending, LLC (the "**Buyer**"), dated March 12, 2015 (substantially in the form attached hereto as **Exhibit 1**, the "**APA**") whereby the Debtors have agreed to sell, and Buyer has agreed to acquire, substantially all of the Debtors' operating assets (collectively, and as specifically set forth and defined in the APA, the "**Acquired Assets**") other than the Excluded Assets, and the Debtors have agreed to transfer and Buyer has agreed to assume certain of the Debtors' liabilities (collectively, and as specifically set forth and defined in the APA, the "**Assumed Liabilities**") (collectively, and including all actions taken or required to be taken in

connection with the implementation and consummation of the APA, the "***Transactions***");
(b) authorizing and approving the sale of the Acquired Assets (the "***Sale***"), free and clear, to the
maximum extent permitted by law, of any and all Liens (other than Permitted Liens and the
BofA Liens), debts and claims (as that term is defined in section 101(5) of the Bankruptcy
Code), Liabilities (including all Liabilities of the Debtors for Employment Related Laws,
Complaints, and Obligations,[2] except to the extent provided in the APA), obligations, costs,
expenses, causes of action, demands, guaranties, options, rights, contractual commitments,
settlements, injunctions, restrictions, interests, encumbrances, reclamation rights, and similar
matters of any kind whatsoever, whether known or unknown, fixed or contingent, or arising prior
to or subsequent to the commencement of these chapter 11 cases, and whether imposed by
agreement, understanding, law, equity or otherwise (collectively, and including to the extent not
already specified above, Successor or Transferee Liability, as defined in paragraph 19 below, but
excluding the Assumed Liabilities, the "***Adverse Interests***"), with all such Adverse Interests to

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: The
Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265), Wet Seal Catalog, Inc. (7604), and Wet Seal GC, LLC
(2855-VA).  The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

[2] "***Employment Related Laws, Complaints, and Obligations***" shall mean all federal, state, or local employment
laws and regulations, including but not limited to the Immigration Reform and Control Act; Title VII of the Civil
Rights Act of 1964, as amended; The Fair Labor Standards Act; The Americans with Disabilities Act, as amended;
The Family Medical and Leave Act, as amended; The Age Discrimination and Employment Act; The National
Labor Relations Act; the California Fair Employment and Housing Act; ERISA; the WARN Act; OSHA
administered whistleblower/anti-retaliation statutes that may be applicable, such as those pertaining to
environmental, transportation laws, and consumer investment protection laws (Sarbanes Oxley and Dodd Frank);
State and local anti-discrimination, anti-retaliation and whistleblower laws; Wage Orders issued by the California
Industrial Welfare Commission; common law tort and contract claims; any other laws or regulations pertaining to
the employment relationship between the Debtors and their current or former employees; all duties, obligations and
requirements imposed by law, contract, or arising out of the Debtors' practices concerning: hiring, evaluations,
promotions, terminations, classification of employees as exempt or non-exempt, the classification of employees as
independent contractors, rest breaks, vacations, time off, pay practices, and any other employment practices; and any
Claims, charges, complaints, administrative complaints, demand or lawsuits alleging violations of any Employment
Related Laws and Obligations, consent decrees, judgments, other decrees, orders, injunctions, settlements,
settlement agreements or conciliation agreements to which the Debtors are bound relating to labor and employment
matters.

attach to the net proceeds of the Sale, in the order of their priority, with the same validity, force and effect that they now have against the Acquired Assets, subject with respect to such net proceeds to any rights, claims and defenses the Debtors or any parties in interest may possess with respect thereto; (c) authorizing the assumption and assignment to Buyer of certain executory contracts and unexpired leases of the Debtors (collectively, the "**Assumed Contracts**") in accordance with the APA and this Order; (d) establishing assumption and rejection procedures for certain executory contracts and unexpired leases; and (e) granting other relief; and the Court having entered an order approving the bidding procedures and granting certain related relief on February 18, 2015 [Docket No. 329] (the "**Bidding Procedures Order**"); and an auction (the "**Auction**") having been commenced on March 10, 2015 and concluded on March 12, 2015 in accordance with the Bidding Procedures Order; and Buyer having been deemed the Successful Bidder by the Debtor, in consultation with the Committee, pursuant to the Bidding Procedures Order; and the Court having conducted a hearing on the Motion on [_____, 2015] (the "**Sale Hearing**") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, the [_____ Declaration], the APA, the Letter Agreement,[3] the Bidding Procedures Order, the record of the hearing before the Court on [_____, 2015]; and having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and it appearing that due notice of the Motion, the APA, the Letter Agreement, the Bidding Procedures Order and the Auction has been provided; and it appearing that the relief requested in

---

[3] To the extent that the Letter Agreement contains any agreements relating to a potential plan of reorganization to be proposed in these Cases, these provisions are agreements between the Debtors, the Official Committee of Unsecured Creditors and the Buyer and this Order shall not be deemed to approve such provisions of the Letter Agreement.

3

the Motion is in the best interests of the Debtors, their estates, their stakeholders and all other parties in interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT HEREBY FINDS AS FOLLOWS:**

<u>Jurisdiction, Venue and Final Order</u>

A.      This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rules 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

<u>Notice of the Transactions, APA, the Letter Agreement,</u>
<u>Sale Hearing, Auction and the Cure Amounts</u>

C.      Actual written notice of the Motion and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all known interested entities including to the following parties: (i) the office of the United States Trustee for the District of Delaware; (ii) counsel for the Committee; (iii) counsel for the Buyer; (iv) counsel for the Bank of America, N.A.; (v) all parties asserting a security interest in or lien against the assets of the Debtors to the extent reasonably known to the Debtors; (vi) each of the Debtors'

4

landlords and each of the notice parties identified in the real property leases, to the extent possible; (vii) various federal, state, county and city tax and regulatory authorities; (viii) all parties requesting notice pursuant to Bankruptcy Rule 2002; and (ix) all other creditors of the Debtors in accordance with Bankruptcy Rule 2002 (collectively, the "***Notice Parties***").

D.    The foregoing notice was good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion is required.  The disclosures made by the Debtors concerning the APA, the Letter Agreement, the Auction, the Transactions and the Sale Hearing were good, complete and adequate.

E.    The Debtors have served cure notices (the "***Cure Notice***") upon all executory contract and lease counterparties notifying such parties: (a) that the Debtors may seek to assume and assign certain contracts and leases on the Closing Date of the Sale or thereafter until the Designation Deadline as provided in the APA and (b) of the proposed Cure Amounts.  The service of such notices was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of establishing a cure amount for such contracts and leases.  Each of the contract and lease counterparties has had an opportunity to object to the Cure Amounts set forth in the Cure Notices.

## Highest and Best Offer

F.    As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors conducted a marketing process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order.  The Auction contemplated by the Bid Procedures was commenced on March 10, 2015 and closed on **[March 12, 2015]**.  At the conclusion of the Auction, Buyer was selected by the Debtors, in consultation with the Committee, as the Successful Bidder.  The process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity

5

for any interested party to make a higher or otherwise better offer to purchase all of the Acquired Assets and assume all of the Assumed Liabilities.

G.      The Acquired Assets were adequately marketed by the Debtors, and the consideration provided by Buyer under the APA and the Letter Agreement constitutes or provides the highest or otherwise best offer and provides fair and reasonable consideration to the Debtors for the sale of all Acquired Assets and the assumption of all Assumed Liabilities, and the performance of the other covenants set forth in the APA and the Letter Agreement, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Buyer is the Successful Bidder for the Acquired Assets in accordance with the Bidding Procedures Order.  The Debtors' determination that the APA constitutes the highest and best offer for the Acquired Assets is a valid and sound exercise of the Debtors' business judgment.

H.      Approval of the Motion, the APA, the Letter Agreement and the consummation of the Transactions contemplated thereby is in the best interests of the Debtors, their respective creditors, estates and other parties in interest and there is substantial risk of deterioration of the value of the Acquired Assets if the Sale is not consummated quickly.   The Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Transactions and the performance of their obligations under the APA and the Letter Agreement.

I.      Entry of an order approving the APA, the Letter Agreement and all the provisions thereof is a necessary condition precedent to Buyer's consummation of the Transactions.

**Good Faith of Buyer**

J.      The APA, the Letter Agreement and the Transactions contemplated thereunder were proposed, negotiated and entered into by and between the Debtors, on the one hand, and Buyer, on the other hand, without collusion, in good faith and at arm's length.

6

K.      In accordance with section 365 of the Bankruptcy Code, including sections 365(b)(1) and 365(f)(2) of Bankruptcy Code, the Debtors have shown that Buyer has the wherewithal, financial and otherwise, to perform all of its obligations under the APA and the Letter Agreement.

L.      Neither Buyer nor any of its respective affiliates, present members, officers, directors, partners, shareholders or any of their respective heirs, successors and assigns (each such entity individually and taken together, the "***Buyer Group***") is an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  Buyer is entering into the Transactions in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding. There has been no showing that the Debtors or the Buyer Group has engaged in any action or inaction that would cause or permit the APA, the Letter Agreement or the Transactions to be avoided or impose any costs or damages under section 363(n) of the Bankruptcy Code.

### No Fraudulent Transfer

M.      The consideration provided by Buyer pursuant to the APA for its purchase of all Acquired Assets and the assumption of all Assumed Liabilities and the performance of the covenants contained in the APA constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

N.      There has been no showing that the Debtors or Buyer (i) has entered into the APA and the Letter Agreement or proposes to consummate the Transactions for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors or (ii) is entering into

7

the APA and the Letter Agreement or proposing to consummate the Transactions fraudulently, for the purpose of statutory or common law fraudulent conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

O.     By virtue of the Transactions contemplated by the APA and the Letter Agreement, (i) the Buyer Group is not a continuation of the Debtors or their respective estates, there is no continuity between Buyer and the Debtors, there is not substantial continuity between Buyer and the Debtors, there is no common identity between the Debtors and Buyer, there is no continuity of enterprise between the Debtors and Buyer, Buyer is not a mere continuation of the Debtors or their estates, and Buyer does not constitute a successor to the Debtors or their estates, (ii) Buyer is not holding itself out to the public as a continuation of the Debtors or their respective estates and (iii) the Transactions do not amount to a consolidation, merger or *de facto* merger of Buyer and the Debtors and/or the Debtors' estates.

### Validity of Transfer

P.     Each Debtor's Board of Directors and the Buyer has authorized the execution and delivery of the APA, the Letter Agreement, the sale of all Acquired Assets to Buyer and the assumption of all Assumed Liabilities by Buyer.  The Debtors and the Buyer (i) have full corporate power and authority to execute and deliver the APA, the Letter Agreement and all other documents contemplated thereby, as applicable, (ii) have all of the power and authority necessary to consummate the Transactions and (iii) have taken all action necessary to authorize and approve the APA, the Letter Agreement and to consummate the Transactions, and no further consents or approvals are required for the Debtors or the Buyer to consummate the Transactions

contemplated by the APA and the Letter Agreement, except as otherwise set forth in the APA or the Letter Agreement.

Q.     Other than the Assumed Liabilities, Buyer shall have no obligations with respect to any Liabilities of the Debtors or any Adverse Interests against any of the Debtors or their property, including, without limitation, the liabilities of the Debtors specifically excluded under the APA (the "***Excluded Liabilities***"), and the Buyer and its successors and assigns are released and forever discharged from any and all claims, causes of action, obligations, liabilities, demands, damages, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the Acquired Assets, except for liabilities and obligations arising expressly under, or expressly assumed by Buyer under, the APA and the Letter Agreement and except for the Debtors' rights, claims and interests with respect to the DIP Financing until the DIP Financing is satisfied at Closing.

R.     The consummation of the Sale and Transactions is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m), 363(n), 365(b)(1) and 365(f)(2) of the Bankruptcy Code, and with respect to Assumed Contracts, all of the applicable requirements of such sections have been or will be complied with in respect of the Transactions as of the effective date of assignment.

S.     The Acquired Assets constitute property of the Debtors' estates and title thereto is presently vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The sale of the Acquired Assets to the Buyer will be, as of the Closing Date or such later date as such Acquired Assets are transferred under the APA, a legal, valid and effective transfer of such assets, and each such transfer and assignment vests or will vest the Buyer with all right,

title and interest of the Debtors to the Acquired Assets free and clear, to the maximum extent permitted by law, of all Adverse Interests.

**Section 363(f) Is Satisfied**

T.    The Debtors may sell and assign the Acquired Assets free and clear, to the maximum extent permitted by law, of all Adverse Interests, and the Transactions will not subject the Buyer or any of the Buyer's assets to any liability for any Adverse Interests whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), because, with respect to each creditor asserting an Adverse Interest, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.    Those holders of Adverse Interests who did not object or who withdrew their objections to the Sale, the Transactions or the Cure Notice are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.    All holders of Adverse Interests are adequately protected — thus satisfying section 363(e) of the Bankruptcy Code — by having their Adverse Interests, if any, attach to the proceeds of the Sale, in the same order of priority and with the same validity, force and effect that such Adverse Interest holder had before the Sale, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

U.    Buyer would not have entered into the APA and the Letter Agreement and would not consummate the sale of all Acquired Assets, thus adversely affecting the Debtors, their estates, creditors, employees and other parties in interest, if the sale of the Acquired Assets was not free and clear, to the maximum extent permitted by law, of all Adverse Interests or if the Buyer Group would be liable for any Adverse Interests, including and as applicable, any Excluded Liabilities.

10

V.     The sale of the Acquired Assets to the Buyer will be, as of the Closing Date and such later date as such Acquired Assets are transferred under the APA, a legal, valid and effective transfer of such assets, and each such transfer and assignment vests or will vest the Buyer with all right, title and interest of the Debtors to the Acquired Assets free and clear, to the maximum extent permitted by law, of all Adverse Interests.  A sale of the Acquired Assets other than one free and clear, to the maximum extent permitted by law, of all Adverse Interests would adversely impact the Debtors' estates, and would yield substantially less value for the Debtors' estates, with less certainty than the Sale.  Therefore, the Sale contemplated by the APA is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

## Assumption and Assignment of the Assumed Contracts

W.     The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order and the APA are integral to the APA, are in the best interests of the Debtors and their respective estates, creditors and other parties in interest, and represent the reasonable exercise of sound and prudent business judgment by the Debtors.

X.     The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for each of the Assumed Contracts.  The Debtors and/or Buyer, as applicable under the APA, have (i) cured and/or provided adequate assurance of cure of any default existing prior to the date of this Sale Order under all of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default existing prior to the date of this Sale Order under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  Each of the Assumed Contracts is free and clear, to the maximum extent permitted by law, of all Adverse Interests against Buyer.

11

Y.      Buyer has provided adequate assurance of its future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  Pursuant to section 365(f) of the Bankruptcy Code, the Assumed Contracts to be assumed and assigned under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, Buyer notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer.

Z.      No default exists in the Debtors' performance under the Assumed Contracts as of the date of this Sale Order other than the failure to pay cure amounts or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.

### Compelling Circumstances for an Immediate Sale

AA.     Time is of the essence.  To maximize the value of the Debtors' assets, it is critical that the Transactions close within the time constraints set forth in the APA.  Accordingly, there is cause to waive the stay contemplated by Bankruptcy Rule 6004.

BB.     The Transactions are in the best interests of the Debtors and their estates, creditors, interest holders and all other parties in interest herein.

**NOW THEREFORE, ITS IS HEREBY ORDERED THAT:**

### General Provisions

1.      The Motion is granted and approved, subject to the terms and conditions set forth herein.  The Sale and the Transactions contemplated by the APA are approved.

2.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court or as resolved in this Order, and all reservations of rights included therein, are hereby overruled on the merits with prejudice.  All persons and entities given notice of the

12

Motion that failed to timely object thereto are deemed to consent to the relief sought therein, including all non-Debtor parties to the Assumed Contracts.

3.      Findings of fact and conclusions of law in the Bidding Procedures Order, including the record of the Bidding Procedures hearing held on February 18, 2015, are incorporated herein by reference.

4.      Where appropriate herein, findings of fact shall be deemed conclusions of law and conclusions of law shall be deemed findings of fact.

## Approval of the APA

5.      The APA, including the Letter Agreement and all of the terms and conditions thereof, and all of the Transactions contemplated therein are approved.  The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA, including the Letter Agreement, be authorized and approved in its entirety, with such amendments thereto as may be made by the parties in accordance with this Order.

6.      The Debtors are authorized to (a) take any and all actions necessary or appropriate to perform, consummate, implement and fully close the Transactions, including the sale to Buyer of all Acquired Assets, in accordance with the terms and conditions set forth in the APA and this Order, and (b) to assume and assign any and all Assumed Contract(s) as and when provided in the APA.

7.      All persons and entities are prohibited and enjoined from taking any action that would adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Acquired Assets to Buyer in accordance with the APA and this Order.

8.      At the Closing, the Debtors will be authorized to fully perform under, consummate, and implement the terms of the APA and the Letter Agreement together with any

13

and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the APA, the Letter Agreement, this Order, and the Transactions.

9.     Nothing contained in any chapter 11 plan proposed in these chapter 11 cases shall conflict with or derogate from the provisions of the APA, the Letter Agreement or this Order.

10.     Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Transactions, including all agreements entered into in connection therewith, and this Order.

11.     To the greatest extent available under applicable law, Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and any other governmental authorization or approval of the Debtors with respect to the Acquired Assets and the Contracts and Leases, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are transferred to Buyer as of the Closing Date.

12.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred or conveyed to Buyer on account of the filing or pendency of the chapter 11 cases.

## Sale and Transfer Free and Clear of Adverse Interests

13.     Upon Closing, at the Closing (or thereafter as of the Assumption Approval with respect to any Assumed Contract that becomes such post-Closing subject to the Assumption and

Assignment Procedures[4] described herein), all of the Debtors' right, title and interest in and to, and possession of, the Acquired Assets shall be immediately vested in Buyer pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code free and clear, to the maximum extent permitted by law, of any and all Adverse Interests.  Such transfer shall constitute a legal, valid, binding and effective transfer of such Acquired Assets.  All person or entities, presently or on or after the Closing, in possession of some or all of the Acquired Assets shall surrender possession of the Acquired Assets to Buyer or its respective designees prior to the Closing.

14.    This Order (a) shall be effective as a determination that, as of the Closing no Adverse Interests other than Assumed Liabilities will be assertable against the Buyer Group or any of its respective assets (including the Acquired Assets), (b) shall be effective as a determination that, as of the Closing (or thereafter as of the Assumption Approval for any Assumed Contract that becomes such post-Closing subject to the Assumption and Assignment Procedures described herein), (i) the Acquired Assets shall have been transferred to Buyer free and clear, to the maximum extent permitted by law, of all Adverse Interests and (ii) the conveyances described herein have been effected; and (c) is and shall be binding upon entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in

---

[4] The "***Assumption and Assignment Procedures***" shall mean those procedures for assumption and assignment of Contracts and Leases described in Paragraphs 34-39 of this Order.

or to any lease; and each of the foregoing persons and entities shall accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Transactions.

15.    Other than the Assumed Liabilities, Buyer shall have no obligations with respect to any Adverse Interests of the Debtors, including the Excluded Liabilities, and the Buyer and its affiliates, successors and assigns are released and forever discharged from any and all Adverse Interests arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, the ownership, sale or operation of the Acquired Assets and the business prior to the Closing or the transfer of Acquired Assets to Buyer of the Debtors, except for the Assumed Liabilities under the APA and except for the Debtors' rights, claims and interests with respect to the DIP Financing until the DIP Financing is satisfied at Closing.  The holders of claims related to the Assumed Liabilities shall have the right to seek payment directly from Buyer on account of the Assumed Liabilities; provided however, that Buyer reserves any and all rights with regard to such Assumed Liabilities, including, but not limited to, Buyer's rights under the APA.

16.    Except with respect to the Assumed Liabilities, all persons and entities (and their respective successors and assigns), including all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Adverse Interests arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, the ownership, sale or operation of the Acquired Assets and the business prior to the Closing or the transfer of Acquired Assets to Buyer (whether prior to the Closing or thereafter as of the Assumption Approval for any Assumed Contract that becomes such post-Closing subject to the Assumption and Assignment Procedures described herein), are hereby forever barred, estopped

and permanently enjoined from asserting such Adverse Interests against the Buyer Group, its property or the Acquired Assets.  Following the Closing (or thereafter as of the Assumption Approval for any Assumed Contract that becomes such post-Closing subject to the Assumption and Assignment Procedures described herein), no holder of any Adverse Interest shall interfere with Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Adverse Interest, or based on any action the Debtor may take in these chapter 11 cases.

17.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Adverse Interests against or in the Acquired Assets shall not have delivered to the Debtors prior to the Closing of the Transactions in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Adverse Interests that the person or entity has with respect to such Acquired Assets, then only with regard to the Acquired Assets that are purchased by Buyer pursuant to the APA and this Order, (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets; and (b) Buyer is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Adverse Interests against the Buyer Group and the applicable Acquired Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office. For the avoidance of doubt, only Acquired Assets that are part of the estates of the Debtors are being sold to Buyer free and clear, to the maximum extent permitted by law, of Adverse Interests pursuant to section 363(f) of the Bankruptcy Code.

## No Successor or Transferee Liability

18.     The Buyer Group shall not be deemed, as a result of any action taken in connection with the APA, the Letter Agreement, the consummation of the Transactions, or the transfer, operation or use of the Acquired Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for Buyer, with respect to any obligations as an assignee under the Assumed Contracts arising after the Closing); (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors, including within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

19.     Except as expressly provided in the APA with respect to Assumed Liabilities, the Buyer Group shall have no liability whatsoever with respect to the Debtors' (or their predecessors or affiliates) respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as described below, "***Successor or Transferee Liability***") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of any settlement or injunction, or any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the

operation of the Acquired Assets or the Business prior to the Closing or such later time as Buyer is assigned and assumes any Assumed Contract.

20.     Except as expressly provided in the APA with respect to the Assumed Liabilities, nothing in this Order or the APA shall require the Buyer Group to (a) continue or maintain in effect, or assume any liability in respect of any employee, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtors are a party or have any responsibility therefor including medical, welfare and pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

21.     Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer Group, or its assets (including the Acquired Assets), with respect to any (a) Adverse Interest or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Adverse Interest; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions

19

contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.

## **Good Faith of Buyer**

22.    The Transactions contemplated by the APA and the Letter Agreement are undertaken by Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the Transactions (including the assumption and assignment of the Assumed Contracts), unless such authorization and consummation of such sale are duly and properly stayed pending such appeal.

23.    There has been no showing that the Debtors or the Buyer engaged in any action or inaction that would cause or permit the Transactions to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  The Buyer is entitled to all the protections and immunities of section 363(n) of the Bankruptcy Code.

24.    The consideration provided by Buyer for the Acquired Assets under the APA and the Letter Agreement is fair and reasonable and the sale may not be avoided under section 363(n) of the Bankruptcy Code.

## **Assumed Contracts**

25.    The Debtors are authorized at the Closing (or thereafter as of the Assumption Approval for any Assumed Contract that becomes such post-Closing subject to the Assumption and Assignment Procedures described herein) to assume and assign each of the Assumed Contracts in accordance with the APA and this Order to Buyer free and clear, to the maximum extent permitted by law, of all Adverse Interests pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and to execute and deliver to Buyer such documents or other instruments as

20

may be necessary to assign and transfer the Assumed Contracts to Buyer.  The payment of the applicable Cure Amounts by the Buyer shall (a) effect a cure of all defaults existing thereunder as of the Closing, (b) compensate for any actual pecuniary loss to such non-Debtor counterparty resulting from such default, and (c) together with the assumption of the Assumed Contracts by the Debtors and the assignment of the Assumed Contracts to Buyer, constitute adequate assurance of future performance thereof.

26.    Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the counterparty to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect with respect to the Debtors' assumption and assignment of such Assumed Contracts in accordance with the APA but will be effective and binding upon the Buyer Group with respect to any purported assignment for the remaining term of any Assumed Contract.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Buyer of the Assumed Contracts have been satisfied.  Upon the Closing or such later time as is provided in the APA with respect to the assumption and assignment of any Assumed Contract, in accordance with sections 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts, and such Assumed Contracts shall remain in full force and effect for the benefit of Buyer.

27.    Each non-Debtor counterparty to the Assumed Contracts shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or Buyer or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss,

21

or condition to assignment existing, arising or accruing as of the Closing (or thereafter as of the Assumption Approval for those that arise post-Closing and are not barred by this Order with respect to any Assumed Contract that becomes such post-Closing subject to the Assumption and Assignment Procedures described herein) or arising by reason of the Closing or the transfer of the Acquired Assets, including any breach related to or arising out of change-in-control in such Assumed Contracts, or any purported written or oral modification to the Assumed Contracts and (b) asserting against Buyer (or its property, including the Acquired Assets) any claim, counterclaim, defense, breach, condition, setoff asserted or assertable against the Debtors existing as of the Closing (or thereafter as of the Assumption Approval for those that arise post-Closing and are not barred by this Order with respect to any Assumed Contract that becomes such post-Closing subject to the Assumption and Assignment Procedures described herein) or arising by reason of the transfer of the Acquired Assets, except for the Assumed Liabilities, *provided, however*, that the Buyer shall be responsible for continuing obligations under the Assumed Contracts, *cum onere*, including, without limitation, liabilities for any breach of such Assumed Contracts occurring after such assignment and obligations to pay year-end adjustment and reconciliation amounts that become obligations after the date of this Order, including tax reconciliations, common area charges and insurance premiums, under the terms of the applicable unexpired lease of real property, subject to any defenses provided by such lease.

28.    Upon the Closing (or thereafter as of the Assumption Approval for any Assumed Contract that becomes such post-Closing subject to the Assumption and Assignment Procedures described herein), Buyer shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts and shall pay all outstanding undisputed cure amounts with respect thereto, and the Debtors shall be released, pursuant to section 365(k) of the Bankruptcy

Code, from any liability under the Assumed Contracts for any breach thereof occurring after such assignment.  There shall be no rent accelerations, assignment fees, increases or any other fees charged to Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts.  To the extent there are any disputed cure amounts for any Assumed Contract, the Debtors will set a status conference with the Court not less than thirty (30) days following the Closing (or thereafter as of the Assumption Approval for any Assumed Contract that becomes such post-Closing subject to the Assumption and Assignment Procedures described herein) to address any remaining issues that cannot be resolved informally between the parties.

29.    Buyer has provided adequate assurance of future performance under the Assumed Contracts within the meaning of sections 365(b)(1)(c), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

30.    Before the Sale Hearing, in accordance with and pursuant to Section 2.6(b) of the APA, Buyer provided to the Debtors and the Debtors filed with the Court, a Closing Assumed Contract List, the notice of which was good, sufficient and appropriate under the circumstances, and no further notice of the Closing Assumed Contract List is required.  Up to three (3) Business Day before the Closing Date, Buyer may add to or remove from the Closing Assumed Contract List any Contract or Lease.  On or before the Closing Date, Buyer shall provide to the Debtors, and the Debtors shall file with the Court, the final Closing Assumed Contract List.

31.    Pursuant to Section 2.6 of the APA, from and after the Closing Date through the Designation Deadline,[5] Buyer shall provide written notice to the Debtors (and the Debtors shall

---

[5] Designation Deadline is defined in the APA to mean May 15, 2015; provided, however, that Buyer may extend such date until June 30, 2015 if Buyer funds the costs to be incurred by the Sellers during the period following May 15, 2015 until June 30, 2015.  Notwithstanding the foregoing, the "Designation Deadline" with respect to the Lease for the Headquarters shall be the earlier of August 13, 2015 and 90 days after the entry of an order confirming the Plan (or such later date as may be agreed to by Buyer, Sellers and the landlord under the Lease for the

(Continued…)

23

provide such notice to the affected landlords or counterparties within three (3) Business Days of receiving such notice from Buyer, which notice the Debtors agree to provide) designating certain Contracts and Leases for either (x) assumption by the Debtors and assignment to the Buyer (each, an "**Assumed Contract**") or (y) exclusion and rejection (or to be rejected to the extent executory) (each an "**Excluded Contract**"); *provided*, *however*, that Buyer shall assume at least 140 Leases as of the Designation Deadline.

32.     After the Closing and prior to the Designation Deadline, the Debtors shall not terminate, amend, supplement, modify, waive any rights under, or create any Adverse Interest with respect to any Contract or Lease, or take any affirmative action not required thereby, without the prior written consent of Buyer (not to be unreasonably withheld or delayed) unless Buyer has provided written notice to Debtors designating such Contract or Lease for rejection pursuant to section 2.6 of the APA.  After receiving written notice from Buyer to assume and assign a Contract or Lease, the Debtors shall use commercially reasonable efforts to obtain an order of the Court to assume and assign such Contract or Lease to Buyer (the "**Assumption Approval**") in accordance with the Assumption and Assignment Procedures set forth herein. Any applicable Cure Amount for the assumption and assignment of a Contract or Lease shall be paid by the Buyer.  For any Contract or Lease that has not been designated as of the Closing as an Excluded Contract or an Assumed Contract under the APA, until the Rejection Effective Date or Assumption Approval, Buyer shall (i) pay to the Debtors or pay directly to the requisite third party, as applicable, an amount equal to the costs and expenses required to be paid by the

---

Headquarters); provided, however, nothing in this Order shall be deemed to extend the deadline for the Debtors to assume, assume and assign or reject the Lease for the Headquarters beyond the existing deadline; provided, further, that the Debtors reserve their right to seek such an extension beyond the existing deadline, pursuant to the Plan.

Debtors after Closing in performing obligations under such Contracts and Leases, if any, as and when such amounts come due (subject to and in accordance with the APA) and (ii) be obligated to perform or cause to be performed all of Debtors' obligations arising after the Closing under such Contract or Lease, and Buyer shall be entitled to all benefits of Debtors' thereunder; provided, that no Cure Amount shall be due with respect to such Contract or Lease unless and until such Contract or Lease is designated as an Assumed Contract and assumed at Assumption Approval.

33.    In the event Buyer has not provided a written designation to assume and assign or reject any Contract or Lease by the Designation Deadline, then such Contract or Lease shall be deemed to be an Excluded Contract and the Debtors may move to reject such Contract or Lease as of the Designation Deadline, and no Debtor shall have any obligation to assign such Contract or Lease to Buyer.

**Assumption and Assignment Procedures**

34.    In the case of any Contracts and Leases that the Debtors seek to assume and assign after the Closing Date pursuant to section 2.6 of the APA, within five (5) Business Days following delivery of a notification by Buyer that a Contract or Lease is designated for assumption and assignment, the Debtors will file with the Court a written notice of the Debtors' intent to assume and assign such Contract or Lease (an "***Assumption Notice***"), substantially in the form attached hereto as **Exhibit 2**.

35.    The Debtors will serve such Assumption Notice via overnight delivery on each of the following parties (the "***Assumption Notice Parties***"):  (a) each counterparty or landlord to any Contract or Lease (and their counsel, if known) to be assumed or assigned by the Debtors, (b) the Office of the United States Trustee, (c) counsel to the Committee and (d) counsel to the Buyer.

25

36.     The Assumption Notice will set forth the following information, to the best of the Debtors' knowledge: (a) the street address of the real property that is the subject of any Lease that the Debtors seek to assume and assign or a description of the Contract that the Debtors seek to assume and assign, (b) the name and address of the affected counterparties or landlords (and their counsel, if known), (c) a description of the deadlines and procedures for filing objections to the Assumption Notice (as set forth below), (d) the name of the Buyer (the "***Proposed Assignee***"), (e) information regarding how a non-debtor party to a Contract or Lease may obtain additional information regarding the Proposed Assignee, (f) any Cure Amounts that arise solely following the deadline to object to the Sale and have not otherwise been paid in the ordinary course, if any, and (g) the proposed order approving the assumption and assignment (the "***Assumption Order***"), substantially in the form attached hereto as **Annex 1** to the Assumption Notice.

37.     A party in interest may object following the Closing to the proposed assumption and assignment by the Debtors of a Contract or Lease following the Closing. Any such objection to the proposed assumption and assignment by the Debtors of a Contract or Lease following the Closing must be in writing and filed and served so that such objection is filed with this Court and actually received by the Debtors and the Assumption Notice Parties no later than ten (10) days after the date the Debtors served the applicable Assumption Notice.

38.     If no timely permitted objection is filed and served with respect to the Assumption Notice, any non-Debtor party to such Contract or Lease shall be deemed to have provided the required consent to the assumption and assignment of such Contract or Lease, and the Debtors shall present the Assumption Order for entry by the Court. The Assumption Order shall provide, among other things, that (a) the assumption and assignment of such Contract or

26

Lease is approved, final and effective pursuant to section 365 of the Bankruptcy Code as of the date of the Assumption Order and (b) the Proposed Assignee provided adequate assurance of future performance under the applicable Contract or Lease in accordance with section 365(f)(2)(B) of the Bankruptcy Code and if applicable, section 365(b)(3) of the Bankruptcy Code.

39.     If a timely permitted objection is properly filed and served on the Assumption Notice Parties in the manner specified above, unless the parties agree otherwise in writing, a hearing will be scheduled to consider that objection.  If that objection is overruled by the Court or withdrawn, the assumption and assignment of the affected Contract or Lease shall be deemed effective as of the date of the Assumption Order.

<u>**Rejection Procedures**</u>

40.     As set forth more fully in Section 2.6 of the APA, in the case of any Contract or Lease that the Buyer does not want to assume and assign, within five (5) days following delivery of a notification by Buyer that a Contract or Lease is designated for rejection, the Debtors shall move to reject such Contract or Lease by filing with the Court a written notice of the Debtors' intent to reject such Contract or Lease (a "***Rejection Notice***"), substantially in the form attached hereto as **<u>Exhibit 3</u>**.  Within three (3) Business Days of delivery of notification by Buyer of its intention to reject a Contract or Lease, the Debtors shall serve such Rejection Notice via overnight delivery on each of the following parties (the "***Rejection Notice Parties***"):  (a) each counterparty or landlord to any Contract or Lease (and their counsel, if known) to be rejected by the Debtors, (b) the Office of the United States Trustee, (c) counsel to the Committee and (d) counsel to the Buyer.

41.     The Rejection Notice will set forth the following information, to the best of the Debtors' knowledge: (a) the street address of the real property that is the subject of any Lease

27

that the Debtors seek to reject or a description of the Contract that the Debtors seek to reject, (b) the name and address of the affected counterparties or landlords (and their counsel, if known), (c) a description of the deadlines and procedures for filing objections to the Rejection Notice (as set forth below), and (d) the proposed order approving the rejection (the "***Rejection Order***"), substantially in the form attached hereto as **Annex 1** to the Rejection Notice.

42.     Should a party in interest object to the proposed rejection by the Debtors to a Contract or Lease, such party must file and serve a written objection so that such objection is filed with this Court and actually received by the Debtors and the Rejection Notice Parties no later than ten (10) days after the date the Debtors served the Rejection Notice.

43.     If a timely objection is properly filed and served on the Rejection Notice Parties, unless the parties agree otherwise in writing, a hearing will be scheduled to consider that objection. If that objection is overruled by the Court or withdrawn, the rejection of the affected Contract or Lease shall be deemed effective as of the applicable Rejection Effective Date specified by Buyer in accordance with the APA.

44.     If no timely objection is filed and served with respect to the rejection of a Contract or Lease within ten (10) days after delivery of the Rejection Notice, the Debtors may file the Rejection Order, which shall provide, among other things, that the rejection of such Contract or Lease shall become effective on the later of (a) the applicable Rejection Effective Date and (b) the surrender of the premises that is the subject of the Lease.

45.     In connection with the rejection of a Lease, if the Debtors have deposited monies with a lessor as a security deposit or other arrangement, such lessor may not set off or recoup or otherwise use such deposit without the prior approval of the Court.

46.    If an affected landlord or counterparty or any other party in interest (the "***Rejection Claimant***") asserts a claim or claims against the Debtors arising from the rejection of a Contract or Lease, such Rejection Claimant shall submit a proof of claim on or before the later of (a) the date that is 30 days after the entry of the Rejection Order or (b) the bar date established by this Court for filing proofs of claim against the Debtors.  If the Rejection Claimant does not timely file such proof of claim, such claimant shall be forever barred from asserting a claim against the Debtors for such rejection damages.

### The Sale Does Not Require the Appointment of a Consumer Privacy Ombudsman

47.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.  11 U.S.C. § 363(b)(1).

48.    The Buyer shall be subject to reasonable restrictions by the Debtors in order to comply with the Debtors' privacy policy, which broadly provides that, if the Debtors or any portion of their assets are acquired, the Debtors may share all types of information with the acquiring company.[6]  Therefore, appointment of a consumer privacy ombudsman is unnecessary.

### Other Provisions

49.    Notwithstanding anything to the contrary contained in Paragraph 13 of this Order, the "Pre-Petition Secured Parties," as that term is defined in that certain *Final Order Pursuant To Sections 105, 361, 362, 363, And 364 Of The Bankruptcy Code And Bankruptcy Rules 2002, 4001, And 9014: (1) Authorizing Post-Petition L/C Financing Facility, (2) Granting Liens And*

---

[6] The Debtors' privacy policy is posted at http://www.wetseal.com/privacy-policy/privacy-policy.html.

*Providing Superpriority Administrative Expense Priority, (3) Authorizing Use Of Cash Collateral And Providing For Adequate Protection, And (4) Modifying The Automatic Stay* [Docket No. 249] (the "***BofA Order***") shall retain their liens solely in and upon up to $500,000 in "Cash Collateral" (as that term is defined in the BofA Order) in the "Cash Management/Indemnity Account" (as that term is defined in the BofA Order) on the date hereof until the earlier to occur of (the "***First Release Date***"): (a) April 6, 2015; or (b) if a "Challenge Proceeding" (as that term is defined in the BofA Order) has been timely commenced on or before such date, the date of the termination of such Challenge Proceeding.  On the First Release Date, the Debtors and Bank of America, N.A. ("***Bank of America***") shall cause such $500,000 to be paid to the Buyer.  Further, notwithstanding anything to the contrary contained in Paragraph 13 of this Order, the Pre-Petition Secured Parties shall retain their liens solely in and upon up to an additional $1,000,000 in Cash Collateral in the Cash Management/Indemnity Account on the date hereof until the date on which the Debtors have terminated Bank of America's cash management and treasury services (the **"Second Release Date"**).  On the Second Release Date, the Debtors and Bank of America shall cause all remaining amounts in the Cash Management/Indemnity Account to be paid to the Buyer.  At no time shall the Cash Management/Indemnity Account contain in excess of $1,500,000, and at no time after the First Release Date shall have the Cash Management/Indemnity Account contain in excess of $1,000,000.

50.     Effective upon the Closing, the Debtors, on behalf of themselves and their respective past, present and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns (collectively, the "***Debtor Releasing Parties***"), hereby release, remise, acquit and forever discharge the Buyer Group and their

30

respective past, present and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, and each of its and their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies and partners (collectively, the "***Buyer Released Parties***"), from any and all claims, contracts, demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, damages, liabilities, costs and expenses, whether known or unknown, whether anticipated or unanticipated, whether claims or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute or common law or other of any kind, nature, or description, including, without limitation as to any of the foregoing, any claim by way of indemnity or contribution, which any Debtor Releasing Party has, may have had or may hereafter assert against any Buyer Released Party arising from or related in any way, either directly or indirectly, to any action or inaction of any Buyer Released Party relating in any way to these chapter 11 cases, the Debtors, their respective past, present and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, including without limitation, any action or inaction of any Buyer Released Party with respect to these chapter 11 cases; provided, however, that the foregoing release shall not apply to the Debtors' rights or the Buyer's obligations under the APA, the Letter Agreement or this Order or the rights of any other party under this Order.

51.    Effective upon the Closing, Buyer, on behalf of itself and its past, present and future subsidiaries, parents, divisions, successors and assigns (collectively, the "***Buyer Releasing Parties***"), hereby releases, remises, acquits and forever discharges each Debtor and its past and

present subsidiaries, parents, divisions, agents, representatives, attorneys, successors and assigns, and each of its and their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, owners and partners (collectively, the "*Debtor Released Parties*"), from any and all claims, contracts, demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, damages, Liabilities, costs and expenses, whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute or common law of any kind, nature, or description (including, without limitation as to any of the foregoing, any claim by way of indemnity or contribution), in each case, which any Buyer Releasing Party has, may have had or may hereafter assert against any Debtor Released Party arising from or related in any way, either directly or indirectly, to any action or inaction of any Debtor Released Party relating in any way to the Business, including without limitation, any action or inaction of any Debtor Released Party relating to the Chapter 11 Cases; provided, however, that the foregoing release shall not apply to (i) the Buyer's rights or the Debtors' obligations under or with respect to this Order or the APA (including Section 6.10 of the APA), any Related Agreements and/or any other agreements entered into in connection with the transactions contemplated by the APA, (ii) the rights of Buyer Releasing Parties under any Insurance Policy and/or (iii) any matter to the extent not related to the Business.

52.     Subject to the terms of the APA, the APA and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and Buyer, in consultation with counsel to the Committee, without further action or order of the Bankruptcy

32

Court; *provided*, *however*, that any such waiver, modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates. Any material modification, waiver, amendment or supplement to the APA must be approved by Order of the Bankruptcy Court.

53.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified with respect to the Debtors to the extent necessary, without further order of this Court, to allow Buyer to deliver any notice provided for in the APA and allow Buyer to take any and all actions permitted or required under the APA in accordance with the terms and conditions thereof. Buyer shall not be required to seek or obtain any further relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other sale-related document, with the exception of the DIP Financing.

54.     All persons, all Governmental Units (as defined in sections 101(27) and 101(41) of the Bankruptcy Code) and all holders of Adverse Interests, based upon or arising out of the Excluded Liabilities are hereby barred and estopped from taking any action against Buyer or the Acquired Assets, including asserting any setoff, right of subrogation or recoupment of any kind, to recover property on account of any Adverse Interests or on account of any liabilities of the Debtors other than Assumed Liabilities pursuant to the APA. All persons holding or asserting any Adverse Interests with respect to the Excluded Assets are hereby enjoined from asserting or prosecuting such Adverse Interests against Buyer or the Acquired Assets for any liability whatsoever associated with the Excluded Assets.

55.     The provisions of this Order authorizing the sale and assignment of the Acquired Assets free and clear, to the maximum extent permitted by law, of all Adverse Interests shall be self-executing, and neither the Debtors nor Buyer shall be required to execute or file releases,

termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.

56.     Neither the Debtors nor any of their Affiliates shall use, license or permit any third party to use, any name, slogan, logo or trademark which is similar or deceptively similar to any of the names, trademarks or service marks included in the Intellectual Property included in the Acquired Assets, and each Debtor is authorized to change its corporate name to a name which (a) does not use the name "Wet Seal", "WTSL" or any other name that references or reflects any of the foregoing in any manner whatsoever, (b) is otherwise substantially dissimilar to its present name and (c) is approved in writing by Buyer.

57.     The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Letter Agreement and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale.  This Court retains jurisdiction to compel delivery of the Acquired Assets, to protect the Buyer Group and its assets, including the Acquired Assets, against any Adverse Interests and Successor and Transferee Liability and to enter orders, as appropriate, pursuant to sections 105, 363 or 365 (or other applicable provisions) of the Bankruptcy Code necessary to transfer the Acquired Assets and the Assumed Contracts to Buyer. This Court retains jurisdiction to adjudicate disputes between Buyer and holders of claims related to the Assumed Liabilities regarding the Assumed Liabilities.

58.     The Transactions contemplated hereunder shall not be affected by any bulk sales laws.

59.     Notwithstanding the possible applicability of Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9014 or otherwise, the terms and conditions of this Order shall be effective immediately upon entry, and the Debtors and Buyer are authorized to close the sale immediately upon entry of this Order.

60.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

61.     To the extent there are any inconsistencies between the terms of this Order, the APA and the Letter Agreement, the terms of this Order shall control.

Wilmington, Delaware
Date: _____, 2015                    _____
                                               United States Bankruptcy Judge

**<u>Exhibit 1</u>**

**Asset Purchase Agreement**

## **Exhibit 2**

**Proposed Assumption Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| THE WET SEAL, INC., *et al.*,[1] | ) |
|  | ) Case No. 15-10081 (CSS) |
| Debtors. | ) |
|  | ) Jointly Administered |
|  | ) |

## NOTICE OF ASSUMPTION AND ASSIGNMENT
## OF UNEXPIRED LEASE OR EXECUTORY CONTRACT

Re: INSERT INFORMATION (the "***Lease***"/or the "***Contract***")

**PLEASE TAKE NOTICE** that, on [DATE], 2015, the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") entered the *Order Authorizing (A) The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of All Claims, Liens, Rights, Interests And Encumbrances; (B) the Debtors to Enter Into and Perform their Obligations Under the Asset Purchase Agreement; and (C) Assume and Assign Certain Executory Contracts and Unexpired Leases* [Docket No. #] (the "***Sale Order***").[2]

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the terms of the Sale Order, the above-captioned debtors and debtors-in-possession (the "***Debtors***") hereby provide this "Notice of Assumption and Assignment of Unexpired Lease or Executory Contract" (the "***Assumption Notice***")[3] of their intent to assume and assign the above-referenced

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: The Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265), Wet Seal Catalog, Inc. (7604), and Wet Seal GC, LLC (2855-VA).  The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

[2] Unless otherwise stated, all capitalized terms not defined herein shall have the same meaning as set forth in the Sale Order.

3 This notice is being sent to counterparties to contracts and leases that may be executory and unexpired leases. This notice is *not* an admission by the Debtors that such contracts or leased are executory or unexpired.

[Lease/Contract]. The Debtors intend to assume and assign the [Lease/Contract] to Mador Lending, LLC (the "*Assignee*"), an affiliate of Versa Capital Management, LLC.  As determined by the Bankruptcy Court upon entry of the Sale Order, the Assignee has the financial wherewithal to meet all future obligations under the [Lease/Contract], and as evidenced by the documentation previously provided if so requested, thereby demonstrating that it has the ability to comply with the requirements of adequate assurance of future performance under section 365(f) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "*Bankruptcy Code*") including section 365(f)(2)(B) of the Bankruptcy Code and, if applicable, section 365(b)(3) of the Bankruptcy Code.  Contact details for the Assignee's counsel are as follows: Greenberg Traurig, LLP, 77 West Wacker Drive, Suite 3100, Chicago, IL 60601 (Attn: Nancy A. Peterman, Esq.).

**PLEASE TAKE FURTHER NOTICE** that, should you object to the Debtors' assumption and assignment of the above-referenced [Lease/Contract], you must file and serve an objection that (i) is in writing, (ii) states the name and address of the objecting party, and (iii) sets forth with specificity any cure amounts that the objecting counterparty asserts must be cured or satisfied with respect to the above-referenced [Lease/Contract] and/or any other objections to the proposed assumption of such [Lease/Contract], with all documentation supporting such objection, so that such objection is filed with the Bankruptcy Court and served so that it is actually received no later than **ten calendar days** after the date of this Assumption Notice (the "*Assumption Objection Deadline*") by the following parties:

**Counsel to the Debtors**
Klee, Tuchin, Bogdanoff & Stern LLP
Attn:  Michael L. Tuchin, Esq.
Attn:  Lee R. Bogdanoff, Esq.
1999 Avenue of the Stars
Los Angeles, CA 90067-6049

2

Email:  mtuchin@ktbslaw.com
Email:  lbogdanoff@ktbslaw.com

Young Conaway Stargatt & Taylor, LLP
Attn:  Michael R. Nestor, Esq.
Attn:  Maris J. Kandestin, Esq.
Rodney Square
1000 North King Street
Wilmington, DE 19801
Email:  mnestor@ycst.com
Email:  mkandestin@ycst.com

**United States Trustee**
Office of the United States Trustee for the District of Delaware
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035

**Counsel to the Official Committee of Unsecured Creditors**
Pachulski Stang Ziehl & Jones LLP
Attn: Bradford J. Sandler, Esq.
919 N. Market Street, 17th Floor
Wilmington, DE 19899-8705
Email: bsandler@pszjlaw.com

Pachulski Stang Ziehl & Jones LLP
Attn: Jeffrey N. Pomerantz, Esq.
Attn: Shirley S. Cho, Esq.
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA 90067-4100
Email: jpomerantz@pszjlaw.com
scho@pszjlaw.com

**Counsel to Mador**
Greenberg Traurig, LLP
Attn: Nancy A. Peterman, Esq.
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Email: Petermann@gtlaw.com

Klehr Harrison Harvey Branzburg LLP
Attn: Domenic E. Pacitti, Esq.
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Email: dpacitti@klehr.com

3

**Additional Parties**
The counterparties, and their counsel (if known).

**PLEASE TAKE FURTHER NOTICE** that, cure amounts due as of the date of the Sale Order under section 365(b) of the Bankruptcy Code were established pursuant to the Sale Order and any additional cure amounts arising post-Closing must be noticed to the parties listed above before the Assumption Objection Deadline.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Sale Order, if a permitted objection is properly filed and served in accordance with the procedures set forth above, and the Debtors, the Assignee and the objecting party cannot consensually resolve the issue(s) raised in the objection, a hearing will be scheduled to consider that objection.  If the objection is overruled by the Court or withdrawn, the assumption and assignment of the [Lease/Contract] shall be deemed effective as of the date of the Assumption Order (as defined below).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Sale Order, if no objection is filed and served in accordance with the above procedures, the Debtors will file the proposed form of order (the "***Assumption Order***"), substantially in the form attached hereto as **Annex I**, that provides, among other things, (i) that the assumption and assignment of the [Lease/Contract] is approved, final and effective as of the date of entry of the Assumption Order; (ii) the Assignee provided adequate assurance of future performance under the [Lease/Contract]; and (iii) the cure amount pursuant to section 365(f)(2)(B) and, if applicable, section 365(b)(3), was or shall be established pursuant to the Order.

> **IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE PLEASE CONTACT DONLIN RECANO AT 1-877-814-9751**

4

Dated:  March [___], 2015

                    _____

Michael R. Nestor, Esq. (DE Bar No. 3526)
Maris J. Kandestin, Esq. (DE Bar No. 5294)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:    (302) 571-1253
Email:  mnestor@ycst.com
             mkandestin@ycst.com

and

Lee R. Bogdanoff, Esq.
Michael L. Tuchin, Esq.
David M. Guess, Esq.
Jonathan M. Weiss, Esq.
KLEE, TUCHIN, BOGDANOFF & STERN  LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel:     (310) 407-4022
Fax:    (310) 407-9090
Email: lbogdanoff@ktbslaw.com
            mtuchin@ktbslaw.com
            dguess@ktbslaw.com
            jweiss@ktbslaw.com

CHI 65678071v4

**<u>Annex I</u> to <u>Exhibit 2</u>**

**Proposed Assumption Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE WET SEAL, INC., *et al.*,[1] | ) | Case No. 15-10081 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### ORDER APPROVING THE ASSUMPTION AND ASSIGNMENT
### OF [LEASE/CONTRACT] BETWEEN [INSERT NAME OF PARTIES]

Pursuant to the *Order Authorizing (A) The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of All Claims, Liens, Rights, Interests And Encumbrances; (B) the Debtors to Enter Into and Perform their Obligations Under the Asset Purchase Agreement; and (C) Assume and Assign Certain Executory Contracts and Unexpired Leases* [Docket No. #] (the "**Sale Order**");[2] and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Debtors having properly filed and served a Notice of Assumption and Assignment of Unexpired Lease or Executory Contract (the "**Assignment Notice**") in accordance with the terms of the Sale Order in respect of the assignment of the [lease/contract] for [INSERT INFORMATION] (the "**Lease/Contract**") to Mador Lending, LLC (the "**Assignee**"); and no timely objections having been filed to the assumption and assignment of the [Lease/Contract] or to extent timely objections have been filed, such objections having been resolved; and due and proper notice of

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: The Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265), Wet Seal Catalog, Inc. (7604), and Wet Seal GC, LLC (2855-VA).  The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

[2] Unless otherwise stated, all capitalized terms not defined herein shall have the same meaning as set forth in the Sale Order.

the Sale Order and the Assignment Notice having been provided, and it appearing that no other notice need be provided; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The assumption and assignment of the [Lease/Contract] is hereby approved.

2.      The Debtors are authorized to assume and assign the [Lease/Contract] to the Assignee pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and the [Lease/Contract] shall be transferred to the Assignee, upon the date of entry of this Order, free and clear, to the maximum extent permitted by law, of any and all Adverse Interests.

3.      All objections with regard to the relief sought herein, if any, that have not been withdrawn, waived or settled, are overruled on the merits.

4.      Upon the assignment to the Assignee, the [Lease/Contract] shall be deemed valid and binding, in full force and effect in accordance with its terms, subject to the provisions of this Order and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any further liability thereunder, including for any breach of the [Lease/Contract].

5.      To the extent that any of the Debtors acts as a guarantor to the [Lease/Contract] (a "*Debtor-Guarantor*"), such Debtor-Guarantor shall have no obligations with respect to the [Lease/Contract] after the date of entry of this Order.

6.      The cure amounts under section 365(b) of the Bankruptcy Code in connection with the assumption and assignment of the [Lease/Contract] were established pursuant to the Sale Order or otherwise agreed by the parties.

2

7.      The assignment of the [Lease/Contract] to the Assignee shall constitute a legal, valid and effective transfer of the [Lease/Contract] and vests or shall vest the Assignee with all right, title and interest to the applicable [Lease/Contract].

8.      The provisions of this Order shall be self-executing, and neither the Debtors nor Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments to effectuate, consummate and implement the provisions of this Order.

9.      To the extent that any provisions in any assumption and assignment agreement conflict with this Order, the provisions of this Order shall govern.

10.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.     The Debtors are authorized to take any action or to execute and deliver to the Assignee any documents or other instruments as may be necessary to implement the terms of this Order and the assignment contemplated herein without further order from this Court.

12.     This Court shall retain exclusive jurisdiction to resolve any dispute arising from or related to this Order.

Dated:  Wilmington, Delaware
_____, 2015

                                          _____
                                          United States Bankruptcy Judge

CHI 65678071v4

**<u>Exhibit 3</u>**

**Proposed Rejection Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| THE WET SEAL, INC., *et al.*,[1] | ) |
| | ) Case No. 15-10081 (CSS) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |

## NOTICE OF REJECTION OF UNEXPIRED LEASE AND EXECUTORY CONTRACT

Re: INSERT INFORMATION (the "***Lease***"/or the "***Contract***")

 **PLEASE TAKE NOTICE** that, on [DATE], 2015, the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") entered the *Order Authorizing (A) The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of All Claims, Liens, Rights, Interests And Encumbrances; (B) the Debtors to Enter Into and Perform their Obligations Under the Asset Purchase Agreement; and (C) Assume and Assign Certain Executory Contracts and Unexpired Leases* [Docket No. #] (the "***Sale Order***"),[2] which, among other things, approved certain procedures (the "***Rejection Procedures***") for the rejection of executory contracts and unexpired leases of nonresidential real property.

 **PLEASE TAKE FURTHER NOTICE** that, in accordance with the Rejection Procedures, the above-captioned debtors and debtors-in-possession (the "***Debtors***") hereby provide this "Notice of Rejection of Unexpired Lease or Executory Contract" (the "***Rejection Notice***") of their intent to reject the above-referenced [Lease/Contract].

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: The Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265), Wet Seal Catalog, Inc. (7604), and Wet Seal GC, LLC (2855-VA).  The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

[2] Unless otherwise stated, all capitalized terms not defined herein shall have the same meaning as set forth in the Sale Order.

**PLEASE TAKE FURTHER NOTICE** that, should you object to the Debtors' rejection of the above-referenced [Lease/Contract], you must file and serve an objection that (i) is in writing, (ii) states the name and address of the objecting party, and (iii) sets forth with specificity any objections to the proposed rejection of such [Lease/Contract], with all documentation supporting such objection, so that such objection is filed with the Bankruptcy Court and served so that it is actually received no later than **ten calendar days** after the date of this Rejection Notice by the following parties:

**Counsel to the Debtors**
Klee, Tuchin, Bogdanoff & Stern LLP
Attn:  Michael L. Tuchin, Esq.
Attn:  Lee R. Bogdanoff, Esq.
1999 Avenue of the Stars
Los Angeles, CA 90067-6049
Email:  mtuchin@ktbslaw.com
Email:  lbogdanoff@ktbslaw.com

Young Conaway Stargatt & Taylor, LLP
Attn:  Michael R. Nestor, Esq.
Attn:  Maris J. Kandestin, Esq.
Rodney Square
1000 North King Street
Wilmington, DE 19801
Email:  mnestor@ycst.com
Email:  mkandestin@ycst.com

**United States Trustee**
Office of the United States Trustee for the District of Delaware
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035

**Counsel to the Official Committee of Unsecured Creditors**
Pachulski Stang Ziehl & Jones LLP
Attn: Bradford J. Sandler, Esq.
919 N. Market Street, 17th Floor
Wilmington, DE 19899-8705
Email: bsandler@pszjlaw.com

Pachulski Stang Ziehl & Jones LLP

2

Attn: Jeffrey N. Pomerantz, Esq.
Attn: Shirley S. Cho, Esq.
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA 90067-4100
Email: jpomerantz@pszjlaw.com
scho@pszjlaw.com

**Counsel to Mador**
Greenberg Traurig, LLP
Attn: Nancy A. Peterman, Esq.
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Email: Petermann@gtlaw.com

Klehr Harrison Harvey Branzburg LLP
Attn: Domenic E. Pacitti, Esq.
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Email: dpacitti@klehr.com

**Additional Parties**
The counterparties, and their counsel (if known).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Sale Order, if no objection is filed and served in accordance with the above procedures to the rejection of such [Lease/Contract], the Debtors shall present the Rejection Order, substantially in the form attached hereto as **Annex 1**, and such rejection shall be deemed effective on the later of (a) [DATE] and (b) the surrender of the premises that is the subject of the Lease (such later date, the "***Rejection Effective Date***").

**PLEASE TAKE FURTHER NOTICE** that, if an objection is properly filed and timely served in accordance with the above, unless the parties agree otherwise in writing, a hearing will be scheduled to consider such objection.  If that objection is overruled by the Court or withdrawn, the rejection of the [Lease/Contract] shall be deemed effective on the Rejection Effective Date.

3

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors have deposited monies with the counterparty pursuant to a security deposit or otherwise, the counterparty holding such monies may not set-off or recoup or otherwise use such monies without prior approval of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that, should you have a claim for any damages as a result of the Debtors' rejection of the above-referenced [Lease/Contract], **you must submit a proof of claim to**:

**Donlin, Recano & Company, Inc.**
Re: The Wet Seal, Inc., et al.
P.O. Box 899
Madison Square Station
New York, NY 10010

**on or before the later of (i) the date that is 30 days after service of an order of the Bankruptcy Court approving the rejection of the [Lease/Contract] or (ii) April 10, 2015, the bar date established for filing proofs of claim against the Debtors**. If you do not properly and timely file such proof of claim, you may be forever barred from asserting any claims for such rejection damages.

*CHI 65678071v4*

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE PLEASE CONTACT DONLIN RECANO AT 1-877-814-9751**

Dated:  March [__], 2015

Michael R. Nestor, Esq. (DE Bar No. 3526)
Maris J. Kandestin, Esq. (DE Bar No. 5294)
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:     (302) 571-1253
Email:  mnestor@ycst.com
            mkandestin@ycst.com

and

Lee R. Bogdanoff, Esq.
Michael L. Tuchin, Esq.
David M. Guess, Esq.
Jonathan M. Weiss, Esq.
Klee, Tuchin, Bogdanoff & Stern  LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel:     (310) 407-4022
Fax:     (310) 407-9090
Email:  lbogdanoff@ktbslaw.com
            mtuchin@ktbslaw.com
            dguess@ktbslaw.com
            jweiss@ktbslaw.com

*CHI 65678071v4*

**<u>Annex 1</u>** to **<u>Exhibit 3</u>**

**Proposed Rejection Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| | ) | |
| THE WET SEAL, INC., *et al.*,[1] | ) | Case No. 15-10081 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## ORDER APPROVING THE REJECTION
## OF [LEASE/CONTRACT] BY AND BETWEEN [INSERT NAME OF PARTIES]

Pursuant to the *Order Authorizing (A) The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of All Claims, Liens, Rights, Interests And Encumbrances; (B) the Debtors to Enter Into and Perform their Obligations Under the Asset Purchase Agreement; and (C) Assume and Assign Certain Executory Contracts and Unexpired Leases* [Docket No. #] (the "***Sale Order***");[2] and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Debtors having properly filed and served a Notice of Rejection of Unexpired Lease or Executory Contract" (the "***Rejection Notice***")  in accordance with the terms of the Sale Order in respect of the rejection of the [lease/contract] for [INSERT INFORMATION] (the "***Lease/Contract***") to [INSERT NAME] (the "***Rejection Notice Parties***"); and no timely objections having been filed to the rejection of the [Lease/Contract]; and due and proper notice of the Sale Order and the

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: The Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265), Wet Seal Catalog, Inc. (7604), and Wet Seal GC, LLC (2855-VA).  The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

[2] Unless otherwise stated, all capitalized terms not defined herein shall have the same meaning as set forth in the Sale Order.

Rejection Notice having been provided, and it appearing that no other notice need be provided; and after due deliberation and sufficient cause appearing therefor,

NOW, IT IS HEREBY ORDERED THAT:

1.      The rejection of the [Lease/Contract] is hereby approved effective as of the Rejection Effective Date (as defined in the Rejection Notice).

2.      If any affected landlord or counterparty subject to this Order (the "***Rejection Claimant***") asserts a claim or claims against the Debtors arising from the rejection of the [Lease/Contract] herein or the abandonment of any personal property on leased premises, such Rejection Claimant shall submit a proof of claim to:

**Donlin, Recano & Company, Inc.**
Re: The Wet Seal, Inc., et al.
P.O. Box 899
Madison Square Station
New York, NY 10010

on or before the later of (i) the date that is 30 days after service of an order of this Court approving the rejection of the [Lease/Contract], or (ii) April 10, 2015, the bar date established by this Court for filing proofs of claim against the Debtors.  If a Rejection Claimant does not timely file such proof of claim, such claimant may be forever barred from asserting a claim for such rejection damages.

3.      The Debtors are authorized to take any action necessary to implement the terms of this Order and the rejection without further order from this Court.

4.      This Court shall retain exclusive jurisdiction to resolve any dispute arising from or related to this Order.

Dated:  Wilmington, Delaware
_____, 2015

_____
United States Bankruptcy Judge

2

**Exhibit 8**

**B. Riley Financial, Inc. Fees and Expenses**
*(estimated as of March 10, 2015)*

| Item | Estimated Amount |
|---|---|
| DIP Commitment Fee | $375,000.00 |
| Skadden, Arps, Slate, Meagher & Flom LLP | $63,325.30 |
| FreedMaxick ABL Services, LLC (fees and expenses relating to appraisal) | $39,291.37 |
| B. Riley (expenses relating to appraisals and store visits) | $20,000.00 |
| **Total** | **$497,616.67** |

**Exhibit 9**

## Martin N. Kostov

| | |
|---|---|
| **From:** | Lee R. Bogdanoff |
| **Sent:** | Wednesday, March 11, 2015 8:41 AM |
| **To:** | Martin N. Kostov |
| **Subject:** | FW: catching up |
| | |
| **Categories:** | Red Category |

**From:** Greg Segall [mailto:gs@versa.com]
**Sent:** Saturday, March 07, 2015 4:21 PM
**To:** Ed Thomas
**Cc:** Lee R. Bogdanoff; jpomerantz@pszjlaw.com; bsandler@pszjlaw.com; Morton Branzburg; Nancy Peterman; Howard Steinberg; Raymond French; Paul Halpern
**Subject:** Re: catching up

Yes Ed, that is correct.
Best,
Greg

**From:** Ed Thomas
**Date:** Saturday, March 7, 2015 at 6:31 PM
**To:** Greg Segall
**Cc:** "lbogdanoff@ktbslaw.com", "jpomerantz@pszjlaw.com", "bsandler@pszjlaw.com", Morton Branzburg, Nancy Peterman, Howard Steinberg, Raymond French, Paul Halpern
**Subject:** RE: catching up

Greg:

Thank you for your email.  Just so that I can communicate this accurately to the team, I interpret your acceptance to mean that Mador is offering employment to Christine Lee, Jon Kubo, Rachel Page, Tom Hillebrandt, and Kim Bajrech and me on the terms set forth in my email. If I am mistaken, please let me know. I, too, am thrilled we are able to work this out and look forward to moving forward if Mador is selected as the winning bidder next week.
,
Best,

Ed

**From:** Greg Segall [mailto:gs@versa.com]
**Sent:** Saturday, March 07, 2015 3:16 PM
**To:** Ed Thomas
**Cc:** lbogdanoff@ktbslaw.com; jpomerantz@pszjlaw.com; bsandler@pszjlaw.com; Morton Branzburg; Nancy Peterman; Howard Steinberg; Raymond French; Paul Halpern
**Subject:** Re: catching up

Ed, we accept your proposal. I am glad we have an agreement and thank you for allowing us to have quickly and definitively resolved this issue.

I now trust that you and your management team have full confidence and comfort in Versa as a buyer, our good faith and our commitment to this transaction, and to working collaboratively with you and your senior management team for the long term success of the company.

Best,
Greg

---

**From:** Ed Thomas
**Date:** Saturday, March 7, 2015 at 3:04 PM
**To:** Greg Segall
**Cc:** "lbogdanoff@ktbslaw.com"
**Subject:** RE: catching up

Thank you for reaching out.  It was very helpful for me to have our conversation.

As we discussed, we are having a great deal of difficulty keeping the executive team together.  It would be exceedingly helpful if you could provide written confirmation on behalf of Mador Lending LLC (Mador) that if Mador is the successful bidder at the auction and the transaction closes, Mador will offer the following people:Christine Lee, Jon Kubo, Rachel Page, Tom Hillebrandt, and Kim Bajrech and me, should you choose to do so, full time employment on the same terms, benefits, responsibilities and within the same or similar travel radius, and that the employment package will include six-month's severance (which will not burn down over time) on market terms (such as for example, no severance if an employee is terminated for "cause," if an employee voluntarily leaves, but otherwise severance would payable if an employee is deemed or actually terminated).  Mador and each executive will agree to negotiate in good faith an equity incentive program post-closing, but the failure of an executive to agree on a package, despite those good faith efforts, will entitle the executive to leave employment and receive his or her six month's severance. The employment offer is predicated on an individual continuing to work for the Company through the closing.

I want to make it clear that our independent board is in control of the auction process for the Company and making all decisions in that regard.  I am not in any way suggesting that I can or would influence the  outcome of that process.  I just want to make sure that the executive team is intact as we go through this process.  I would expect that, if you provide the confirmation I am requesting, this would all be disclosed at the auction and to the Court.

I want to  also make it clear that I am not in any way suggesting you are required to make this offer.  My only goal is to deliver to you a management team at closing, if that is what you want.

Best,
Ed

---

**From:** Greg Segall [mailto:gs@versa.com]
**Sent:** Saturday, March 07, 2015 11:18 AM
**To:** Ed Thomas
**Subject:** Re: catching up

Ed, thanks for your time on the phone today. I'm glad we were able to talk and answer your questions. Please let me know when you have confirmed things with Lee.

I know there is still a process in front of us but I look forward to concluding successfully and making a lot of money together, having fun, and maybe playing some golf soon.

See you Monday.
Greg

**From:** Ed Thomas
**Date:** Friday, March 6, 2015 at 9:02 PM
**To:** Greg Segall
**Subject:** Re: catching up

Great!!

Ed Thomas
Chief Executive Officer
The Wet Seal, Inc.
26972 Burbank
Foothill Ranch, CA 92610
(949) 699-4898 Direct Line
(949) 699-4721 Fax
(949) 370-3412 Cell


On Mar 6, 2015, at 5:49 PM, Greg Segall <gs@versa.com> wrote:

> Thanks Ed I'll call your after 930am your time tomorrow morning.
>
> On Mar 6, 2015, at 4:46 PM, Ed Thomas <Ed.Thomas@wetseal.com> wrote:
>
> Your office is ready here. ☺ It's only 82 here today.
> I can talk before 11 am PT tomorrow or after 2pm PT.
> Let me know what works for you. Call me on my cell. If I miss your call, I am probably on a call with an attorney and will call you right back.
>
> **From:** Greg Segall [mailto:gs@versa.com]
> **Sent:** Friday, March 06, 2015 1:41 PM
> **To:** Ed Thomas
> **Subject:** catching up
>
> Ed, hope you're well. 17 degrees here and 10 inches of new snow last night so a convenient time for a trip to the west coast!
> Any time we might catch up on a few things tomorrow in a call?
> Thanks.
> Greg
> ───────────────────────────────────────
>
> **Greg Segall** | Versa Capital Management, LLC
> Cira Centre | 2929 Arch Street, Philadelphia, PA 19104-7324
> Tel 215 609 3409 | GS@versa.com
>
> IMPORTANT LEGAL NOTICE
> This message is intended only for the use of the named addressee. It may contain information that is copywritten, privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this in error, please notify the sender immediately and delete it from your system. Communications using this system are monitored and recorded for lawful business purposes.