## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>THE WET SEAL, INC., a Delaware corporation, *et al.*,[1]<br><br>　　　　　　　Debtors. | Chapter 11<br><br>Case No.  15-10081 (CSS)<br><br>(Jointly Administered)<br><br>**(Proposed) Objection Deadline: March 25, 2015 at 4:00 p.m. (ET)**<br>**(Proposed) Hearing Date: April 1, 2015 at 10:00 a.m. (ET)** |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS AND ENCUMBRANCES; (B) THE DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT; AND (C) THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Wet Seal, Inc. ("WSI") and its subsidiaries, the debtors and debtors in possession (the "Debtors") in the above-captioned jointly administered chapter 11 cases (the "Cases"), hereby move the Court (the "Motion") for entry of an order (the "Sale Order"), substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105, 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9006, 9007, 9014, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1, and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (i) authorizing and approving the entry into, performance under and terms and conditions of the *Asset Purchase Agreement* by and between the Debtors and Mador Lending, LLC (together with its permitted successors, designees and assigns, "Buyer" or "Mador"), an affiliate

---

[1]  The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: The Wet Seal, Inc. (5940); The Wet Seal Retail, Inc. (6265), Wet Seal Catalog, Inc. (7604), and Wet Seal GC, LLC (2855-VA).  The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

of Versa Capital Management, LLC, dated March 12, 2015 (substantially in the form attached as

**Exhibit 1** to the Sale Order, the "APA")[2] whereby the Debtors have agreed to sell, and Buyer

has agreed to acquire, substantially all of the Debtors' operating assets (collectively, and as

specifically set forth and defined in the APA, the "Acquired Assets") other than the Excluded

Assets (as defined below), and the Debtors have agreed to transfer and Buyer has agreed to

assume certain of the Debtors' liabilities (collectively, and as specifically set forth and defined in

the APA, the "Assumed Liabilities") (collectively, and including all actions taken or required to

be taken in connection with the implementation and consummation of the APA, the

"Transactions"); (ii) authorizing and approving the sale of the Acquired Assets (the "Sale") free

and clear, to the maximum extent permitted by law, of any and all Liens (other than Permitted

Liens and the BofA Liens on the BofA Accounts, each as defined below), debts and claims (as

that term is defined in section 101(5) of the Bankruptcy Code), Liabilities (including all

Liabilities of the Debtors for Employment Related Laws, Complaints, and Obligations (as

defined in the Sale Order), except to the extent provided in the APA), obligations, costs,

expenses, causes of action, demands, guaranties, options, rights, contractual commitments,

settlements, injunctions, restrictions, interests, encumbrances, reclamation rights, and similar

matters of any kind whatsoever, whether known or unknown, fixed or contingent, or arising prior

to or subsequent to the commencement of these Cases, and whether imposed by agreement,

understanding, law, equity or otherwise (collectively, and including to the extent not already

specified above, Successor or Transferee Liability, as defined below, but excluding the Assumed

Liabilities, the "Adverse Interests"), with all such Adverse Interests to attach to the net proceeds

of the Sale, in the order of their priority, with the same validity, force and effect that they now

---

[2]  All capitalized terms used but not defined herein shall have the meanings provided to them in the APA.

01:16805982.1

have against the Acquired Assets, subject with respect to such net proceeds to any rights, claims and defenses the Debtors or any parties in interest may possess with respect thereto; (iii) authorizing the assumption and assignment to Buyer of certain executory contracts (all executory contracts of the Debtors, the "Contracts") and unexpired leases (all leases of the Debtors, the "Leases") of the Debtors (collectively, the "Assumed Contracts") in accordance with the APA; (iv) establishing assumption and assignment procedures (the "Assumption and Assignment Procedures") and rejection procedures (the "Rejection Procedures") for certain Contracts and Leases; and (v) granting related relief.

In support of the Motion, the Debtors rely on, and incorporate herein as if set forth in full, the *Declaration of Thomas R. Hillebrandt in Support of First Day Motions* [Docket No. 19] (the "Prior Hillebrandt Declaration"), the *Declaration of Derek Pitts*, etc. [Docket No. 22] (the "Prior Pitts Declaration"), the *Declaration of Thomas R. Hillebrandt*, etc. [Docket No. 409] (the "Supplemental Hillebrandt Declaration"), and the *Declaration of Derek Pitts*, etc. [Docket No. 410] (the "Supplemental Pitts Declaration"), as well as the *Transcript of March 10 and 12, 2015 Auction* [Docket No. 422] (the "Auction Transcript") and the *Declaration of Paul Halpern*, etc. (the "Halpern Declaration"), which the Debtors are filing concurrently herewith.

In further support of the Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, the Debtors seek approval of their entry into the APA with Mador, the successful bidder at the conclusion of the Debtors' auction on March 12, 2015.  After an extensive marketing process, competitive bidding, and arm's length negotiation with Mador (with the active involvement and cooperation of the Committee (defined below)), the Debtors have concluded that the APA and the Transactions contemplated thereunder constitute or provide the highest or otherwise best offer and provide fair and reasonable consideration to the Debtors

01:16805982.1

for the sale of all Acquired Assets and the assumption of all Assumed Liabilities, that will provide a greater recovery for the Debtors' estates than would be possible by any other available alternative.  The Debtors' selection of Mador as the successful bidder is also affirmatively supported by the Committee.  Consequently, approval of the Motion is in the best interests of the Debtors, their respective creditors, estates and other parties in interest.

2.      The need for approval of the APA is urgent and immediate.  The terms of the APA require that the Sale Order be a final, non-appealable order by April 15, 2015, which in turn requires that the Sale Order to be entered by April 1, 2015.  Similarly, the Debtors' proposed DIP Financing (as defined below) provided by Mador will be in default in accordance with its terms if the Sale Order is not entered by April 1, 2015.  In addition, in accordance with the Court-approved bid procedures, B. Riley will cease to be the "back-up bidder" as soon as Mador provides a $1 million additional deposit.

3.      The Debtors believe that there is substantial risk of deterioration of the value of the Acquired Assets if the Transactions are not consummated quickly.  The Debtors have operated in chapter 11 for over two months, which has created a severe diversion of their resources and kept management from fully focusing on the Debtors' core business.  There is an increased likelihood that the Debtors' business will not be able to survive if these Cases are prolonged any further, as the strain of administrative expenses and the difficulty of operating a competitive business in bankruptcy will only increase.  It is crucial for the Debtors to complete their restructuring in the near future and the APA presents the Debtors with the best option to do so in a value-maximizing and efficient way.

01:16805982.1

4.      For these reasons and those set forth below, this Court should enter the Sale Order authorizing the Debtors to enter into the APA with Mador and consummate the Transactions contemplated thereunder.[3]

## JURISDICTION

5.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

6.      Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

7.      The statutory and legal predicates for the relief requested herein are sections 105, 363, and 365 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9014, and 9019, and Local Rules 2002-1, 6004-1, and 9006-1.

## BACKGROUND

### I.    The Chapter 11 Cases

8.      On January 15, 2015 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.

---

[3] The Debtors are also concurrently filing a separate motion to request that the Motion be heard on shortened notice.

01:16805982.1

9.      The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  To date, no trustee or examiner has been appointed in these Cases by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").  The U.S. Trustee appointed an official committee of unsecured creditors (the "Committee") on January 30, 2015.

10.     The detailed factual background relating to the Debtors and the commencement of these Cases is set forth in the Prior Hillebrandt Declaration and the Prior Pitts Declaration.

## II.     The PSA and the Bidding Process

11.     On the Petition Date, the Debtors filed a motion [Docket No. 3], seeking, among other things, approval of the Debtors' assumption of that certain *Plan Sponsorship Agreement* (as the same may have been amended or modified, the "PSA"), dated as of January 15, 2015, entered into by and among the Debtors and B. Riley Financial, Inc. ("B. Riley").  The PSA, as modified, contemplated a proposed plan of reorganization that would, among other things, provide for the purchase by B. Riley of 80% of the newly-issued common stock in reorganized WSI in consideration of $25 million in the form of (i) conversion of the principal amount of B. Riley's debtor-in-possession term loan facility into equity, and (ii) cash (the "B. Riley Offer").

12.     On February 5, 2015, the Court entered the *Order Pursuant to 11 U.S.C. §§ 105(a), 365(a) and 503(b)(1) (I) Approving and Authorizing the Assumption of the Plan Sponsorship Agreement as Modified, and (II) Approving and Authorizing the Payment of Break-Up Fee and Expense Reimbursement* [Docket No. 252] (the "PSA Order"), thereby approving the Debtors' assumption of the modified PSA.  The PSA, as modified, also contained certain "go shop" provisions, which permitted the Debtors, in cooperation with the Committee, to actively solicit and negotiate higher and better offers than the restructuring contemplated under the PSA.

13.     On February 6, 2015, the Debtors filed a motion [Docket No. 259] (the "Bidding Procedures Motion"), seeking, among other things, approval of certain bidding procedures (the "Bidding Procedures") governing the submission of competing proposals to (i)(a) sponsor an alternative plan of reorganization for the Debtors (a "Plan Transaction") or (b) acquire all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code (a "363 Transaction") and (ii) with respect to either a Plan Transaction or a 363 Transaction, provide debtor-in-possession financing to replace the Debtors' existing debtor-in-possession financing (a "Replacement Financing").

14.     On February 18, 2015, the Court entered the *Order Approving Certain Bid Procedures Governing the Submission of Competing Proposals to (I)(A) Sponsor of a Plan of Reorganization for the Debtors or (B) Acquire All or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code and (II) Provide Debtor-in-Possession Financing* [Docket No. 329] (the "Bidding Procedures Order"), thereby granting the Bidding Procedures Motion and approving the Bidding Procedures, as modified.  Pursuant to the Bidding Procedures Order, an auction (the "Auction") to determine the highest or otherwise best bid would commence on March 10, 2015 if any competing qualified bids were submitted by the March 5, 2015 bid deadline established by the Court (the "Bid Deadline").  Before commencement of the Auction, the Debtors, in consultation with the Committee, determined that only Mador had submitted a competing qualified bid by the Bid Deadline.

## III.    The Auction

15.     The Auction commenced on March 10, 2015.  As described in more detail below, Mador agreed to acquire substantially all of the Debtors' operating assets pursuant to section 363 of the Bankruptcy Code and provide the Debtors with Replacement Financing.  After Buyer presented an overbid in the form of a 363 Transaction, the Debtors, the Committee and Buyer

01:16805982.1

held a continuous series of all-day meetings through March 12, 2015 concerning various issues

raised by Buyer's overbid and to negotiate, *inter alia*, the language of the APA, that certain letter

agreement dated March 12, 2015 by and among the Debtors, Buyer, and the Committee, a copy

of which is attached as <u>Appendix B</u> to the APA (the "<u>Letter Agreement</u>"), and the Sale Order.

On March 12, 2015, at the conclusion of the Auction, the Debtors, in consultation with the

Committee, selected Mador as the successful bidder, in accordance with the terms of the Bidding

Procedures Order.

16.     On March 13, 2015, the Debtors filed the *Notice of (I) Auction Results and

(II) Status of (A) Joint Plan of Reorganization of The Wet Seal, Inc. and Subsidiary Debtors and

(B) Disclosure Statement for Joint Plan of Reorganization of The Wet Seal, Inc. and Subsidiary

Debtors* [Docket No. 407] (the "<u>Auction Results Notice</u>"), disclosing Mador's selection as the

successful bidder at the Auction and that the Debtors were no longer proceeding with the

B. Riley Offer, including the related chapter 11 plan of reorganization and disclosure statement.

17.     On March 13, 2015, the Debtors also filed the *Motion of the Debtors for Entry of

Order Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy

Rules 2002, 4001 and 9014: (I) Authorizing Replacement Postpetition Financing from Mador

Lending, LLC, (II) Granting Liens and Providing Superpriority Administrative Expense Priority,

(III) Authorizing Use of Cash Collateral and Providing for Adequate Protection, and

(IV) Modifying the Automatic Stay* [Docket No. 408] (the "<u>DIP Financing Motion</u>"), requesting

approval of the Replacement Financing to be provided by Mador, in accordance with the results

of the Auction and the terms of that certain Senior Secured, Super-Priority Debtor-in-Possession

Credit Agreement, dated as of March 12, 2015, among Mador Lending, LLC, as lender, The Wet

Seal, Inc., as lead borrower for The Wet Seal, Inc., The Wet Seal Retail, Inc., and Wet Seal

Catalog, Inc., as borrowers and debtors in possession, and the guarantors party thereto (as the same may have been or be amended, modified, restated, or supplemented and in effect from time to time, the "DIP Financing").

## THE ASSET PURCHASE AGREEMENT[4]

### I.    Material Terms of the Agreement

18.    The following chart summarizes the terms and conditions of the APA:

| Term | Description |
|---|---|
| **Sellers** | The Wet Seal, Inc., The Wet Seal Retail, Inc., Wet Seal Catalog, Inc., and Wet Seal GC, LLC<br><br>(*see* introductory paragraph of APA (pg. 1)) |
| **Buyer** | Mador Lending, LLC (together with its permitted successors, designees and assigns)<br><br>(*see* introductory paragraph of APA (pg. 1)) |
| **Purchase Price** | The Purchase Price is comprised of (a) the payment of an amount in cash (the "Cash Payment") equal to  (i) $7,500,000, less (ii) the Deposit; (b) (i) a credit bid pursuant to section 363(k) of the Bankruptcy Code (a "Credit Bid") of all the DIP Financing Obligations held by Buyer, (ii) a Credit Bid of a portion of the DIP Financing Obligations held by Buyer plus the assumption by Buyer of the remaining outstanding DIP Financing Obligations and/or (iii) the assumption by Buyer of all of the outstanding DIP Financing Obligations; and (c) the assumption by Buyer of the Assumed Liabilities.<br><br>(*see* § 2.5 of APA) |
| **Acquired Assets** | All of the Debtors' right, title and interest in and to all of the Debtors' properties, assets and rights of every nature, kind and description, tangible and intangible, whether real, personal or mixed, whether accrued, contingent or otherwise, wherever situated or located, existing as of the Closing, including all rights to bring claims for past, present or future infringement of the Intellectual Property owned by the Debtors; provided, however, that, notwithstanding the foregoing or |

---

[4]    The summary of the terms and conditions of the APA set forth in this Motion and the following chart are intended solely for informational purposes and are qualified in their entirety by the APA and the Sale Order.  In the event there is any conflict between this Motion and the APA, the APA will prevail.  In the event there is any conflict between this Motion and/or the APA and the Sale Order, the Sale Order will prevail.

| | |
|---|---|
| | anything contained in the APA to the contrary, the Acquired Assets shall not include any Excluded Assets.<br><br>(*see* defined terms of APA (pg. 2); § 2.1 of APA) |
| **Assumed Liabilities** | Those liabilities and obligations enumerated on Schedule 2.3 of the APA, specifically:<br>(1) Liabilities under the Assumed Contracts and the Assumed Permits to the extent arising from and after the Closing Date (except for any Liabilities to the extent based on the actions of the Debtors).<br><br>(2) All current liabilities, trade payables and accrued expenses of the Debtors incurred in the Ordinary Course of Business, in each case, as of the Closing Date (and not paid by the Debtors prior thereto), to the extent arising and related to the period following the Petition Date.<br><br>(3) all accrued payroll, accrued and unused vacation, and accrued payroll Taxes, in each case, as of the Closing Date (and not paid by the Debtors prior thereto) to the extent arising and related to the period following the Petition Date, provided that the Debtors pay all such liabilities and obligations as and when due through the Closing Date consistent with the Debtors' past practices.<br><br>(4) To the extent required by applicable law, Liabilities relating to continuation health care coverage, to the extent required by COBRA, to Current Employees and Former Employees of the Debtors (and their qualified beneficiaries) who left employment or otherwise experienced a COBRA qualifying event on or prior to the Closing Date.<br><br>(5) All employee related Liabilities that are Priority Claims or Administrative Claims (and not paid by the Debtors prior to the Closing Date), to the extent such Liabilities are Administrative Claims as set forth in item 11 in Schedule 2.3 of the APA or Priority Claims as set forth in item 15 in Schedule 2.3 of the APA.<br><br>(6) All Consumer Liabilities as of the Closing Date.<br><br>(7) All Operational Expenses that are the obligation of Buyer pursuant to Section 2.10 of the APA.<br><br>(8) Ordinary course gift card obligations of the Debtors as of the Closing Date, provided that such obligations (i) arise from gift cards sold in the Ordinary Course of Business and (ii) shall not include any escheatment claims asserted by any Governmental Entity or any similar claim; and provided that the amount of any such obligation shall be no more than the face value of the gift card and shall be |

limited to use of such gift cards presented by individual holders for goods sold at their retail stores by the Debtors, subject to such lawful limitations as the Debtors may impose for gift cards issued by them.

(9) any portion of the DIP Financing Obligations that is not credit bid by Buyer as part of the Purchase Price under Section 2.5(b) of the APA.

(10) Liabilities consisting of amounts Buyer has expressly agreed to pay, including all Cure Amounts.

(11) Administrative Claims incurred prior to the Closing Date to the extent allowed by order of the Bankruptcy Court (including, by way of clarification, all Taxes incurred for the period from and after the Petition Date through the Closing Date to the extent such Taxes are Administrative Claims as set forth in item 11 in Schedule 2.3 of the APA or Priority Claims as set forth in item 15 in Schedule 2.3 of the APA) or otherwise agreed to by Buyer.

(12) Any fees and expenses incurred by professionals employed by the Debtors and/or the Committee, provided that such fees and expenses shall not (in the aggregate) exceed 110% of the amount of the professional fee budget included in the Cash Budget for the period through and including May 15, 2015.

(13) all obligations under any Employee Benefit Plan to the extent such obligations are Administrative Claims as set forth in item 11 in Schedule 2.3 of the APA or Priority Claims as set forth in item 15 in Schedule 2.3 of the APA.

(14) Sponsorship of, and obligations under, the Health Plans, provided that the Debtors pay all such liabilities and obligations as and when due through the Closing Date consistent with the Debtors' past practices.

(15) Priority Claims incurred prior to the Closing Date to the extent allowed by order of the Bankruptcy Court or agreed to (in writing) by Buyer; provided, however, that any Priority Claims with respect to Taxes may, at the written election of Buyer, remain as (and be deemed) an Excluded Liability, to be paid in accordance with section 1129(a)(9) of the Bankruptcy Code under the Plan, so long as Buyer covenants to fund such payment obligations (it being understood, however, that any Taxes that are Assumed Liabilities hereunder shall be determined after giving effect, to the extent possible, to available deductions for net operating losses of the Debtors).

01:16805982.1

| | |
|---|---|
| | (16) The break-up fee and expense reimbursement payable to B. Riley (the "<u>Break-Up Fee Payment</u>"), pursuant to the PSA Order (it being understood that Buyer shall pay the Break-Up Fee Payment when due). |
| | (17) Claims for stub-rent pursuant to section 503(b) of the Bankruptcy Code (it being understood that Buyer shall pay such amounts no later than the later of (a) 10 days following Closing and (b) the last day of the month in which the Closing occurs). |
| | (*see* defined terms of APA (pg. 2); Schedule 2.3 of APA) |
| **Excluded Assets** | The following assets of the Debtors: (a) all of the Debtors' and their respective Affiliates' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Debtor or any of its Affiliates as a corporation, limited liability company or other entity; (b) all equity securities of any Debtor and all net operating losses of any Debtor (it being understood, however, that any such net operating losses shall, to the extent possible, be applied so as to reduce any Taxes that are Assumed Liabilities under the APA); (c) all Leases (and related Leased Real Property) and Contracts, in each case, other than the Assumed Contracts; (d) the Excluded Claims; (e) any loans or notes payable to any Debtor or any of its Affiliates from any employee of any Debtor or any of its Affiliates (other than Ordinary Course of Business employee advances and other than loans or notes from any Transferred Employees); (f) any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that the Debtors are required by Law to retain and (3) any Records or other documents relating to the Cases that are protected by the attorney-client privilege; <u>provided</u> that Buyer shall have the right to make copies of any portions of such retained Records to the extent that such portions relate to the Business or any Acquired Asset; (g) all Permits other than the Assumed Permits; (h) all assets maintained pursuant to or in connection with any Employee Benefit Plan (other than the Health Plans); and (i) the rights of Sellers under the APA and all cash and non-cash consideration payable or deliverable to the Debtors under the APA. |
| | (*see* defined terms of APA (pp. 6-7)) |
| **Permitted Liens** | Permitted Liens means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings; (b) with |

| | respect to leased or licensed personal property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assumed Contract; (c) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business for amounts which are not delinquent and which are not material or which are being contested in good faith by appropriate proceedings; (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property; and (f) matters that would be disclosed on an accurate survey or inspection of the real property but which do not interfere in any material respect with the right or ability to use the property as currently used or operated or to convey fee simple title.<br><br>(*see* defined terms of APA (pp. 11-12)) |
| **BofA Liens** | The security interests of Bank of America in the DIP Collateral, including (a) the Cash Management/Indemnity Account and (b) the L/C Cash Collateral Account.<br><br>(*see* defined terms of APA (pg. 3); ¶ 49 of the Sale Order) |

19.    The following chart discloses certain information required pursuant to Local Rule

6004-1(b):

| **Term** | **Description** |
|---|---|
| **Sale to Insider**<br>*Local Bankr. R.*<br>*6004-1(b)(iv)(A)* | Neither Buyer nor any of its respective affiliates, present members, officers, directors, partners, shareholders or any of their respective heirs, successors and assigns is an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. |
| **Agreements with Management**<br>*Local Bankr. R.* | At Closing, Buyer will offer employment to Edmond Thomas, Christine Lee, Jon Kubo, Rachel Page, Tom Hillebrandt and Kim Bajrech, on the terms outlined in the email exchange between Edmond |

| | |
|---|---|
| *6004-1(b)(iv)(B)* | Thomas and Greg Segall on March 7, 2015 concluding at 4:21 p.m. Pacific Time, which is Exhibit 9 to the Auction Transcript. |
| **Releases** *Local Bankr. R. 6004-1(b)(iv)(C)* | Mutual releases between Buyer and the Debtors, covering their respective related and affiliated parties.<br><br>(*see* § 9.21 of APA; ¶¶ 50 & 51 of the Sale Order) |
| **Private Sale/No Competitive Bidding** *Local Bankr. R. 6004-1(b)(iv)(D)* | The Debtors selected Buyer after conducting (i) a marketing process in accordance with the Bidding Procedures Order and (ii) the Auction on March 10 and 12, 2015.  At the conclusion of the Auction, Buyer was selected by the Debtors, in consultation with the Committee, as the Successful Bidder. |
| **Closing and Other Deadlines** *Local Bankr. R. 6004-1(b)(iv)(E)* | Buyer's obligation to consummate the Transactions is subject to satisfactions of the following conditions (all of which may be waived): (a) no material breach of the Debtors' representations and warranties; (b) no breach of the Debtors' covenants; (c) performance of the Debtors' obligations under the Employee Benefit Plans; (d) there are no laws in effect making the Closing illegal; (e) the Sale Order has become a Final Order; (f) from the date of the APA until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect; and (g) delivery of certain officer's certificates from the Debtors.<br><br>The Debtors' obligation to consummate the Transactions is subject to satisfactions of the following conditions (all of which may be waived): (a) no material breach of Buyer representations and warranties; (b) no breach of Buyer's covenants; (c) there are no laws in effect making the Closing illegal; (d) the Sale Order has become a Final Order; and (e) delivery of certain officer's certificates from Buyer.<br><br>(*see* §§ 7.1 & 7.2 of APA) |
| **Good Faith Deposit** *Local Bankr. R. 6004-1(b)(iv)(F)* | Prior to the execution of the APA and in accordance with the Bidding Procedures Order, Buyer made a cash deposit in the amount of $1,500,000 (the "Initial Deposit") by wire transfer of immediately available funds.  Upon entry of the Sale Order by the Bankruptcy Court, Buyer shall make an additional cash deposit in the amount of $1,000,000 (the "Additional Deposit").<br><br>(*see* § 2.11 of APA) |
| **Interim Arrangements with Buyer** *Local Bankr. R. 6004-1(b)(iv)(G)* | Prior to Closing, the Debtors and Buyer shall use reasonable best efforts to perform and satisfy all conditions to each of their respective obligations to consummate the Transactions contemplated by the APA.<br><br>The Debtors shall give any notices to third parties, and each Debtor shall use its reasonable best efforts to obtain any third party consents or sublicenses. |

01:16805982.1

| | |
|---|---|
| | Prior to Closing, the Debtors shall make certain filings with the Court, including this Motion.<br><br>Until the Closing, the Debtors shall use their commercially reasonable efforts to: (i) operate the Business in the Ordinary Course of Business, including ordering and purchasing Inventory, and making capital, sales and marketing expenditures, (ii) preserve in all material respects the Acquired Assets (excluding sales of Inventory in the Ordinary Course of Business), and (iii) preserve their current relationships with the suppliers, vendors, customers, clients, contractors and other Persons having business dealings with the Business.<br><br>The Debtors and Buyer shall promptly disclose to each other, after attaining knowledge (as applicable to each of the Debtors and Buyer) of any material failure of any of the Debtors or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under the APA in any material respect.<br><br>Upon reasonable advance written request by Buyer, the Debtors shall permit Buyer to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of the Debtors, to all premises, properties, personnel, Records and Contracts related to the Business, in each case, for the sole purpose of evaluating the Business.<br><br>Prior to the Closing and for a period of ninety days following the Closing Date, no Party shall issue any press release or make any public announcement relating to the subject matter of the APA without the prior written approval of each of Buyer and the Debtors.<br><br>The Debtors shall seek and use their respective commercially reasonable efforts to arrange meetings and telephone conferences with material suppliers of the Debtors as may be reasonably requested by Buyer and necessary and appropriate for Buyer to coordinate transition of such suppliers following the Closing.<br><br>The Debtors shall not initiate, solicit, engage in, or consummate any competing transactions.<br><br>No later than March 20, 2015, the Debtors shall deliver to Buyer the "Disclosure Schedule" contemplated under the APA.<br><br>*(see* § 5 of APA) |
| **Use of Proceeds** | None. |

| | |
|---|---|
| *Local Bankr. R. 6004-1(b)(iv)(H)* | |
| **Tax Exemption** *Local Bankr. R. 6004-1(b)(iv)(I)* | None. |
| **Record Retention** *Local Bankr. R. 6004-1(b)(iv)(J)* | From and after the Closing, Buyer shall promptly provide to the Debtors and their respective Representatives and the Trustee (after reasonable notice and during normal business hours and without charge to the Debtors) access to all Records included in the Acquired Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for the Debtors or the Trustee (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) seven years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Cases or (iv) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes.  Such access shall include access to any information in electronic form to the extent reasonably available.  The Debtors have the right to retain originals or copies of all of Records included in the Acquired Assets for periods prior to the Closing.  Prior to destroying any Records included in the Acquired Assets for periods prior to the Closing, Buyer shall notify the Debtors thirty days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Debtors to retain such Records, at Debtors' cost and expense. With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that the Debtors and the Trustee may request in defending or prosecuting such Litigation or claim and shall make available to the Debtors and the Trustee such personnel as are most knowledgeable about the matter in question, all without charge.<br><br>(*see* § 6.3 of APA) |
| **Sale of Avoidance Actions** *Local Bankr. R. 6004-1(b)(iv)(K)* | Certain "Acquired Avoidance Actions" will be acquired by Buyer as part of the Acquired Assets.  Acquired Avoidance Actions means all causes of action, lawsuits, claims, rights of recovery and other similar rights of any Debtor, including avoidance claims or causes of action under Chapter 5 of the Bankruptcy Code, (i) against landlords, vendors or other counterparties who are party to any Assumed Contract, (ii) against any Participating Vendor and/or (iii) relating in any way to any party who was a beneficiary of a letter of credit or |

|  | holding proceeds of a letter of credit on or before the Closing Date.<br><br>(*see* defined terms of APA (pg. 2); § 2.1(q) of APA)<br><br>Upon execution by a vendor (such vendor, a "<u>Participating Vendor</u>") of an agreement with Buyer, in form and substance acceptable to Buyer, to continue to participate in and extend trade credit going forward in connection with the operation of the Business by Buyer (such agreement, a "<u>Participating Vendor Agreement</u>") no later than ninety (90) days following the Closing Date, the applicable Participating Vendor shall be entitled to a waiver and release of any and all claims and causes of action against such Participating Vendor arising under section 547 of the Bankruptcy Code; and (b) the Debtors shall not pursue any litigation, claims and/or causes of action (including causes of action under Chapter 5 of the Bankruptcy Code) against any Participating Vendor (or any vendor who could be a Participating Vendor, unless and until it is determined that such vendor is not a Participating Vendor, in which case, the Debtors may only pursue a claim or cause of action against such vendor to the extent such claim or cause of action is an Excluded Asset hereunder).<br><br>(*see* § 6.9 of APA) |
| **Successor Liability**<br>*Local Bankr. R. 6004-1(b)(iv)(L)* | Except as expressly provided in the APA with respect to Assumed Liabilities, Buyer and its respective affiliates, present members, officers, directors, partners, shareholders or any of their respective heirs, successors and assigns (each such entity individually and taken together, the "<u>Buyer Group</u>") shall have no liability whatsoever with respect to the Debtors' (or their predecessors or affiliates) respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as described below, "<u>Successor or Transferee Liability</u>") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of any settlement or injunction, or any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets or the Business prior to the Closing or such later time as Buyer is assigned and assumes any Assumed Contract.<br><br>Except as expressly provided in the APA with respect to the Assumed Liabilities, nothing in the APA shall require the Buyer Group to (a) continue or maintain in effect, or assume any liability in respect of any |

| | |
|---|---|
| | employee, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtors are a party or have any responsibility therefor including medical, welfare and pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.<br><br>Effective upon the Closing, all persons and entities shall be forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer Group, or its assets (including the Acquired Assets), with respect to any (a) Adverse Interest or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Adverse Interest; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.<br><br>(*see* ¶¶ 19-21 of the Sale Order) |
| **Sale Free and Clear of Unexpired Leases** *Local Bankr. R. 6004-1(b)(iv)(M)* | None. |
| **Credit Bid** *Local Bankr. R. 6004-1(b)(iv)(N)* | A portion of the Purchase Price is composed of (i) Credit Bid of all the DIP Financing Obligations held by Buyer, (ii) a Credit Bid of a portion of the DIP Financing Obligations held by Buyer plus the assumption by Buyer of the remaining outstanding DIP Financing Obligations and/or (iii) the assumption by Buyer of all of the outstanding DIP Financing Obligations.<br><br>(*see* § 2.5(b) of APA) |
| **Relief from Bankruptcy Rule** | The Debtors seek a waiver of the 14-day stays under Bankruptcy Rules 6004(d) and 6004(h), as described in more detail below. |

01:16805982.1

| 6004(h) *Local Bankr. R. 6004-1(b)(iv)(O)* | (*see* §§ 8.1(d) & 8.1(e) of APA) |
|---|---|

## II.  Assumption and Assignment of Certain Assumed Contracts as of the Closing Date

20.     In accordance with the APA, the Debtors seek to assume and assign to Buyer certain of the Assumed Contracts as of the Closing Date, free and clear, to the maximum extent permitted by law, of all Adverse Interests pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and to execute and deliver to Buyer such documents or other instruments as may be necessary to assign and transfer such Assumed Contracts to Buyer.  In connection therewith, the Debtors propose the following with respect to the Assumed Contracts to be assumed and assigned to Buyer as of the Closing Date:

    a.     On or before March 18, 2015, the Debtors shall have caused to be served by first-class mail a cure notice (the "Cure Notice"), and shall have provided a copy of the same to Buyer.  The Cure Notice informs each recipient that its respective Contract or Lease may be designated by Buyer as either assumed or rejected, and the timing and procedures relating to such designation, and, to the extent applicable (i) the title of the Contract or Lease, (ii) the name of the counterparty to the Contract or Lease, (iii) the Debtors' good faith estimates of the cure amounts, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts (the "Cure Amounts") required in connection with such Contract or Lease, (iv) the identity of Buyer and (v) the deadline (the "Assumed Contracts Objection Deadline") by which any such Contract or Lease counterparty may file an objection to the proposed assumption and assignment and/or Cure Amounts, and the procedures relating thereto.

    b.     Buyer shall have, prior to the hearing on the Motion, identified the Contracts and Leases that Buyer has decided will be Assumed Contracts to be assumed and assigned to Buyer on the Closing Date by providing a list thereof to the Debtors (as updated in accordance with the APA, the "Closing Assumed Contract List"), which Closing Assumed Contract List the Debtors shall have filed with the Court prior to the hearing on this Motion.

01:16805982.1

c.  Unless otherwise ordered by the Court, the payment of the applicable Cure Amounts by Buyer shall (a) effect a cure of all defaults existing under an Assumed Contract as of the Closing, (b) compensate for any actual pecuniary loss to such non-Debtor counterparty resulting from such default, and (c) together with the assumption of the Assumed Contracts by the Debtors and the assignment of the Assumed Contracts to Buyer, constitute adequate assurance of future performance thereof.

d.  Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the counterparty to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract, shall constitute unenforceable anti-assignment provisions that are void and of no force and effect with respect to the Debtors' assumption and assignment of such Assumed Contracts in accordance with the APA but will be effective and binding upon Buyer with respect to any purported assignment for the remaining term of any Assumed Contract.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Buyer of the Assumed Contracts shall be deemed to have been satisfied.  Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts, and such Assumed Contracts shall remain in full force and effect for the benefit of Buyer.

e.  Each non-Debtor counterparty to the Assumed Contracts shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or Buyer or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing or the transfer of the Acquired Assets, including any breach related to or arising out of change-in-control in such Assumed Contracts, or any purported written or oral modification to the Assumed Contracts and (b) asserting against Buyer (or its property, including the Acquired Assets) any claim, counterclaim, defense, breach, condition, setoff asserted or assertable against the Debtors existing as of the Closing or arising by reason of the transfer of the Acquired Assets, except for the Assumed Liabilities, *provided, however*, that Buyer shall be responsible for continuing obligations under the Assumed Contracts, *cum onere*, including, without limitation, liabilities for any breach of such Assumed Contracts occurring after such assignment and obligations to pay year-end adjustment and reconciliation amounts that become obligations after the date of entry of the order approving this Motion, including tax reconciliations, common area charges and insurance premiums, under the terms of the applicable unexpired lease of real property, subject to any defenses provided by such lease.

01:16805982.1

f.      Upon the Closing, Buyer shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts and shall pay all outstanding undisputed cure amounts with respect thereto, and the Debtors shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assumed Contracts for any breach thereof occurring after such assignment. There shall be no rent accelerations, assignment fees, increases or any other fees charged to Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts. To the extent there are any disputed cure amounts for any Assumed Contract, the Debtors will set a status conference with the Court not less than thirty (30) days following the Closing to address any remaining issues that cannot be resolved informally between the parties.

g.      Up to three (3) business days prior to the Closing Date, Buyer may, in its sole discretion, add or remove any Contract or Lease as an Assumed Contract to be assumed and assigned to Buyer on the Closing Date by amending the Closing Assumed Contract List, and, in connection with the Closing, the Debtors shall move in the Court to assign any such Contract or Lease on the Closing Assumed Contract List to Buyer, and at the Closing shall assume and assign to, and Buyer shall accept the assignment of and assume such Contract or Lease.

h.      Any Cure Amounts with regard to Assumed Contracts listed in the Closing Assumed Contract List shall be paid by Buyer at the Closing.

i.      In advance of the Closing Date, Buyer may, in its sole discretion, designate a Contract or Lease for exclusion and rejection by delivering written notice to the Debtors and, in connection with the Closing, the Debtors shall move to reject any such Contract or Lease as of the Rejection Effective Date (as defined below).

## III.    Assumption and Assignment Procedures and Rejection Procedures for Contracts and Leases To Be Assumed and Assigned or Rejected After the Closing Date

21.     In addition to seeking to assume and assign to Buyer each of the Assumed

Contracts as of the Closing Date, the Debtors submit that it is necessary to establish certain

Assumption and Assignment Procedures with respect to Contracts and Leases to be assumed and

assigned to Buyer from and after the Closing Date through the Designation Deadline.[5]

Accordingly, the Debtors propose the following Assumption and Assignment Procedures:

a.   From and after the Closing Date through the Designation Deadline, Buyer shall provide written notice to the Debtors (and the Debtors shall provide such notice to the affected landlords or counterparties within three (3) Business Days of receiving such notice from Buyer, which notice the Debtors agree to provide) designating certain Contracts and Leases as Assumed Contracts; *provided*, *however*, that Buyer shall assume at least 140 Leases as of the Designation Deadline, subject to the terms of the APA.  With respect to any such Contracts and Leases that Buyer designates as Assumed Contracts after the Closing Date, within three (3) Business Days following delivery of the notification by Buyer, the Debtors will file with the Court a written notice of the Debtors' intent to assume and assign such Contract or Lease (an "<u>Assumption Notice</u>"), substantially in the form attached hereto as **<u>Exhibit 2</u>** to the Sale Order, and shall serve such Assumption Notice via overnight delivery on each of the following parties (the "<u>Assumption Notice Parties</u>"):  (a) each counterparty or landlord to any Contract or Lease (and their counsel, if known) to be assumed or assigned by the Debtors, (b) the Office of the U.S. Trustee, (c) counsel to the Committee and (d) counsel to Buyer.

b.   The Assumption Notice will set forth the following information, to the best of the Debtors' knowledge:  (a) the street address of the real property that is the subject of any Lease that the Debtors seek to assume and assign or a description of the Contract that the Debtors seek to assume and assign, (b) the name and address of the affected counterparties or landlords (and their counsel, if known), (c) a description of the deadlines and procedures for filing objections to the Assumption Notice (as set forth below), (d) the name of Buyer (the "<u>Proposed Assignee</u>"), (e) information regarding how a non-debtor party to a Contract or Lease may obtain additional information regarding the Proposed Assignee, (f) any Cure Amounts that arise solely following the deadline to object to the Sale and have not otherwise been paid in the ordinary course, if any, and (g) the proposed order approving the assumption and assignment (the "<u>Assumption Order</u>"), substantially in the form attached as **<u>Annex 1</u>** to the Assumption Notice.

---

[5]  "<u>Designation Deadline</u>" is defined in the APA to mean May 15, 2015; provided, however, that Buyer may extend such date until June 30, 2015 if Buyer funds the costs to be incurred by the Debtors during the period following May 15, 2015 until June 30, 2015.  Notwithstanding the foregoing, the "Designation Deadline" with respect to the Lease for the Debtors' Headquarters (as defined in the APA) shall be the earlier of August 13, 2015 and 90 days after the entry of an order confirming the Plan (or such later date as may be agreed to by Buyer, Debtors and the landlord under the Lease for the Headquarters); provided, however, nothing in this Motion shall be deemed to extend the deadline for the Debtors to assume, assume and assign or reject the Lease for the Headquarters beyond the existing deadline; provided, further, that the Debtors reserve their right to seek such an extension beyond the existing deadline, pursuant to the Plan.

c.      A party in interest may object following the Closing to the proposed assumption and assignment by the Debtors of a Contract or Lease following the Closing. Any such objection to the proposed assumption and assignment by the Debtors of a Contract or Lease following the Closing must be in writing and filed and served so that such objection is filed with this Court and actually received by the Debtors and the Assumption Notice Parties no later than ten (10) days after the date the Debtors served the applicable Assumption Notice.

d.      If no timely permitted objection is filed and served with respect to the Assumption Notice, any non-Debtor party to such Contract or Lease shall be deemed to have provided the required consent to the assumption and assignment of such Contract or Lease, and the Debtors shall present the Assumption Order for entry by the Court. The Assumption Order shall provide, among other things, that (a) the assumption and assignment of such Contract or Lease is approved, final and effective pursuant to section 365 of the Bankruptcy Code as of the date of the Assumption Order and (b) the Proposed Assignee provided adequate assurance of future performance under the applicable Contract or Lease in accordance with section 365(f)(2)(B) of the Bankruptcy Code and if applicable, section 365(b)(3) of the Bankruptcy Code.

e.      If a timely permitted objection is properly filed and served on the Assumption Notice Parties in the manner specified above, unless the parties agree otherwise in writing, a hearing will be scheduled to consider that objection. If that objection is overruled by the Court or withdrawn, the assumption and assignment of the affected Contract or Lease shall be deemed effective as of the date of the Assumption Order.

f.      After the Closing and prior to the Designation Deadline, the Debtors shall not terminate, amend, supplement, modify, waive any rights under, or create any Adverse Interest with respect to any Contract or Lease, or take any affirmative action not required thereby, without the prior written consent of Buyer (not to be unreasonably withheld or delayed) unless Buyer has provided written notice to the Debtors designating such Contract or Lease for rejection pursuant to the terms of the APA. After receiving written notice from Buyer to assume and assign a Contract or Lease, the Debtors shall use commercially reasonable efforts to obtain an order of the Court to assume and assign such Contract or Lease to Buyer (the "Assumption Approval"). Any applicable Cure Amount for the assumption and assignment of a Contract or Lease shall be paid by Buyer. For any Contract or Lease that has not been designated as of the Closing as an Excluded Contract (as defined below) or an Assumed Contract under the APA, until the Rejection Effective Date or Assumption Approval, Buyer shall (i) pay to the Debtors or pay directly to the requisite third party, as applicable, an amount equal to the costs and expenses required to be paid by the Debtors after Closing in performing obligations under such Contracts and Leases, if any, as and when such amounts come due (subject to and in accordance with the APA) and (ii) be obligated to perform or cause to be performed all of the Debtors' obligations arising after the Closing under such Contract or Lease, and Buyer shall be entitled to all benefits

of the Debtors' thereunder; provided, that no Cure Amount shall be due with respect to such Contract or Lease unless and until such Contract or Lease is designated as an Assumed Contract and assumed at Assumption Approval.

g.     Any Cure Amounts with regard to Assumed Contracts, including any amounts payable to any landlord under any Lease that is an Assumed Contract that relates to the period prior to the Assumption Approval, shall be paid by Buyer, on or before the Assumption Approval, and not by the Debtors and the Debtors shall have no liability therefor, and neither the Cure Amounts paid by nor the expense of any other obligation set forth in Section 2.6(f) of the APA shall reduce, directly or indirectly, any consideration received by the Debtors thereunder.

22.     Finally, the Debtors submit that it is necessary to establish certain Rejection Procedures with respect to any Contract or Lease that Buyer does not want to assume and assign, either as of the Closing Date or from and after the Closing Date through the Designation Deadline.  Accordingly, the Debtors propose the following Rejection Procedures:

a.     From and after the Closing Date through the Designation Deadline, Buyer shall provide written notice to the Debtors designating certain Contracts and Leases for exclusion and rejection (or to be rejected to the extent executory) (each an "Excluded Contract").  Within three (3) Business Days following delivery of a notification by Buyer that a Contract or Lease is designated as an Excluded Contract, the Debtors shall move to reject such Contract or Lease by filing with the Court a written notice of the Debtors' intent to reject such Contract or Lease (a "Rejection Notice"), substantially in the form attached as **Exhibit 3** to the Sale Order, and shall serve such Rejection Notice via overnight delivery on each of the following parties (the "Rejection Notice Parties"):  (a) each counterparty or landlord to any Contract or Lease (and their counsel, if known) to be rejected by the Debtors, (b) the Office of the United States Trustee, (c) counsel to the Committee and (d) counsel to Buyer.

b.     The Rejection Notice will set forth the following information, to the best of the Debtors' knowledge: (a) the street address of the real property that is the subject of any Lease that the Debtors seek to reject or a description of the Contract that the Debtors seek to reject, (b) the name and address of the affected counterparties or landlords (and their counsel, if known), (c) a description of the deadlines and procedures for filing objections to the Rejection Notice (as set forth below), and (d) the proposed order approving the rejection (the "Rejection Order"), substantially in the form attached as **Annex 1** to the Rejection Notice.

c.     Should a party in interest object to the proposed rejection by the Debtors to a Contract or Lease, such party must file and serve a written objection so that such objection is filed with this Court and actually received by the Debtors and the Rejection Notice Parties no later than ten (10) days after the date the Debtors served the Rejection Notice.

d.     If a timely objection is properly filed and served on the Rejection Notice Parties, unless the parties agree otherwise in writing, a hearing will be scheduled to consider that objection. If that objection is overruled by the Court or withdrawn, the rejection of the affected Contract or Lease shall be deemed effective as of the later of (i) the date of delivery of such Rejection Notice to the Contract or Lease counterparty or (ii) in the case of a Lease, the date of surrender of the premises that are the subject of such Lease (such date, the "Rejection Effective Date"), as specified by Buyer in accordance with the APA.

e.     In connection with the rejection of a Lease, if the Debtors have deposited monies with a lessor as a security deposit or other arrangement, such lessor may not set off or recoup or otherwise use such deposit without the prior approval of the Court.

f.     If an affected landlord or counterparty or any other party in interest (the "Rejection Claimant") asserts a claim or claims against the Debtors arising from the rejection of a Contract or Lease, such Rejection Claimant shall submit a proof of claim on or before the later of (a) the date that is 30 days after the entry of the Rejection Order or (b) the bar date established by this Court for filing proofs of claim against the Debtors.  If the Rejection Claimant does not timely file such proof of claim, such claimant shall be forever barred from asserting a claim against the Debtors for such rejection damages.

g.     In the event Buyer has not provided a written designation to assume and assign or reject any Contract or Lease by the Designation Deadline, then such Contract or Lease shall be deemed to be an Excluded Contract and the Debtors may move to reject such Contract or Lease as of the Designation Deadline, and no Debtor shall have any obligation to assign such Contract or Lease to Buyer.

## RELIEF REQUESTED

23.     By this Motion the Debtors seek entry of the Sale Order, substantially in the form attached hereto as **Exhibit A**, (i) authorizing and approving the Debtors' entry into, performance under, and the terms and conditions of the APA, including without limitation, the Letter Agreement; (ii) authorizing and approving the Sale of the Acquired Assets free and clear of Adverse Interests; (iii) authorizing the assumption and assignment to Buyer of the Assumed

01:16805982.1

Contracts, in accordance with the APA; (iv) establishing assumption and rejection procedures for certain of the Contracts and Leases; and (v) granting related relief.

## BASIS FOR RELIEF

**I.    The Proposed Sale Is a Product of the Debtors' Sound Business Judgment and Should Be Approved**

24.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not set forth a standard for determining when a sale or disposition of property of the estate should be authorized, courts in the Third Circuit generally authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  *See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

25.     The sale of estate assets outside the ordinary course of business is appropriate if: (a) there is a sound business purpose for the sale; (b) the proposed sale price is fair; (c) the debtor has provided interested parties with adequate and reasonable notice; and (d) the buyer has acted in good faith.  *See*, *e.g.*, *In re Abbotts Dairies*, 788 F.2d at 145-57; *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).

26.     The Debtors respectfully submit that a sound business purpose exists to justify the Transactions.  A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve and enhance the value of the assets for the debtor's estate, its creditors, or interest holders.  *See, e.g., Committee*

*of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

27.    In this case, the Debtors' significant efforts pursuing higher and better offers for their assets culminated in the selection of Mador as the successful bidder at the Auction.  In light of the extensive time and resources spent pursuing a value-maximizing transaction for the Acquired Assets, the Debtors respectfully submit that the consideration provided by Buyer under the APA and the Letter Agreement constitutes or provides the highest or otherwise best offer and provides fair and reasonable consideration to the Debtors for the sale of all Acquired Assets and the assumption of all Assumed Liabilities, and the performance of the other covenants set forth in the APA and the Letter Agreement, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  In addition, the consummation of the Transactions pursuant to the APA will enable the Debtors to expeditiously confirm a chapter 11 plan of reorganization with the support of the Committee, Buyer and its affiliate Rodam, LLC ("Rodam"),[6] one of the Debtors' largest creditors.  Therefore, approval of this Motion, the APA, the Letter Agreement and the consummation of the Transactions is in the best interests of the Debtors, their respective creditors, estates and other parties in interest and there is substantial risk of deterioration of the value of the Acquired Assets if the Sale is not consummated quickly.

28.    The Debtors also submit that the APA, the Letter Agreement and the Transactions contemplated thereunder were proposed, negotiated and entered into by and between the

---

[6] "Rodam" is "Mador" spelled backwards.

01:16805982.1

Debtors, on the one hand, and Buyer, on the other hand, with the active involvement of the

Committee and the Debtors' officers and professionals.  The Debtors' entry into the APA has the

affirmative support of the Committee and the Committee is also a party to the Letter Agreement.

There is no evidence of fraud or collusion by any of those parties.  To the contrary, the APA and

Letter Agreement were intensely negotiated at arm's length over the course of three consecutive

days with all parties involved acting in good faith.  Furthermore, as discussed in more detail

below, Buyer is not an "insider" of the Debtors as that term is defined in section 101(31) of the

Bankruptcy Code.

29.     Finally, notice of this Motion will be provided to the Notice Parties (as defined

below) and in accordance with the requirements of the Bankruptcy Code, the Bankruptcy Rules,

and the Local Rules and as applicable under the circumstances.  In addition, the Debtors have

previously provided notice of the Bidding Procedures Order and have filed the Auction Results

Notice.

II.     **Sale of the Acquired Assets Should Be Granted Free and Clear of Substantially All Liens, Claims, Interests, Encumbrances, and Other Interests Pursuant to Section 363(f) of the Bankruptcy Code**

30.     Under section 363(f) of the Bankruptcy Code, a debtor may sell property "under

subsection (b) and (c) free and clear of any interest in such property of an entity other than the

estate."  In particular, section 363(f) authorizes a debtor to sell property free and clear if

01:16805982.1

(1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)      such entity consents;

(3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)      such interest is in bona fide dispute; or

(5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed Sale of the Acquired Assets.  *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002); *see also Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 257 (3d Cir. 2000) (discussing how section 363(f) authorizes the sale of a debtor's assets free and clear of all liens, claims and interests if "any one of [the] five prescribed conditions" is met).

31.      With respect to each of Liens against the Acquired Assets, the Debtors can satisfy at least one of the five conditions set forth in section 363(f).

32.      First, the Debtors believe that holders of the Liens have or will consent to a Sale to Buyer free and clear of their Liens under section 363(f)(2).

33.      Second, with respect to section 363(f)(3), the $7.5 million Cash Payment being provided by Buyer to the Debtors alone by far exceeds the total of all of the Liens against the Acquired Assets.  The Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs [Docket Nos. 360-67] (the "**Schedules**"), which were filed with the Court on February 27, 2015, reflect that there are no such Liens against the Acquired Assets;[7] and there is less than

---

[7] The Liens identified in the Schedules are on the BofA Accounts, which again are not Acquired Assets.

01:16805982.1

$350,000 in secured proofs of claim that have been filed to date relating to alleged liens against the Acquired Assets.[8]  The Debtors' pre-petition lenders' junior liens against the Acquired Assets secure only contingent indemnification claims.[9]  As of the Petition Date and as of the date of this Motion, no party has asserted any claim against the pre-petition lenders and those lenders hold no liquidated indemnification claims against the Debtors.  The Debtors are not aware of any claims against the pre-petition lenders, nor of any basis to object to or challenge their liens and claims.[10]  The Committee has fully investigated the pre-petition lenders' liens and claims and has concluded that there is no colorable basis on which to bring an objection or challenge with respect to those liens and claims.[11]  Nor has any other party sought standing to object to or challenge those liens and claims.  What is more, the pre-petition lenders' liens securing their contingent indemnification claims are themselves soon to be released under the BofA DIP Order. Upon the passage of the challenge date without any objection or challenge, pursuant to Paragraph 16 of the BofA DIP Order, the pre-petition lenders' liens against the property of the Debtors and their estates (other than the liens on the BofA Accounts, except to the extent otherwise provided in the BofA DIP Order) will be released.  Finally, pursuant to the Sale Order, the pre-petition lenders are more than adequately protected.  If the Motion is granted, until the pre-petition lenders' liens are to be released pursuant to Paragraph 16 of the BofA DIP Order, the pre-petition lenders' junior liens will attach as a first lien against the $7.5 million Cash Payment

---

[8]  The filed proofs of claim against the Debtors can be viewed at the website maintained by the Debtors' claims and noticing agent, at www.donlinrecano.com/wetseal, under the "Creditor/Claims Search" tab of the website.

[9]  The Debtors' approximately $1.5 million Cash/Management Indemnity Account and the Debtors' pre-petition and post-petition letter of credit accounts – in and against which Bank of America, N.A. and the Debtors' pre-petition lenders hold claims and interests – are not Acquired Assets.  The Debtors will continue to own the Cash/Management Indemnity Account and the letter of credit accounts following the Sale, provided that, after Closing, the Debtors must pay over any surplus from those accounts that they have a right to receive to Buyer.

[10]  Because the Debtors dispute that there are any colorable contingent indemnification claims secured by the junior liens, the Debtors may also sell the Acquired Assets free and clear of such those liens under section 363(f)(4).

[11]  The Committee has indicated that it intends to file a statement with the Court confirming this shortly.

01:16805982.1

(in addition to being secured by the existing $1.5 million Cash Management/Indemnity Account), which is an amount that indisputably not only exceeds any conceivable claim against the pre-petition lenders that may give rise to an indemnity claim, but represents an improvement of position to those lenders' current junior lien against illiquid assets of the Debtors' estates.

34.     Accordingly, the Debtors request that the Sale be approved "free and clear," with any Liens, claims, encumbrances, and other Adverse Interests to attach to the net proceeds of the Sale in the order of their priority, with the same validity, force and effect that they now have against the Acquired Assets, subject, with respect to such net proceeds, to any rights, claims and defenses the Debtors or any parties in interest may possess with respect thereto.

## III.    The APA Has Been Negotiated in Good Faith and Buyer Should be Granted the Protection of Section 363(m) of the Bankruptcy Code

35.     As described above, the Debtors and Buyer negotiated the APA in good faith and at arm's length, with the active involvement of the Committee.  Accordingly, Buyer is entitled to the protections afforded by Bankruptcy Code section 363(m).  Section 363(m) provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets.  The Third Circuit has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a

debtor's interest in executory contracts under section 365 of the Bankruptcy Code.  See *Krebs*

*Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 497-98 (3rd. Cir. 1998).

36.     Although the Bankruptcy Code does not define "good faith purchaser," the Third

Circuit has stated that a good faith purchaser is "one who purchases in 'good faith' and for

'value.'"  *In re Abbotts Dairies*, 788 F.2d at 147.  To constitute a lack of good faith, a party's

conduct in connection with the sale usually must amount to "fraud, collusion between the

purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other

bidders."  *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *see*

*also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona*

*Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995).

37.     The APA, the Letter Agreement and the Transactions contemplated thereunder

were proposed, negotiated and entered into by and between the Debtors, on the one hand, and

Buyer, on the other hand (and in the case of the Letter Agreement, the Committee), without

collusion, in good faith and at arm's length.  The Debtors, Buyer, and the Committee were each

represented by competent counsel in connection with the negotiation and documentation of the

APA and Letter Agreement.  Neither Buyer nor any other entity in Buyer Group is an "insider"

of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

Furthermore, there has been no showing that the Debtors, Buyer or the Committee is entering

into the APA and the Letter Agreement or proposing to consummate the Transactions for the

purpose of hindering, delaying or defrauding any creditor, or fraudulently.

38.     For all of these reasons, the Debtors request that the Court determine that

(i) Buyer is entering into the Transactions in good faith and is a good faith buyer within the

meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full

protection of that provision, and (ii) the APA does not constitute an avoidable transaction

pursuant to section 363(n) of the Bankruptcy Code.

## IV.    The Sale Does Not Require the Appointment of a Consumer Privacy Ombudsman

39.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or

release personally identifiable information about individuals unless such sale or lease is

consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to

section 332 of the Bankruptcy Code.   11 U.S.C. § 363(b)(1).

40.    Buyer shall be subject to the provisions of the Debtors' longstanding privacy

policy, which broadly provides that, if the Debtors or any portion of their assets are acquired, the

Debtors may share all types of information with the acquiring company.[12]   Therefore,

appointment of a consumer privacy ombudsman is not appropriate.  *See*, *e.g.*, *In re Crucible

Materials Corp.*, 2009 Bankr. LEXIS 4893, at *16 (Bankr. D. Del. Aug. 31, 2009) (no

appointment of consumer privacy ombudsman required where sale of assets complied with

debtors' privacy policy); *In re Penn Traffic Co.*, 2010 Bankr. LEXIS 5399, at *14 (Bankr. D.

Del. Jan. 8, 2010) (same).

## V.    The Assumption and Assignment of the Assumed Contracts Should Be Approved

41.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign

executory contracts and unexpired leases, subject to the approval of the Court, provided that the

defaults under such contracts and leases are cured and adequate assurance of future performance

is provided.  The debtor's decision to assume or reject an executory contract or unexpired lease

must only satisfy the business judgment test and will not be subject to review unless such

decision is clearly an unreasonable exercise of such judgment.  *See*, *e.g.*, *Sharon Steel Corp. v.*

---

[12]  The Debtors' privacy policy is posted at http://www.wetseal.com/privacy-policy/privacy-policy.html.

*Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *In re Penn Traffic Co.*, 524

F.3d 373, 383 (2d Cir. 2008) (business judgment test "rather obviously presupposes that the

estate will assume a contract only where doing so will be to its economic advantage").  The

business judgment test "requires only that the trustee [or debtor in-possession] demonstrate that

[assumption or] rejection of the contract will benefit the estate."  *Sharon Steel*, 872 F.2d at 40.

42.    Once an executory contract is assumed, the trustee or debtor in possession may

elect to assign such contract.  *See L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home*

*Ctrs., Inc.)*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a

means to maximize the value of the debtor's estate").  Section 365(f) of the Bankruptcy Code

provides that the "trustee may assign an executory contract . . . only if the trustee assumes such

contract and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The

meaning of "adequate assurance of future performance" depends on the facts and circumstances

of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes. Inc.*

*v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re*

*Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future

performance does not mean absolute assurance that debtor will thrive and pay rent).

43.    The Debtors submit that the assumption of the Assumed Contracts and their

assignment to Buyer as of the Closing Date is necessary to the consummation of the Transactions

and is well within the Debtors' sound business judgment.  The Assumed Contracts are necessary

to run the Debtors' business, and as such, they were essential to inducing the highest or

otherwise best offer for the Acquired Assets.  It is also unlikely that any purchaser would want to

acquire any company on a going-concern basis unless a significant number of the contracts and

leases needed to conduct the business and manage the day-to-day operations were included in the

01:16805982.1

transaction.  In addition, the APA and Sale Order provide that the Debtors and/or Buyer will have (i) cured and/or provided adequate assurance of cure of any default existing prior to the date of the Sale Order under all of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default existing prior to the date of the Sale Order under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.

44.     Counterparties to the Assumed Contracts will be provided with a Cure Notice and will have an opportunity to object to the potential assumption and assignment of their Assumed Contracts prior to the entry of the Sale Order.  As set forth in the Sale Order, any counterparty that fails to object to the proposed assumption and assignment of any Assumed Contract will be deemed to consent to that assumption and assignment pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the Cure Amounts identified in the Cure Notice.  *See*, *e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor was deemed to have consented to sale by not objecting to sale motion).

45.     Accordingly, the Debtors submit that the assumption of the Assumed Contracts and their assignment to Buyer on the Closing Date should be approved as an exercise of the Debtors' sound business judgment.

## VI.    The Procedures for Assumption and Assignment and Rejection of Contracts and Leases Are Appropriate and Should Be Approved

46.     As set forth above, the APA contemplates that the Debtors may assume and assign to Buyer or reject certain Contracts and Leases from and after the Closing Date and through the Designation Deadline.  The Assumption and Assignment Procedures and Rejection Procedures each establish a process by which (a) the Debtors, after given instruction by Buyer,

may designate certain Contracts and Leases for assumption and assignment or rejection, and

provide notice to parties in interest; (b) Buyer and/or the Debtors can reconcile Cure Amounts, if

any, and provide adequate assurance of future performance with respect to Contracts and Leases

to be assumed and assigned; and (c) counterparties to the Contracts and Leases can object to the

proposed assumption and assignment or rejection and/or to the related Cure Amounts.

47.    The Debtors submit that the Assumption and Assignment Procedures and

Rejection Procedures are fair and reasonable, provide sufficient notice to the counterparties to

each Contract or Lease, and provide certainty to all parties in interest regarding their obligations

and rights in respect thereof.  Accordingly, the Debtors request the Court approve the

Assumption and Assignment Procedures and Rejection Procedures set forth in the Sale Order.

**VII.    The Letter Agreement Is an Integral Part of the APA and Should Be Approved**

48.    The Letter Agreement was negotiated among the Debtors, Buyer, and the

Committee as an indispensable part of the overall APA negotiations and, as such, constitutes an

integral part of the APA.  Specifically, the Letter Agreement sets forth certain agreements among

the Debtors, Buyer, and the Committee, including without limitation that:

a.    Any plan of reorganization to be proposed by the Debtors and/or the Committee shall be consistent with the terms and conditions of the APA and in a form reasonably acceptable to Buyer (the "Plan").

b.    The Plan shall contain releases and exculpations, including, without limitation, for (a) Buyer, (b) all current and former members of the Committee, (c) the Debtors and (d) each of their respective officers, directors, members, affiliates, subsidiaries, professionals, advisors, representatives, agents, successors and assigns.

c.    Buyer shall cause those claims previously held by Hudson Bay Master Fund Ltd. to be voted in favor of the Plan (the "Claims").

d.    The Claims shall be subordinated for distribution purposes under the Plan.

01:16805982.1

e.   Buyer shall not consent or agree to the allowance or reclassification of any claim as a general unsecured claim without the written consent of the Debtors and Committee or any trustee of a trust appointed in connection with the Plan (the "Trustee"), as applicable, or by Order of the Court.

f.   No amendments to the Plan shall be made by any party that adversely affects the rights or recoveries of the general unsecured creditors without the Committee's consent.

g.   The consideration paid by Buyer under the APA is the only consideration to be provided by Buyer in connection with the Plan.

h.   There shall be no option for the general unsecured creditors or any other creditors to receive equity in or from Buyer or any of its affiliates under the Plan.

i.   Neither the Debtors nor the Trustee shall consent or agree to the allowance or reclassification of any claim as an Administrative Claim (as defined in the APA) or Priority Claim (as defined in the APA) without the written consent of Buyer.

j.   At Buyer's election, in accordance with the APA, any priority tax claim shall be retained by the Debtors' estates and paid in accordance with Section 1129(a)(9) of the Bankruptcy Code; provided that Buyer shall be obligated to make any and all such payments.

k.   The Trustee and any oversight committee members shall be selected by the Committee, in the Committee's sole discretion.

l.   Buyer shall have no liability for any costs of administering any trust established under the Plan.

m.   Buyer shall have the ability to designate any of the Debtors' executory contracts or unexpired leases for assumption or rejection to and including May 15, 2015 subject to the terms and conditions of the APA; *provided*, *however*, that Buyer may extend such date until June 30, 2015 if Buyer funds the costs to be incurred by the Debtors during the period following May 15, 2015 and to and including June 30, 2015 (the "Extended Designation Deadline").

n.   The Plan shall be effective no earlier than May 15, 2015, unless agreed by Buyer. To the extent that Buyer exercises its option for the  Extended Designation Deadline, the Plan shall be effective no earlier than June 30, 2015, unless agreed by Buyer.  Further, as provided in the APA, Buyer shall fund the costs incurred by the Debtors that arise from and during the Extended Designation Period.

o.      Notwithstanding the foregoing, with respect to the Debtors' lease for the offices located at 26972 Burbank, Foothill Ranch, CA 92610 (the "Headquarters Lease"), Buyer shall be entitled to assume or reject the Headquarters Lease until the earlier of (a) August 13, 2015 and (b) 90 days after the entry of an order confirming the Plan (or such later date as may be agreed to by Buyer, the Debtors and the landlord under the Headquarters Lease.

49.     The terms of the Letter Agreement will ensure that the Debtors, the Committee, Buyer, and its affiliate Rodam, the Debtors' largest creditor, not only support approval of the APA, but also proceed together expeditiously towards confirmation of a Plan.  This Court, however, is not being asked to pre-approve the terms of the Plan itself, and approval of  the Letter Agreement does not assure that the Plan will be confirmed.  In fact, the proposed Sale Order expressly states: "To the extent that the Letter Agreement contains any agreements relating to a potential plan of reorganization to be proposed in these Cases, these provisions are agreements between the Debtors, the Official Committee of Unsecured Creditors and the Buyer and this Order shall not be deemed to approve such provisions of the Letter Agreement."  Sale Order at p.3 n.3.  Accordingly, any and all confirmation matters will be addressed at a confirmation hearing in a distinct inquiry which examines whether the Plan satisfies the applicable standards under the Bankruptcy Code, at which parties in interest may object to the Plan on any number of grounds.  What entry into the Letter Agreement does do, however, is allow the Debtors a chance to propose a viable Plan for confirmation, with the full support of the Committee, Buyer and Rodam, one of the Debtors' largest creditors.

**WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d)**

50.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order.  Under Bankruptcy Rule

01:16805982.1

6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen (14) days after entry of the order.

51.     Timely consummation of the Transactions is of critical importance to Buyer and the Debtors' efforts to preserve and maximize the business and the value of the assets available to the estates.  As such, the Debtors submit that cause exists and request that the Court waive the fourteen (14) stay periods contemplated under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

52.     The Debtors will provide notice of this Motion, together with copies of the proposed Sale Order (exclusive of exhibits), by overnight mail to: (i) the office of the U.S. Trustee, (ii) counsel to the Committee; (iii) counsel to B. Riley, (iv) counsel to Bank of America, N.A., (v) counsel to the Pre-Petition Secured Parties, (vi) counsel to Buyer, (vii) any party that has asserted or that the Debtors believe may assert a lien in the Debtors' assets; (viii) all parties who have filed a notice of appearance and request for service of papers in the Cases pursuant to Bankruptcy Rule 2002; (ix) each of the Debtors' current landlords and each counterparty to the Debtors' Contracts (as defined in the APA); (x) the United States Internal Revenue Service; and (xi) the United States Securities and Exchange Commission (collectively, the "Notice Parties"). The notice shall provide that copies of the Motion and Sale Order (inclusive of exhibits) shall be available free of charge at: www.donlinrecano.com/wetseal.  In addition, the Debtors will provide a two-page notice of this Motion by regular United States mail to all of the Debtors' other creditors and parties-in-interest in these Cases, other than the Debtors' current and former employees.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

01:16805982.1

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that this Court enter an the Sale Order, substantially in the form attached hereto as **Exhibit A**, (i) granting the relief sought herein, and (ii) granting such other and further relief as it deems just and proper.

Dated:  March 16, 2015
      Wilmington, Delaware

*/s/ Maris J. Kandestin*

Michael R. Nestor, Esq. (DE Bar No. 3526)
Maris J. Kandestin, Esq. (DE Bar No. 5294)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:    (302) 571-1253
Email:  mnestor@ycst.com
       mkandestin@ycst.com

and

Lee R. Bogdanoff, Esq.
Michael L. Tuchin, Esq.
David M. Guess, Esq.
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel:     (310) 407-4022
Fax:    (310) 407-9090
Email: lbogdanoff@ktbslaw.com
      mtuchin@ktbslaw.com
      dguess@ktbslaw.com

*Counsel for the Debtors and Debtors in Possession*