## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| SEAL123, INC., *et al.*,[1] | Case No.: 15-10081 (CSS) |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT PLAN OF LIQUIDATION OF SEAL123, INC. AND SUBSIDIARY DEBTORS AND THEIR OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Michael R. Nestor, Esq. (DE Bar No. 3526)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Email: mnestor@ycst.com


Lee R. Bogdanoff, Esq.
Michael L. Tuchin, Esq.
David M. Guess, Esq.
KLEE, TUCHIN, BOGDANOFF & STERN  LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel:    (310) 407-4022
Fax:    (310) 407-9090
Email: lbogdanoff@ktbslaw.com
         mtuchin@ktbslaw.com
         dguess@ktbslaw.com

*Counsel to the Debtors and Debtors in Possession*

Jeffrey N. Pomerantz, Esq.
PACHULSKI, STANG, ZIEHL & JONES, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jnpomerantz@pszjlaw.com

Robert J. Feinstein, Esq.
PACHULSKI, STANG, ZIEHL & JONES, LLP
780 Third Ave., 34th Floor
New York, NY 10017-2024
Tel: (212) 561-7700
Fax: (212) 561-7777
Email: rfeinstein@pszjlaw.com

Bradford J. Sandler, Esq. (DE Bar No. 4142)
PACHULSKI, STANG, ZIEHL & JONES, LLP
919 North Market St., 17th Floor
Wilmington, Delaware 19801
Tel: (302) 652-4100
Fax: (302) 652-4400
Email: bsandler@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Seal123, Inc. (f/k/a The Wet Seal, Inc.) (5940); Seal123 Retail, Inc. (f/k/a The Wet Seal Retail, Inc.) (6265), Seal123 Catalog, Inc. (f/k/a Wet Seal Catalog, Inc.) (7604), and Seal123 GC, LLC (f/k/a Wet Seal GC, LLC (2855-VA). The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

# DISCLAIMER

**THIS DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE FIRST AMENDED JOINT PLAN OF LIQUIDATION OF SEAL123, INC. AND SUBSIDIARY DEBTORS AND THEIR OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THAT THE PLAN PROPONENTS (DEFINED BELOW) ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT.   THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE PLAN.  ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF, OR ARE INCONSISTENT WITH, SUCH DOCUMENTS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES.  ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.**

**THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN.  ALTHOUGH THE PLAN PROPONENTS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERY UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OCCUR.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY FEDERAL, STATE, LOCAL OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. PERSONS OR ENTITIES HOLDING OR TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING, SECURITIES OR CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

**THE PLAN PROPONENTS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER THE FEDERAL SECURITIES LAWS. STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES AND REPRESENT THE PLAN PROPONENTS' ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE PLAN PROPONENTS' PLAN OR DISTRIBUTIONS THEREUNDER. IN ADDITION TO STATEMENTS THAT EXPLICITLY DESCRIBE SUCH RISKS AND UNCERTAINTIES, READERS ARE URGED TO CONSIDER STATEMENTS LABELED WITH THE TERMS "BELIEVES," "BELIEF," "EXPECTS," "INTENDS," "ANTICIPATES," "PLANS," OR SIMILAR TERMS TO BE UNCERTAIN AND FORWARD-LOOKING. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO SEE THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE PLAN AND DISTRIBUTIONS THEREUNDER.**

01:17684433.1

# TABLE OF CONTENTS

**Page(s)**

| | | |
|---|---|---:|
| I. | INTRODUCTION | 1 |
| | A. | Overview of the Plan | 1 |
| | B. | Plan Voting Instructions and Procedures | 4 |
| II. | GENERAL HISTORICAL INFORMATION ABOUT THE DEBTORS | 8 |
| | A. | Background and Corporate Structure | 8 |
| | B. | Business Overview | 9 |
| | C. | Prepetition Capital Structure | 10 |
| | D. | SEC Filings | 13 |
| | E. | Prepetition Litigation | 13 |
| | F. | Events Leading to the Filing of the Chapter 11 Cases | 14 |
| III. | THE CHAPTER 11 CASES | 14 |
| | A. | First Day Orders | 14 |
| | B. | Debtor-in-Possession Financing | 15 |
| | C. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 16 |
| | D. | Additional Orders | 16 |
| | E. | Plan Sponsorship Agreements, Bid Procedures, and Auction | 17 |
| | F. | Asset Purchase Agreement with Mador | 19 |
| | G. | United States Trustee | 24 |
| | H. | Appointment of Creditors' Committee | 24 |
| | I. | Meeting of Creditors | 24 |
| | J. | Schedules, Statements of Financial Affairs, and Claims Bar Date | 24 |
| IV. | SUMMARY OF THE JOINT CHAPTER 11 PLAN | 25 |
| | A. | Purpose and Effect of the Plan | 25 |
| | B. | Substantive Consolidation | 26 |
| | C. | Liquidation Trust | 27 |
| | D. | Estimated Recoveries for Holders of General Unsecured Claims | 28 |
| | E. | Treatment of Unclassified Claims | 29 |
| | F. | Classification and Treatment of Claims and Interests | 32 |
| | G. | Acceptance or Rejection of the Plan | 35 |
| | H. | Implementation of the Plan | 36 |

I.      Executory Contracts and Unexpired Leases ..........................................................38

J.      Provisions Governing Distributions...................................................................38

K.      Procedures for Resolving Disputed, Contingent, and Unliquidated Claims
        and Distributions with Respect Thereto...........................................................42

L.      Conditions Precedent to the Occurrence of the Effective Date ...........................44

M.      Retention of Jurisdiction .................................................................................45

N.      Miscellaneous Plan Provisions ........................................................................46

V.      RISK FACTORS ...................................................................................................51

A.      Parties May Object to the Plan's Classification of Claims and Equity
        Interests ..........................................................................................................51

B.      The Debtors May Not Be Able to Obtain Confirmation of the Plan ....................51

C.      The Conditions Precedent to the Effective Date of the Plan May Not
        Occur...............................................................................................................51

D.      The Cash Available for Distributions to General Unsecured Creditors May
        Be Further Reduced .........................................................................................51

E.      Claims Estimation ...........................................................................................52

VI.     CONFIRMATION OF THE PLAN...........................................................................52

A.      The Confirmation Hearing ...............................................................................52

B.      Requirements for Confirmation of the Plan.......................................................52

C.      Best Interests of Creditors................................................................................54

D.      Feasibility........................................................................................................54

E.      Acceptance by Impaired Classes ......................................................................55

F.      Confirmation Without Acceptance by All Impaired Classes................................55

G.      Alternatives to Confirmation and Consummation of the Plan..............................56

VII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES
        OF THE PLAN ......................................................................................................56

A.      Taxation of the Liquidation Trust and Liquidation Trust Beneficiaries................58

B.      Other Tax Consequences to Holders of Claims..................................................61

C.      Certain Tax Consequences to the Debtors .........................................................62

VIII.   RECOMMENDATION ...........................................................................................64

## EXHIBITS

EXHIBIT A    Joint Plan of Liquidation

| THE PLAN PROPONENTS HEREBY ADOPT AND INCORPORATE THE |
| --- |

**EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT
BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

## I.    INTRODUCTION

Seal123, Inc. (f/k/a The Wet Seal, Inc., "Seal123"), together with its debtor affiliates Seal123 Retail, Inc. (f/k/a The Wet Seal Retail, Inc., "123 Retail"), Seal123 Catalog, Inc. (f/k/a Wet Seal Catalog, Inc., "123 Catalog"), and Seal123 GC, LLC (f/k/a Wet Seal GC, LLC, "123 GC") (collectively, the "Debtors"),[2] and the official committee of unsecured creditors (the "Creditors' Committee" and, together with the Debtors, the "Plan Proponents") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this disclosure statement (the "Disclosure Statement") pursuant to sections 1125 and 1126(b) of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes on the *First Amended Joint Plan of Liquidation of Seal123, Inc. and Subsidiary Debtors and Their Official Committee of Unsecured Creditors*, dated August 10, 2015 (as amended, supplemented and modified from time to time pursuant to its terms, the "Plan").  A copy of the Plan is attached hereto as **Exhibit A**.[3]

The purpose of this Disclosure Statement is to enable Creditors whose Claims are Impaired under the Plan and who are entitled to vote to make an informed decision in exercising their right to accept or reject the Plan.  This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection and reorganization under chapter 11 of the Bankruptcy Code, the course of these Chapter 11 Cases, and the anticipated orderly liquidation of the Debtors' remaining Assets.  This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the Confirmation process and the voting and election procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

### A.    Overview of the Plan

#### 1.    General Structure of the Plan

The Plan is a liquidation plan.  The Debtors' Assets are largely limited to Cash, as well as Causes of Action under the Plan and certain other Excluded Assets (as defined in the APA), following the Sale, described in more detail below, under which substantially all of the Debtors' operating assets (collectively, the "Acquired Assets") were sold to Mador Lending, LLC ("Mador" and, together with The Wet Seal, LLC and The Wet Seal Gift Card, LLC, both as assignees of Mador, "Buyer"), an affiliate of Versa Capital Management, LLC ("Versa"),[4] pursuant to the terms

---

[2] Upon the Closing Date (defined below) of the Sale (defined below), the case captions in each of the Debtors' jointly administered chapter 11 cases were amended as indicated above.  *See Notice of Sale Closing and Effective Date of Amendment of Case Caption* [Dkt. No. 595].  Following the Closing Date, the Debtors' corporate names were formally changed as indicated above.

[3] All capitalized terms used but not defined herein shall have the meanings provided to them in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between the summary herein and the Plan, the Plan shall govern.

[4] Versa is a private equity investment firm focused on control investments in distressed and special situations in middle market companies in North America.  Versa or Versa affiliates have acquired or invested in, among others, BridgeStreet Global Hospitality, Hatteras/CABO Yachts, Eastern Mountain Sports, Avenue Stores, Polartec, American Laser

*(FOOTNOTE CONTINUED)*

and conditions of the *Asset Purchase Agreement*, dated March 12, 2015, by and between the Debtors and Buyer (including the Letter Agreement dated March 12, 2015 attached thereto, and together with the First Amendment to Asset Purchase Agreement by and among the Debtors and Buyer, dated as of June 30, 2015, the "APA"), for, among other things, (i) $7.5 million in Cash, (ii) the credit bid of the DIP Facility (defined below), and (iii) the assumption by Buyer of certain specified liabilities (the "Assumed Liabilities"), as described more fully herein and in Schedule 2.3 of the APA.

Under the Plan and pursuant to a Global Plan Settlement, for purposes of voting and distribution in connection with the Plan, the Debtors will be substantively consolidated, meaning that all of the Assets and liabilities of the Debtors will be deemed to be the Assets and liabilities of a single entity. As a result, the votes to accept or reject the Plan by Holders of Claims against a particular Debtor will be tabulated as votes to accept or reject the Plan for the substantively consolidated Debtors.

The Plan provides for the creation of a Liquidation Trust that will administer and liquidate all remaining property of the Debtors, including the proceeds of the Sale after the payment of fees and expenses as described more fully in Section IV.D of this Disclosure Statement. The Plan also provides for Distributions to certain Holders of Secured Claims, Administrative Claims, Professional Fee Claims, Priority Claims, and General Unsecured Claims, and for the funding of the Liquidation Trust. Finally, the Plan provides for the cancellation of all Equity Interests in the Debtors, the dissolution and wind-up of the affairs of the Debtors, and the transfer of any remaining Assets of the Debtors' Estates to the Liquidation Trust.

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE RECOVERIES TO CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CONSTITUENTS. FOR THESE REASONS, THE PLAN PROPONENTS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN.**

### 2.    Material Terms of the Plan

The following is an overview of certain material terms of the Plan:

- All Allowed L/C Facility Claims, Assumed Non-Ordinary Course Administrative Claims, Non-Assumed Non-Ordinary Course Administrative Claims, Assumed Ordinary Course Administrative Claims, Priority Tax Claims, Prepetition Credit Agreement Claims, Secured Claims, Priority Claims, and Assumed General Unsecured Claims will be paid or otherwise satisfied in full as required by the Bankruptcy Code, unless otherwise agreed to by the Holders of such Claims and the Liquidation Trustee or Buyer, as applicable.

- Any Claim, or portion thereof, as to which two or more Debtors are co-liable as a legal or contractual matter, including, without limitation, based on principles of joint

Skincare, Black Angus Steakhouses, Allen Vanguard, Bob's Stores, Civitas Media, Bell and Howell, Central Parking, Republic Storage, Holliston, Briteline, and Central Lewmar.

or several liability or based upon contractual guarantees, is defined under the Plan as a "Multi-Debtor Consolidated Claim." Pursuant to the Global Plan Settlement, Holders of Allowed General Unsecured Claims that constitute Multi-Debtor Consolidated Claims will hold a single Allowed General Unsecured Claim against the Debtors that is in an Allowed amount that is 150% of the face amount of such Holder's Allowed Multi-Debtor Consolidated Claim against a single Debtor.

• Holders of Allowed General Unsecured Claims will receive their Pro Rata share of the Liquidation Trust Interests, unless otherwise agreed to by the Liquidation Trustee and the Holders of such Claims.

• Rodam has agreed in writing to vote the Rodam Claims to accept the Plan and that, upon the Effective Date, the Rodam Claims would be subordinate to all other Allowed General Unsecured Claims. Accordingly, upon the Effective Date, the Rodam Claims will be Allowed General Unsecured Claims, but will not be entitled to any distribution until all other Allowed General Unsecured Claims are paid in full in accordance with the Plan.

• Holders of Subordinated Claims will not be entitled to any distribution or recovery on account of such Claims.

• As of the Effective Date, all Equity Interests of any kind will be deemed void, cancelled, and of no further force and effect and the Holders thereof will not receive or retain any property or interest in property under the Plan on account of such Equity Interests.

     **3.**     **Summary of Treatment of Claims and Equity Interests Under the Plan**

The table below summarizes the classification and treatment of the Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES FOR GENERAL UNSECURED CLAIMS SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ACTUAL RECOVERIES MAY DIFFER.   FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE PLAN.**

| Class | Claim or Equity Interest | Summary of Treatment | Projected Recovery Under Plan |
|-------|--------------------------|----------------------|-------------------------------|
| 1 | Prepetition Credit Agreement Claims | Unimpaired; Deemed to Accept Plan | 100% |
| 2 | Secured Claims | Unimpaired; Deemed to Accept Plan | 100% |

| 3 | Priority Claims | Unimpaired; Deemed to Accept Plan | 100% |
|---|---|---|---|
| 4 | Assumed General Unsecured Claims | Unimpaired; Deemed to Accept Plan | 100% |
| 5 | General Unsecured Claims | Impaired; Entitled to Vote on Plan | 5.5-6.6%[5] |
| 6 | Subordinated Claims | Impaired; Deemed to Reject | 0% |
| 7 | Equity Interests | Impaired; Deemed to Reject | 0% |

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

### B.    Plan Voting Instructions and Procedures

#### 1.    Voting Rights

Under the Bankruptcy Code, only classes of claims or interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan under section 1126 of the Bankruptcy Code are entitled to vote to accept or reject such plan.  Any class that is "unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted such plan.  As set forth in section 1124 of the Bankruptcy Code, a class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered.  Holders of claims or interests within an impaired class are entitled to vote to accept or reject a plan if such claims or interests are "allowed" under section 502 of the Bankruptcy Code.

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the amount of allowed claims voting to accept such plan.  Acceptance by a class of claims requires more than one-half of the number of total allowed claims voting in the class to vote in favor of the plan and at least two-thirds in dollar amount of the total allowed claims voting in the class to vote in favor of the plan; only those holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met.  Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number that actually vote cast their Ballots in favor of acceptance.

Pursuant to the Plan, Claims in Class 5 are Impaired by, and entitled to receive a Distribution under, the Plan, and only the Holders of Claims in that Class are entitled to vote to accept or reject

---

[5] This range is discussed in Section IV.D of this Disclosure Statement.  As also is discussed in Section IV.D of this Disclosure Statement, the range of recovery for Multi-Debtor Consolidated Claims is higher: 8.2% - 9.9%.

the Plan.  Only Holders of Claims in Class 5 as of September 8, 2015 (the "Voting Record Date") may vote to accept or reject the Plan.

Pursuant to the Plan, Claims in Classes 1, 2, 3, and 4 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

Pursuant to the Plan, Claims and Equity Interests in Classes 6 and 7 will not receive or retain any property under the Plan on account of such Claims or Equity Interests, as applicable, and are, therefore, deemed to reject the Plan and are not entitled to vote on the Plan.

### 2.    Solicitation Materials

The Debtors, with the approval of the Bankruptcy Court, have engaged Donlin, Recano & Company, Inc. (the "Voting Agent") to serve as the voting agent to process and tabulate Ballots and to generally oversee the voting process.  The following materials constitute the solicitation package (the "Solicitation Package"):

- This Disclosure Statement, including the Plan and all other Exhibits annexed thereto;

- The Bankruptcy Court order approving this Disclosure Statement (the "Disclosure Statement Order") (excluding exhibits);

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");

- A single Ballot, to be used in voting to accept or to reject the Plan, and applicable instructions with respect thereto (the "Voting Instructions");

- A pre-addressed, postage pre-paid return envelope; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Debtors, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order.  The Solicitation Package is also available at the Debtors' restructuring website at https://www.donlinrecano.com/Clients/wsi/Index.

If you are the Holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to Donlin, Recano & Company, Inc., Re: Seal123, Inc., *et al.*, 6201 15th Avenue, Brooklyn, NY 11219.  If your Claim is subject to a pending claim objection and you wish to vote on the Plan, you must File a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes and your Claim or portion thereof, as applicable, must be temporarily allowed by the Bankruptcy Court for voting purposes by the Voting Deadline or you will not be entitled to vote to accept or reject the Plan.

**THE DEBTORS, THE LIQUIDATION TRUSTEE, AND BUYER, AS APPLICABLE, RESERVE THE RIGHT, THROUGH THE CLAIM OBJECTION PROCESS, TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM FOR DISTRIBUTION PURPOSES.**

### 3. Voting Instructions and Procedures

All votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtors or the Voting Agent. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has fixed September 8, 2015 as the Voting Record Date for the determination of the Holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is October 19, 2015 at 4:00 p.m. (prevailing Eastern Time) (the "Voting Deadline").** In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and received no later than the Voting Deadline at the following address, as applicable:

### If by Regular Mail, to:

Donlin, Recano & Company, Inc.
Re: Seal123, Inc., *et al.*
Attn: Seal123, Inc. Ballot Processing
P.O. Box 2034, Murray Hill Station
New York, NY 10156-0701

### If by Overnight Courier or Hand Delivery, to:

Donlin, Recano & Company, Inc.
Re: Seal123, Inc., *et al.*
Attn: Seal123, Inc. Ballot Processing
6201 15th Avenue
Brooklyn, NY 11219

Only the Holders of Claims in Class 5 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline. Each Holder of a Claim must vote its entire Claim either to accept or reject the Plan and may not split such vote. The Ballots will clearly indicate the appropriate return address. It is important to follow the specific Voting Instructions provided on each Ballot.

Unless otherwise provided in the Voting Instructions accompanying the Ballots, the following Ballots will not be counted in determining whether the Plan has been accepted or rejected:

- Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan;

- Any Ballot received after the Voting Deadline, except if the Debtors, in consultation with the Creditors' Committee, have granted an extension of the Voting Deadline with respect to such Ballot, or by order of the Bankruptcy Court;

- Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

- Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim Holder;

- Any Ballot cast by an Entity that does not hold a Claim in the voting Class; and

- Any unsigned Ballot or Ballot without an original signature.

The Ballots also permit Holders of Class 5 Claims that do not vote either to accept or reject the Plan (either by failing to indicate an acceptance or rejection, indicating both an acceptance and rejection or otherwise submitting a Ballot that is not counted in determining whether the Plan has been accepted or rejected) to opt out of the releases set forth in Section 11.12 of the Plan by checking the appropriate box on their Ballots to elect the Release Opt-Out. Holders of Claims in Class 5 that vote to accept the Plan are deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Released Parties from any and all claims and causes of action to the extent provided in Section 11.12 of the Plan, regardless of whether they elect the Release Opt-Out on their Ballots. Holders of Claims in Class 5 that vote to reject the Plan are not bound by the releases set forth in Section 11.12 of the Plan, regardless of whether they elect the Release Opt-Out on their Ballots. Holders of Claims in Class 5 that do not submit a Ballot at all are deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Released Parties from any and all claims and causes of action to the extent provided in Section 11.12 of the Plan. For the avoidance of doubt, Holders of Claims in Class 5 that do not receive Distributions solely as a result of Section 7.6 of the Plan are not Releasing Parties.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Any party who has delivered a properly completed Ballot for the acceptance or rejection of the Plan that wishes to withdraw such acceptance or rejection rather than changing its vote may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to

withdraw the vote sought to be withdrawn, and (iv) be actually received by the Voting Agent prior to the Voting Deadline.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim, (b) the Solicitation Package that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan, this Disclosure Statement, or any appendices or Exhibits to such documents, please contact the Voting Agent at the address specified above. Copies of the Plan, Disclosure Statement and other documents Filed in these Chapter 11 Cases may be obtained free of charge at the Debtors' restructuring website at https://www.donlinrecano.com/Clients/wsi/Index. Documents Filed in these Chapter 11 Cases may also be examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Eastern Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will File a voting report (the "<u>Voting Report</u>") as soon as reasonably practicable after the Voting Deadline. The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE PLAN PROPONENTS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN BY THE VOTING DEADLINE.**

### 4. Confirmation Hearing and Deadline for Objections to Confirmation

Objections to Confirmation of the Plan must be Filed and served on the Debtors and certain other entities, all in accordance with the Confirmation Hearing Notice, so that they are actually received by no later than October 19, 2015 at 4:00 p.m. (prevailing Eastern Time). Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court. For further information, refer to Section VI of this Disclosure Statement, "Confirmation of the Plan."

## II. GENERAL HISTORICAL INFORMATION ABOUT THE DEBTORS

### A. Background and Corporate Structure

Prior to the Sale, the Debtors were a national multi-channel specialty retailer selling fashion apparel and accessory items designed for female customers aged 13 to 24 years old.

Seal123 (f/k/a The Wet Seal, Inc.), one of the Debtors, is a Delaware corporation. Each of the other Debtors is a wholly-owned subsidiary of Seal123: (a) 123 Retail (f/k/a The Wet Seal Retail, Inc.), a Delaware corporation, (b) 123 Catalog (f/k/a Wet Seal Catalog, Inc.), a Delaware

corporation, and (c) 123 GC (f/k/a Wet Seal GC, LLC), a Virginia limited liability company. The following chart illustrates the current corporate structure of the Debtors:



As of the Petition Date, The Wet Seal, Inc. (n/k/a Seal123) was governed by a seven-member Board of Directors, which included Nancy Lublin, John S. Mills, Kenneth M. Reiss, Adam Lance Rothstein, Gregory P. Taxin, Deena Varshavskaya, and Edmond S. Thomas. On the Closing Date (defined below) of the Sale, the Board of Directors was reduced to the following three members, who continue to serve: Adam Lance Rothstein, Gregory P. Taxin, and Bill Langsdorf.

As of the Petition Date, the Debtors' management team included Edmond S. Thomas as Chief Executive Officer, Thomas Hillebrandt as Interim Chief Financial Officer of Seal123 and Chief Financial Officer of the other Debtors, Christine Lee as Chief Merchandising Officer, and Jon Kubo as Chief Digital Officer.

Following the Closing Date of the Sale, the former management team was terminated and Bill Langsdorf was appointed as the President, Chief Executive Officer, Chief Financial Officer, Secretary, principal executive officer and principal financial and accounting officer of the Debtors. Mr. Langsdorf is the former Chief Financial Officer of The Wet Seal, Inc., Tilly's, Inc., Anchor Blue Retail Group, Inc., and House2Home, Inc.

## B.    Business Overview

Prior to the Sale, the Debtors operated in the fast fashion section of the women's clothing industry. The Debtors were comprised of two primary units: (a) the retail store business, which was primarily operated by The Wet Seal Retail, Inc. (n/k/a 123 Retail); and (b) the e-commerce business, which was primarily operated by Wet Seal Catalog, Inc. (n/k/a 123 Catalog). The Debtors also sold gift cards, which business was primarily operated through Wet Seal GC, LLC (n/k/a 123 GC).

C.      **Prepetition Capital Structure**

1.      **Secured Debt**

As of the Petition Date, the Debtors were indebted to Bank of America, N.A. (the "Prepetition Lender") under the Amended and Restated Credit Agreement dated as of February 3, 2011 (as amended, the "Prepetition Credit Agreement"), by and among the Debtors, Bank of America, N.A., as the administrative agent, collateral agent, L/C issuer and swing line lender, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as sole lead arranger and sole bookrunner, and the other lenders party thereto. As of the Petition Date, there were no outstanding borrowings under the Prepetition Credit Agreement, and all letters of credit issued by the Prepetition Lender (then approximating $10.8 million) were fully cash collateralized by the Debtors. The Prepetition Lender retained the right to assert certain contingent and unliquidated indemnification claims against the Debtors in accordance with the terms of the Prepetition Credit Agreement. Pursuant to that same Prepetition Credit Agreement, the Prepetition Lender's indemnification claims were secured by its lien upon substantially all of the Debtors' assets.

As of the Petition Date, the Prepetition Lender held a first priority lien against the Debtors' cash, cash equivalents, investments, receivables and inventory, but not their intellectual property; however, pursuant to the L/C Facility Orders, subject to the satisfaction of certain conditions precedent, the Prepetition Lender agreed to subordinate and/or release its lien on the Debtors' assets as first granted under the Prepetition Credit Agreement, in consideration for which the Debtors agreed to (i) establish a $1.5 million cash collateral account with the Prepetition Lender (in addition to the account collateralizing the letter of credit obligations), and (ii) provide other forms of adequate protection. (The foregoing $1.5 million account has since been released to the Buyer pursuant to the APA.) The Prepetition Lender presently holds only a first priority, duly perfected lien against the account collateralizing the letter of credit obligations. As discussed in more detail below, the letters of credit outstanding under the Prepetition Credit Agreement as of the Petition Date were rolled up into the L/C Facility pursuant to the terms of the L/C Credit Agreement (both as defined below) and as approved by the Bankruptcy Court. The amounts of letters of credit outstanding as of the Petition Date have been further reduced after the Petition Date as a result of draws by certain of the Debtors' factors. As a result of these post-petition draws against letters of credit, the amount presently in the account collateralizing the letter of credit obligations is approximately $1,669,000.

Other than the claims of the Prepetition Lender, the Debtors do not have any material secured debt. Following the General Bar Date (defined below), the Plan Proponents conducted an analysis of Filed proofs of claim, in order to reach an estimate of other potential Secured Claims asserted against the Debtors. After eliminating (i) duplicate and superseded proofs of claim, (ii) proofs of claim by the Prepetition Lender or related to the letters of credit issued by the Prepetition Lender, and (iii) proofs of claim that have been resolved by the Debtors, the Plan Proponents estimate that other proofs of claim Filed as Secured Claims do not exceed $440,000 in the aggregate. However, approximately $270,000 of that amount is on account of claims Filed by taxing authorities that constitute Priority Claims or Administrative Claims (both as defined in the APA) under the terms of the APA and are Assumed Liabilities of the Buyer. In addition, the remaining approximately $170,000 in Filed Secured Claims may be further reduced by the payment of cure amounts in connection with the assumptions and assignments to the Buyer of the executory contracts and leases underlying certain of these Filed Secured Claims or as part of the claims resolution process.

## 2.    Unsecured Debt

(a)    Scheduled Claims

As of the Petition Date, unsecured claims against the Debtors included: (i) the senior convertible notes in the principal amount as of the Petition Date of $24.9 million issued to Hudson Bay Master Fund Ltd. ("Hudson Bay") and subsequently acquired by Rodam, LLC ("Rodam"), an affiliate of Buyer, (ii) accrued and unpaid trade and other unsecured debt incurred in the ordinary course of the Debtors' businesses, (iii) unpaid amounts owed to the Debtors' vendors and to factors under related factoring agreements, (iv) claims by landlords for unpaid rent and other amounts under the Debtors' leases, and (v) claims arising from the closure of 338 of the Debtors' retail stores on or about January 7, 2015. Creditors and interested parties should review the Debtors' Schedules (defined below) Filed with the Bankruptcy Court for more complete information concerning the nature and amount of the Debtors' liabilities as of the Petition Date.

Based on the Debtors' Schedules, the Plan Proponents estimate that unsecured Claims against the Debtors should total about $129.5 million. This estimate, however, does not account for any additional General Unsecured Claims against the Debtors arising from the rejection of executory contracts and leases that have been or will be designated (or deemed to be designated) for rejection by the Buyer. Conversely, this estimate does not account for the reduction or elimination of any General Unsecured Claims against the Debtors, for amounts owed under existing executory contracts and leases, as a result of the assumption and assignment to the Buyer of such executory contracts and leases.[6] In addition, as discussed below, certain Creditors have asserted amounts in their proofs of claim that exceed the amounts that the Debtors have scheduled. Thus, the total amount of Allowed General Unsecured Claims may greatly exceed or fall short of the estimates set forth herein.

Approximately $29 million of the estimated $129.5 million in unsecured Claims is on account of the Rodam Claims. Pursuant to the Plan, Rodam has agreed in writing to vote the Rodam Claims to accept the Plan and that the Rodam Claims would be subordinate to all other Allowed General Unsecured Claims. Accordingly, upon the Effective Date, the Rodam Claims will be Allowed General Unsecured Claims, but will not be entitled to any distribution until all other Allowed General Unsecured Claims are paid in full in accordance with the Plan.

Certain of the nonresidential leases of real property of 123 Retail (f/k/a The Wet Seal Retail, Inc.) were guaranteed by Seal123 (f/k/a The Wet Seal, Inc.). Based on the Debtors' Schedules, the Plan Proponents estimate that of the estimated $129.5 million in unsecured Claims, about $38 million is comprised of (i) about $19 million in General Unsecured Claims, against 123 Retail (f/k/a The Wet Seal Retail, Inc.), as lessee, scheduled as held by lessors of certain guaranteed nonresidential leases that have been rejected, and (ii) about $19 million in General Unsecured Claims, against Seal123 (f/k/a The Wet Seal, Inc.) as contractual guarantor of 123 Retail's lease obligations, scheduled as guarantee claims held by the same lessors whose guaranteed nonresidential

---

[6] The Plan Proponents estimate that approximately $1.6 million of the $129.5 million total is on account of amounts owed under executory contracts and leases that may be assumed and assigned to the Buyer and cured by the Buyer in accordance with the terms of the APA, assuming all such contracts and leases are assumed and assigned.

leases have been rejected..[7]  Under the terms of the Plan, to the extent such Claims are Allowed, they are deemed to constitute Multi-Debtor Consolidated Claims, meaning that each Holder of such Claims holds a single Allowed General Unsecured Claim against the Debtors in an Allowed amount of 150% of the face amount of such Holder's Multi-Debtor Consolidated Claims against a single Debtor.  Thus, for example, if a lessor holds a $1 million General Unsecured Claim against 123 Retail that is guaranteed by Seal123 in the same amount, such lessor's Multi-Debtor Consolidated Claim will be Allowed for distribution purposes under the Plan in the amount of $1.5 million, rather than $2 million.  Based on the above $38 million estimate, the approximately $38 million in Claims would ultimately be Allowed in the amount of $28.5 million (150% of the $19 million estimate) for distribution purposes under the Plan, as opposed to $38 million.

Based on the preceding, after adjusting the $129.5 million of estimated unsecured Claims against the Debtors to reflect (i) the subordination of the $29 million Rodam Claims; and (ii) a reduction of $9.5 million on account of the treatment of the lessor Multi-Debtor Consolidated Claims described in the preceding paragraph, the Plan Proponents estimate that the General Unsecured Claims against the Debtors should total about $91 million, provided that Allowed General Unsecured Claims may exceed or fall short of this estimate for the reasons described above.

(b)    Filed Claims

Following the General Bar Date, the Plan Proponents conducted an analysis of the proofs of claim asserted against the Debtors, in order to reach a preliminary estimate of General Unsecured Claims against the Debtors based on the Filed proofs of claim.  As part of this analysis, the Plan Proponents (i) eliminated certain intercompany, duplicate, and superseded proofs of claim; (ii) reduced the amounts filed on account of the Rodam Claims; and (iii) adjusted the amounts on account of the various Multi-Debtor Consolidated Claims against the Debtors.

Based on this analysis, the Plan Proponents estimate that the Filed General Unsecured Claims against the Debtors should total about $101.3 million.  The difference between this estimate and the $91 million estimate based on the Debtors' Schedules is primarily caused by (i) General Unsecured Claims Filed by numerous lessors of the Debtors in amounts larger than set forth in the Schedules; (ii) a General Unsecured Claim in the amount of at least $1.7 million, Filed on account of damages and attorneys' fees from a pending civil litigation, which the Debtors have scheduled in the amount of $0.00; (iii) a General Unsecured Claim in the amount of $1 million, Filed on account of an alleged personal injury claim against the Debtors, which the Debtors have scheduled in the amount of $0.00; and (iv) General Unsecured Claims for rejection damages Filed with respect to executory contracts and leases that have not yet been rejected and may or may not be rejected by the Debtors.

The Plan Proponents' estimate of Filed General Unsecured Claim does not account for (i) any additional General Unsecured Claims against the Debtors Filed as a result of the rejection of executory contracts and leases that have been or will be designated (or deemed to be designated) for rejection by the Buyer; (ii) any reduction or elimination of Filed General Unsecured Claims against the Debtors, for amounts owed under existing executory contracts and leases, as a result of the

---

[7] Seal123's contractual guarantees under these leases are in many instances capped at an amount not to exceed the sum that would have been due from 123 Retail, as lessee, for a period of thirty-six (36) months following a default by 123 Retail under the applicable lease.

payment of cure claims by the Buyer in connection with the assumption and assignment to the Buyer of the executory contracts and leases underlying such Filed General Unsecured Claims; and (iii) any additional reductions or eliminations of Filed General Unsecured Claims as part of the claims resolution process.  Thus, the total amount of Allowed General Unsecured Claims may greatly exceed or fall short of the estimates set forth herein.

### 3.    Equity Interests

Seal123 (f/k/a The Wet Seal, Inc.) is publicly-owned and has two classes of common stock.  The number of shares outstanding of Class A common stock, par value $0.10 per share, as of December 5, 2014, was 84,358,776.  As of the Petition Date, there were no shares outstanding of Class B common stock, par value $0.10 per share, or any preferred stock in Seal123.  Seal123 is the parent company of the remaining Debtors, who are its wholly-owned subsidiaries.  On January 27, 2015, Seal123 was de-listed from NASDAQ.  Seal123's Class A common stock is currently traded on the "pink sheets."

### D.    SEC Filings

As a public company, Seal123 has been required to file certain reports with the SEC.  All of Seal123's public securities filings are available at www.sec.gov/edgar.shtml.

### E.    Prepetition Litigation

As of the Petition Date, the Debtors were party to litigation pending in non-bankruptcy forums in the ordinary course of their businesses.  Shortly before the Petition Date, a putative class action complaint was filed (but not served on the Debtors) in the United States District Court for the Central District of California on behalf of employees of the Debtors who were laid off shortly before the Petition Date alleging violations of, and asserting over $5 million in claims under, the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq.* (the "WARN Act").  *See Pruitt, et al. v. The Wet Seal Inc.*, Case No. 2:15-cv-00312-DSF-E (C.D. Cal.) (the "WARN Act Action").  The Debtors dispute that they have any liability under the WARN Act generally or, specifically, in connection with any of the claims asserted in the WARN Act Action.  The litigation in which the Debtors are defendants, including the WARN Act Action that has not been served on the Debtors, has been stayed by Bankruptcy Code section 362(a).

The Debtors are also involved in pending litigation in which one or more of the Debtors is a plaintiff or other non-defendant party, including without limitation, in the following cases: (1) *In re Payment Card Interchange Fee and Merchant Discount Fee Antitrust Litigation*, Case No. 1:05-md-01720-MKB-JO (E.D.N.Y.) and related appeals, in which the Debtors are plaintiff objectors to the settlement of a class action that sought damages and injunctive relief for alleged violations of antitrust laws committed by Visa, MasterCard, and various banks; (2) *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:14-md-01720-MKB-JO (E.D.N.Y.), in which the Debtors are part of a group of over 60 merchant plaintiffs who are pursuing an opt-out case for damages related to the same or similar conduct as presented by the preceding class action case; and (3) *In re American Express Anti-Steering Rules Antitrust Litigation,* Case No. 1:11-md-02221-NGG-RER (E.D.N.Y.), in which Seal123 is an objector to the proposed settlement of an antitrust class action filed in 2005.  The Debtors are evaluating these and any other pending

actions.  The Debtors and the Liquidation Trustee, as applicable, reserve their rights to continue to prosecute any and all of these actions to the extent set forth in the Plan.

F.      **Events Leading to the Filing of the Chapter 11 Cases**

In the period before the Petition Date, the Debtors faced a series of business challenges.  The Debtors retained Houlihan Lokey Capital, Inc. ("Houlihan") in November 2014 to serve as the Debtors' investment banker to explore strategic alternatives.  Houlihan engaged in discussions with potential lenders and potential investors regarding out-of-court and in-court alternatives.  The Debtors and Houlihan determined that it would not be possible to restructure out of court without significant lease concessions.  As it became apparent that sufficient lease concessions would not be forthcoming in time, the Debtors and Houlihan focused on obtaining debtor-in-possession financing and a viable exit strategy to enable the Debtors to survive as a going concern.

Shortly prior to the Petition Date, B. Riley Financial, Inc. ("B. Riley") agreed to provide debtor-in-possession financing to the Debtors and to sponsor a plan of reorganization.  As discussed below, after the Petition Date and the formation of the Creditors' Committee, the Debtors conducted an auction on March 10 and 12, 2015 (the "Auction"), at the conclusion of which the Debtors selected Mador as the successful bidder and entered into the APA and, as a result, the Debtors terminated the B. Riley transaction and instead closed the Sale to Mador.

Additional detailed factual background relating to the Debtors and the events leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Thomas R. Hillebrandt in Support of First Day Motions* [Dkt. No. 19].

III.    **THE CHAPTER 11 CASES**

On January 15, 2015, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  The Chapter 11 Cases are being jointly administered under the caption *In re Seal123, Inc., et al.*, Case No. 15-10081 (CSS).  An immediate effect of commencement of the Chapter 11 Cases was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors during the pendency of the Chapter 11 Cases.  The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the Effective Date.

A.      **First Day Orders**

On or about the Petition Date, the Debtors Filed certain "first day" motions and applications with the Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of these Chapter 11 Cases and to facilitate the Debtors' transition to debtor-in-possession status. The Bankruptcy Court held a hearing on these first-day motions on January 20, 2015.  Following hearings, the Bankruptcy Court entered a series of customary "First Day" and "Second Day" orders.

### B.      Debtor-in-Possession Financing

#### 1.      DIP Facilities

On or about the Petition Date, the Debtors Filed a motion seeking Bankruptcy Court approval of debtor-in-possession financing on the terms set forth in that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of January 15, 2015 (the "B. Riley DIP Credit Agreement"), by and among the Debtors and B. Riley, as DIP Lender.  The B. Riley DIP Credit Agreement provided for a senior secured, super-priority credit facility (the "B. Riley DIP Facility") of up to $20.0 million.  The motion was granted on an interim and then final basis.

As discussed in more detail below, as a result of the selection of Mador as the successful bidder at the Auction, on March 13, 2015, the Debtors Filed a motion (the "DIP Facility Motion") seeking Bankruptcy Court approval of replacement debtor-in-possession financing on the terms set forth in that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of March 12, 2015 (the "DIP Credit Agreement"), by and among the Debtors and Mador, as DIP Lender.  The DIP Credit Agreement provided for financing (the "DIP Facility") by Mador that was in all material respects similar to (and, in some instances, more favorable)[8] than the B. Riley DIP Facility, which the DIP Facility replaced.  This motion was granted.  Thereafter, in accordance with the terms of the APA, Buyer elected to Credit Bid (defined below) all the DIP Facility obligations held by Buyer as part of the Purchase Price (defined below) under the APA and, consequently, there are no obligations outstanding under the DIP Facility.

#### 2.      Letter of Credit Facility

On or about the Petition Date, the Debtors also Filed a motion seeking Bankruptcy Court approval of debtor-in-possession financing on the terms set forth in that certain Senior Secured, Super-Priority Debtor-in-Possession Letter of Credit Agreement, dated as of January 15, 2015 (the "L/C Credit Agreement"), by and among the Debtors and Bank of America, N.A., as L/C Issuer ("BofA").  The L/C Credit Agreement provided for a senior secured, super-priority debtor-in-possession letter of credit facility (the "L/C Facility") of up to approximately $18.3 million on the closing date of the L/C Facility (inclusive of the "roll up" of approximately $10.8 million in pre-petition letters of credit which have been deemed issued under the L/C Credit Agreement).  Pursuant to the L/C Credit Agreement, in addition to the payment of any applicable fees and other charges in respect of each issued letter of credit, upon the issuance of each letter of credit the Debtors are obligated to deposit with BofA cash collateral in an amount equal to 103% of the original face amount of each such letter of credit (collectively, the "L/C Cash Collateral").  In accordance with the L/C Facility Orders, (a) BofA was granted first priority, senior, duly perfected liens and security interests in and upon the aforementioned cash collateral, and (b) BofA was granted relief from the automatic stay to pay itself from the cash collateral upon a draw by a beneficiary of any letter of credit and/or for reimbursement and/or payment of any other amounts that may become due under the L/C Credit Agreement.  The motion was granted on an interim and then final basis.

---

[8] For example, interest accruing under the DIP Facility was 0.25% per annum less than under the B. Riley DIP Facility.

Under these arrangements, parties in interest were afforded a period, through and including April 6, 2015 (the Creditors' Committee was granted a shorter period, ending on March 31, 2015), to commence a "Challenge Proceeding" with regard to BofA's asserted prepetition liens and claims. After investigating the pre-petition lenders' liens and claims, the Creditors' Committee concluded that there is no colorable basis on which to bring an objection or challenge with respect to those liens and claims, and as a result the Creditors' Committee did not initiate any "Challenge Proceeding" prior to the expiration of its March 31, 2015 deadline. Similarly, no other party timely initiated a "Challenge Proceeding" by the expiration of the April 6, 2015 deadline.

### C.  Assumption and Rejection of Executory Contracts and Unexpired Leases

On or about the Petition Date, the Debtors Filed omnibus motions to reject certain executory contracts and unexpired leases, including contracts and leases relating to the Debtors' 338 retail stores that were closed shortly prior to the Petition Date, and a motion to establish procedures for the rejection of executory contracts and unexpired leases of non-residential real property in these Chapter 11 Cases. Following the Petition Date, the Debtors also entered into four stipulations with certain landlords for the rejection of certain leases of closed retail stores. On February 4 and February 5, 2015, the Bankruptcy Court entered orders granting the foregoing motions and stipulations.

In addition, as discussed in more detail below, pursuant to the Sale Order (defined below), the Bankruptcy Court authorized certain Assumption and Assignment Procedures and Rejection Procedures (both defined below) for the Debtors' contracts and leases that had not previously been rejected, in accordance with the terms of the APA. Following the entry of the Sale Order, the Debtors Filed notices of assumptions and assignments and rejections of contracts and leases and the Bankruptcy Court entered orders authorizing such assumptions, assignments and rejections.

### D.  Additional Orders

On and after the Petition Date, the Debtors Filed a number of motions and applications to retain professionals and to streamline the administration of the Chapter 11 Cases. The Bankruptcy Court entered the following orders granting the foregoing motions and applications:

- Order Authorizing Employment and Retention of Klee, Tuchin, Bogdanoff & Stern LLP as Counsel for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date [Dkt. No. 278];

- Order Authorizing the Employment and Retention of Donlin, Recano & Company, Inc., as Administrative Agent for the Debtors, *Nunc Pro Tunc* to the Petition Date [Dkt. No. 291];

- Order Authorizing the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business [Dkt. No. 325];

- Order Providing that Creditors' Committees Are Not Authorized or Required to Provide Access to Confidential Information to Creditors [Dkt. No. 277];

- Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Dkt. No. 279];

- Order Extending the Debtors' Deadline to File Schedules of Assets and Liabilities and Statements of Financial Affairs [Dkt. No. 276];

- Order (1) Authorizing Employment and Retention of Houlihan Lokey Capital, Inc. as Financial Advisor and Investment Banker for the Debtors *Nunc Pro Tunc* to the Petition Date and (II) Modifying Certain Information Requirements of Del. Bankr. L.R. 2016-2 [Dkt. No. 324];

- Order Authorizing Debtors to Retain and Employ Paul Hastings LLP as Special Counsel, *Nunc Pro Tunc* to the Petition Date [Dkt. No. 282];

- Order Authorizing the Debtors to Retain and Employ Young Conaway Stargatt & Taylor, LLP as Co-Counsel to the Debtors, Effective as of the Petition Date [Dkt. No. 281];

- Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof [Dkt. No. 280];

- Order Pursuant to Fed. R. Bankr. P. 2014(a) and Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention of FTI Consulting, Inc. as Financial Advisors to the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date [Dkt. No. 443]; and

- Order Authorizing the Debtors to Retain and Employ PricewaterhouseCoopers LLP, *Nunc Pro Tunc* to March 31, 2015, for the Purpose of Providing the Debtors with Tax Compliance Services, and, as Necessary, Tax Consulting Services and Other Tax Services and Approving Request for a Waiver of the Information Requirements of Local Rule 2016-2 [Dkt. No. 657].

In addition, the Creditors' Committee Filed applications to retain professionals and the Bankruptcy Court entered the following orders granting such applications:

- Order Authorizing and Approving the Retention of Pachulski Stang Ziehl & Jones LLP as Counsel to the Official Committee of Unsecured Creditors Effective as of January 30, 2015 [Dkt. No. 424]; and

- Order Authorizing and Approving the Employment of Province, Inc. as Financial Advisor to the Official Committee of Unsecured Creditors Effective as of January 30, 2015 [Dkt. No. 435].

### E.  Plan Sponsorship Agreements, Bid Procedures, and Auction

On January 15, 2015 the Debtors entered into that certain Plan Sponsorship Agreement with B. Riley (the "B. Riley PSA").  Pursuant to the B. Riley PSA, B. Riley agreed to sponsor a plan of reorganization for the Debtors.  The B. Riley PSA, as amended, permitted the Debtors to openly

solicit inquiries and proposals and engage in negotiations and have discussions regarding an alternative transaction pursuant to bid procedures agreed upon by the Debtors, B. Riley and the Creditors' Committee.  If the Debtors pursued an alternative transaction, they would be liable to B. Riley for a break-up fee and expense reimbursement pursuant to the terms of the B. Riley PSA.

On February 5, 2015, the Bankruptcy Court entered its *Order Pursuant to 11 U.S.C. §§ 105(a), 365(a) and 503(b) (I) Approving and Authorizing the Assumption of the Plan Sponsorship Agreement as Modified, and (II) Approving and Authorizing the Payment of Break-Up Fee and Expense Reimbursement* [Dkt. No. 252] (the "B. Riley PSA Order"), pursuant to which the Bankruptcy Court authorized the Debtors to assume the B. Riley PSA, as modified.  Among other things, the B. Riley PSA Order contemplated the submission of competing proposals to sponsor a plan of reorganization (a "Plan Transaction") or acquire all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code (a "363 Transaction") and, in either case, provide replacement debtor-in-possession financing.  On February 6, 2015, the Debtors Filed a motion to approve certain bidding procedures governing the submission of such competing proposals.

On February 18, 2015, the Bankruptcy Court entered the *Order Approving Certain Bid Procedures Governing the Submission of Competing Proposals to (I)(A) Sponsor a Plan of Reorganization for the Debtors or (B) Acquire All or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code and (II) Provide Debtor-in-Possession Financing* [Dkt. No. 329] (the "Bidding Procedures Order"), pursuant to which the Bankruptcy Court approved the bidding procedures, as modified.  Pursuant to the Bidding Procedures Order, an auction to determine the highest or otherwise best bid would commence on March 10, 2015 if any competing qualified bids were submitted by the March 5, 2015 bid deadline.  Before commencement of the Auction, the Debtors, in consultation with the Creditors' Committee, determined that only Mador had submitted a competing qualified bid by the bid deadline.

Before the commencement of the Auction, Mador agreed that, should it be chosen as the successful bidder, it would provide full time employment on the same terms, benefits, and responsibilities, and within the same or similar travel radius, to the following current executives of the Debtors: Edmond S. Thomas, Christine Lee, Jon Kubo, Thomas Hillebrandt, Rachel Page, and Kim Bajrech (the "Executives"), provided the Executives would continue to work for the Debtors through at least the Closing Date.  Mador also agreed that the employment packages for the Executives would include six-months' severance (which would not reduce over time) on market terms; provided, however, that if any of the Executives and Mador could not, after good-faith negotiations, agree on an equity incentive program for the Executives following the Closing Date, such Executive would be entitled to leave employment and receive his or her six months' severance.

The Auction commenced on March 10, 2015.  As described in more detail below, Mador agreed to acquire substantially all of the Debtors' operating assets pursuant to section 363 of the Bankruptcy Code and provide the Debtors with replacement financing in the form of the DIP Facility.  After Mador presented an overbid in the form of a 363 Transaction, the Debtors, the Creditors' Committee and Mador held a continuous series of all-day meetings through March 12, 2015 concerning various issues raised by Mador's overbid and to negotiate, *inter alia*, the language of the APA, the Letter Agreement (defined below), and the Sale Order (defined below).  On March 12, 2015, at the conclusion of the Auction, the Debtors, in consultation with the Creditors'

Committee, selected Mador as the successful bidder, in accordance with the terms of the Bidding Procedures Order.

On March 13, 2015, the Debtors Filed the *Notice of (I) Auction Results and (II) Status of (A) Joint Plan of Reorganization of The Wet Seal, Inc. and Subsidiary Debtors and (B) Disclosure Statement for Joint Plan of Reorganization of The Wet Seal, Inc. and Subsidiary Debtors* [Dkt. No. 407], disclosing Mador's selection as the successful bidder at the Auction and that the Debtors were no longer proceeding with the B. Riley PSA, including the related chapter 11 plan of reorganization and disclosure statement that had been Filed pursuant to the B. Riley PSA.

### F.     Asset Purchase Agreement with Mador

On March 12, 2015, the Debtors and Buyer entered into the APA and on March 16, 2015, the Debtors Filed the *Debtors Motion for Entry of an Order Authorizing (A) the Sale of Substantially All of the Debtors Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances; (B) the Debtors to Enter Into and Perform their Obligations Under the Asset Purchase Agreement; and (C) the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases* [Dkt. No. 426] (the "Sale Motion"), seeking Bankruptcy Court entry of an order (the "Sale Order")[9] authorizing and approving, among other things, (i) the Debtors' entry into and performance under the APA; (ii) the sale of the Acquired Assets (the "Sale") free and clear of any and all liens (other than certain Permitted Liens and the BofA Liens on the BofA Accounts, as defined in the Sale Order); (iii) the assumption by Buyer of certain of the Debtors' liabilities (the "Assumed Liabilities"); (iv) the assumption by the Debtors and assignment to Buyer of certain executory contracts (all executory contracts of the Debtors, the "Contracts") and unexpired leases (all unexpired leases of the Debtors, the "Leases") of the Debtors (collectively, the "Assumed Contracts"); and (v) the establishing of assumption and assignment procedures (the "Assumption and Assignment Procedures") and rejection procedures (the "Rejection Procedures") for certain of the Debtors' Contracts and Leases.  The purchase price (the "Purchase Price") payable by Buyer under the APA was comprised of (a) a Cash payment equal to $7,500,000; (b) a credit bid pursuant to section 363(k) of the Bankruptcy Code (a "Credit Bid") of all the DIP Facility obligations held by Buyer; and (c) the assumption by Buyer of the Assumed Liabilities.

On April 1, 2015, the Bankruptcy Court entered the *Order Authorizing (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances; (B) the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement; and (C) the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases* [Dkt. No. 538], pursuant to which the Bankruptcy Court authorized the Debtors (i) to enter into the APA and to perform all of their contractual obligations thereunder; and (ii) to consummate the transactions under the APA, including the Sale.  The closing of the transactions contemplated by the APA, including the Sale, took place on April 15, 2015 (the "Closing Date").

---

[9] The summary of the terms and conditions of the APA set forth in this Disclosure Statement are intended solely for informational purposes and are qualified in their entirety by the APA and the Sale Order.  In the event there is any conflict between the Disclosure Statement and the APA, the APA will prevail.  In the event there is any conflict between the Disclosure Statement and/or the APA and the Sale Order, the Sale Order will prevail.

Under the terms of the APA and as enumerated on Schedule 2.3 of the APA, the Assumed Liabilities that were assumed by Buyer were:

1) Liabilities under the Assumed Contracts and the Assumed Permits (as defined in the APA) to the extent arising from and after the Closing Date (except for any Liabilities to the extent based on the actions of the Debtors).

2) All current liabilities, trade payables and accrued expenses of the Debtors incurred in the Ordinary Course of Business (as defined in the APA), in each case, as of the Closing Date (and not paid by the Debtors prior thereto), to the extent arising and related to the period following the Petition Date.

3) All accrued payroll, accrued and unused vacation, and accrued payroll Taxes (as defined in the APA), in each case, as of the Closing Date (and not paid by the Debtors prior thereto) to the extent arising and related to the period following the Petition Date, provided that the Debtors pay all such liabilities and obligations as and when due through the Closing Date consistent with the Debtors' past practices.

4) To the extent required by applicable law, Liabilities relating to continuation health care coverage, to the extent required by COBRA (as defined in the APA), to Current Employees and Former Employees (each as defined in the APA) of the Debtors (and their qualified beneficiaries) who left employment or otherwise experienced a COBRA qualifying event on or prior to the Closing Date.

5) All employee related Liabilities that are Priority Claims or Administrative Claims (both as defined in the APA) (and not paid by the Debtors prior to the Closing Date), to the extent such Liabilities are Administrative Claims as set forth in item 11 of Schedule 2.3 of the APA or Priority Claims as set forth in item 15 of Schedule 2.3 of the APA.

6) All Consumer Liabilities (as defined in the APA) as of the Closing Date.

7) All Operational Expenses (as defined in the APA) that are the obligation of Buyer pursuant to Section 2.10 of the APA.

8) Ordinary course gift card obligations of the Debtors as of the Closing Date, provided that such obligations (i) arise from gift cards sold in the Ordinary Course of Business and (ii) shall not include any escheatment claims asserted by any Governmental Entity (as defined in the APA) or any similar claim; and provided that the amount of any such obligation shall be no more than the face value of the gift card and shall be limited to use of such gift cards presented by individual holders for goods sold at their retail stores by the Debtors, subject to such lawful limitations as the Debtors may impose for gift cards issued by them.

9) Any portion of the DIP Facility obligations that is not credit bid by Buyer as part of the Purchase Price under Section 2.5(b) of the APA.

10)     Liabilities consisting of amounts Buyer has expressly agreed to pay, including all Cure Amounts (as defined in the APA).

11)     Administrative Claims incurred prior to the Closing Date to the extent allowed by order of the Bankruptcy Court (including, by way of clarification, all Taxes incurred for the period from and after the Petition Date through the Closing Date to the extent such Taxes are Administrative Claims as set forth in item 11 of Schedule 2.3 of the APA or Priority Claims as set forth in item 15 of Schedule 2.3 of the APA) or otherwise agreed to by Buyer.

12)     Any fees and expenses incurred by professionals employed by the Debtors and/or the Creditors' Committee, provided that such fees and expenses shall not (in the aggregate) exceed 110% of the amount of the professional fee budget included in the Cash Budget (as defined in the APA) for the period through and including May 15, 2015.

13)     All obligations under any Employee Benefit Plan (as defined in the APA) to the extent such obligations are Administrative Claims as set forth in item 11 of Schedule 2.3 of the APA or Priority Claims as set forth in item 15 of Schedule 2.3 of the APA.

14)     Sponsorship of, and obligations under, the Health Plans (as defined in the APA), provided that the Debtors pay all such liabilities and obligations as and when due through the Closing Date consistent with the Debtors' past practices.

15)     Priority Claims incurred prior to the Closing Date to the extent allowed by order of the Bankruptcy Court or agreed to (in writing) by Buyer; provided, however, that any Priority Claims with respect to Taxes may, at the written election of Buyer, remain as (and be deemed) an Excluded Liability (as defined in the APA), to be paid in accordance with section 1129(a)(9) of the Bankruptcy Code under the Plan, so long as Buyer covenants to fund such payment obligations (it being understood, however, that any Taxes that are Assumed Liabilities under the APA shall be determined after giving effect, to the extent possible, to available deductions for net operating losses of the Debtors).

16)     The break-up fee and expense reimbursement payable to B. Riley (the "Break-Up Fee Payment"), pursuant to the B. Riley PSA Order (it being understood that Buyer shall pay the Break-Up Fee Payment when due).

17)     Claims for stub-rent pursuant to section 503(b) of the Bankruptcy Code (it being understood that Buyer shall pay such amounts no later than the later of (a) 10 days following Closing and (b) the last day of the month in which the Closing occurs).

Furthermore, under the terms of the Sale Order, and notwithstanding anything in the APA to the contrary, in addition to the fees and expenses incurred by Houlihan that are being assumed by Buyer pursuant to paragraph 12 of Schedule 2.3 of the APA, Buyer assumed 50% of the Transaction Fee (as defined in the Houlihan Engagement Agreement (defined below)), in an amount not to exceed $750,000 (the "Assumed Houlihan Transaction Fee"), that is or becomes due and owing by the Debtors to Houlihan pursuant to its Engagement Agreement with the Debtors, dated as of

November 17, 2014 (the "Houlihan Engagement Agreement"), as modified by that certain Order approving the Houlihan Engagement Agreement [Dkt. No. 324], and that is or becomes an Allowed Administrative Claim. Any portion of the Houlihan Transaction Fee other than the Assumed Houlihan Transaction Fee would be payable by the Debtors' Estates.

Under the terms of the Sale Order and the APA, Buyer did not assume or agree to be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of the Debtors, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities and the Assumed Houlihan Transaction Fee (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities"). For example, any Administrative Claims that are not an Assumed Liability are not payable by Buyer. Such Claims would instead be payable by the Debtors' Estates, as provided for under the Plan.

Furthermore, the APA provides that the following Assets of the Debtors (the "Excluded Assets") will not be sold to Buyer and are instead retained by the Debtors:

1) All of the Debtors' and their respective Affiliates' (as defined in the APA) certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Debtor or any of its Affiliates as a corporation, limited liability company or other entity.

2) All equity securities of any Debtor and all net operating losses of any Debtor (it being understood, however, that any such net operating losses shall, to the extent possible, be applied so as to reduce any Taxes that are Assumed Liabilities under the APA).

3) All Leases (and related Leased Real Property, as defined in the APA) and Contracts, in each case, other than the Assumed Contracts.

4) All (a) litigation, claims and causes of action against any former officer and/or director of any Debtor who was not an officer and/or director on the Petition Date (but not any Person who is a Transferred Employee (as defined in the APA)); (b) avoidance claims or causes of action arising under Chapter 5 of the Bankruptcy Code (other than the Acquired Avoidance Actions (as defined in the APA)); (c) all rights of Sellers with respect to the litigation captioned *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 1:05-md-01720 (E.D.N.Y), in which Debtors are plaintiffs; and (d) all rights (including rights of set-off and rights of recoupment), refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Debtors against third parties to the extent related to any Excluded Asset or Excluded Liability. Acquired Avoidance Actions consist of all causes of action, lawsuits, claims, rights of recovery and other similar rights of any Debtor, including avoidance claims or causes of action under Chapter 5 of the Bankruptcy Code, (i) against landlords, vendors or other counterparties who are party to any Assumed Contract, (ii) against any Participating Vendor (as defined

in the APA) and/or (iii) relating in any way to any party who was a beneficiary of a letter of credit or holding proceeds of a letter of credit on or before the Closing Date.

5)      Any loans or notes payable to any Debtor or any of its Affiliates from any employee of any Debtor or any of its Affiliates (other than Ordinary Course of Business employee advances and other than loans or notes from any Transferred Employees (as defined in the APA)).

6)      Any (1) confidential personnel and medical Records (as defined in the APA) pertaining to any Current Employees or Former Employees (each as defined in the APA) to the extent the disclosure of such information is prohibited by applicable law, (2) other Records that the Debtors are required by law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records to the extent that such portions relate to the Business or any Acquired Asset.

7)      All Permits (as defined in the APA) other than the Assumed Permits.

8)      All assets maintained pursuant to or in connection with any Employee Benefit Plan (other than the Health Plans).

9)      The rights of the Debtors under the APA and all cash and non-cash consideration payable or deliverable to the Debtors under the APA.

In conjunction with the APA, the Debtors, Buyer, and the Creditors' Committee also entered into a letter agreement, dated March 12, 2015 (the "Letter Agreement"), which is incorporated into and is an integral part of the APA, setting forth the agreement of the parties regarding various aspects of the Plan and other matters. As a result of the Letter Agreement and the Plan, Rodam agreed to vote the Rodam Claims in favor of the Plan and the Rodam Claims will be subordinate to all other Allowed General Unsecured Claims. Accordingly, upon the Effective Date, the Rodam Claims will be Allowed General Unsecured Claims, but will not be entitled to any distribution until all other Allowed General Unsecured Claims are paid in full in accordance with the Plan.

The APA and Sale Order also set forth the Assumption and Assignment Procedures and Rejection Procedures pursuant to which Buyer is designating Contracts and Leases for either (i) assumption by the Debtors and assignment to Buyer or (ii) exclusion and rejection. Originally Buyer was required to designate Contracts and Leases for assumption and assignment or for exclusion and rejection by May 15, 2015 (the "Designation Deadline"). Subject to the terms of the APA, Buyer agreed that at least 140 Leases would be designated for assumption and assignment.

Following the Closing Date, the Designation Deadline was initially extended through and including June 30, 2015. Subsequently, the Debtors and Buyer entered into the First Amendment to Asset Purchase Agreement, dated as of June 30, 2015 (the "First Amendment").[10] The First Amendment provides, inter alia, that the Designation Deadline shall be extended to August 31,

---

[10] The First Amendment is included as Exhibit A to the Notice of Extension of Designation Deadline [Dkt. No. 685].

2015; provided, however, that, the Designation Deadline with respect to a particular Lease shall be July 31, 2015 unless Buyer has received any requisite consent to the extended Designation Deadline from the applicable lessor, to the extent required under the Bankruptcy Code.

The First Amendment also clarifies Buyer's obligations under the APA with respect to the fees and expenses of Professionals employed by the Debtors and/or the Creditors' Committee, providing that, with respect to such fees and expenses (other than fees and expenses of such Professionals already paid as of June 24, 2015), commencing on June 25, 2015, Buyer will pay all such allowed fees and expenses incurred prior to the Effective Date of the Plan as they become due and payable, up to an aggregate maximum amount of $1,000,000.[11]

### G.    United States Trustee

The U.S. Trustee has appointed Benjamin A. Hackman, Esq. as the attorney for the U.S. Trustee in connection with these Chapter 11 Cases.  The Debtors have worked cooperatively to address concerns and comments from the U.S. Trustee's office during these Chapter 11 Cases.

### H.    Appointment of Creditors' Committee

On January 30, 2015, the U.S. Trustee appointed the Creditors' Committee in these Chapter 11 Cases.  The initial members of the Creditors' Committee were Hudson Bay, Simon Property Group, Inc. ("Simon"), GGP Limited Partnership, Hansae Co. Ltd., and Heart and Hips.  On March 3, 2015, Hudson Bay resigned from the Creditors' Committee.  Simon is the chair of the Creditors' Committee.  The counsel to the Creditors' Committee is Pachulski Stang Ziehl & Jones LLP and the financial advisor to the Creditors' Committee is Province, Inc.

### I.    Meeting of Creditors

The meeting of creditors under section 341(a) of the Bankruptcy Code was held on February 23, 2015 at the J. Caleb Boggs Federal Building, 844 King St., Room 5209, Wilmington, Delaware 19801, and was continued to and concluded on April 1, 2015.  At the meeting of creditors, the U.S. Trustee and creditors asked questions of a representative of the Debtors.

### J.    Schedules, Statements of Financial Affairs, and Claims Bar Date

The Debtors Filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules") on February 27, 2015 [Dkt. Nos. 360-67].  The Bankruptcy Court established (i) April 10, 2015 at 5:00 p.m. (prevailing Eastern Time) as the deadline for Creditors (other than governmental units) to File proofs of claim against the Debtors (the "General Bar Date"); and (ii) July 14, 2015 at 5:00 p.m. (prevailing Eastern Time) as the deadline for any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code) to File proofs of claim against the Debtors.

---

[11] For the avoidance of doubt, Professional Fee Claims that are not an obligation of Buyer under the APA, including the First Amendment thereto, would instead be payable by the Debtors' Estates, as provided for under the Plan.

## IV.  SUMMARY OF THE JOINT CHAPTER 11 PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Equity Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the Exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Equity Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Equity Interests in the Debtors, the Debtors' Estates, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict, inconsistency, or discrepancy between this Disclosure Statement and the Plan, the Confirmation Order, the Plan Supplement, or any other operative document, the terms of the Plan, Confirmation Order, Plan Supplement, and/or such other operative document, as applicable, shall govern and control; provided that, in any event, the terms of (1) the Confirmation Order and then (2) the Plan, in that order, shall govern and control over all other related documents.

### A.    Purpose and Effect of the Plan

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its constituents. Chapter 11 also allows a debtor to formulate and consummate a plan of liquidation.  A plan of liquidation sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of liquidation by a bankruptcy court makes the plan binding upon the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The Plan provides for the distribution of the proceeds of the liquidation of all Assets of the Debtors to various Creditors as contemplated under the Plan and for the wind-up of the Debtors' corporate affairs.  More specifically, the Plan provides for the creation of a Liquidation Trust that will administer and liquidate all remaining property of the Debtors, including Causes of Action, and for the funding of such Liquidation Trust.

Under the Plan, Claims against, and Equity Interests in, the Debtors are divided into Classes according to their relative seniority and other criteria.  If the Plan is confirmed by the Bankruptcy Court and consummated, the Claims and Equity Interests of the various Classes will be treated in accordance with the provisions in the Plan for each such Class and the Liquidation Trustee will make Distributions as provided in the Plan.  A general description of the Classes of Claims and Equity Interests created under the Plan, the treatment of those Classes under the Plan, and the property to be distributed under the Plan are described below.

### B.    Substantive Consolidation

Solely for purposes of voting and distribution in connection with the Plan, pursuant to the Global Plan Settlement set forth in Section 5.2 of the Plan, the Assets, Claims, and affairs of the Debtors and their Estates shall be "substantively consolidated." This means that the separateness of the Debtors and the Estates will be ignored and all of the Debtors and all of the Estates will be treated as if they were one Debtor and one Estate.

More specifically, on and after the Effective Date (i) all Assets and liabilities of the Debtors shall be treated as though they were pooled, (ii) each Claim Filed or deemed to be Filed against any Debtor shall be deemed Filed as a single Claim against and a single obligation of the Debtors, (iii) all Claims held by a Debtor against any other Debtor shall be cancelled or extinguished, (iv) no Distributions shall be made under the Plan on account of any Claim held by a Debtor against any other Debtor, (v) the Equity Interests shall be cancelled, (vi) no Distributions shall be made under the Plan on account of any Equity Interest held by a Debtor in any other Debtor, (vii) all guarantees of any Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof executed by any other Debtor shall be treated as one Multi-Debtor Consolidated Claim against the substantively-consolidated Debtors, and (viii) any joint or several liability of any of the Debtors shall be one obligation of the substantively-consolidated Debtors and any Claims based upon such joint or several liability shall be treated as one Multi-Debtor Consolidated Claim against the substantively-consolidated Debtors. In addition, Holders of Allowed General Unsecured Claims that constitute Multi-Debtor Consolidated Claims shall hold a single Allowed General Unsecured Claim against the substantively-consolidated Debtors that is in an Allowed amount that is 150% of the face amount of such Holder's Multi-Debtor Consolidated Claims against a single Debtor.

As permitted by section 1123(a)(5)(C) of the Bankruptcy Code, one basis for substantive consolidation in these Chapter 11 Cases, for purposes of voting and distribution in connection with the Plan, is the vote of the Class of Creditors entitled to vote in favor of such treatment.

The Plan is predicated on the treatment of General Unsecured Claims without regard to the specific Debtor as to which the Holders of such Claims assert their Claims. As noted above, Holders of Allowed General Unsecured Claims that constitute Multi-Debtor Consolidated Claims are treated under the Plan as holding an amount equal to 150% of the face amount of such Allowed General Unsecured Claims, thereby limiting potential multiple recoveries on account of such Claims, but recognizing that such Holders hold legal and contractual rights that are greater than Creditors whose Claims are solely against a single Debtor. Thus, the Plan proposes a hybrid form of substantive consolidation, in which Holders of Multi-Debtor Consolidated Claims receive some additional consideration to account for their additional potential contractual entitlements, while avoiding the difficulty and expense for the Debtors associated with determining these Holders' recoveries from each Estate. In all other respects, the Estates are treated as one for distribution purposes under the Plan. That is the essence of the Global Plan Settlement embodied in the Plan.

The form of substantive consolidation proposed under the Plan ultimately should benefit all Creditors. Absent the substantive consolidation proposed under the Plan, the process of disentangling the Estates of the Debtors would be both time consuming and costly.

First, allocating the value derived from each Debtor in connection with the Sale (or Causes of Action) would be challenging. There is no clear apportionment of the value and associated liabilities of the Debtors' store Leases (all in the name of 123 Retail), headquarters Lease (in the name of Seal123), store employees (employed by 123 Retail), headquarters employees (employed by Seal123), and intellectual property, including trademarks (all owed by Seal123). Apportioning value and associated liabilities with respect to these assets would be an exceedingly difficult task and could lead to prolonged disputes or litigation among the individual Debtors and their creditors.

Second, and relatedly, all of the Debtors were either primarily or secondarily liable on the DIP Credit Agreement, which was credit bid in connection with the Sale. Absent substantive consolidation, there is no clear answer concerning how much value each Estate received in the form of the credit bid, and therefore how much of the cash paid by Buyer is allocable to each Estate.

Third, based on the Debtors' Schedules, certain Debtors are indebted to other Debtors on account of intercompany claims in the following prepetition amounts: (1) 123 Retail is indebted to Seal123 for approximately $125.8 million; and (2) 123 Catalog is indebted to Seal123 for approximately $69.5 million. Notably, these numbers just relate to prepetition intercompany claims and do not cover any postpetition, pre-Sale intercompany claims, or any rights of contribution, indemnification or reimbursement among the Estates. Prior to the Sale, the revenues derived from 123 Catalog's online sales were deposited into Seal123's accounts and commingled with the proceeds of 123 Retail's brick-and-mortar sales. Seal123, in turn, directly and indirectly made certain operational payments on behalf of 123 Retail and 123 Catalog. For example, payments were made to pay vendors, insurers, and all employees of 123 Retail and 123 Catalog. In addition, net revenues from the sale of gift cards, which business was operated by 123 GC, were transferred monthly to Seal123 accounts. Absent substantive consolidation, reconciliation and treatment of these intercompany claims would be required, which could be both difficult and costly. In addition, there could be disputes among the Estates as to whether the intercompany claims should be treated as Claims for distribution purposes, which could create additional costs and expenses for the Estates.

The Plan does not propose substantive consolidation to deprive a specific Creditor or group of Creditors of their rights while providing a windfall to other Creditors. Rather, given the limited amount available for distribution to General Unsecured Creditors, and the expense involved in disentangling the financial affairs of the Estates, the recovery by Creditors will be maximized by consolidating the assets and liabilities of each of the Debtors. Accordingly, the Plan Proponents believe that substantive consolidation of the Debtors, for purposes of voting and distribution in connection with the Plan, is in the best interest of the Debtors' Estates and parties in interest.

## C.    Liquidation Trust

On the Effective Date, the Debtors and the Liquidation Trustee shall execute the Liquidation Trust Agreement and shall take all steps necessary to establish the Liquidation Trust in accordance with the Plan and the beneficial interests therein, which shall be for the benefit of the Liquidation Trust Beneficiaries.

On the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Liquidation Trust all of their rights, title, and interest in and to all of the Liquidation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, except as

specifically provided in the Plan, the Confirmation Order, the L/C Credit Agreement, or the L/C Facility Orders, the Liquidation Trust Assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to (i) the Liquidation Trust Interests and the Liquidation Trust Expenses, as provided for in the Plan and the Liquidation Trust Agreement, and (ii) Claims required to be paid by the Liquidation Trust pursuant to the Plan with priority over General Unsecured Claims, including, without limitation, Administrative Claims and Professional Fee Claims.

The Liquidation Trustee shall be the exclusive trustee of the Liquidation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The Liquidation Trustee shall be Meta Advisors LLC, and any successor thereto, appointed and serving from time to time as Liquidation Trustee under the Liquidation Trust Agreement. The salient terms of the Liquidation Trustee's employment, including the Liquidation Trustee's duties and compensation, shall be set forth in the Liquidation Trust Agreement.

The Liquidation Trust shall be governed by the Liquidation Trust Agreement and administered by the Liquidation Trustee. The powers, rights, and responsibilities of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article V of the Plan, subject to any required reporting to the Liquidation Trust Oversight Committee as may be set forth in the Liquidation Trust Agreement. The Liquidation Trust shall hold and distribute the Liquidation Trust Assets in accordance with the provisions of the Plan and the Liquidation Trust Agreement. Other rights and duties of the Liquidation Trustee and the Liquidation Trust Beneficiaries shall be as set forth in the Liquidation Trust Agreement.

The Liquidation Trust Agreement generally will provide for, among other things, the payment of the (i) Liquidation Trust Expenses and (ii) other reasonable expenses of the Liquidation Trust.

On or before the date that is seven (7) days prior to the Voting Deadline (defined below), the Debtors will File a Plan Supplement that includes, among other things, the form of Liquidation Trust Agreement and the identity and compensation of the initial members of the Liquidation Trust Oversight Committee. As the Plan Supplement is updated or otherwise modified, it will be made available at the Debtors' restructuring website at https://www.donlinrecano.com/Clients/wsi/Index.

## D.    Estimated Recoveries for Holders of General Unsecured Claims

The Plan Proponents estimate that Holders of Allowed General Unsecured Claims in these Chapter 11 Cases should recover between 5.5% and 6.6% of the total amount of their Allowed General Unsecured Claims, assuming that (i) there are no additional significant recoveries with respect to the Causes of Action that the Liquidation Trust may pursue; (ii) there are no significant adjustments to the total estimated amount of General Unsecured Claims based on the proofs of claims Filed against the Debtors; and (iii) there are no significant increases or reductions of General Unsecured Claims based on the assumption and assignment or rejection, respectively, of additional Contracts and Leases of the Debtors. The Plan Proponents have calculated this range of projected recoveries for General Unsecured Claims taking into account two variables: (i) the total estimated

amount of General Unsecured Claims, in accordance with the Debtors' Schedules; and (ii) the total estimated amount of Cash available for Distributions to Holders of Allowed General Unsecured Claims. The Plan Proponents have not attributed value to other Assets of the Debtors.

As described in more detail in Section II.C.2 of this Disclosure Statement, after making adjustments on account of the Rodam Claims and certain Multi-Debtor Consolidated Claims, the Plan Proponents estimate that the General Unsecured Claims against the Debtors should not exceed $91 million, based on the Debtors' Schedules. As discussed in Section II.C.2, the Plan Proponents estimate that the Filed General Unsecured Claims against the Debtors as of the General Bar Date should total about $101.3 million and additional assumptions and assignments or rejections of Contracts or Leases will result in the disallowance of certain Claims and the assertion of new Claims that are neither scheduled nor covered by previously-Filed proofs of claim. Therefore, the Allowed General Unsecured Claims may exceed the $91 million estimate, based on the Debtors' Schedules.

The Debtors' Cash consists or will consist primarily of (i) the unspent portion of the $7,500,000 Cash payment component of the Purchase Price under the APA; (ii) recoveries with respect to the Causes of Action; and (iii) any other potential recoveries with respect to Excluded Assets under the APA. However, the Cash has been or will be reduced by, among other things, (i) the Liquidation Trust Expenses; (ii) any other costs and expenses that constitute Excluded Liabilities of Buyer, including certain Non-Assumed Non-Ordinary Course Administrative Claims and Professional Fee Claims as to which Buyer is not liable, as provided under the APA and described in more detail in Section III.F of this Disclosure Statement; (iii) any other wind-down fees and expenses of the Debtors that are not otherwise payable by Buyer under the APA; and (iv) any amounts not paid by Buyer for which the Liquidation Trust is secondarily liable. After considering all of these variables, the Plan Proponents estimate a high range of Cash available for Distributions of $6,000,000, a middle range of $5,500,000, and a low range of $5,000,000; provided, however, that these ranges do not take into account any additional potential recoveries with respect to the Causes of Action that the Liquidation Trust may pursue. Taking into account the estimated $91 million of General Unsecured Claims described above, the Plan Proponents estimate that Holders of General Unsecured Creditors will recover approximately 6.6% at the high range, 6% at the medium range, and 5.5% at the low range of projected recoveries.[12] The actual amount of Cash to satisfy Allowed General Unsecured Claims may be higher or lower than these ranges.

### E.     Treatment of Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Allowed L/C Facility Claims, Assumed Non-Ordinary Course Administrative Claims, Non-Assumed Non-Ordinary Course Administrative Claims, Assumed Ordinary Course Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and the respective treatment of such unclassified Claims is set forth in Article 3.1 of the Plan.

### 1.     L/C Facility Claims

---

[12] Each Holder of a Multi-Debtor Consolidated Claim will receive a single General Unsecured Claim against the substantively-consolidated Debtors that is 150% of the face amount of such Holder's Multi-Debtor Consolidated Claim against a single Debtor, *i.e.*, extrapolating the above estimates, approximately 9.9% at the high range of the estimate, 9% at the middle range of the estimate, and 8.2% at the low range of the estimate.

All L/C Facility Claims are Allowed.  On the Effective Date, BofA, as the Holder of the Allowed L/C Facility Claim, shall have such rights as appear in the L/C Credit Agreement and the L/C Facility Orders, including, without limitation, retaining its first-priority, duly-perfected Lien and security interest in and upon the L/C Cash Collateral as provided for under the L/C Credit Agreement and the L/C Facility Orders, respectively.  If as of the Effective Date there remain any outstanding letters of credit, the L/C Credit Agreement shall remain in full force and effect until such time as all outstanding letters of credit have either been returned undrawn, or fifteen (15) days after the expiration date thereof and no drawing or presentation has been made.  BofA shall further retain the L/C Cash Collateral relating to outstanding letters of credit until such time as all such letters of credit have either been returned undrawn, or fifteen (15) days after the expiration date thereof and no drawing or presentation has been made, at which time BofA shall release the L/C Cash Collateral to Buyer in accordance with the APA.  Notwithstanding any contrary provision or term in the Plan, at the election of Buyer, in lieu of BofA retaining the L/C Cash Collateral, Buyer may deliver to BofA a back-to-back letter of credit issued by a financial institution reasonably satisfactory to BofA, in an amount equal to the sum of the L/C Cash Collateral then on deposit in the Pre-Petition Cash Collateral Account and the Post-Petition Cash Collateral Account (in each case as defined in the L/C Facility Orders), in which case BofA shall release the L/C Cash Collateral to Buyer.  From and after the Effective Date, BofA, as L/C Issuer (as defined in the L/C Credit Agreement), may apply L/C Cash Collateral on deposit to satisfy the letter of credit obligations without any further notice to any party and without any order of the Bankruptcy Court; and the Confirmation Order shall provide that BofA, as L/C Issuer (as defined in the L/C Credit Agreement), is granted relief from any applicable injunction imposed by the Plan and/or the Confirmation Order to enable it to apply the L/C Cash Collateral in respect of drawings and letter of credit fees when due and/or for reimbursement and/or payment of any other amounts that may become due under the L/C Credit Agreement (as provided in the L/C Credit Agreement and L/C Facility Orders).

## 2.    Assumed Non-Ordinary Course Administrative Claims

Except as otherwise provided for in the Plan, and subject to the requirements of the Plan, on, or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) thirty (30) days following the date on which an Assumed Non-Ordinary Course Administrative Claim becomes an Allowed Assumed Non-Ordinary Course Administrative Claim, the Holder of such Allowed Assumed Non-Ordinary Course Administrative Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Assumed Non-Ordinary Course Administrative Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Assumed Non-Ordinary Course Administrative Claim or (b) such other less favorable treatment as to which such Holder and Buyer shall have agreed upon in writing.  Allowed Assumed Non-Ordinary Course Administrative Claims shall be paid by Buyer pursuant to the APA.

## 3.    Non-Assumed Non-Ordinary Course Administrative Claims

Except as otherwise provided for in the Plan, and subject to the requirements of the Plan, on, or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) thirty (30) days following the date on which a Non-Assumed Non-Ordinary Course Administrative Claim becomes an Allowed Non-Assumed Non-Ordinary Course Administrative Claim, the Holder of such Allowed Non-Assumed Non-Ordinary Course Administrative Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Non-Assumed Non-Ordinary Course

Administrative Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Non-Assumed Non-Ordinary Course Administrative Claim or (b) such other less favorable treatment as to which such Holder and the Liquidation Trustee shall have agreed upon in writing. Allowed Non-Assumed Non-Ordinary Course Administrative Claims shall be paid solely by the Liquidation Trust. Buyer shall have no obligation to pay any such Claims.

### 4.    Assumed Ordinary Course Administrative Claims

Assumed Ordinary Course Administrative Claims shall be paid by Buyer in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto. Holders of Assumed Ordinary Course Administrative Claims are not required to File a request for payment of such Claims.

### 5.    Professional Fee Claims

All final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be made by application Filed with the Bankruptcy Court and served on counsel to the Liquidation Trustee, counsel to Buyer, counsel to the Debtors, and counsel to the U.S. Trustee no later than thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such applications must be Filed and served on counsel to the Liquidation Trustee, counsel to Buyer, counsel to the Debtors, counsel to the Creditors' Committee, counsel to the U.S. Trustee and the requesting Professional on or before the date that is twenty-one (21) days after the date on which the applicable application was served (or such longer period as may be allowed by Order of the Bankruptcy Court or by agreement with the requesting Professional). All Professional Fee Claims shall be paid to the extent approved by Order of the Bankruptcy Court within five (5) Business Days from entry of such Order by the Buyer to the extent it is liable under the APA and by the Liquidation Trust to the extent not paid by the Buyer. On the Effective Date, the Liquidation Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Liquidation Trust and shall be maintained by the Liquidation Trustee in accordance with the Plan and the Liquidation Trust Agreement. The Liquidation Trust shall fund the Professional Fee Reserve on the Effective Date in an amount that is agreed upon by the Debtors and the Creditors' Committee prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date not paid by the Buyer under the APA. If the Debtors and the Creditors' Committee are unable to agree on an amount by which the Professional Fee Reserve is to be funded, the Debtors and the Creditors' Committee shall submit the issue to the Bankruptcy Court, which, following notice and a hearing, shall fix the amount of the required funding. All Professional Fee Claims that have not previously been paid, otherwise satisfied, or withdrawn shall be paid from the Professional Fee Reserve. Any excess funds in the Professional Fee Reserve shall be released to the Liquidation Trust to be used for other purposes consistent with the Plan and the Liquidation Trust Agreement.

### 6.    Priority Tax Claims

In full satisfaction, settlement, and release of and in exchange for such Claims, Allowed Priority Tax Claims shall be paid by Buyer, at Buyer's option, as follows: (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Tax Claim on the later of the Effective Date or thirty (30) days following the date on which such Priority Tax Claim becomes an Allowed

Priority Tax Claim, (b) in regular installment payments in Cash over a period not exceeding five (5) years after the Petition Date, plus interest on the unpaid portion thereof at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Confirmation Date occurs, and (c) such other treatment as to which the Holder of an Allowed Priority Tax Claim and the Buyer shall have agreed upon in writing.

## F.    Classification and Treatment of Claims and Interests

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

### 1.    Class 1:  Prepetition Credit Agreement Claims

Subject to the L/C Facility Orders and the DIP Facility Order, including the provisions of each relating to the subordination and/or release, and priorities, of Liens, all Liens, Claims, rights, and adequate protection held by any Holder of an Allowed Prepetition Credit Agreement Claim as of the Effective Date with respect to such Claim are preserved until such time as such Holder has been paid by the Liquidation Trust in Cash equal to the value of such Claim.

Class 1 is Unimpaired and therefore Holders of Prepetition Credit Agreement Claims are conclusively presumed to have accepted the Plan.

### 2.    Class 2:  Secured Claims

On, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) thirty (30) days following the date on which a Secured Claim becomes an Allowed Secured Claim, the Holder of such Allowed Secured Claim shall receive, at the election of the Liquidation Trustee or Buyer (solely to the extent that the Secured Claim is an Assumed Claim) in full satisfaction, settlement, and release of and in exchange for, such Allowed Secured Claim, (i) Cash equal to the value of such Claim, (ii) the return of the Holder's Collateral securing such Claim, (iii) such Claim reinstated pursuant to sections 1124(1) or 1124(2) of the Bankruptcy Code, or (iv) such other less favorable treatment as to which such Holder and the Liquidation Trustee or Buyer, as applicable, shall have agreed upon in writing. Any Holder of an Allowed Secured Claim shall retain its Lien in the Collateral or the proceeds of the Collateral (to the extent that such Collateral is sold by the Liquidation Trust free and clear of such Lien) to the same extent and with the same priority as such Lien held as of the Effective Date until such time as (A) such Holder (i) has been paid Cash equal to the value of such Claim, (ii) has received a return of the Collateral securing such Claim, (iii) has such Claim reinstated pursuant to sections 1124(1) or 1124(2) of the Bankruptcy Code, or (iv) has been afforded such other less favorable treatment as to which such Holder and the Liquidation Trustee or Buyer, as applicable, shall have agreed upon in writing; or (B) such purported Lien has been determined by an Order of the Bankruptcy Court to be invalid or otherwise avoidable.

Class 2 is Unimpaired and therefore Holders of Secured Claims are conclusively presumed to have accepted the Plan.

### 3.    Class 3:  Priority Claims

On, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) thirty (30) days following the date on which a Priority Claim becomes payable pursuant to any agreement between Buyer and the Holder of such Priority Claim or (iii) the date on which a Priority Claim becomes payable pursuant to and as specified by an Order of the Bankruptcy Court, the Holder of such Allowed Priority Claim shall receive solely from Buyer pursuant to the APA, in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Claim, either (i) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Claim or (ii) such other less favorable treatment as to which such Holder and Buyer shall have agreed upon in writing.

Class 3 is Unimpaired and therefore Holders of Priority Claims are conclusively presumed to have accepted the Plan.

### 4.    Class 4:  Assumed General Unsecured Claims

The Holder of an Assumed General Unsecured Claim shall receive solely from Buyer pursuant to the APA, in full satisfaction, settlement, and release of and in exchange for such Assumed General Unsecured Claim, payment in full of such Claim in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

Class 4 is Unimpaired and therefore Holders of Assumed General Unsecured Claims are conclusively presumed to have accepted the Plan.

### 5.    Class 5:  General Unsecured Claims

On, or as soon as reasonably practicable after the Effective Date, the Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Claim, (i) its Pro Rata share of the Liquidation Trust Interests, or (ii) such other less favorable treatment as to which such Holder and the Liquidation Trustee shall have agreed upon in writing.  Pursuant to the Global Plan Settlement, Holders of Allowed General Unsecured Claims that constitute Multi-Debtor Consolidated Claims shall hold a single Allowed General Unsecured Claim against the Debtors that is in an Allowed amount that is 150% of the Face Amount of such Holder's Allowed Multi-Debtor Consolidated Claim against a single Debtor.  (By way of illustration, an Entity that holds an Allowed General Unsecured Claim in the Face Amount of $1,000,000 against a Debtor based on a contract and against another Debtor based upon a guarantee with respect to that contract will be entitled to an Allowed General Unsecured Claim in the Allowed amount of $1,500,000 against the Debtors.)  No Distributions shall be made by the Liquidation Trust to Holders of Allowed General Unsecured Claims prior to the Administrative Claim Bar Date.

Rodam has agreed in writing to vote the Rodam Claims to accept the Plan and that, upon the Effective Date, the Rodam Claims would be subordinate to all other Allowed General Unsecured Claims.  Accordingly, upon the Effective Date, the Rodam Claims shall be Allowed General Unsecured Claims, but shall not be entitled to any distribution until all other Allowed General Unsecured Claims are paid in full in accordance with the Plan.

Class 5 is Impaired and therefore Holders of General Unsecured Claims are entitled to vote on the Plan.

### 6.     Class 6:  Subordinated Claims

On the Effective Date, Holders of Subordinated Claims shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan on account of such Subordinated Claims.

Class 6 is deemed to have rejected the Plan and therefore Holders of Subordinated Claims are not entitled to vote on the Plan.

### 7.     Class 7:  Equity Interests

As of the Effective Date, all Equity Interests of any kind shall be deemed void, cancelled, and of no further force and effect and the Holders thereof shall not receive or retain any property or interest in property under the Plan on account of such Equity Interests.

Class 7 is deemed to have rejected the Plan and therefore Holders of Equity Interests are not entitled to vote on the Plan.

### 8.     Special Provisions Regarding Insured Claims

Any Allowed General Unsecured Claim with respect to an Insured Claim shall be limited to the amount by which the Allowed Insured Claim exceeds the total coverage available with respect to such Insured Claim under the Debtors' applicable insurance policies.

If there is insurance, any party with rights against or under the applicable insurance policy, including, without limitation, Buyer, the Liquidation Trust, and Holders of Insured Claims, may pursue such rights.

Nothing in Section 3.5 of the Plan shall constitute a waiver of any causes of action the Debtors or the Liquidation Trust may hold against any Entity, including the Debtors' insurance carriers; and nothing in Section 3.5 of the Plan is intended to, shall, or shall be deemed to preclude any Holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any Distribution such Holder may receive under the Plan; provided, however, that the Debtors and the Liquidation Trustee do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

The Plan shall not expand the scope of, or alter in any other way, the rights and obligations of the Debtors' insurers under their policies, and the Debtors' insurers shall retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including Buyer, the Debtors and the Liquidation Trustee, the existence, primacy and/or scope of available coverage under any alleged applicable policy.  The Plan shall not operate as a waiver of any other Claims the Debtors' insurers have asserted or may assert in any proof of claim or the Debtors' rights and defenses to such proofs of claim.

### 9.    Provision Governing Allowance and Defenses to Claims

On and after the Effective Date, the Liquidation Trust shall have all of the Debtors' and the Estates' rights under Section 558 of the Bankruptcy Code. Nothing under the Plan shall affect the rights and defenses of the Debtors, the Estates, and the Liquidation Trust in respect of any Claim, including all rights in respect of legal and equitable objections, defenses, setoffs, or recoupment against such Claims; provided, however, that with respect to a Multi-Debtor Consolidated Claim, such rights, defenses, setoffs, or recoupments against such Claim shall not be affected by the substantive consolidation of the Estates of the Debtors and will apply to a Multi-Debtor Consolidated Claim only to the extent that such rights, defenses, setoffs, or recoupments would have applied against the Claims underlying the Multi-Debtor Consolidated Claim had the substantive consolidation of the Estates of the Debtors not taken place. The Liquidation Trust may, but shall not be required to, setoff against any Claim (for purposes of determining the Allowed amount of such Claim on which Distribution shall be made), any claims of any nature whatsoever that the Estates or the Liquidation Trust may have against the Claim Holder, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidation Trust of any such Claim it may have against such Claim Holder. The Liquidation Trustee may designate any Non-Assumed Claim as Allowed at any time from and after the Effective Date.

### G.    Acceptance or Rejection of the Plan

### 1.    Impaired Classes of Claims Entitled to Vote

Only the votes of Holders of Claims in Class 5 shall be solicited with respect to the Plan.

### 2.    Acceptance by an Impaired Class

In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, Class 5 shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in Class 5 that have timely and properly voted to accept or reject the Plan.

### 3.    Presumed Acceptances by Unimpaired Classes

Class 1, Class 2, Class 3, and Class 4 are Unimpaired under the Plan. Under section 1126(f) of the Bankruptcy Code, the Holders of Claims in such Unimpaired Classes are conclusively presumed to have accepted the Plan, and, therefore, the votes of the Holders of such Claims shall not be solicited.

### 4.    Impaired Classes Deemed to Reject Plan

Holders of Claims and Equity Interests in Class 6 and Class 7 are not entitled to receive or retain any property or interests in property under the Plan. Under section 1126(g) of the Bankruptcy Code, such Holders are deemed to have rejected the Plan, and, therefore, the votes of such Holders shall not be solicited.

### 5.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

Because at least one Impaired Class is deemed to have rejected the Plan, the Plan Proponents will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

### 6.    Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Equity Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

### H.    Implementation of the Plan

### 1.    Implementation of the Plan

The Plan will be implemented by, among other things, the establishment of the Liquidation Trust, the transfer to the Liquidation Trust of the Assets of the Estates, including, without limitation, all Cash and the Causes of Action, and the making of Distributions by the Liquidation Trust in accordance with the Plan and Liquidation Trust Agreement.

### 2.    Global Plan Settlement and Substantive Consolidation

The Plan contemplates and is predicated upon entry of an Order substantively consolidating the Debtors' Estates and the Chapter 11 Cases pursuant to the Global Plan Settlement set forth below, approval of which is being sought under Bankruptcy Rule 9019.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code and Bankruptcy Rule 9019, effective as of the Effective Date, of the substantive consolidation of the Estates of the Debtors for the purposes of confirming and consummating the Plan, including, but not limited to, voting, Confirmation and Distribution, and the Bankruptcy Court's findings that the substantive consolidation of the Estates of the Debtors to the extent set forth in the Plan is (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (ii) in the best interests of the Debtors, the Estates and all Holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing.

Pursuant to the Global Plan Settlement, on and after the Effective Date, (i) all Assets and liabilities of the Debtors shall be treated as though they were pooled, (ii) each Claim filed or to be filed against any Debtor shall be deemed filed as a single Claim against, and a single obligation of, the Debtors, (iii) all Claims held by a Debtor against any other Debtor shall be cancelled or extinguished, (iv) no Distributions shall be made under the Plan on account of any Claim held by a Debtor against any other Debtor, (v) the Equity Interests shall be cancelled, (vi) no Distributions shall be made under the Plan on account of any Equity Interest held by a Debtor in any other Debtor, (vii) all guarantees of any Debtors of the obligations of any other Debtor shall be eliminated so that

any Claim against any Debtor and any Claim based upon a guarantee thereof executed by any other Debtor shall be treated as one Multi-Debtor Consolidated Claim against the substantively-consolidated Debtors, and (viii) any joint or several liability of any of the Debtors shall be one obligation of the substantively-consolidated Debtors and any Claims based upon such joint or several liability shall be treated as one Multi-Debtor Consolidated Claim against the substantively-consolidated Debtors.

The substantive consolidation of the Debtors under the Plan and pursuant to the Global Plan Settlement shall not (other than for purposes related to funding Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (iii) any agreements entered into by the Liquidation Trust on or after the Effective Date, (iv) the Debtors' or the Liquidation Trust's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (v) any Causes of Action or Avoidance Actions or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no substantive consolidation of the Estates of the Debtors, and (vi) distributions to the Debtors or the Liquidation Trust from any insurance policies or the proceeds thereof. Notwithstanding the substantive consolidation called for in the Plan and pursuant to the Global Plan Settlement, each and every Debtor shall remain responsible for the payment of U.S. Trustee fees pursuant to 28 U.S.C. § 1930 until its particular case is closed, dismissed or converted.

Pursuant to the Global Plan Settlement, Holders of Allowed General Unsecured Claims that constitute Multi-Debtor Consolidated Claims shall hold a single Allowed General Unsecured Claim against the substantively-consolidated Debtors that is in an Allowed amount that is 150% of the Face Amount of such Holder's Allowed Multi-Debtor Consolidated Claim against a single Debtor. (By way of illustration, an Entity that holds an Allowed General Unsecured Claim in the Face Amount of $1,000,000 against a Debtor based on a contract and against another Debtor based upon a guarantee with respect to that contract will be entitled to an Allowed General Unsecured Claim in the Allowed amount of $1,500,000 against the Debtors.)

The Plan and Disclosure Statement, jointly, shall serve as, and shall be deemed to be, a motion for entry of an Order of the Bankruptcy Court under Bankruptcy Rule 9019 approving the Global Plan Settlement and the associated substantive consolidation of the Debtors' Estates and Chapter 11 Cases. If no objection to the Global Plan Settlement is timely filed and served by any Holder of an Impaired Claim affected by the Plan as provided in the Plan on or before the Voting Deadline or such other date as may be established by the Bankruptcy Court, the Global Plan Settlement may be approved by the Bankruptcy Court as part of the Confirmation Order. If any such objections are timely filed and served, the Global Plan Settlement and the objections thereto shall be considered by the Bankruptcy Court at the Confirmation Hearing.

### 3. The Debtors' Post-Effective Date Corporate Affairs

(a)     Debtors' Directors and Officers

On the Effective Date, each of the Debtors' directors and officers shall be terminated automatically without the need for any corporate action or approval and without the need for any

corporate filings, and shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.

(b)    Wind-Up and Dissolution of the Debtors.

The Debtors shall be dissolved automatically effective on the Effective Date without the need for any corporate action or approval and without the need for any corporate filings.  On the Effective Date or as soon thereafter as is reasonably practicable, the Liquidation Trustee shall wind-up the affairs of the Debtors, if any, and file final tax returns for the Debtors.  The Liquidation Trust shall bear the cost and expense of the wind-up of the affairs of the Debtors, if any, and the cost and expense of the preparation and filing of the final tax returns for the Debtors.

## I.    Executory Contracts and Unexpired Leases

### 1.    Executory Contracts and Unexpired Leases

Subject to the occurrence of the Effective Date, all executory contracts and unexpired leases of the Debtors that have not been assumed and assigned, or rejected, prior to the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order, as of the Confirmation Date.  Any Creditor asserting a Rejection Claim shall File a proof of claim within thirty (30) days of the Effective Date.

### 2.    Rejection Claims

Any Rejection Claims that are not timely Filed pursuant to Section 6.1 of the Plan shall be forever disallowed and barred.  If one or more Rejection Claims are timely Filed pursuant to Section 6.1 of the Plan, the Liquidation Trustee may File an objection to any Rejection Claim on or prior to the Claim Objection Deadline.

## J.    Provisions Governing Distributions

### 1.    Distributions for Allowed Claims

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable distribution date shall be made on or as soon as practicable after the applicable distribution date.  Distributions on account of Claims that first become Allowed Claims after the applicable distribution date shall be made pursuant to Section 8.5 of the Plan and on the day selected by the Liquidation Trustee.

The Liquidation Trustee may accelerate any distribution date with respect to Distributions on account of Allowed General Unsecured Claims other than the initial distribution date if the facts and circumstances so warrant and to the extent not inconsistent with the Plan.

Distributions made as soon as reasonably practicable after the Effective Date or such other date set forth in the Plan shall be deemed to have been made on such date.

### 2.    Interest on Claims

Except to the extent provided in section 506(b) of the Bankruptcy Code, the Plan, or the Confirmation Order, or under or in connection with the L/C Facility Orders, post-petition interest shall not accrue or be paid on Claims, and no Holder of an Allowed Claim shall be entitled to interest accruing on any Claim from and after the Petition Date.

3.     **Distributions by Liquidation Trustee and Buyer as Disbursing Agents**

The Liquidation Trustee shall serve as the disbursing agent under the Plan with respect to Distributions to Holders of Allowed Claims required to be paid by the Liquidation Trust pursuant to the Plan.  Buyer shall serve as the disbursing agent with respect to Distributions to Holders of Allowed Claims required to be paid by Buyer pursuant to the APA and the Sale Order.  The Liquidation Trustee and Buyer, as applicable, shall make all Distributions required to be made to such Holders of Allowed Claims, in the case of the Liquidation Trustee, pursuant to the Plan and the Liquidation Trust Agreement, and, in the case of the Buyer, pursuant to the APA and the Sale Order. Neither the Liquidation Trustee nor the Buyer shall be required to give any bond or surety or other security for the performance of their duties as disbursing agents unless otherwise ordered by the Bankruptcy Court.

4.     **Means of Cash Payment**

Cash payments under the Plan shall be made, at the option, and in the sole discretion, of the Liquidation Trustee or Buyer, as applicable, by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Liquidation Trustee or Buyer, as applicable.  Cash payments to foreign creditors may be made, at the option, and in the sole discretion, of the Liquidation Trustee or Buyer, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.  Cash payments made pursuant to the Plan in the form of checks issued by the Liquidation Trustee or Buyer, as applicable, shall be null and void if not cashed within one hundred and twenty (120) days of the date of the issuance thereof.  Requests for reissuance of any check within one hundred and twenty (120) days of the date of the issuance thereof shall be made directly to the Liquidation Trustee or Buyer, as applicable.

For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

5.     **Fractional Distributions**

Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

6.     **De Minimis Distributions**

Notwithstanding anything to the contrary contained in the Plan, the Liquidation Trustee and Buyer, as applicable, shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be

distributed on account of such Claim is less than $25, and such amount, solely with respect to the Liquidation Trustee, shall be distributed in accordance with the terms of the Plan and the Liquidation Trust Agreement.  Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $25 shall be forever barred from asserting such Claim against Liquidation Trust Assets or the Buyer.

### 7.    Delivery of Distributions

Distributions to Holders of Allowed General Unsecured Claims shall be made (a) at the addresses set forth on the proofs of claim Filed by such Holders, (b) at the addresses reflected in the Schedules if no proof of claim has been Filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Liquidation Trustee or to Buyer, as applicable.  If any Holder's Distribution is returned as undeliverable, a reasonable effort shall be made to determine the current address of such Holder, but no further Distributions to such Holder shall be made unless and until the Liquidation Trustee or Buyer, as applicable, is notified of such Holder's then current address, at which time all missed Distributions shall be made to such Holder without interest.  The responsibility to provide the Liquidation Trustee or Buyer, as applicable, a current address of a Holder of Claims shall always be the responsibility of such Holder.  Except as set forth above, nothing contained in the Plan shall require the Liquidation Trustee or Buyer, as applicable, to attempt to locate any Holder of an Allowed General Unsecured Claim.  Amounts in respect of undeliverable Distributions made by the Liquidation Trustee shall be held in trust on behalf of the Holder of the Claim to which they are payable by the Liquidation Trust until the earlier of the date that such undeliverable Distributions are claimed by such Holder and one hundred twenty (120) days after the date the undeliverable Distributions were made.

### 8.    Application of Distribution Record Date

At the close of business on the Distribution Record Date, the claims registers for all General Unsecured Claims shall be closed, and there shall be no further changes in the record holders of General Unsecured Claims.  Except as provided in the Plan, the Liquidation Trustee and Buyer, as applicable, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of General Unsecured Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims registers as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Plan to such Entities or the date of such Distributions.

### 9.    Withholding, Payment, and Reporting Requirements with Respect to Distributions

All Distributions under the Plan to be made by the Liquidation Trustee and Buyer, as applicable, shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding, payment, and reporting requirements.  The Liquidation Trustee and Buyer, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. The Liquidation Trustee or the Buyer, as applicable, may require, in its sole and absolute discretion

and as a condition to the receipt of any Distribution, that the Holder of an Allowed General Unsecured Claim complete and return to the Liquidation Trust or the Buyer, as applicable, the appropriate Form W-8 or Form W-9, as applicable to each Holder.  Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed upon the Liquidation Trust or Buyer, as applicable, in connection with such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Liquidation Trustee or Buyer, as applicable, for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidation Trust or Buyer, as applicable, in connection with such Distribution.

### 10.     Setoffs

The Liquidation Trust or the Buyer, as applicable, may, but shall not be required to, set off against any Claim or any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors, the Liquidation Trust, or the Buyer, as applicable, may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidation Trust or the Buyer, as applicable, of any such claim that it may have against such Holder.

### 11.     No Distribution in Excess of Allowed Amounts

Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim (excluding Distributions with respect to Multi-Debtor Consolidated Claims pursuant to Section 3.3.1(a) and Section 5.2(d) of the Plan and payments on account of interest due and payable from and after the Effective Date pursuant to the Plan, if any).

### 12.     Allocation of Distributions

All Distributions received under the Plan by Holders of Claims shall be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim.

### 13.     Joint Distributions

The Liquidation Trustee may, in its sole discretion, make Distributions jointly to any Holder of a Claim and any other Entity who has asserted, or whom the Liquidation Trustee has determined to have, an interest in such Claim.

### 14.     Forfeiture of Distributions

If the Holder of a Claim fails to cash a check payable to it within the time period set forth in Section 7.4(a) of the Plan, fails to claim an undeliverable Distribution within the time limit set forth in Section 7.7 of the Plan, or fails to complete and return to the Liquidation Trust the appropriate Form W-8 or Form W-9 within one hundred twenty (120) days of the request by the Liquidation Trust or Buyer, as applicable, for the completion and return to it of the appropriate form pursuant to Section 7.9 of the Plan, then such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Liquidation Trust or Buyer, as applicable, any Liquidation Trust Interests held by such Holder shall be deemed cancelled, and the Claims of such Holder shall be forever barred.  If the forfeited Distributions relate to Non-Assumed Claims, they shall become unrestricted Liquidation Trust Assets and be redistributed to the Liquidation Trust Beneficiaries after reserving as necessary for payment of Liquidation Trust Expenses and otherwise in compliance with this Article and the Liquidation Trust Agreement.  In the event the Liquidation Trustee determines, in its sole discretion, that any such amounts are too small in total to redistribute cost-effectively to the Liquidation Trust Beneficiaries, the Liquidation Trustee may instead donate them to the American Bankruptcy Institute Endowment Fund free of any restrictions thereon, notwithstanding any federal or state escheat laws to the contrary.  If the forfeited Distributions relate to Assumed Claims, they shall be returned to Buyer free of any restrictions thereon, notwithstanding any federal or state escheat laws to the contrary.

### K.    Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Distributions with Respect Thereto

#### 1.    Objections to and Resolution of Disputed Claims

Subject to Section 8.2 of the Plan, from and after the Effective Date, the Liquidation Trustee (acting in accordance with the terms of the Liquidation Trust Agreement) shall have the exclusive authority to compromise, resolve and Allow any Disputed Claim that is a Non-Assumed Claim without the need to obtain approval from the Bankruptcy Court, and any agreement entered into by the Liquidation Trustee (acting in accordance with the terms of the Liquidation Trust Agreement) with respect to the Allowance of any Non-Assumed Claim shall be conclusive evidence and a final determination of the Allowance of such Claim.  Correspondingly, subject to Section 8.2 of the Plan, from and after the Effective Date, Buyer shall have the exclusive authority to compromise, resolve and Allow any Disputed Claim that is an Assumed Claim without the need to obtain approval from the Bankruptcy Court, and any agreement entered into by Buyer with respect to the Allowance of any Assumed Claim shall be conclusive evidence and a final determination of the Allowance of such Claim.

#### 2.    Limitations on Allowance and Reclassification of Claims

Notwithstanding Section 8.1 of the Plan, the Liquidation Trustee shall not consent or agree to the Allowance or reclassification of any Claim as an Administrative Claim or Priority Claim without the written consent of Buyer (including by email).  Notwithstanding Section 8.1 of the Plan, Buyer shall not consent or agree to the Allowance or reclassification of any Claim as a General Unsecured Claim without the written consent of the Liquidation Trustee (including by email); provided, however, that Buyer may seek to obtain the Allowance or reclassification of a Claim as a General Unsecured Claim by Order of the Bankruptcy Court, subject to the Liquidation Trustee's right to object thereto.

### 3.      Claim Objections

All objections to Claims (other than Professional Fee Claims, which shall be governed by Section 11.2 of the Plan) shall be Filed by the Liquidation Trustee or Buyer, as applicable, on or before the Claim Objection Deadline, which date may be extended upon presentment of an Order to the Bankruptcy Court by the Liquidation Trustee or the Buyer prior to the expiration of such period and without need for notice or hearing.  The Claim Objection Deadline shall be automatically extended as provided by Local Rule 9006-2 upon the Filing of a proposed form of order by the Liquidation Trustee or Buyer, as applicable, requesting an extension of the Claim Objection Deadline.  If a timely objection has not been Filed to a proof of claim or the Schedules have not been amended with respect to a Claim that was scheduled by the Debtors but was not Scheduled by the Debtors as contingent, unliquidated, and/or disputed, then the Claim to which the proof of claim or Scheduled Claim relates will be treated as an Allowed Claim.

### 4.      Estimation of Contingent or Unliquidated Claims

The Liquidation Trustee or the Buyer, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute the Allowed amount of such Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

### 5.      Distributions on Account of Disputed Claims

No payments or Distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is a Disputed Claim, until such Disputed Claim becomes an Allowed Claim.  The Liquidation Trustee or the Buyer, as applicable, shall, on the applicable distribution date, make Distributions on account of any Disputed Claim that has become an Allowed Claim.  Such Distributions shall be based upon the Distributions that would have been made to the Holder of such Claim under the Plan if such Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

### 6.      Section 503(b)(9) Claim Reserve

Unless, on or prior to the Effective Date, all timely-filed Section 503(b)(9) Claims have been paid, otherwise satisfied, withdrawn or disallowed, on the Effective Date, the Buyer shall establish the Section 503(b)(9) Claim Reserve in the Face Amount of all timely-filed Section 503(b)(9) Claims against the Debtors that have not been paid, otherwise satisfied, withdrawn or disallowed. If the Debtors, the Creditors' Committee and the Buyer are unable to agree on an amount by which the Section 503(b)(9) Claim Reserve is to be funded, the Debtors, the Creditors' Committee and the Buyer shall submit the issue to the Bankruptcy Court, which, following notice and a hearing, shall fix the amount of the required reserve. All Section 503(b)(9) Claims that have not previously been

paid, otherwise satisfied, withdrawn or disallowed shall be paid from the Section 503(b)(9) Claim Reserve; provided, however, that no payment shall be made to the Holder of a Section 503(b)(9) Claim without either the consent of the Buyer or an Order of the Bankruptcy Court.  The Buyer shall be permitted to reduce and release the reserve commensurate with the disposition (*i.e.*, payment, other satisfaction, withdrawal or disallowance) of all timely-filed Section 503(b)(9) Claims.

### L.    Conditions Precedent to the Occurrence of the Effective Date

#### 1.    Conditions to the Occurrence of the Effective Date

The occurrence of the Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section 9.2 of the Plan:

(i) the Bankruptcy Court shall have entered the Confirmation Order;

(ii) the Confirmation Order shall not be subject to any stay;

(iii) the Liquidation Trust Agreement shall have been executed;

(iv) the Liquidation Trust shall have been established and the Liquidation Trust Assets shall have been transferred to and vested in the Liquidation Trust free and clear of all Claims and Equity Interests, except as specifically provided in the Plan and the Liquidation Trust Agreement;

(v) the Professional Fee Reserve shall be funded pursuant to Section 11.2 of the Plan in an amount agreed to by the Debtors and the Creditors' Committee or, if there is a dispute concerning the amount of the funding required, in an amount fixed by the Bankruptcy Court; and

(vi) the Section 503(b)(9) Claim Reserve shall be funded pursuant to Section 8.6 of the Plan in an amount agreed to by the Debtors, the Creditors' Committee and the Buyer or, if there is a dispute concerning the amount of the funding required, in an amount fixed by the Bankruptcy Court; provided, that this condition to the occurrence of the Effective Date shall be deemed waived if, on or prior to the Effective Date, all timely-filed Section 503(b)(9) Claims against the Debtors have been paid, otherwise satisfied, withdrawn or disallowed

#### 2.    Waiver of Conditions to the Occurrence of the Effective Date

The conditions to the Effective Date set forth in Section 9.1 of the Plan may be waived in writing by the Plan Proponents at any time without further Order.

#### 3.    Effect of Non-Occurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Sections 9.1 and 9.2 of the Plan, the Plan Proponents reserve all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated.  If the Confirmation Order is vacated pursuant to Section 9.3 of the Plan, (i) the Plan shall be null and void in all respects, and (ii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or

any Equity Interest in, the Debtors, the Estates, or any other Person, or (b) prejudice in any manner the rights of the Debtors, the Estates, or any other Person.

## M.      Retention of Jurisdiction

### 1.      Scope of Retained Jurisdiction

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, these Chapter 11 Cases and the Plan to the fullest extent permitted by law (provided, however, that notwithstanding the foregoing, with respect to all civil proceedings arising in or related to the Chapter 11 Cases and the Plan, the Bankruptcy Court shall have original but not exclusive jurisdiction, in accordance with section 1334(b) of title 28 of the United States Code), including, among other things, jurisdiction to do the following:

(a) allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status of any Claim not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the Holder), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims;

(b) hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(c) hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required cure or the liquidation or allowance of any Claims arising therefrom;

(d) effectuate performance of and payments under the provisions of the Plan and APA and enforce remedies upon any default under the Plan and APA;

(e) hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases, including, without limitation, the Avoidance Actions and the Causes of Action, and with respect to the Plan;

(f) enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created, executed, or contemplated in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(g) hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

  
(h) consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i) issue injunctions, enter and implement other Orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(j) enter and implement such Orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(k) hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, the APA, the Sale Order, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with any of the foregoing documents and Orders;

(l) enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(m) except as otherwise limited in the Plan, recover all assets of the Debtors and property of the Estates, wherever located;

(n) hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o) hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

(p) hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

(q) resolve any cases, controversies, suits, or disputes related to the Liquidation Trust, including the Liquidation Trust Assets, and related to the APA, including relating to claims against Buyer by Holders of Assumed Claims; and

(r) enter a final decree closing the Chapter 11 Cases.

## 2.    Failure of the Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Section 10.1 of the Plan, the provisions of Article X of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## N.    Miscellaneous Plan Provisions

### 1.    Non-Ordinary Course Administrative Claims

Subject to the last sentence of Section 11.1 of the Plan, all requests for payment of a Non-Ordinary Course Administrative Claim must be Filed with the Bankruptcy Court and served on counsel to the Liquidation Trustee, counsel to Buyer, counsel to the Debtors, and counsel to the U.S. Trustee no later than the Administrative Claim Bar Date. In the event of an objection to allowance of a Non-Ordinary Course Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Non-Ordinary Course Administrative Claim. Post-petition statutory tax claims shall not be subject to the Administrative Claim Bar Date.

### 2.    Payment of Statutory Fees; Filing of Quarterly Reports

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date shall be paid by the Liquidation Trust. The Liquidation Trust shall have the obligation to pay quarterly fees to the Office of the United States Trustee pursuant to section 1930 of title 28 of the United States Code through the entry of the Final Decree for each of the Debtors or the dismissal or conversion of the Chapter 11 Cases. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to section 1930 of title 28 of the United States Code.

### 3.    Special Provisions Concerning the APA

On and after the Effective Date the Liquidation Trustee shall be the assignee of the Debtors under the APA with all of the Debtors' rights thereunder, including to enforce the APA against Buyer. Nothing in the Plan shall expand the Assumed Liabilities (as defined under the APA) or modify or amend the APA or the Sale Order, and the terms of the Plan shall be interpreted consistent with the APA and the Sale Order. The consideration paid by Buyer under or in connection with the APA is the only consideration to be provided by Buyer under or in connection with the Plan. Pursuant to the APA, Buyer shall have no liability for any Liquidation Trust Expenses. Pursuant Section 6.13(b) of the APA, the Plan must be in a form reasonably acceptable to Buyer.

### 4.    Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases, provided, however, that (a) the Creditors' Committee shall continue in existence and its Professionals shall continue to be retained with respect to applications Filed or to be Filed pursuant to sections 330 and 331 of the Bankruptcy Code and (b) the Liquidation Trust shall be deemed the successor to the Creditors' Committee with respect to any motions seeking to enforce the Plan and the transactions contemplated hereunder or the Confirmation Order and any pending appeals and related proceedings.

### 5.    Modifications and Amendments

The Plan Proponents may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date; provided, however, that any

alterations, modifications, or amendments to the Plan, pursuant to Section 6.13(c) of the APA, must be reasonably acceptable to Buyer. All alterations, amendments, or modifications to the Plan must comply with section 1127 of the Bankruptcy Code. The Plan Proponents shall provide parties in interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or Order of the Bankruptcy Court. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Holder.

After the Confirmation Date and prior to substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of the Plan, the Debtors or the Liquidation Trustee, as applicable, may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings (i) pursuant to Section 6.13(c) of the APA, are reasonably acceptable to Buyer, and (ii) do not adversely affect the treatment of Holders of Claims under the Plan without the consent of the Creditors' Committee or Liquidation Trustee. Such proceedings must comply with section 1127 of the Bankruptcy Code. To the extent required, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Holder.

### 6.      Compromises and Settlements

From and after the Effective Date, the Liquidation Trustee may compromise and settle the Claims against the Debtors that are Non-Assumed Claims, subject to Section 8.2 of the Plan, as well as Causes of Action and Avoidance Actions that the Liquidation Trust may have against other Entities without any further approval by the Bankruptcy Court. From and after the Effective Date, only Buyer may compromise and settle the Claims against the Debtors that are Assumed Claims, subject to Section 8.2 of the Plan. Until the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court and, to the extent required under the APA, the approval of Buyer) Claims against them, Avoidance Actions, Causes of Action, or other claims that they may have against other Entities.

### 7.      Non-Discharge of the Debtors; Injunction

**In accordance with section 1141(d)(3) of the Bankruptcy Code, the Plan does not discharge the Debtors. Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Equity Interests against the Debtors. As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan. As of the Confirmation Date, all parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, causes of action, liabilities, or Equity Interests**

based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

8.      **Releases and Related Matters**

(a) **On the Effective Date, for good and valuable consideration, the adequacy of which is confirmed pursuant to the Plan, each of the Releasing Parties shall be deemed to have forever released, waived, and discharged each of the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including, without limitation, Avoidance Actions), and liabilities whatsoever, whether known or unknown, whether foreseen or unforeseen, whether liquidated or unliquidated, whether fixed or contingent, whether matured or unmatured, existing or hereafter arising, at law, in equity, or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, the Plan or any other previously-proposed chapter 11 plan of reorganization or plan sponsorship agreement, the APA, or the Sale Order, except for acts or omissions that are determined in a Final Order to have constituted actual fraud, gross negligence or willful misconduct; provided, however, that nothing in Section 11.12 of the Plan shall affect any Person's rights, claims or causes of action against the Debtors, the Liquidation Trust or Buyer under the Plan, the Confirmation Order, the APA, the Sale Order, the L/C Credit Agreement, or the L/C Facility Orders, or the liabilities or obligations of such parties thereunder.**

(b) **Entry of the Confirmation Order shall constitute (i) the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Section 11.12 of the Plan, and (ii) the Bankruptcy Court's findings that such releases are (1) in exchange for good and valuable consideration provided by the Released Parties (including, without limitation, performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (2) in the best interests of the Debtors, the Estates, and all Holders of Claims that are Releasing Parties, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) a bar to any of the Releasing Parties asserting any released claim against any of the Released Parties.**

(c) **Each Holder of a Claim in Class 5 shall be a Releasing Party and, as such, provides the releases set forth in Section 11.12 of the Plan, unless such Holder either (a) votes to reject the Plan or (b) does not otherwise vote to accept or reject the Plan but timely submits a Release Opt-Out indicating such Holder's decision to not participate in the releases set forth in Section 11.12 of the Plan.  For the avoidance of doubt, Holders of Claims in Class 5 that do not receive Distributions solely as a result of Section 7.6 of the Plan are not Releasing Parties.  For the further avoidance of doubt, each Holder of a Claim in Class 5 that votes to accept the Plan (other than a Holder that does not receive Distributions solely as a result of Section 7.6) is a Releasing Party, and any Release Opt-Out that might be submitted by any such Holder that voted to accept the Plan shall be void and of no effect.**

9.      **Exculpation and Limitation of Liability**

**On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, to the maximum extent permitted by law, none of the Exculpated Parties shall have or incur any liability to any Entity, including, without limitation, to any Holder of a Claim or an Equity Interest, for any post-petition act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the formulation, negotiation, preparation, dissemination, solicitation of acceptances, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with the Plan, or the administration of the Plan or the property to be distributed under the Plan; _provided_, _however_, that nothing in Section 11.13 of the Plan shall affect any Person's rights, claims or causes of action against the Debtors under the Plan, the Confirmation Order, the APA, the Sale Order, the L/C Credit Agreement, or the L/C Facility Orders, or the Debtors' liabilities or obligations thereunder; and _provided_, _further_, that the exculpation provisions of Section 11.13 of the Plan shall not apply to acts or omissions constituting fraud, willful misconduct, intentional misconduct, or gross negligence by such Exculpated Party as determined by a Final Order. The Exculpated Parties shall be entitled to rely upon the written advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and administration thereof. The Confirmation Order shall serve as a permanent injunction against any Person seeking to enforce any claim or cause of action against the Exculpated Parties that has been exculpated pursuant to Section 11.13 of the Plan.**

### 10.    Revocation, Withdrawal, or Non-Consummation

The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of liquidation. If the Plan Proponents revoke or withdraw the Plan prior to the Confirmation Date, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims) and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Equity Interests in, any Debtor, or any Avoidance Actions, Causes of Action or other claims by or against any Debtor, the Creditors' Committee, Buyer, or any Entity, (ii) prejudice in any manner the rights of any Debtor, the Creditors' Committee, Buyer, or any Entity in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor, the Creditors' Committee, Buyer, or any other Entity.

### 11.    Final Decree

Upon the Liquidation Trustee's determination that all Claims have been Allowed, disallowed, expunged or withdrawn, and that all Causes of Action held by the Liquidation Trust have either been finally resolved or abandoned, the Liquidation Trustee shall move for the entry of a Final Decree pursuant to section 350 of the Bankruptcy Code. On entry of the Final Decree, the members of the Liquidation Trust Oversight Committee, the Liquidation Trustee, and the Liquidation Trust's professionals and agents shall be deemed discharged under the Liquidation Trust Agreement and have no further duties or obligations thereunder. Upon a motion by the Liquidation Trustee, the Bankruptcy Court may enter an order relieving the members of the Liquidation Trust Oversight

Committee, the Liquidation Trustee, and the Liquidation Trust's professionals and agents of any further duties, discharging and releasing those Persons from all liability related to the Liquidation Trust, and releasing the Liquidation Trustee's bond, if any. The Liquidation Trustee may request the entry of the Final Decree notwithstanding the fact that not all Assets have been monetized and distributed to the Holders of Allowed Claims.

## V.    RISK FACTORS

### A.    Parties May Object to the Plan's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Plan Proponents believe that the classification of the Claims and Equity Interests under the Plan complies with this requirement. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B.    The Debtors May Not Be Able to Obtain Confirmation of the Plan

With regard to any proposed plan, the Debtors may not receive the requisite acceptances to confirm a plan. In the event that votes with respect to Claims in the Class entitled to vote are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponents intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Plan Proponents may not be able to obtain Confirmation of the Plan. Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under section 1129 of the Bankruptcy Code have not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Plan Proponents will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors.

### C.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not occur.

### D.    The Cash Available for Distributions to General Unsecured Creditors May Be Further Reduced

Under the Plan and the APA, Buyer is responsible for the payment of certain Administrative Claims, Professional Fee Claims, and Priority Claims. If Buyer fails to meet its obligation to pay such Administrative Claims, Professional Fee Claims, and Priority Claims, or if such Claims exceed the amounts that Buyer has agreed to pay, such Claims will be paid by the Liquidation Trust and the Cash available for Distributions to General Unsecured Creditors will be reduced (unless and until, if applicable, the Liquidation Trustee subsequently recovers such amounts from Buyer). In addition,

the Cash available for Distributions to General Unsecured Creditors may be further reduced by, among others, (i) any Liquidation Trust Expenses, (ii) any other costs and expenses that constitute Excluded Liabilities of Buyer, including certain Non-Assumed Non-Ordinary Course Administrative Claims and Professional Fee Claims as to which Buyer is not liable; (iii) any other wind-down fees and expenses of the Debtors that are not otherwise payable by Buyer under the APA; and (iv) any amounts not paid by Buyer for which the Liquidation Trust is secondarily liable.

### E.    Claims Estimation

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein. Furthermore, a number of additional Contracts and Leases may be rejected at the Buyer's discretion in accordance with the terms of the Sale Order and the APA. Any claims Filed for rejection damages on account of those Contracts and Leases may result in a greater amount of General Unsecured Claims than estimated herein.

## VI.    CONFIRMATION OF THE PLAN

### A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on October 30, 2015 at 2:00 p.m. (prevailing Eastern Time), before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801. The Confirmation Hearing Notice, which sets forth the time and date of the Confirmation Hearing has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be Filed and served so that they are actually received by no later than October 19, 2015 at 4:00 p.m. (prevailing Eastern Time). **Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court**.

### B.    Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan is that the Plan (i) is accepted by all Impaired Classes of Claims, or, if rejected by an Impaired Class of Claims, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Plan Proponents believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Plan Proponents have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, the Plan Proponents believe that the Plan satisfies or will satisfy the following applicable Confirmation requirements of section 1129 of the Bankruptcy Code:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of a Claim in an Impaired Class of Claims has accepted the Plan, or will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.

- The Class of Claims that is entitled to vote on the Plan will have accepted the Plan.

- Except to the extent a different treatment is agreed to, the Plan provides that all Allowed Administrative Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

### C.        Best Interests of Creditors

Often called the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that a Bankruptcy Court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 on the Effective Date.

The Plan is a plan of liquidation.  The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage.

Conversion to chapter 7 of the Bankruptcy Code would mean the establishment of a new claims bar date, which could result in new General Unsecured Claims being asserted against the Estates, thereby diluting the recoveries of other Holders of Allowed General Unsecured Claims.

In addition, pursuant to the Letter Agreement, the approximately $29 million Rodam Claims are subordinate to all other Allowed General Unsecured Claims under the Plan.  Accordingly, upon the Effective Date, the Rodam Claims will be Allowed General Unsecured Claims, but will not be entitled to any distribution until all other Allowed General Unsecured Claims are paid in full in accordance with the Plan..  There is no guarantee that this would happen in a chapter 7 liquidation. Moreover, Rodam might assert a $29 million Rodam Claim against each of the individual Estates, thereby significantly diluting the recoveries of other Holders of Allowed General Unsecured Claims.

Furthermore, any chapter 7 trustee would have to confront all of the allocation, reconciliation, and liability issues among the Debtors described in more detail in Section IV.B of this Disclosure Statement.  Without limitation, a chapter 7 trustee would need to (i) allocate value among the individual Estates, (ii) reconcile the existing intercompany claims and resolve any objections or disputes with respect to such claims, and (iii) determine rights of contribution, reimbursement and indemnification with respect to the Debtors' joint liabilities.  This process would be extremely time-consuming and costly, and reduce any recoveries available for the Creditors of the Estates.

Therefore, the Plan Proponents believe that confirmation of the Plan will provide each Holder of a General Unsecured Claim with a greater recovery than such Holder would receive pursuant to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### D.        Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors, or any successor to the Debtors (unless such liquidation or reorganization is proposed in the plan).  This requirement is satisfied as the Plan proposes a liquidation and the Plan Proponents believe the Debtors' Cash and any additional proceeds from the Debtors' Assets will be sufficient to allow the Liquidation Trustee to make all payments required to be made under the Plan. Accordingly, the Plan Proponents believe that the Plan is feasible.

### E.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or reject the plan.  Thus, a Class of Impaired Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

### F.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class of claims, determined without including the acceptance of the plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

Because at least one Impaired Class is deemed to have rejected the Plan, the Plan Proponents will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

### 1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan.  The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.  The Plan Proponents submit that if the Plan Proponents "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" against any rejecting Class.

### 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending upon the type of claims or interests in such rejecting class. The Plan Proponents submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that the applicable "fair and equitable" standards are met.

### G.    Alternatives to Confirmation and Consummation of the Plan

The Plan Proponents believe that the Plan affords Holders of Claims the potential for a better realization on the Debtors' assets than a chapter 7 liquidation, and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances of the voting Class of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative plan or plans of liquidation, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate and propose a different plan or plans of liquidation. The Plan Proponents believe that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

The Chapter 11 Cases may also be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to complete the liquidation of the Debtors' assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. As described above, the Plan Proponents believe that the Plan will provide each Holder of a General Unsecured Claim with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## VII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

This discussion is provided for information purposes only, and is based on provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to

the United States federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly, and adversely, affect the United States federal income tax consequences of the Plan.

The following summary does not address the U.S. federal income tax consequences to the Holder of the Rodam Claims or to Holders of Claims not entitled to vote to accept or reject the Plan. In addition, to the extent that the following discussion relates to the consequences to Holders of Claims entitled to vote to accept or reject the Plan, it is limited to Holders that are United States persons within the meaning of the IRC. For purposes of the following discussion, a "United States person" is any of the following:

- An individual who is a citizen or resident of the United States;

- A corporation created or organized under the laws of the United States or any state or political subdivision thereof;

- An estate, the income of which is subject to federal income taxation regardless of its source; or

- A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of its particular facts and circumstances, or to certain types of Holders subject to special treatment under the IRC. Examples of Holders subject to special treatment under the IRC are governmental entities and entities exercising governmental authority, foreign companies, persons who are not citizens or residents of the United States, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, persons that have a functional currency other than the U.S. dollar, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction. This discussion does not address the state, local or foreign tax consequences of the Plan.

The tax treatment of Holders of Claims and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon the following factors, among others: (i) whether the Claim or portion thereof constitutes a Claim for principal or interest; (ii) the type of consideration, if any, received by the Holder in exchange for the Claim, and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction or a worthless securities deduction with respect to the Claim or any portion thereof in the

current or prior taxable years; (viii) whether the Holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules apply to the Holder.  Therefore, each Holder should consult such Holder's own tax advisor for tax advice with respect to that Holder's particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of a final Distribution under the Plan.  Events occurring after the date of the Disclosure Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.  No ruling has been or will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto.  No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Holder of a Claim.  This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT SUCH HOLDER'S TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.**

### A.    Taxation of the Liquidation Trust and Liquidation Trust Beneficiaries

#### 1.    General

The Liquidation Trust will be organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.  Thus, the Liquidation Trust is intended to be classified for federal income tax purposes as a "grantor trust" within the meaning of Treasury Regulation section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684.  No request for a ruling from the IRS will be sought on the classification of the Liquidation Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position with respect to the classification of the Liquidation Trust.  If the IRS were to challenge successfully the classification of the Liquidation Trust as a grantor trust, the federal income tax consequences to the Liquidation Trust and to the Liquidating Trust Beneficiaries could vary from those discussed herein (including the potential for an entity-level tax).

For all U.S. federal income tax purposes, all parties with respect to the Liquidation Trust (including, without limitation, the Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) must treat the transfer of Liquidation Trust Assets (other than those Liquidation Trust Assets placed in a Disputed Claims Reserve taxed as a DOF (as defined below)) to the Liquidation Trust as (i) a transfer of such Liquidation Trust Assets by the Debtors to the Liquidation Trust Beneficiaries, which transfer will be subject to certain Claims required to be paid by the Liquidation Trust pursuant to the Plan with priority over General Unsecured Claims, including, without limitation, Administrative Claims and Professional Fee Claims (collectively, "Senior Claims"), followed by (ii) a transfer of such Liquidation Trust Assets, subject to the Senior Claims, by the Liquidation Trust Beneficiaries to the Liquidation Trust, with the Liquidation Trust Beneficiaries being treated as the grantors and owners of the Liquidation Trust.

Each Holder of a Claim that is a Liquidation Trust Beneficiary generally will recognize gain or loss in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in the Claim. The amount realized by a Holder of an Claim on the Effective Date will equal the fair market value of the Liquidation Trust Assets deemed received in respect of such Claim, less (i) the Holder's pro rata share of the Senior Claims, and (ii) the amount, if any, attributable to accrued but unpaid interest. A Holder that is deemed to receive Liquidation Trust Assets in respect of its Claim will then have a tax basis in such Liquidation Trust Assets in an amount equal to the fair market value of such Liquidation Trust Assets on the date of receipt, less the amount, if any, attributable to accrued but unpaid interest.

As further described below, because each Holder's share of the Liquidation Trust Assets in the Liquidation Trust may change depending upon the resolution of Disputed Claims, a Holder may be prevented from recognizing for tax purposes all of its gain or loss from the consummation of the Plan until all Disputed Claims have been resolved.

In general, a Liquidation Trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to IRC Sections 671 *et. seq.*, owned by the persons who are treated as transferring assets to the trust. Accordingly, each Liquidation Trust Beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit recognized or incurred by the Liquidation Trust. None of the Debtors' loss carryforwards will be available to reduce any income or gain of the Liquidation Trust. Moreover, upon the sale or other disposition (or deemed disposition) of any of the Liquidation Trust Assets not held in a DOF, each Liquidation Trust Beneficiary must report on its federal income tax return its share of any gain or loss measured by the difference between (1) its share of the amount of cash and/or the fair market value of any property received by the Liquidation Trust in exchange for the Liquidation Trust Asset so sold or otherwise disposed of and (2) its adjusted tax basis in its share of the Liquidation Trust Asset. The character of any such gain or loss to the Liquidation Trust Beneficiary will be determined as if such Liquidation Trust Beneficiary itself had directly sold or otherwise disposed of the Liquidation Trust Asset. The character of items of income, gain, loss, deduction and credit to any Liquidation Trust Beneficiary, and the ability of the Liquidation Trust Beneficiary to benefit from any deductions or losses, will depend on the particular circumstances or status of the Liquidation Trust Beneficiary.

Given the treatment of the Liquidation Trust as a grantor trust and subject to the discussion below regarding disputed claims reserves, each Liquidation Trust Beneficiary has an obligation to

report its share of the Liquidation Trust's tax items (including gain on the sale or other disposition of a Liquidation Trust Asset), which obligation is not dependent on the distribution of any cash or other Liquidation Trust Assets by the Liquidation Trust.  Accordingly, a Liquidation Trust Beneficiary may incur a tax liability as a result of owning a share of the Liquidation Trust Assets, regardless of whether the Liquidation Trust distributes cash or other assets. Due to the requirement that the Liquidation Trust maintain certain reserves, the Liquidation Trust's ability to make current cash distributions may be limited or precluded.  In addition, due to possible differences in the timing of income on, and the receipt of cash from the Liquidation Trust Assets, a Liquidation Trust Beneficiary may be required to report and pay tax on a greater amount of income for a taxable year than the amount of cash received by the Liquidation Trust Beneficiary during the year.

The Liquidation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidation Trust Assets (*e.g.*, income, gain, loss, deduction and credit).  Each Liquidation Trust Beneficiary will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidation Trust will pertain to Liquidation Trust Beneficiaries who received their interests in connection with the Plan.

### 2.    Disputed Claims Reserves

A portion of the Liquidation Trust Assets transferred to the Liquidation Trust will be attributable to Disputed Claims.  The tax treatment of the transfers of Liquidation Trust Assets with respect to the Disputed Claims generally will be the same as the tax treatment of transfers of Liquidation Trust Assets with respect to Allowed Claims.  The Liquidation Trustee, however, may create one or more reserve accounts for the Liquidation Trust Assets held on account of Disputed Claims.  Under the IRC, amounts earned by an escrow account, settlement fund or similar fund must be subject to current tax.  Although the U.S. Treasury Department has issued certain Treasury Regulations addressing the tax treatment of such funds, the U.S. Treasury Department has not issued Treasury Regulations to address the tax treatment of such funds in a bankruptcy context.  Accordingly, the proper tax treatment of such funds, and the extent to which a reserve established by the Liquidation Trustee would be treated as such a fund, is uncertain.  Depending on the facts and the relevant law, such funds may be treated as grantor trusts to debtors, grantor trusts to claimholders, or as trusts subject to an entity-level tax.  Except as described below, the Debtors intend to treat the Liquidation Trust Assets held in any reserve established by the Liquidation Trust on account of Disputed Claims as having been transferred to the Liquidation Trust by the Holders of such Disputed Claims, and the Holders of the Disputed Claims as grantors and owners of the Liquidation Trust.

Under the Plan, the Liquidation Trust may be allowed, for federal income tax purposes, to treat an account, trust, fund or reserve that holds assets to satisfy the Disputed Claims as a Disputed Ownership Fund ("<u>DOF</u>") taxable under IRC Section 468B and Treasury Regulation section 1.468B-9.  If the Liquidation Trustee were to file an election to treat a reserve as a DOF, then the DOF would be treated as a separate taxable entity for U.S. federal income tax purposes, and would be required to file tax returns and pay any tax due on income earned or gain recognized that was attributable to the Assets held in the reserve with respect to which the DOF election was made.  Any tax liability of the DOF will reduce the distributions to certain Holders.  For purposes of determining

the DOF's federal income tax liability, a DOF would not be required to report as income transfers of assets to the DOF, but would be required to include in income all income received or accrued from assets transferred to the DOF. The DOF would not be allowed a tax deduction for a distribution of assets or of the net after-tax income earned by the DOF to a Holder. The initial tax basis of assets transferred to a DOF would be the fair market value of the assets determined on the date of transfer to the DOF, and the DOF's holding period would begin on the date of the transfer.

No assurance can be given that the IRS would accept a DOF election made by the Liquidation Trustee with respect to a reserve. If the IRS were to successfully reject a DOF election, the reserve with respect to which the DOF election was made would be subject to the rules described above.

### B.    Other Tax Consequences to Holders of Claims

A Holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Allowed Claim and the amount realized by the Holder in respect of its Allowed Claim. Over time and on a cumulative basis, the amount realized generally will equal the amount realized by the Holder on the Effective Date as a result of the transfer of the Liquidation Trust Assets to the Liquidation Trust (see prior discussion regarding Taxation of the Liquidation Trust and Liquidation Trust Beneficiaries), plus or minus, as the case may be, the difference between the amount realized on the Effective Date and the aggregate amount of the Cash (and the fair market value of property, if any) distributed to the Holder by the Liquidation Trust, less the amount, if any, attributable to accrued but unpaid interest. A Holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or deemed received) under the Plan is attributable to interest that accrued on a Allowed Claim but was not previously paid by the Debtors or included in income by the Holder of the Allowed Claim.

The character of any gain or loss that is recognized as such will depend upon a number of factors, including the status of the Holder, the nature of the Allowed Claim in the Holder's hands, whether the Allowed Claim was purchased at a discount, whether and to what extent the Holder has previously claimed a bad debt deduction with respect to the Allowed Claim, and the Holder's holding period of the Allowed Claim. If the Allowed Claim in the Holder's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Holder held such Allowed Claim for longer than one year, or short-term capital gain or loss if the Holder held such Allowed Claim for one year or less. Any capital loss realized generally may be used by a corporate Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains plus $3,000 of ordinary income in any single taxable year.

A Holder of an Allowed Claim who receives, in respect of the Holder's Allowed Claim, an amount that is less than that Holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRC Section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to the ability to take a bad debt deduction. A Holder that has previously recognized a loss or deduction in respect of that Holder's Allowed Claim may be required to include in gross income (as ordinary income) any amounts

received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Allowed Claim.

Holders of Allowed Claims who were not previously required to include any accrued but unpaid interest with respect to a Allowed Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. A Holder previously required to include in gross income any accrued but unpaid interest with respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

A Holder of an Allowed Claim constituting an installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than at face value or distributed, transmitted, sold or otherwise disposed of within the meaning of IRC Section 453B.

Under backup withholding rules, a Holder of an Allowed Claim may be subject to backup withholding with respect to payments made pursuant to the Plan unless such Holder (i) is a corporation or is otherwise exempt from backup withholding and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of failure to report all dividend and interest income. Any amount withheld under these rules will be credited against the Holder's federal income tax liability. Holders of Allowed Claims may be required to establish an exemption from backup withholding or to make arrangements with regard to payment of any backup withholding.

Holders of Disallowed Claims and Subordinated Claims will not receive any Distribution as part of the Plan. Accordingly, because such a Holder may receive an amount that is less than that Holder's tax basis in such Claim, such Holder may be entitled to a bad debt deduction under IRC Section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a bad debt deduction is claimed. Holders of Disallowed Claims and Subordinated Claims, therefore, are urged to consult their tax advisors with respect to the ability to take a bad debt deduction.

C.      **Certain Tax Consequences to the Debtors**

Under the IRC, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD Income") realized during the taxable year. Section 108 of the IRC provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the bankruptcy court and the cancellation is granted by the court or is pursuant to a plan approved by the court.

Section 108 of the IRC requires the amount of COD Income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers (collectively, "NOLs"), certain tax credits and tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and passive activity loss carryovers. Attribute reduction is calculated

only after the tax for the year of the discharge has been determined. Section 108 of the IRC further provides that a taxpayer does not realize COD Income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Under the Plan, Holders of certain Allowed Claims are expected to receive less than full payment on their Claims and Holders of Disallowed Claims and Subordinated Claims are expected to receive no payment. The Debtors' liability to the Holders of such Claims in excess of the amount satisfied by Distributions under the Plan will be canceled and therefore will result in COD Income to the Debtors. The Debtors should not realize any COD Income, however, to the extent that payment of such Claims would have given rise to a deduction to the Debtors had such amounts been paid. In addition, any COD Income that the Debtors realize should be excluded from the Debtors' gross income pursuant to the bankruptcy exception to section 108 of the IRC described above, because the cancellation will occur in a case under the Bankruptcy Code, while the taxpayer is under the jurisdiction of the bankruptcy court, and the cancellation is granted by the court or is pursuant to a plan approved by the court. The exclusion of the COD Income, however, will result in a reduction of certain tax attributes of the Debtors, such as the NOLS, as described above. Because attribute reduction is calculated only after the tax for the year of discharge has been determined, the COD Income realized by the Debtors under the Plan should not diminish the NOLs and other tax attributes that may be available to offset any income and gains recognized by the Debtors in the taxable year that includes the Effective Date.

## VIII.    RECOMMENDATION

In the opinion of the Plan Proponents, the Plan is superior and preferable to any alternative. Accordingly, the Plan Proponents recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  August 10, 2015

Respectfully submitted,

SEAL123, INC.
(on behalf of itself and each of the Debtors)


By:      /s/ Bill Langsdorf
         Name: Bill Langsdorf
         Title:   Chief Executive Officer

Creditors' Committee

By:      /s/ Ronald M. Tucker
         Simon Property Group, Inc.
         Solely in its Capacity as Chair of the
         Official Committee of Unsecured Creditors
         Name: Ronald M. Tucker

**EXHIBIT A**

**Joint Plan of Liquidation**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SEAL123, INC., et al.,[1] | Case No. 15-10081 (CSS) |
| Debtors. | (Jointly Administered) |

## FIRST AMENDED JOINT PLAN OF LIQUIDATION OF
## SEAL123, INC. AND SUBSIDIARY DEBTORS AND
## THEIR OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Dated: Wilmington, Delaware
August 10, 2015

Michael R. Nestor, Esq. (DE Bar No. 3526)
YOUNG CONAWAY STARGATT & TAYLOR,
LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel: (302) 571-6600
Fax: (302) 571-1253
E-mail: mnestor@ycst.com

Lee R. Bogdanoff, Esq.
Michael L. Tuchin, Esq.
David M. Guess, Esq.
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel: (310) 407-4022
Fax: (310) 407-9090
E-mail: lbogdanoff@ktbslaw.com
            mtuchin@ktbslaw.com
            dguess@ktbslaw.com

*Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Seal123, Inc. (f/k/a The Wet Seal, Inc.) (5940); Seal123 Retail, Inc. (f/k/a The Wet Seal Retail, Inc.) (6265), Seal123 Catalog, Inc. (f/k/a Wet Seal Catalog, Inc.) (7604), and Seal123 GC, LLC (f/k/a Wet Seal GC, LLC) (2855-VA). The Debtors' address is 26972 Burbank, Foothill Ranch, CA 92610.

Jeffrey N. Pomerantz, Esq.
PACHULSKI, STANG, ZIEHL & JONES, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
Tel: (310) 277-6910
Fax: (310) 201-0760
E-mail: jpomerantz@pszjlaw.com

Robert J. Feinstein, Esq.
PACHULSKI, STANG, ZIEHL & JONES, LLP
780 Third Ave., 34th Floor
New York, NY 10017-2024
Tel: (212) 561-7700
Fax: (212) 561-7777
E-mail: rfeinstein@pszjlaw.com

Bradford J. Sandler, Esq. (DE Bar No. 4142)
PACHULSKI, STANG, ZIEHL & JONES, LLP
919 North Market St., 17th Floor
Wilmington, DE 19801
Tel: (302) 652-4100
Fax: (302) 652-4400
E-mail: bsandler@pszjlaw.com

*Counsel to the Creditors' Committee*

01:17655630.1

2

**FIRST AMENDED JOINT PLAN OF LIQUIDATION OF
SEAL123, INC. AND SUBSIDIARY DEBTORS AND
THEIR OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**INTRODUCTION**

The Debtors (as defined below) and the Creditors' Committee (as defined below) hereby propose this Plan (as defined below), which provides for the resolution of the outstanding Claims (as defined below) and Equity Interests (as defined below) asserted against the Debtors. Reference is made to the Disclosure Statement (as defined below) for (i) a discussion of the Debtors' history, businesses, properties, results of operations, and projections for future operations, (ii) a summary and analysis of this Plan, and (iii) certain related matters, including risk factors relating to the consummation of this Plan and Distributions (as defined below) to be made under this Plan. The Debtors and the Creditors' Committee are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code (as defined below).

These bankruptcy cases are being jointly administered pursuant to an order of the United States Bankruptcy Court for the District of Delaware. Under Section 5.2 of the Plan and pursuant to the Global Plan Settlement (as defined below), for purposes of voting and distribution in connection with the Plan, the Debtors will be substantively consolidated, meaning that all of the assets and liabilities of the Debtors will be deemed to be the assets and liabilities of a single entity. As a result, the votes to accept or reject the Plan by Holders of Claims against a particular Debtor shall be tabulated as votes to accept or reject the Plan for the substantively-consolidated Debtors. The Plan Proponents reserve the right to make appropriate modifications of the Plan if and to the extent necessary to effectuate confirmation of the Plan.

All Holders of Claims who are entitled to vote on the Plan are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Rule 3019 of the Bankruptcy Rules (as defined below), and Section 11.6 of the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith, have been approved for use in soliciting acceptances and rejections of this Plan. Nothing in the Plan should be construed as constituting a solicitation of acceptances of the Plan unless and until the Disclosure Statement has been approved and distributed to all Holders of Claims to the extent required by section 1125 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ CAREFULLY THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS THERETO) AND THE PLAN, EACH IN ITS ENTIRETY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

# ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

For purposes of the Plan, except as expressly provided or unless the context otherwise requires:

(a) all capitalized terms used in the Plan and not otherwise defined in the Plan shall have the meanings ascribed to them in this Article I of the Plan;

(b) any capitalized term used in the Plan that is not defined in the Plan, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable;

(c) whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine;

(d) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(e) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time;

(f) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan;

(g) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

(h) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; and

(i) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

The following capitalized terms used in the Plan shall have following meanings:

**1.1    Administrative Claim:**  A Claim (other than a Professional Fee Claim, but, for the avoidance of doubt, including Ordinary Course Professional Fee Claims) arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, to the extent not previously paid, otherwise satisfied, or withdrawn, including, but not limited to, (a) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, (b) all Claims for Stub Rent under section 503(b) of the Bankruptcy Code and lease payments under section 365(d)(5) of the Bankruptcy Code, and (c) all Section 503(b)(9) Claims.

**1.2    Administrative Claim Bar Date:**  The last date by which an Entity must File a request for payment of a Non-Ordinary Course Administrative Claim (other than a Section 503(b)(9)

Claim), which shall be the date that is forty-five (45) days after the Effective Date, or the first Business Day following such day if the forty-fifth (45th) day after the Effective Date is not a Business Day, or, alternatively, such earlier date as is set by the Bankruptcy Court with the consent of the Liquidation Trustee and Buyer.  For the avoidance of doubt, post-petition statutory tax claims shall not be subject to the Administrative Claim Bar Date.  For the further avoidance of doubt, the bar date for Section 503(b)(9) Claims was April 10, 2015.

**1.3** **Allowed**, **Allowed Claim**, or **Allowed [___] Claim:**  Either (i) any Claim, proof of which is/was Filed on or before the date designated by the Bankruptcy Court as the last date(s) for Filing proofs of Claim with respect to such Claim, or which has been or hereafter is Scheduled by the Debtors on the Schedules as liquidated in amount and not disputed or contingent, unless and until, in either case, an objection to the allowance thereof has been Filed within the Claim Objection Deadline, or is a Claim as to which any objection has been determined, in whole or in part, in favor of the Holder of the Claim by a Final Order of the Bankruptcy Court; (ii) any Administrative Claim, request for payment of which is/was Filed on or before the Administrative Claim Bar Date, which has been determined, in whole or in part, in favor of the Holder of such Administrative Claim by a Final Order of the Bankruptcy Court; or (iii) a Claim (including an Administrative Claim) that is Allowed (a) in any contract, instrument, or other agreement entered into in connection with the Plan, (b) in a Final Order (including pursuant to a Final Order estimating a Claim pursuant to Section 502(c) of the Bankruptcy Code), (c) pursuant to the terms of the Plan, or (d) for purposes of Distribution by designation of the Liquidation Trustee.

**1.4** **APA:**  The Asset Purchase Agreement by and among the Debtors and Buyer, dated as of March 12, 2015, including the Letter Agreement dated March 12, 2015 attached thereto, together with the First Amendment to Asset Purchase Agreement by and among the Debtors and Buyer, dated as of June 30, 2015.

**1.5** **Assets:**  Any and all right, title, and interest of the Debtors and their Estates in and to property of whatever type or nature, including their books and records.

**1.6** **Assumed Claim** or **Assumed [_____] Claim**:  Any Claim that is assumed by Buyer pursuant to the APA.

**1.7** **Avoidance Actions**:  Any and all avoidance or equitable subordination or recovery actions under section 105(a), 502(d), 510, 542 through 551 and 553 of the Bankruptcy Code or any similar state law causes of action.

**1.8** **Ballot:**  The ballot form distributed to each Holder of a Claim entitled to vote to accept or reject this Plan.

**1.9** **Bankruptcy Code:**  Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as may be amended).

**1.10** **Bankruptcy Court:**  The United States Bankruptcy Court for the District of Delaware, or in the event such court ceases to exercise jurisdiction over any Chapter 11 Case, such court or adjunct thereof that exercises jurisdiction over such Chapter 11 Case in lieu of the United States Bankruptcy Court for the District of Delaware.

01:17655630.1 **1.11** **Bankruptcy Rules:**  The Federal Rules of Bankruptcy Procedure (as may be

amended).

**1.12**   **BofA**:  Bank of America, N.A., as its interests appear under the L/C Credit Agreement and L/C Facility Orders, respectively.

**1.13**   **B. Riley:**  B. Riley Financial, Inc., a Delaware corporation.

**1.14**   **Business Day:**  Any day, excluding Saturdays, Sundays, or "legal holidays" (as defined in Bankruptcy Rule 9006(a)) on which commercial banks are open for business in Wilmington, Delaware.

**1.15**   **Buyer:**  Mador Lending, LLC, a Delaware limited liability company; The Wet Seal, LLC, a Delaware limited liability company, as assignee of Mador Lending, LLC under the APA; and The Wet Seal Gift Card, LLC, a Virginia limited liability company, as assignee of Mador Lending, LLC under the APA.

**1.16**   **Cash:**  Legal tender of the United States of America and equivalents thereof.

**1.17**   **Causes of Action:**  All (a) litigation, claims and causes of action against any Pre-Petition Officers and Directors; (b) Avoidance Actions (other than the Acquired Avoidance Actions (as defined in the APA)); (c) all rights of the Debtors with respect to the litigation captioned *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:05-md-01720-MKB-JO (E.D.N.Y.), in which the Debtors are plaintiffs; and (d) all rights (including rights of set-off and rights of recoupment), refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Debtors against third parties to the extent related to any Excluded Asset (as defined in the APA) or Excluded Liability (as defined in the APA).  For the avoidance of doubt, Causes of Action shall not include any causes of action, lawsuits, claims, rights of recovery and other similar rights of any Debtor (including, without limitation, Avoidance Actions) (i) against landlords, vendors or other counterparties who are party to any Assumed Contract (as defined in the APA), (ii) against any Participating Vendor (as defined in the APA) and/or (iii) relating in any way to any party who was a beneficiary of a letter of credit or holding proceeds of a letter of credit on or before April 15, 2015.

**1.18**   **Chapter 11 Cases:**  The voluntary chapter 11 bankruptcy cases commenced by the Debtors, which are being jointly administered under case caption *Seal123, Inc., et al.*, Case No. 15-10081 (CSS).

**1.19**   **Claim:**  A claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtors or the Estates whether or not asserted or Allowed.

**1.20**   **Claim Objection Deadline:**  Ninety (90) days after the Effective Date, subject to extension as set forth in Section 8.3 of the Plan.

**1.21**   **Class:**  A category of Claims or Equity Interests designated pursuant to the Plan.

**1.22**   **Collateral**:  Any property or interest in property of a Debtor's Estate that is subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state

law.

**1.23    Confirmation:**  Entry by the Bankruptcy Court of the Confirmation Order.

**1.24    Confirmation Date:**  The date upon which the Confirmation Order is entered by the Bankruptcy Court.

**1.25    Confirmation Hearing:**  Collectively, the hearing or hearings held by the Bankruptcy Court on confirmation of the Plan, as such hearing or hearings may be continued from time to time.

**1.26    Confirmation Order:**  The Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**1.27    Creditor:**  Any Holder of a Claim.

**1.28    Creditors' Committee**:  The Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases, as it may be reconstituted from time to time.

**1.29    Debtor** or **Debtors:**  Individually and collectively, Seal123, Inc., a Delaware corporation (f/k/a The Wet Seal, Inc.), Seal123 Retail, Inc., a Delaware corporation (f/k/a The Wet Seal Retail, Inc.), Seal123 Catalog, Inc., a Delaware corporation (f/k/a Wet Seal Catalog, Inc.), and Seal123 GC, LLC, a Virginia limited liability company (f/k/a Wet Seal GC, LLC).

**1.30    DIP Facility Order:**  The *Order Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (1) Authorizing Post-Petition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral, and (4) Modifying the Automatic Stay* [Dkt. No. 454], entered by the Bankruptcy Court on March 19, 2015.

**1.31    Disclosure Statement**:  The *Disclosure Statement for the First Amended Joint Plan of Liquidation of Seal123, Inc. and Subsidiary Debtors and Their Official Committee of Unsecured Creditors*, dated as of August 10, 2015, and all exhibits thereto, as the same may be amended, modified or supplemented.

**1.32    Disputed Claim:**  Any Claim, including any Administrative Claim, that is not an Allowed Claim and which has not been withdrawn, disallowed, or expunged.

**1.33    Disputed Claim Reserve:**  Any reserve established and maintained by the Liquidation Trustee for the payment of Disputed Claims.

**1.34    Disputed Ownership Fund:**  A "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9.

**1.35    Distribution:**  The transfer of Cash or other property by the Liquidation Trustee or Buyer, as applicable, to the Holders of Allowed Claims.

**1.36    Distribution Record Date**:  The record date for determining entitlement to receive Distributions under the Plan on account of Allowed General Unsecured Claims, which date shall be (i) with respect to General Unsecured Claims other than Rejection Claims, the third (3rd)

01:17655630.1

Business Day after the Effective Date at 5:00 p.m. prevailing Eastern time, (ii) with respect to Rejection Claims, the third (3rd) Business Day after the date for Filing Rejection Claims set forth in Section 6.1 of the Plan at 5:00 p.m. prevailing Eastern time.

**1.37**   **Donlin:**  Donlin Recano & Co., Inc.

**1.38**   **Effective Date.**  The date that is the first Business Day on which each condition set forth in Article IX of the Plan has been satisfied or waived as set forth therein.

**1.39**   **Entity:**  Shall have the meaning set forth in section 101(15) of the Bankruptcy Code. Unless otherwise specified herein, any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors, assigns, and affiliates.

**1.40**   **Equity Interests:**  All previously issued and outstanding common stock, preferred stock, or other equity interests in the Debtors outstanding immediately prior to the Effective Date, including, without limitation, treasury stock and all options, warrants, calls, rights, puts, awards, commitments, or any other agreements of any character to convert, exchange, exercise for, or otherwise receive such common stock, preferred stock, or other equity interests.

**1.41**   **Estates:**  The chapter 11 estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

**1.42**   **Exculpated Parties:**  (a) the Debtors, (b) the present or former officers and directors of the Debtors (other than the Prepetition Officers and Directors), (c), the Professionals retained by the Debtors pursuant to an Order of the Bankruptcy Court, (d) the Creditors' Committee, (e) the present or former members of the Creditors' Committee, and (f) the Professionals retained by the Creditors' Committee pursuant to an Order of the Bankruptcy Court.

**1.43**   **File**, **Filed**, or **Filing:**  File, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

**1.44**   **Face Amount:**  When used in reference to an Allowed Claim, the amount of such Claim that is Allowed, and, and, when used in reference to a Disputed Claim, (i) the liquidated amount set forth in the proof of claim or request for payment relating to the Disputed Claim (if any); (ii) an amount agreed to by the Liquidation Trustee or Buyer, as applicable, and the Holder of the Disputed Claim; or (iii) if a request for estimation is Filed with respect to such Disputed Claim, the amount at which such Disputed Claim is estimated by the Bankruptcy Court.

**1.45**   **Final Decree:**  The Order entered pursuant to section 350 of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 5009-1 closing a Chapter 11 Case.

**1.46**   **Final Order:**  An order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, that is not subject to stay or appeal, and for which the applicable time within which to take such action has expired, or for which such actions has been adjudicated by the highest court with jurisdiction over the matter.

**1.47**   **General Unsecured Claim:**  Any unsecured, non-priority Claim against the Debtors or the Estates that is neither an Assumed General Unsecured Claim nor a Subordinated Claim.

01:17655630.1

**1.48**    **Global Plan Settlement:**    The agreement, set forth in Section 5.2 of this Plan which, among other things, provides for the substantive consolidation of the Debtors' Estates.

**1.49**    **Holder:**    The Person that is the owner of record of a Claim or Equity Interest, as applicable.

**1.50**    **Impaired:**    Any Class of Claims or Equity Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.51**    **Insured Claim:**    Any Claim or portion of a Claim (other than a Claim held by an employee of the Debtors for workers' compensation coverage under the workers' compensation program applicable in the particular state in which the employee is employed by the Debtors) that is insured under the Debtors' insurance policies, but only to the extent of such coverage.

**1.52**    **L/C Cash Collateral**:    The funds in the "Post-Petition Cash Collateral Account," as defined in the L/C Facility Orders.

**1.53**    **L/C Credit Agreement**:    The *Senior Secured, Super-Priority Debtor-in-Possession Letter of Credit Agreement*, dated as of January 15, 2015, among Bank of America, N.A., as L/C Issuer, and Seal123, Inc. (f/k/a The Wet Seal, Inc.), as Applicant Representative for Seal123, Inc., Seal123 Retail, Inc. (f/k/a The Wet Seal Retail, Inc.), and Seal123 Catalog, Inc. (f/k/a Wet Seal Catalog, Inc.), as the Applicants and debtors in possession, as the same may have been or be amended, modified, restated, or supplemented and in effect from time to time.

**1.54**    **L/C Facility**:    The letter-of-credit financing under the L/C Credit Agreement.

**1.55**    **L/C Facility Claim**:    A Claim under or in connection with the L/C Credit Agreement, the L/C Facility Orders, and/or related documents and agreements.

**1.56**    **L/C Facility Orders**:    Collectively, (a) the *Interim Order Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (1) Authorizing Post-Petition L/C Financing Facility, (2) Granting Liens and Providing Superpriority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral and Providing for Adequate Protection, (4) Modifying the Automatic Stay, and (5) Scheduling a Final Hearing* [Dkt. No. 105], entered by the Bankruptcy Court on January 20, 2015, and (b) the *Final Order Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (1) Authorizing Post-Petition L/C Financing Facility, (2) Granting Liens and Providing Superpriority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral and Providing for Adequate Protection, and (4) Modifying the Automatic Stay* [Dkt. No. 249], entered by the Bankruptcy Court on February 5, 2015.

**1.57**    **Lien**:    Any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage, or hypothecation to secure payment of a debt or performance of an obligation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

**1.58**    **Liquidation Trust:**    The trust established for the benefit of the Liquidation Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Liquidation

Trust Agreement.

**1.59   Liquidation Trust Agreement:**   The agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Liquidation Trust.

**1.60   Liquidation Trust Assets:**   All Assets of the Estates, including, but not limited to, Cash, the Causes of Action and any proceeds realized or received from such Assets, and all rights of setoff, recoupment, and other defenses against Non-Assumed Claims.   For the avoidance of doubt, any assets treated as owned by a Disputed Ownership Fund pursuant to Section 5.4.5(b) of the Plan shall not be treated as Liquidation Trust Assets for federal income tax purposes.

**1.61   Liquidation Trust Beneficiaries:**   The Holders of General Unsecured Claims.

**1.62   Liquidation Trustee:**   Meta Advisors LLC, and any successor thereto, appointed and serving from time to time as Liquidation Trustee under the Liquidation Trust Agreement, acting in its capacity as Liquidation Trustee on behalf of the Liquidation Trust.

**1.63   Liquidation Trust Expenses:**   All reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Liquidation Trustee on account of administration of the Liquidation Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, and reasonable escrow expenses.

**1.64   Liquidation Trust Interests**:   The non-transferable interests in the Liquidation Trust that are issued to Liquidation Trust Beneficiaries pursuant to the Plan.

**1.65   Liquidation Trust Oversight Committee**:   The committee of three (3) Persons established pursuant to Article V of this Plan to oversee the Liquidation Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Liquidation Trust Agreement.

**1.66   Local Rules:**   The Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, as amended from time to time.

**1.67   Multi-Debtor Consolidated Claim:**   Any Claim, or portion thereof, as to which two or more Debtors are co-liable as a legal or contractual matter, including, without limitation, based on principles of joint or several liability or based upon contractual guarantees.

**1.68   Non-Assumed Claim** or **Non-Assumed [     ] Claim**:   Any Claim that is not an Assumed Claim.

**1.69   Non-Ordinary Course Administrative Claim:**   Any Administrative Claim that is not an Ordinary Course Administrative Claim.

**1.70   Order:**   An order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any case or the docket of any other court of competent jurisdiction.

**1.71   Ordinary Course Administrative Claim:**   Any Administrative Claim with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11

Cases (including, without limitation, Ordinary Course Professional Fee Claims, wages, salaries, and commissions for services rendered after the Petition Date and before the Effective Date); provided, that in no event shall obligations arising after the Petition Date from personal injury, property damage, products liability, consumer complaints, employment law, secondary payor liability, or any tort or equitable claims be Ordinary Course Administrative Claims.  Further, Claims for Stub Rent under section 503(b) of the Bankruptcy Code, Claims in connection with the cure of defaults under unexpired leases and executory contracts under section 365(b) of the Bankruptcy Code, and Section 503(b)(9) Claims are not Ordinary Course Administrative Claims.

**1.72    Ordinary Course Professional:**  Any Ordinary Course Professional, as that term is defined in the *Order Authorizing the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business* [Dkt. No. 325].

**1.73    Ordinary Course Professional Fee Claim:**  A Claim of an Ordinary Course Professional for compensation or reimbursement of costs and expenses relating to services incurred during the period from the Petition Date through the Effective Date.

**1.74    Person:**  An individual or Entity, limited liability company, corporation, partnership, association, trust or unincorporated organization, joint venture or other person or a government or any agency or political subdivision thereof.

**1.75    Petition Date:**  January 15, 2015, the date on which the Debtors Filed their voluntary chapter 11 petitions for relief in the Bankruptcy Court.

**1.76    Plan:**  The *First Amended Joint Plan of Liquidation of Seal 123, Inc. and Subsidiary Debtors and Their Official Committee of Unsecured Creditors*, dated as of August 10, 2015, and all exhibits thereto, including, without limitation, the Plan Supplement, as the same may be amended, modified or supplemented.

**1.77    Plan Proponents:**  The Debtors and Creditors' Committee.

**1.78    Plan Supplement:**  The ancillary documents necessary to the implementation and effectuation of the Plan, including, without limitation, the form of Liquidation Trust Agreement and the identity of the initial members of the Liquidation Trust Oversight Committee, which shall be Filed on or before the date that is seven (7) days prior to the Voting Deadline.

**1.79    Prepetition Credit Agreement Claim:**  A Claim under or in connection with that certain Amended and Restated Credit Agreement dated as of February 3, 2011 (as amended, modified or supplemented prior to the Petition Date), and/or related documents and agreements.

**1.80    Prepetition Officers and Directors:**  The officers and directors of any Debtor that (a) at no time were officers or directors of a Debtor from the Petition Date through the Effective Date, and (b) are not Transferred Employees (as defined in the APA).

**1.81    Priority Claim:**  A Claim that is entitled to priority under section 507(a) of the Bankruptcy Code, other than an Administrative Claim and a Priority Tax Claim.

**1.82    Priority Tax Claim:**  A Claim that is entitled to priority under section 507(a)(8) of the

Bankruptcy Code.

**1.83  Professional:**  Any professional (other than an Ordinary Course Professional) employed in the Chapter 11 Cases pursuant to sections 327, 328, 1103, or 1104 of the Bankruptcy Code or any professional or other Person (in each case, other than an Ordinary Course Professional) seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(3) or 503(b)(4) of the Bankruptcy Code.

**1.84  Professional Fee Claim:**  A Claim of a Professional for compensation or reimbursement of costs and expenses relating to services incurred during the period from the Petition Date through the Effective Date.

**1.85  Professional Fee Reserve**:  The reserve established and funded by the Liquidation Trustee pursuant to Section 11.2 of the Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

**1.86  Pro Rata:**  The proportion that the Allowed Claim in a particular Class bears to the aggregate amount of (a) Allowed Claims in such Class as of the date of determination, plus (b) Disputed Claims in such Class as of the date of determination, in their aggregate Face Amounts or such other amount: (i) as calculated by the Liquidation Trustee on or before the date of any such Distribution; (ii) as determined by an Order of the Bankruptcy Court estimating such Disputed Claim; or (iii) as directed by a Final Order of the Bankruptcy Court.

**1.87  Rejection Claim:**  Any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

**1.88  Released Parties:**  (a) Buyer, (b) Rodam, (c) Versa Capital Management, LLC, (d) B. Riley, (e) the Debtors, (f) the Creditors' Committee, and (g) each of the preceding entities' respective present or former members, officers, managers, directors, employees, consultants, professionals, advisors, agents, and other representatives, including, without limitation, attorneys, accountants, and financial advisors, and their respective subsidiaries and affiliates, and the successors or assigns of the foregoing, in each case solely in their capacities as such; provided, however, that the Prepetition Officers and Directors are not Released Parties.

**1.89  Release Opt-Out:**  The item set forth in the Ballots, due by the Voting Deadline, pursuant to which Holders of Claims in Class 5 that do not otherwise vote to accept or reject the Plan may opt out of the releases set forth in Section 11.12 of the Plan.

**1.90  Releasing Parties:**  (a) The Debtors, (b) the Estates, (c) any Entity seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, (d) Rodam, and (e) all Holders of Claims in Class 5 that (i) vote to accept the Plan or (ii) do not otherwise vote to accept or reject the Plan and do not timely submit a Release Opt-Out indicating such Holder's decision to not participate in the releases set forth in Section 11.12 of the Plan; provided, however, that, for the avoidance of doubt, Holders of Claims in Class 5 that do not receive Distributions solely as a result of Section 7.6 of the Plan are not Releasing Parties.

**1.91  Rodam:**  Rodam, LLC, a Delaware limited liability company, an affiliate of Buyer.

**1.92    Rodam Claims:**  The claims held by Rodam against each of the Debtors.

**1.93    Sale Order:**  The *Order Authorizing (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances; (B) the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement; and (C) the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases* [Dkt. No. 538], entered on April 1, 2015.

**1.94    Scheduled:**  Any Claim set forth on the Schedules.

**1.95    Schedules:**  The Schedules of Assets and Liabilities Filed by the Debtors, as such Schedules may be amended from time to in accordance with Bankruptcy Rule 1009.

**1.96    Section 503(b)(9) Claim:**  A Claim arising under section 503(b)(9) of the Bankruptcy Code for the value of any goods received by the Debtors within twenty (20) days before the Petition Date that were sold to the Debtors in the ordinary course of their business.

**1.97    Section 503(b)(9) Claim Reserve**:  The reserve established, maintained and controlled by the Buyer pursuant to Section 8.6 of the Plan to provide sufficient funds to satisfy in full unpaid Allowed Section 503(b)(9) Claims.

**1.98    Secured Claim:**  A Claim that is (i) secured by a valid, perfected, and enforceable Lien on property in which the Debtors or the Estates have an interest that is not subject to avoidance, or (ii) subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interest in such property or to the extent of the amount subject to setoff, as applicable, all as determined pursuant to sections 506(a) and 1111(b) of the Bankruptcy Code.

**1.99    Securities Law Claim:**  Any Claim that is subject to subordination under section 510(b) of the Bankruptcy Code, whether or not the subject of an existing lawsuit, (a) arising from rescission of a purchase or sale of any equity securities of any Debtor or an affiliate of any Debtor, (b) for damages arising from the purchase or sale of any such equity security, (c) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims, or (d) except as otherwise provided for in the Plan, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including, without limitation (i) any prepetition indemnification, reimbursement or contribution obligations of the Debtors, pursuant to the Debtors' corporate charters, by-laws, agreements entered into any time prior to the Petition Date, or otherwise, and relating to Claims otherwise included in the foregoing clauses (a) through (c), and (ii) Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the sale of equity securities, or otherwise subject to section 510(b) of the Bankruptcy Code.

**1.100    Stub Rent**:  Rent covering a period of a Debtor's postpetition tenancy for which payment became due prepetition.

**1.101    Subordinated Claim:**  Any Securities Law Claim or other Claim that is subordinated to General Unsecured Claims pursuant to section 510 of the Bankruptcy Code or Final Order

01:17655630.1

of the Bankruptcy Court.

**1.102  Unimpaired:**  Any Class of Claims that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

**1.103  U.S. Trustee:** The Office of the United States Trustee for the District of Delaware.

**1.104  Voting Deadline**:  The date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information, pursuant to section 1125(a) of the Bankruptcy Code, and authorizing the Debtors to solicit acceptances of the Plan.

## ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

**2.1  Unclassified Claims.**  Holders of the following Claims are not entitled to vote on the Plan:

1.    *L/C Facility Claims*

2.    *Assumed Non-Ordinary Course Administrative Claims*

3.    *Non-Assumed Non-Ordinary Course Administrative Claims*

4.    *Assumed Ordinary Course Administrative Claims*

5.    *Professional Fee Claims*

6.    *Priority Tax Claims*

**2.2  Unimpaired Classes of Claims.**  Holders of Claims in the following Unimpaired Classes of Claims are deemed to have accepted the Plan and are not entitled to vote on the Plan:

1.    *Prepetition Credit Agreement Claims (Class 1)*

2.    *Secured Claims (Class 2)*

3.    *Priority Claims (Class 3)*

4.    *Assumed General Unsecured Claims (Class 4)*

**2.3  Impaired/Voting Class of Claims.**  Holders of Claims in the following Impaired Class of Claims are entitled to vote on the Plan:

1.    *General Unsecured Claims (Class 5)*

**2.4  Impaired/Non-Voting Classes of Claims and Equity Interests**.  Holders of Claims and Equity Interests in the following Impaired Classes of Claims and Equity Interests are deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan:

1.    *Subordinated Claims (Class 6)*

2.    *Equity Interests (Class 7)*

## ARTICLE III

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

**3.1    Unclassified Claims.**

**3.1.1    L/C Facility Claims**.  All L/C Facility Claims are Allowed.  On the Effective Date, BofA, as the Holder of the Allowed L/C Facility Claim, shall have such rights as appear in the L/C Credit Agreement and the L/C Facility Orders, including, without limitation, retaining its first-priority, duly-perfected Lien and security interest in and upon the L/C Cash Collateral as provided for under the L/C Credit Agreement and the L/C Facility Orders, respectively.  If as of the Effective Date there remain any outstanding letters of credit, the L/C Credit Agreement shall remain in full force and effect until such time as all outstanding letters of credit have either been returned undrawn, or fifteen (15) days after the expiration date thereof and no drawing or presentation has been made.  BofA shall further retain the L/C Cash Collateral relating to outstanding letters of credit until such time as all such letters of credit have either been returned undrawn, or fifteen (15) days after the expiration date thereof and no drawing or presentation has been made, at which time BofA shall release the L/C Cash Collateral to Buyer in accordance with the APA.  Notwithstanding any contrary provision or term in the Plan, at the election of Buyer, in lieu of BofA retaining the L/C Cash Collateral, Buyer may deliver to BofA a back-to-back letter of credit issued by a financial institution reasonably satisfactory to BofA, in an amount equal to the sum of the L/C Cash Collateral then on deposit in the Pre-Petition Cash Collateral Account and the Post-Petition Cash Collateral Account (in each case as defined in the L/C Facility Orders), in which case BofA shall release the L/C Cash Collateral to Buyer.  From and after the Effective Date, BofA, as L/C Issuer (as defined in the L/C Credit Agreement), may apply L/C Cash Collateral on deposit to satisfy the letter of credit obligations without any further notice to any party and without any order of the Bankruptcy Court; and the Confirmation Order shall provide that BofA, as L/C Issuer (as defined in the L/C Credit Agreement), is granted relief from any applicable injunction imposed by the Plan and/or the Confirmation Order to enable it to apply the L/C Cash Collateral in respect of drawings and letter of credit fees when due and/or for reimbursement and/or payment of any other amounts that may become due under the L/C Credit Agreement (as provided in the L/C Credit Agreement and L/C Facility Orders).

**3.1.2    Assumed Non-Ordinary Course Administrative Claims**.  Except as otherwise provided for herein, and subject to the requirements of this Plan, on, or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) thirty (30) days following the date on which an Assumed Non-Ordinary Course Administrative Claim becomes an Allowed Assumed Non-Ordinary Course Administrative Claim, the Holder of such Allowed Assumed Non-Ordinary Course Administrative Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Assumed Non-Ordinary Course Administrative Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Assumed Non-Ordinary Course Administrative Claim or (b) such other less favorable treatment as to which such Holder and Buyer shall have agreed upon in writing.  Allowed Assumed Non-Ordinary Course Administrative Claims shall be paid by Buyer pursuant to the APA.

**3.1.3    Non-Assumed Non-Ordinary Course Administrative Claims**.    Except as otherwise provided for herein, and subject to the requirements of this Plan, on, or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) thirty (30) days following the date on which a Non-Assumed Non-Ordinary Course Administrative Claim becomes an Allowed Non-Assumed Non-Ordinary Course Administrative Claim, the Holder of such Allowed Non-Assumed Non-Ordinary Course Administrative Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Non-Assumed Non-Ordinary Course Administrative Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Non-Assumed Non-Ordinary Course Administrative Claim or (b) such other less favorable treatment as to which such Holder and the Liquidation Trustee shall have agreed upon in writing.    Allowed Non-Assumed Non-Ordinary Course Administrative Claims shall be paid solely by the Liquidation Trust.    Buyer shall have no obligation to pay any such Claims.

**3.1.4    Assumed Ordinary Course Administrative Claims**.    Assumed Ordinary Course Administrative Claims shall be paid by Buyer in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.    Holders of Assumed Ordinary Course Administrative Claims are not required to File a request for payment of such Claims.

**3.1.5    Professional Fee Claims**.    Professional Fee Claims shall be paid as set forth in Section 11.2 of the Plan.

**3.1.6    Priority Tax Claims**.    In full satisfaction, settlement, and release of and in exchange for such Claims, Allowed Priority Tax Claims shall be paid by Buyer, at Buyer's option, as follows: (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Tax Claim on the later of the Effective Date or thirty (30) days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, (b) in regular installment payments in Cash over a period not exceeding five (5) years after the Petition Date, plus interest on the unpaid portion thereof at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Confirmation Date occurs, and (c) such other treatment as to which the Holder of an Allowed Priority Tax Claim and the Buyer shall have agreed upon in writing.

**3.2    Unimpaired Classes of Claims.**

**3.2.1    Class 1:  Prepetition Credit Agreement Claims.**    Subject to the L/C Facility Orders and the DIP Facility Order, including the provisions of each relating to the subordination and/or release, and priorities, of Liens, all Liens, Claims, rights, and adequate protection held by any Holder of an Allowed Prepetition Credit Agreement Claim as of the Effective Date with respect to such Claim are preserved until such time as such Holder has been paid by the Liquidation Trust in Cash equal to the value of such Claim.    Class 1 is Unimpaired and therefore Holders of Prepetition Credit Agreement Claims are conclusively presumed to have accepted the Plan.

**3.2.2    Class 2:  Secured Claims**.    On, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) thirty (30) days following the date on which a Secured Claim becomes an Allowed Secured Claim, the Holder of such Allowed Secured Claim shall receive, at the election of the Liquidation Trustee or Buyer (solely to the extent that the Secured Claim is an Assumed Claim) in full satisfaction, settlement, and release of and in exchange for, such Allowed Secured Claim, (i) Cash equal to the value of such Claim, (ii) the return of the Holder's Collateral securing such Claim, (iii) such Claim reinstated pursuant to sections 1124(1) or 1124(2) of the Bankruptcy Code, or (iv) such other less favorable treatment as to which such

Holder and the Liquidation Trustee or Buyer, as applicable, shall have agreed upon in writing. Any Holder of an Allowed Secured Claim shall retain its Lien in the Collateral or the proceeds of the Collateral (to the extent that such Collateral is sold by the Liquidation Trust free and clear of such Lien) to the same extent and with the same priority as such Lien held as of the Effective Date until such time as (A) such Holder (i) has been paid Cash equal to the value of such Claim, (ii) has received a return of the Collateral securing such Claim, (iii) has such Claim reinstated pursuant to sections 1124(1) or 1124(2) of the Bankruptcy Code, or (iv) has been afforded such other less favorable treatment as to which such Holder and the Liquidation Trustee or Buyer, as applicable, shall have agreed upon in writing; or (B) such purported Lien has been determined by an Order of the Bankruptcy Court to be invalid or otherwise avoidable.  Class 2 is Unimpaired and therefore Holders of Secured Claims are conclusively presumed to have accepted the Plan.

**3.2.3    Class 3:  Priority Claims**.  On, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) thirty (30) days following the date on which a Priority Claim becomes payable pursuant to any agreement between Buyer and the Holder of such Priority Claim or (iii) the date on which a Priority Claim becomes payable pursuant to and as specified by an Order of the Bankruptcy Court, the Holder of such Allowed Priority Claim shall receive solely from Buyer pursuant to the APA, in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Claim, either (i) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Claim or (ii) such other less favorable treatment as to which such Holder and Buyer shall have agreed upon in writing.  Class 3 is Unimpaired and therefore Holders of Priority Claims are conclusively presumed to have accepted the Plan.

**3.2.4    Class 4:  Assumed General Unsecured Claims**.  The Holder of an Assumed General Unsecured Claim shall receive solely from Buyer pursuant to the APA, in full satisfaction, settlement, and release of and in exchange for such Assumed General Unsecured Claim, payment in full of such Claim in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.  Class 4 is Unimpaired and therefore Holders of Assumed General Unsecured Claims are conclusively presumed to have accepted the Plan.

**3.3    Impaired/Voting Classes of Claims.**

**3.3.1    Class 5:  General Unsecured Claims**.

(a) On, or as soon as reasonably practicable after the Effective Date, the Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Claim, (i) its Pro Rata share of the Liquidation Trust Interests, or (ii) such other less favorable treatment as to which such Holder and the Liquidation Trustee shall have agreed upon in writing.  Pursuant to the Global Plan Settlement, Holders of Allowed General Unsecured Claims that constitute Multi-Debtor Consolidated Claims shall hold a single Allowed General Unsecured Claim against the Debtors that is in an Allowed amount that is 150% of the Face Amount of such Holder's Allowed Multi-Debtor Consolidated Claim against a single Debtor.  (By way of illustration, an Entity that holds an Allowed General Unsecured Claim in the Face Amount of $1,000,000 against a Debtor based on a contract and against another Debtor based upon a guarantee with respect to that contract will be entitled to an Allowed General Unsecured Claim in the Allowed amount of $1,500,000 against the Debtors.)  No Distributions shall be made by the Liquidation Trust to Holders of Allowed General Unsecured Claims prior to the Administrative Claim Bar Date.  Class 5 is Impaired and

01:17655630.1

157374.1                                                           15

therefore Holders of General Unsecured Claims are entitled to vote on the Plan.

(b) Rodam has agreed in writing to vote the Rodam Claims to accept the Plan and that, upon the Effective Date, the Rodam Claims would be subordinate to all other Allowed General Unsecured Claims.  Accordingly, upon the Effective Date, the Rodam Claims shall be Allowed General Unsecured Claims, but shall not be entitled to any distribution until all other Allowed General Unsecured Claims are paid in full in accordance with the Plan.

### 3.4    Impaired/Non-Voting Classes of Claims and Equity Interests.

**3.4.1    Class 6:  Subordinated Claims**.  On the Effective Date, Holders of Subordinated Claims shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan on account of such Subordinated Claims.  Class 6 is deemed to have rejected the Plan and therefore Holders of Subordinated Claims are not entitled to vote on the Plan.

**3.4.2    Class 7:  Equity Interests**.  As of the Effective Date, all Equity Interests of any kind shall be deemed void, cancelled, and of no further force and effect and the Holders thereof shall not receive or retain any property or interest in property under the Plan on account of such Equity Interests.  Class 7 is deemed to have rejected the Plan and therefore Holders of Equity Interests are not entitled to vote on the Plan.

### 3.5    Special Provisions Regarding Insured Claims.

(a) Any Allowed General Unsecured Claim with respect to an Insured Claim shall be limited to the amount by which the Allowed Insured Claim exceeds the total coverage available with respect to such Insured Claim under the Debtors' applicable insurance policies.

(b) If there is insurance, any party with rights against or under the applicable insurance policy, including, without limitation, Buyer, the Liquidation Trust, and Holders of Insured Claims, may pursue such rights.

(c) Nothing in this Section 3.5 shall constitute a waiver of any causes of action the Debtors or the Liquidation Trust may hold against any Entity, including the Debtors' insurance carriers; and nothing in this Section 3.5 is intended to, shall, or shall be deemed to preclude any Holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any Distribution such Holder may receive under the Plan; provided, however, that the Debtors and the Liquidation Trustee do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

(d) The Plan shall not expand the scope of, or alter in any other way, the rights and obligations of the Debtors' insurers under their policies, and the Debtors' insurers shall retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including Buyer, the Debtors and the Liquidation Trustee, the existence, primacy and/or scope of available coverage under any alleged applicable policy.  The Plan shall not operate as a waiver of any other Claims the Debtors' insurers have asserted or may assert in any proof of claim or the Debtors' rights and defenses to such proofs of claim.

01:17655630.1 **3.6    Provision Governing Allowance and Defenses to Claims.**  On and after the

Effective Date, the Liquidation Trust shall have all of the Debtors' and the Estates' rights under Section 558 of the Bankruptcy Code. Nothing under the Plan shall affect the rights and defenses of the Debtors, the Estates, and the Liquidation Trust in respect of any Claim, including all rights in respect of legal and equitable objections, defenses, setoffs, or recoupment against such Claims; provided, however, that with respect to a Multi-Debtor Consolidated Claim, such rights, defenses, setoffs, or recoupments against such Claim shall not be affected by the substantive consolidation of the Estates of the Debtors and will apply to a Multi-Debtor Consolidated Claim only to the extent that such rights, defenses, setoffs, or recoupments would have applied against the Claims underlying the Multi-Debtor Consolidated Claim had the substantive consolidation of the Estates of the Debtors not taken place. The Liquidation Trust may, but shall not be required to, setoff against any Claim (for purposes of determining the Allowed amount of such Claim on which Distribution shall be made), any claims of any nature whatsoever that the Estates or the Liquidation Trust may have against the Claim Holder, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidation Trust of any such Claim it may have against such Claim Holder. The Liquidation Trustee may designate any Non-Assumed Claim as Allowed at any time from and after the Effective Date.

## ARTICLE IV

### ACCEPTANCE OR REJECTION OF THE PLAN

**4.1    Impaired Class of Claims Entitled to Vote.**  Only the votes of Holders of Claims in Class 5 shall be solicited with respect to the Plan.

**4.2    Acceptance by an Impaired Class.**  In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, Class 5 shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in Class 5 that have timely and properly voted to accept or reject the Plan.

**4.3    Presumed Acceptances by Unimpaired Classes.**  Class 1, Class 2, Class 3, and Class 4 are Unimpaired under the Plan. Under section 1126(f) of the Bankruptcy Code, the Holders of Claims in such Unimpaired Classes are conclusively presumed to have accepted the Plan, and, therefore, the votes of the Holders of such Claims shall not be solicited.

**4.4    Impaired Classes Deemed to Reject Plan.**  Holders of Claims and Equity Interests in Class 6 and Class 7 are not entitled to receive or retain any property or interests in property under the Plan. Under section 1126(g) of the Bankruptcy Code, such Holders are deemed to have rejected the Plan, and, therefore, the votes of such Holders shall not be solicited.

**4.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.**  Because at least one Impaired Class is deemed to have rejected the Plan, the Plan Proponents will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**4.6    Elimination of Vacant Classes.**  Any Class of Claims or Equity Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an

Allowed Claim or Equity Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE V

## IMPLEMENTATION OF THE PLAN AND THE LIQUIDATION TRUST

**5.1      Implementation of the Plan.**  The Plan will be implemented by, among other things, the establishment of the Liquidation Trust, the transfer to the Liquidation Trust of the Assets of the Estates, including, without limitation, all Cash and the Causes of Action, and the making of Distributions by the Liquidation Trust in accordance with the Plan and Liquidation Trust Agreement.

**5.2      Global Plan Settlement and Substantive Consolidation.**

The Plan contemplates and is predicated upon entry of an Order substantively consolidating the Debtors' Estates and the Chapter 11 Cases pursuant to the Global Plan Settlement set forth below, approval of which is being sought under Bankruptcy Rule 9019.

(a) Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code and Bankruptcy Rule 9019, effective as of the Effective Date, of the substantive consolidation of the Estates of the Debtors for the purposes of confirming and consummating the Plan, including, but not limited to, voting, Confirmation and Distribution, and the Bankruptcy Court's findings that the substantive consolidation of the Estates of the Debtors to the extent set forth herein is (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (ii) in the best interests of the Debtors, the Estates and all Holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing.

(b) Pursuant to the Global Plan Settlement, on and after the Effective Date, (i) all Assets and liabilities of the Debtors shall be treated as though they were pooled, (ii) each Claim filed or to be filed against any Debtor shall be deemed filed as a single Claim against, and a single obligation of, the Debtors, (iii) all Claims held by a Debtor against any other Debtor shall be cancelled or extinguished, (iv) no Distributions shall be made under the Plan on account of any Claim held by a Debtor against any other Debtor, (v) the Equity Interests shall be cancelled, (vi) no Distributions shall be made under the Plan on account of any Equity Interest held by a Debtor in any other Debtor, (vii) all guarantees of any Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof executed by any other Debtor shall be treated as one Multi-Debtor Consolidated Claim against the substantively-consolidated Debtors, and (viii) any joint or several liability of any of the Debtors shall be one obligation of the substantively-consolidated Debtors and any Claims based upon such joint or several liability shall be treated as one Multi-Debtor Consolidated Claim against the substantively-consolidated Debtors.

(c) The substantive consolidation of the Debtors under the Plan and pursuant to the Global Plan Settlement shall not (other than for purposes related to funding Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) executory

01:17655630.1

18

contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (iii) any agreements entered into by the Liquidation Trust on or after the Effective Date, (iv) the Debtors' or the Liquidation Trust's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (v) any Causes of Action or Avoidance Actions or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no substantive consolidation of the Estates of the Debtors, and (vi) distributions to the Debtors or the Liquidation Trust from any insurance policies or the proceeds thereof. Notwithstanding the substantive consolidation called for herein and pursuant to the Global Plan Settlement, each and every Debtor shall remain responsible for the payment of U.S. Trustee fees pursuant to 28 U.S.C. § 1930 until its particular case is closed, dismissed or converted.

(d) Pursuant to the Global Plan Settlement, Holders of Allowed General Unsecured Claims that constitute Multi-Debtor Consolidated Claims shall hold a single Allowed General Unsecured Claim against the substantively-consolidated Debtors that is in an Allowed amount that is 150% of the Face Amount of such Holder's Allowed Multi-Debtor Consolidated Claim against a single Debtor.  (By way of illustration, an Entity that holds an Allowed General Unsecured Claim in the Face Amount of $1,000,000 against a Debtor based on a contract and against another Debtor based upon a guarantee with respect to that contract will be entitled to an Allowed General Unsecured Claim in the Allowed amount of $1,500,000 against the Debtors.)

(e) The Plan and Disclosure Statement, jointly, shall serve as, and shall be deemed to be, a motion for entry of an Order of the Bankruptcy Court under Bankruptcy Rule 9019 approving the Global Plan Settlement and the associated substantive consolidation of the Debtors' Estates and Chapter 11 Cases.  If no objection to the Global Plan Settlement is timely filed and served by any Holder of an Impaired Claim affected by the Plan as provided herein on or before the Voting Deadline or such other date as may be established by the Bankruptcy Court, the Global Plan Settlement may be approved by the Bankruptcy Court as part of the Confirmation Order.  If any such objections are timely filed and served, the Global Plan Settlement and the objections thereto shall be considered by the Bankruptcy Court at the Confirmation Hearing.

### 5.3    The Debtors' Post-Effective Date Corporate Affairs.

**5.3.1    Debtors' Directors and Officers.**  On the Effective Date, each of the Debtors' directors and officers shall be terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.

**5.3.2    Wind-Up and Dissolution of the Debtors.**  The Debtors shall be dissolved automatically effective on the Effective Date without the need for any corporate action or approval and without the need for any corporate filings.  On the Effective Date or as soon thereafter as is reasonably practicable, the Liquidation Trustee shall wind-up the affairs of the Debtors, if any, and file final tax returns for the Debtors.  The Liquidation Trust shall bear the cost and expense of the wind-up of the affairs of the Debtors, if any, and the cost and expense of the preparation and filing of the final tax returns for the Debtors.

### 5.4    Liquidation Trust.

**5.4.1    Creation and Governance of the Liquidation Trust.**   On the Effective Date, the
Debtors and the Liquidation Trustee shall execute the Liquidation Trust Agreement and

shall take all steps necessary to establish the Liquidation Trust in accordance with the Plan and the beneficial interests therein, which shall be for the benefit of the Liquidation Trust Beneficiaries.  Additionally, on the Effective Date the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Liquidation Trust all of their rights, title, and interest in and to all of the Liquidation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, except as specifically provided in the Plan, the Confirmation Order, the L/C Credit Agreement, or the L/C Facility Orders, the Liquidation Trust Assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to (i) the Liquidation Trust Interests and the Liquidation Trust Expenses, as provided for in the Plan and the Liquidation Trust Agreement, and (ii) Claims required to be paid by the Liquidation Trust pursuant to the Plan with priority over General Unsecured Claims, including, without limitation, Administrative Claims and Professional Fee Claims; and such transfer shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax.  The Liquidation Trustee shall be the exclusive trustee of the Liquidation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  The Liquidation Trust shall be governed by the Liquidation Trust Agreement and administered by the Liquidation Trustee.  The powers, rights, and responsibilities of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Article V, subject to any required reporting to the Liquidation Trust Oversight Committee as may be set forth in the Liquidation Trust Agreement.  The Liquidation Trust shall hold and distribute the Liquidation Trust Assets in accordance with the provisions of the Plan and the Liquidation Trust Agreement.  Other rights and duties of the Liquidation Trustee and the Liquidation Trust Beneficiaries shall be as set forth in the Liquidation Trust Agreement.  For the avoidance of doubt, after the Effective Date, the Debtors and the Estates shall have no interest in the Liquidation Trust Assets, the transfer of the Liquidation Trust Assets to the Liquidation Trust is absolute, and the Liquidation Trust Assets shall not be held or deemed to be held in trust by the Liquidation Trustee on behalf of any of the Debtors or the Estates.

**5.4.2    Purpose of the Liquidation Trust**.  The Liquidation Trust shall be established for the purpose of pursuing or liquidating the Liquidation Trust Assets, reconciling and objecting to Non-Assumed Claims, as provided for in the Plan, and making Distributions to the Liquidation Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

**5.4.3    Liquidation Trustee and Liquidation Trust Agreement**.

(a) The Liquidation Trust Agreement generally will provide for, among other things:

(i) the payment of the Liquidation Trust Expenses;

(ii) the payment of other reasonable expenses of the Liquidation Trust;

(iii) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv) the investment of Cash by the Liquidation Trustee within certain limitations,

including those specified in the Plan;

(v) the orderly liquidation of the Liquidation Trust Assets;

(vi) litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Liquidation Trust Oversight Committee;

(vii) the prosecution and resolution of objections to Non-Assumed Claims, subject to reporting and oversight by the Liquidation Trust Oversight Committee; and

(viii) the establishment of such Disputed Claim Reserves as the Liquidation Trustee deems appropriate.

(b) Except as otherwise ordered by the Bankruptcy Court, the Liquidation Trust Expenses shall be paid from the Liquidation Trust Assets in accordance with the Plan and Liquidation Trust Agreement.   The Liquidation Trustee shall establish a reserve for the payment of Liquidation Trust Expenses and shall periodically replenish such reserve, as necessary.

(c) The Liquidation Trustee, on behalf of the Liquidation Trust, may employ, without further order of the Bankruptcy Court, professionals (including those previously retained by the Creditors' Committee) to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Liquidation Trust Assets in accordance with the Plan and the Liquidation Trust Agreement.

(d) The Liquidation Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Liquidation Trust in favor of the Liquidation Trustee and the Liquidation Trust Oversight Committee.   Any such indemnification shall be the sole responsibility of the Liquidation Trust and payable solely from the Liquidation Trust Assets.

(e) In furtherance of and consistent with the purpose of the Liquidation Trust and the Plan, the Liquidation Trustee, for the benefit of the Liquidation Trust, shall, subject to reporting and oversight by the Liquidation Trust Oversight Committee: (i) hold the Liquidation Trust Assets for the benefit of the Liquidation Trust Beneficiaries, (ii) make Distributions to the Liquidation Trust Beneficiaries as provided herein and in the Liquidation Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Non-Assumed Claims, without approval of the Bankruptcy Court.   The Liquidation Trustee shall be responsible for all decisions and duties with respect to the Liquidation Trust and the Liquidation Trust Assets, except as otherwise provided in the Plan and the Liquidation Trust Agreement.   In all circumstances, the Liquidation Trustee shall act in the best interests of the Liquidation Trust Beneficiaries pursuant to the terms of the Plan and the Liquidation Trust Agreement.

**5.4.4   <u>Compensation and Duties of Liquidation Trustee</u>**.   The salient terms of the Liquidation Trustee's employment, including the Liquidation Trustee's duties and compensation shall be set forth in the Liquidation Trust Agreement.  The Liquidation Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

**5.4.5    United States Federal Income Tax Treatment of the Liquidation Trust**.

(a) For all United States federal income tax purposes, the parties shall treat the transfer of the Liquidation Trust Assets to the Liquidation Trust as:  (i) a transfer of the Liquidation Trust Assets directly to the applicable Liquidation Trust Beneficiaries, followed by (ii) the transfer by the Liquidation Trust Beneficiaries to the Liquidation Trust of such Liquidation Trust Assets in exchange for the Liquidation Trust Interests; provided, however, that the Liquidation Trust Assets will be subject to (x) Claims required to be paid by the Liquidation Trust pursuant to the Plan with priority over General Unsecured Claims, including, without limitation, Administrative Claims and Professional Fee Claims, and (y) any post-Effective Date obligations incurred by the Liquidation Trust relating to the pursuit of Liquidation Trust Assets.  Accordingly, the applicable Liquidation Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Liquidation Trust Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(b) The Plan permits the Liquidation Trustee to establish Disputed Claim Reserves.  The Liquidation Trustee may, at the Liquidation Trustee's sole discretion, file a tax election to treat any such Disputed Claim Reserve as a Disputed Ownership Fund or other taxable entity rather than as a part of the Liquidation Trust for federal income tax purposes.  If such election is made, the Liquidation Trust shall comply with all tax reporting and tax compliance requirements applicable to the Disputed Ownership Fund or other taxable entity, including, but not limited to, the filing of separate income tax returns for the Disputed Ownership Fund or other taxable entity and the payment of any federal, state or local income tax due.

**5.4.6    Tax Reporting**.

(a) The Liquidation Trustee shall file tax returns for the Liquidation Trust treating the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

(b) The Liquidation Trustee shall be responsible for payment, out of the Liquidation Trust Assets, of any taxes imposed on the Liquidation Trust or its assets.

(c) The Liquidation Trustee shall distribute such notices to the applicable Liquidation Trust Beneficiaries as the Liquidation Trustee determines are necessary or desirable.

**5.4.7    Liquidation Trust Assets**.  The Liquidation Trustee shall have the exclusive right, on behalf of the Liquidation Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action without any further order of the Bankruptcy Court, except as otherwise provided herein or in the Liquidation Trust Agreement.  From and after the Effective Date, the Liquidation Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the Liquidation Trust, shall serve as a representative of the Estates with respect to any and all Causes of Action and shall retain and possess the right to commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal.

**5.4.8    Liquidation Trust Expenses**.  From and after the Effective Date, the Liquidation Trust shall, in the ordinary course of business and without the necessity of any approval by the
01:17655630.1    Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the

Liquidation Trust and any professionals retained by the Liquidation Trust from the Liquidation Trust Assets, except as otherwise provided in the Liquidation Trust Agreement.

**5.4.9    Distributions by Liquidation Trustee**.  The Liquidation Trustee, in its discretion, may make Distributions at any time following the Administrative Claim Bar Date, provided that such Distributions are otherwise permitted under, and not inconsistent with, the terms of the Plan, the Liquidation Trust Agreement, and applicable law.

**5.4.10    Cash Investments**.  The Liquidation Trustee may invest Cash (including any earnings thereon or proceeds therefrom); provided, however, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

**5.4.11    Dissolution of the Liquidation Trust**.  The Liquidation Trustee and the Liquidation Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Liquidation Trustee determines that the pursuit of additional Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (b) all objections to Disputed Claims are fully resolved, and (c) all Distributions required to be made by the Liquidation Trust have been made, but in no event shall the Liquidation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Liquidation Trust Assets.  Upon dissolution of the Liquidation Trust, any remaining Liquidation Trust Assets that exceed the amounts required to be paid under the Plan may be transferred by the Liquidation Trustee to the American Bankruptcy Institute Endowment Fund.

**5.4.12    Control Provisions**.  To the extent there is any inconsistency between The Plan as it relates to the Liquidation Trust and the Liquidation Trust Agreement, the Plan shall control.

## ARTICLE VI

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**6.1    Executory Contracts and Unexpired Leases.**  Subject to the occurrence of the Effective Date, all executory contracts and unexpired leases of the Debtors that have not been assumed and assigned, or rejected, prior to the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order, as of the Confirmation Date.  Any Creditor asserting a Rejection Claim shall File a proof of claim within thirty (30) days of the Effective Date.

**6.2    Rejection Claims.**  Any Rejection Claims that are not timely Filed pursuant to Section 6.1 of the Plan shall be forever disallowed and barred.  If one or more Rejection Claims are timely Filed pursuant to Section 6.1 of the Plan, the Liquidation Trustee may File an

objection to any Rejection Claim on or prior to the Claim Objection Deadline.

## ARTICLE VII

## PROVISIONS GOVERNING DISTRIBUTIONS

**7.1     Distributions for Allowed Claims.**

(a) Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable distribution date shall be made on or as soon as practicable after the applicable distribution date.  Distributions on account of Claims that first become Allowed Claims after the applicable distribution date shall be made pursuant to Section 8.5 of the Plan and on the day selected by the Liquidation Trustee.

(b) The Liquidation Trustee may accelerate any distribution date with respect to Distributions on account of Allowed General Unsecured Claims other than the initial distribution date if the facts and circumstances so warrant and to the extent not inconsistent with the Plan.

(c) Distributions made as soon as reasonably practicable after the Effective Date or such other date set forth herein shall be deemed to have been made on such date.

**7.2     Interest on Claims.**  Except to the extent provided in section 506(b) of the Bankruptcy Code, the Plan, or the Confirmation Order, or under or in connection with the L/C Facility Orders, post-petition interest shall not accrue or be paid on Claims, and no Holder of an Allowed Claim shall be entitled to interest accruing on any Claim from and after the Petition Date.

**7.3     Distributions by Liquidation Trustee and Buyer as Disbursing Agents.**  The Liquidation Trustee shall serve as the disbursing agent under the Plan with respect to Distributions to Holders of Allowed Claims required to be paid by the Liquidation Trust pursuant to this Plan.  Buyer shall serve as the disbursing agent with respect to Distributions to Holders of Allowed Claims required to be paid by Buyer pursuant to the APA and the Sale Order.  The Liquidation Trustee and Buyer, as applicable, shall make all Distributions required to be made to such Holders of Allowed Claims, in the case of the Liquidation Trustee, pursuant to the Plan and the Liquidation Trust Agreement, and, in the case of the Buyer, pursuant to the APA and the Sale Order.  Neither the Liquidation Trustee nor the Buyer shall be required to give any bond or surety or other security for the performance of their duties as disbursing agents unless otherwise ordered by the Bankruptcy Court.

**7.4     Means of Cash Payment**.

(a) Cash payments under this Plan shall be made, at the option, and in the sole discretion, of the Liquidation Trustee or Buyer, as applicable, by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Liquidation Trustee or Buyer, as applicable.  Cash payments to foreign creditors may be made, at the option, and in the sole discretion, of the Liquidation Trustee or Buyer, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.  Cash payments made pursuant to this Plan in the form of checks issued by the Liquidation Trustee or Buyer, as applicable, shall be null and void if not cashed within one hundred and twenty (120) days of the date of the issuance thereof. Requests for reissuance of any check within one hundred and twenty (120) days of the date

01:17655630.1

of the issuance thereof shall be made directly to the Liquidation Trustee or Buyer, as applicable.

(b) For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

**7.5**   **Fractional Distributions.**   Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan.   Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**7.6**   **De Minimis Distributions.**   Notwithstanding anything to the contrary contained in the Plan, the Liquidation Trustee and Buyer, as applicable, shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $25, and such amount, solely with respect to the Liquidation Trustee, shall be distributed in accordance with the terms of the Plan and the Liquidation Trust Agreement.   Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $25 shall be forever barred from asserting such Claim against Liquidation Trust Assets or the Buyer.

**7.7**   **Delivery of Distributions.**   Distributions to Holders of Allowed General Unsecured Claims shall be made (a) at the addresses set forth on the proofs of claim Filed by such Holders, (b) at the addresses reflected in the Schedules if no proof of claim has been Filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Liquidation Trustee or to Buyer, as applicable. If any Holder's Distribution is returned as undeliverable, a reasonable effort shall be made to determine the current address of such Holder, but no further Distributions to such Holder shall be made unless and until the Liquidation Trustee or Buyer, as applicable, is notified of such Holder's then current address, at which time all missed Distributions shall be made to such Holder without interest.  The responsibility to provide the Liquidation Trustee or Buyer, as applicable, a current address of a Holder of Claims shall always be the responsibility of such Holder.   Except as set forth above, nothing contained in the Plan shall require the Liquidation Trustee or Buyer, as applicable, to attempt to locate any Holder of an Allowed General Unsecured Claim.   Amounts in respect of undeliverable Distributions made by the Liquidation Trustee shall be held in trust on behalf of the Holder of the Claim to which they are payable by the Liquidation Trust until the earlier of the date that such undeliverable Distributions are claimed by such Holder and one hundred twenty (120) days after the date the undeliverable Distributions were made.

**7.8**   **Application of Distribution Record Date**.   At the close of business on the Distribution Record Date, the claims registers for all General Unsecured Claims shall be closed, and there shall be no further changes in the record holders of General Unsecured Claims.   Except as provided herein, the Liquidation Trustee and Buyer, as applicable, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of General Unsecured Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims registers as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Plan to such Entities or the date of such Distributions.

**7.9    Withholding, Payment, and Reporting Requirements with Respect to Distributions**. All Distributions under the Plan to be made by the Liquidation Trustee and Buyer, as applicable, shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding, payment, and reporting requirements. The Liquidation Trustee and Buyer, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  The Liquidation Trustee or the Buyer, as applicable, may require, in its sole and absolute discretion and as a condition to the receipt of any Distribution, that the Holder of an Allowed General Unsecured Claim complete and return to the Liquidation Trust or the Buyer, as applicable, the appropriate Form W-8 or Form W-9, as applicable to each Holder. Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed upon the Liquidation Trust or Buyer, as applicable, in connection with such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Liquidation Trustee or Buyer, as applicable, for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidation Trust or Buyer, as applicable, in connection with such Distribution.

**7.10    Setoffs.**  The Liquidation Trust or the Buyer, as applicable, may, but shall not be required to, set off against any Claim or any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors, the Liquidation Trust, or the Buyer, as applicable, may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidation Trust or the Buyer, as applicable, of any such claim that it may have against such Holder.

**7.11    No Distribution in Excess of Allowed Amounts**.  Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim (excluding Distributions with respect to Multi-Debtor Consolidated Claims pursuant to Section 3.3.1(a) and Section 5.2(d) of the Plan and payments on account of interest due and payable from and after the Effective Date pursuant to the Plan, if any).

**7.12    Allocation of Distributions**.  All Distributions received under the Plan by Holders of Claims shall be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim.

**7.13    Joint Distributions**.    The Liquidation Trustee may, in its sole discretion, make Distributions jointly to any Holder of a Claim and any other Entity who has asserted, or whom the Liquidation Trustee has determined to have, an interest in such Claim.

      **7.14    Forfeiture of Distributions**.  If the Holder of a Claim fails to cash a check payable

to it within the time period set forth in Section 7.4(a), fails to claim an undeliverable Distribution within the time limit set forth in Section 7.7, or fails to complete and return to the Liquidation Trust the appropriate Form W-8 or Form W-9 within one hundred twenty (120) days of the request by the Liquidation Trust or Buyer, as applicable, for the completion and return to it of the appropriate form pursuant to Section 7.9, then such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Liquidation Trust or Buyer, as applicable, any Liquidation Trust Interests held by such Holder shall be deemed cancelled, and the Claims of such Holder shall be forever barred.  If the forfeited Distributions relate to Non-Assumed Claims, they shall become unrestricted Liquidation Trust Assets and be redistributed to the Liquidation Trust Beneficiaries after reserving as necessary for payment of Liquidation Trust Expenses and otherwise in compliance with this Article and the Liquidation Trust Agreement.  In the event the Liquidation Trustee determines, in its sole discretion, that any such amounts are too small in total to redistribute cost-effectively to the Liquidation Trust Beneficiaries, the Liquidation Trustee may instead donate them to the American Bankruptcy Institute Endowment Fund free of any restrictions thereon, notwithstanding any federal or state escheat laws to the contrary.  If the forfeited Distributions relate to Assumed Claims, they shall be returned to Buyer free of any restrictions thereon, notwithstanding any federal or state escheat laws to the contrary.

## ARTICLE VIII

### PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO

**8.1**    **Objections to and Resolution of Disputed Claims.**  Subject to Section 8.2, from and after the Effective Date, the Liquidation Trustee (acting in accordance with the terms of the Liquidation Trust Agreement) shall have the exclusive authority to compromise, resolve and Allow any Disputed Claim that is a Non-Assumed Claim without the need to obtain approval from the Bankruptcy Court, and any agreement entered into by the Liquidation Trustee (acting in accordance with the terms of the Liquidation Trust Agreement) with respect to the Allowance of any Non-Assumed Claim shall be conclusive evidence and a final determination of the Allowance of such Claim.  Correspondingly, subject to Section 8.2, from and after the Effective Date, Buyer shall have the exclusive authority to compromise, resolve and Allow any Disputed Claim that is an Assumed Claim without the need to obtain approval from the Bankruptcy Court, and any agreement entered into by Buyer with respect to the Allowance of any Assumed Claim shall be conclusive evidence and a final determination of the Allowance of such Claim.

**8.2**    **Limitations on Allowance and Reclassification of Claims.**  Notwithstanding Section 8.1, the Liquidation Trustee shall not consent or agree to the Allowance or reclassification of any Claim as an Administrative Claim or Priority Claim without the written consent of Buyer (including by email).  Notwithstanding Section 8.1, Buyer shall not consent or agree to the Allowance or reclassification of any Claim as a General Unsecured Claim without the written consent of the Liquidation Trustee (including by email); provided, however, that Buyer may seek to obtain the Allowance or reclassification of a Claim as a General Unsecured Claim by Order of the Bankruptcy Court, subject to the Liquidation Trustee's right to object thereto.

**8.3**    **Claim Objections.**  All objections to Claims (other than Professional Fee Claims, which shall be governed by Section 11.2 of this Plan) shall be Filed by the Liquidation Trustee or Buyer, as applicable, on or before the Claim Objection Deadline, which date may be extended upon

presentment of an Order to the Bankruptcy Court by the Liquidation Trustee or the Buyer prior to the expiration of such period and without need for notice or hearing. The Claim Objection Deadline shall be automatically extended as provided by Local Rule 9006-2 upon the Filing of a proposed form of order by the Liquidation Trustee or Buyer, as applicable, requesting an extension of the Claim Objection Deadline. If a timely objection has not been Filed to a proof of claim or the Schedules have not been amended with respect to a Claim that was scheduled by the Debtors but was not Scheduled by the Debtors as contingent, unliquidated, and/or disputed, then the Claim to which the proof of claim or Scheduled Claim relates will be treated as an Allowed Claim.

**8.4    Estimation of Contingent or Unliquidated Claims**.  The Liquidation Trustee or the Buyer, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute the Allowed amount of such Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

**8.5    Distributions on Account of Disputed Claims**.  No payments or Distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is a Disputed Claim, until such Disputed Claim becomes an Allowed Claim.  The Liquidation Trustee or the Buyer, as applicable, shall, on the applicable distribution date, make Distributions on account of any Disputed Claim that has become an Allowed Claim. Such Distributions shall be based upon the Distributions that would have been made to the Holder of such Claim under the Plan if such Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

**8.6    Section 503(b)(9) Claim Reserve**.  Unless, on or prior to the Effective Date, all timely-filed Section 503(b)(9) Claims have been paid, otherwise satisfied, withdrawn or disallowed, on the Effective Date, the Buyer shall establish the Section 503(b)(9) Claim Reserve in the Face Amount of all timely-filed Section 503(b)(9) Claims against the Debtors that have not been paid, otherwise satisfied, withdrawn or disallowed.  If the Debtors, the Creditors' Committee and the Buyer are unable to agree on an amount by which the Section 503(b)(9) Claim Reserve is to be funded, the Debtors, the Creditors' Committee and the Buyer shall submit the issue to the Bankruptcy Court, which, following notice and a hearing, shall fix the amount of the required reserve.  All Section 503(b)(9) Claims that have not previously been paid, otherwise satisfied, withdrawn or disallowed shall be paid from the Section 503(b)(9) Claim Reserve; provided, however, that no payment shall be made to the Holder of a Section 503(b)(9) Claim without either the consent of the Buyer or an Order of the Bankruptcy Court.  The Buyer shall be permitted to reduce and release the reserve commensurate with the disposition (*i.e.*, payment, other satisfaction, withdrawal or disallowance) of all timely-filed Section 503(b)(9) Claims.

01:17655630.1

# ARTICLE IX

## CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE

**9.1**    **Conditions to the Occurrence of the Effective Date.**    The occurrence of the Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section 9.2 of the Plan:

(i) the Bankruptcy Court shall have entered the Confirmation Order;

(ii) the Confirmation Order shall not be subject to any stay;

(iii) the Liquidation Trust Agreement shall have been executed;

(iv) the Liquidation Trust shall have been established and the Liquidation Trust Assets shall have been transferred to and vested in the Liquidation Trust free and clear of all Claims and Equity Interests, except as specifically provided in the Plan and the Liquidation Trust Agreement;

(v) the Professional Fee Reserve shall be funded pursuant to Section 11.2 of the Plan in an amount agreed to by the Debtors and the Creditors' Committee or, if there is a dispute concerning the amount of the funding required, in an amount fixed by the Bankruptcy Court; and

(vi) the Section 503(b)(9) Claim Reserve shall be funded pursuant to Section 8.6 of the Plan in an amount agreed to by the Debtors, the Creditors' Committee and the Buyer or, if there is a dispute concerning the amount of the funding required, in an amount fixed by the Bankruptcy Court; provided, that this condition to the occurrence of the Effective Date shall be deemed waived if, on or prior to the Effective Date, all timely-filed Section 503(b)(9) Claims against the Debtors have been paid, otherwise satisfied, withdrawn or disallowed.

**9.2**    **Waiver of Conditions to the Occurrence of the Effective Date.**    The conditions to the Effective Date set forth in Section 9.1 of the Plan may be waived in writing by the Plan Proponents at any time without further Order.

**9.3**    **Effect of Non-Occurrence of Conditions to the Effective Date.**    If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Sections 9.1 and 9.2 of the Plan, the Plan Proponents reserve all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated.  If the Confirmation Order is vacated pursuant to this Section 9.3 of the Plan, (i) the Plan shall be null and void in all respects, and (ii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Equity Interest in, the Debtors, the Estates, or any other Person, or (b) prejudice in any manner the rights of the Debtors, the Estates, or any other Person.

# ARTICLE X

## RETENTION OF JURISDICTION

**10.1**    **Scope of Retained Jurisdiction.**    Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain

01:17655630.1

157374.1                                    29

exclusive jurisdiction over all matters arising out of, or related to, these Chapter 11 Cases and the Plan to the fullest extent permitted by law (provided, however, that notwithstanding the foregoing, with respect to all civil proceedings arising in or related to the Chapter 11 Cases and the Plan, the Bankruptcy Court shall have original but not exclusive jurisdiction, in accordance with section 1334(b) of title 28 of the United States Code), including, among other things, jurisdiction to do the following:

(a) allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status of any Claim not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the Holder), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims;

(b) hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(c) hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required cure or the liquidation or allowance of any Claims arising therefrom;

(d) effectuate performance of and payments under the provisions of the Plan and APA and enforce remedies upon any default under the Plan and APA;

(e) hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases, including, without limitation, the Avoidance Actions and the Causes of Action, and with respect to the Plan;

(f) enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created, executed, or contemplated in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(g) hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(h) consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i) issue injunctions, enter and implement other Orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(j) enter and implement such Orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(k) hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, the APA, the Sale Order, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with any of the foregoing documents and Orders;

(l) enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(m) except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

(n) hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o) hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

(p) hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

(q) resolve any cases, controversies, suits, or disputes related to the Liquidation Trust, including the Liquidation Trust Assets, and related to the APA, including relating to claims against Buyer by Holders of Assumed Claims; and

(r) enter a final decree closing the Chapter 11 Cases.

**10.2    Failure of the Bankruptcy Court to Exercise Jurisdiction.**    If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Section 10.1 of the Plan, the provisions of this Article X shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

**11.1    Non-Ordinary Course Administrative Claims.**    Subject to the last sentence of this Section 11.1, all requests for payment of a Non-Ordinary Course Administrative Claim must be Filed with the Bankruptcy Court and served on counsel to the Liquidation Trustee, counsel to Buyer, counsel to the Debtors, and counsel to the U.S. Trustee no later than the Administrative Claim Bar Date.    In the event of an objection to allowance of a Non-Ordinary Course Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Non-Ordinary Course Administrative Claim.    Post-petition statutory tax claims shall not be subject to the Administrative Claim Bar Date.

**11.2    Professional Fee Claims**.    All final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be

01:17655630.1

made by application Filed with the Bankruptcy Court and served on counsel to the Liquidation Trustee, counsel to Buyer, counsel to the Debtors, and counsel to the U.S. Trustee no later than thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such applications must be Filed and served on counsel to the Liquidation Trustee, counsel to Buyer, counsel to the Debtors, counsel to the Creditors' Committee, counsel to the U.S. Trustee and the requesting Professional on or before the date that is twenty-one (21) days after the date on which the applicable application was served (or such longer period as may be allowed by Order of the Bankruptcy Court or by agreement with the requesting Professional). All Professional Fee Claims shall be paid to the extent approved by Order of the Bankruptcy Court within five (5) Business Days from entry of such Order by the Buyer to the extent it is liable under the APA and by the Liquidation Trust to the extent not paid by the Buyer. On the Effective Date, the Liquidation Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Liquidation Trust and shall be maintained by the Liquidation Trustee in accordance with the Plan and the Liquidation Trust Agreement. The Liquidation Trust shall fund the Professional Fee Reserve on the Effective Date in an amount that is agreed upon by the Debtors and the Creditors' Committee prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date not paid by the Buyer under the APA. If the Debtors and the Creditors' Committee are unable to agree on an amount by which the Professional Fee Reserve is to be funded, the Debtors and the Creditors' Committee shall submit the issue to the Bankruptcy Court, which, following notice and a hearing, shall fix the amount of the required funding. All Professional Fee Claims that have not previously been paid, otherwise satisfied, or withdrawn shall be paid from the Professional Fee Reserve. Any excess funds in the Professional Fee Reserve shall be released to the Liquidation Trust to be used for other purposes consistent with the Plan and the Liquidation Trust Agreement.

**11.3    Payment of Statutory Fees; Filing of Quarterly Reports**. All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date shall be paid by the Liquidation Trust. The Liquidation Trust shall have the obligation to pay quarterly fees to the Office of the United States Trustee pursuant to section 1930 of title 28 of the United States Code through the entry of the Final Decree for each of the Debtors or the dismissal or conversion of the Chapter 11 Cases. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to section 1930 of title 28 of the United States Code.

**11.4    Special Provisions Concerning the APA**. On and after the Effective Date the Liquidation Trustee shall be the assignee of the Debtors under the APA with all of the Debtors' rights thereunder, including to enforce the APA against Buyer. Nothing in the Plan shall expand the Assumed Liabilities (as defined under the APA) or modify or amend the APA or the Sale Order, and the terms of the Plan shall be interpreted consistent with the APA and the Sale Order. The consideration paid by Buyer under or in connection with the APA is the only consideration to be provided by Buyer under or in connection with the Plan. Pursuant to the APA, Buyer shall have no liability for any Liquidation Trust Expenses. Pursuant Section 6.13(b) of the APA, the Plan must be in a form reasonably acceptable to Buyer.

**11.5    Dissolution of Creditors' Committee**. On the Effective Date, the Creditors' Committee shall dissolve and all members, employees, or agents thereof shall be released and

01:17655630.1

32

discharged from all rights and duties arising from or related to the Chapter 11 Cases, provided, however, that (a) the Creditors' Committee shall continue in existence and its Professionals shall continue to be retained with respect to applications Filed or to be Filed pursuant to sections 330 and 331 of the Bankruptcy Code and (b) the Liquidation Trust shall be deemed the successor to the Creditors' Committee with respect to any motions seeking to enforce the Plan and the transactions contemplated hereunder or the Confirmation Order and any pending appeals and related proceedings.

**11.6**    **Modifications and Amendments**.

(a) The Plan Proponents may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date; provided, however, that any alterations, modifications, or amendments to the Plan, pursuant to Section 6.13(c) of the APA, must be reasonably acceptable to Buyer. All alterations, amendments, or modifications to the Plan must comply with section 1127 of the Bankruptcy Code. The Plan Proponents shall provide parties in interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or Order of the Bankruptcy Court. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Holder.

(b) After the Confirmation Date and prior to substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of the Plan, the Debtors or the Liquidation Trustee, as applicable, may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings (i) pursuant to Section 6.13(c) of the APA, are reasonably acceptable to Buyer, and (ii) do not adversely affect the treatment of Holders of Claims under the Plan without the consent of the Creditors' Committee or Liquidation Trustee. Such proceedings must comply with section 1127 of the Bankruptcy Code. To the extent required, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Holder.

**11.7**    **Severability of Plan Provisions**. If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted, is valid and enforceable pursuant to its terms.

**11.8    Successors and Assigns**.  The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Entity.

**11.9    Compromises and Settlements**.  From and after the Effective Date, the Liquidation Trustee may compromise and settle the Claims against the Debtors that are Non-Assumed Claims, subject to Section 8.2 of the Plan, as well as Causes of Action and Avoidance Actions that the Liquidation Trust may have against other Entities without any further approval by the Bankruptcy Court.  From and after the Effective Date, only Buyer may compromise and settle the Claims against the Debtors that are Assumed Claims, subject to Section 8.2 of the Plan. Until the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court and, to the extent required under the APA, the approval of Buyer) Claims against them, Avoidance Actions, Causes of Action, or other claims that they may have against other Entities.

**11.10    Binding Effect of Plan.**  Upon the Effective Date, section 1141 of the Bankruptcy Code shall become applicable with respect to the Plan and the Plan shall be binding on all parties to the fullest extent permitted by section 1141(a) of the Bankruptcy Code.

**11.11    Non-Discharge of the Debtors; Injunction.  In accordance with section 1141(d)(3) of the Bankruptcy Code, this Plan does not discharge the Debtors.  Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Equity Interests against the Debtors.  As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under this Plan other than assets required to be distributed to that Entity under the Plan.  As of the Confirmation Date, all parties are precluded from asserting against any property to be distributed under this Plan any Claims, rights, causes of action, liabilities, or Equity Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in this Plan or the Confirmation Order.**

**11.12    Releases and Related Matters.**

**(a) On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Releasing Parties shall be deemed to have forever released, waived, and discharged each of the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including, without limitation, Avoidance Actions), and liabilities whatsoever, whether known or unknown, whether foreseen or unforeseen, whether liquidated or unliquidated, whether fixed or contingent, whether matured or unmatured, existing or hereafter arising, at law, in equity, or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, the Plan or any other previously-proposed chapter 11 plan of reorganization or plan sponsorship agreement, the APA, or the Sale Order, except for acts or omissions that are determined in a Final Order to have constituted actual fraud, gross negligence or willful misconduct; provided, however, that nothing in this Section 11.12 shall affect any Person's rights, claims or causes of action against the Debtors, the Liquidation Trust or Buyer**

under the Plan, the Confirmation Order, the APA, the Sale Order, the L/C Credit Agreement, or the L/C Facility Orders, or the liabilities or obligations of such parties thereunder.

(b) Entry of the Confirmation Order shall constitute (i) the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Section 11.12, and (ii) the Bankruptcy Court's findings that such releases are (1) in exchange for good and valuable consideration provided by the Released Parties (including, without limitation, performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (2) in the best interests of the Debtors, the Estates, and all Holders of Claims that are Releasing Parties, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) a bar to any of the Releasing Parties asserting any released claim against any of the Released Parties.

(c) Each Holder of a Claim in Class 5 shall be a Releasing Party and, as such, provides the releases set forth in this Section 11.12, unless such Holder either (a) votes to reject the Plan or (b) does not otherwise vote to accept or reject the Plan but timely submits a Release Opt-Out indicating such Holder's decision to not participate in the releases set forth in this Section 11.12.  For the avoidance of doubt, Holders of Claims in Class 5 that do not receive Distributions solely as a result of Section 7.6 of the Plan are not Releasing Parties.  For the further avoidance of doubt, each Holder of a Claim in Class 5 that votes to accept the Plan (other than a Holder that does not receive Distributions solely as a result of Section 7.6) is a Releasing Party, and any Release Opt-Out that might be submitted by any such Holder that voted to accept the Plan shall be void and of no effect.

11.13    __Exculpation and Limitation of Liability__.  On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, to the maximum extent permitted by law, none of the Exculpated Parties shall have or incur any liability to any Entity, including, without limitation, to any Holder of a Claim or an Equity Interest, for any post-petition act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the formulation, negotiation, preparation, dissemination, solicitation of acceptances, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with the Plan, or the administration of the Plan or the property to be distributed under the Plan; __provided__, __however__, that nothing in this Section 11.13 shall affect any Person's rights, claims or causes of action against the Debtors under the Plan, the Confirmation Order, the APA, the Sale Order, the L/C Credit Agreement, or the L/C Facility Orders, or the Debtors' liabilities or obligations thereunder; and __provided__, __further__, that the exculpation provisions of this Section 11.13 shall not apply to acts or omissions constituting fraud, willful misconduct, intentional misconduct, or gross negligence by such Exculpated Party as determined by a Final Order.  The Exculpated Parties shall be entitled to rely upon the written advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and administration thereof.    The Confirmation Order shall serve as a permanent injunction against any Person seeking to enforce any claim or cause of action against the Exculpated Parties that has been exculpated pursuant to this Section 11.13 of the Plan.

11.14    __Term of Injunctions or Stays__.    Unless otherwise provided herein or in the

Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in or arising from the Plan or the Confirmation Order), shall remain in full force and effect through and including the Effective Date.

**11.15  Revocation, Withdrawal, or Non-Consummation**.  The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of liquidation.  If the Plan Proponents revoke or withdraw the Plan prior to the Confirmation Date, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims) and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Equity Interests in, any Debtor, or any Avoidance Actions, Causes of Action or other claims by or against any Debtor, the Creditors' Committee, Buyer, or any Entity, (ii) prejudice in any manner the rights of any Debtor, the Creditors' Committee, Buyer, or any Entity in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor, the Creditors' Committee, Buyer, or any other Entity.

**11.16  Computation of Time**.  In computing any period of time prescribed or allowed by the Plan, the provisions of Rule 9006(a) of the Bankruptcy Rules shall apply.

**11.17  Headings.**  The headings of articles, paragraphs, and subparagraphs of the Plan are inserted for convenience only and shall not affect the interpretation of any provision of the Plan.

**11.18  Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Delaware shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation of each Debtor shall govern corporate governance matters with respect to such Debtor; in each case without giving effect to the principles of conflicts of law thereof.

**11.19  Claims and Noticing Agent.**  At the option of the Liquidation Trustee, Donlin, in its capacity as claims and noticing agent, shall continue to serve the Liquidation Trustee.  Donlin shall be compensated in accordance with that certain Standard Claims Administration and Noticing Agreement, dated January 7, 2015, or such other terms as Donlin and the Liquidation Trustee may agree in writing, without the need for further Bankruptcy Court authorization or approval; provided, however, that the Bankruptcy Court shall retain jurisdiction over any disputes related to payment of any fees claimed by Donlin.  Except to the extent the Bankruptcy Court orders otherwise, Donlin shall comply in all respects with Local Rule 2002-1(f).

**11.20  Notices.**  Following the Effective Date, all pleadings and notices Filed in the Chapter 11 Cases shall be served solely on (i) the Liquidation Trustee and its counsel, (ii) Buyer, (iii) the U.S. Trustee, (iv) any party whose rights are affected by the applicable pleading or notice, and (v) any party Filing a request for notices and papers on and after the Effective Date.

01:17655630.1  **11.21  Final Decree.**  Upon the Liquidation Trustee's determination that all Claims have

been Allowed, disallowed, expunged or withdrawn, and that all Causes of Action held by the Liquidation Trust have either been finally resolved or abandoned, the Liquidation Trustee shall move for the entry of a Final Decree pursuant to section 350 of the Bankruptcy Code.  On entry of the Final Decree, the members of the Liquidation Trust Oversight Committee, the Liquidation Trustee, and the Liquidation Trust's professionals and agents shall be deemed discharged under the Liquidation Trust Agreement and have no further duties or obligations thereunder.  Upon a motion by the Liquidation Trustee, the Bankruptcy Court may enter an order relieving the members of the Liquidation Trust Oversight Committee, the Liquidation Trustee, and the Liquidation Trust's professionals and agents of any further duties, discharging and releasing those Persons from all liability related to the Liquidation Trust, and releasing the Liquidation Trustee's bond, if any.  The Liquidation Trustee may request the entry of the Final Decree notwithstanding the fact that not all Assets have been monetized and distributed to the Holders of Allowed Claims.

**11.22  Conflicts with the Plan.**  In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement and any other Order in the Chapter 11 Cases, or any other agreement to be executed by any Person pursuant to the Plan, the provisions of the Plan shall control and take precedence; provided, however, that the Confirmation Order shall control and take precedence in the event of any inconsistency between the Confirmation Order, any provision of the Plan, and any of the foregoing documents.

## ARTICLE XII

## REQUEST FOR CONFIRMATION

**12.1**    **Request for Confirmation.**    The Plan Proponents request Confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code.


IN WITNESS WHEREOF, the Plan Proponents have executed the Plan this 10th day of August 2015.

Debtors


By:    /s/ Bill Langsdorf
       Name: Bill Langsdorf
       Title:   Chief Executive Officer


Creditors' Committee


By:    /s/ Ronald M. Tucker
       Simon Property Group, Inc.
       Solely in its Capacity as Chair of the
       Official Committee of Unsecured Creditors
       Name: Ronald M. Tucker

01:17655630.1